Lewis Stein, Esq.
NUSBAUM, STEIN,GOLDSTEIN,
 BRONSTEIN & KRON, P.A.
20 Commerce Boulevard, Suite E
Succasunna, NJ  07876
nsgbk.office@verizon.net
(973) 584-1400
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAYA GROSSBAUM and MENACHEM GROSSBAUM, her spouse, individually and as *guardians ad litem* of the infant ROSIE GROSSBAUM, | : : : : : : |
| Plaintiffs, | : CIVIL ACTION NO. : 07-CV-1359 (GEB) : |
| vs. | : : |
| GENESIS GENETICS INSTITUTE, LLC, of the State of Michigan, MARK R. HUGHES, NEW YORK UNIVERSITY SCHOOL OF MEDICINE and NEW YORK UNIVERSITY HOSPITALS CENTER, both corporations in the State of NEW YORK, ABC CORPS. 1-10, JOHN DOES 1-10, | : : : : : : : : |
| Defendants. | : : |

### CERTIFICATION OF LEWIS STEIN, ESQ.

1.    I am an attorney at law in the State of New Jersey

having been admitted to practice in the United States District

Court for the District of New Jersey in 1961.  I have been the sole attorney who has been involved in the processing of this litigation on behalf of the Plaintiffs.

2.   By facsimile and regular mail dated February 26, 2010 I received a letter from Stephen N. Leuchtman, counsel to the Defendant, Genesis Genetics (see copy annexed hereto as Exhibit A), enclosing the report of "Kangpu Xu, Ph.D." (see copy of report annexed hereto as Exhibit B).

3.   Subsequently, by fax on March 4th, I received a letter from Mr. Leuchtman (see copy of letter annexed hereto as Exhibit C) enclosing the expert report of Dr. Mark Hughes dated March 2, 2010 (see copy of report annexed hereto as Exhibit D).

4.   Upon review the reports of Dr. Xu and Hughes revealed a substantial amount of identical paragraphs and, within other paragraphs, identical sentences and even identical misplaced punctuation.  See copy of Dr. Kangpu Xu's expert report of February 26th with bolded sections of identical language also found in Dr. Hughes' report of March 2nd.  See copies of both Dr. Xu's and Hughes' bolded reports annexed hereto as Exhibits E and F respectively.

5.   Further idiosyncrasies in Dr. Xu's report are found in the biographical paragraph located at the bottom of Page 1 of his report where there are numerous syntactical mistakes on almost every line that do not similarly appear in that part of

the report where opinions and comments are made with regard to the medical principles to be applied to the facts of the case.

6.    The similarities between the two experts' reports on behalf of Defendant Genesis Genetics were the subject of investigation at the depositions of both Drs. Xu and Hughes.

7.    Dr. Xu in his deposition gave testimony that: "English is a second language to him (T33-18); he left China at age 31 (T:34-3); he came to Canada sometime around 1987 and did not return to China thereafter (T:33-20 to 34:6). He did not have any assistance in preparing the report, except he discussed a few points with Mr. Leuchtman, but he wrote the report himself. (T:34-7) He denied ever speaking to Dr. Hughes about the report or the case. (T:34-11 to 34-16) The report was prepared on a computer typed by himself. (T:36-4 to 36-16) When the syntactical curiosities in the biographical paragraph were pointed out to Dr. Xu, he stated that he was not native to the English language (T:40-7), and did not seek editorial help which he usually does with his publications since he believed his letter to be confidential. (T:40-13) See copy of Dr. Xu's deposition transcript annexed hereto as Exhibit G.

8. The aforementioned characteristics of Dr. Xu's report dated February 26th, which incidentally was forwarded to the Plaintiff by Mr. Leuchtman by letter dated the same day as the date of the report, leave open the question as to whether Dr.

Xu's report was prepared by the defense in this case with all of the implications that that fact bears.

9.   Dr. Hughes' deposition as an expert offered on behalf of himself, which is annexed hereto as Exhibit H, took place on May 14, 2010 in Detroit.  Dr. Hughes had previously been deposed as a defendant on February 19, 2009.

10.   When presented with his report of March 2, 2010, Dr. Hughes stated, "I didn't write it, but I saw it." (T:6-2)  When asked, "Is that your signature, Doctor?"  He answered, "Yep.  Well, I didn't sign it with my hand, that's an electronic one, but yes." (T:6-5 to 6-7)  That testimony begets a further inquiry since Dr. Hughes' handwritten signature appears in the Genesis Genetics records previously provided to the Plaintiff at Page 4 and 5 of his initial consultation.  It is respectfully submitted that a real question exists as to why the signature looks as it does on the report as compared to the signature that was contained in the Genesis Genetics record.

11.   When asked, "Well, if you didn't write it, could you tell me who wrote it?"  The witness then turned to his lawyer, Stephen Leuchtman, and stated, "Because you [Mr. Leuchtman] did it..." (T:6-10)  He went on to claim that he was traveling and that Leuchtman emailed him a draft of the report which he subsequently edited and electronically signed and sent back to Leuchtman. (T: 6-13 to 6-23)  Specifically to Leuchtman he said,

4

"You wrote the stuff and I edited it." (T:6-19)  The witness
added further, "It's not exactly the way I would have written
it." (T:6-25 to 7-1)  Dr. Hughes repeated again spontaneously,
facing Leuchtman, "Because I didn't write this, I didn't
actually write this." (T:7-13 to 7-14)

12.  There followed an inappropriate interruption of the
testimony by both Mr. Leuchtman and Mr. Hamad, attorney for the
Defendant NYU.  That was the first of at least 20 inappropriate
interruptions by either Mr. Leuchtamn or Mr. Hamad during the
course of an 80 page deposition.  This will be the subject of
further discussion.

13.  A recess was requested by defense counsel, which
lasted more than 20 minutes.  Upon return, Mr. Leuchtman stated,
"I am going to instruct Dr. Hughes not to answer any further
questions about how the report came into existence." (T:18-11 to
18-13)  Further efforts to inquire about the email transmittals
and its availability were not answered.  See Pages 18 and 19 of
Dr. Hughes' deposition transcript marked as Exhibit H.

14.  In addition, provided with the report was a two page
biography of Dr. Hughes which appeared to be intended to serve
as his *curriculum vitae* (see copy annexed hereto as Exhibit I).
When the witness was confronted with the two page biography, Dr.
Hughes stated, "I do not know where this exactly came from."  He
indicated that that biography was also not written by him, but

by someone else unknown to him. (T:21-1)

15.   Mr. Leuchtman was advised by the undersigned that it was my intention to seek his testimony as a fact witness to the creation of Dr. Hughes' expert report.  During the further course of his deposition, Dr. Hughes indicated that the report contained statements that he did not agree with.  He expressly disclaimed agreement with a sentence made in the second to last paragraph of his report which read: *Based on the literature, most misdiagnoses are due to intercourse or unprotected sex.*  Asked if he agreed with that, he said, "No." (T:78-6 to 78-9)

16.   Dr. Hughes also acknowledged another incorrect statement in what purported to be his letter report.  At Page 40 of his deposition transcript, he disclaimed the validity of a statement that read: *I have had people over the years voice objection to amino or CVS and when this has happened I have referred them to organizations who did not require conventional prenatal follow-up testing with amnio or CVS."* (T:40-7 to 40-19)

17.   In addition, Defendant Hughes surprised both the undersigned, counsel for the Plaintiff, and counsel for NYU when he stated in his deposition for the first time that the document contained in Genesis Genetics' records (T:62-4 to 62-19) and found in the NYU records was in fact <u>not</u> a document created by him and the electronic signature attached to the record was not affixed by him, but by some other member of the Genesis Genetic

staff.  Moreover, this document, which had been previously
identified during the course of NYU's deposition testimony as
being the only report from Genesis Genetics, was now
characterized by Dr. Hughes in his deposition that the above
mentioned report form "was not the standard form by which
Genesis Genetics reports the results of its testing." (T:58-1)
The report was described as a "temp report early as quickly as
we have the data."  Subsequent to sending the report, marked as
Exhibit J, according to Dr. Hughes, Dr. Hughes or one of his
staff sits down and writes a formal report. (T:59-7 to 59-9)
This "formal report", which report appears in the Genesis
Genetics' records, was not found in the NYU chart.  At all times
during the depositions of the NYU staff (Dr. Licciardi, Dr.
Grifo and embryologist Alexis Adler, as well as in the first
deposition of Dr. Hughes, there was no indication that the
document marked as Exhibit J, was either not electronically
signed by Dr. Hughes and was to be considered only a temporary
or interim report.

   18.  One of the critical fact issues in this case is
whether a genetic study of the patient's embryos was available
that would reduce or eliminate the risk of having an affected
baby.  One such process is described as "linkage analysis" in
the laboratory study.  When confronted with the literature
indicating that that process was well known as of publications

in 2001, Dr. Hughes reported that "they [the publishers] were taking two cells in order to get those results so they were biopsying a couple of cells from each embryo.  Most of the clinics we work with don't want to do that including NYU." (T:47-13 to 47-16)  This is new testimony and becomes a fact issue of considerable importance.

   19.  In addition, that issue became the subject of inquiry in Dr. Kangpu Xu's deposition.  Dr. Xu stated at one point, "We started to do—tried to do linkage analysis in early 2000." (T:27-13)  He elaborated that he thought that he was not really sure whether it was in the year 2000.  He elaborated further that "It was—well, it started in the beginning of 2000.  I can't be 100%—I can't be 100% sure." (T:28-16)  When asked specifically the following question, Dr. Xu answered as follows:

> 19   Q. IS IT YOUR TESTIMONY THAT NO LINKAGE ANALYSIS WAS
> 20   DONE AT YOUR LABORATORY FOR CYSTIC FIBROSIS PRIOR TO
> 21   2000?
> 22   A. I CAN'T BE SURE BUT IT'S LIKELY.

(T:28-19 to 28-22)

   20.  He followed that up with what seemed to be an entirely inconsistent answer in response to the next question:

> 23   Q. OKAY. IS IT YOUR TESTIMONY UNDER OATH THAT NO
> 24   CYSTIC FIBROSIS ANALYSIS WAS DONE USING LINKAGE
> 25   PROCEDURES IN CYSTIC FIBROSIS PRIOR TO 2004?
> 1    A. IN MY LAB?
> 2    Q. YES.
> 3    A. THAT WILL BE TRUE.  THAT WILL BE CORRECT.  YES.
> 4    Q. OKAY.  WHEN IS THE FIRST OCCASION THAT YOU USED
> 5    LINKAGE ANALYSIS FOR A CYSTIC FIBROSIS MUTATION?

```
6      A. MID 2000.  MID 2000, I WOULD SAY.
7      Q. WHEN YOU SAY "MID 2000," WHAT YEAR ARE YOU
8      REFERRING TO?
9      A. I DON'T REMEMBER EXACTLY WHAT YEAR UNLESS I GO
10     BACK TO LOOK AT OUR LAB RECORDS.
11     Q. OKAY.  IS IT POSSIBLE THAT YOU WERE DOING LINKAGE
12     ANALYSIS IN 2004?
13     MR. LEUCHTMAN:  PRIOR TO 2004?
14     Q. YES.
```

(T:28-23 to T:29-14)

The pursuit of this factual information would appear to be a

critical fact in the entire case.

   I certify that the foregoing statements made by me are

true.  I am aware that if any of the foregoing statements made

by me are willfully false, I am subject to punishment.

Date: June 2, 2010

_____
Signature of Attorney

Lewis Stein, Esq._____
Printed name

20 Commerce Blvd., Suite E
Succasunna, NJ  07876_____
Address


nsgbk.office@verizon.net___
E-mail address

(973) 584-1400_____
Telephone number

# EXHIBIT A

FEB. 26. 2010  4:36PM    GOODMAN KALAHAR                    NO. 115   P. 1/4

# Stephen N. Leuchtman, P.C.

1380 E. Jefferson Ave. Detroit, Mi 48207

*Tel:* (313) 259-6900, ext. 126

*Fax:* (313) 259-3474

leuchlaw@gmail.com



February 26, 2010

## BY FACSIMILE & REGULAR MAIL

Lewis Stein, Esq.
Nusbaum, Stein, Goldstein,
    Bronstein & Kron
20 Commerce Blvd.
Succasunna, NJ 07876

R. Scott Eichhorn, Esq.
Marshall, Dennehy, Warner, Coleman & Goggin, P.C.
425 Eagle Rock Avenue, Suite 302
Roseland, NJ 07068

Sarah Blaine, Esq.
Lowenstein Sandler
65 Livingston Avenue
Roseland, NJ 07068

RE:    **Grossbaum v. Genesis Genetics Institute et al.**
        **Case # 07–CV–1359 (HAA)**

Dear Counsel:

Enclosed herewith please find the report of Kangpu Xu, PhD, HCLD, in compliance with the Court's most recent Scheduling Order. His CV will follow under separate cover.

Very truly yours,

Stephen N. Leuchtman

Enclosures

# EXHIBIT B

 **Weill Cornell Medical College**          ⌐ New York-Presbyterian Hospital
                                                                ⌐ Weill Cornell Medical Center

Kangpu Xu, Ph.D.
Director, Laboratory of Preimplantation Genetics
Associate Professor

The Center for Reproductive Medicine and Infertility
1300 York Avenue, P.O. Box 30
New York, NY 10065

Telephone: 212-746-6301
Fax: 212-746-8589
E-mail: kpxu@med.cornell.edu


PLAINTIFF'S
EXHIBIT
PIXU II
5/13/2010

February 26, 2010

Stephen N. Leuchtman, P.C.
1380 E. Jefferson Ave.
Detroit, MI 48207

RE: Grossbaum v. Genesis Genetics & Hughes

Dear Mr. Leuchtman,

Per your request, I have reviewed the following documents which you sent to me:

1) Medical Records of Genesis Genetics
2) Medical Records of IVF Center of New York University Medical Center
3) Reports from Dr. Garry R, Cutting and Dr. Charles M. Strom
4) Depositions of Mark R. Hughes, MD, PhD, Genesis Genetics; and Frederick Licciardi, MD, James Grifo, MD, PhD; Ms Alexis Adler, Kaycian Brown, R.N.; and Ms. Imelda Weill, New York University Medical Center
5) Depositions of Chaya Grossbaum (Volume 1 and 2) and Menachem M. Grossbaum.

As I understand, both Chaya Grossbaum and Menachem M. Grossbaum are carriers of a mutation for cystic fibrosis gene. They were referred to NYU IVF center and underwent IVF and biopsy at NYU and the specimens were sent and analyzed by Genesis Genetics. The child born from the procedure was found be affected with cystic fibrosis.

As you probably know, I have been involved in PGD since 1992 when I was recruited as a faculty member at Cornell Medical College. I have published number of papers in PGD. For example, in 1993 we studied a new procedure, call Primer Extension Preamplification (PEP) for single human blastomeres. In particular we tested the most common CF mutation, delta F508, in the amplified products (Human Reproduction, 1993 vol.8, No.12, pp2206-2210). In 1999, we published the first successful PGD case for sickle cell anemia (JAMA). Again in 2004, first PGD for retinoblastoma was reported in American Journal of Ophthalmology. Furthermore, I am a certified laboratory directory by ABB (American Board of Bioanalysis) since 2002 and by New York State Department of Health as laboratory director since Oct. 5, 2004. My laboratory, Laboratory of Preimplantation Genetics, Center for Reproductive Medicine and Infertility, Weill Medical College of Cornell University, obtained permit for performing PGD for molecular testing since March 2006 and for

- 1 -

cytogenetics, since 2007. Beginning from 1995, as I was the head of the PGD program and later as the director of the laboratory at the Center for Reproductive Medicine and Infertility, Weill Cornell Medical College. We have completed over 1300 cases of PGD for variety of indications, including more than 70 cases for cystic fibrosis, covering more than a dozen of CF mutations.

Having known Dr. Mark Hughes as many years as I have been involved in PGD, he is, without any doubt, one of the most renowned pioneers in Preimplantation Genetic Diagnosis. He was the coauthor of the very first paper in the scientific literature described the success of PGD for cystic fibrosis (1992, New England Journal of Medicine). He was a member of President Bioethics Council that described the importance of PGD and recommended funding for PGD research in 1994. It is definitely not trivial that he was recognized and highly praised by the Jewish community, Bonei Olem, for his contribution to PGD (see Dr. Licciardi's deposition, page 25).

An open question and a central issue in PGD is that PGD has its limitations because it is a single cell based test. It has been recognized in the beginning of last decade in the PGD community that allele drop out (ADO), which occurs when low DNA copy numbers are used as the starting material for genetic testing, is a challenging issue. Numerous papers have been published in order to reduce or eliminate this inherent risk. Some proposed to biopsy two cells from one embryo, others tested different lysis strategies; still others were trying to use whole genome amplification to obtain more DNA for replicate testing. None of them appears to be fully effective. Current understanding is that ADO is a very complicated matter and there may be many contributing factors. ADO varies from cell type to cell type. ADO is usually low in the healthy cells, such as lymphocytes and fibroblast cells harvested at the growth phase. Likewise in blastomeres, ADO may also vary according the healthy status of the cells/embryos. It is not unreasonable that a healthy diploid blastomere (D3, 7-9 cell stages) provide lowest chance of ADO. Indeed, we have seen more aneuploidy/mosaicism in those slow developing or arrested embryos (4-5 cells on the morning of Day-3 post fertilization) in our FISH based aneuploidy tests.

Accumulated knowledge from the Human Genome Project facilitates the use of linkage markers which may reduce substantially the risk of ADO. Though it is highly desirable, markers are not always used even as of today for various reasons. Finding informative linkage markers is not trivial task or an overnight procedure. Building whole sets of linkage markers for each disorder/mutation is a continuing process. In 2004, not all the laboratories were using linkage markers and not for every single mutation; in other words, multiplex PCR was not the standard in 2004. During a period from 2001 to 2005, we successfully performed PGD for RB, an autosome dominant disorder with 50% risk without using markers. The reason was not that we were ignorant, but with the limitation that we had because we could not find markers that were informative for the couple. Three healthy singletons were born from 4 diferent IVF-PGD attempts. I believe tests conducted by Dr. Hughes were proper, appropriate and within the standard of practice existing at the time for this couple.

The tests performed on July 18-19, 2004 did statistically reduce the risk, from 25% to a much lower percentage. It was proper to recommend the transfer of embryo #7 and 8 based upon both reports issued by Dr. Hughes and Genesis Genetics on July 19, 2004. Results in both of Dr. Hughes' reports prepared on July 19, 2004 were within the accepted level of risk and the level of risk agreed to by the patients.

Another issue of embryological work using polar body biopsy is open for debate. Polar body biopsy or preconception genetic diagnosis was reported in 1990. However, the use of polar body biopsy has been limited in a few laboratories around the world. A few laboratories that performing polar body biopsy, such as those in Germany and Italy, not because of its superior strategy but because of their

country's law. As of today polar body biopsy for PGD is yet to be a mainstream approach (see a most recent debate article by Geraedts et al. Human Reproduction, 2010, v25, pp575). It was not its technical difficult, but with its real benefits in routine PGD. If one looks ESHRE (European Society of Human Reproduction and Embrylogy) data collection from I to IX (the latest one), one could only find few cases PGD using polar bodies as testing materials. At CRMI, we performed PB biopsy in the late 90's for balanced translocation; the girl is now over 12 year old. Nevertheless, we have not, as most of the labs in the world, used PB biopsy as a routine procedure.

Because of the ever-present risk of ADO, and other risk factors inherent in PGD, CVS and amniocentesis are universally relied upon as a safety net in PGD. CVS has been shown to be very accurate. I know from my experience that Dr. Hughes and Genesis Genetics will not take on PGD of a couple if they will not agree in advance to CVS or amniocentesis; and this is appropriate and within accepted standards.

From the documents I reviewed I believe that the couple was well informed on many occasions that there were risks of misdiagnosis and they have signed at least two important PGD consents, one from NYU, and one from Hughes' team. Dr Hughes went all the details, as much as he could, with the couple. Specifically, and without going into every detail in the consent forms, the Grossbaums demonstrated an understanding that this is not a perfect technology, it is complicated, it is an experimental process, lowering the risk to zero is not realistic or possible, the technology can fail, and follow-up confirmation testing (in the form of CVS or amniocentesis) is necessary. The Grossbaums agreed to go forward in light of the risks and alternatives, and they agreed with both NYU and Genesis Genetics to undergo confirmation testing in the form of CVS or amniocentesis.

Because of so many variables involved in PGD, the cause(s) of PGD misdiagnosis is always difficult to pin down. Based on the literature most misdiagnosis is due to intercourse or unprotected sex. In a published data collection (ESHRE PGD consortium data collection VII: cycles from January to December 2004 with pregnancy follow-up to October 2005, Human Reproduction, 2008; Vol 23, No. 4, pp 741755), the best data collection and analysis in PGD community, the consortium stated on page 750 that "Eighteen misdiagnosis have been reported, 9 after PGD for PCR and 9 after PGD or PGS using FISH. In all cases of misdiagnosis, unprotected sex during the PGD cycle could be responsible as any embryos generated in vivo would not be tested." With this in mind, it is speculation to say that the bad result in this case was caused by the implantation of an affected embryo, as opposed to any of a number of other causes, including intercourse or unprotected sex by the Grossbaums.

In summary, I see a tragic case happened, not because of any negligence, but unfortunately because of the complexity and the limitations of the PGD technology and likely other confounding factors. Genesis Genetics did very professionally, and no deviations were seen from the standard of care.

Respectfully yours,

Kangpu Xu, Ph.D., HCLD.
Associate Professor
Director, Laboratory of Preimplantation Genetics
CRMI, Weill Cornell Medical College

# EXHIBIT C

# Stephen N. Leuchtman, P.C.

1380 E. Jefferson Ave. Detroit, MI 48207

*Tel:* (313) 259-6900, ext. 126

*Fax:* (313) 259-3474

leuchlaw@gmail.com



March 3, 2010

## BY FACSIMILE & REGULAR MAIL

Lewis Stein, Esq.
Nusbaum, Stein, Goldstein,
      Bronstein & Kron
20 Commerce Blvd.
Succasunna, NJ 07876

R. Scott Eichhorn, Esq.
Marshall, Dennehy, Warner, Coleman & Goggin, P.C.
425 Eagle Rock Avenue, Suite 302
Roseland, NJ 07068

Sarah Blaine, Esq.
Lowenstein Sandler
65 Livingston Avenue
Roseland, NJ 07068

RE:   **Grossbaum v. Genesis Genetics Institute et al.**
      **Case # 07-CV-1359 (HAA)**

Dear Counsel:

Enclosed herewith please find the report of Mark R. Hughes, M.D., PhD, and two resumes of his qualifications, in compliance with the Court's most recent Scheduling Order.

Very truly yours,

Stephen N. Leuchtman

Enclosures

# EXHIBIT D





March 2, 2010

Stephen N. Leuchtman, P.C.
1380 E. Jefferson Ave.
Detroit, MI 48207

RE: Grossbaum v. Genesis Genetics & Hughes

Dear Mr. Leuchtman,

As this case has progressed, I have been provided with and have read the following materials:

1) Medical Records of Genesis Genetics
2) Medical Records of IVF Center of New York University Medical Center
3) Reports from Dr. Garry R, Cutting and Dr. Charles M. Strom
4) Depostions of Mark R. Hughes, MD, PhD, Genesis Genetics; and Frederick Licciardi, MD, James Grifo, MD, PhD; Ms Alexis Adler, Kaycian Brown, R.N.; and Ms. Imelda Weill, New York University Medical Center
5) Depostions of Chaya Grossbaum (Volume 1 and 2) and Menachem M. Grossbaum.

Both Chaya Grossbaum and Mechachem Grossbaum are carriers of a mutation for cystic fibrosis gene. They were referred to NYU IVF center and underwent IVF and biopsy at NYU and the specimens were sent and analyzed by Genesis Genetics. The child born from the procedure was found be affected with cystic fibrosis.

I spoke with the Grossbaums on March 25, 2004 and explained to them in detail what was going to happen in the course of preimplantation genetic diagnosis (PGD). I explained that the technology involved is imperfect and pushes medical diagnostic technology to its absolute limit, its practical limit and its theoretical limit. I explained that PGD technology is in fact an experimental process, and that the technology can fail. I explained that the risk of natural pregnancy was that there was one chance in four that the baby would be afflicted with cystic fibrosis, whereas that risk could be significantly lowered by PGD, but not eliminated. Each test for the cystic fibrosis mutation(s) is custom-designed, so it is extremely difficult to predict the chances of success in any given implantation following PGD. I advised people in 2004 that the risk of having an affected child is three to five percent, and I am certain I imparted this to the Grossbaums.

Further, Genesis Genetics and I will not perform PGD for a couple who does not agree in advance to

Genesis Genetics Institute, LLC
5555 Conner, Suite 1100
Detroit, MI 48213
313-579-9650   313-544-4006 fax
GenesisGenetics.org

undergo chorionic villus sampling (CVS) or amniocentesis (amnio) early in the pregnancy.  CVS is typically done at around ten weeks, and amnio is usually done at fifteen to sixteen weeks.  I made the necessity of undergoing CVS or amnio known to the Grossbaums, and they agreed to this condition.  At no time did they voice any objection or problem to me about CVS or amnio.  Had they made any such objection, I would not have taken their case; and this fact was well known to NYU.  I have had people over the years voice objections to amnio or CVS; and when this has happened, I have referred them to organizations who did not require conventional prenatal follow-up testing with amnio or CVS.  It has always been an absolute, fully agreed upon, prior requirement of our program.

After the Grossbaums were informed about information including all of the above and more, they advised that they had no questions and were satisfied with what was going to be done.  In may, 2004, I sent them a Preimplantation Genetic Diagnosis Patient Informed Consent, which the Grossbaums signed on June 4, 2004 and I countersigned on July 16, 2004.  this Informed Consent included the following language, to which the Grossbaums agreed:  "between ten and fifteen weeks of pregnancy you will undergo conventional prenatal genetic testing in the form of chorionic villus sampling  (CVS) or amniocentesis.  The sample will be used to confirm the predicted PGD test results."  Based upon this written agreement following the oral agreement on March 25, 2004, I went ahead with PGD for this couple.  My review of the NYU records and the depositions of the NYU people confirms that at no time did the Grossbaums ever voice any reservations to NYU about undergoing CVS or amnio.

As Dr. Kangpu Xu has pointed out in his report, an open question and a central issue in PGD is that PGD has its limitations because it is a single cell based test. It has been recognized since the beginning of last decade in the PGD community that allele drop out (ADO), which occurs when low DNA copy numbers are used as the starting material for genetic testing, is a challenging issue. Numerous papers have been published in order to reduce or eliminate this inherent risk. Some proposed to biopsy two cells from one embryo, others tested different lysis strategies, still others were trying to use whole genome amplification to obtain more DNA for replicate testing. Current understanding is that ADO is a very complicated matter and there are may be many contributing factors. ADO varies from cell type to cell type. ADO is usually low in the healthy cells, such as lymphocytes and fibrolast cells harvested at the growth phase. Likewise in blastomeres, ADO may also vary according the healthy status of the cells/embryos. It is not unreasonable that a healthy diploid blastomere (D3, 7-9 cell stages) provide lowest chance of ADO.

The use of linkage markers in 2004 for cystic fibrosis mutations was not standard of care in the field of PGD.  Multiplex testing was done at the time in some laboratories for some diseases, but it was very new and experimantal in early 2004, including when the Grossbaums underwent PGD and IVF. Even today for various reasons, these procedures are not in universal use. Finding informative linkage markers is not trivial task or an overnight procedure. As Dr. Kangpu Xu has pointed out, building whole sets of linkage markers for each disorder/mutation is a continuing process. In 2004, not all the laboratories were using linkage markers and not for every single mutation; in other words, multiplex PCR was not the standard in 2004.  I believe the tests conducted by my lab and myself were proper, appropriate and within the standard of practice existing at the time for this couple.

The tests performed on July 18-19, 2004 statistically reduced the risk, from 25% to much a much lower percentage. It was proper to recommend the transfer of embryo #7 and 8 based upon both

reports issued by myself and Genesis Genetics. I prepared two reports on July 19. One was somewhat abbreviated; and the other went into greater detail. The results in both of my reports prepared on July 19, 2004 were within the accepted level of risk and the level of risk agreed to by the patients.

When I biopsy cells, I can comment to a degree on the likelihood that they will be affected or carriers of the disease we are looking for; but I cannot comment on the condition of the embryos on the day of implantation. Ultimately, the decision to go forward is that of the couple involved based on the best information their doctor and my lab and I can impart to them as of the day of implantation or transfer.

Dr. Kangpu Xu addresses polar body biopsy at great length in his expert report. I agree with his conclusions.

As allluded to above, because of the ever-present risk of ADO, and other risk factors inherent in PGD, CVS and amniocentesis are universally relied upon as a safety net in PGD. It was within the applicable standard of care for my lab and myself to insist upon agreement to CVS or amniocentesis as a condition to doing PGD. The Grossbaums agreed to go forward in light of the risks and alternatives, and they agreed with both NYU and Genesis Genetics to undergo confirmation testing in the form of CVS or amniocentesis.

As was pointed out by Dr. Kangpu Xu, because of so many variables involved in PGD, the causes of PGD misdiagnosis are always difficult to pin down. Based on the literature most misdiagnoses are due to intercourse or unprotected sex. In a published data collection (ESHRE PGD consortium data collection VII: cycles from January to December 2004 with pregnancy follow-up to October 2005, Human Reproduction, 2008; Vol 23, No. 4, pp 741755), the best data collection and analysis in PGD community, the consortium stated on page 750 that "Eighteen misdiagnosis have been reported, 9 after PGD for PCR and 9 after PGD or PGS using FISH. In all cases of misdiagnosis, unprotected sex during the PGD cycle could be responsible as any embryos generated in vivo would not be tested." With this in mind, it is speculation to say that the bad result in this case was caused by the implantation of an affected embryo, as opposed to any of a number of other causes, including intercourse or unprotected sex by the Grossbaums.

In summary, I believe that the unfortunate result in this case occurred, not because of any negligence, but unfortunately because of the complexity and the limitations of the PGD technology and likely other confounding factors. We acted professionally and at all times consistently with the standard of care as it existed at the time.

Very truly yours,

Mark R. Hughes

# EXHIBIT E



# Weill Cornell Medical College

New York-Presbyterian Hospital
Weill Cornell Medical Center

Kangpu Xu, Ph.D,
Director, Laboratory of Preimplantation Genetics
Associate Professor

The Center for Reproductive Medicine and Infertility
1300 York Avenue, P.O. Box 30
New York, NY 10065

Telephone: 212-746-6301
Fax: 212-746-8589
kpxu med.cornell.edu

February 26, 2010

Stephen N. Leuchtman, P.C.
1380 E. Jefferson Ave.
Detroit, MI 48207

RE: Grossbaum v. Genesis Genetics & Hughes

Dear Mr, Leuchtman,

Per your request, I have reviewed the following documents which you sent to me:

1) **Medical Records of Genesis Genetics**
2) **Medical Records of IVF Center of New York University Medical Center**
3) **Reports from Dr. Garry R, Cutting and Dr. Charles M. Strom**
4) **Depositions of Mark R. Hughes, MD, PhD, Genesis Genetics; and Frederick Licciardi, MD, James Grifo, MD, PhD; Ms Alexis Adler, Kaycian Brown, R.N.; and Ms. Imelda Weill, New York University Medical Center**
5) **Depositions of Chaya Grossbaum (Volume 1 and 2) and Menachem M. Grossbaum.**

As I understand, both Chaya Grossbaum and Menachem M. Grossbaum are carriers of a mutation for cystic fibrosis gene. They were referred to NYU IVF center and underwent IVF and biopsy at NYU and the specimens were sent and analyzed by Genesis Genetics. The child born from the procedure was found be affected with cystic fibrosis.

As you probably know, I have been involved in PGD since 1992 when I was recruited as a faculty member at Cornell Medical College. I have published number of papers in PGD. For example, in 1993 we studied a new procedure, call Primer Extension Preamplification (PEP) for single human blastomeres. In particular we tested the most common CF mutation, delta F508, in the amplified products (Human Reproduction, 1993vo1.8, No.12, pp2206-2210). In 1999, we published the first successful. PGD case for sickle cell anemia (JAMA). Again in 2004, first PGD for retinoblastoma was reported in American Journal of Ophthalmology. Furthermore, I am a certified laboratory directory by ABB (American Board of Bioanalysis) since 2002 and by New York State Department of Health as laboratory director since Oct. 5, 2004. My laboratory, Laboratory of Preimplantation Genetics, Center for Reproductive Medicine and Infertility, Weill Medical College of Cornell University, obtained permit for performing POD for molecular testing since March 2006 and for

-1-

cytogenetics, since 2007. Beginning from 1995, as I was the head of the PGD program and later as the director of the laboratory at the Center for Reproductive Medicine and Infertility, Weill Cornell Medical College. We have completed over 1300 cases of POD for variety of indications, including more than 70 cases for cystic fibrosis, covering more than a dozen of CF mutations.

Having known Dr. Mark Hughes as many years as I have been involved in PGD, he is, without any doubt, one of the most renowned pioneers in Preimplantation Genetic Diagnosis. He was the coauthor of the very first paper in the scientific literature described the success of POD for cystic fibrosis (1992, New England Journal of Medicine). He was a member of President Bioethics Council that described the importance of PGD and recommended funding for PGD research in 1994. It is definitely not trivial that he was recognized and highly praised by the Jewish community, Bonei Olem, for his contribution to PGD (see Dr. Liciardi's deposition, page 25).

**An open question and a central issue in PGD is that POD has its limitations because it is a single cell based test. It has been recognized in the beginning of last decade in the PGD community that allele drop out (ADO), which occurs when low DNA copy numbers are used as the starting material for genetic testing, is a challenging issue. Numerous papers have been published in order to reduce or eliminate this inherent risk. Some proposed to biopsy two cells from one embryo, others tested different lysis strategies; still others were trying to use whole genome amplification to obtain more DNA for replicate testing.** None of them appears to be fully effective. **Current understanding is that ADO is a very complicated matter and there may be many contributing factors. ADO varies from cell type to cell type. ADO is usually low in the healthy cells, such as lymphocytes and fibroblast cells harvested at the growth phase. Likewise in blastomeres, ADO may also vary according the healthy status of the cells/embryos. It is not unreasonable that a healthy diploid blastomere (D3, 7-9 cell stages) provide lowest chance of ADO.** Indeed, we have seen more aneuploidy/mosaicism in those slow developing or arrested embryos (4-5 cells on the morning of Day-3 post fertilization) in our FISH based aneuploidy tests.

Accumulated knowledge from the Human Genome Project facilitates the use of linkage markers which may reduce substantially the risk of ADO. Though it is highly desirable, markers are not always used even as of today for various reasons. **Finding informative linkage markers is not trivial task or an overnight procedure. Building whole sets of linkage markers for each disorder/mutation is a continuing process. In 2004, not all the laboratories were using linkage markers and not for every single mutation; in other words, multiplex PCR was not the standard in 2004.** During a period from 2001 to 2005, we successfully performed PGD for RB, an autosome dominant disorder with 50% risk without using markers. The reason *was* not that we were ignorant, but with the limitation that we had because we could not find markers that were informative for the couple. Three healthy singletons were born from 4 different IVF-PGD attempts. **I believe tests conducted by Dr. Hughes were proper, appropriate and within the standard of practice existing at the time for this couple.**

**The tests performed on July 18-19, 2004 did** statistically reduce **the risk, from 25% to a much lower percentage. It was proper to recommend the transfer of embryo #7 and 8 based upon both reports issued by Dr. Hughes and Genesis Genetics** on July 19, 2004. **Results in both of Dr. Hughes' reports prepared on July 19, 2004 were within the accepted level of risk and the level of risk agreed to by the patients.**

Another issue of embryological work using polar body biopsy is open for debate. Polar body biopsy or preconception genetic diagnosis was reported in 1990. However, the use of polar body biopsy has

been limited in a few laboratories around the world. A few laboratories that performing polar body biopsy, such as those in Germany and Italy, not because of its superior strategy but because of their country's law, As of today polar body biopsy for POD is yet to be a mainstream approach (see a most recent debate article by Geraedts et al. Human Reproduction, 2010, v25, pp575). It was not its technical difficult, but with its real benefits in routine PGD. If one looks ESHRE (European Society of Human Reproduction and Embrylogy) data collection from Ito IX (the latest one), one could only find few cases PGD using polar bodies as testing materials. At CRMI, we performed PB biopsy in the late 90's for balanced translocation; the girl is now over 12 year old, Nevertheless, we have not, as most of the labs in the world, used PB biopsy as a routine procedure.

**Because of the ever-present risk of ADO, and other risk factors inherent in POD, CVS and amniocentesis are universally relied upon as a safety net in POD.** CVS has been shown to be very accurate. I know from my experience that Dr. Hughes and Genesis Genetics will not take on PGD of a couple if they will not agree in advance to CVS or amniocentesis; and this is appropriate and within accepted standards.

From the documents I reviewed I believe that the couple was well informed on many occasions that there were risks of misdiagnosis and they have signed at least two important PGD consents, one from NYU, and one from Hughes' team. Dr Hughes went all the details, as much as he could, with the couple. Specifically, and without going into every detail in the consent forms, the Grossbaums demonstrated an understanding that this is not a perfect technology, it is complicated, **it is an experimental process**, lowering the risk to zero is not realistic or possible, **the technology can fail**, and follow-up confirmation testing (in the form of CVS or amniocentesis) is necessary. The Grossbaums agreed to go forward in light of the risks and alternatives, and they agreed with both NYU and Genesis Genetics to undergo confirmation testing in the form of CVS or amniocentesis.

**Because of so many variables involved in PGD, the cause(s) of POD misdiagnosis is always difficult to pin down. Based on the literature most misdiagnosis is due to intercourse or unprotected sex. In a published data collection (ESHRE PGD consortium data collection VII: cycles from January to December 2004 with pregnancy follow-up to October 2005, Human Reproduction, 2008; Vol 23, No. 4, pp 741755), the best data collection and analysis in PGD community, the consortium stated on page 750 that "Eighteen misdiagnosis have been reported, 9 after POD for PCR and 9 after PGD or PGS using FISH. In all cases of misdiagnosis, unprotected sex during the POD cycle could be responsible as any embryos generated in vivo would not be tested." With this in mind, it is speculation to say that the bad result in this case was caused by the implantation of an affected embryo, as opposed to any of a number of other causes, including intercourse or unprotected sex by the Grossbaums.**

In summary, I see a tragic case happened, **not because of any negligence, but unfortunately because of the complexity and the limitations of the PGD technology and likely other confounding factors.** Genesis Genetics did very professionally, and no deviations were seen from the standard of care.

Respectfully yours,

Kangpu Xu, Ph.D., HCLD.
Associate Professor
Director, Laboratory of Preimplantation Genetics
CRMI, Weill Cornell Medical College

# EXHIBIT F

 genetics institute

March 2, 2010

Stephen N. Leuchtman, P.C.
1380 E. Jefferson Ave.
Detroit, MI 48207

RE: Grossbaum v. Genesis Genetics & Hughes

Dear Mr. Leuchtman,

As this case has progressed, I have been provided with and have read the following materials:

1) **Medical Records of Genesis Genetics**
2) **Medical Records of IVF Center of New York University Medical Center**
3) **Reports from Dr. Garry R, Cutting and Dr. Charles M. Strom**
4) **Depostions of Mark R. Hughes, MD, PhD, Genesis Genetics; and Frederick Licciardi, MD, James Grifo, MD, PhD; Ms Alexis Adler, Kaycian Brown, R.N.; and Ms. Imelda Weill, New York University Medical Center**
5) **Depostions of Chaya Grossbaum (Volume 1 and 2) and Menachem M. Grossbaum.**

**Both Chaya Grossbaum and Mechachem Grossbaum are carriers of a mutation for cystic fibrosis gene. They were referred to NYU IVF center and underwent IVF and biopsy at NYU and the specimens were sent and analyzed by Genesis Genetics. The child born from the procedure was found be affected with cystic fibrosis.**

1 spoke with the Grossbaums on March 25, 2004 and explained to them in detail what was going to happen in the course of preimplantation genetic diagnosis (PGD). I explained that the technology involved is imperfect and pushes medical diagnostic technology to its absolute limit, its practical limit and its theoretical limit. I explained that PGD technology **is in fact an experimental process**, and that **the technology can fail**. I explained that the risk of natural pregnancy was that there was one chance in four that the baby would be afflicted with cystic fibrosis, whereas that risk could be significantly lowered by PGD, but not eliminated. Each test for the cystic fibrosis mutation(s) is custom-designed, so it is extremely difficult to predict the chances of success in any given implantation following PGD. I advised people in 2004 that the risk of having an affected child is three to five percent, and I am certain I imparted this to the Grossbaums.

Further, Genesis Genetics and I will not perform PGD for a couple who does not agree in advance to

undergo chorionic villus sampling (CVS) or amniocentesis (amnio) early in the pregnancy. CVS is typically done at around ten weeks, and amnio is usually done at fifteen to sixteen weeks. I made the necessity of undergoing CVS or amnio known to the Grossbaums, and they agreed to this condition. At no time did they voice any objection or problem to me about CVS or amnia. Had they made any such objection, I would not have taken their case; and this fact was well known to NYU. I have had people over the years voice objections to amnio or CVS; and when this has happened, I have referred them to organizations who did not require conventional prenatal follow-up testing with amnio or CVS. It has always been an absolute, fully agreed upon, prior requirement of our program.

After the Grossbaums were informed about information including all of the above and more, they advised that they had no questions and were satisfied with what was going to be done. In may, 2004, I sent them a Preimplantation Genetic Diagnosis Patient Informed Consent, which the Grossbaums signed on June 4, 2004 and I countersigned on July 16, 2004. this Informed Consent included the following language, to which the Grossbaums agreed: "between ten and fifteen weeks of pregnancy you will undergo conventional prenatal genetic testing in the form of chorionic villus sampling (CVS) or amniocentesis (amnio). The sample will be used to confirm the predicted PGD test results." Based upon this written agreement following the oral agreement on March 25, 2004, I went ahead with PGD for this couple. My review of the NYU records and the depositions of the NYU people confirms that at no time did the Grossbaums ever voice any reservations to NYU about undergoing CVS or amnio.

As Dr. Kangpu Xu has pointed out in his report, **an open question and a central issue in** PGD is **that PGD has its limitations because it is a single cell based test. It has been recognized** since **the beginning of last decade in the PGD community that allele drop out (ADO), which occurs when low DNA copy numbers are used as the starting material for genetic testing, is a challenging issue. Numerous papers have been published in order to reduce or eliminate this inherent risk. Some proposed to biopsy two cells from one embryo, others tested different lysis strategies, still others were trying to use whole genome amplification to obtain more DNA for replicate testing. Current understanding is that ADO is a very complicated matter and there are may be many contributing factors. ADO varies from cell type to cell type. ADO is usually low in the healthy cells, such as lymphocytes and fibrolast cells harvested at the growth phase. Likewise in blastomeres, ADO may also vary according the healthy status of the cells/embryos. It is not unreasonable that a healthy diploid blastomere (D3, 7-9 cell stages) provide lowest chance of ADO.**

The use of linkage markers in 2004 for cystic fibrosis mutations was not standard of care in the field of PGD. Multiplex testing was done at the time in some laboratories for some diseases, but it was very new and experimental in early 2004, including when the Grossbaums underwent PGD and IVF. Even today for various reasons, these procedures are not in universal use. **Finding informative linkage markers is not trivial task or an overnight procedure.** As Dr. Kangpu Xu has pointed out, **building whole sets of linkage markers for each disorder/mutation is a continuing process. In 2004, not all the laboratories were using linkage markers and not for every single mutation; in other words, multiplex PCR was not the standard in 2004. I believe the tests conducted by my lab and myself were proper, appropriate and within the standard of practice existing at the time for this couple.**

**The tests performed on July 18-19, 2004 statistically reduced the risk, from 25% to much a much lower percentage. It was proper to recommend the transfer of embryo #7 and 8 based upon both**

**reports issued by** myself **and Genesis Genetics.** I prepared two reports on July 19. One was somewhat abbreviated; and the other went into greater detail. The **results in both of my reports prepared on July 19, 2004 were within the accepted level of risk and the level of risk agreed to by the patients.**

When 1 biopsy cells, I can comment to a degree on the likelihood that they will be affected or carriers of the disease we are looking for; but I cannot comment on the condition of the embryos on the day of implantation. Ultimately, the decision to go forward is that of the couple involved based on the best information their doctor and my lab and I can impart to them as of the day of implantation or transfer.

Dr. Kangpu Xu addresses polar body biopsy at great length in his expert report. I agree with his conclusions.

As alluded to above, **because of the ever-present risk of ADO, and other risk factors inherent in PGD, CVS and amniocentesis are universally relied upon as a safety net in PGD.** It was within the applicable standard of care for my lab and myself to insist upon agreement to CVS or amniocentesis as a condition to doing PGD. The Grossbaums agreed to go forward in light of the risks and alternatives, and they agreed with both NYU and Genesis Genetics to undergo confirmation testing in the form of CVS or amniocentesis.

As was pointed out by Dr. Kangpu Xu, **because of so many variables involved in PGD, the causes of PGD misdiagnosis are always difficult to pin down. Based on the literature most misdiagnoses are due to intercourse or unprotected sex.** In a published data collection (ESHRE PGD consortium data collection VII: cycles from January to December 2004 with pregnancy follow-up to October 2005, Human Reproduction, 2008; Vol 23, No. 4, pp 741755), the best data collection and analysis in PGD community, the consortium stated on page 750 that "Eighteen misdiagnosis have been reported, 9 after PGD for PCR and 9 after PGD or PGS using FISH. In all cases of misdiagnosis, unprotected sex during the PGD cycle could be responsible as any embryos generated in vivo would not be tested." With this in mind, it is speculation to say that the bad result in this case was caused by the implantation of an affected embryo, as opposed to any of a number of other causes, including intercourse or unprotected sex by the Grossbaums.

In summary, I believe that the unfortunate result in this case occurred, **not because of any negligence, but unfortunately because of the complexity and the limitations of the PGD technology and likely other confounding factors.** We acted professionally and at all times consistently with the standard of care as it existed at the time.

Very truly yours,

Mark R. Hughes

# EXHIBIT G

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
DOCKET NO.  07-cv-1359

CHAYA GROSSBAUM and MENACHEM
GROSSBAUM, her spouse,
individually, as guardians
ad litem of the infant, ROSIE
GROSSBAUM,

                    Plaintiffs,

        v.

GENESIS GENETICS INSTITUTE,          DEPOSITION OF:
LLC, of the State of Michigan;       DR. KANGPU XU
MARK R. HUGHES, MD; NEW YORK
UNIVERSITY SCHOOL OF MEDICINE
and NEW YORK UNIVERSITY
HOSPITALS CENTER, both
corporations in the State of
New York; ABC Corporations
1-10 and JOHN DOE 1-10,

                    Defendants.

        T R A N S C R I P T of testimony taken

stenographically by and before PHILIP A. FISHMAN, a

Certified Shorthand Reporter and Notary Public of the

State of New Jersey, at the offices of LOWENSTEIN,

SANDLER, ESQS., 1251 Avenue of the Americas, New York,

New York on Thursday, May 13, 2010, commencing at three

o'clock in the afternoon.

                PHILIP A. FISHMAN
            COURT REPORTING AGENCY
          89 Headquarters Plaza North
            Morristown, New Jersey 07960
          973-285-5331 - FAX 732-605-9391

---

2

A P P E A R A N C E S

NUSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON, ESQS.
20 Commerce Boulevard
Succasunna, New Jersey
BY:  LEWIS STEIN, ESQ.
Appearing on behalf of the Plaintiff.


STEPHEN N. LEUCHTMAN, PC
1380 East Jefferson Avenue
Detroit, Michigan
Appearing on behalf of Genesis Genetics Institute
and Dr. Hughes


MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.
425 Eagle Rock Avenue
Roseland, New Jersey

BY:  JAMELE A. HAMAD, ESQ.
Appearing on behalf of New York University School of
Medicine and New York University Hospitals Center.

---

3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KANGPU XU | | | | |
| By Mr. Stein | 4 | | 121 | |
| BY Mr. Hamad | | 120 | | |


E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| P-1-Dr. Xu | Report | 35 |
| P-2-Dr. Xu | Genesis Genetics Report | 35 |

---

4

                KANGPU   X U,
1300 York Avenue, New York, New York, having been duly
sworn according to law, testifies under oath as follows:


DIRECT-EXAMINATION BY MR. STEIN:

    Q.  Good morning, Dr. Xu.

    A.  Good morning.

    Q.  Am I pronouncing your name correctly?

    A.  Very accurately.

    Q.  We are here today to take your deposition, which
is merely a multi syllable word to describe a question
and answer session in which I am going to ask you some
questions and your answers and my questions are going to
be recorded by the gentleman who sits to my left and
your right, who is a Certified Shorthand Reporter.

        At the end a booklet, a transcript of your
answers and my questions will be prepared for use in
this litigation.

        To that end, I would like to give you a couple of
instructions.

    A.  Okay.

    Q.  One, it is not unlikely during this question and
answer session that I will ask you a question that makes
no sense to a specialist in genetics, since I am,
needless to say, not trained in that specialty, so if I

5

1  should pose a question that makes no sense to you,
2  please indicate that to me and I will be happy to
3  withdraw the question and try and rephrase it or give
   you an entirely new question.
      Do you understand that?
6  A.  Yes.
7  Q.  Because if you do answer my question both I and
8  counsel assembled here have a right to assume that you
9  understand my question.
10      Do you understand that?
11  A.  Yes.
12  Q.  A few other instructions.
13      There is likely to come a time when the meaning
14  of my question will become apparent to you before I
15  finish speaking it?
16      Please do your best to refrain from speaking
17  until I conclude my question so that the reporter does
18  not have to take both of us speaking at once.
19      Along the same lines please answer all of my
20  questions verbally so that the reporter doesn't have to
21  interpret those common elements of speech in which you
22  either gesture or give the classic "uh-huh" to an
23  answer, so please try to answer all my questions
24  verbally.
25  A.  Okay.

6

1  Q.  Also I should tell you that since this deposition
2  may be used in the course of litigation, even though you
3  are sitting here in a law office, you should treat the
4  question and answer session with the same seriousness as
5  if you were giving testimony in open court.
6      Do you understand that?
7  A.  Yes.
8  Q.  And that is the reason that you have been placed
9  under oath here today.
10      Do you understand the significance of the oath
11  and the consequences for you to violate that oath by
12  testifying untruthfully?
13      Do you understand that?
14  A.  Yes.
15  Q.  Okay.  And with that I would like to ask you have
16  you had this experience before?  Have you ever had your
17  deposition taken prior to today?
18  A.  No.
19  Q.  In coming to this deposition today, could you
20  tell me whether you read any documents in preparation
   for this deposition?
   A.  Yes.  I read the documents Mr. Leuchtman provided
23  to me.  I think I listed these documents in my report.
24  Q.  Okay.  And by your "report" you are referring to
25  a letter dated February 26, 2010.  Is that correct?

7

1  A.  Yes.
2      MR. LEUCHTMAN:  I should say since the
3  report we have sent --
4      MR. STEIN:  Mr. Leuchtman --
5      MR. LEUCHTMAN:  The doctor -- there are two
6  other deposition transcripts.
7      MR. STEIN:  I didn't ask him anything about
8  what he got since his report, so if I am interested in
9  that in my deposition I will ask him.
10      Okay?
11      Thank you.
12  Q.  Now, you referenced the documents that you
13  reviewed, you said, were in your report, is that
14  correct, before you wrote the report?
15  A.  Yes.
16  Q.  Okay.  Now, did you review any other documents
17  than those listed as items No. 1, 2, 3 and 4 in your
18  letter of February 26, 2010?
19  A.  What do you mean, the "reports"?
20      I read or referenced all published articles.
21  Q.  Now, in preparation for today's deposition, did
22  you reread any of those documents that you listed as
23  items 1, 2, 3 and 4 in your report?
24  A.  I came back a couple of these, yes.
25  Q.  I am sorry?

8

1  A.  I came back to some of the documents, yes.
2  Q.  Okay.  And did you review anything else besides
3  what is listed and mentioned in your letter of February
4  26, 2010?
5  A.  Well, in the reports I mention these, what is it,
6  ESHRE, European Society of Human Reproduction and
7  Fertility published papers, I think mainly I reviewed.
8  Q.  Since you sent your letter of February 26, 2010,
9  did you review anything else concerning this case
10  besides what you have mentioned in your report either in
11  the list at the beginning of the report items 1 to 5 or
12  literature that you refer to in the content and body of
13  your report?
14  A.  I reviewed the two depositions sent to me from
15  Mr. Leuchtman by Dr. Cutting and Dr. Strom.
16  Q.  Okay.  And do you know Dr. Cutting?
17  A.  I met him once, I believe.
18  Q.  Okay.  And do you remember where that was?
19  A.  I think it's in 2002 in Johns-Hopkins.
20  Q.  What were you doing there?
21  A.  I was invited by IVF clinic to give a lecture for
22  preimplantation genetic diagnosis.
23  Q.  And --
24  A.  And the director there, I think, showed me, and
25  introduced me to his lab very briefly, I believe I met

9

1  him.

2      Q.  Now, when that lecture that you gave at

3  Johns-Hopkins in 2002 did you prepare a paper in

   connection with that lecture?

       A.  No.

6      Q.  Okay.  Did you provide anything in writing to the

7  attendees at that lecture?

8      A.  No.  I don't think so.

9      Q.  When you said you don't think so, are you unsure?

10     A.  Yes.  I am sure.

11     Q.  I am sorry?

12     A.  Yes.  I am sure.  I did not provide any written

13  material.

14     Q.  Okay.  You know Dr. Charles Strom?

15     A.  Also from professional meetings, yes.

16     Q.  And when you say "from professional meetings,"

17  are you referring to more than one occasion that you

18  know Dr. Strom?

19     A.  I remember definitely once in late '90s I went to

20  Chicago, there was a preimplantation genetic diagnosis

21  meeting actually held in RGI, so I was there.

22     Q.  All right.

23     A.  He was there.

24     Q.  Do you remember when that was specifically?

25     A.  It's late '90s.

10

1         I don't remember the specific year.

2      Q.  And do you know Charles Strom as one of the most

3  renowned pioneers in preimplantation genetic diagnosis?

4      A.  Yes.

5      Q.  Do you have a present recollection of reading his

6  deposition and what he says in his deposition?

7      A.  I do have a few -- yes, a few -- a few points

8  that he has made.

9      Q.  Did you take any notes when you read his

10  deposition?

11     A.  No.

12     Q.  Okay.  And did you have a present recollection of

13  anything that he said in his deposition that you read

14  that you disagree with?

15     A.  Yes.

16     Q.  Specifically what do you recall you disagreed

17  with?

18     A.  One of the disagreements, I think, is polar body

19  biopsy.

20     Q.  And what did you disagree with his comment about

   "polar body biopsy"?

       A.  He believed that it is a common practice and

23  actually polar body biopsy is not as standard of a

24  procedure in many PDG labs.

25     Q.  Is it done in any PDG labs?

11

1      A.  In a few PDG labs.

2      Q.  And which ones do polar body analysis?

3      A.  Well, the pioneering lab is from Chicago, RGI,

4  Drs. Verlinsky and Strom are the pioneers of that

5  technology or that technique, but it has not been widely

6  used.

7      Q.  Was it used anywhere else besides Chicago?

8         MR. LEUCHTMAN:  May I ask for clarification.

9         We are talking about within the United

10  States?

11        MR. STEIN:   I didn't talk about limit it to

12  anything.

13        My question was is it used anywhere else

14  besides RGI.

15        MR. LEUCHTMAN:  In that case I will object.

16        MR. STEIN:   Okay.  You got your objection.

17     A.  We used in my lab.  I used it in late '90s until

18  this year, but occasionally for specific reasons.

19     Q.  And for what reason?

20     A.  Well, for example, this year we used one for a

21  patient who has a de novo mutation of retinoblastoma,

22  that's what we are after, preimplantation case.  De novo

23  meaning the mutation occurs from her, not inherited from

24  her parents, so we could not establish a linkage, so we

25  did a polar body biopsy, try to see the linkage marker

12

1  and the mutation, so we use that for that case.

2         We started to use in late '90s for female balance

3  translocation and, actually, the first baby that, a live

4  baby from balance translocation was born in late '90s,

5  so we have been using that technique, but not as a

6  routine.

7      Q.  Okay.

8      A.  And, I think, in Germany or, perhaps, Italy, they

9  are also using polar body biopsy because the law

10  prevents them to do Day 3 embryo biopsy and from the

11  literature I read the one published by a consortium from

12  European Society of Human Reproduction, the data shows,

13  that's the best data, I think, collected in PDG area

14  because they have very good organizations.

15        I think the data in mid 2000 or let's say from

16  beginning of 2000 and collected eight years, the

17  percentage of cycles use polar body biopsy is about

18  seven percent, so I don't think it's widely used and the

19  last year the data shows slightly increase from seven

20  percent to about 15 percent.  I think I have the paper

21  there, so I think from that world consortium collection

22  it's 15, 16 percent, that's polar body biopsy.

23        Considering Germany and Italy, those are the

24  places where law prohibit use Day 3 biopsy, so that's

25  what my opinion or my understanding is how wide use this

13

1  or how less frequently used as polar body biopsy.
2    Q.  Okay.  Do I understand then that you used polar
3  body technique in the particular case that you described
   for us in your de novo mutation, because you were not
   satisfied that you could get the linkage analysis for
6  that patient.  Is that correct?
7    A.  Yes.
8    Q.  Do you do single cell biopsies on embryos for
9  that patient?
10    A.  Yes.
11    Q.  And, I take it, that you were not satisfied that
12  single cell biopsy would give you enough data to protect
13  you against misdiagnosis without doing polar bodies in
14  addition.  Is that correct?
15    A.  This main purpose establish linkage, because we
16  had markers, not particularly for -- for the diagnosis.
17  We purposely for establishing the linkage.
18    Actually, for that case of 20 embryos we only did
19  a 10 polar body biopsy or biopsies, polar body biopsies
20  from 10 oocytes.  The remaining embryo we didn't do for
21  technical reasons -- you know -- if you want me to go
22  through that and give you further details.
23    Q.  Why did you want to do more than a single cell
24  biopsy for that patient?
25    A.  I am sorry.

14

1    Q.  Why did you want to do more than a single cell
2  biopsy of the embryos for that patient?
3    A.  As I said, because we could not establish a
4  linkage, so polar body will give you linkage after that
5  mutation and as blastomere markers.  We could have her
6  parents, but that would not be informative, because of a
7  de novo mutation.
8    Q.  But why did you want to do linkage in addition to
9  doing single cell blastomere studies of the embryo?
10    A.  Linkage does increase the accuracy.
11    Q.  Now, I would like to direct your attention to
12  your CV for a moment.
13    By the way, did you bring a copy of your CV with
14  you?
15    A.  Yes, I have it.
16    Q.  Okay.  Now, your CV states that you had the
17  position of associate professor at the Center of
18  Reproductive Medicine and Fertility at the Weill Medical
19  College at Cornell?
20    A.  Yes.
   Q.  What are your duties in respect to that position?
   A.  I am director of the laboratory of
23  preimplantation genetics, so I have clinical duties
24  which involve clinical preimplantation genetics
25  diagnosis.  Specifically I do biopsy and I direct,

15

1  supervising the lab, my staff, arranging from three to
2  sometimes five, because I have a visiting scientist and
3  I do biopsy and we also provide clinical services for
4  preimplantation genetic diagnosis and we are doing what
5  we call cytogenetics or FISH based PGD and also we
6  provide services for PCR based, which is a single gene
7  disorders, including cystic fibrosis, Sickle Cell
8  anemia, retinoblastoma, and so on.  We have provided a
9  dozen disorders that we do.
10    Q.  So other than your responsibilities in terms of
11  being director of a clinical laboratory as you have
12  described it, do you have any teaching responsibilities?
13    A.  Limited.
14    I do sometimes give lectures to the medical
15  students and I have interactions with fellows.  We have
16  a reproductive fellows we call "RE fellows" and we have
17  interactions with the fellows helping them to do
18  research project.
19    Q.  Okay.  And how often do you lecture the medical
20  students?
21    A.  About once a year, not very often.
22    Q.  Okay.  And how often do you -- withdraw that.
23    Do you actually lecture the fellows in the
24  reproductive genetics fellowships?
25    A.  Mostly is personal interaction one-on-one, but,

16

1  yes, sometimes if they request, I will do the lecture,
2  yes.
3    Q.  Do they work in your clinical practice along with
4  you and learn from you, is that the right procedure?
5    A.  They are mainly IVF, doing IVF, but PGD is a
6  small part of IVF, so they learn PDG part as well.
7    Q.  How long have you been doing the PDG studies for
8  cystic fibrosis similar to autosome diseases?
9    A.  Well, to start with when I recruited in 1992,
10  actually, when I started at that point, we published a
11  paper in human reproduction in 1993 and we tried to
12  amplify single cell and then detect cystic fibrosis, one
13  of the mutation delta F508.
14    Q.  That was research?
15    A.  That was research, yes.
16    Q.  Research.
17    When did you offer clinical services to the
18  public, when did you start doing that?
19    A.  In late '90s.
20    Q.  When you say "late '90s," you are talking about
21  1998?
22    A.  About.
23    I don't remember the specific year.
24    Q.  And at that time you were not only in a clinic
25  that retrieved the embryos, created the embryos and also

17

1  did the genetic studies of the embryos to determine
2  whether the embryos were fit for reimplantation?
3      A.  Yes.
       Q.  And but you were there for about six years before
   that, you were at Weill Cornell from 1992, I believe,
6  you indicated?
7      A.  Yes.
8      Q.  They had a fertility clinic between 1992 and
9  1998?
10     A.  Yes.
11     Q.  Okay.  Did you at that time collaborate with any
12 laboratories to do PGD studies?
13     A.  We are doing in-house actually.  Well,
14 collaborated, I don't know what specifically collaborate
15 means.  Research collaboration.
16     Q.  I will rephrase the question.
17     A.  Okay.
18     Q.  The process by which PDG studies are done
19 involves individual fertilization procedures and it also
20 involves an analysis of the cells of embryos to
21 determine the suitability for implantation.  Correct?
22     A.  Yes.
23     Q.  Okay.  Now, I think you indicated -- I understand
24 starting about 1998 your clinic began to do in-house, so
25 to speak, the complete process.  Not only did you do all

18

1  aspects of the invitro fertilization in the hospital but
2  also you analyze the embryos to determine whether or not
3  the embryos were appropriate for implantation in
4  connection with the mutation that you were working with.
5  That's the process.  Correct?
6      A.  That's the process.
7         Actually, our clinic started offering PDG
8  clinically from 1992.  That's our center.
9         The first PGD baby in US was born from our
10 center.
11     Q.  Okay.  Now, who did the analysis of the embryos
12 in connection with that PDG workup?
13     A.  From our center?
14     Q.  Yes.
15     A.  Dr. Grifo was there, Jimmy Grifo.  Dr. Santiago
16 Munne was there, so that period of time, and they left
17 mid '90s.
18     Q.  Grifo went to NYU and Munne went to Saint
19 Barnabas in New Jersey?
20     A.  Right.
       Q.  Now, your laboratory was not equipped, according
   to what I understand, to do the assessment of the
23 blastomeres to determine the suitability for
24 implantation genetically until sometime in '90, '98, so
25 which laboratories did you use to do that analysis?

19

1      A.  That is not -- I think it's not correct.
2         We -- our lab was equipped, so we continued from
3  1992.  We did not stop.
4         When these people, Dr. Grifo and Munne left I
5  took over.  I was the head of the PGD program.
6         In other words, because -- I am sorry -- during
7  that period of time PGD is more regarded as a research,
8  so I took over the research group and we continued.
9         We had a microscope, we had a PCR machine.  We
10 have a genetic analyzer.  We had a good one.
11     Q.  Did you receive embryos from any other fertility
12 clinics during that period of time for analysis?
13     A.  No.
14     Q.  Are you receiving them at this time?
15     A.  No.
16     Q.  So your laboratory is not available to outside
17 clinics, fertility clinics to do PGD studies.  Is that
18 correct?
19     A.  Correct.  Correct.
20     Q.  Now, in this case you're acting as an expert
21 witness on behalf of Genesis Genetics and Dr. Hughes.
22        Do you understand that?
23     A.  Yes.
24     Q.  Have you ever acted as an expert in any other
25 case?

20

1      A.  No.
2      Q.  Who is the chairman of your department?
3      A.  Dr. Zev Rosenwaks.
4      Q.  Does he know about your activities in offering an
5  expert opinion in this case?
6      A.  I mention it to him.
7      Q.  When did you do that?
8      A.  I think -- I think the day Mr. Leuchtman asked
9  me, I think.
10     Q.  Okay.  How did you get involved in this case?
11     A.  Mr. Leuchtman approached me.
12     Q.  Okay.  Was he the first person to approach you?
13     A.  Yes.
14     Q.  Did you have any contact with Dr. Hughes at about
15 the time that Dr. Leuchtman approached you?
16     A.  No.
17        MR. HAMAD:  We aren't doctors.
18     Q.  Have you talked to Dr. Hughes about this case?
19     A.  No.
20     Q.  Have you communicated with Dr. Hughes by e-mail
21 about this case?
22     A.  No.
23     Q.  Has Dr. Hughes communicated with you by e-mail
24 about this case?
25     A.  No.

21

1    Q.  Has -- have you ever been sued in any capacity
2  while you were at Cornell?
3    A.  No.
     Q.  Were you ever sued in your -- when you practiced
   as a veterinarian to the extent that you did?
6    A.  No.
7    Q.  Has anyone, to your knowledge, at Cornell been
8  sued regarding the services that they render in either
9  invitro fertilization or PGD?
10   A.  Not that I know of, no.
11   Q.  Now, obviously, you know Dr. Grifo since you were
12 colleagues at one time?
13   A.  Yes.
14   Q.  And do you still see Dr. Grifo from time to time?
15   A.  I haven't seen him for years.
16   Q.  Years?
17   A.  Right.
18   Q.  Okay.  And when you say "years," give me an
19 estimate of the years.
20   A.  Probably two, three.
21       We did meet by passing in professional meetings,
22 but I don't remember I saw him last year.  I am sure --
23 not I am sure -- probably he went, but I didn't.
24   Q.  Where was it last year?
25   A.  It's in Atlanta.

22

1    Q.  Do you know Dr. Licciardi?
2    A.  I don't think I know him personally.
3        I saw him at the meetings.  I know who he is, but
4  I never kind of met him formally.
5    Q.  And do you know anybody else on the NYU staff in
6  their fertility clinic?
7    A.  I know Alex -- Alexis Adler.  She worked in
8  Cornell before.
9    Q.  In what capacity does she work at Cornell?
10   A.  She was an embryologist.
11   Q.  Okay.  Anybody else at NYU that you know?
12   A.  I don't know exactly who is there, but maybe one
13 or two fellows from our center were there, if they are
14 still there.
15       I think I may know them.
16       Oh, Dr. Noyes, Nicole Noyes, I think I know her,
17 because she worked also before at Cornell.
18   Q.  Now, I take it you agreed to be an expert when
19 Mr. Leuchtman called you.  Is that correct?
20   A.  Yes.
     Q.  Can you tell me what documents -- what formed the
   transmission of documents?  How did you get them?
23   A.  He FedEx to me.
24   Q.  And you created a file with the records that he
25 sent you?

23

1    A.  I don't have a file.  I have the package.
2    Q.  Do you have the package here?
3    A.  Yes, I have it here.
4    Q.  May I see it, please.
5    A.  Sure.
6        MR. LEUCHTMAN:  It's somewhat thicker,
7  unlike others we send with all the depositions.
8        MR. HAMAD:  You got to start early this
9  morning.
10       MR. STEIN:   First I am going to tell you
11 point blank, that -- I consider that to be an
12 inappropriate comment during the course of a deposition
13 of a witness and if that type of thing continues, I am
14 going to ask that we get appropriate recognition by the
15 court, please.
16       MR. HAMAD:  You are talking --
17       MR. STEIN:   You haven't said a word.
18       MR. HAMAD:  I am just making sure.
19   Q.  Among the materials that you were showing me I
20 see, are the grafts from the studies done at Genesis
21 Genetics?
22   A.  Yes.
23   Q.  And I take note that they are color coded.  There
24 are some red lines and there are some, what appear to
25 be, black lines.  Is that correct?

24

1    A.  Right.
2    Q.  Was it significant to your evaluation of these
3  grafts that they be color coded?
4    A.  Yes.
5    Q.  I see also that there are some stickers on two
6  pages what I would describe as a purple color.
7        Did you put those on there?
8    A.  Yes.
9    Q.  Now, in looking at what constitutes your packet
10 of documents that you reviewed in this case, I do not
11 see any letters of transmission or transmittal to you.
12       Do you have any records or documents to show when
13 those records were transmitted to you?
14   A.  I don't have it.
15   Q.  Can you tell me when you got those records?
16   A.  Was it in February?  In February it must be.
17   Q.  Okay.  Now, you say "February it must be," I take
18 it, because you are looking at your report?
19   A.  The report.
20   Q.  And you assume you got those records before you
21 wrote your report and so, therefore, it was sometime in
22 February, you believe, you got those records.
23   A.  Right, except Strom and Cutting's depositions,
24 obviously.
25   A.  Yes.

25

1   Q.  They were taken after you wrote your report.
2   Correct?
3   A.  Right.
    Q.  Now, I notice in your letter -- and whenever I
    refer to a "letter," I am not going to spell it out each
6   time -- we always are referring to the February 26, 2010
7   letter, I take it.
8       Do you understand that, Doctor?
9   A.  Yes.
10  Q.  Okay.  In your letter you indicate and I quote,
11  "We have completed over 1300 cases of PGD for a variety
12  of indications including more than 70 cases for cystic
13  fibrosis covering more than a dozen" and then it says
14  "of CF mutations."
15      Can you tell us in those 70 cases --
16  A.  Uh-huh.
17  Q.  -- did you actually look at some statistics
18  before including that information in your report?
19  A.  What do you mean statistics?
20  Q.  Is this a statistic that is taken off the top of
21  your head or is there a compilation of the 70 cases
22  which you can look at a statistical record and know that
23  there were 70 cases?  How did you determine that number?
24  A.  We have the record.
25  Q.  Okay.

26

1   A.  Our lab.
2   Q.  And can you tell me how many of those cases of
3   cystic fibrosis mutations involved compound heterozygous
4   parents?
5   A.  That I don't remember.  I have to check.  No, I
6   don't have that number.
7   Q.  Can you give me any estimate?
8   A.  I can only estimate definitely less than 50, 50
9   percent.
10  Q.  Okay.
11  A.  That, I think, as far as I could estimate.
12  Q.  And what are compound heterozygous mutations?
13  A.  I am sorry.
14  Q.  What are compound -- can you explain what
15  "compound heterozygous" mutations are?
16  A.  Compound heterozygous mutations, the couple or
17  husband or wife, we call the partners, because of the
18  marriage, one partner carries one mutation is different
19  from the other partner's mutation.  It's a compound.  In
20  other occasions they may carry the same mutation, delta
    fibroid and cystic fibrosis is most common.
22      Q.  But if the partners carry the same mutation,
23  that's called something other than compound
24  heterozygous?
25  A.  That's correct.

27

1   Q.  What is that called?
2   A.  Called the same mutation.
3   Q.  Is that called homozygous?
4   A.  Homozygous is the meaning, it's the same, the
5   same mutation.  It's a homozygous -- you don't refer a
6   couple as a homozygous.  Homozygous refers to
7   individual.
8   Q.  Okay.  Have you ever had a misdiagnosis in doing
9   molecular testing at Cornell?
10  A.  Not that I know.
11  Q.  And from what you already said I understand you
12  to do linkage analysis.  Is that correct?
13  A.  We started to do -- try to do linkage analysis in
14  early 2000.  Actually, we had a case for retinoblastoma
15  and this is autosome dominant disease.  We try to
16  develop that linkage marker and we had three and
17  unfortunately for that particular case, it was not
18  informative, so the patient, we discussed it with the
19  patient.  The patient decided to go ahead.  They said if
20  you could give us from 50 percent of a chance affected
21  down to allele drop out, five, ten percent, they say
22  that's significantly reduce the risk, so they wanted to
23  go ahead.  So we went ahead and, well, they had a
24  healthy baby, and the first one I actually attempt
25  wasn't successful.  The second one they had a healthy

28

1   girl.  A year later they come again and had a healthy
2   boy and another year and a half, maybe, they got a third
3   healthy baby, so that was very lucky family.  They are
4   so grateful, but in that case we couldn't find -- you
5   know -- in the time frame we couldn't offer linkage
6   marker.
7   Q.  Is that the case that you mention you reported
8   on?
9   A.  Yes.
10  Q.  In the literature, the one you just described?
11  A.  Yes, we published that.
12  Q.  Now, is it your testimony that it is that case
13  it's the first time you used linkage analysis?
14  A.  I think it is, but I am not really sure.
15  Q.  Okay.  And about what year was that, Doctor?
16  A.  It was -- well, it started in the beginning of
17  2000 around.  I can't be 100 percent --- I can't be 100
18  percent sure.
19  Q.  Is it your testimony that no linkage analysis was
20  done at your laboratory for cystic fibrosis prior to
21  2000?
22  A.  I can't be sure but it's likely.
23  Q.  Okay.  Is it your testimony under oath that no
24  cystic fibrosis analysis was done using linkage
25  procedures in cystic fibrosis prior to 2004?

29

1   A.  **In my lab?**

2   Q.  Yes.

3   A.  **That will be true.  That will be correct.  Yes.**

     Q.  Okay.  When is the first occasion that you used

linkage analysis for a cystic fibrosis mutation?

6   A.  **Mid 2000.  Mid 2000, I would say.**

7   Q.  When you say "mid 2000," what year are you

8  referring to?

9   A.  **I don't remember exactly what year unless I go**

10  **back to look at our lab records.**

11   Q.  Okay.  Is it possible that you were doing linkage

12  analysis in 2004?

13       MR. LEUCHTMAN:  Prior to 2004?

14   Q.  Yes.

15   A.  **If retinoblastoma is one that we were looking,**

16  **yes.**

17   Q.  Okay.  And is it possible that you were doing

18  linkage analysis for cystic fibrosis in early 2004?

19       MR. LEUCHTMAN:  I object to the form of the

20  question.

21       It's speculation.

22   A.  **I don't remember if we did.**

23   Q.  Okay.  Are you able to say definitely that you

24  did not do linkage analysis for cystic fibrosis in the

25  year 2003?

30

1   A.  **No, I can't say definite.**

2   Q.  Do you routinely do linkage analysis for cystic

3  fibrosis mutations currently in the year 2010?

4   A.  **Yes.**

5   Q.  And have you been doing it currently for several

6  years now in cystic fibrosis?

7   A.  **Several years, I would say, yes.**

8   Q.  Okay.  Have you ever been approached by other

9  fertility centers to do PGD analysis for them?

10   A.  **Yes.**

11   Q.  And you have declined?

12   A.  **Well, that's our center's policy.  We decided not**

13  **to take outside specimens.**

14   Q.  Now, in connection with the operation of your

15  clinic, do you yourself actually participant in the IVF

16  process in either overseeing or participating in

17  removing the eggs?

18       MR. HAMAD:  I object to the form.

19   A.  **Yes, I do biopsy.**

20   Q.  And after the biopsy is completed and the PGD

study is done, do you counsel with the parents about the

use of the embryos?

23   A.  **No, I don't.  I don't directly consult with the**

24  **parents.**

25   Q.  Do you meet with the parents at any time --

31

1   A.  **No.**

2   Q.  -- during this process?

3   A.  **No.**

4   Q.  And who does that in your lab?

5   A.  **Not the lab.**

6      **Our center the physicians, the nurses and the**

7  **genetic counselors and they usually have a geneticist at**

8  **Cornell or outside.**

9      **These are the people they will meet.**

10   Q.  All right.

11      Do you decide whether the PGD results are --

12  create embryos and that are recommended to the family to

13  be used?

14   A.  **What --**

15       MR. HAMAD:  Objection to form.

16      You can answer.

17   A.  **We produce the report and I sign the report and**

18  **on the report we will recommend which one transfer or**

19  **not transfer.  Then the report goes to the embryology**

20  **lab, and the embryology lab, physician, patient, those**

21  **are the ones to decide which one to transfer.**

22   Q.  Did you do follow-up to see the results of the

23  IVF -- do you do follow-up to determine the results of

24  IVF either with respect to the prenatal studies or the

25  delivery of a live baby?

32

1   A.  **Our center work as a team.  We have the nurses,**

2  **we have genetic counselors and they do the follow-ups.**

3   Q.  Thank you.

4      And that's the policy of your center.  Is that

5  correct?

6   A.  **That's the way we operate, yes.**

7   Q.  And do you participate in establishing those

8  policies and practices?

9   A.  **Yes.**

10   Q.  Okay.  And why do you do follow-up for what

11  purpose?

12   A.  **Well, it's a quality assurance purposes.  We try**

13  **to improve constantly our services.**

14      **That's the main purpose.**

15   Q.  Now, are you familiar with the consent forms that

16  the partners are required to sign when they undertake

17  PGD testing?

18   A.  **Yes.**

19   Q.  And do those consent -- do you have any copies of

20  those consent forms here?

21   A.  **I don't have our center's consent, no.**

22   Q.  Are you familiar with the consent form?

23   A.  **Well, I don't remember all the details.  Yes, I**

24  **know what is the main part.**

25   Q.  Okay.  And is it a condition for you to provide

33

1  PGD studies that the parents of the hopeful child, agree
2  to do prenatal testing by either CVS or amnio?
3      A.  Yes.
    Q.  And if the parents don't consent, do you refuse
   to do the PGD analysis?
6      A.  Well, I don't know that part whether they refuse
7  to do it, because my lab get is already consented.
8      Q.  Right.
9      A.  The consenting process is by the physicians and
10 now by the genetic counselors.
11     Q.  Okay.
12     A.  So I only perform the patient that already
13 consented.
14     Q.  Okay.  And, I take it, it's not your role to
15 understand anything about the family's attitude toward
16 abortion.  Is that correct?
17     A.  That's correct.
18     Q.  I take it English is a second language for you?
19     A.  Yes.
20     Q.  And you came to Canada sometime around 1987, from
21 China?
22     A.  From Denmark.
23     Q.  From Denmark.  You studied in Denmark?
24     A.  Right.  I obtained by PhD in Denmark.
25     Q.  And China is -- Chinese is your native language?

34

1      A.  Yes.
2      Q.  And how old were you when you left China?
3      A.  I must be 31.
4      Q.  And did you return at all after you got your PhD
5  in Denmark for any extensive length of time?
6      A.  No.  Only a short visit.
7      Q.  Now, the report that you have provided, did you
8  have any assistance in preparing this report?
9      A.  No.  I think I discussed a few points with Mr.
10 Leuchtman, but not -- I wrote my report.
11     Q.  Okay.  And did you talk to Dr. Hughes about the
12 content of your report?
13     A.  No.
14     Q.  Have you ever discussed this case with Dr.
15 Hughes?
16     A.  No.
17         MR. LEUCHTMAN:  You asked that, but ask it
18 again if you want.
19     Q.  Have you seen Dr. Hughes' report in this case?
20     A.  Dr. Hughes' report, yes, I did.
21     Q.  Okay.  And do you recall the circumstances under
   which you got Dr. Hughes' report?
23     A.  I am sorry.
24         Can you repeat?
25     Q.  The circumstances under which you got Dr. Hughes'

35

1  report, how did you get it?
2      A.  The report is included in this package.
3      Q.  Dr. Hughes has issued an opinion letter dated
4  March 2, 2010.
5         Have you seen it?
6      A.  Opinion letter?
7         MR. STEIN:    Suppose, Phil, at this point
8  we mark for identification first Dr. Hughes' report.
9         MR. LEUCHTMAN:  If that was included in the
10 package, then, yes.
11         If not, then it's post this stuff.
12     Q.  Do you have your report, Doctor?
13     A.  Right here.
14         MR. STEIN:    Suppose we mark this P-1 for
15 identification.
16         (Report is marked as Exhibit P-1-Xu for
17 identification.)
18         MR. STEIN:    Do you have a clean copy, Mr.
19 Leuchtman, of Dr. Hughes' report?
20         MR. LEUCHTMAN:  I think I might.
21         Yes, it's attached somewhere.
22         The short answer is yes.
23         MR. STEIN:    Can we mark that and we can
24 show it to Dr. Xu.
25         MR. LEUCHTMAN:  Yeah.

36

1         (Genesis Genetics Institute report is marked
2  as Exhibit P-2-Xu for identification.)
3         MR. STEIN:    We are back on the record.
4      Q.  Now, we have marked P-1-Xu for identification and
5  that's your report, so I will return it to you because I
6  have a copy and I will ask you this:  How was this
7  report produced?
8         Did you type it?
9      A.  Yes, I did.
10     Q.  And explain to me, what was the mechanics, how
11 did you create this letter that we have, the three-page
12 letter dated February 26, 2010?
13     A.  Well, I read the package and then form an opinion
14 and then I put a few points that I think I wanted to
15 express my opinion, then I typed in my computer and I
16 printed.
17     Q.  Okay.  Did you make any notes from the records
18 that you read to use in typing this on your computer,
19 this report?
20     A.  I am sorry.
21     Q.  Did you make any handwritten notes?
22     A.  No, I worked along with the computer.
23     Q.  Okay.  So do I understand that there were no
24 handwritten notes that you made as you went through the
25 records to formulate the opinions that you ultimately

37

1 put on paper, on your computer, and then printed on this
2 letter of February 26th. Is that correct?
3     A. I made -- I might make the notes. These are the
4 notes. I would not keep them just when I finish the
5 report.
6     Q. Okay. When you finished your report, was that --
7 was that the date that's on there, February 26, 2010,
8 when you finished this report?
9     A. Yes.
10     Q. Did you send it to anybody for approval before
11 you sent it to Mr. Leuchtman?
12     A. No.
13     Q. Did you show it to the chairman of your
14 department before you sent it to Mr. Leuchtman?
15     A. No. I only mention that to him and he said this
16 is your own decision and that's after mention that and
17 never touch this anymore.
18     Q. Were you paid for the services in putting
19 together this report?
20     A. No, not --
21     Q. Did you send a bill?
22     A. No, I have not.
23     Q. And are you going to send a bill?
24     A. That I don't know. I think it's -- I haven't
25 even thought about it.

38

1     Q. Are you doing this as a favor to Dr. Hughes?
2     A. I don't think it's a favor, just I was asked and
3 I have my own opinions in the PGD area we do see
4 misdiagnosis and what causes it. It's not that easy to
5 determine. I think I wanted to express my opinion.
6     Q. And so it was because of your interest in
7 expressing your opinions that you got involved in this
8 case. Is that correct?
9         Is that what you are testifying to here today?
10     A. I wouldn't say exactly, but part of it, yes.
11     Q. Now, you are here today to give your deposition.
12        Do you have an arrangement to be paid for your
13 time here today?
14     A. I am sorry.
15     Q. Do you have an arrangement to be paid for the
16 time that you are here today giving your deposition?
17     A. No.
18     Q. Do you expect to be paid for being here today?
19     A. That I don't know. I don't have expectations,
20 but if that is a practice, I will take it, but I have
21 not sent a bill or anything, or discussed anything of a
   payment.
23     Q. Okay. And have you thought about what kind of
24 fee you were -- you would charge for coming here today?
25     A. No, I have not thought about it.

39

1     Q. Now, was it -- withdraw that.
2        When you provided this letter to Mr. Leuchtman --
3 it's addressed to him -- dated February 26, 2010, did
4 you give him a disc with it?
5     A. No.
6     Q. So you just gave him the three-page letter. Is
7 that correct?
8     A. Right.
9     Q. And it was your decision to line up the records
10 that you saw one, two, three, four and five. Is that
11 correct?
12     A. Well, that part, I think, I talked to Mr.
13 Leuchtman and he said if you read it would be a good
14 idea to list it.
15     Q. Okay. And so then you listed it?
16     A. Yes.
17     Q. And it was your writing that listed it, one, two,
18 three, four and five?
19     A. Right.
20     Q. And as we look at the large paragraph that is at
21 the bottom of Page 1 of your report that begins, "As you
22 probably know" --
23     A. Uh-huh.
24     Q. If you --
25     A. Yes.

40

1     Q. If you look at that paragraph I see in the second
2 line you write and I quote, "I have published a number
3 of papers in PGD."
4        Now, did you omit putting an "A" between
5 "published" and "numbers" or is it just your style of
6 writing to say you have "published number of papers?"
7     A. I think that's the one that I am not native
8 English. It's not a style. I think --
9     Q. Okay. And is that true in the next line when you
10 say "We studied a new procedure call Primer Extension
11 Preamplification."
12        That's also your manner of using English?
13     A. Not -- I wouldn't say "manner." If -- when I
14 publish things I will have my secretary or helper to
15 send. For this particular document I did not ask for --
16 I thought I have to keep as a confidential, so I did not
17 ask anybody to editor.
18        I did go through the spelling check, but I notice
19 still there is spelling mistakes, but it's -- you know
20 -- I think my own product, these are mistakes from my
21 own.
22     Q. Okay. And I also notice as I go further in that
23 paragraph, that I read the sentence down, you see where
24 it says, "Further, I am a certified laboratory
25 directory."

41

1    Are you a directory or a director?

2    **A. It's so embarrassing, a director.**

3    Q. Okay. And I was looking to see whether there was

a verb in that sentence. Is that a full sentence,

"Furthermore, I am a certified laboratory directory by

6    ABB"?

7    **A. I am.**

8    Q. Okay.

9    **A. I think "am" is the verb.**

10   Q. Now, when you go down to the next sentence, we

11   see that you "obtained permit" in the last line. Is

12   that right?

13   **A. In the last line "obtained permit," yes.**

14   Q. You don't use the word "a" to identify that it

15   was a permit.

16   That's again your use of English. Is that

17   correct?

18   **A. I think it's -- if edited it would avoid it, it**

19   **would be avoided.**

20   Q. You would have put an "a" in there if it was

21   edited?

22   **A. Yes.**

23   MR. HAMAD:  You want to see my writing in

24   Chinese?

25   MR. LEUCHTMAN:  We are going through a lot

42

1    of trouble for English as a second language lecture from

2    Mr. Stein

3    Q. And then as we go along in that sentence, you use

4    the "construction for molecular testing since March."

5    I take it you obtained a permit for performing

6    PGD for molecular testing in March, 2006?

7    **A. In, yes.**

8    Q. Instead of "since." Is that correct?

9    **A. Yes.**

10   Q. Okay. And if you had an editor you would have

11   changed that to "in"?

12   **A. Yes, I would.**

13   Q. And likewise at the top of page --

14   **A. Yes, in 2007.**

15   Q. Okay. Then when we see the next sentence,

16   "Beginning from 1995," you said "as I was the head."

17   Would you prefer to leave the "as" out and just

18   say --

19   **A. Agreed.**

20   Q. And finally the last sentence in that paragraph,

21   "cystic fibrosis covering more than a dozen of CF

mutations"?

23   **A. "Of".**

24   Q. Now, when I compared your report with Dr. --

25   MR. LEUCHTMAN:  Hughes.

43

1    Q. -- Hughes' report -- I am going to show you a

2    copy of Dr. Hughes' report?

3    MR. LEUCHTMAN:  Let's first ask

4    foundationally -- this is an objection -- whether he has

5    ever seen Dr. Hughes' report.

6    MR. STEIN:   I can ask that question.

7    MR. LEUCHTMAN:  Good. Go ahead.

8    Q. Have you ever seen Dr. Hughes' report?

9    MR. LEUCHTMAN:   Before now?

10   **A. No.**

11   Q. Never read it?

12   **A. No.**

13   Q. Okay. Let's just take a look at your report and

14   Dr. Hughes' report.

15   Do you see any similarity in the numbers one,

16   two, three, four and five between your report and Dr.

17   Hughes' report?

18   MR. LEUCHTMAN:  I object to this line of

19   questioning.

20   If he has never seen Hughes' report --

21   MR. STEIN:   Okay. We have your objection

22   on the record.

23   MR. LEUCHTMAN:  -- then it's irrelevant --

24   MR. STEIN:   Good.

25   MR. LEUCHTMAN:  -- whether there are

44

1    similarities. The person to ask about this is Mark

2    Hughes, and I am sure you will.

3    **A. For the list, yes, I see similar.**

4    Q. Okay. And do you notice they are not only

5    similar, they are identical?

6    **A. Looks like it.**

7    Q. They are even identical to the point of having a

8    comma after the "R" in Gary R. Cutting's name in No. 3.

9    Is that correct?

10   **A. Yes.**

11   Q. Okay. So it's your testimony that Dr. Hughes did

12   not provide you with the form and the content of that

13   paragraph to include in your report. Is that right?

14   **A. That's right.**

15   Q. Okay. Now, you have indicated there that you

16   have read the depositions of Chaya Grossbaum Volume 1

17   and 2 and Menachem Grossbaum. Is that correct?

18   **A. Yes.**

19   Q. Was there anything in that deposition that you

20   found significant in writing your report of February 26,

21   2010?

22   **A. The one significant thing I feel is that the**

23   **couple was well counseled in -- I don't remember the**

24   **particular dates, I think March, was it, 2004, I think,**

25   **and the couple was really well informed, they are**

45

1  intellectual, and they know lots of things and these are
2  the couple I was very impressed the knowledge and
3  including the second volume and the mother was doing,
   follow the instructions of helping the little child,
   it's very impressive. I think it's -- that's part of
6  the way it strikes me.
7      Q.  Well, that may have struck you, but where do you
8  mention that anywhere in your report?
9      A.  That I don't think that I -- I didn't think that
10 it is relevant to my opinion.
11     Q.  Do I understand then that the content of the
12 depositions of Chaya Grossbaum, both volumes, and
13 Menachem Grossbaum was not significant in formulating
14 the opinions that you did to put in your letter. Is
15 that correct?
16         MR. LEUCHTMAN:  Objection to the form of the
17 question.
18         MR. STEIN:   Okay.
19     A.  I wouldn't say it's insignificant.
20         It's just not part of what I will -- you know --
21 form this. It is significant, but it is not part that
22 lead me to form the report.
23     Q.  Is there anything in your report that is based on
24 the deposition testimony of Chaya Grossbaum or Menachem
25 Grossbaum?

46

1      A.  I am sorry.
2          Could you repeat it.
3      Q.  Yes.
4          Is there anything in your report that is based on
5  the content of the depositions of Chaya Grossbaum or
6  Menachem Grossbaum?
7          MR. LEUCHTMAN:  I object to the form of the
8  question.
9          MR. STEIN:   What is wrong with the form of
10 the question?
11         How is it, the form, inappropriate or
12 improper, Mr. Leuchtman?
13         MR. LEUCHTMAN:  Well, he read all the
14 records. He formulated opinions based upon the entire
15 record.
16         MR. STEIN:  The form we are talking about.
17         MR. LEUCHTMAN:  Yes.
18         MR. STEIN:   What is wrong with the form of
19 the question?
20         MR. LEUCHTMAN:  What is wrong with the form
   of the question is that it assumes, without proper
   foundation, that is this is this witness' thought process,
23 that he has to make a direct linear connection between
24 testimony he read and some part of his opinion as
25 opposed to reading all the transcripts and formulating

47

1  opinion based upon that.
2          MR. STEIN:   Okay.
3      Q.  Can you answer my question?
4          What opinion that is contained in your letter of
5  February 26, 2010, is based upon the content of the
6  Grossbaum depositions?
7          MR. LEUCHTMAN:  Same objection, and also as
8  to the form.
9          I don't know what you are looking at, Mr.
10 Hamad, but also as to the form based in whole or in
11 part, the question is vague and ambiguous.
12         MR. HAMAD:  I am looking at my e-mail, but
13 I thought the question was what portions of the
14 deposition transcript of Ms. Grossbaum did he look at.
15         MR. LEUCHTMAN:  No.
16         MR. STEIN:  That's not the question. Let's
17 get the question answered.
18         I will have it read back. Do you want it
19 read back?
20         MR. HAMAD:  Please.
21         MR. STEIN:   Would you read the question
22 back, Mr. Fishman.
23         (Whereupon, the court reporter reads as
24 requested.)
25         MR. HAMAD:  I join in that objection to the

48

1  extent that I think it is vague somewhat.
2          MR. STEIN:  Good.
3      Q.  Can you answer the question?
4      A.  I will say that at Page No. 3 --
5      Q.  Yes?
6      A.  -- that ADO and CVS issues.
7      Q.  Show me what sentence on Page 3.
8      A.  Page 3 second paragraph.
9      Q.  Because --
10     A.  Because of -- or the second sentences.
11         MR. HAMAD:  Can you read that sentence into
12 the record, Doctor?
13     A.  "CVS has been shown to be very accurate. I know
14 from my experience that Dr. Hughes and Genesis Genetics
15 will not take on PGD of a couple if they will not agree
16 in advance to CVF or amniocentesis, and this is
17 appropriate and within accepted standards."
18     Q.  Okay. Now, can you tell me which part of that
19 sentence or that paragraph that consists of five lines
20 is based on what is contained in the Grossbaum
21 deposition?
22     A.  I read Grossbaums deposition. I think they were
23 told in the counseling, I think they understood the
24 whole process and the consequences of ADO or technical
25 failures.

49

1    I think that part is in there.

2    Q.   Now you are telling me what the Grossbaums

3  understood.

     Is there any reference in that five lines to what

the Grossbaums understood?

6    A.   Right now I could not recollect which page of the

7  Grossbaums.  I believe it's in there.

8    Q.   Okay.  Do you have an index to the Grossbaums

9  deposition?

10   A.   So where should I look now?

11   Q.   Is there an index on the back of the deposition?

12   A.   Yes.

13   Q.   So can you give me, using that index, can you

14  show me where in the deposition you relied on

15  information?

16   A.   CVS, CVS, I have to look, go back, Page 72, so on

17  72 -- let me read, and so he told you the first

18  conversation with him that there had been errors made in

19  the past.  He said there had been errors but it was --

20  he had a high, very high success rate.  I think that is,

21  probably that's the part they discussed errors.

22   I remember there must be mention, but I don't

23  know where the page.  I can spend time to look into

24  details.

25   Q.   Now, let's look at your report.  Okay?

50

1    It says on that report, "Because of the ever

2  present risk of ADO and other risk factors inherent in

3  PGD CV S and amniocentesis are usually relied upon as a

4  safety net."  You said that?

5    A.   Yes.

6    Q.   In connection with your work at the laboratory

7  you are not -- in your laboratory you are not involved

8  at all with the patient.  Is that correct?

9    A.   How do you define that, "not involved with the

10  patient"?

11   Q.   You don't talk to the patient?

12   A.   Directly.

13   Q.   You said --

14   A.   That's true.  That's correct.

15   Q.   So then you don't -- you are not involved in

16  consenting the patient.  Is that correct?

17   A.   Not directly.

18   Q.   Well, how are you indirectly involved other than

19  the fact for you to have involvement there has to be

20  consent obtained by others?  Is that correct?

2    A.   When we create a consent, we discuss -- it's an

    evolving process.  We modify it a few times over the

23  last ten years, so I was involved in writing or

24  modifying the consent.

25   Q.   Okay.  Now, you say in the next sentence, "I know

51

1  from my experience that Dr. Hughes and Genesis Genetics

2  will not take on PGD for a couple if they will not agree

3  in advance to CVS or amniocentesis."

4    Can you tell me what experience you are referring

5  to?

6    A.   It's most likely from meeting, conversations and

7  conference meetings and that sort of thing.

8    Q.   And what meeting are you talking about?

9    A.   Well, I had quite a few meetings -- you know --

10  at the same time.  Once I can remember I went to China

11  and he was invited to give lecture too there and we have

12  that kind of interactions.

13   Q.   And at that time he told you -- you now have a

14  recollection of a conversation in which he told you that

15  he doesn't do PGD unless the parents consent and agree

16  to do either CVS or amnio.  Is that right?

17   A.   I do not remember that particular meeting we

18  talked about, but I am just using the meeting as an

19  example that we met often and he also gave lectures.  We

20  invited him at least once, maybe more, at least once,

21  that he gave a lecture of a PGD in our institute.

22   Q.   So then it's from -- are you telling me in that

23  lecture at your institute, you heard him say that?

24   Is that what you are testifying to?

25   A.   No.

52

1    Q.   Okay.

2    A.   I think on many occasions one of these occasions

3  that we mentioned.

4    Q.   So then when you refer to your experience you are

5  referring to one occasion at a meeting he mentioned

6  that.  Is that right?

7    A.   I would say at least -- at least the one.

8    Q.   Okay.  And from one meeting and a conversation

9  with Dr. Hughes you conclude that that is your

10  experience.  Is that right?

11   A.   Well, I wouldn't say only from one meeting.

12   Of course, I heard his talk, many, many places and

13  he gave lectures on many, many occasions.

14   Q.   Give me some examples of where these many, many

15  places were that he gave lectures that you were in

16  attendance?

17   A.   Well, ASRM.

18   Q.   I am sorry?

19   A.   American Society of Reproductive Medicine and he

20  also gave lectures.

21   Q.   Where was the lecture that you mentioned he gave

22  a lecture?

23   A.   I cannot recall where exactly and when, because

24  it's definitely more than once.

25   Q.   Okay.  By the way, does your -- would you know if

53

1  any families had come to your clinic at Cornell Weill
2  because Dr. Hughes refused to do their tests, since they
3  were not going to do CVS or amnio?
4      A.  That I don't know.
5      Q.  And tell me, what other laboratories refused to
6  do PGD studies if the family refuses to do CVS or amnio?
7      A.  I don't recall.
8          These are the process, I think, now the genetic
9  counselors are dealing with, so we have, I think as a
10  referral lab we are dealing with RGI and we are dealing
11  with Mark Hughes' lab, the Hughes' lab, and also
12  Reprogenetics and we had also experience with a referral
13  to Genzyme, and that's a FISH based PGD.  They are no
14  longer offering any testing anymore, but those are the
15  main labs that we are dealing with.
16     Q.  And why do you do referrals with those labs?  Why
17  do you deal with those labs?
18     A.  Well, PGD is a very complex, particularly for
19  single genes, there are thousands genes for each gene
20  for cystic fibrosis.  There are more than 1,000
21  mutations.
22         One lab will not be able to really offer
23  everything, so, for example, as I said, our lab is
24  limited with the resources.  We can't do more than a
25  thousand mutations, but for rare mutations, then we will

54

1  go to the larger lab.  They offer more and they cover
2  more mutations.
3      Q.  Well, do you do the cystic fibrosis mutations?
4      A.  Yes.
5      Q.  Are there any cystic fibrosis mutations that you
6  refer out to other laboratories?
7      A.  Yes.
8      Q.  Which ones?
9      A.  Either Mark Hughes lab or RGI.
10     Q.  What kind of -- what CVS mutations do you refer
11  to Mark Hughes or --
12         MR. LEUCHTMAN:  You mean V -- CF?
13     Q.  CF.  Yes.  I am sorry.
14     A.  Well the less common ones, less common ones.
15  That's the main reason, and sometimes the patient has
16  previous history or connections with RGI or Mark Hughes
17  and they switch center and then we may, so it varies.
18     Q.  Uh-huh.  Do you do PGD analysis for the delta
19  F508 cystic fibrosis mutation?
20     A.  Yes, we do.
21     Q.  You do PG mutations for G54 2X?
22     A.  We do not that long.  In early 2000, in early
23  2000 we didn't do it.
24     Q.  When did you start doing G54 2X?
25     A.  Well, G54 2X is the mutation that's not

55

1  recognized by enzyme called the restriction enzyme and
2  you have to go through either whole sequencing or now we
3  are using methodology called a mini sequencing, that --
4  that not depends on enzyme.
5          In the early days in the '90s, like the one that
6  we publish cystic -- Sickle Cell anemia, that's
7  recognized, the DNA sequences is recognized by a
8  particular enzyme.  That's the easy way to go for that
9  mutation, but G45 2X is not, so we could not find the
10  enzyme.  In our lab it doesn't have, at that time,
11  didn't have the machine, so later on we acquired a
12  machine and then we start to work on that.
13     Q.  When did you acquire the machine?
14     A.  About early 2000.
15     Q.  You mean 2001, 2002?
16     A.  Likely.
17     Q.  Now, are you involved in the process of referring
18  to other labs embryos for PGD study?
19         MR. LEUCHTMAN:  You mean cells biopsy?
20         MR. STEIN:  That's what I mean.
21         MR. LEUCHTMAN:  I am sorry, Lew.
22         MR. STEIN:  I am sorry, Mr. Leuchtman, if
23  the witness didn't understand what I mean, then he can
24  tell me.
25         I am using a frame of reference.

56

1          MR. LEUCHTMAN:  Well, you know --
2          MR. STEIN:  I am trying to shorten the
3  words.  If he finds it difficult to understand what I am
4  talking about, then he will tell me.  That was his
5  instruction at the beginning.
6          For you to intrude on the questioning is
7  inappropriate.
8          MR. LEUCHTMAN:  I am not suggesting any
9  answer.  You know my intrusion is not coaching.  It's
10  just simply somebody is going to read this transcript
11  and if the question isn't clarified, they are going to
12  think and if the witness doesn't catch the error in it,
13  it is an error, then someone could be misled.  Maybe
14  that's a matter of indifference to you.  It isn't to us.
15          I am sorry.
16          MR. STEIN:  I don't characterize it as --
17     Q.  You understand, Doctor, when we talk about doing
18  PGD studies on embryos, those studies primarily involve
19  single cell analysis.
20          Do you understand that?
21     A.  Yes.
22     Q.  My question -- so when I simply refer to the
23  embryo, you know I am referring to the single cell
24  analysis.  You understand that.  Correct?
25     A.  Yes.

57

1    Q.  Okay.  Now, my question again, when you send out
2    blastomeres from an embryo for analysis at either the
3    laboratories that you mentioned, are you involved in
     that process?
        A.  Do you mean involved in the procedure or
6    involving the prearrangement for that particular couple?
7        Q.  Let's start with you make the arrangement with
8    the laboratory?
9        A.  For -- I am sorry -- I interrupt.
10          For the arrangement the genetic counselors will
11   arrange which lab, whether it's Chicago or Detroit or
12   any other places, but when it's an actual case, most
13   likely I am the person to do the biopsy and I have a
14   staff or assistant in helping -- we have very strict
15   procedures -- you know -- masks and all of these to
16   avoid contaminations, and then she will do the receiving
17   of the single cell and we all double-check the numbers
18   and then we ship.
19          So in that sense, I am involved.
20       Q.  Okay.  Now, when the report comes back, are you
21   involved in getting the report?
22       A.  I am part of receiving report.  We have several
23   people receiving the report.  I am one of those, and
24   mainly the embryologic lab receives the reports and they
25   will at the time of the transfer discuss, well, the

58

1    physician, attending, and then the patient, the
2    embryologist.
3           I am involved if there is any technical question
4    that I can help to explain, then I will be involved.
5        Q.  You do not routinely receive the reports from
6    referral laboratories.  Is that correct?
7        A.  What do you mean "routinely"?
8        Q.  On each occasion when you send specimens for PGD
9    analysis to a referral laboratory such as Genesis
10   Genetics or Chicago and there is a report that comes
11   back from those laboratories, do you routinely see those
12   reports when they come back?
13       A.  Yes.
14       Q.  Okay.  And then you place them in a file in the
15   chart?
16       A.  Right.
17       Q.  And when they come back and you place them in the
18   chart, do they usually carry with them some form of
19   transmittal indication, date, time of the transmittal?
20       A.  Yes.
21       Q.  Now, in your review of the Grossbaums' chart at
     NYU, I take it you reviewed that chart.  Is that
23   correct?
24       A.  Yes.
25       Q.  Did you see that there were two reports that came

59

1    back from Genesis Genetics?
2           MR. HAMAD:   Objection to form.
3           The NYU chart two reports?
4           MR. STEIN:   Pardon me?
5        Q.  Did you see two reports from Genesis Genetics by
6    Dr. Hughes regarding the Grossbaums that were sent to
7    NYU?
8        A.  Yes.
9        Q.  Okay.  You saw the two in the Genesis Genetics
10   record.  Isn't that so?
11       A.  Yes.
12       Q.  You only saw one in the NYU record.  Isn't that
13   so?
14       A.  That I don't recall.  I have to double-check it.
15       Q.  Why don't you double-check.
16          MR. LEUCHTMAN:  Withdrawn.
17          I take it back.  I should have waited.
18          I am sorry.
19          MR. STEIN:   That's all right.
20          MR. LEUCHTMAN:  I will stipulate.
21          I think you want to ask the question anyway
22   that NYU records did not contain Dr. Hughes' second
23   report for whatever reason.
24       A.  Okay.  I have NYU's report here.
25          No, I don't see it.

60

1        Q.  Okay.  Let me show you what purports to be a
2    report from Genesis Genetics to NYU showing the result
3    of the PGD analysis for the Grossbaums.
4           Do you see that?
5        A.  Yes, I see it.
6        Q.  Behind that in the chart is something called a
7    transmittal verification report?
8        A.  Yes, I see it.
9        Q.  Is it customary for you to receive, when you
10   receive reports from the laboratories that you refer to,
11   a transmittal verification report?
12       A.  We will have that fax sheets, yes.
13       Q.  Okay.  And that is in the process a method of
14   confirming that the report has been sent and received.
15          Isn't that why you have the transmittal
16   verification report?
17       A.  Right.
18       Q.  And it's standard procedure for the report when
19   it's transmitted to have a transmittal verification
20   report made a part of the chart.  Isn't that so?
21          MR. HAMAD:  By both the center and the
22   receiver, both the receiver of the reports.
23       Q.  The receiver of the -- when you refer to a
24   laboratory for a PGD analysis and you receive the
25   report, you customarily and routinely receive a

61

1   transmittal verification report.  Isn't that so?
2      A.   That's in the fax machine.
3      Q.   And you put it in a chart at your lab.  Is that
so?
4      A.   Actually, I am not sure we have -- our fax
6   machine had this piece.
7         Our fax machine -- when we send we definitely
8   have this sheet, but receiving I don't think we have
9   that kind of report.
10     Q.   Okay.
11          MR. HAMAD:   I thought you were asking if
12  the sender sends him that copy as well.
13          MR. STEIN:   Yes.
14     Q.   Does the sender send you that copy?
15          MR. LEUCHTMAN: That's what he is asking.
16     A.   That's what I am asking.
17     A.   The sender.
18     Q.   When you receive the report, do you have the
19  verification of transmittal included in your chart?
20     A.   The sender does not send this type of --
21     Q.   Okay.  That's all I am asking.
22          Now, did you mention Genesis Genetics?  You, so
23  to speak, refer to that laboratory?
24     A.   Yes.
25     Q.   And you refer to the RGI laboratory in Chicago?

62

1      A.   Yes.
2      Q.   Can you tell me whether you still refer to both
3   of those laboratories?
4      A.   Yes.
5      Q.   And is there any basis on which you choose one or
6   the other?
7      A.   There is several factors considered.
8         The main factor who offers that particular
9   service.
10        Sometimes one offers and the other one does not
11  -- is not -- hasn't yet established the procedure and
12  then, obviously, we will go that way.
13     Q.   Okay.  And can you give me an example of that,
14  what type of service one offers and the other does not?
15     A.   Well, there are thousands of mutations.  We will
16  check this particular one.
17        Let's say it's a rare one and not common one and
18  RGI may already have that mutation established and the
19  Genesis may not, then we will definitely go to RGI or
20  vice-versa.
21     Q.   How do you determine whether or not a particular
laboratory has the analysis established?
23     A.   In the early days when I was involved directly,
24  then I call them and ask them, and a genetic counselor,
25  they contact their genetic counselor to see if they have

63

1   in their inventory.
2      Q.   Tell me what you mean by the "early days" when
3   you were involved.
4      A.   Well, because the early days, in the '90s, we do
5   only 30, 40 cases a year and we don't have -- we didn't
6   even have a genetic counselor hired directly in our
7   center.  Now we have our own in the center and those are
8   the early days, '90s, I would say.
9      Q.   And did RGI do linkage analysis in early 2000?
10     A.   In 2000 we have very few cases sent to RGI.
11     Q.   Okay.
12     A.   And we started collaborating or work with Mark
13  Hughes earlier than RGI.
14     Q.   Say that again, please.
15     A.   We started to refer cases to Mark Hughes many
16  years earlier than to RGI.
17     Q.   And does Genesis Genetics do linkage analysis
18  today?
19     A.   Yes.
20     Q.   Can you tell me when Genesis Genetics first
21  started to do linkage analysis?
22     A.   I don't recall any specific year.
23     Q.   Was it as early as 2001, 2002?
24     A.   Likely not -- you know -- I don't have the
25  specific dates.

64

1      Q.   All right.
2         Before I leave the deposition transcripts, other
3   than the deposition of Dr. Hughes, was there anything in
4   the deposition of Dr. Frederick Licciardi that you
5   relied on in forming the opinions that are contained in
6   your report of February 26th?
7         MR. HAMAD:   Objection to form.
8         MR. LEUCHTMAN:  Other than the deposition of
9   Dr. Hughes, is there anything in the deposition of Dr.
10  Licciardi?
11        I object to the form.
12        MR. STEIN:  I agree.
13     Q.   Is there anything in the deposition of Dr.
14  Licciardi that you relied on in formulating the opinions
15  contained in your report of February 26th?
16     A.   I read his deposition, but I don't think there is
17  much to rely on his deposition.
18     Q.   Okay.  Was there anything in the deposition of
19  Dr. James Grifo that you relied on in formulating the
20  opinions contained in your report?
21     A.   Well, one thing I share with Dr. Grifo is ADO and
22  misdiagnosis, that's the one as a PGD.  Any people
23  working in PGD, that's really in our mind all the time.
24  We really -- that's really exactly what we are trying to
25  avoid and we try to help these couples.  I share

65

1  completely, I agree with Dr. Grifo.
2      Q. Even though you may agree with Dr. Grifo, did you
3  rely solely on the deposition of Dr. Grifo to formulate
   that opinion?
                   MR. HAMAD:   Objection to form.
6                  I don't think he says he "relied on his
7  deposition."
8      A. I don't think I relied on his deposition.
9      Q. Okay. So then is it fair to say that there was
10 nothing specifically in Dr. Grifo's deposition that you
11 relied on to formulate the opinions in your report?
12     A. Well, I am not too sure.
13         Well, I don't think it's a main source of
14 forming, I would say, forming my opinion --
15     Q. Okay.
16     A. -- in the report.
17     Q. So do I understand that you would have formulated
18 the same opinions if you had never read Dr. Grifo's
19 deposition? Is that correct?
20     A. I would.
21     Q. Is that correct?
22     A. Yes.
23     Q. Okay. How about -- pardon me -- the deposition
24 of Ms. Alexis Adler, was there anything contained in the
25 deposition of Alexis Adler that you relied on to

66

1  formulate your -- the opinions contained in your report?
2      A. I don't think there is specific -- any specific
3  points.
4      Q. Okay. So the answer is no, there is nothing that
5  you relied on in Alexis Adler's deposition to formulate
6  your report. Is that correct?
7      A. If you say "nothing," I would disagree, but it's
8  not major.
9      Q. Okay. Show me what is contained -- show me in
10 your report what you relied on with Alexis Adler to
11 supply by way of information for you to rely on in
12 formulating your report?
13                 MR. HAMAD:   Objection to form.
14                 I think you misstate his prior testimony.
15                 I don't think he said he "relied" on it.
16                 MR. STEIN:   I don't think he said it
17 either. I wasn't clear, so I want to be very clear.
18     A. Well, the embryology part, I think -- let me see,
19 is it the embryology part -- I said it's not main
20 source, but all of these depositions, they say -- they
   provide or probably influence my report.
                   I wouldn't -- it's hard to pick up that specific
23 one.
24     Q. Show me in your report what you say was based on,
25 in any way, on what is in Alexis Adler's deposition?

67

1      A. I wouldn't say any specifics.
2      Q. Okay.
3      A. There is no specific point.
4      Q. And likewise for the deposition of Kaycian Brown
5  and Imelda Weill, is it also true that you did not rely
6  on anything contained in their depositions to formulate
7  the opinions contained in your report? Isn't that so?
8      A. I would agree.
9      Q. Okay. Now, Doctor, do you agree that PGD
10 involving couples with compound heterozygous has an
11 acceptable high error rate?
12     A. I disagree on "acceptable." I think that's -- it
13 depends on different couples.
14     Q. Well --
15     A. Definition of "unacceptable."
16     Q. Well, do couples who have compound heterozygous
17 in their genetic make up --
18                 MR. LEUCHTMAN: Heterozygous?
19     Q. -- have a higher error rate than other mutations?
20                 MR. HAMAD:   I am going to object to form.
21                 MR. LEUCHTMAN: Same here.
22     A. Similar as autosome dominant inheritance, so it
23 would not more complex than that one.
24     Q. Well, autosome -- autosome dominant --
25     A. Which is a 50/50.

68

1      Q. Okay. So couples who have mutations that are not
2  described as compound heterozygous --
3                 MR. LEUCHTMAN: Heterozygous.
4                 MR. STEIN:   Thank you, Mr. Leuchtman. I
5  will repeat the question.
6      Q. Couples that have cystic fibrosis mutations that
7  are not described as compound heterozygosity have a 25
8  percent chance of having an affected baby. Isn't that
9  right?
10                 MR. LEUCHTMAN: Objection as to the form.
11                 MR. STEIN:   Okay.
12     A. Not heterozygosity and have a 25 percent, if they
13 share the same mutation you mean?
14     Q. If they are not heterozygous, compound
15 heterozygous, do they have a 25 percent chance of having
16 an affected baby?
17     A. Yes. You are correct.
18     Q. A dominant recessive -- withdraw that question.
19         People who have heterozygous-dominant mutation
20 have a 50 percent chance. Is that correct?
21     A. Yes, dominant disorders, yes.
22     Q. Okay. Are any cystic fibrosis mutations
23 dominant?
24     A. No, cystic fibrosis is recessive.
25     Q. So do -- in the cystic fibrosis mutation

69

1   analysis, do couples who have compound heterozygous
2   mutations have a greater risk of having an affected baby
3   than those people who do not have compound
    heterozygosity mutations?
        A.  It's more complex, yes.
6       Q.  You also agree that ADO, which is allele drop out
7   is the most likely cause of reported errors in PGD of
8   cystic fibrosis in which affected compound heterozygous
9   embryos were misdiagnosed as carrier embryos because the
10  analysis used can only detect one of the inherited
11  mutations?
12      A.  I am sorry.
13          Could you repeat it again.
14          MR. LEUCHTMAN:  I guess we have this, Lew:
15  I am obliged to object to this question as leading, a
16  general statement from some specific article.
17          MR. STEIN:   That's fine.
18          MR. HAMAD:   I am not going to object.
19          I am going to ask where you are reading that
20  from, Lew.
21          MR. STEIN:   We will get there.
22      Q.  Are you familiar with a review article by Alan R.
23  Thornhill and Karen Snow?
24      A.  I read it before.
25      Q.  And do you know Alan R. Thornhill?

70

1       A.  Yes, I know him.
2       Q.  How do you know him?
3       A.  Through professional meetings.
4       Q.  Okay.  And do you know where he is located?
5       A.  He is in London now.
6       Q.  Okay.  And where was he in the year 2002?
7       A.  That I don't know.
8       Q.  Was he ever at the Mayo Clinic?
9       A.  Yes, he was.
10      Q.  Okay.  And do you know Karen Snow?
11      A.  Karen Snow, no, I don't.
12      Q.  Is Alan R. Thornhill a respected authority in
13  PGD?
14      A.  I am not sure if it's authority, but definitely
15  respected scientist.
16      Q.  Okay.  And is his publications relied upon by
17  people in the genetic and IVF field?
18          MR. HAMAD:   Objection to form, the IVF.
19          How can this physician speak about the IVF.
20          MR. LEUCHTMAN:  I will object as to
    foundation.
22      A.  What we read and we value his intellectual and
23  also his scientific insights.
24      Q.  And you are familiar with his review article --
25  by the way, what journals do you read?

71

1       A.  I read, well, Human Reproduction Fertility
2   Sterility, Molecular Human Reproduction, and many.  Then
3   plus Nature and Science.  These are all New England
4   Journal of Medicine, American Journal, which is Journal
5   of American Medical Association and, I guess -- I think
6   a lot, lots more.
7       Q.  Do you read the Journal of Molecular Diagnostics?
8       A.  That particular journal, I am not a regular
9   reader, no.
10      Q.  Do you read it from time to time?
11      A.  If that's usually we search the particular field
12  and then we will go to that journal.
13      Q.  Okay.  Do you agree with Dr. Thornhill's
14  statement in his review article published in the Journal
15  of Elective Diagnostics in February of 2002, when at
16  Page 14, he writes, "Another problem unique to single
17  cell PCR is that of allele drop out, a phenomenon where
18  only one of the two alleles present is successfully
19  amplified"?
20      A.  Yes, I agree with that.
21      Q.  Do you agree with his statements -- his statement
22  that "in addition to reducing ADO strategies have been
23  posed to increase the detection of ADO"?
24      A.  Was proposed, yes.
25      Q.  Okay.  "One such strategy is the use of linked

72

1   markers which simultaneously controls for condemnation,
2   use of one or two linked markers reduces undetected ADO
3   by approximately 50 percent and 75 percent respectively
4   and with three linked markers, ADO is virtually always
5   detected."
6           Do you agree with that?
7       A.  I would agree with the first part, but the second
8   part, I think, it depends how good these markers, how
9   good you design, and how good, how well positioned the
10  marker.
11          The markers is a tricky issue.  You wanted to see
12  introgenic, which is within the gene.  That's close to
13  the gene, because there is a phenomenon called a
14  recombination, so if a marker is far away, there is a
15  recombination occurs that will make it even wrong
16  diagnosis, so you have to recognize that and introgenic
17  markers sometimes are less polymorphic. Polymorphic
18  means whether it applies to this particular couple
19  sometimes if the male partner and female partner shares
20  the same size, when we determine the markers, then that
21  marker is not useful, so we have to find a particular
22  marker for particular couple, so, I think, it depends,
23  so, I think, I agree with him the first part, but not
24  the second part.  I think a little --
25      Q.  Well, would you agree with this statement that he

73

1   makes, "The use of linked markers carries considerable
2   advantages, not only from the point of view of reducing
3   the possibility of misdiagnosis, but also by potentially
4   increasing the number of embryos available for
    transplant"?
6       A.   I think the second part, again, it's not
7   necessarily.   The first part, yes, increase the
8   accuracy.
9       Q.   Okay.   And that knowledge was published in 2001,
10  November 2001.
11      Would you agree that the state of knowledge in
12  the community doing PGD about the advantage of having
13  linkage analysis was well known by November 2001?
14      A.   Yes, the concept and the use, yes, when we do the
15  retinoblastoma, and we tried using linkage marker.
16      Q.   And it's true that Chicago, RGI in Chicago,
17  was using linkage analysis in 2000.   Isn't that true?
18      A.   I read their publications.
19      Q.   Yes.   Okay.
20      So, Doctor, if under hypothetical circumstances
21  Dr. Hughes and Genesis Genetics was not using linked
22  markers in 2004 and Chicago and RGI was using linked
23  markers, wouldn't it have been better for a couple to be
24  referred for analysis to Chicago than to Detroit?
25          MR. LEUCHTMAN:   Objection to form.

74

1           MR. HAMAD  Objection to form.
2       A.   This is really a complicated issue.
3       To referring to what referral lab is not only
4   determined by what the procedure they provide.   There is
5   also a link historically where do you usually go and
6   which lab perform better.
7       I think -- we have not have a close kind of
8   referral in '90s with RGI.   I would not speculate -- you
9   know -- any reasons, but we did not have a close
10  referral collaboration with RGI.
11          MR. HAMAD:   I am also going to put a belated
12  objection to that question.
13          It mistakes the doctor's answers.   I think
14  the doctor never said that it was accepted.   He did not
15  say it was accepted.   He said it was done.   He used that
16  to argue it was accepted.   It's a difference.
17          MR. STEIN:   You say it is different, your
18  testimony, we will take your deposition to determine
19  what is a difference.
20          MR. HAMAD:   Off the record.
            (Whereupon, a discussion takes place off the
        record.)
23          THE WITNESS:   If I may, I should add
24  sometimes a patient has a say.
25      For example, they started to build up,

75

1   already started the case, and they paid for pretest and
2   even with our suggestion they may still choose the one
3   that they already established a relationship with the
4   lab.
5           MR. LEUCHTMAN:   Off the record one second.
6           (Whereupon, a discussion takes place off the
7   record.)
8       Q.   Whether the use of linkage analysis, that was
9   reported as early as 1997, wasn't it, Doctor?
10      A.   I don't recall what exactly.   I think in the
11  prenatal field it probably even earlier.
12      Q.   Have you attended the annual meetings of the
13  international working group of preimplantation genetics?
14      A.   The working group, yes, now it's called PDDIS,
15  yes, I did.   Not every year.
16      Q.   Were you a member of the working group?
17      A.   I am a member of that society.   Now it's called a
18  society.
19      Q.   When did you become a member of that group?
20      A.   I don't recall when exactly the timing.   Probably
21  early 2000.
22      Q.   Not in the '90S?
23      A.   Well, I went -- actually, that's the place where
24  I met the first time, I believe, with Dr. Strom, that is
25  in Chicago.   That's the same society evolved.

76

1       Q.   And did you go to Rio de Janeiro, Brazil for the
2   sixth annual meeting?
3       A.   No, I didn't.
4       Q.   Did you get -- did you review the reports of
5   those working groups on a regular basis?
6       A.   Yes, sir.
7       Q.   And is it likely that you would have read the
8   Journal of Assisted Reproduction and Genetics, Volume 14
9   No. 2 in 1997?
10      A.   Most likely.   That's the journal also I regular
11  read.
12      Q.   Okay.   Now, Doctor, you mentioned RGI and you
13  mentioned Hughes' group and Genesis Genetics.
14      What other laboratories were doing PGD analysis
15  at that time -- back in the early 2000's?   Do you know?
16      A.   I am sorry.
17      Where or what other.
18      Q.   What other laboratories were doing PGD?   You were
19  doing it yourself, but that was not open for referral by
20  other clinics.
21      A.   Right.
22      Q.   But what other laboratories were accepting
23  referrals at that time?
24      A.   Reprogenetics.
25      Q.   And where are they located?

77

1    A.  In New Jersey.

2    Q.  Okay.  Were they doing single cell blastomere

3  analysis?

    A.  Well, I don't know the details, but I don't think

they did that early 2000.

6          MR. LEUCHTMAN:  Single cell?

7          MR. STEIN:    Yes.

8    Q.  They were doing FISH?

9    A.  They were doing FISH because my former colleague

10  he is expert in FISH.

11    Q.  Now, what other laboratories do you know of that

12  was accepting referrals?

13    A.  I don't think -- although I can't be sure -- I

14  know what is it, one in Virginia, Genetic -- is that

15  called Genetic Genesis?  There is one.

16    Q.  Do you know --

17    A.  In Virginia.

18    Q.  Do you know who is associated with the one in

19  Virginia?

20    A.  GIVF.  Well, in short, it's called GIVF.

21    Q.  What specialist was involved?  Do you know the

22  name of the man that --

23    A.  Dr. Shulman.  Shulman.

24    Q.  -- Was in charge?  Okay.

25    A.  I am not 100 percent sure, but somewhere very

78

1  close.  He is the one doing it, and then Jones

2  Institute.

3    Q.  Okay where are they located?

4    A.  Virginia.

5    Q.  And who is associated with the Jones Institute,

6  what individual was the director?

7    A.  Susan.  I know her fairly well.  Susan is the

8  person, the first name, Gatling, started from G.  And

9  she is -- she is the one doing PGD for long, long time

10  actually.  They are also similar like us.  It's also

11  economic.  I don't know if they ever receive from

12  outside.

13    Q.  That's part --

14    A.  Jones Institute.

15    Q.  Is it part of an academic institution?

16    A.  Yes.

17    Q.  Which one, University of Virginia?

18    A.  No.  I don't believe it's University of Virginia.

19    Q.  But it's a major teaching university?

20    A.  Yes, it's a teaching university.

21    Q.  Okay.  And what other -- were there any other

laboratories at the time?

23    A.  In early 2000?

24    Q.  Yes.

25    A.  There are a few small places attempting, but I

79

1  don't think they are major.

2    Q.  Were there any other Medical Center based

3  laboratories like Cornell Weill who were doing it as you

4  would describe, in-house and not accepting referrals

5  that you knew of at that time?

6    A.  Not that I know major.  They all try to establish

7  it, but there is no really major ones.

8          MR. STEIN:    Okay.  I think this is a good

9  time to take a break.

10          MR. LEUCHTMAN:  Okay.  Thanks.

11          (Whereupon, a short recess is taken.)

12    Q.  Doctor, I am just referring to one more statement

13  that Mr. Thornhill -- Dr. Thornhill had back in his

14  publication that we were referring to.

15          Do you agree with this statement, "For

16  compound heterozygous or autosomal-dominant conditions,

17  the consequences of ADO can be catastrophic as

18  misdiagnosis and subsequent transfer of affected embryos

19  can occur."

20          Do you agree with that?

21    A.  Agree, yes.  Yes.

22    Q.  In fact, it goes on, "Indeed ADO is the most

23  likely cause of reported errors in PGD of cystic

24  fibrosis in which affected compound heterozygous embryos

25  were misdiagnosed as carrier embryos because the

80

1  analysis used could only detect one of the inherited

2  mutations."

3          Do you agree with that?

4    A.  I think that was the understanding or at least

5  the view in the year he wrote the paper, but it's more

6  complex than just ADO.

7    Q.  Do you agree?

8    A.  So --

9    Q.  Do you agree that is a completely inaccurate

10  statement?

11          MR. LEUCHTMAN:  Let him finish his answer.

12    Q.  I am sorry.

13    A.  I don't think that is a complete description of a

14  misdiagnosis.  I think it is part of the reason for

15  misdiagnosis.

16    Q.  All right.

17          And linkage analysis you would recommended as a

18  method for improving the accuracy in that type of

19  situation where you have compound heterozygous embryos.

20          Do you agree?

21    A.  Yes or autosome dominant as well.

22    Q.  Well, here we are not dealing with

23  autosomal-dominant.

24          We are dealing here with cystic fibrosis, a

25  recessive gene in which we have with the Grossbaums, a

81

1  compound heterozygous mutation.
2      Do you agree that we have that kind of mutation
3  with the Grossbaums?
4      **A.  For this case, yes, I agree.**
5      **Q.**  Do you agree that ADO has been shown by many
6  authors to be at least 20 percent and some authors have
7  shown it as high as 70 percent?
8          MR. HAMAD:  Objection to form.
9          MR. LEUCHTMAN:  Of what?
10     **Q.**  I said ADO has been shown by many authors to be
11  at least 20 percent and some authors have shown it as
12  high as 70 percent.
13         Do you agree with that.
14     **A.  I disagree.**
15         MR. LEUCHTMAN:  I object.
16         It's an incomplete statement.
17         MR. STEIN:  Only if the doctor says it's
18  incomplete, if he can't answer the question and he says
19  it's incomplete.
20         MR. HAMAD:  I think he answered it.  He
21  disagrees.  He was going to explain why he disagrees.
22     **Q.  You disagree?**
23     **A.  I disagree.**
24         MR. HAMAD:  He was explaining in the middle
25  of why he disagrees.

82

1      **Q.**  What does the literature report is the rate of
2  ADO in analyzing single cell blastomeres for cystic
3  fibrosis?
4      **A.  Well, ADO, I think we are still trying,**
5  **struggling with ADO with all the possible methodology**
6  **and, I think, still we are trying to investigate what is**
7  **the extent, how to prevent it or at least reduce.**
8      **I think the statement from 20 percent to 70**
9  **percent to my knowledge, is overstatement, and also we**
10  **look at our own data. I think it's not that high.**
11     **Some of it is, because, for example, one of the**
12  **reason is the poor embryo. When embryo quality is poor,**
13  **one of the poor embryo is due to aneuploidy. Aneuploidy**
14  **may cause ADO as well. Little a more likely existing in**
15  **the slow arrested embryos and in human embryo field what**
16  **is common is very difficult to get good embryo as a**
17  **research material, because very few people will be able**
18  **to donate their healthy embryos.**
19     **So in the literature the common issue the centers**
20  **are able to get the material from arrested three days,**
21  **on Day 3, four cells, that's discarded, and then they do**
22  **experiment. They show huge percentage, 70 percent.**
23  **That's the publication, but these are not real ADO in**
24  **PGD cases, so I disagree with that number.**
25     **Q.**  Do you agree with the number around 27 percent?

83

1          MR. HAMAD:  Objection to form.
2      **A.  I think it's too high.**
3      **Q.**  Too high.
4      Are you familiar with the Atlas of
5  Preimplantation Genetic Diagnosis that was published by
6  the Chicago group around 2000?
7      **A.  I saw this.**
8      **Q.**  You saw it?
9      **A.  Yes.**
10     **Q.**  And you saw it because it was part of the
11  accumulated literature and materials in the PGD
12  industry, so to speak.  Is that correct?
13     **A.  Yes.**
14     **Q.**  All right.
15     Let me show you Page 152 of the Atlas.
16     Do you see there a graph for ADO?
17     **A.  Okay.  Figure 5, yes, exactly.**
18     **Q.**  What number is that graph?
19     **A.  NCF, it says, 27.1.  It's a blastoma.**
20     **Q.**  Do you disagree with that statistic?
21     **A.  I disagree.**
22     **Q.**  Okay.
23     **A.  I think that's from early studies and I don't**
24  **know where the material was from.**
25     **Q.**  Well, this manual is published in the year 2000.

84

1  Do you recognize that?
2      **A.  Yes.**
3      **Q.**  And you disagree with this publication to that
4  extent.  Is that right?
5          MR. HAMAD:  Objection to form.
6      **A.  Yes, I disagree.**
7      **Q.**  Okay.
8          MR. LEUCHTMAN:  I also disagree, or object
9  to the characterization of it as a "manual."
10         MR. STEIN:  It's called an Atlas.
11         You disagree this is called an Atlas.
12         MR. LEUCHTMAN:  No, I disagree with your
13  characterization as a "manual."
14         Stay with me, Lew.
15         MR. STEIN:  All right.  All right.
16         What about -- why do you disagree with the
17  characterization as a manual.
18         MR. LEUCHTMAN:  **Because it isn't a manual.**
19         A manual tells you how to do things.  An
20  Atlas is a sort of a publication.  I realize we have
21  different standards of precision.
22     **Q.**  Dr. Xu, do you know what the risk is of
23  misdiagnosis in the analysis of blastomeres by single
24  cell studies in genetic laboratories in percentage
25  terms?

85

1    A.  It is not that easy to pinpoint and the outcome
2  from the published literature is misdiagnosed as a born
3  child is one to two percent if you look at the
4  literature.
      MR. LEUCHTMAN:  But I will belatedly object
6  to the question as vague and ambiguous as to time and
7  circumstances.
8        MR. HAMAD:  I will join in that objection.
9        You are referring to actual births or I mean
10 there could be 80 over 40.
11   Q.  Are you familiar with the literature published by
12 the group headed by Dr. Gresen?
13   A.  Yes, I read it before.
14   Q.  Okay.  And he published an article in 2000
15 entitled Multiplex PCR of Polymorphic markers flanking
16 the CFTR gene?
17       Do you recall that publication?
18   A.  Yes.
19   Q.  Is that type of publication relied on by people
20 in the PGD business, so to speak?
21   A.  Certainly we read and we use that as information,
22 yes.
23   Q.  Now, in Dr. Gresen's article there is a
24 statement, "The risk of misdiagnosis equals a chance of
25 a double recombination between flanking markers and is

86

1  less than 0.05 percent.
2        Do you recall reading that?
3    A.  I don't recall reading that, but I think it's not
4  accurate, because there are so many markers.  The
5  distance of the markers determine the recombination, so
6  it is too general statement.
7    Q.  Okay.  Do you know what the rate of misdiagnosis
8  for CF PGD at Chicago has been since 2000?
9    A.  I don't know.
10   Q.  Have you heard of any reported misdiagnosis out
11 of Chicago since 2000?
12   A.  I have not heard.
13   Q.  Okay.  Have you heard of any reported
14 misdiagnosis out of Genetic Genesis Laboratories since
15 2000?
16       MR. LEUCHTMAN:  Obviously, we are dealing
17 with one.
18       MR. STEIN:  I know.
19       MR. LEUCHTMAN:  I am glad you know.
20       MR. STEIN:  I know we are dealing with
21 one.  He knows we are dealing with one.
      A.  Not that I know.
23   Q.  Pardon me?
24   A.  Not that I know.
25   Q.  You don't know of any other one other than this

87

1  one.  Is that right?
2    A.  Right.
3    Q.  Do you agree that if you have three linked
4  markers, ADO is virtually always detected?
5    A.  I disagree.
6    Q.  Okay.  Do you have an opinion as to whether at
7  the time that the couple, that is, the Grossbaums,
8  presented for PGD, they should have been informed that
9  this particular situation is extremely risky when
10 performed on blastomere biopsies because of the risk of
11 allele drop out?
12           MR. HAMAD:  Objection to form.
13           MR. LEUCHTMAN:  Same.  I will join in that.
14   A.  I disagree.
15       I don't think extremely risky.  That I disagree.
16       I think PGD always there is a risk for PGD, but
17 extremely risk for heterozygous compound mutation the
18 risk is a little higher, but it's not extreme.
19   Q.  How much higher is it?
20   A.  Well, it depends on ADOs.  How do you define
21 what's the estimation of ADOs?
22   Q.  What is your estimation of ADO?
23   A.  Well, to my knowledge 20 percent is over estimate
24 when you have good embryos or biopsy isn't complete.
25       By the biopsy if you have a good person to

88

1  perform the biopsy, the cells intact, it will be less
2  likely to have ADO compared to -- if you pull a cell,
3  the cell, the membrane dissolved, then it also could
4  contribute ADO, so, I think, ADO with 20 percent is
5  overstated.
6    Q.  All right.
7        What do you think -- well, do you have an opinion
8  as to what this couple's risk of ADO was with conditions
9  shown by Dr. Hughes in his report?
10   A.  We quote with ADO of a five to ten percent.
11 That's what I current in my estimate.
12   Q.  From compound heterozygous patients you will
13 quote an ADO risk of five to ten percent?
14   A.  ADO actually defines for a specific allele, so
15 this allele is five percent, five to ten, and that
16 allele, for a test, it's not -- not a compound or single
17 mutation, so it's specifically refers to that particular
18 allele.
19   Q.  And that particular allele is identified as which
20 allele?
21   A.  Whichever.  In this case, of course, it's defined
22 F548 or G542X.
23   Q.  And should the couple have been told to do a
24 single cell blastomere study that they had a higher risk
25 than the couples who don't have that compound

89

1 heterozygous circumstance?
2           MR. HAMAD:  Objection to form.
3           MR. LEUCHTMAN:  Same.
4     **A.  I think it should be informed and I understand**
**that's what it did.**
6     Q.  Okay.  And who informed them, that you
7 understand?
8     **A.  What I understand, Dr. Hughes.**
9     Q.  Do you understand Dr. Hughes told them they had a
10 higher risk because they were compound heterozygous than
11 the average?  You understand he told them that?
12           MR. HAMAD:  Objection to form.
13           MR. LEUCHTMAN:  Same.
14    **A.  In that Dr. Hughes notes I see the explanation of**
15 **all the risks.**
16    Q.  Okay.  Can you tell me where he told them they
17 had an increased risk because they were compound
18 heterozygous in his notes?
19           MR. HAMAD:  Objection to form.
20           MR. LEUCHTMAN:  Same.
21    **A.  I can see on Page 2.**
22    **This is a complicated two different mutation**
23 **test -- tested -- excuse me -- simultaneously in one**
24 **cell.**
25           **I think that will --**

90

1     Q.  That will do it?
2     **A.  Implies -- well, obviously -- not obviously -- I**
3 **think when the real conversation occurs, there will be**
4 **more than just that sentence, but that sentence**
5 **indicates it's a complicated two different mutation --**
6 **mutations tested.**
7     Q.  Should he have told them -- withdraw that.
8           Is there any indication he told them that there
9 was a type of an analysis called linkage analysis that
10 could improve the accuracy and reduce the risk of
11 misdiagnosis?
12    **A.  I am not sure if this is in his notes, linkage**
13 **analysis.**
14    Q.  Pardon me?
15    **A.  I didn't find that for linkage analysis, anything**
16 **noted here.**
17    Q.  Okay.  And assuming that there were laboratories
18 that were doing linkage analysis in 2004, should Dr.
19 Hughes have told the Grossbaums that they could get a
20 more accurate analysis with linkage analysis and a
21 reduced risk of misdiagnosis if they went to a different
    laboratory?
23    **A.  As I mentioned before, I think referring or the**
24 **decision whether to go to a lab, it depends on many**
25 **other factors.  It's not only one that what test they**

91

1 **are offering.**
2     Q.  What are the other factors that could determine
3 whether or not you go to a laboratory other than the one
4 issue of whether the laboratory does linkage analysis or
5 not, what are the other factors?
6     **A.  Well, IVF clinics, the working relationship with**
7 **the lab.  As I also indicated earlier on that we have**
8 **been doing with Dr. Hughes in the '90s, we have very few**
9 **cases with RGI, so I think that's one.**
10    Q.  What is it about the working relationship that
11 would suggest that they be sent to one laboratory versus
12 the other?  What do you mean by "working relationship"?
13           MR. HAMAD:  Objection to form.
14    **A.  Well, perhaps the physicians know Dr. Hughes,**
15 **would be one.**
16    Q.  What in the knowledge of the physicians knowing a
17 doctor have to do with the choice of what laboratory
18 they should go to?  Tell me what in that relationship is
19 significant to you.
20           MR. HAMAD:  I am going to object to the
21 form of the question.  This is a hypothetical.  It has
22 nothing to do with the facts in this case, considering
23 these patients came in.
24           MR. STEIN:  You made your objection.
25           MR. HAMAD:  I am sorry.

92

1     Q.  Go ahead.
2     **A.  The doctors may go to a scientific meeting, learn**
3 **who is performing what kind of a test.  Then they will**
4 **go for that particular test or go to that particular**
5 **lab.**
6     Q.  In your opinion the laboratory had no obligation
7 to advise the couple that there could be a type of
8 analysis done for them which would reduce the risk of
9 misdiagnosis and that type of analysis was not being
10 offered by Genesis Genetics?
11           MR. HAMAD:  Objection to form.
12           MR. LEUCHTMAN:  Same here.
13           MR. HAMAD:  This again, this is a
14 hypothetical, and I think you should term it as a
15 hypothetical.
16           In this case I think the facts are clear
17 these patients came in already having contacted Dr.
18 Hughes before they saw the laboratory.  It has nothing
19 to do with this case.
20           MR. STEIN:  Fine.
21    Q.  Go ahead.
22    **A.  Saying it is obligations, I think it depends on**
23 **what kind of knowledge they have.**
24           **I don't think in 2000 or even as of today, there**
25 **is a clear publication which lab has a better or more**

93

1 accurate, so I don't think the information is that
2 regularly available.
3   Q.  All right.
      Let's be more specific.
      From the knowledge that you had in 2004 in June
6 when the Grossbaums were undergoing PGD, RGI in Chicago
7 was doing linkage analysis.  Isn't that so?
8         MR. HAMAD:  Objection to form.
9   A.  I was not that clearly aware of that.
10   Q.  All right.
11   A.  At least from my -- you know -- from my point of
12 view.
13   Q.  Okay.  Was it important from your point of view
14 to know in 2004 whether there was laboratories doing
15 linkage analysis for cystic fibrosis compound
16 heterozygous couples?
17   A.  It would be important to know, but there is not a
18 mechanism there.
19      American Society of Reproductive Medicine just
20 started under the ASRM, a society called Society for
21 Assisted Reproductive Technology.  SART, and they start
22 to collect the data only two or three years ago.  They
23 tried to start to build up that data base, so can inform
24 different centers.
25      That is not even on-line yet.  Right now it's not

94

1 available, but they recognize that as indicated it's a
2 critical issue, so they just started.  We started to
3 feed in the data, so I hope it will be soon or in the
4 near future that kind of information will be available,
5 but that wasn't available publicly or -- you know --
6 unless you go to the meetings there might be talk, but
7 it's not a data base you can easily search for.
8   Q.  Turning to your report, Doctor, and you state,
9 "In 2004, not all the laboratories were using linkage
10 markers and not for every single mutation."
11      In other words, multiplex PCR was not the
12 standard in 2004.  Is that right?
13   A.  Yes.
14   Q.  All right.
15      So what laboratories were not using multiplex PCR
16 in 2004?
17         MR. HAMAD:  Besides Genesis?
18         MR. LEUCHTMAN:  And to a large extent his
19 own.
20   A.  It is an evolving process and we started to use
21 that linkage marker in the mid 2000, but then we have to
22 make a decision which disease we are going to start with
23 and according to our statistics, cystic fibrosis is the
24 major one because it's a more common, although we
25 started reported sickle cell anemia.

95

1   Q.  Doctor, can I direct your attention to the
2 specific statement you made?
3   A.  Uh-huh.
4   Q.  You did make the statement, did you not --
5   A.  Yes.
6   Q.  -- that in 2004, "Not all the laboratories were
7 using linkage markers and not for every single
8 mutation."  Okay?
9   A.  Yes.
10   Q.  You said that?
11   A.  Yes.
12   Q.  Okay.  Now, we are dealing here with the cystic
13 fibrosis --
14   A.  Yes.
15   Q.  -- mutation, and we are dealing here with delta
16 508 and G542?
17   A.  Right.
18   Q.  Can you tell me what laboratories were not using
19 multiplex PCR in 2004?
20   A.  That I don't know.  I think -- I don't know what
21 exactly -- Jones Institute was using and I don't know
22 whether Reprogenetics was using and we started to build
23 these, but we have not routinely used it.
24   Q.  So then if you didn't know what Reprogenetics was
25 doing, and you didn't know what Jones was doing, how can

96

1 you say that not all laboratories were using the
2 mutation?
3   A.  Well, one of the things I think even as of 2009,
4 that's not a cystic fibrosis, if you think it's relevant
5 or not, I will not use that example, but if you allow
6 me, in New Jersey I think a lab they are offering for
7 myotonic dystrophy, which is also dominant gene.  They
8 use the one marker, not three, as -- you know --
9 recommended in 2000, so, I think, my point is that using
10 of a marker is a process, not just you turn on and you
11 have to use and you will be able to use all the markers.
12   Q.  You keep talking about an evolving process,
13 however you agree the literature by 2000 had clearly
14 indicated and defined linkage analysis.  Isn't that so?
15         MR. HAMAD:  Objection to form.
16         MR. LEUCHTMAN:  Same.
17   A.  Not defined.  They started to recognize use and
18 recommend the use of a linkage markers.
19   Q.  And if it was recommended in 2000, do you know of
20 laboratories -- well, that were using it in 2004?  Do
21 you know what laboratories were using linkage markers
22 for cystic fibrosis with patients, delta 508 and G542,
23 what laboratories were using linkage markers?
24   A.  I am not aware of which ones were using it.  It's
25 likely RGI.

97

1    I don't think we send at that time to RGI yet,
2  but I have to check our record.
3    Q.  Well, whether you were sending them there or not,
4  from your meetings and from your awareness of what they
5  were publishing by way of analysis in 2000, did you not
6  assume they were doing it for those mutations based on
7  the literature and based on their Atlas and the
8  information that they published?
9    A.  I think they publish the workers it's usually the
10  leading -- leading centers '01 of these studies, but to
11  implement it takes time.
12    For example, I just -- if you allow me -- people
13  started to using micro array technology to detect 24
14  chromosomes and it's proposed a few years ago, but still
15  in the process of not every lab is using that
16  technology.  They already show in the publication you
17  can detect 24 chromosomes, but very few labs are doing
18  it now offering for clinical use, so from the
19  publication to clinical use it takes some time to
20  implement.
21    Q.  Now, Doctor, let's turn to the report that
22  Genesis Genetics sent to NYU.
23    Do you have a copy of it?
24    A.  Yes, I have.
25    Q.  In his report Dr. Hughes said that sample No. 8

98

1  was okay for transfer.  Is that correct?
2    A.  Yes.
3    Q.  And No. 10 was okay for transfer.  Is that
4  correct?
5    A.  Yes.
6    Q.  He did not indicate that any of the others were
7  okay for transfer?
8    MR. HAMAD:  Objection to form.
9    Q.  Isn't that correct?
10    MR. HAMAD:  He did not use those words.
11  It's an unclear question.
12    MR. STEIN:  Okay.  You can state your
13  objection.  If the doctor finds it unclear, then he can
14  tell me.
15    MR. HAMAD:  Fair enough.  I did.
16    A.  The report there are two said okay for transfer,
17  eight and the tenth.
18    Q.  Okay.  Do you have an opinion as to why he did
19  not say that the others were okay for transfer?
20    A.  It's likely from the test that he has from CF10,
21  no division for A and no division for ten and they got
    results from both mutations.
23    Q.  And what was it about that, the others, to cause
24  him not to indicate that they were okay for transfer?
25    MR. HAMAD:  Objection to form.

99

1    MR. STEIN:  Okay.
2    Q.  Do you have an opinion as to why he did not label
3  any of the others okay for transfer?
4    A.  It looks like because of no amplification.
5    Q.  What's the significance of there being no
6  amplification?
7    A.  No amplification means there is no information
8  from that particular mutation.
9    Q.  Okay.  And so, therefore, those embryos which
10  were numbered other than 8 and 10 would not be deemed
11  okay for transfer.  Is that correct?
12    MR. HAMAD:  Objection to form.
13    That's totally misstating his testimony, but
14  he can answer.
15    MR. STEIN:  Okay.
16    A.  The transfer of an embryo is finally determined
17  by the patient, the couple, and physicians, because we
18  -- again, I use my experience.
19    I think we had a case many years ago a patient
20  wanted to transfer back, trisomy 21, which could lead to
21  Down's syndrome and the physicians had to -- had a
22  really difficult time to discuss.  In the end it didn't
23  transfer.  I think a patient is the one that finally
24  determines it, so I think a recommendation is here, but
25  a transfer is determined by patient and the physicians.

100

1    Q.  Well, when the patient makes a decision as to
2  whether to transfer an embryo on this list that is not
3  recommended as okay for transfer in the report of the
4  laboratory as was here, what factors should the patient
5  take into consideration in making that decision?
6    MR. HAMAD:  Objection to form.
7    Clearly beyond the scope of this witness' --
8    MR. STEIN:  Okay.
9    MR. HAMAD:  -- expertise.
10    A.  Well, I think it involve in the transfer.  I am
11  not involved in it.
12    Q.  Okay.  If the patient -- if 8 and 10 were not
13  transferred, then say as in this case, 7 was transferred
14  during invitro fertilization, was there a higher risk of
15  misdiagnosis with No. 7 than there was with either 8 or
16  10?
17    A.  I don't see that a particular higher risk.  There
18  is a risk -- you know -- ADO is a risk for any embryos,
19  even clearly you will get both results and still have
20  the risk of ADO.
21    Q.  Okay.  What is it in the laboratory analysis that
22  makes 8 and 10 okay for transfer and 7 not indicated by
23  Dr. Hughes to be okay for transfer?
24    MR. HAMAD:  Objection.
25    That was exactly my point.

101

1        MR. STEIN:   You have made -- you got an
2   objection, just state it.  Object and let's move on.
3        MR. HAMAD:   Mischaracterizing his prior
testimony.
     MR. STEIN:   All right.  Fine.
6     A.  Well, I think the report indicates what they have
7   from the test and on the column, the last column on the
8   right is the one, the recommendation, call it here, they
9   put.  I think the one no amplification they didn't have
10  the results and they have to 8 and 10, they have the
11  results and recommend it.
12       That's what I can see from the report.
13    Q.  So, in fact, 7 has -- if they don't have
14  amplification of the CF10 allele, then there is a
15  greater risk that the embryo being transferred would be
16  at risk of having an affected baby?
17       MR. HAMAD:   Objection to form.
18    Q.  Isn't that so?
19       MR. LEUCHTMAN:  Argumentative.
20       MR. HAMAD:  It was already asked and he
21  answered it.
22       He can answer it again.
23    A.  Well, there is one -- well, to whole PGD is
24  trying to reduce the risk.
25    Q.  Right.

102

1     A.  When you have one allele, CF11, which is G542X
2   mutation in the test that indicates it is a normal one.
3   At least we get some information there and that
4   information will reduce the risk, so, I think, in the
5   PGD whenever you have, you got the results is reduce the
6   risk, so the risk for No. 7 compared to without doing it
7   is reduced.
8     Q.  Okay.  Reduced from 25 percent to what?
9     A.  To -- well, the one that it doesn't have
10  amplification, then it's 50.  So 25 percent, because the
11  one that you already have -- well, that means if there
12  is no ADO, then it's normal, right for that particular
13  mutation on that side is normal.  Well, of course, you
14  have to think about the ADO occurs.  It could happen
15  with whatever percentage we are discussing now whether
16  its 70 percent or what we quote five to ten percent, so
17  that's the risk.
18    Q.  You quote five to ten percent?
19    A.  Of each mutation of one single mutation as ADO.
20    Q.  Right.  And then the risk of misdiagnosis would
be five to ten percent in your view when you don't have
the amplification?
23    A.  Well, the risk of ADO for that mutation and then
24  you have 50 percent that are unknown, those both events
25  occurs, so you have 50 percent times the five to ten

103

1   percent.
2        MR. HAMAD:  What's that number?
3     Q.  Which comes out to what?
4     A.  Which comes out -- it should be 2.5 to five
5   percent.
6        MR. HAMAD:   That's for No. 7 we are talking
7   about?
8        MR. LEUCHTMAN:   Yes.
9     Q.  50 percent to 2.5 to five percent?
10    A.  For ADO for X on 11 and G542.  X is five to ten
11  percent of ADO, because you already pick it up a normal
12  allele, and you didn't see the T, which is five to ten
13  percent.  Exon ten, or delta F508, you didn't have
14  information, so which means you have 50/50, right, so
15  two events can happen, which the probability, then it's
16  50 times five or ten or five to ten.
17    Q.  50 times five to ten comes out to what?
18    A.  Percent.  Of a percent.  Five to ten is allele
19  drop out.
20       Now, on exon ten you don't have, you don't need
21  to know allele drop out anymore, because you don't have
22  it.  If there is information there it is normal or it is
23  affected, then you still have -- you have to calculate
24  the ADO of that particular allele.
25    Q.  It could be affected.  It could be 100 percent?

104

1        MR. HAMAD:  No.
2     A.  That's why 50/50.  It's a 50/50, because you
3   don't know the information.  You don't have the
4   information.
5     Q.  All right.
6     A.  It's a 50/50.
7     Q.  And so 50/50 on one side and five to ten percent
8   on the other side?
9     A.  On the other side.
10    Q.  So it's greater -- if you have one side as 50/50,
11  it's got to be greater than five to ten as the entire
12  embryo, isn't it?
13       MR. HAMAD:   Objection to form.
14       That's totally taking -- discounting the
15  science.  You have to have both together in order to fit
16  the baby, you have to multiply it.  That's what he has
17  been doing.
18    Q.  When you multiply 50/50 on one side and five to-
19  ten on the other, don't you have a greater number than
20  five to ten for the combined risk of both of them
21  together?
22       MR. HAMAD:   These are percentage points that
23  you are talking about?
24       MR. STEIN:   Yes.
25       MR. HAMAD:  50 percent times five to ten

105

1  percent what do you get?
2         We can pull out a calculator.
3         MR. LEUCHTMAN:  .5 percent is .05.
       MR. HAMAD:  Okay.
   Q.  Okay.
6         MR. LEUCHTMAN:  I get .05.  That's just me.
7         MR. HAMAD:  Doctor, so we can be clear,
8  counsel is asking you the question:
9         For embryo No. 7, 50 percent in the one
10  column times 25 -- times five to ten percent in the
11  second column, gives you what percentage of allele drop
12  out for embryo No. 7?
13     A.  What percentage could be affected?
14     Allele drop out we already said, because for exon
15  ten you don't have the information, so you don't
16  calculate allele drop out.
17     Q.  All right.
18     A.  For X on 11 you have normal allele and there is a
19  five to ten percent of risk of allele drop out, because
20  it could be -- you may miss in five to ten percent of a
21  chance, miss the mutant allele.
22     Q.  The risk of misdiagnosis, you say, is the
23  combination of the two, which is two and a half percent?
24     A.  Two-and-a-half, or two to five.
25     Q.  Okay.  Now, in your report -- by the way, from

106

1  your awareness of Mark Hughes' history with PGD, did he
2  invent PGD?
3     A.  Well, I wouldn't say "invent," but he is a part
4  of the pioneer, the first paper.  He is a coauthor of
5  the first paper in there, so I think he is the -- is one
6  of the pioneers.
7     Q.  Do you have any information as to why Mark Hughes
8  left the National Institute of Health?
9     A.  I don't have the detail.  No, I don't know.
10     Q.  Why he left Bayler University Medical Center?
11     A.  That I don't know.
12     Q.  Do you have -- have you heard anything about why
13  he left Georgetown?
14     A.  No, I don't know.
15     Q.  Have you heard anything about why he left Wayne
16  State University Medical Center?
17     A.  No, I don't know.
18     Q.  In your report when you referred to the
19  literature regarding polar body --
20     A.  Yes.
21     Q.  -- the literature that you cite does not relate
   to the screening of human preimplantation embryos for
23  chromosome abnormalities?
24     A.  I am sorry.
25         Which page?

107

1         MR. LEUCHTMAN:  Top of Page 3.
2     Q.  Yes, you write, "As of today polar body biopsy
3  for PGD is yet to be a mainstream approach.  See a most
4  recent debate article by Geraedts in Human
5  Reproduction."
6         Do you recall citing that?
7     A.  Yes.
8     Q.  That article doesn't refer to compound
9  heterozygous or single cell biopsy, does it?
10     A.  That's -- yes, I agree with you.  I think this is
11  more of a general, yes.
12     Q.  It refers to chromosome abnormalities, doesn't
13  it, in that particular article?
14     A.  Well, mainly refers to PGS or chromosome
15  analysis, yes, but also -- well --
16     Q.  Pardon me?
17     A.  That's mainly --
18     Q.  I am sorry.
19         It doesn't specifically refer to the situation we
20  have here, does it?
21     A.  No, it's not specific.  It's a general.
22     Q.  Okay.  And you say in your report, and I quote --
23  the last paragraph, next to the last paragraph on Page
24  3, "In a published data collection ESHRE PGD consortium
25  data collection, VII," and you cite that, but you go on

108

1  to say, and I quote, "based on the" -- I am going to
2  withdraw that and ask you a different question.
3         "Based on the literature most misdiagnosis is due
4  to intercourse or unprotected sex."
5         You make that statement.  Is that correct?
6     A.  Yes, in my report.
7     Q.  Do you stand by that statement?
8     A.  Well, this is based on the quote I also put in
9  here, "Eighteen misdiagnosis have been reported, nine
10  after PGD for PCR and nine after PGD or PGS using FISH.
11  In all cases of misdiagnosis, unprotected sex during the
12  PGD cycle could be responsible as any embryos generated
13  in vivo would not be tested."
14     Q.  All right.
15         Can you tell me whether or not there is any basis
16  for concluding that the baby born to the Grossbaums was
17  as a result of unprotected sex or intercourse during the
18  critical period of IVF?
19     A.  I think this is one of a possible reason.
20  According to the literature I think one of the possible.
21  I think it can be ADO.  Could be contamination, or a
22  host of different issues.  I think it's not easy to
23  pinpoint, but according to the literature, I think it
24  looks like at least you cannot exclude that possibility.
25     Q.  Doctor, isn't it true that the literature does

109

1  not say that most misdiagnosis is due to intercourse or
2  unprotected sex. Isn't that a misstatement of the
3  literature?
4      **A.  Well, the literature says it could be responsible**
5  **in all cases of misdiagnosis.**
6      Q.  Does it say specifically that most misdiagnosis
7  is due to intercourse or unprotected sex? It doesn't
8  say that, does it?
9      **A.  It's different description.**
10     **Q.  What?**
11     **A.  It's a different description. I think it's --**
12  **that's -- you know -- again I quoted it here basically.**
13     Q.  And what you said there is an over statement, is
14  it not, as to what the literature says?
15     **A.  Is it the best accurate, I don't know, but again**
16  **I read in all cases misdiagnosis unprotected sex could**
17  **be responsible. That's what I understand from the**
18  **literature.**
19     Q.  And in order for it to be responsible, the
20  patient would have to disregard the instructions of
21  the -- the normal instructions given to a patient
22  undergoing PGD IVF? Isn't that so?
23     **A.  I am sorry.**
24         **Could you repeat.**
25     Q.  In order for a couple to have -- to have a baby

110

1  as a result of unprotected sex, they would have to
2  disregard the instructions given to them in the ordinary
3  course of getting IVF and PGD, would they not?
4      **A.  That I don't know, what the patient take.**
5      Q.  Isn't it standard and normal for a patient or a
6  couple undergoing PGD, to be told not to have
7  unprotected sex during the period in which they are
8  having PGD and IVF?
9      **A.  Yes.**
10     Q.  Okay.  So if it's normal and standard for them to
11  be told that for them to have unprotected sex, they
12  would have to be disregarding their instructions,
13  wouldn't they?
14     **A.  That I don't know for the patient. I cannot**
15  **answer for the patient.**
16     Q.  And you don't have any basis for believing that
17  they did not respect the advice given to them by the
18  fertility clinic, do you?
19     **A.  I don't have.**
20         MR. HAMAD:  Objection to form.
21     Q.  Now, in order to do linkage analysis on a patient
22  or a couple, you would have to get a source for the DNA
23  from either siblings or family members.  Isn't that so?
24     **A.  Yes.**
25     Q.  Did you see any evidence in reviewing Dr. Hughes'

111

1  chart at Genesis Genetics that there was a request made
2  of the Grossbaums to provide a DNA sample by way of
3  blood or otherwise from any family members?
4      **A.  I see there is a note with a question mark. Dr.**
5  **Hughes' note has a question mark of a parent. I think I**
6  **noticed that one, blood possible from parents seems not**
7  **-- that's only I notice. I don't see anything else**
8  **that's read into this question, but this one.**
9      Q.  So you didn't see anything or indicate that they
10  were asking for to give blood or that he didn't have it
11  or that he wanted it and the Grossbaums were
12  unresponsive.  Isn't that so?
13     **A.  I don't see the details but it looks like a**
14  **question mark "blood possible from parents."**
15         **That indicate to me he probably requested it, if**
16  **that is possible from parents seems not. He definitely**
17  **considered that.**
18     Q.  Okay.  So that indicates to you that he made the
19  request?
20     **A.  Yes, to me.**
21     Q.  Do you have an opinion as to the cause of the
22  misdiagnosis in this case?
23     **A.  I think it's a complex and all the possibilities**
24  **ADO or unprotected sex or others that may cause**
25  **misdiagnosis.**

112

1      Q.  Are you able to give an opinion based on
2  reasonable probability as to whether one or the other
3  was more significant in causing this?
4      **A.  No, I cannot say one is more likely to the other.**
5      Q.  Okay.  Do you see any evidence of contamination
6  here?
7      **A.  No, but I have to add, even without -- well, from**
8  **lab record there is no indication of it, but it doesn't**
9  **really mean that it didn't happen, because contamination**
10  **control is a difficult one even we include the blanks,**
11  **but it does not exclude all the possibility of**
12  **contamination.**
13     Q.  Now, Doctor, you have Dr. Hughes' report, which
14  we have marked P-2 for identification in front of you.
15         And we have your report in front of us.  Is that
16  correct?
17     **A.  Right.**
18     Q.  Okay.  Now, I would like you to look at the first
19  paragraph under the listing, which starts "As I
20  understand."
21     **A.  Uh-huh.**
22     Q.  Do you see the paragraph, four lines, is that
23  right, four lines down, the first paragraph?
24     **A.  Yes.**
25     Q.  Okay.  Your report -- this is Dr. Hughes' report.

113

1  Do you see four lines?
2      A. Four lines?
3      Q. Underneath the numbered paragraph, do you see the paragraph with four lines?
4      A. Uh-huh.
6      Q. Okay. And starting with "both Chaya Grossbaum," do you see where it says "both Chaya Grossbaum"?
8      A. Uh-huh.
9      Q. And look at your report, those four lines.
10          Do you see they are exactly the same?
11          MR. LEUCHTMAN: We have been through this, and he said, and this is an objection, that he authored the report without any reference to anything Hughes has written.
15          MR. STEIN: I hear what you said.
16          Now can I ask him my questions.
17          MR. LEUCHTMAN: Obviously, I can't stop you from asking the questions.
19          MR. STEIN: Thank you.
20      Q. Do you see them, Doctor?
21      A. Yes.
22      Q. They are exactly the same, are they not?
23      A. Accept the one -- as I understand.
24      Q. Beginning with the words "both Chaya Grossbaum" and the rest of those four lines are exactly the same in

114

1  both reports, are they not?
2          MR. LEUCHTMAN: We will stipulate to that and we will stipulate the similarities are whatever they are.
5      Q. Do you see that?
6      A. Yes.
7      Q. Also there doesn't seem to be any of the idiosyncrasies in the language that were present in the earlier paragraph that you and I discussed. Isn't that true?
11      A. Sorry. Is that the list?
12      Q. Pardon me?
13      A. You refer to the list?
14          MR. LEUCHTMAN: You mean the entire report?
15          MR. STEIN: Can you not interfere with my questions, please.
17          MR. LEUCHTMAN: All right.
18          Objection.
19          The question is unclear, vague and ambiguous.
      Q. Do you understand my question?
23          MR. LEUCHTMAN: I am helping you to try to straighten it out.
25      A. Can you repeat it, please?

115

1      Q. Yes.
2          When we went over the earlier paragraph of your report that appeared at the bottom of Page 1, you and I went over it line by-line. Right?
5      A. Yes.
6      Q. And we found certain idiosyncrasies indicative of the fact that that was -- English being your second language, didn't have construction that you would leave without it being edited. You agree you indicated that?
10      A. Yes.
11      Q. But when I look at the paragraph that we are discussing now, which is the middle paragraph, if you will, on Page 1, where the four lines are identical, we don't see that -- any of that type of what I would call idiosyncrasies, do you see that, there is none of that in that paragraph?
17      A. Well, I don't recognize it, anything, yes.
18      Q. And you still say that that paragraph was written by you and not by anyone else, is that right, in your report?
21      A. Yes.
22      Q. Okay. Now turn to Page 2.
23          Doctor, in the Genesis Genetics report, which is the second full paragraph or the third paragraph in the middle, Dr. Hughes' report introduces it as "Dr. Kangpu

116

1  Xu has pointed out in his report," and then we see the words "an open question."
3          Do you see the words "an open question" in his report?
5      A. "An open," yes, I see.
6      Q. Okay. The rest of that paragraph is word for word, punctuation for punctuation, exactly the same as it appeared in your report, is it not?
9      A. I have to double check on it.
10          None of them appears to be fully effective.
11      Q. That's correct. That's not in Hughes' report?
12      A. So, I think, it's similar, but it's not.
13      Q. Everything up until the last line is exactly the same. Correct?
15      A. I see also there is a "since," I think it's not in my report.
17          MR. LEUCHTMAN: You know, again these reports are going to speak for themselves.
19          Since Hughes' report was after Kangpu's, as he has said, he is the person to be asking about this.
21          MR. HAMAD: I guess we will find out in 24 hours.
23          MR. STEIN: Yes.
24          MR. LEUCHTMAN: Okay. Perry Mason -- you know -- his report was first. I happen to know that

117

1  firsthand, but if you think that by some artful
2  questioning you can get him to change what is the truth,
3  we will sit here for another half an hour and you can
   point out all the commas and semicolons and all the rest
   of it.
6        MR. STEIN:   When do we take your
7  deposition, Mr. Leuchtman?
8        MR. LEUCHTMAN:   Whenever you want, I
9  suppose, if you can figure out a reason to take it.
10       MR. HAMAD:   You guys realize he is taking
11 all this down on the record.
12    Q.  You also notice that we can turn to Page 3 of
13 your report, we can see on Page 3 you begin a paragraph,
14 "Because of the ever-present risk of ADO."  Is that
15 right?
16    A.  Yes.  I see it.
17    Q.  That also appears -- the first two lines appear
18 to be exactly the same in Hughes' report.  Isn't that
19 so?
20    A.  That I don't know.  I have to check his.
21       MR. LEUCHTMAN:   We will take your word for
22 it, Mr. Stein.
23       What's your question?
24    A.  Where is his -- the --
25    Q.  Well, try three paragraphs from the end of his

118

1  report on Page 3, do you see, "As alluded to above,
2  because of the ever-present risk of ADO and other risk
3  factors inherent in PGD, that CVS and amniocentesis are
4  universally relied upon as a safety net in PGD," those
5  are exactly the same words that appear in your report.
6  Isn't that so, they're the same?
7    A.  Yes, there is one sentence very similar.
8    Q.  Okay.  And then if we go to Page 3 in your report
9  you have a paragraph that begins, "Because of so many
10 variables," do you see that?
11   A.  Yes, I see.
12   Q.  And that's -- and those words appear in the rest
13 of the paragraph exactly the same as is in Dr. Hughes'
14 report.  Isn't that so?
15   A.  Yes.  It looks like similar.  I didn't go
16 word-by-word.
17   Q.  And then finally in the last paragraph, starting
18 at, we see the words at the end of the first line, you
19 say, "In summary I see a tragic case happened."  And
20 then we see the words and I quote, "not because of any
   negligence but unfortunately because of the complexity
   and the limitation of PGD technology and likely other
23 confounding factors.
24       Do you see that, exactly the same words in Dr.
25 Hughes' report.  Do you see that?

119

1    A.  I see the similarities, yes.
2    Q.  And also did you notice that throughout those
3  paragraphs the idiosyncrasies that were present in the
4  first paragraph that you and I went over, do not appear
5  present in any of the paragraphs that are similar
6  between your report and Dr. Hughes' report.  Do you see
7  that?
8    A.  I haven't checked that, definitely that
9  paragraph.
10   Q.  And you still maintain, Dr. Xu, that you did not
11 have any input from Dr. Hughes in the construction of
12 your report.  Is that right?
13   A.  Yes.
14       MR. STEIN:   Give me a second and I will be
15 finished.  I am almost done, guys.
16       MR. HAMAD:   I am just going to have one
17 question.
18       MR. STEIN:   Okay.  Do you want to ask
19 yours, and I will go over to see if I have anything
20 else.
21       MR. LEUCHTMAN:   Let's just finish it the way
22 we are supposed to.
23       MR. STEIN:   That isn't the way it worked
24 when we took Dr. Cutting's dep, was it, Mr. Leuchtman?
25 Was it?

120

1        MR. HAMAD:  I don't remember that.
2        MR. LEUCHTMAN:  I don't remember, Mr. Stein,
3  in all honesty.  I questioned -- no, I don't think I
4  passed the witness.
5        MR. HAMAD:  Actually, you know what --
6        MR. LEUCHTMAN:  I had questions after he was
7  done.  It's not the same thing.
8        MR. STEIN:   Yeah.  Right.
9        I will take another minute if you guys want
10 to wait.
11       (Whereupon, a discussion takes place off the
12 record.)
13
14 CROSS-EXAMINATION BY MR. HAMAD:
15   Q.  Doctor, if you can, can you tell me if there is a
16 substantial difference in the risk associated with
17 implanting embryo No. 7 versus embryo No. 8?
18   A.  I don't see the substantial differences in the
19 risk.
20   Q.  Would it also be fair to say that embryo No. 7 is
21 at least as good as embryo No. 8?
22   A.  What do you mean "good"?
23   Q.  Fair enough.
24       Would it also be fair to say that, embryo No. 7
25 is at least as risky as embryo No. 8?

121

1    A. Similar.

2         MR. HAMAD:   Thank you.

3         No further questions.

REDIRECT-EXAMINATION BY MR. STEIN:

    Q. You don't see any greater risk in No. 7 than 8,

6 Doctor?

7    A. Similar, we calculated one side is unknown.

8    The other side is, the lab test to pick up a

9 normal allele, then the only risk is ADO.

10    Q. Okay.

11    A. For that particular limitation, ADO for that

12 particular mutation, of course, we did not have, they

13 did not have the information from delta F508 or

14 Exon ten.

15    Q. And that doesn't mean that it's a greater risk

16 than 8 or 10 with No. 7?

17    A. Well, that one does not have the information, of

18 course, it has a risk.

19    Q. Does it have a greater risk between 7 -- does 7

20 have a greater risk of misdiagnosis than 8 or 10?

21         MR. HAMAD:   Objection to form.

22         He just answered and told you that it

23 doesn't, but he can say it many more times for you.

24    A. 10 or 8 already picked up from exon 11.  It's a

25 carrier, so itself compared to exon 11, 10 and 8 have a

122

1 higher risk, because it already has limitation from exon

2 11.  7 does not have or at least from the test did not

3 detect the mutant allele.

4         MR. STEIN:   Okay.  Very good.

5         Thank you.

6         MR. LEUCHTMAN: Does that mean you are done?

7         MR. STEIN:   I am done.

8         MR. HAMAD:   No further questions.

9         MR. LEUCHTMAN: I don't have any questions.

10         MR. STEIN:   I didn't think you did.

11

12

13

14

15

16

17

18

19

20

21

23

24

25

123

1              C E R T I F I C A T E

2

3    I, PHILIP A. FISHMAN, a Certified Shorthand Reporter

4 and Notary Public of the State of New Jersey do hereby

5 certify that prior to the commencement of the

6 examination DR. KANGPU XU was sworn by me to testify the

7 truth, the whole truth and nothing but the truth.

8    I DO FURTHER CERTIFY that the foregoing is a true and

9 accurate transcript of the testimony as taken

10 stenographically by and before me at the time, place and

11 on the date hereinbefore set forth, to the best of my

12 ability.

13    I DO FURTHER CERTIFY that I am neither a relative nor

14 employee nor attorney nor counsel of any of the parties

15 to the action; and that I am neither a relative nor

16 employee of such attorney or counsel; and that I am not

17 financially interested in the action.

18

19

20         _____

21         PHILIP A. FISHMAN, CSR

22

23 Dated_____

24

25

1                    C E R T I F I C A T E

2

3        I, PHILIP A. FISHMAN, a Certified Shorthand Reporter

4    and Notary Public of the State of New Jersey do hereby

5    certify that prior to the commencement of the

6    examination DR. KANGPU XU was sworn by me to testify the

7    truth, the whole truth and nothing but the truth.

8        I DO FURTHER CERTIFY that the foregoing is a true and

9    accurate transcript of the testimony as taken

10   stenographically by and before me at the time, place and

11   on the date hereinbefore set forth, to the best of my

12   ability.

13       I DO FURTHER CERTIFY that I am neither a relative nor

14   employee nor attorney nor counsel of any of the parties

15   to the action; and that I am neither a relative nor

16   employee of such attorney or counsel; and that I am not

17   financially interested in the action.

18

19

20   _____

21   PHILIP A. FISHMAN, CSR

22

23   Dated_____

24

25

# EXHIBIT H

Mark Hughes
5/14/2010

1   IN THE UNITED STATES DISTRICT COURT

2   IN THE DISTRICT OF NEW JERSEY

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - /

4   CHAYA GROSSBAUM and MENCHEN

5   GROSSBAUM, Her Spouse, Individually, and

6   as Guardian ad litem of the Infant, ROSIE

7   GROSSBAUM,

8            Plaintiffs,

9   -vs-                        Index No. 07-CV-359

10  GENESIS GENETICS INSTITUTE, LLC,

11  OF THE STATE OF MICHIGAN, MARK R.

12  HUGHES, M.D., NEW YORK UNIVERSITY

13  SCHOOL OF MEDICINE, and NEW YORK

14  UNIVERSITY HOSPITALS CENTER, both

15  Corporations of the State of New York,

16  ABC CORPORATIONS:  1-10 and John Doe,

17     Defendants.

18  _____/

19

20  PAGE 1 - 82

21

22     The Deposition of DR. MARK HUGHES,

23     Taken at 1380 Trowbridge Place,

24     Detroit, Michigan,

25     Commencing at 12:55 p.m.,

Mark Hughes
5/14/2010

2 (Pages 2 to 5)

Page 2

1   Friday, May 14, 2010
2   Before Laura J. Steenbergh, CSR-3707, RPR, CRR, RMR
3
4   APPEARANCES:
5
6   NUSBAUM, STEIN, GOLDSTEIN
7   BRONSTEIN & KRON, P.A.
8       Attorneys for Plaintiffs
9       20 Commerce Blvd.
10      Succasunna, NJ 070876
11      BY: LEWIS STEIN, ESQ.
12      BY: LYNN HARRISON, PARALEGAL
13
14  TROWBRIDGE LAW FIRM
15      Attorneys for Defendants
16      Genesis Genetics Institute, LLC
17      And Mark R. Hughes, M.D.
18      1380 East Jefferson Avenue
19      Detroit, Michigan 48207
20      BY: STEPHEN LEUCHTMAN, ESQ.
21      BY: ALI ZAIDI, ESQ.
22
23
24
25

Page 3

1   APPEARANCES (Continued):
2
3   MARSHALL, DENNEHEY, WARNER
4   COLEMAN & GOGGIN
5       Attorneys for Defendants
6       New York University School of
7       Medicine and New York University
8       Hospitals Center
9       425 Eagle Rock Avenue, Suite 302
10      Roseland, New Jersey 07068
11      BY: JAY A. HAMAD, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                   INDEX TO EXAMINATIONS
2
3   Witness                         Page
4   DR. MARK HUGHES
5
6   EXAMINATION BY MR. STEIN:        6
7   EXAMINATION BY MR. HAMAD:        79
8
9                   INDEX TO EXHIBITS
10
11  Exhibit                         Page
12      (Exhibits retained)
13  DEPOSITION EXHIBITS P1 AND P2    5
14  DEPOSITION EXHIBITS P3 AND P4    35
15  DEPOSITION EXHIBITS P5 THROUGH P9  57
16
17
18
19
20
21
22
23
24
25

Page 5

1   Detroit, Michigan
2   Friday, May 14, 2010
3   About 12:55 p.m.
4       DEPOSITION EXHIBITS P1 AND P2
5       WERE MARKED BY THE REPORTER
6       FOR IDENTIFICATION
7           MR. STEIN:  Dr. Hughes, we're here today to take
8   your deposition for the second time, since I have been in
9   receipt of a letter dated March 2nd, 2010, addressed to
10  Stephen F. Leuchtman, consisting of three pages, which
11  we've marked for purposes of this deposition P1, and it
12  would be Hughes 2, since we already had your deposition
13  one time, and also a two-page bibliography, which I've
14  marked P2 or had marked P2.
15          MR. LEUCHTMAN:  It's not a bibliography.
16          MR. STEIN:  That's my characterization.  No, a
17  biography.  Did I say bibliography?  I misspoke.
18          And which we've marked P2.  And as a result of
19  having received this letter and the advice that you plan
20  to offer yourself as an expert witness in the event this
21  matter goes to trial, we're here to take your deposition
22  today on the basis of this recent submission.
23          DR. MARK HUGHES,
24  having first been duly sworn, was examined and testified on
25  his oath as follows:

**Mark Hughes**
5/14/2010

3  (Pages 6 to 9)

Page 6

1  EXAMINATION BY MR. STEIN:
2  Q.  Now, let me show you the document, P1, and ask if you
3      recognize that as the letter that you authored.
4  A.  Well, I didn't write it, but I saw it.
5  Q.  Okay.  Is that your signature, Doctor?
6  A.  Yep.  Well, I didn't sign it with my hand, that's an
7      electronic one, but yes.
8  Q.  Okay.  Well, if you didn't write it, could you tell me
9      who wrote it?
10      THE WITNESS:  Because you did it.  Is this the
11  letter when I was traveling?
12      MR. LEUCHTMAN:  Yes.
13      THE WITNESS:  Okay.  So, yeah.  So I'm trying to
14  remember.  I was out of town someplace, I can look up
15  where, and Mr. Leuchtman asked me to put together a
16  summary report for him, which I couldn't do, because I
17  wasn't in -- I can't remember where I was, but I was out
18  of town -- and he needed it like immediately, and I said
19  why don't you put it together and I'll edit it.
20      So I was kind of impressed.  You wrote this
21  stuff, but I didn't.  But I edited this electronically,
22  and then I added my signature to it, and then I sent it
23  back to you.  Yeah.
24      MR. STEIN:  Okay.
25      THE WITNESS:  So but -- it's not exactly the way

Page 7

1  I would have written it, but you had some deadline or
2  something you needed this by, so --
3  BY MR. STEIN:
4  Q.  Okay.  You are, in the phrase you, are turning to Mr.
5      Leuchtman, who sits to your immediate left, and the you
6      who you have referred to in your testimony is Mr.
7      Leuchtman, is that correct?
8  A.  That's --
9      THE WITNESS:  You wrote this, you put this
10  together.  Because you sent it to me as an e-mail, Mr.
11  Leuchtman, right?
12      MR. LEUCHTMAN:  Yes.
13      THE WITNESS:  Okay.  Because I didn't write this.
14  I didn't actually write this.
15      MR. HAMAD:  Yes, to which -- there's two
16  questions there.  Yes, you wrote it, or yes, you sent it
17  as an e-mail?
18      BY MR. STEIN:
19  Q.  Well, the answer may have two parts to it but my question
20  to you is simply --
21      MR. LEUCHTMAN:  I sent it to him.
22      MR. HAMAD:  Exactly.
23      MR. STEIN:  Listen.  If you would be kind enough
24  to listen to my question.
25

Page 8

1  BY MR. STEIN:
2  Q.  You have given testimony under oath which this young lady
3      to my left and your right is recording, as a shorthand
4      reporter, verbatim.
5  A.  Yes.
6  Q.  And in connection with that recording you have used the
7      phrase you in your answer, and turned to your left and
8      looked at Mr. Leuchtman, is that correct?
9  A.  That's correct.
10      MR. LEUCHTMAN:  Well, some would call you a word
11  and not a phrase, but whatever.
12      THE WITNESS:  That is correct.
13      BY MR. STEIN:
14  Q.  And so my simple question was, when in the transcript we
15      read the word you wrote this, in that phrase, and you
16      look at Mr. Leuchtman, you are, in effect, referring to
17      Mr. Leuchtman as the person who wrote this, is that
18      correct?
19  A.  He wrote this document, which I edited electronically,
20      signed, and sent back to him, yes.
21  Q.  And how did you obtain -- you obtained electronically
22      this three-page letter, as it now appears, before
23      editing, and then you edited it on your computer --
24  A.  Um-hum (affirmatively).
25  Q.  -- and electronically sent it back to him, is that right?

Page 9

1  A.  That's correct.
2  Q.  And then is it your understanding that that's the last
3      you saw of the letter before it was transmitted to me?
4  A.  That was the last I saw the letter until now.
5  Q.  Okay.  So I take it you haven't read this letter in
6      preparation for today's testimony, is that correct?
7  A.  No, no.
8  Q.  That's not correct, or is correct?
9  A.  I haven't read this letter in preparation for this
10  testimony.
11  Q.  Okay.  Now, can you tell me where Genesis Genetics is
12      located vis-à-vis the location of this office that we're
13      now in?
14  A.  It's about 10 miles, 12 miles east.
15  Q.  Okay.  And it appears to have been provided to me in the
16      form we've marked P1/Hughes 2 on the stationery of
17      Genesis Genetics.
18  A.  Um-hum (affirmatively).  Old stationery, by the way.
19  Q.  Pardon me?
20  A.  It's older stationery, but yes.
21  Q.  Do you have any understanding as to how Mr. Leuchtman
22      obtained the Genesis Genetics stationery?
23  A.  No.  I put it on the stationery.  So he sent it to me as
24      a document.  I can find it in my e-mail box.  He sent it
25      to me as a document, I edited it, put it on the

Mark Hughes
5/14/2010

4 (Pages 10 to 13)

Page 10

1   stationery electronically, and sent it back to him.
2   Because we don't have stationery printed. We use the
3   electronic version in the computer.
4   Q. So that letterhead is a product of your electronic
5   capacities in your computer, is that it?
6   A. Um-hum (affirmatively).
7   Q. Now, this computer, is that a laptop that you take with
8   you?
9   A. Um-hum (affirmatively).
10  Q. Okay. Now, I take it that in some way you got this
11  request to provide this report from Mr. Leuchtman at the
12  last minute or some way where you had to effectuate this?
13  A. I don't remember the details, but -- I don't remember the
14  details. What I remember is he was -- he said I've got
15  to have a letter from you saying blankity-blank, whatever
16  it was. And I said, well, how detailed does it have to
17  be, and he said fairly detailed. And I said, well, I
18  don't have any of those records with me, when do you need
19  it by, and I wasn't going to be back. So he composed the
20  letter.
21  Q. Okay. Can I assume --
22      THE WITNESS: I assume you composed the letter,
23  or an assistant of yours, or somebody composed the
24  letter. I actually was kind of impressed with it,
25  because I agreed with most of it, but I took some things

Page 11

1   out. I can't remember what, but I could go compare.
2   BY MR. STEIN:
3   Q. You can go compare because you have the data in your
4   computer as to the form that you received the letter from
5   Mr. Leuchtman?
6   A. Right. I should have that, yeah.
7   Q. And that's a --
8       MR. LEUCHTMAN: I think we've gone about far
9   enough into attorney-client privilege.
10      MR. STEIN: Well --
11      MR. LEUCHTMAN: I'm not sure where you're going
12  with this, Mr. Stein, but I'm going to instruct Dr.
13  Hughes not to answer any further questions about the give
14  and take between he and I in the generation of this
15  report. You have most of the answers you're seeking
16  anyway.
17      MR. STEIN: Well, I have his comment with respect
18  to that objection. Are you instructing him not to answer
19  any further questions on this subject invoking the
20  attorney-client privilege, Mr. Leuchtman? Let me get
21  that clear.
22      MR. HAMAD: What subject are you --
23      MR. LEUCHTMAN: Well, it's also work product.
24  Yeah. You mean how the report came to be?
25      MR. STEIN: That's all we have discussed in this

Page 12

1   deposition to this moment, so how anybody could have any
2   further need for clarification as to what I'm talking
3   about and the subject matter of our discussion in which
4   you're invoking the privilege is beyond me. It's clear
5   you have just interrupted the questioning by stating this
6   has gone as far as you think it appropriate, considering
7   the effect or implications of the attorney-client
8   privilege.
9       MR. LEUCHTMAN: Well, and work product. The
10  issue is does it reflect his opinions. You haven't asked
11  that, and I hope at some point you do, i.e., in the next
12  question, and then maybe we can move on to the substance
13  of your inquiry in this deposition.
14      MR. STEIN: Well, what you would like and what I
15  intend to do have no relationship in reality, Mr.
16  Leuchtman, since I am here to decide what I think is
17  appropriate questioning of a deposition on a report I
18  received that purported to be a report of an expert.
19  Now, I intend to continue asking questions on how that
20  report was created. If you are going to instruct your
21  client not to answer any further questions, I will
22  address that issue. If you're not, I'm going to continue
23  to pursue the details of the production of that report.
24  Now, you'll have to advise me as to what the nature of
25  your further action will be regarding the objection.

Page 13

1       MR. LEUCHTMAN: Well, I'm not sure at this point.
2   It depends on the next question you ask, I guess.
3       MR. STEIN: Okay.
4       MR. LEUCHTMAN: However, he has testified that he
5   got that from me, that he edited it, and then he sent it
6   out, and that it is his report.
7       MR. STEIN: I know what the testimony is, I've
8   listened to it for the last 10 minutes. Now --
9       MR. LEUCHTMAN: Yes, and often repeatedly. I
10  mean, let's --
11      MR. STEIN: Now, are we going to continue with my
12  questioning, or are you going to interpose an instruction
13  to your client raising privilege on either of the two
14  grounds that you've stated that he not answer any further
15  questions on that issue?
16      MR. LEUCHTMAN: Ask your next question, and we'll
17  just see where we go from there. But I hope it's a new
18  one, since basically you've asked three questions in
19  slightly various forms over and over again.
20  BY MR. STEIN:
21  Q. Dr. Hughes.
22  A. Yeah.
23  Q. Do I understand that you still possess the computer on
24  which you communicated with Mr. Leuchtman regarding the
25  creation of the report which I've marked P1/Hughes 2?

**Mark Hughes**
5/14/2010

5 (Pages 14 to 17)

Page 14

1    MR. LEUCHTMAN: I'm going to object to the form
2    of the question. He has no idea what you understand, but
3    subject to that objection, you can go ahead and answer
4    the question.
5         Unless you want to rephrase it so that it makes
6    sense.
7    THE WITNESS: I am fairly certain -- until you
8    look you never know for sure -- but I'm fairly certain
9    that I would have the e-mail that he sent me with the
10   text here in it that I then sent back to him on
11   letterhead. I should still have that in the computer,
12   yes.
13   BY MR. STEIN:
14   Q. And that's a laptop computer?
15   A. Yes.
16   Q. What's the nature of the computer? Can you identify it
17   for me, the make and model of the computer?
18   A. It's a Dell. I forget. And the signatures, I have them
19   in a file and I just drag them over and put them on
20   documents when I'm traveling.
21   Q. Okay. Now, do you have a file on this case here with you
22   today?
23   A. No. Well, the only thing I have is this -- is the -- is
24   this. I have my notes from the laboratory.
25   Q. Okay. Do you have a file within your computer relative

Page 15

1    to this case?
2    A. I have a folder that contains some correspondence and
3    notes, yes, about the case.
4    Q. And that's where you would, I expect, find the e-mail
5    communication that you're now talking about?
6    A. No. It would still be in the e-mail in and out box, I
7    think. But I have to go look.
8    Q. Are you in a position to look now, here?
9    A. No, I don't have it here.
10   Q. Okay. Can I assume that the e-mail communication between
11   you and Mr. Leuchtman regarding the creation of this
12   report was on or about March 2nd or a few days before
13   that?
14   A. I frankly have no idea. I don't remember when this was.
15   I remember seeing this, I remember working on it, but I
16   frankly don't remember when. You could have told me it
17   was January and I'd have said okay. I mean, I don't
18   know.
19   Q. Okay. Well, it bears the date of March 2nd, does it not?
20   A. Yes, it does.
21   Q. Do you know where you were traveling on March 2nd?
22   A. Nope. But I could look it up.
23   Q. And what do you have to do to look it up?
24   A. Go onto my computer and look on my calendar.
25   Q. Okay. And that, again, is not here today, is that

Page 16

1    correct?
2    A. No.
3    Q. Okay. Now, at the time that you had this exchange with
4    Mr. Leuchtman regarding the content of this report, had
5    you been aware that Dr. Xu had prepared an expert report
6    in this case?
7    A. Dr. Xu?
8    MR. LEUCHTMAN: Kangpu.
9    THE WITNESS: Oh, Kangpu Xu. Okay. No. As a
10   matter of fact, I know nothing about what -- in fact, I
11   found out today that Kangpu gave his deposition. I
12   didn't even know that. I was in Europe all last week.
13   So I didn't know -- I haven't talked to him since -- the
14   last time I saw Kangpu was in Atlanta at the ASRM meeting
15   last October.
16   BY MR. STEIN:
17   Q. Okay. And at that time you talked to him?
18   A. Um-hum (affirmatively).
19   Q. And did you mention to him at that time the fact that you
20   were being sued for a misdiagnosis by one of your
21   patients?
22   A. No.
23   Q. Had you ever talked to him about this case?
24   A. Never.
25   Q. Was it your idea that -- is his proper name referred to

Page 17

1    as Xu is his last name, or is it a combined --
2    A. Well, no. His first name is Kangpu, and I've always
3    pronounced his last name Xu, but that might not be
4    correct. But that's what I've always said.
5    Q. We'll refer to him as Dr. Xu.
6    A. Okay. That's probably more correct.
7    Q. Which I think he acknowledged to be the preferred
8    pronunciation.
9    A. Okay. Don't tell him I didn't know how to --
10   Q. And was it you who suggested that Dr. Xu be consulted to
11   be an expert on your behalf in this case?
12   A. I gave my counsel a list of names to choose from, of
13   people who I thought might be good, and he was on that
14   list.
15   Q. And you allowed your counsel to choose?
16   MR. LEUCHTMAN: Well, objection. You don't have
17   to answer that. How is this -- it's strategy with an
18   expert, and it's attorney-client privilege and work
19   product. He's told you he gave me a list.
20   MR. STEIN: Mr. Leuchtman, I respectfully suggest
21   that you have, to the extent that you have been involved,
22   as now described, in the preparation and submission of
23   this report, have in all likelihood made yourself a fact
24   witness in this case, so you can be guided accordingly as
25   to how you want to conduct yourself, but that's my view

Mark Hughes
5/14/2010

6  (Pages 18 to 21)

Page 18

1    of the law and the legal rights that the people may have
2    here. But --
3          MR. HAMAD:  Do you want to take a couple minutes
4    just for a second?
5          (A recess was taken).
6          MR. STEIN:  Are you gentlemen ready to resume
7    this deposition?
8          MR. LEUCHTMAN:  Well, we are. However, subject
9    to my motion to strike all the questions about how this
10   report came into existence on a basis of attorney-client
11   privilege, and I'm going to instruct Dr. Hughes not to
12   answer any further questions about how the report came
13   into existence. He is here in his capacity as an expert,
14   however, he's still my client, and you are getting into
15   attorney-client privilege, and we will have no more of
16   it.
17         MR. STEIN:  Well, I intend to ask the questions
18   so that we have a record, and you can simply object and
19   say the words attorney-client privilege and we go from
20   there. Okay?
21         MR. LEUCHTMAN:  If that is your prerogative, yes,
22   sir.
23   BY MR. STEIN:
24   Q.  Okay. Dr. Hughes, you've indicated that you received an
25   e-mail draft of a report which you edited while you were

Page 19

1    out of the country on or about March 2nd, 2010, is that
2    correct?
3          MR. LEUCHTMAN:  Objection, attorney-client
4    privilege. Don't answer the question.
5    BY MR. STEIN:
6    Q.  Okay. And you edited the -- I think you said you edited
7    the e-mail that you received, is that correct?
8          MR. LEUCHTMAN:  Objection, attorney-client
9    privilege. Don't answer the question.
10         And by the way, we're not conceding that these
11   questions are accurate as stated or an accurate
12   reflection of Dr. Hughes' testimony, which will be struck
13   anyway.
14         MR. STEIN:  Okay.
15   BY MR. STEIN:
16   Q.  I understood you did say you were traveling. Now, I may
17   have assumed that the travel was out of the country, so
18   I'd like to know whether you can recall where you were
19   traveling at that time.
20         MR. LEUCHTMAN:  Objection, for the same reasons.
21   BY MR. STEIN:
22   Q.  Now, you indicated you edited the e-mail that you
23   received from Mr. Leuchtman that is the form of report
24   that ultimately I received. Can you describe for me
25   whether or not you rewrote any of the entire paragraphs

Page 20

1    in connection with the e-mail you received?
2          MR. LEUCHTMAN:  Same objection, same instruction.
3    BY MR. STEIN:
4    Q.  Can you tell me whether you recall any of the portions of
5    that report -- withdraw that question.
6          Attached to the report is a two-page document
7    which we've marked P2. Do you see it there?
8    A.  Yep.
9    Q.  Now, that has been offered, it's been marked P2/Hughes 2,
10   and it's been offered what appears to be in satisfaction
11   of a customary requirement that a CV be provided with
12   respect to any expert report that is submitted. Do you
13   recognize P2/Hughes 2?
14   A.  It's old, but -- I do not know where this exactly came
15   from.
16         MR. LEUCHTMAN:  Well, you weren't asked that,
17   just whether you recognize it.
18         THE WITNESS:  Well it's my picture, and it's --
19   you know.
20   BY MR. STEIN:
21   Q.  When you say it's old, can you tell me what you mean by
22   old?
23   A.  Oh, it's over five years old, I think. Maybe eight.
24   Q.  Are you the author of the content of the document which
25   we've marked P2/Hughes 2?

Page 21

1    A.  No. This was written by somebody who was going to
2    introduce me at some function. And so I recognize parts
3    of it, so it's just been -- it looks like it's been cut
4    and pasted. Yeah. I give lots of lectures, and people
5    have something that they hand out, and this is the kind
6    of thing that they do.
7    Q.  Well, do you provide the people who hand this kind of
8    thing out with the information to be included in --
9    A.  Sometimes. And sometimes they just go on the Internet
10   and get it, put it together.
11   Q.  So this particular document, as it now appears, P2/Hughes
12   2, have you ever seen it before in its present form?
13   A.  I've seen versions of this, so I don't know for a fact
14   that it's exactly this one, but I've seen versions of
15   this. Usually I -- I was reading the bottom, usually it
16   will say something like the such and such society is
17   pleased to have -- something. And this is something that
18   the person who introduces me reads usually or something
19   like that.
20   Q.  Okay. I understand what it usually is, but I'm asking
21   you if you have ever seen this particular one.
22   A.  I couldn't say. But I've seen versions of this, but I
23   don't know if I've seen this one.
24   Q.  Okay. And P2/Hughes 2 consists of two pages. I'd like
25   to direct your attention to the second page of P2/Hughes

**Mark Hughes**
5/14/2010

7 (Pages 22 to 25)

Page 22

1    2, and ask you if you've ever seen that page before.
2    A. No. But I've seen these comments before.
3    Q. And what do you mean by you've seen comments before?
4    A. Well, like some of these sentences I've seen in many
5    places. Like I completed an MD at Baylor, and did this
6    and that, and a collaboration with the Hammersmith
7    Hospital in London, that's kind of a canned paragraph
8    that I've seen many places. And the part about Science
9    Magazine I've seen. I think usually what happens is that
10   somebody writes this, puts it on the Internet, and then
11   other people find it, and then they just adjust it for
12   their own use.
13   Q. Now, while I look at P2/Hughes 2 -- you don't have a copy
14   then for your use, is that correct?
15   A. No, I don't have one.
16       MR. LEUCHTMAN: (Indicating).
17       THE WITNESS: Okay. I do.
18   BY MR. STEIN:
19   Q. Okay. Now, in the second paragraph of P2/Hughes 2, there
20   appears the words, Dr. Hughes moved to Michigan to take a
21   position as professor and director of molecular medicine
22   and genetics, professor of OB-GYN, and professor of
23   pathology, but it does not identify the institution which
24   you took that position. Did you notice that, Doctor?
25   A. No, I didn't.

Page 23

1    Q. Well, if you look at it now, you'll see that it does not
2    mention the name of the institution, correct?
3    A. Okay.
4    Q. Could you tell us what institution you took that
5    position?
6    A. Wayne State University.
7    Q. And a particular division of Wayne State University was
8    it, Doctor?
9    A. Well, it was the College of Medicine.
10   Q. And were you in a particular department?
11   A. Well, I was in multiple departments.
12   Q. Okay. Well, did you have emphasis in one department more
13   than another?
14   A. Yes. Genetics.
15   Q. And did you have a superior in the department of genetics
16   at that time?
17   A. The department was in transition, but yes, there was a
18   Dr. Grunberger, who was my chairman until he stepped
19   down.
20   Q. And were you still there when he stepped down?
21   A. Yes.
22   Q. Okay. And did the medical school have a head, like a
23   president or a dean? How did the hierarchy at that
24   school exist at that time?
25   A. Well, there's the university president that is over the

Page 24

1    colleges. My laboratories were over in the College of
2    Sciences building, but my appointments were in the
3    College of Medicine.
4    Q. And who was the president at that time?
5    A. It changed when I was arriving, but Irving Reid.
6    Q. Was he there when you left?
7    A. Yes.
8    Q. And were you asked to leave?
9    A. No.
10   Q. Was there any issues regarding your continued stay there
11   at the time you left?
12   A. Yes.
13   Q. And what were those issues?
14   A. The medical school had a -- made a decision that they
15   didn't want to practice medicine. Unlike some medical
16   schools that have a hospital, Wayne State University
17   doesn't have a hospital. So they provide education and
18   put medical students and residents and fellows into
19   hospitals in the area. And the decision was made that
20   doing embryo testing was a clinical activity that needed
21   to happen in a hospital, not actually in my research
22   laboratory. Because the field was moving to becoming
23   more of a service and less of a research process. So we
24   had discussions about forming a non-profit organization
25   that would be outside of the university in which this

Page 25

1    would occur. And we actually did that, we formed a
2    non-profit company. But the university bureaucracy was
3    at a pace at which it was more and more difficult than I
4    -- they wanted me to stop doing this. And there were
5    patients that were asking for it, and so I said, well,
6    I'm going to resign and go work in the nonprofit.
7    Q. When you say you set up the nonprofit, was that with the
8    consent of the administration at the time it was set up?
9    A. Yeah. All the discussions were with the vice-president
10   of research.
11   Q. And who was that?
12   A. George Dambach.
13   Q. Can you spell the last name, please?
14   A. D A M B A C H.
15   Q. Okay. And was he there at the time you left?
16   A. I think so, yeah.
17       No, I think he just left. I'm not -- I don't
18   remember. Right around that time he left.
19   Q. Okay. Now, you had previously been at the National
20   Institute of Health, is that right?
21   A. Yes.
22   Q. And when you left the National Institute of Health, were
23   there any issues between you and the National Institute
24   of Health?
25       MR. LEUCHTMAN: Objection, vague.

Mark Hughes
5/14/2010

8  (Pages 26 to 29)

Page 26

1      MR. STEIN: Okay.
2      MR. LEUCHTMAN: I'm not telling him not to
3   answer.
4      THE WITNESS: Oh. I'm now gun shy. Whenever you
5   talk I don't know what to say.
6      Yes, there was. I was -- can I extrapolate? I
7   was recruited to the NIH and Georgetown University
8   because of my research in embryo science, and did
9   significant amounts of work there, and gave major
10   lectures at the NIH and at Georgetown, and taught on the
11   subject, and was quite publicly known.  Then there was a
12   change in the administration of Washington.  The
13   republicans took the house for the first time in decades,
14   and Newt Gingrich was the speaker of the house, and the
15   philosophy of doing anything whatsoever with an embryo
16   anywhere near the NIH became of a concern because we were
17   all very actively trying to double the NIH budget at the
18   time.  So we were all busy lobbying to get more money for
19   biomedical research.  And so suddenly I became a
20   liability in that quest.
21   BY MR. STEIN:
22   Q.  And so they asked you to leave?
23   A.  Yes.  Well, they said I could stay, but I couldn't work
24   on this.  And then the good Jesuits were now in the
25   public eye, and they became concerned because it was

Page 27

1   obvious what was going on, and so --
2   Q.  Did you continue to work with embryos after it became
3   government policy not to allow that type of research at
4   the NIH?
5   A.  I don't know anything about the policies of when it was
6   or when it wasn't.  What I know is that when the decision
7   was made that we shouldn't do this at the NIH, or have a
8   faculty member -- or, not a faculty member -- a staff
9   member of the NIH doing it even across the street at the
10   Samaritan Hospital because of the political issues
11   involved, I was asked to resign.
12   Q.  Were you using NIH offices to conduct the research that
13   you were doing contrary to government policy?
14   A.  No.  I was using the offices at Georgetown.
15   Q.  Okay.  Now, turning to your deposition, Exhibit P1, which
16   is your report, three-page report, in the paragraph
17   before the bottom of the first page that begins, I spoke
18   with the Grossbaums and conducted the interview that you
19   have described in your report, I take it that that
20   conversation lasted for some time?
21   A.  They usually last an hour and a half, sometimes longer.
22   Q.  Okay.  Now, that is, obviously, direct contact between
23   you and what would become your patient when they sent the
24   laboratory materials from NYU, is that correct?
25   A.  Not exactly.

Page 28

1   Q.  Okay.  And I take it that you suggested that is not a
2   contact with a patient in the sense that a doctor has
3   contact with patients, is that correct?
4   A.  In general laboratories never talk to patients.  They do
5   the test that was ordered, they write a report, they send
6   it to the person who ordered the test, and that's the
7   extent of it.  In the field of PGD, the few of us that do
8   this feel that it's more important to communicate
9   beforehand with the patient about the risks and benefits
10   of the procedure.  Because sometimes the doctors at the
11   clinics don't necessarily know the nuances of the latest.
12   They're IVF experts, not genetic experts.  So from a
13   perspective of an informed consent, we take and go the
14   extra mile and spend time with them, a significant amount
15   of time with them, explaining to them the steps involved.
16   Q.  Now, have you ever encountered the issue with regard to
17   practicing medicine in the State of Michigan under its
18   rules and regulations for the medical profession?
19      MR. LEUCHTMAN: Encountered what issue?  Object
20   to the form of the question as vague and ambiguous.
21      MR. STEIN: I'll rephrase it.
22   BY MR. STEIN:
23   Q.  Has the issue ever been raised with the regulatory
24   authorities in Michigan who regulate the practice of
25   medicine as to whether or not the contacts that you have

Page 29

1   with the patient constitutes practicing medicine?
2   A.  I don't have a license in Michigan to practice medicine.
3   I don't practice medicine.  I happen to have an MD, but
4   what I do is science, it's my PhD.  I don't practice
5   medicine.
6   Q.  And you don't consider the providing informed consent to
7   the patient who's going to be a prospective submitter of
8   materials for laboratory analysis to be practicing
9   medicine, is that right?
10   A.  Not even remotely.  It's more like a genetic counselor.
11   That's why we don't talk to the patient during or after
12   the case.
13   Q.  Okay.  Now, when you said -- and you have a copy of your
14   letter in front of you?
15   A.  Yeah.
16   Q.  And you say in that paragraph that -- you explained, to
17   quote you, I explained the technology involved isn't
18   perfect and pushes medical diagnostic technology to its
19   absolute limit.
20      Can you tell me what you mean by that?
21   A.  Yes.  Unlike testing that's done in almost any other
22   field of medicine, we're studying the smallest unit of
23   life, one cell.  And we're studying it for the smallest
24   unit of inheritance, one gene.  And we're studying it for
25   the smallest possible part of a gene, changes of a single

**Mark Hughes**
5/14/2010

9 (Pages 30 to 33)

Page 30

1 letter, a single molecule. And 100 years from now the
2 technology can't be smaller than that. And we have to do
3 it overnight. So the point that we make to the patients,
4 which is the reason why not only does the laboratory have
5 an informed consent, but the clinic does, is to reiterate
6 recovery and over that this is the limits of medical
7 diagnostic testing. In fact, it's been that way for 20
8 years.
9 Q. Well, I think you've indicated in Hughes 1 that at the
10 time of that deposition you had done over a thousand
11 cases, is that right?
12 A. Oh, yeah.
13 Q. And you're aware of the clinic that Dr. Xu -- that is the
14 laboratory that Dr. Xu is connected with, the Center For
15 Reproductive Medicine and Infertility in New York, are
16 you not?
17 A. Um-hum (affirmatively). I am.
18 Q. And are you aware that that laboratory and that clinic
19 has done over 3,000 cases of PGD?
20 A. Well, there's a nomenclature issue here.
21 Q. Okay. And what is that?
22 A. Cornell does a technique called PGS, Preimplantation
23 Genetic Screening. This is a technique that was in vogue
24 in the mid-2000's, in which you look at chromosomes. But
25 they send almost all of their single-gene tests to us.

Page 31

1 They do sickle cell anemia and cystic fibrosis, and
2 there's a few tests that they do there inhouse, but most
3 of the cases they send to us. So it's counting apples
4 and oranges, because they're different techniques. One
5 technique is looking at genes, and one technique is
6 counting chromosomes to look for abnormal number of
7 chromosomes.
8 Q. So they don't do single-cell analysis for cystic fibrosis
9 there?
10 A. They do. They do cystic fibrosis, and sickle cell
11 anemia, and I'm not sure what other ones, but virtually
12 all of their cases that are not those few they do they
13 send to us. So I can assure you there's no way they've
14 done 3,000 single-gene cases of PGD. Not even close.
15 Q. How about 1300 cases of PGD?
16 A. We need to define the difference in order for the numbers
17 to be accurate. In order for me to answer the question I
18 need to know what we're talking about. If we're talking
19 about embryo testing of a sample, whatever the sample is,
20 for a gene defect, as opposed to chromosome numbers. If
21 you lump the two together, the numbers are huge. Because
22 this technology of FISH was widely used by many groups,
23 including Cornell for a while. If you talk about
24 single-gene testing, like for cystic fibrosis, I don't
25 know how many they've done, but not anywheres near 1300,

Page 32

1 I'm sure.
2 Q. No, cystic fibrosis they've only indicated they've done
3 70.
4 A. Okay.
5 Q. But are they still sending single-cell analysis to you?
6 A. Um-hum (affirmatively).
7 Q. And this has been continuing all during that period of
8 time?
9 A. Yes. In fact, last week or the week before we received a
10 sample from them.
11 Q. Okay. Do you interact with Dr. Xu at Cornell in
12 connection with the referrals?
13 A. No.
14 Q. Who do you interact with there?
15 A. I don't, but the team interacts with a woman -- whose
16 name I'm blanking out. But there's a woman there who
17 does it all, who actually, I think, runs the lab, I
18 think. I'm not sure. But we interact with the nurses,
19 and with the embryologists, because we're the laboratory
20 in which they are interacting with if they're sending the
21 sample out.
22 Q. And do you interact with the doctor or physician who's
23 involved with the IVF there?
24 A. Almost never. Unless they call because they have a
25 question.

Page 33

1 Q. And when they call --
2 A. Are you talking about Cornell, or NYU now?
3 Q. I'm talking about Cornell.
4 A. It's the same for both. I just want to make sure we're
5 on the right institution.
6 Q. Okay. Now, you also indicate in that letter that the
7 technology can fail. Can you tell me in what manner the
8 technology can fail?
9 A. Oh, many ways. So the cell that is biopsied may not
10 represent the rest of the embryo. The cell that's
11 biopsied may not have a nucleus. The cell that's
12 biopsied may not be properly transferred to the tube to
13 be sent, it gets stuck on the wall or some other place.
14 The amplification technique that is used to make multiple
15 copies of that DNA can fail, or partially fail, or fail
16 because one or other of the chromosomes aren't there, or
17 there's too many. You can have failures because of DNA
18 contamination. You can have failures because of allele
19 dropout.
20 Q. And these various ways in which --
21 A. And more. There's more, but --
22 Q. Okay. Is there an explanation as to why a laboratory
23 like the one at Cornell would have -- and, by the way,
24 failures can be found before the report is issued, it
25 could be an in-house identification of the failure, is

Mark Hughes
5/14/2010

10 (Pages 34 to 37)

Page 34

1    that correct?  Or are you talking about failures
2    resulting from misdiagnosis?
3    A. I'm talking about a failure -- it depends on how you're
4    defining failure. I'm trying to answer the global
5    question.
6    Q. Well, I'm trying to understand how you used the term in
7    your report that the technology can fail. Are you
8    talking about misdiagnosis there?
9    A. One of the things.
10   Q. What else were you talking about when you talked about
11   the technology can fail in that report that you
12   submitted?
13   A. So that you either can -- there can be an error, a
14   laboratory error or some or error, or there can be no
15   answer at all in the sample.
16   Q. Okay. So in the context of the communication that you
17   had with the Grossbaums, were you talking about both a
18   failure in terms of the sample and in respect to
19   misdiagnosis?
20   A. I'm talking about failure in the global sense.
21   Q. Now, with respect to the Grossbaums, you indicated that
22   you had to have a custom design for their analysis of
23   their cells sent from the embryos, is that correct?
24   A. Yes.
25   Q. And that custom design is that described as their asset?

Page 35

1    A. Yes.
2        MR. STEIN: Would your mark these P3 and P4?
3        DEPOSITION EXHIBITS P3 AND P4
4        WERE MARKED BY THE REPORTER
5        FOR IDENTIFICATION
6    BY MR. STEIN:
7    Q. Do you recognize P3 and P4 as the designs provided by you
8    to me as being the assays design for the Grossbaums?
9    A. This looks like the designs from our -- they look like
10   the same. Yep, this looks like it's right, yes.
11   Q. All right. And are these created in your laboratory
12   specifically for the studies to be done of the
13   Grossbaums' cells that are submitted by NYU for your
14   analysis?
15   A. Well, we have multiple different assays that we need to
16   try to see which is going to work for them. This is the
17   one that was selected.
18   Q. Okay. And what's the process by which you try these, I
19   think, as you say, multiple designs that would work?
20   A. We obtain DNA from the critical family members, and we
21   sequence the DNA in the area of which the mutation has
22   been reported to be. We always want to confirm the
23   mutation from the outside laboratory that found it. And
24   then we run a battery of marker pairs against their DNA
25   in two picograms amount of DNA, basically equivalent to

Page 36

1    one cell, in order to see which is going to work the
2    best. And in this case it was complicated because we
3    have two different mutations, the man and the woman have
4    two different ones. So we wanted to be able to see them
5    both at the same time, so that would be a multiplex
6    analysis, which is a bit more complicated. So we test
7    those ahead of time.
8    Q. And this is from the couple who was submitting the cells
9    for analysis, is that correct?
10   A. That's correct.
11   Q. And these were the designs that were selected, is that
12   right?
13   A. Yeah. I would say so, yep. I mean, if I sent them to
14   you or had them sent to you, then that's right.
15   Q. Okay. And now, again, as you just indicated, you would
16   not have taken their case if they did not agree to do the
17   CVS and the -- or, alternatively, an amniocentesis?
18   A. That's correct.
19   Q. But you don't -- you did not in those words say that to
20   them, is that true?
21   A. I don't remember exactly what I said. I'd have to go
22   back to the notes.
23   Q. Okay.
24   A. But to that effect that it's a requirement of our process
25   and if they are unwilling to do that, then we can send

Page 37

1    them someplace else.
2    Q. And where do you send them?
3    A. Well, probably RGI, but I don't know.
4    Q. Okay. Well, when you say -- I think you indicated in
5    your report that you send them someplace else, didn't
6    you?
7    A. It depends on -- in 2004 I don't remember exactly where
8    we were sending patients, but it would be different
9    places for different mutations, but in general there's
10   really only a couple of places that do this. So we would
11   refer the patient probably to Genetics and IVF in
12   Virginia, or to RGI in Chicago.
13   Q. And those laboratories, as far as you know, do not have
14   that as a firm condition for them to do an analysis, is
15   that correct?
16   A. I don't know what their process is, but they are other
17   laboratories that can offer this, they're quite good, and
18   so they can talk to the genetic counselors there to
19   identify what would be possible for them.
20   Q. Well, Doctor, I take it you would not be referring a
21   potential couple for analysis at Genesis Genetics to
22   another laboratory if you weren't aware that that
23   laboratory did not have the requirements that you have
24   that they agree --
25   A. Well, first of all --

**Mark Hughes**
5/14/2010

11 (Pages 38 to 41)

Page 38

1  Q. -- to CVS or amnio in advance, is that right?
2  A. No. No. So first of all, I don't do any referring,
3      because the patient isn't mine. The patient belongs to
4      the clinic and the doctor who's taking care of them. So
5      we would tell that doctor -- as far as I would go is I
6      would tell the patient that we wouldn't be able to help
7      them, that there may be other laboratories who would,
8      that we will communicate this back to their physician,
9      and then they can decide where to go, but we can't help
10     them.
11  Q. So is it your testimony that you were not aware whether
12      or not the other laboratories that you mentioned, RGI or
13      the laboratory in Virginia, would do a PGD study on a
14      couple that did not agree to do amnio or CVS, is that
15      your testimony?
16  A. I don't know what their policy would be in a given case,
17      depending on the rarity of the mutation, the type of
18      mutation, the number of samples that would be available.
19      I don't know what their policies would be.
20  Q. We're talking strictly about a policy that you indicated
21      exists at Genesis Genetics at that time, and I take it to
22      the present.
23  A. That's correct.
24  Q. That you will not have taken a case if the couple do not
25      agree to undertake CVS or amnio following the IVF

Page 39

1      procedure, is that correct?
2  A. That's correct.
3  Q. That's your policy?
4  A. That's our policy.
5  Q. And you were not aware, either at the time that you saw
6      the Grossbaums or even today, as to whether or not the
7      other laboratories that do the kind of PGD studies that
8      you do would do those studies without a commitment for
9      the people to undertake amnio or CVS, is that correct?
10  A. I do not -- I can't comment on the policies of the other
11      places, and I'm not aware of it.
12  Q. Okay. And is it your testimony that you yourself would
13      not have been referring anyone to these laboratories, it
14      would have to be the doctor that --
15  A. Right. Because the patient, if I was to tell NYU that
16      I've referred their patient to another laboratory, they'd
17      have a fit, and rightfully so.
18  Q. Okay. So then you've never referred then to
19      organizations who did not require conventional prenatal
20      follow-up, testing, amnio or CVS, is that right?
21  A. I don't refer patients to anywhere. I tell patients that
22      -- and there's about three or four a month -- I tell them
23      we're unable to help you, and I explain why. And I say
24      we will talk with your doctors and there are other
25      laboratories that might be able to help you.

Page 40

1  Q. Okay. And this was the practice at the time that the
2      Grossbaums had their studies?
3  A. Yes.
4  Q. And this is a status that you've always known to be the
5      case, is that right? I'll withdraw that question.
6      That's a vague question.
7          Well, can you tell me then, Doctor, why at the top
8      of page two of your report, P1, I read the following
9      statement, I have had people over the years voice
10     objection to amnio or CVS, and when this has happened I
11     have referred them to organizations who did not require
12     conventional prenatal follow-up testing with amnio or
13     CVS.
14         Can you tell me how you could write that in a
15     report and yet testify the way you have here today?
16  A. I'm not specifically referring the patient to another
17      organization. That's incorrectly stated. I've never
18      referred a patient to another center. I give them
19      options through their doctor.
20  Q. Okay. Now, you've also indicated in your report that you
21      discuss the risk of misdiagnosis, is that correct?
22  A. Yes.
23  Q. And -- give me a second.
24         All right. Doctor, I believe you indicated in
25      your prior deposition that the risk of misdiagnosis was

Page 41

1      between three and five percent, is that correct?
2  A. That's the risk that's quoted around the world in other
3      PGD programs, and in general the genetic counselors quote
4      that number. In our group it isn't that high, but that's
5      the number that's been sort of announced by --
6  Q. Okay. Can you tell me, when you say that's announced by
7      other groups and around the world, where are these
8      announcements made? What specifically are you referring
9      to?
10  A. So at scientific meetings people stand up and talk about
11      the error rates that they see.
12  Q. And you have a specific recollection of people standing
13      -- of particular people standing up?
14  A. Sure.
15  Q. Okay. What group or what person in these meetings do you
16      recall standing up and they have an error rate of three
17      to five percent?
18  A. They don't necessarily say that they have an error rate.
19      They quote that as the rate in the field.
20  Q. Okay.
21  A. And I've always thought that was high.
22  Q. Okay. In other words, individuals have stated at
23      meetings, who are attending the meetings and are working
24      in the field, that the error rate in the field in general
25      is three to five percent, is that correct?

**Mark Hughes**
**5/14/2010**

12 (Pages 42 to 45)

Page 42

1   A. I've heard that many times.
2   Q. Okay. And has that error rate changed over time?
3   A. Actually the quoted numbers from just last week at the
4       international meetings were still three to five percent.
5   Q. Okay. So someone got up and quoted three to five percent
6       at the meeting last week?
7   A. I heard it discussed, yes.
8   Q. Okay. And who did you hear it discussed from? Who said
9       it?
10  A. I'd have to go look.
11  Q. And where would you look?
12  A. I'd look at the minutes of the meeting that we just had.
13  Q. And those minutes are circulated?
14  A. No. They're notes that I would have taken. Or they
15      might be in the abstract. We can look.
16  Q. And is the abstract circulated for everybody who's in
17      attendance at the meeting?
18  A. Yes.
19  Q. And what was the nature of the meeting, what was the
20      group that met?
21  A. The PGD International Society.
22  Q. And where was the meeting?
23  A. France.
24  Q. And was Dr. Xu there?
25  A. No.

Page 43

1   Q. And your rate is less than one-half of one percent, is it
2       not?
3   A. No. Our rate runs between one and two, depending on the
4       year.
5   Q. So each year you have one to two percent misdiagnosis?
6   A. 1.2, 1.3, 1.4, 1.5.
7   Q. Now, is that specifically with respect to cystic
8       fibrosis, or is that with respect to all --
9   A. No. That's all diseases.
10  Q. And how many do you do a year?
11  A. I can tell you what we did in 2004.
12  Q. How many did you do in 2004?
13  A. I wrote the numbers down. We did 582 cycles.
14  Q. And you have that specifically available to you, you
15      wrote it down?
16  A. I wrote it down before I came over here. Because I
17      figured you'd ask.
18  Q. Okay. And what did you write it down on?
19  A. (No response).
20  Q. What did you write it down on?
21  A. I just wrote it in the corner here on this piece of
22      paper.
23  Q. Before you came over here?
24  A. No. I had it in my mind. But I knew the question was
25      coming, so I scribbled it over here so I wouldn't forget

Page 44

1       the numbers.
2   Q. And do you know how many you did in 2009, last year?
3   A. No. But almost twice that.
4   Q. And how many failures did you have in 2004?
5   A. Three.
6   Q. The Grossbaums was one of them?
7   A. Yes.
8   Q. And what was the analysis done on the other two that had
9       failed?
10  A. One of them was a healthy child that we predicted was a
11      carrier, and one of them was an affected that was picked
12      up on amniocentesis or CVS.
13  Q. And was it picked up?
14  A. Yeah.
15  Q. And did the parents abort in that case?
16  A. I don't remember. There's no link between those. An
17      amniocentesis is not a search and destroy mission.
18  Q. I think we explored that at the last deposition, didn't
19      we?
20  A. I don't remember.
21  Q. You haven't read your deposition --
22  A. Months ago.
23  Q. -- prior to coming here today?
24  A. No.
25  Q. The 582 cycles that you described, were they for all

Page 45

1       forms of genetic disorders, or just for cystic fibrosis?
2   A. No. For all forms.
3   Q. Now, the Grossbaums were described as having a mutation
4       that was -- can be said to be compound heterozygous, is
5       that right?
6   A. Yes.
7   Q. Do you know how many of the cystic fibrosis studies that
8       you did in 2004 were for couples who had compound
9       heterozygous mutations?
10  A. I don't know those numbers off my head, no.
11  Q. Do you know how frequently you see compound heterozygous
12      mutations to be analyzed?
13  A. Fairly frequently. Now.
14  Q. Now?
15  A. Um-hum (affirmatively).
16  Q. How about in 2004?
17  A. We would see them then, too, but it's gone up
18      substantially, the numbers. Because the ability to find
19      the mutations in these different diseases has gone up,
20      because the technology for looking for the mutations is
21      easier. So just a few years ago there weren't very many
22      places that would -- well, cystic fibrosis is different
23      -- but for many of these disorders there wasn't anyone
24      who was willing to screen by DNA sequencing the entire
25      gene looking for what the other mutation might be, so PGD

**Mark Hughes**
5/14/2010

13  (Pages 46 to 49)

Page 46

1    was not offered then.
2    Q. And what year are you talking about?
3    A. 2003/2004/2005.
4    Q. PGD was not offered for a particular class of mutation?
5    A. We wouldn't do it if we didn't know what the other
6       mutation was.
7    Q. Well, the mutation for this couple, both mutations were
8       well-known back in 2003, were they not?
9    A. Absolutely they were.
10   Q. And they were well-known for a number of years before
11      2003, wasn't that so?
12   A. That's correct.
13   Q. So with respect to that mutation and that compound
14      heterozygosity, those mutations were being analyzed and
15      PGD, were they not at that time?
16   A. They were.
17   Q. And you weren't, by 2003, declining to study compound
18      heterozygosity, were you?
19   A. No.
20   Q. And you were studying that type of gene mutation and
21      reporting on it without the use of linkage analysis, is
22      that right?
23   A. In 2004?
24   Q. 2004, yes.
25   A. Early 2004 yes, that would be right. Um-hum

Page 47

1    (affirmatively).
2    Q. And that would be for 2003 and 2002, is that right?
3    A. That's correct.
4    Q. The use of linkage analysis certainly increases the
5       accuracy and reduces the risk of misdiagnosis, isn't that
6       true?
7    A. Not in 2004. It was just beginning to be proven to be
8       so, and the manuscripts were beginning to come out
9       showing that it worked.
10   Q. When you say they were beginning to come out, we do agree
11      that Dresen's group in Europe was reporting in 2001 the
12      success rate for using linkage analysis, weren't they?
13   A. They were taking two cells in order to get those results,
14      so they were biopsying a couple of cells from each
15      embryo. Most of the clinics we work with don't want to
16      do that, including NYU. And the group in Chicago that
17      was doing it was biopsying a polar body, oftentimes a
18      first polar body and a second polar body and a
19      blastomere.
20   Q. Is that in all compound heterozygous cases?
21   A. I don't know. But that was their standard that they
22      reported at meetings and in their papers. And they
23      argued at the meetings that this was a better approach.
24      And this was all kind of coming out. But we had a 1.2
25      percent error rate, which was significantly less than

Page 48

1    anybody else was reporting, so -- and we were having
2    difficulties getting multiplex PCR to make that better or
3    look like it make it better. Theoretically we could see
4    where it was quite valuable, but we were not happy with
5    the results, in those early papers we weren't able to
6    reproduce them.
7    Q. When you say you were not happy with the results, what do
8       you mean by that?
9    A. Well, in anything in science and medicine, a manuscript
10      comes out, and this doesn't suddenly make it the gold
11      standard of practice. Because if it was a gold standard
12      of practice, that paper wouldn't even be allowed to be
13      published because it isn't new or exciting. So the
14      papers that were coming out in 2001 were theoretical to
15      start with, then they became one or two cases, take a
16      couple of cells, do the analysis and see what the results
17      are.
18         The RGI group actually were quite leaders in this,
19      and were showing some beautiful data at the time. But
20      others of us were having difficulties duplicating that.
21      We weren't as good as them perhaps, I'm not sure. But we
22      were not comfortable, with our preliminary when we
23      developed the test for a couple, we were not comfortable
24      with the multiplexing of more than two different
25      mutations at the same time. We didn't have the ability,

Page 49

1    nor did we think we needed, because we had such a low
2    error rate, that we weren't ready to be offering
3    something that was just being discussed.
4    Q. Well, if there was a laboratory as close as Chicago, you
5       having good results with linkage analysis, didn't you see
6       it as on obligation of your relationship with the couples
7       such as the Grossbaums who had compound heterozygosity,
8       to afford them the opportunity to go there?
9    A. That's up to the doctor to decide what laboratory they're
10      going to use, first of all. And secondly, it wasn't
11      hardly proven until the Goossens paper came out that that
12      was actually working clinically.
13   Q. And when did the Goossens paper come out?
14   A. Late 2003. I think. I can't remember. I think it was
15      in the fall of 2003.
16         Now, the --
17   Q. And by the Goossens paper you're talking about Improving
18      Clinical Preimplantation Genetic Diagnosis for Cystic
19      Fibrosis by Duplex PCR?
20   A. Yes.
21   Q. And you were aware of that paper when it came out?
22   A. I don't remember when I first saw it, but when I did it
23      was a good group that had some clinical successes, and it
24      was beginning to -- the handwriting was beginning to
25      become quite clear that this was the future. Now, we

Page 50

were already trying to do it, but we do lots of things in the laboratory as we test for several years before we move it to clinical activities.
Q. Now, when you say you were already trying to do it, can you explain what you mean by that?
A. So we would take hundreds of single cells that we would micropick, as though they were a cell from an embryo. Lymphocytes, fibroblasts, amniocytes, in which we knew what the mutations were in those cell lines. We would pick them and study them as though they were a biopsy from an embryo, blinded. And then we would analyze to see if we could reproduce the results better than the error rates that we already had in our program. And what we were finding was that the -- we would pick up some markers that were very nice to have, but we would lose other pieces of data, oftentimes the mutation. And so to get them to all work together just was a problem. We weren't comfortable that the technology was improving anything. So that's what happens over a period of a few years, you try, you analyze, you compare, you check out to see if the other laboratory's work is reproducible. And sometimes it is and sometimes it isn't. And in the field of IVF there's all kinds of these false starts, but you don't know which one's a false start. So you don't just move it to the clinical arena because somebody

Page 51

publishes a couple of papers, most of them theoretical.
Q. Well, you do agree in the year 2000 Chicago had published its atlas describing the use of linkage analysis, isn't that so?
A. Everybody knew about linkage analysis.
Q. And do you agree that Dresen's paper was in about the year 2000 or 2001, wasn't it? Dresen.
A. I don't recognize that name. I probably was a graduate student or something.
Q. Or am I mispronouncing it? Is it Dresen? It's D R E S E N. That's the Department of Molecular Cell Biology and Genetics at Maastricht University, that would be in the Netherlands, and it was published in 2000.
A. Let's see.
Q. (Indicating).
MR. STEIN: Let the record show I've handed Dr. Hughes a copy of the journal publication that I've just referred to and he's reading it.
THE WITNESS: Yeah. We could test single lymphocytes and fibroblasts like this. This isn't an actual -- there's no pregnancies here, there's no proof that it works in an IVF embryo. Now, later, soon thereafter, there was. But this is studying lymphocytes, and some blastomeres. Let's see here. Blastomeres were obtained from human embryos that were donated in IVF. So

Page 52

this is all -- this is a nice paper. It was new, exciting, new possibilities for changing the technology. But it was a long way from clinical implementation, certainly in the United States, except at RGI.
Q. Well, Doctor, let's separate that. It would appear from this article in 2000 out of the Netherlands, as well as the RGI publication in its atlas, that the technology was known by 2000 by these various groups as to how to do it, isn't that so?
A. The ability to do multiplex PCR had been around long before that.
Q. All right. So if these groups --
A. And we were doing it.
Q. Well, when you use the term multiplex analysis --
A. It means having a single cell and looking at multiple places in that genome.
Q. Is that the same as linkage analysis, in your terminology?
A. Looking at those multiple places produces the linkage information.
Q. Okay. So then using that technique as a standard use in their laboratory, RGI was doing it, they had the technology, didn't they?
A. We had the -- lots of people have the technology. The question was, was it ready to be added and was it proved

Page 53

to be useful and was it better.
Q. Well, if it reduced the --
A. Let me give you an example. The same group who I think are outstanding in Chicago, Svetlana Rechitsky and Buck Strom, they were great scientists, they were working on a technology called FISH. And when you quote these numbers from Cornell with thousands of cycles, those were done with FISH. In fact, the world jumped on the ability to count chromosomes using FISH technology. And now, all of the medical societies that oversee this have said that there's no scientific evidence that this works. There's no scientific evidence that a patient should have FISH testing. And it's written in the practice guidelines of the field by the authorities who you would recognize that direct the way something is performed in medicine. In the society's guidelines of practice it says that there's no scientific evidence that FISH works. Now, it's controversial. We never believed in that technology either, and never performed it. Why? Because we couldn't get it to work with the kinds of reliability we wanted. In the same way in IVF, there's all sorts of steps that are taken to try to improve the technology an get people pregnant with healthy babies. It's done all the time. Many of those fall by the way side as being not helpful, can't be reproduced. So in the first few

**Mark Hughes**
5/14/2010

15 (Pages 54 to 57)

Page 54

1    years of the year 2000 people started talking about doing
2    this in PGD, and everybody, I would hope, was trying to
3    get this to work because of the theoretical idea that it
4    was going to help and avoid one of the problems with PGD,
5    which is allele drop out. But you have to have a
6    technique that improved it significantly more than what
7    you already had. No more than Memorial Sloan Kettering
8    invents a new cancer agreement and no other cancer
9    programs in the country use it for some five years or ten
10   years while they're assessing it. It doesn't make it
11   standard, just because you publish a paper, doesn't make
12   it standard of care.
13   Q. Well, when you publish it in an atlas on how to do it,
14   would you say that then it has moved from theoretical to
15   clinical practice?
16   A. No.
17        MR. LEUCHTMAN: Object to the form of the
18   question.
19        THE WITNESS: The atlas is written by the people
20   who are promoting their own science.
21   BY MR. STEIN:
22   Q. All right. Now, in fact, had you been provided with
23   blood samples from family members of the Grossbaums, you
24   would have done linkage analysis, wouldn't you?
25   A. We would have tried.

Page 55

1    Q. And --
2    A. I'm not sure we would have used it in their case, but we
3    certainly would have tried. We would have looked at
4    genomic markers in their parents and tried.
5    Q. But no request was ever made to have the parents provide
6    blood samples, were they?
7        MR. HAMAD: Objection to form.
8        THE WITNESS: I don't think that's true, but I
9    don't know for sure.
10   BY MR. STEIN:
11   Q. Well, you have your chart in front of you. Did you ever
12   see any specific request made for the parents' blood
13   samples in your initial interview?
14   A. Let me look. It's going to take a bit.
15   Q. And by parents, I mean the parents of the couple, as
16   opposed to parents, I mean the parents of the
17   expectant baby.
18   A. Yeah. But they're not parents yet, so we don't call them
19   parents.
20   Q. Okay.
21        MR. HAMAD: Can I have the question read back? I
22   thought he already answered it and he said he didn't
23   know.
24        THE WITNESS: I have a little cryptic thing here
25   that says, blood possible from parents, question mark,

Page 56

1    seems not. I'm not sure what that means. I think -- I'm
2    assuming it meant that we had a discussion about it, but
3    I would have written more if the discussion was very
4    long. So I think it was mentioned, and like many of the
5    patients they are very uncomfortable about involving
6    their parents, the next generation up. They have a child
7    or a sibling that could be helpful they'll offer, but --
8    but it looks like there was some pushback, but that would
9    be my guess from that little cryptic note.
10   BY MR. STEIN:
11   Q. By the way, you're looking at a photocopy of your
12   records, is that right?
13   A. Yeah.
14   Q. And where are the originals of these records?
15   A. They will be -- well, they're scanned, and they'll be in
16   the electronic chart.
17   Q. Okay. So the original copies of your handwriting as it
18   was made on the day you made it are not available
19   anymore?
20   A. I don't know about 2004. It could be. It could be -- I
21   don't know if we systematically scanned 2004 into the
22   electronics. I can find out for you. If it isn't, we
23   have it as paper.
24   Q. Okay. And where would you have it as paper, over at your
25   --

Page 57

1    A. Yeah.
2    Q. -- laboratory?
3    A. Over in the lab.
4        MR. STEIN: I'll write a request so I can
5    understand whether that exists or not.
6    BY MR. STEIN:
7    Q. Doctor, you have in front of you the reports that you
8    sent out in this case?
9    A. They should be here. Just a second.
10        Yes.
11   Q. Now, Doctor, is that the standard form by which you
12   report the results of your analysis? By that I mean --
13   A. This one?
14   Q. Let's mark it for identification.
15        DEPOSITION EXHIBITS P5 THROUGH P9
16        WERE MARKED BY THE REPORTER
17        FOR IDENTIFICATION
18   BY MR. STEIN:
19   Q. Doctor, I show you a page from what's been represented to
20   be the medical records of Genesis Genetics Re Grossbaum,
21   that Midterm Medical may be mine and not yours, but the
22   records of Genesis Genetics regarding Grossbaum, and I
23   show you the page we've marked P5.
24   A. Yes.
25   Q. Do you have it in front of you?

**Mark Hughes**
**5/14/2010**

16 (Pages 58 to 61)

Page 58

1  A. Yes, I do.
2  Q. Does that represent the standard form by which Genesis
3     Genetics reports the results of its testing?
4  A. No.
5  Q. And in what way is it not the standard form?
6  A. Well, several clinics, NYU being one of them, wanted to
7     have us send them a temp report early, as quickly as we
8     had the data. Because it would always take us another
9     half an hour to an hour and a half, depending on how many
10    cases we had that day, to produce the formal report,
11    write up what it means. So they and several other
12    clinics want to know what's happening in written form,
13    not over the telephone, so that they can call the family,
14    my understanding is so that they can call the family and
15    tell them to come in for an embryo transfer or not,
16    rather than making them wait another hour or an hour and
17    a half for a formal report that morning. Because this
18    test is done all night long. So in the morning the
19    data's read, most clinics receive a formal report as the
20    only report. Some groups ask for something quicker so
21    that they could call, so you'd have to check with the
22    clinic, but my understanding was they would then call
23    this couple and tell them, yes, you can come in, or no,
24    there's nothing to transfer, or your embryos have not
25    developed or whatever. So the lab person will put

Page 59

1     together a quick report so that the clinic is then aware
2     that they can proceed and get ready for the transfer. So
3     it's faxed on a regular fax machine, we send off a fax to
4     them, a person in the lab reads the data, it's read by
5     another person, and then they send it off real quick.
6        By then I come in or one of the people who's got
7     the authority to write a formal report, and we sit down
8     and take the information, look at it and write a formal
9     report that's supposed to go in the medical record. So
10    actually I must admit I was surprised to see that NYU
11    even kept it, but whatever.
12       But Alexis, who runs the center there, she's kind
13    of -- and she wanted -- didn't want any verbals, she
14    wanted it in writing so that they could do the transfer.
15 Q. So are you saying that it was Alexis who --
16 A. No, I don't know it was. But Alexis was the person
17    who would normally interact with us and would say, you
18    know, I want to know if I can call the patient, send us a
19    report.
20 Q. So this particular form of report was not by any means
21    standard that you sent to most or all of the IVF utility
22    clinics that send you samples, is that what your
23    testimony is?
24       MR. LEUCHTMAN: I'll object to the form of the
25    question.

Page 60

1        MR. HAMAD: I'm going to object on the grounds
2     that this also -- although is an expert deposition, I
3     think Dr. Hughes just went beyond to change the facts of
4     this case, to change his fact testimony. So I'm
5     objecting. We may have to come back here to re-depose
6     Dr. Hughes on some of these issues, which, obviously,
7     showing up for an expert deposition I don't expect the
8     facts of case to be changed on me in the last second. So
9     for the remaining of this deposition, I will preserve my
10    right to come back here, have further deposition of Dr.
11    Hughes on this issue.
12       THE WITNESS: I would like to say that --
13       MR. STEIN: Well, wait a second. You say when
14    answering to questions, you don't participate except for
15    --
16       MR. LEUCHTMAN: Well, I think he's entitled to
17    respond that. He's been accused of changing the facts.
18       THE WITNESS: I'm not changing anything.
19       MR. STEIN: It was inappropriate for counsel to
20    make this statement.
21       MR. HAMAD: I'm just reserving my rights, that's
22    all. That's it.
23       MR. STEIN: Where is there in the practice of
24    deposition taking that you have to reserve a right on the
25    record during the course of the questioning that's being

Page 61

1     conducted by a lawyer of a witness?
2        MR. HAMAD: There is plenty of references in the
3     court rules regarding the rules of experts and rules of
4     fact deponents, correct?
5        MR. STEIN: At the end of the questioning --
6        MR. HAMAD: Fair enough.
7        MR. STEIN: -- if you want to, when the witness
8     is excused, put on the record something you feel you need
9     to do to preserve a right, as opposed to sending a letter
10    tomorrow or making a motion --
11       MR. HAMAD: Fair enough.
12       MR. STEIN: -- then --
13       MR. HAMAD: I guess I jumped the gun. I'll wait
14    an hour, I'll say exactly what I just said, and then
15    we'll be back here.
16       MR. STEIN: Well, I think you can do what you
17    like, but --
18 BY MR. STEIN:
19 Q. Doctor, do I understand that this document which we've
20    marked P5, in the form in which it appears as part of the
21    Genesis Genetics records, was not a standard form which
22    you generally used to report to most of the clinics that
23    you did PGD studies for in 2004?
24       MR. LEUCHTMAN: Object to the form of the
25    question.

**Mark Hughes**
**5/14/2010**

17 (Pages 62 to 65)

Page 62

1      MR. STEIN: Okay.
2   BY MR. STEIN:
3      Q. Can you answer the question, please?
4      A. A formal report is done on stationery with an explanation
5         with lots more information. This was -- the purpose of
6         this was for the NYU team to be able to see that there
7         were embryos predicted suitable to be transferred, and
8         act on it if they wish. So it's not like it's wrong,
9         it's that it's not complete. And it takes a while to do
10        a longer one. And so we sent this to them fully
11        expecting them to read it and act on it. That's fine.
12        There's nothing wrong with it.
13     Q. This bears electronically signed your signature. Can we
14        understand that by the presence of your electrically
15        signed signature this is a document that you endorse by
16        way of the content, or either created yourself or had
17        someone create and then have you read it and endorse it?
18     A. This was put together by a lab person who electronically
19        puts my name on it and sends it to the clinic.
20     Q. Now, in connection with reporting the results of lab
21        studies , is it important in the custom and habit of the
22        laboratory to document the transmittal of your report to
23        the clinic?
24     A. I'm not sure what you mean.
25     Q. Well, is it customary -- withdraw that.

Page 63

1         Is it a requirement of your practices and
2         procedures as Genesis Genetics as you go forward in doing
3         your analysis that when the report is transmitted a
4         record is kept of the date and time that the report is
5         transmitted?
6      A. No. No laboratory does that. They send out reports by
7         mail oftentimes. They don't have a -- they don't send
8         out report -- hospitals don't send out reports.
9         Laboratories don't send reports to doctors and hospitals
10        with everything being certified or -- we don't do that.
11     Q. So when you report on your analysis to the clinics so
12        that the patient can be called in, you don't keep any
13        record or require that a record be maintained of the
14        transmittal of the results of your analysis at a
15        particular date and time?
16     A. No. We send the report to them -- if they didn't get it
17        they'd be calling, I can promise you -- and then we put
18        the chart away.
19     Q. I see.
20        So if we look at --
21     A. Any more than if I ordered any other test.
22     Q. So you don't require in the operation of Genesis Genetics
23        that there be a verification of the transmission of the
24        report in your chart?
25     A. We don't keep any kind of verification that we wrote a

Page 64

1         report or that we sent it, no. If the recipient didn't
2         receive a report we would hear about it.
3      Q. Can you explain to me what the document in your chart at
4         Genesis Genetics which has been provided to me, which
5         we've marked P6, what's the purpose of that and what is
6         it?
7      A. So the person in the lab who faxed this on the paper fax
8         machine got a verification and threw it in the chart with
9         it.
10     Q. Okay. So then in fact you do --
11     A. This is not -- you asked is this a requirement or a
12        standard procedure. It's not a standard procedure to
13        have this piece of paper in there at all.
14     Q. So then that's a -- okay.
15        Now, do you have any documentation in your chart
16        as to -- withdraw that.
17        There appears also in your chart a document which
18        we previously had used in one deposition marked P8 for
19        identification, a message page, is that correct?
20     A. Yep. Yes.
21     Q. Do you have anything in your records to verify the
22        transmittal of that record, of that document which we've
23        marked P8?
24     A. You mean like another fax?
25     Q. Right.

Page 65

1      A. No.
2      Q. So there's no form of verification in your chart that the
3         document, P8, was received by NYU, is that right?
4         MR. HAMAD: Asked and just answered.
5         MR. LEUCHTMAN: Not exactly.
6         THE WITNESS: I don't have any document that says
7         -- they didn't write me back and say we got it.
8   BY MR. STEIN:
9      Q. Or any other mechanism, such as a fax verification or any
10        kind of fax entry which would --
11     A. Well, when I do this, and I know I did this one, because
12        it's come off of my computer, when I do this I write the
13        message, I go to Outlook, find the proper address and fax
14        number, it goes into the Microsoft Word's electronic
15        computer fax submitting thing and out it goes, it puts
16        this in there.
17     Q. So I take it that this document, P8, also may be found in
18        your computer, is that right?
19     A. I would assume so. From 2004 I don't know, I've had
20        several computers since then, but maybe. And in fact it
21        was -- this part's generated by the program, so it pulls
22        the phone number and the time off.
23     Q. Okay.
24     A. And I do that because the -- it's a crisper picture.
25     Q. Okay. Now showing you P9 for identification. That is

Mark Hughes
5/14/2010

18 (Pages 66 to 69)

Page 66

1  what you represent to be your formal report?
2       MR. HAMAD: Objection to form.
3       THE WITNESS: It's our formal report.
4  BY MR. STEIN:
5  Q. And that is your complete report on the Grossbaums'
6     matter?
7  A. Yes.
8  Q. Okay. Now, turning to the P8 -- do you have a copy in
9     front of you?
10 A. Yes.
11 Q. In the first paragraph of P8 you describe the results as
12    disappointing, is that correct?
13 A. Yes.
14 Q. And then you go on in your second paragraph to say, if
15    the couple chooses a transfer with this partial data set,
16    do you not?
17 A. Um-hum (affirmatively).
18 Q. Does that statement assume that the couple will be
19    advised that there is only a partial data set?
20       MR. HAMAD: Objection to form.
21       THE WITNESS: I'm not assuming anything.
22 BY MR. STEIN:
23 Q. Well, for the couple to choose to transfer this partial
24    data set there has to be some communication to them that
25    there is a partial data set that was disappointing,

Page 67

1  doesn't there?
2       MR. HAMAD: Objection, form. Misstates his prior
3     testimony. You can answer.
4  BY MR. STEIN:
5  Q. Go ahead.
6  A. I'm not sure I understand. We're dealing with an
7     outstanding group of people who understand PGD very well.
8     They're going look at this table and see that --
9  Q. Doctor, my question --
10       MR. STEIN: Can I have the last question read
11    back please?
12       (Record repeated as requested).
13       THE WITNESS: When a doctor reads a diagnostic
14    report that they receive, they read it and understand
15    what it says. I mean, that's why they order the test.
16    So you send them the information, whichever one you want,
17    and it's pretty clear that there's a partial data set.
18    It doesn't take rocket science to see that.
19 BY MR. STEIN:
20 Q. Doctor, my question just called for a yes or no answer.
21 A. Then I don't understand the question.
22 Q. All right. If, as you say in your message, a document we
23    marked P8, if the couple chooses a transfer with this
24    partial data set, you are referring to a choice made by
25    the couple who you provided laboratory services to, are

Page 68

1  you not?
2  A. I'm referring to the choice that the couple would make
3     after hearing the information about the quality of their
4     embryos, and the molecular results and the options that
5     they have in front of them about what they would like to
6     do. And it isn't necessarily so, I mean, I don't know,
7     but it isn't necessarily so that the clinic would agree
8     to what that would be. They might and they might not.
9  Q. Might agree and might not agree to what?
10 A. Well, if the doctor said we're not going to transfer this
11    embryo, some clinics would say we're not going to
12    transfer the embryo. Other clinics would say, well, no,
13    the embryo belongs to you and you can take it if you
14    wish. I stay away from those things, but I point out the
15    limitations of the testing.
16 Q. Are you presuming by that comment that the couple will be
17    advised of the disappointing result of your test?
18       MR. HAMAD: Objection to form, asked and
19    answered.
20       THE WITNESS: I'm not assuming anything.
21 BY MR. STEIN:
22 Q. Okay. Now, you say that in that message that AVO is
23    possible in compound heterozygous testing such as this,
24    and even more likely given the embryo quality. That's
25    what you write, is that right?

Page 69

1  A. Yes.
2  Q. Now, in the preliminary report that you sent, as you
3     described it, we've marked P5, you discuss allele
4     dropout, don't you?
5  A. Yes. Well, I mentioned it in -- it's mentioned in sample
6     two.
7  Q. Now, just so I'm clear, is it not anticipated that the
8     clinic will proceed with IVF based on the form of report
9     that is present and marked P5?
10       MR. HAMAD: Asked and answered, three questions
11    ago.
12       THE WITNESS: This report is sent to them just
13    like any laboratory report. They review it, they make a
14    decision in the best interests of the patient, I hope,
15    and I don't have any assumptions about which ones they're
16    going to transfer. In fact, earlier this week a couple
17    elected to take two embryos that were affected, so --
18 BY MR. STEIN:
19 Q. Aside from what the couples intend to do as a result of
20    the decision, you are presuming when you send P5 that the
21    fertility clinic will act on the content of the
22    information contained in P5, are you not?
23 A. No. I'm sending them information. What they do with it
24    at that point is completely up to them. They can say we
25    don't like any of this, they can say we're going to

Mark Hughes
5/14/2010

19 (Pages 70 to 73)

Page 70

1 transfer five embryos, they can say we're going to freeze
2 all of them, or we're going to discard all of them, or
3 they can have a conversation with the patient. They're
4 going to decide what they want to do with the data.
5 Q. But they're going to rely on the information in the form
6 presented on P5, are they not? Wouldn't you anticipate
7 that?
8 A. I would anticipate that that would be a piece of their
9 decision-making process, yes.
10 Q. And in that piece you write with respect to embryo sample
11 number two that possibly affected was ADO paternal, is
12 that right?
13 A. Yes.
14 Q. And that's because there was no deletion, is that right?
15 A. It's because we're seeing the mutation in exon 11.
16 Q. All right.
17 A. And there could be a little dropout of 10.
18 Q. But as far as you know from 10, what you've got in the
19 results of your analysis was that the mutation was not
20 present in 10, is that right?
21 A. The mutation is present in 11.
22 Q. Right.
23 A. And we couldn't see the mutation in 10.
24 Q. So if the mutation is present only in 11 and you don't
25 see the mutation in 10, then why would that sample number

Page 71

1 two not be okay for transfer?
2 A. It could be. But it's possibly affected, and we wanted
3 to point that out. Because we absolutely positively see
4 the paternal mutation and we do not see the normal copy
5 of the gene. There should be a G there. We should see
6 the G, and we don't see it.
7 Q. Right.
8 A. And it's the only embryo that had that setting.
9 Q. Well, when you go down to number eight, you see GT?
10 A. Yes.
11 Q. What does that mean, in CF11?
12 A. Okay. So we know that the mutant allele, the mutant gene
13 is present from the father -- I'm sorry, from the mother.
14 Q. Right.
15 A. And we see a G that would have come in from the sperm.
16 So it's a heterozygote at that location, which is
17 perfectly reasonable.
18 Q. Okay. So --
19 A. So we know that embryo has a normal copy of -- so we
20 know it's a carrier of 11, we know it's a carrier of the
21 mother's mutation, and we don't see a mutation in 10.
22 Q. Right. So how do you know that there isn't allele drop
23 out with respect to a 10 at that point?
24 A. Well, I suppose there could be, but the fact that we see
25 both alleles -- we see an allele from the mother, and

Page 72

1 from the father in the other exon.
2 Q. Well, that's the same as two. You see an allele in
3 one --
4 A. No, it's not the same. No.
5 Q. And you have no deletion in 10, and you're concerned
6 about allele dropout there, why aren't you concerned
7 about allele drop out with 10?
8 A. Because there must be a G in exon 11. Every sample must
9 have a G in exon 11. If it doesn't, there's allele
10 dropout.
11 Q. All right. Well, and if you've got allele dropout in 11,
12 it means that that may be a carrier of the mutation,
13 right?
14 A. It could be. That's why -- for which one are we talking
15 about?
16 Q. 8.
17     MR. HAMAD: A risk of allele dropout or allele
18 dropout? I don't know what you're saying.
19     MR. STEIN: It could be --
20     THE WITNESS: So in embryo 11 we have all of the
21 data that would be consistent with it being a carrier
22 female, carrier of the mother's mutation.
23     MR. STEIN: Right.
24     MR. LEUCHTMAN: Well, hold on.
25     MR. HAMAD: Embryo 11.

Page 73

1     THE WITNESS: I thought we were on 8.
2     MR. HAMAD: Exon 11. You're talking about CF11,
3 right?
4     THE WITNESS: Yes.
5     MR. HAMAD: Okay.
6 BY MR. STEIN:
7 Q. Okay. So now that's okay for transfer, correct? You say
8 so in your --
9 A. Yes.
10 Q. But now 7, you see a G, that means that's a carrier at
11 worst, right?
12     MR. HAMAD: Objection, form.
13 BY MR. LEUCHTMAN:
14 Q. 7 you've got described as carrier at worst, right?
15 A. Yes, that's the wording used.
16 Q. Okay. And in exon 7 you don't know what the -- I'm
17 sorry, sample number 7, as far as the father's gene, you
18 don't have any amplification, right?
19 A. No.
20 Q. So why isn't that given the same description, okay for
21 transfer, as number 8?
22     MR. HAMAD: Objection, form.
23     THE WITNESS: There would have had to have been a
24 double dropout.

**Mark Hughes**
**5/14/2010**

20 (Pages 74 to 77)

Page 74

1    BY MR. STEIN:
2    Q. Well, if you have no amplification, is that considered a
3        dropout?
4    A. Yes.
5    Q. Allele dropout?
6    A. Yes.
7    Q. And so there is a greater risk of an affected baby in
8        number 7 than 8, I take it?
9            MR. HAMAD: Objection to form, misstates his
10           prior testimony.
11           MR. LEUCHTMAN: I'll object as to form also.
12   BY MR. STEIN:
13   Q. Go ahead. Want to answer the question?
14   A. I wouldn't say that.
15   Q. Why not?
16   A. We think -- I mean, when we look at the numbers for
17       embryo 7, the risk of that embryo having a double dropout
18       would, in our hands, be quite small, less than one
19       percent.
20   Q. Well, why didn't you call it okay for transfer?
21   A. When we said okay for transfer it meant those were the
22       preferential embryos. A doctor would look at carrier at
23       worst and say, well, we could transfer that one if it
24       worsens the status as a carrier. We were pointing out
25       the ones we were most happy with the data.

Page 75

1    Q. So you were less happy with the data in 7 than you were
2        with 8, is that right?
3            MR. HAMAD: Objection, form.
4            THE WITNESS: What we do is we try to point out
5        what ones we like the best, that's true. The terminology
6        used in the formal report is probably more accurate, but
7        the result, the decisions that they made from the
8        testimony that I read in the depositions of the NYU
9        people, we wouldn't argue with any of it.
10   BY MR. STEIN:
11   Q. Then if in fact you had what you would consider 3 based
12       on 7, 8 and 10, 3 embryos that I take it you wouldn't
13       argue with if they were utilized, why would you be
14       concerned as you were in the message about the couple
15       choosing to transfer the partial data set?
16           MR. HAMAD: Objection to form. Concern is not a
17       word that was used, object to that characterization.
18           MR. STEIN: Okay.
19           MR. LEUCHTMAN: I will, too.
20           THE WITNESS: Yeah, I'm not concerned. We point
21       out that those are the embryos that -- I mean, anyone
22       knows that if you didn't get data it's less valuable than
23       if you do. So I pointed it out in word form, but it's
24       obvious from the data page.
25           MR. STEIN: I'd like to go over the rest of my

Page 76

1    notes here.
2    BY MR. STEIN:
3    Q. Now, just one last question. I think you indicated in
4        your testimony, and I may be wrong, that there were some
5        things in the report of March 2nd that was actually sent
6        that you would not entirely agree with.
7            MR. LEUCHTMAN: In the report that was sent?
8            MR. STEIN: In the report I got.
9            MR. LEUCHTMAN: Object, it mischaracterizes his
10       testimony.
11           MR. STEIN: Yeah, fine.
12           MR. LEUCHTMAN: Thank you. I need to get your
13       approval of the objection.
14   BY MR. STEIN:
15   Q. Is there anything that as you read it now that you do not
16       agree with in the report?
17           MR. HAMAD: I'll also join Mr. Leuchtman's
18       testimony. I think the witness has never said that he
19       didn't agree with anything in his report.
20           MR. STEIN: I asked is anything that he doesn't
21       agree with. That's a simple question, Mr. --
22           MR. HAMAD: What is the point of the question?
23           MR. STEIN: Please don't interrupt.
24           MR. HAMAD: I'll try not.
25           THE WITNESS: I don't want to answer unless I've

Page 77

1    had a chance to study every single word. I assumed that
2    a letter that was sent to my own counsel, I had no idea
3    that this thing was so important, that this is going to
4    turn into a major deal. Many people write things for me
5    all day long, all the time. And I skim them and review
6    them and put my name on them. This is not unusual. And
7    when the letter's going to my own attorney, I didn't have
8    a clue what the legal mumbo-jumbo of that meant.
9            MR. LEUCHTMAN: Well, all right. Let's --
10           THE WITNESS: That's about as much as I want to
11       --
12   BY MR. STEIN:
13   Q. Are you saying you didn't understand that this letter was
14       going to be turned over to counsel --
15           MR. LEUCHTMAN: Objection, that gets into
16       attorney-client privilege. He's not going to answer that
17       question.
18           MR. STEIN: I'm going to restate the question.
19           MR. LEUCHTMAN: He's not going to answer the
20       question.
21   BY MR. STEIN:
22   Q. When you signed this letter addressed to your attorney,
23       you had no idea that that letter then was going to be
24       turned over in that form that you signed to counsel for
25       the plaintiffs, myself, is that right?

**Mark Hughes**
**5/14/2010**

21 (Pages 78 to 81)

Page 78

1   MR. LEUCHTMAN: Objection, don't answer the
2   question. That asks for what was said in conversations
3   between attorney and client.
4   MR. STEIN: Okay. I've got another question.
5   BY MR. STEIN:
6   Q. There's a statement made in the second to last paragraph,
7   based on the literature, most misdiagnosis are due to
8   intercourse or unprotected sex. Do you agree with that?
9   A. No.
10  Q. Pardon me?
11  A. No.
12  Q. Okay. But yet it was in the letter that you signed, is
13  that right?
14  A. Yeah. It's quite common, but it's not -- I would say not
15  the most common. But I don't know how you prove it. And
16  as a scientist you need to be able to prove it.
17  Q. And also, you have no evidence that the Grossbaums had
18  intercourse with unprotected sex during their period of
19  --
20  A. I did not have cameras in their bedroom, no. I don't
21  know -- there's many reasons, you're focusing on a
22  laboratory here, but there's many reasons for this, and
23  that's just one of them.
24  MR. STEIN: Okay.
25  MR. LEUCHTMAN: Let's take a recess.

Page 79

1   (A short recess was taken)
2   MR. STEIN: Just a couple more.
3   BY MR. STEIN:
4   Q. In this case did you have an opportunity to see Dr.
5   Charles Strom's report?
6   A. Yes.
7   Q. And you know him?
8   A. Oh, yes.
9   Q. And you respect his opinions in general, if not in this
10  case?
11  A. I think he's a class guy.
12  Q. Okay. And I take it you disagree though with the content
13  of his report, is that right?
14  A. I think that he's voicing his opinion based on the
15  experience he had in his own laboratory, and it's
16  excellent, and so I can't quibble with the data that he
17  was generating.
18  MR. STEIN: All right. I don't have anything
19  more.
20  MR. HAMAD: Doctor, I have a question for you
21  actually.
22  EXAMINATION BY MR. HAMAD:
23  Q. I'd like to you take a look at your -- actually we'd like
24  you to take a look at your report.
25  A. Which one?

Page 80

1   Q. Your expert report in this case. Just let me know after
2   you've had a chance to review it if there's any opinions
3   in there that you don't agree with or that you would like
4   to retract. Because we just want to make sure the report
5   we have is, you know, is a good report from you, reflects
6   your opinions?
7   A. I haven't read every single one.
8   MR. LEUCHTMAN: No, no, no. That's not the one
9   he's talking about. The letter to me.
10  THE WITNESS: The letter to you.
11  MR. HAMAD: I'll rephrase it.
12  BY MR. HAMAD:
13  Q. Doctor, we would like you to take a look at your report,
14  the expert report you served in this case, and moving on
15  with this lawsuit we'd like to know if you stand by those
16  opinions, with the exception of the sentence --
17  A. Well, and I -- so with the exception of I refer, so that
18  kind of a little thing, so in here there's an I refer.
19  Q. Yeah.
20  A. Well, okay. There could be a couple of little things
21  like that in here.
22  Q. Besides that.
23  A. But in general I concur with the report and read it
24  quickly and signed it.
25  Q. And you concur with the opinions expressed in that

Page 81

1   report?
2   A. Yes.
3   Q. Okay. And you still do today?
4   A. Yes.
5   Q. And you attempt to do so at the time of trial?
6   A. Yes.
7   MR. HAMAD: Okay. No further questions.
8   MR. LEUCHTMAN: I don't have any questions.
9   (The deposition was concluded at 3:40 p.m.)

Mark Hughes
5/14/2010

22 (Page 82)

Page 82

```
 1                  CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN   )
 3                        ) SS
 4   COUNTY OF MACOMB    )
 5       I, LAURA J. STEENBERGH, Certified Shorthand Reporter, a
 6   Notary Public in and for the above county and state, do
 7   hereby certify that the above deposition was taken before me
 8   at the time and place hereinbefore set forth; that the
 9   witness was by me first duly sworn to testify to the truth,
10   and nothing but the truth, that the foregoing questions asked
11   and answers made by the witness were duly recorded by me
12   stenographically and reduced to computer transcription; that
13   this is a true, full and correct transcript of my
14   stenographic notes so taken; and that I am not related to,
15   nor of counsel to either party nor interested in the event of
16   this cause.
17
18
19         _____
20         LAURA J. STEENBERGH
21         CSR 3707 Notary Public,
22         Macomb County, Michigan
23   My Commission expires: 2/14/15
24
25
```

# EXHIBIT I

DEPOSITION
EXHIBIT
P2
5-14-10 LS





**Professor Mark Hughes, MD, PhD**
**Director, Genesis Genetics Institute**
**Director, Applied Genomics Technology Center**

Professor Mark Hughes graduated in Biology and Chemistry from **St. Johns University**, and then received a Masters in Biophysics at **Stanford University**, followed by a Ph.D. in Molecular Biochemistry at the **University of Arizona** Medical Center. He continued his training at the **Baylor College of Medicine** in Houston as a postdoctoral fellow with Bert O'Malley, where his pivotal work was published in *Science* and *Nature* and involved the cloning of the vitamin D and progesterone receptors and characterization of the first mutations found in human gene transcription factors. Following this training Hughes completed his M.D. at Baylor, followed by house staff training in Internal Medicine and clinical subspecialty training at **Duke University**. He then returned as junior faculty to Baylor's newly formed Genetics Institute led by Thomas Caskey. Among his accomplishments was the realization that single cells could be molecularly data mined for diagnostic advantage: This led to a multi-year collaboration with IVF clinicians and embryologists at the Hammersmith Hospital in London; the field of Preimplantation Genetic Diagnosis was born. *In 1993 Hughes' research was recognized by Science magazine as being one of the "ten most significant advances" in all of science that year, spanning all the physical, biological and mathematical sciences for that year.*

It was then that Professor Hughes was recruited to be one of the first 11 members of the **Human Genome Institute at NIH**. The Genome Project was getting underway and Hughes was recruited to lead the section on Translational Genomic Diagnostics. He also chaired Human Genetics at **Georgetown University**. Doctor Hughes then moved to Michigan to take a position as Professor and Director of Molecular Medicine and Genetics, Professor of OB-Gyn, and Professor of Pathology. He was named as the Director of the state of Michigan's 'Life Sciences Genomics Hub', focused on cutting-edge molecular medicine.

Hughes' work has centered on understanding gene expression in the early human embryo. His work on embryonic stem cells was acknowledged in 2001 when, along with Ian Wilmut (of Dolly the sheep fame) Hughes was awarded the "Pioneer in Stem Cell Biology" award. Professor Hughes, along with Professor Lord Robert Winston and Dr. Alan Handyside developed and performed the world's first cases of PGD. As we know, this field is now practiced world wide – today's speaker continues to push the frontiers of this technology and guide it in all its ethical ramifications, while he has expanded this work to systems-wide molecular understanding of early embryo development. His goal is to better understand, and hopefully prevent, many inherited birth defects of children. You may have seen him on the two hour BBC special, "Good Morning America", the "Today show", "CBS Evening News", and the subject of television newsmagazine segments for 60 Minutes and 20/20, and full hour programs on the Discovery Channel. His most recent medical advances have been in using Preimplantation Genetic Diagnosis to assist couples in avoiding serious diseases in their children and, at the same time, obtain a stem cell cure for a sick child already in the family. He performs this "miracle" every day now for hundreds of families Four years ago, because of federal funding limitations on embryonic stem cell science, he moved the PGD aspects of his work into the Genesis Genetics Institute where the diagnostic aspects of PGD are provided to over 270 human reproductive centers in North and South America, Europe and now Asia.

Mark Hughes has an international reputation for his work on single-cell analysis and preimplantation genetic diagnosis. Through this work, Hughes diagnoses specific hereditary diseases in a single cell biopsied from an eight-cell embryo prior to implantation in the mother's uterus. This specialized procedure allows parents at high genetic risk to greatly reduce their odds of passing the genetic disease of concern on to their children.

Hughes graduated in Biology and Chemistry from St. Johns University, and then received a Masters in Biophysics at Stanford University, followed by a Ph.D. in Molecular Biochemistry at the University of Arizona Medical Center. He continued his training at Baylor College of Medicine where his pivotal work was published in *Science and Nature*. Professor Hughes completed his M.D. at Baylor, followed by house staff training in Internal Medicine and clinical subspecialty training at Duke University. He then returned as junior faculty to Baylor's newly formed Genetics Institute. Among his accomplishments was the realization that single cells could be molecularly data mined for diagnostic advantage. This led to a multi-year collaboration with IVF clinicians and embryologists at the Hammersmith Hospital in London; the field of Preimplantation Genetic Diagnosis (PGD) was born. *In 1993 Hughes' research was recognized by Science magazine as being one of the "ten most significant advances" in all of science that year; spanning all the physical, biological and mathematical sciences.*

It was then that Professor Hughes was recruited to be one of the first 11 members of the Human Genome Institute at NIH. The Genome Project was getting underway and Hughes was recruited to lead the section on Translational Genomic Diagnostics. He also chaired Human Genetics at Georgetown University. Doctor Hughes then moved to Michigan to take a position as Professor and Director of Molecular Medicine and Genetics, Professor of OB-Gyn, and Professor of Pathology.

In 2003, he moved the PGD aspects of his work into the Genesis Genetics Institute where the diagnostic aspects of PGD are provided to the most respected reproductive centers all around the world. Able to test for hundreds of genetic diseases, the Institute assists thousands of couples reach their dream of building a healthy family.

# EXHIBIT J

Morganstern-Grossbaum results – 07/19/2004

Patient: Chaya Morganstern-Grossbaum – carrier - Exon 11, G542X Nt1756g>t
Partner: Menachem Grossbaum – carrier - Exon 10, dF508Nt1652 delCTT

Locus ID: 1080          Chromosome: 7q31.2          Gene: CFTR
OMIM: 602421

Biopsy done 7/17/2004 – began 10 am EDT, completed 11 am EDT
Quality is 1-4, where 1 is best
20 total tubes – 10 cells, 10 blanks

| Sample | Quality | CF 10 | CF 11 | Call |
|--------|---------|-------|-------|------|
| 2 | 2-8c | No deletion | T only | Possibly affected – ADO paternal |
| 3 | 2-3c | No amp | No amp | No molecular signal |
| 4 | 2-4c | No amp | G | Carrier at worst |
| 7 | 2-7c | No amp | G | Carrier at worst |
| 8 | 2-8c | No deletion | G/T | Carrier maternal – OK for transfer |
| 9 | 2-4c | No amp | No amp | No molecular signal |
| 10 | 2-4c | No deletion | G/T | Carrier maternal – OK for transfer |
| 13 | 2-4c | No amp | G | Carrier at worst |
| 14 | 2-7c | No amp | No amp | No molecular signal |
| 15 | 2-4c | No amp | G | Carrier at worst |
| CG | | No deletion | G/T | Control – as expected |
| MG | | Het. deletion | G | Control – as expected |

Note: For sample 2, since only the mutant maternal allele was observed, it is possible that
the paternal allele also dropped out of CF 10, and could be affected.

All controls and media blanks worked as expected. These data are very clear. All media
blanks showed no evidence of exogenous DNA contamination.

Electronically signed,

Mark Hughes, M.D. Ph.D.