UNITED STATES DISTRICT COURT
for the
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAYA GROSSBAUM and MENACHEM GROSSBAUM, her spouse, individually and as *guardians ad litem* of the infant ROSIE GROSSBAUM, | : : : : : |
| Plaintiffs, | : CIVIL ACTION NO. : 07-CV-1359 (GEB) |
| | : |
| vs. | : |
| | : |
| GENESIS GENETICS INSTITUTE, LLC, of the State of Michigan, MARK R. HUGHES, NEW YORK UNIVERSITY SCHOOL OF MEDICINE and NEW YORK UNIVERSITY HOSPITALS CENTER, both corporations in the State of NEW YORK, ABC CORPS. 1-10, JOHN DOES 1-10, | : : : : : : : : : |
| Defendants. | : : |

BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
RETURNABLE SEPTEMBER 7, 2010 AT 10:00 A.M.

NUSBAUM, STEIN, GOLDSTEIN,
 BRONSTEIN & KRON, P.A.
20 Commerce Blvd., Suite E
Succasunna, NJ  07876
nsgbk.office@verizon.net
(973) 584-1400
Attorneys for Plaintiffs

On the Brief
Lewis Stein, Esq.

TABLE OF CONTENTS

                                                        PAGE

PRELIMINARY STATEMENT                                     1

FACTUAL BACKGROUND                                        2

THE STANDARD FOR REVIEW                                  12

THE MAGISTRATE JUDGE'S ORDER OF JULY 13, 2010            14

CONCLUSION                                               26

TABLE OF CITATIONS

PAGE

CASES:

Chambers v. Heidelberg, USA, Inc.
2007 WL 1544255 (D.N.J.)                                26

Johnson Development Group, Inc. v. Carpenter's Local
Union 1578
130 F.R.D. 348, 353 (D.N.J. 1990)                       20

Leap Systems v. Money Trax Inc.
2010 WL 2232715 (D.N.J.)                                13

Penny Pact
559 F.2d.                                               20


RULES:

Rule 26                                              4, 5, 25

Rule 26(a)(2)(B)                                        2

Rule 26(e)(II)                                          11

PRELIMINARY STATEMENT

Much has been made by U.S. Magistrate Judge Esther Salas and New Jersey counsel for Defendants, Genesis Genetics and Mark Hughes, M.D. [hereinafter "Genesis"] (Doc. No. 63: letter in opposition dated June 3, 2010) that this Court rejected Plaintiffs' prior application to allow additional fact discovery originally made seven weeks after the close of fact discovery, but prior to the submission of required experts' reports (nine in number).  That application sought the deposition of two laboratory employees of Genesis Genetics and documents supporting the claims made by Defendant Dr. Mark Hughes in his deposition in February 2009.  That application was found unpersuasive under prevailing standards notwithstanding indisputable facts that:

(1) Defendant Genesis Genetics did not produce a complete laboratory chart until the case was two years old (May 8, 2009);

(2) Defendant's counsel erroneously asserted the completeness of the record in response to Plaintiffs' requests;

(3) The six scheduling orders of the Magistrate's cited in this Court's memorandum opinion were on four occasions the result of communications to the Court by Plaintiffs' counsel (on one occasion expressing concern

that the Plaintiffs would be victimized by the

Defendant Genesis' dilatory tactics);

(4) There was no evidence that the Plaintiffs were

dilatory, inattentive or disrespectful of the

scheduling orders;

(5) The discovery requests were not made in bad faith; and

(6) The discovery requests were not unnecessarily

burdensome or prejudicial to the Defendant.

As will be seen from the record now before the Magistrate

Judge as more particularly set forth below, the basis of this

application relates principally to events that took place in

connection with Defendants compliance with Rule 26(a)(2)(B)

Expert Reports.

FACTUAL BACKGROUND

This complex medical malpractice case involves medical

technology that was developed in the 1990's to detect genetic

mutations in embryos prior to "in vitro fertilization"

[hereinafter "IVF"] thereby essentially reducing or eliminating

the risk of a baby being born with cystic fibrosis.  The

Defendant Genesis and its Director, Dr. Mark Hughes, was one of

only four or five laboratories in the United States providing

such analysis, with substantially more in Europe.

In March 2004 the Plaintiffs, Chaya and Menachem Grossbaum,

both carriers of the cystic fibrosis mutation (a recessive gene

mutation) with a 25% chance of having an affected baby, sought assistance from the Fertility Clinic at NYU.  They were there informed about preimplantation genetic diagnosis [hereinafter "PGD"] and were referred by NYU to Dr. Mark Hughes and Genesis Genetics in Detroit for embryo analysis.  After an initial consultation by telephone with Dr. Hughes, the IVF process was started at NYU.  Single cells from each of ten embryos were sent for analysis to Genesis on July 16, 2004.  A report dated July 17th was forwarded to NYU bearing the electronic signature of Mark Hughes, M.D. (Doc. No. 62; Cert. Exh. D)  The fax transmittal record of this report appears in both the files of Genesis as well as NYU.  A second more expansive commentary on the lab studies addressed to NYU by Genesis and Dr. Mark Hughes appears in the Genesis laboratory file, but not in the NYU file. There is no transmittal record in any file with respect to this report.  NYU's staff personnel deny receiving the second transmittal.  Implantation took place at NYU, pregnancy ensued and a baby girl was born in Saint Clare's Hospital in Denville, New Jersey on March 25, 2005.  Unfortunately, the baby suffers a significant form of the disabling disease of cystic fibrosis affecting her respiratory capacity and her digestive abilities due to pancreatic insufficiency. Investigation of the circumstances that lead to the birth of this unfortunate child (now five years old) lead Plaintiffs' counsel to Dr. Garry

3

Cutting, Professor of Pediatrics and Medical Genetics at Johns Hopkins Medical School and Director of the institution's DNA laboratory—a nationally recognized expert in cystic fibrosis. (Doc. No. 31: Dr. Cutting's *curriculum vitae*)  It was Dr. Cutting who pointed out the lack of a complete record that ultimately was forthcoming from Genesis on May 8, 2009.

In the interim, the undersigned, counsel for the Plaintiffs, asked Dr. Cutting some general questions by letter dated December 7, 2007. (Doc. No. 66)  This was prior to the receipt of the complete record and prior to the depositions of Defendant Dr. Hughes and all five members of NYU's medical staff, which took place between March 19, 2009 and July 24, 2009.  Dr. Cutting answered four general questions for the undersigned, emphasizing in his own words, his "limited understanding of the records."  Dr. Cutting did not offer any opinions regarding the standard of care with respect to NYU. Moreover, he did not address the issue of causation other than to make his preliminary observations about the ramifications of the selection of a particular embryo for implantation by NYU. Subsequently, approximately two months after the final deposition of NYU's staff, Dr. Cutting produced his Rule 26 report dated September 29, 2009. (Doc. No. 66)  Approximately six weeks later, on November 12, 2009, Dr. Charles Strom, Medical Director of the Genetic Testing Center of Quest

Diagnostics, Nicholls Institute, San Juan Capistrano, California, provided his Rule 26 report. Both of these expert reports were provided to the Defendants consistent with the requirements of Judge Salas' then current scheduling order.

After brief extensions requested and obtained from the Magistrate Judge, Defendants provided their liability experts' reports as follows:

> For Genesis Genetics- Dr. Kangpu Xu, Director of Laboratory of Preimplantation Genetics and Associate Professor at the Weill Cornell Medical College and Weill Cornell Medical Center, dated February 26, 2010; and Dr. Mark Hughes, Director of Genesis Genetics and a named Defendant in this action, dated March 2, 2010.

> For NYU- Dr. Samuel C. Pang, Medical Director of the Reproductive Science Center, Lexington, Massachusetts, dated February 25, 2010.

A cursory review of the reports received on behalf of Defendant Genesis revealed their striking similarity. Not only were the reports similar in structure, but also whole paragraphs in both reports were identical, i.e. verbatim, illustrated in the bold type in Exhibits F and G attached to the Certification of the undersigned that was provided in support of the application to the Magistrate Judge. (Doc. No. 62; Cert. Exh. F and G)

Depositions followed with Dr. Garry Cutting first on April 24, 2010 in Baltimore, Maryland, consuming four and one-half hours on a Saturday afternoon (Dr. Cutting did not have other dates available); then Dr. Charles Strom made himself available on a trip East and was deposed on May 8, 2010 in New York City, which deposition was concluded on June 24, 2010, likewise in New York City.

During the deposition of Dr. Xu, which took place on May 13, 2010, Plaintiffs' counsel explored the issue of the similarities between Dr. Xu's report and that of Dr. Mark Hughes. Dr. Xu denied having any assistance in preparing his report, except he "discussed a few points with Mr. Leuchtman," but he wrote the report himself. (Doc. No. 62; Cert. Exh. G; T:34-7) He denied ever speaking to Dr. Hughes about the report or the case. (T:34-11 to 34-16) The report was prepared on a computer typed by himself. (T:36-4 to 36-16) Aside from the similarities, another curiosity was evident in Dr. Xu's report. The biographical paragraph is replete with syntactical idiosyncrasies not uncommon to a writer for which English is a second language and, in Dr. Xu's case, Chinese is first. Dr. Xu owned up to these syntactical idiosyncrasies that were apparent by noting: English is a second language to him (T:33-18); he left China at age 31 (T:34-3); came to Canada sometime in around 1987 and did not return to China thereafter (T:33-20). He also

pointed out that he did not seek editorial help, which he usually does with his publications, since he believed his letter to be confidential. (T:40-13)

Dr. Mark Hughes, who had been deposed as a named Defendant on February 19, 2009, was again deposed on May 14, 2010 in his capacity as an expert witness.  When presented with what purported to be his March 2, 2010 report, he expressly denied writing the report turning to his lawyer, Stephen Leuchtman, and indicated "you did it."  The exact colloquy was as follows. "Well, if you didn't write it, could you tell me who wrote it?" Dr. Hughes then turned to his lawyer, Stephen Leuchtman, and stated, "Because you [Mr. Leuchtman] did it..." (Doc. No. 62; Cert. Exh. H; T:6-10)  He went on to claim that he was traveling and that Leuchtman emailed him a draft of the report which he subsequently edited and electronically signed and sent back to Leuchtman. (T: 6-13 to 6-23)  Specifically to Leuchtman he said, "You wrote the stuff and I edited it." (T:6-19)  The witness added further, "It's not exactly the way I would have written it." (T:6-25 to 7-1)  He repeated again spontaneously, facing Leuchtman, "Because I didn't write this, I didn't actually write this." (T:7-13 to 7-14)

Following this startling disclosure, defense counsel asked for a deposition recess, which lasted more than 20 minutes. Upon return, Mr. Leuchtman stated, "I am going to instruct Dr.

Hughes not to answer any further questions about how the report came into existence." (T:18-11 to 18-13)   Further efforts to inquire about the email transmittals and its availability were not answered.  (Doc. No. 62; Cert. Exh. H; T: 18 and T:19)

In addition, provided with the report was a two page biography of Dr. Hughes which appeared to be intended to serve as his *curriculum vitae*. (Doc. No. 62; Cert. Exh. I)  When Dr. Hughes was confronted with the two page biography, this witness stated, "I do not know where this exactly came from."  He indicated that that biography was also not written by him, but by someone else unknown to him. (T:21-1)

Not only did Dr. Hughes disclaim writing the report and notwithstanding his claim at editing, Dr. Hughes indicated that the report supplied over his name contained statements with which he did not agree.  He expressly disclaimed agreement with a sentence made in the second to last paragraph of his report which read, "Based on the literature, most misdiagnoses are due to intercourse or unprotected sex."  Asked if he agreed with that statement, he said, "No." (T:78-6 to 78-9)  He also acknowledged another incorrect statement in what purported to be his letter report.  At Page 40 of his deposition transcript, he disclaimed the validity of a statement that read, "I have had people over the years voice objection to amino or CVS and when this has happened I have referred them to organizations who did

not require conventional prenatal follow-up testing with amnio or CVS." (T:40-7 to 40-19)

Aside from the curious nature of the testimony with respect to the authorship of Dr. Hughes' report, two other startling statements were made by Dr. Hughes during this deposition. He stated in his deposition for the first time that the document contained in Genesis Genetics' records (Doc. No. 62; Cert. Exh. H; T:62-4 to 62-19) and found in the NYU records which purported to be Genesis Genetics' laboratory report to NYU and was "electronically signed Mark Hughes, M.D., Ph.D.," was in fact not a document created by him and the electronic signature attached to the record was not affixed by him, but by some other member of the Genesis Genetic staff. This statement of fact was never made known in the extensive discovery that took place prior to this second deposition of Dr. Mark Hughes. He never mentioned it during the discussion that took place in his first deposition of February 19, 2009, where the report (Doc No. 62; Cert. Exh. J) was discussed along with a second letter memorandum sent by him. In addition, this report, which NYU purported to rely upon, was in fact a preliminary report and, even though the same date as his second or final report, was explained to be forwarded at the request of NYU for preliminary reports as soon as they could be available. This fact, that the report upon which NYU purported to rely upon and which all of

the depositions of NYU witnesses were based was intended to be a preliminary report in accordance with a practice established between NYU and Genesis Genetics—a totally new revelation.

Another aspect of new material developed during deposition testimony of Genesis' expert witnesses related to the information contained in Dr. Xu's deposition.  Dr. Xu in his report discussed in general and abstract terms the circumstances in which allele dropout [hereinafter "ADO"], a situation where the analysis of a chromosome for the genetic mutation fails to pickup the particular location on the gene where the mutation exists, occurs under certain circumstances.  However, Dr. Xu never mentioned he disputed the statistical data reported in the literature by Dr. Strom in his report, which Dr. Xu had prior to his issuing of his report.  However, Dr. Xu in his deposition challenged Dr. Strom's reported statistics based on experience at his institution.

Approximately two weeks after the conclusion of the depositions of Drs. Xu and Hughes, by letter dated June 2, 2010 with Certification and Exhibits attached, the undersigned "raised the issues" contained in this application with Magistrate Judge Salas prefacing the argument with the statement, "In all likelihood the issues I raise within this letter require a formal motion and by this letter we seek permission to file said motion." (Doc. No. 62)

A previously scheduled telephone status conference took place on June 3rd, the following statement appears in the record:

> And then we're going to address an issue that came before the Court just last night, document 62, filed June 2nd of this year by Mr. Stein, which -- taking a very quick look at it, because I have been conducting an all-day oral argument with 16 or 20 attorneys prior to getting on the phone call here today. I haven't had the luxury of sitting down and fully reviewing the document, but it does appear as Mr. Stein is requesting yet again permission to reopen fact discovery, which this Court has dealt with -- I think, at least from my counting -- on four separate occasions; and, in fact, Judge Brown affirmed my ruling denying Mr. Stein's request, and that -- Judge Brown's order is dated February 9, 2010.
>
> So if, indeed, this is what I think it is, I am going to let Mr. Stein know on the record that I am not engaging in any further briefing or consideration to reopen fact discovery. I have dealt with that issue, I have ruled on that issue, and that issue will stand. Based on the district judge's --
> (Doc. No. 68; Page 5)

With this as the Court's mindset, the Court agreed to determine whether the application to re-open fact discovery is based on new material or a re-hash of the old application. Also, on that conference call, defense counsel for NYU claimed that there was a supplemental report issued by Dr. Cutting, which he was not provided with, pursuant to Rule 26(e)(II).  The Court's response was "Mr. Stein, how come you did not supply counsel with the supplemental report before Dr. Cutting was deposed?" Again, the Court deferred final judgment on an

application by NYU to re-depose Dr. Cutting following further submissions.  There was not such supplemental report.

Subsequently, in connection with its submission, NYU provided the Court with a copy of the letter dated May 24, 2008, in which Dr. Cutting was responding to the earlier inquiry of Plaintiffs' counsel, which was prior to receiving the complete laboratory records of Genesis Genetics, prior to receiving any expert reports and depositions of any fact witnesses in the case.

Defendant Genesis, through its New Jersey counsel, by letter dated June 3, 2010, as previously noted, invoked Judge Brown's February 9, 2010 order and made much of the prior orders of the Court completely overlooking the fact that these are new issues created as a result of Genesis' expert reports and testimony.  Peculiarly, the Genesis counsel's argument offered by Lowenstein Sandler characterized this Court's order of February 9, 2010 as "the law of the case."  We fail to see that that statement has any legal basis.

THE STANDARD FOR REVIEW

The standard for review, as noted by this Court in its memorandum opinion of February 9, 2010, is that a District Court may modify or set aside a Magistrate Judge's non-dispositive order if the ruling was "clearly erroneous or contrary to law" and further, that "a Magistrate Judge's ruling on a non-

dispositive matter such as a discovery motion is entitled to great deference and is reversible only for abuse of discretion." (Citations omitted.) (See memorandum opinion dated February 9, 2010 at Page 2.)

To provide further guidance in the application of such general terms as "clearly erroneous" and "abuse of discretion," the District Court has expounded further.  Judge Freda L. Wolfson in Leap Systems v. Money Trax Inc., 2010 WL 2232715 (see copy of unpublished opinion annexed hereto at Pages 3 and 4), wrote:

> The Magistrate Judge may 'hear and determine any [non-dispositive] pretrial matter pending before the court.'...Because the Court has found that the Magistrate Judge's ruling in this case is non-dispositive, this Court will only reverse that ruling if it is 'clearly erroneous or contrary to law.'...A magistrate judge's finding is clearly erroneous when, although there may be some evidence to support it, the reviewing court, after considering the entirety of the evidence, 'is left with the definite and firm convection that a mistake has been committed.'...'A district judge's simple disagreement with the magistrate judge's findings is insufficient to meet the clearly erroneous standard of review.'
>
> ***
>
> Furthermore, where the appeal seeks review of a matter within the exclusive authority of the magistrate judge, such as a discovery dispute, an even more deferential standard, the abuse of discretion standard, may be applied. ...'An abuse of discretion occurs: 'when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion

is abused only where no reasonable man would
take the view adopted.''...(`An abuse of
discretion occurs when a `material factor
deserving significant weight is ignore, when
an improper factor is relied upon, or when all
proper and no improper factors are assessed,
but the court makes a serious mistake in
weighing them''.)  `This test display
considerable defense to the determination of
magistrates in such matters.'...However, an
error 1f law or finding of fact that is
clearly erroneous may indeed constitute such
abuse.
[Citations omitted.]

THE MAGISTRATE JUDGE'S
ORDER OF JULY 13, 2010

I

The Magistrate Judge's recitation of the numerous

management events without reference to the factual circumstances

underlying the scheduling adjustments as a basis for ruling on

the present application is totally unreasonable and unfair to

the Plaintiffs.  Were such an analysis to be made, it is

respectfully suggested that the repeated adjustments were in

large measure the result of:

(a)   The delay by Genesis in producing the basic

information solely within its control needed for an

assessment of the core issue of Plaintiffs' case—the

laboratory studies which resulted in a cystic fibrosis

baby;

14

(b)   The refusal of NYU to produce the requested members of the Fertility Clinic in short order, and only producing one at a time over a period of five months;

(c)   Plaintiffs' need to rely on genetic expertise from a limited pool;

(d)   Plaintiffs' ability to obtain the consultation with Dr. Garry Cutting of Johns Hopkins whose preeminent medical status allowed only limited availability to the Plaintiffs for consultation;

(e)   The limited availability of PGD laboratory expertise from a small and relatively close community with Plaintiffs' ultimate connection to Dr. Charles Strom, Director of Quest Diagnostics Genetics Laboratory in San Juan Capistrano, California, not taking place until mid 2009; and

(f)   Preoccupation of the Magistrate Judge with the age of the case and the shortened litigation events—almost to the exclusion of all other considerations.

Moreover, characterization of the Magistrate Judge that the Court was "faced with Plaintiffs' numerous requests for extensions since February 2009" is a mischaracterization.  Also, the claim that this is the "fourth request" (and that the Defendant Genesis claimed it to be five) is a distortion of the record.  The Plaintiffs made an initial request for the

depositions of two staff members of Genesis spontaneously and
orally during a previously unscheduled in-Court proceeding as
part of a status conference on September 21, 2009, when the
Magistrate Judge declined to "reopen fact discovery." (Doc. No.
68; Page 30)  This request was followed by an apparently
inappropriate reconsideration request and an appeal to the
District Court.  Aside from briefly raising this question
informally in a status conference following the deposition of
Plaintiffs' experts and the receipt of the Defendants' experts'
reports, the only other request to open fact discovery is the
application now under review.  In fact, other than the purported
reconsideration application mentioned above, this is the only
application in writing to the Magistrate Judge to re-open fact
discovery.  And even this application was framed as a request
for permission to file a formal motion, not only to challenge
the *pro hac vice* status of the Defendant's counsel, Stephen
Leuchtman, Esq., but also to address the entire discovery
request now before the Court.  The request for permission to
file a formal motion, required by the Magistrate Judge's initial
management order, was not acknowledged by the Magistrate Judge.
No opportunity for full briefing or oral argument on the merits
was afforded.  The result was the Magistrate Judge's letter
order of July 13, 2010.

16

II

A

The Magistrate Judge rejected Plaintiffs' application to depose Defendant's counsel with the following observation:

> Plaintiffs seek Mr. Leuchtman's deposition based on allegations that Mr. Leuchtman authored Dr. Hughes' and Dr. Xu's (two of Genesis' experts) reports rather than the experts themselves.  Plaintiffs support for this contention is a comparison of the two reports and testimony by the experts. (See Page Two of letter order.)

This statement is inaccurate and a misstatement of the record. The similarities between the two experts' reports are self-evident.  But the authorship of only one, Dr. Mark Hughes' report, is known—he admitted this himself.  The authorship of Dr. Xu's report is unknown.  Dr. Xu claims that he had no assistance in preparing the report. (Doc. No. 64; Cert. Exh. G; T:34-9)  While Plaintiffs are clearly interested in establishing that Dr. Xu's report was also authored in large measure by Attorney Leuchtman, that is the fact that Plaintiffs seek to investigate and establish through the deposition testimony of Mr. Leuchtman and examining the correspondence and emails between Mr. Leuchtman and the experts, Dr. Hughes and Dr. Xu.

B

The Magistrate Judge's response to Plaintiffs' request was:

> The Court finds that the quality of information in Mr. Leuchtman's knowledge is

17

> disproportional to Plaintiffs' needs.  The
> information sought from Mr. Leuchtman is
> available from other sources, namely the
> experts themselves.  In fact, Plaintiffs had
> the opportunity to depose Dr. Xu and Dr. Xu
> about the authorship of both expert reports at
> each expert's deposition.  Any further inquiry
> is appropriate during cross-examination and
> not in a deposition of Genesis' attorney.
> Plaintiffs have cited no case law which merits
> the Court permitting such a deposition.  On
> the contrary, Defendant Genesis has cited
> ample reasons and relevant case laws as to why
> such deposition would be improper.  See letter
> dated June 3, 2010, Document #63 at 2-4.

Aside from the curious reference to Defendant Genesis' letter

memorandum in which the Magistrate Judge does not identify

specifically which reasons she relies on, the Magistrate's

reasoning is certainly subject to significant question.  Is the

Plaintiff required to accept Dr. Xu's testimony that he is the

author without assistance of his own report?  What in the record

explains the curious similarities of Dr. Xu's report with Dr.

Hughes' report?  Did Mr. Leuchtman copy Dr. Xu's report to

include in Dr. Hughes' report?  Why are the syntactical

idiosyncrasies in Xu's report as to the biographical data not

present in the opinion part of Xu's report?  Did Mr. Leuchtman

actually write or suggest language to Dr. Xu to be included in

his report?  Did Mr. Leuchtman suggest the opinions to be

included in Xu's report?

In addition, as to Dr. Hughes' report, did Hughes actually

edit his report before it was served on Plaintiffs' counsel?  If

so, why does Dr. Hughes now dispute two significant statements in the report as being opinions that he does not hold to be true?  To what extent did Hughes edit the report?  Was Hughes' report entirely the work of Mr. Leuchtman?  Does the electronic signature indicate that Hughes ever saw the report?  When Plaintiffs' sought at Dr. Hughes' deposition to inquire about the email communications, the Defendant through his counsel, Mr. Leuchtman, interposed an attorney-client privilege objection and shutdown further questions.  Is the Plaintiff not entitled to know prior to trial whether the reports that had been submitted by the Defendant Genesis were in fact the work of their attorney and not the work of the respective experts?

III

The Magistrate Judge notes in her opinion letter the following:

> Plaintiffs have cited no case law which merits
> the Court permitting such a deposition [of
> Stephen Leuchtman, Esq.].

However, the Magistrate Judge has apparently miscited case law to support her conclusion.  The citation to "ABB Air v. Grecco, 167 F.R.D. 668 (D.N.J. 1996) (barring expert testimony on specific issues for failure to comply with scheduling orders)," upon our reading does not support the holding stated by the Magistrate Judge herein.  In that case, then Magistrate Judge (now Judge) Wolfson specifically held that plaintiff's

19

motion to preclude defendant's expert testimony...is denied.   In
so holding, Judge Wolfson stated:

> The Third Circuit has, on several occasions,
> manifested distinct aversion to the exclusion
> of important testimony absent evidence of
> extreme neglect or bad faith upon the
> proponent of the testimony. (*Id.* at 671.) ...
> The District Court may be found to have abused
> its discretion if [its] exclusion of testimony
> results in fundamental unfairness in the trial
> of the case.

Finally, Judge Wolfson noted:

> A court reviewing a scheduling order violation
> should apply the Penny Pact factors:
>
> (1)   The prejudice or surprise in fact of the
> party against whom the excluded witness who
> would have testified;
>
> (2)   The ability of the party to cure the
> prejudice;
>
> (3)   The extent to which waiver of the rule
> against calling unlisted witnesses would
> disrupt the orderly and efficient trial of the
> case or of other cases in the Court; and
>
> (4)   Bad faith or willfulness in failing to
> comply with the District Court's order.
> (Penny Pact, 559 F.2d. at 904-05)

While not precisely applicable to the scheduling orders

involved here, there is absolutely no suggestion of bad faith,

prejudice, harassment or undue burden to the Defendants if the

Plaintiffs were allowed to pursue the reasonable investigation

suggested in its application.

In addition, it should be recognized that <u>Johnson</u>

<u>Development Group, Inc. v. Carpenter's Local Union 1578</u>, 130

<u>F.R.D.</u> 348, 353 (D.N.J. 1990), cited by the Defendant Genesis to

the Magistrate Judge and incorporated in the letter order is a

case in which deposition testimony of counsel <u>was allowed</u>.

IV

A

The Magistrate Judge opined:

> Moreover, Plaintiffs have not demonstrated
> what the two NYU personnel and Dr. Rosenwaks
> would testify about, which could not have been
> previously explored. (See letter opinion of
> June 2, 2010 at Paragraphs 2 and 3.)

In our letter of June 2, 2010 (Doc. No. 62; Page 2),

Paragraphs (2) and (3) we note Dr. Hughes' testimony at his May

14, 2010 deposition that his basic report was not intended to be

his final report, but was a preliminary report sent pursuant to

the request of NYU.  This now raises a factual issue as to

whether NYU did in fact request a preliminary report and whether

the characterization of the designated report, which gave no

indication of being preliminary, now provides an explanation for

a second report which was part of the Genesis Genetics file, but

was never a part of the NYU record.  We stated further:

> To this end, we seek leave to take the re-
> depositions of NYU personnel: (a) Dr. Grifo,
> who headed the Division of Reproductive
> Endocrinology; and (b) Alexis Adler, the
> embryologist, who was involved in requesting

21

and receiving the reports from Genesis
Genetics.

The Court's comment is curious in that the two paragraphs
referenced above specifically identify the area of concern
regarding the relationship between NYU and Genesis and is
certainly within the knowledge of the personnel at Genesis as
well as personnel at NYU.

Until such time as Dr. Hughes set forth his testimony in
his deposition of May 14, 2010, how could the Plaintiffs
anticipate that the signed report relied upon by NYU was in fact
(by the sworn testimony of Dr. Hughes) not signed by him and was
a preliminary report according to the desires of NYU staff and
the arrangements between the two.

The Magistrate's comment on Plaintiffs' request for further
discovery on this issue is clearly unsupportable.

B

Paragraph 5 of the aforementioned letter of June 2, 2010 by
the Plaintiffs to the Magistrate Judge sets forth the basis for
further investigation into the evidence at Weill Cornell
regarding the incidence of allele dropout.  In his deposition,
Dr. Xu clearly went beyond any comment made in his report and
thus, created the necessity for fact investigation into the
subject of the Weill Cornell experience.  For that reasons, Dr.
Zev Rosenwaks, Director of the Center for Reproductive Medicine

and Infertility at Weill Cornell, was requested to be deposed.
Likewise, how could the factual circumstances alluded to herein
be known prior the deposition of Dr. Xu?

V

The Magistrate Judge granted Defendant NYU's request to re-
depose Plaintiffs' expert, Dr. Garry Cutting, based on:

> Documents produced by the Plaintiffs at Dr.
> Cutting's deposition" and allowed that
> deposition to be taken in-person.  Defendant
> NYU has cited to a specific document which was
> previously requested and not promptly
> produced.  (Doc. No. 66 at 1-2: NYU's letter
> dated June 7, 2010)

There is categorically no factual support for the
Magistrate's statement that "a specific document was previously
requested and was not promptly produced."  As noted in the
factual record stated above, Plaintiffs' initial letter to Dr.
Cutting preceded any depositions of Genesis Genetics' witnesses
and the five NYU staff members from the Fertility Clinic.  It
also preceded receipt of the complete laboratory record from
Genesis Genetics by a full one and one-half years.

In addition, the Defendant NYU mischaracterizes the letter
as a "request for a report."  There is absolutely no request for
a report in the letter.  Plaintiffs' counsel inquiry at that
time was for educational purposes with four questions posed.  No
opinion was given by Dr. Cutting as to any departures from
standard of care by NYU.

23

One of the questions we posed, specifically Number 4, asked if the substitution of embryos by NYU "would substantially increase the risk of cystic fibrosis child above what would have been expected under any appropriately done evaluations." Dr. Cutting's answer specifically stated, "From our limited understanding of the records."

Plaintiffs, in the interest of eliminating the potential for any confusion by Defendant NYU THAT Dr. Cutting's impressions in December 2007 were different from his report in September 2009, did not oppose further questions of Dr. Cutting regarding his very narrow issue. Plaintiffs still do not oppose the inquiry to Dr. Cutting regarding this issue. However, there appears to be a very limited amount of questioning relative to the comment in the letter of May 24, 2008 as opposed to any comments made on the deposition in April 2010. The need to travel to Baltimore and impose on Dr. Cutting's time to setup on in-person deposition at a situs other than the Medical School appears to be unreasonable and an unnecessary burden to the witness and the Plaintiffs in this matter.

There is no evidence of a discovery violation. It is entirely reasonable for the Plaintiffs to suggest that the further questioning of this witness be taken telephonically. The questions could not conceivable last more than 10 or 15 minutes.

Moreover, the entire subject appears more appropriately, as the Magistrate Judge suggested in ruling on Plaintiffs' application, one for cross-examination and not for re-deposition.

Plaintiffs can clearly ask why the Plaintiffs are being treated differently in this matter from the Defendants.

VI

THE <em>PRO HAC VICE</em> STATUS OF<br>STEPHEN LEUCHTMAN, ESQ.

Federal Rule 26 points up the significance of expert reports and the form and content which they should take.  The Rule is predicated on the assumption that the opinions offered are those formulated and held by the expert.  When an attorney prepares a report and submits it as that of the expert, even though the expert's signature is affixed, as in this case, it is respectfully submitted that the intent and purpose of the Rule is subverted—as is the judicial process.

An expert report is of particular significance in informing the factfinder as to the standard of care, the departures and the effects thereof.  The evidence in this case calls into question Stephen Leuchtman of the Michigan Bar in connection with the formulation and presentation of the opinions of the purported experts.  Mr. Leuchtman's deposition is now sought and may become part of the factual evidence in the case. The basis

for revoking *pro hac vice* appointments was set forth in <u>Chambers v. Heidelberg, USA, Inc.</u>, 2007 <u>WL</u> 1544255 (D.N.J.).

CONCLUSION

Plaintiffs respectfully submit that the matter set forth above amply supported the Plaintiffs' burden to demonstrate that the July 13, 2010 letter order of the Magistrate Judge should be reversed and the deferential standard met.   To do otherwise would be to deny this Infant Plaintiff evidence that may be important at trial to support her claim.

Respectfully submitted,

Lewis Stein

Dated: July 27, 2010

Westlaw.

Page 1

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

Only the Westlaw citation is currently available.Not for Publication

United States District Court,
D. New Jersey.
LEAP SYSTEMS, INC., Plaintiff,
v.
MONEYTRAX, INC. and Norman Baker, Defendants.
**Civil Action No. 05-1521 (FLW).**

June 1, 2010.

Heather Marie Hughes, Melissa L. Klipp, Walter John Fleischer, Jr., Drinker, Biddle & Reath, LLP, Florham Park, NJ, for Plaintiff.

Marc D. Haefner, Christine Intromasso Gannon, Connell Foley, LLP, Roseland, NJ, Jeffrey Dwight Ullman Ullman, Furhman & Platt, PC, Morristown, NJ, for Defendants.

**OPINION**

WOLFSON, District Judge.

**\*1** Intervenor Todd Langford ("Langford") appeals the Magistrate Judge's September 24, 2009 Order denying his application to unseal portions of the transcript of a recorded settlement FN1 (the "Settlement") between Plaintiff LEAP Systems, Inc. ("LEAP") and Defendants MoneyTrax, Inc. ("MoneyTrax") and Norman Baker ("Baker"). For the reasons stated herein, the Magistrate Judge's decision is MODIFIED and AFFIRMED.

> FN1. Langford does not appeal the Magistrate Judge's decision granting him to intervene in this action for the purposes of moving to unseal the transcript.

**BACKGROUND AND PROCEDURAL HISTORY**

For the purposes of this appeal, the Court will only recount the relevant facts. This action was commenced in 2005. The Complaint alleged that Norman Baker, who had been affiliated with LEAP for years before his withdrawal from active involvement with the company in 2002, had misappropriated certain proprietary information from LEAP and disclosed such information to co-defendant MoneyTrax, LEAP's principal competitor. After a year of unsuccessful mediation, this Court conducted a settlement conference with the parties on March 25, 2008. On that day, the parties reached two settlement agreements, one between LEAP and Baker, and the other, between LEAP and MoneyTrax. Baker's then-attorney, who is also counsel for Langford on this appeal, urged the Court to record the settlement so as to memorialize the terms of the Settlement and the parties' assent to those terms. In April 2008, LEAP moved to seal the transcript because it contains specific terms of the Settlement. Neither Baker nor MoneyTrax opposed the motion. By Order dated May 9, 2008, the Court granted the motion ("Sealing Order").FN2 Significantly, the Court found that LEAP had a significant interest in keeping the terms of the Settlement confidential (1) to protect LEAP from competitors using the materials and information contained therein to unfairly compete against LEAP; and (2) because disclosure would put LEAP at a severe tactical disadvantage in enforcing and litigating its rights by having its litigation strategies, negotiation tactics, and business information made public. *See* Order dated May 9, 2008.

> FN2. Disputes regarding the LEAP-Baker Settlement arose almost immediately thereafter. Consequently, on November 14, 2008, the Court facilitated another settlement agreement between LEAP and Baker; the terms of the second settlement were also recorded. Those terms, however, are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

not the subject of Langford's appeal.

After the conclusion of this action, LEAP filed a state lawsuit against Langford and various business entities, in which he is a principal or participant, alleging that Langford had misappropriated certain LEAP proprietary information. Ullman's Cert. at ¶¶ 4, 33. According to Langford, in order for him to establish his defense in the state court action, he needs to access the sealed portion of the transcript at issue. *Id.* at ¶¶ 4-5, 34. To that end, Langford asserts his common law right of access to all the records of the proceedings in this matter. In that regard, Langford moved to intervene in this case and to unseal the transcript of the recorded settlement. Lanford's motions were referred to the Magistrate Judge.

By Letter Ordered dated September 24, 2009, the Magistrate Judge permitted Langford to intervene, but denied his request to unseal the transcript. In that Order, relying on this Court's prior findings of fact during the settlement, the Magistrate Judge reasoned that "[t]he Recording [of the transcript] [was] not part of the official court record and was only meant to serve as a reference for the parties when they drafted the actual agreement. The parties agreed to keep the particular settlement terms confidential." *See* Magistrate Judge's Order dated September 24, 2009 at p. 2. Hence, the Magistrate Judge concluded that the March 25, 2008 recording "was not a judicial record and therefore is not accessible by the public ... Neither Langford nor any other member of the public has a legitimate right in seeking access the parties' unfiled and privately recorded, confidential settlement agreement" *Id.* Subsequently, Langford's appeal ensued.

## DISCUSSION

### I. Standard of Review

*2 As an initial matter, the parties dispute the standard of review applicable in this appeal. The standard of review applied by this Court turns on

whether the issue being appealed is "dispositive" or "non-dispositive." The threshold question-whether the Magistrate Judge's determination to continuing sealing the transcript of March 25, 2008 is non-dispositive-must be resolved in the first instance. According to Langford, since the determination to unseal the transcript is the sole remaining issue in the underlying matter, the resolution of his motion "terminates the proceedings from his point of view," and as such, the Magistrate Judge's decision is dispositive, which disposed of Langford's "business before the court." Lanford's Brief In Support of Appeal at p. 3. Langford relies on the Third Circuit case of *National Relations Board ( NLRB) v. Frazier,* 966 F.2d 812, 815 (3d Cir.1992) for his position. However, *Frazier* is neither factually or legally analogous to the present case. Before the Court elucidates the proper standard of review, some comments on *Frazier* are appropriate.

In *Frazier,* the NLRB had a pending unfair labor practice proceeding and it issued a subpoena *ad testificandum* to appellee employee. The employee refused to testify and the NLRB filed an application for enforcement of its subpoena pursuant to § 11(2) of the National Labor Relations Act. *Frazier,* 966 F.2d at 814. There was no other "case" or "controversy" before the district court. The district court then referred the matter to a magistrate judge. The magistrate judge denied the application and the district court affirmed the order, applying the clearly erroneous or contrary to law standard of review since the district court found that the application was a non-dispositive motion. *Id.* at 815. On appeal, the circuit court reversed and held that the district court should have reviewed the magistrate judge's ruling *de novo. Id.* at 815. However, in that connection, the Third Circuit found that the motion to quash the subpoena was akin to a motion to dismiss as it had a final effect on the rights and duties of the parties. *Id .* at 817. The court reasoned that "[u]nlike the pretrial motions which district judges refer to magistrate judges, in this case the question of subpoena enforcement was not ancillary to the Board's main action in the district court. Rather, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

Board applied to the district court in a special proceeding, under 29 U.S.C. § 161(2), the sole purpose of which was to aid the Board in compelling production of evidence and attendance of witnesses." *Id.* at 818.

Here, the facts contrast those in *Frazier.* The Magistrate Judge's decision on Langford's motion to unseal does not dispose of any claim or defenses of a party, nor does it dispose of a case. *See In re Gabapentin Patent Litigation,* 312 F.Supp.2d 653, 661-62 (D.N.J.2004) (to determine whether a motion is dispositive or non-dispositive, the relevant inquiry is if the matter is "dispositive of a claim or defense of a party" to the action "as contemplated by *Fed.R.Civ.P.* 72(a)"). In fact, the underlying action was closed when Langford filed his motions. Indeed, Langford's motion to unseal bears no relation to the underlying claims between LEAP, MoneyTrax and Baker. In that sense, the Magistrate Judge's determination is not the "functional equivalent" of a dismissal. *See Id.* at 622. While the Magistrate Judge's decision disposed of Langford's motion, that motion, however, is precisely the type of non-dispositive discovery dispute falling within the domain of magistrate judges. *See Id.; see also L Civ. R.* 72.1(a) comment 2 (quoting *Gabapentin,* 312 F.Supp.2d at 662). Absent any controlling authority to the contrary, this Court will treat the matter as non-dispositive under § 636(b)(1)(A) and apply the clearly erroneous/contrary to law standard of review. The Court will now turn to that standard.

*\*3* The Magistrate Judge may 'hear and determine any [non-dispositive] pretrial matter pending before the court.' " *Cardona v. Gen. Motors Corp.,* 942 F.Supp. 968, 971 (D.N.J.1996) (quoting 28 U.S.C. § 636(b)(1)(A)); *see also Fed.R.Civ.P.* 72(a). Because the Court has found that the Magistrate Judge's ruling in this case is non-dispositive, this Court will only reverse that ruling if it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *Fed.R.Civ.P.* 72(a); L. Civ. R. 72.1(c)(1)(A). A magistrate judge's finding is clearly erroneous when, although there may be some evid-

ence to support it, the reviewing court, after considering the entirety of the evidence, "is left with the definite and firm conviction that a mistake has been committed." *Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co.,* 131 F.R.D. 63, 65 (D.N.J.1990) (quotations omitted). "A district judge's simple disagreement with the magistrate judge's findings is insufficient to meet the clearly erroneous standard of review." *Andrews v. Goodyear Tire & Rubber Co., Inc.,* 191 F.R.D. 59, 68 (D.N.J.2000) (citations omitted).

In contrast, "the phrase 'contrary to law' indicates plenary review as to matters of law." *Haines v. Liggett Group, Inc.,* 975 F.2d 81, 91 (3d Cir.1992); *accord In re Human Tissue Products Liability Litigation,* No. 06-135(WJM), 2009 WL 1097671, * 1 (D.N.J. Apr.23, 2009) (citation omitted). *See also, Mruz v. Caring, Inc. .,* 166 F.Supp.2d 61, 66 (D.N.J.2001) ("[T]his Court will conduct a de novo review of a Magistrate Judge's legal conclusions."); *accord Cooper Hosp./Univ. Med. Ctr. v. Sullivan,* 183 F.R.D. 119, 127 (D.N.J.1998). "A ruling is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law." *Kounelis v. Sherrer,* 529 F.Supp.2d 503, 518 (D.N.J.2008) (*citing Gunter v. Ridgewood Energy Corp.,* 32 F.Supp.2d 162, 164 (D.N.J.1998)).

Furthermore, where the appeal seeks review of a matter within the exclusive authority of the **magistrate judge**, such as a **discovery** dispute, an even more deferential standard, the abuse of discretion standard, may be applied. *Port Auth. v. Affiliated FM Ins. Co.,* No. 91-2907(JWB), 2001 U.S. Dist. LEXIS 7579, at * 5 (D.N.J. Mar. 29, 2001); *see also Nestle Foods Corp. v. Aetna Cas. and Sur. Co.,* No. 89-1701(CSF), 1992 WL 233797, at * 1 (D.N.J. Sep.8, 1992); *Cooper Hosp./Univ. Med. Ctr. v. Sullivan,* 183 F.R.D. at 127. "An abuse of discretion occurs: 'when the judicial action is **arbitrary**, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted.' " *Richards v. Johnson & Johnson, Inc.,* No.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

05-3663(KSH), 2008 WL 544663, at * 2 (D.N.J. Feb.26, 2008) (*quoting Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 115 (3d Cir.1976) (*internal quotation omitted* )); *see also United States v. Soto-Beniquez,* 356 F.3d 1, 30 (1st Cir.2003), *cert. denied,* 541 U.S. 1074 (2004) ("An abuse of discretion occurs when a "material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them") (*internal citations omitted* )). "This test displays considerable deference to the determination of magistrates in such matters." *Port Auth. v. Affiliated FM Ins. Co.,* 2001 U.S. Dist. LEXIS 7579 at * 5 (*quoting* 7 Moore's Federal Practice ¶ 72.03(7.-3) at 72-42 (1989)). However, an error of law or finding of fact that is clearly erroneous may indeed constitute such abuse. *See, e.g., Marshak v. Treadwell,* No. 08-1771, 2009 WL 1886153, at * 4 (3d Cir. Jul.2, 2009) (noting on review of district court's contempt decision for abuse of discretion that reversal is appropriate "only where the decision 'is based on an error of law or a finding of fact that is clearly erroneous' "); *see also Republic of the Philippines v. Pimentel,* 553 U.S. 851, 128 S.Ct. 2180, 2189, 171 L.Ed.2d 131 (2008) ("a court 'by definition abuses its discretion when it makes an error of law' ") (*quoting Koon v. United States,* 518 U.S. 81, 99-100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)).

**II. Whether the Transcript of March 25, 2008 Conference Constitutes Judicial Proceeding**

*\*4 Langford invokes the right to access doctrine; under this doctrine, the public's right of access to judicial proceedings and judicial records is generally "beyond dispute." *Pichler v. UNITE,* 585 F.3d 741, 746 n. 5 (3d Cir.2009) (citing *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 780-81 (3d Cir.1994) (citations omitted)). However, the Third Circuit has instructed that a settlement agreement, that is not filed with the Court, is not a "judicial record" for purposes of the right of access doctrine.

*See Enprotech Corp. v. Renda,* 983 F.2d 17, 20-21 (3d Cir.1993); *Pansy,* 23 F.3d at 781. Accordingly, as an initial inquiry, whether or not a document or record is subject to the right of access turns on whether the document being sought is considered a "judicial record." Relying on this Court's language in the Sealing Order, the Magistrate Judge found that the transcript of the March 25, 2008 proceeding is "not part of the official court record and was only meant to serve as a reference for the parties when they drafted the actual agreement. The parties agreed to keep the particular settlement terms confidential." Magistrate Judge's Order at p. 2.

Indeed, this Court's Sealing Order contained the following sections:

1. The materials that LEAP seeks to seal is a recording made on March 25, 2008 ("Recording") discussing the specific terms of the settlement agreement between the parties in this matter.

2. On March 25, 2008, the parties to this matter reached a settlement agreement. In order to capture the terms of the agreement, the parties were granted permission to use the tape recorder in [the Magistrate Judge's] courtroom in order to preserve the agreement.

* * *

4. LEAP has a privacy interest in keeping this information from becoming public record as it contains sensitive business information of a private agreement between the parties.

* * *

6. Upon consideration of the Declaration submitted by LEAP and the materials that LEAP seeks to have the Court seal, the Court concludes that LEAP has met its burden of proving, under L. Civ. R. 5.3 and applicable case law, that the materials described above should be filed under seal. Specifically, the Court concludes that (a) the material clearly contain confidential information of the parties that the parties agreed to keep confid-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

ential as part of their agreement; (b) the parties have a legitimate interest in maintaining the confidentiality of the materials in order to protect themselves from their competitors who could use the materials and the information contained therein to unfairly compete with the parties and that would put LEAP at a severe tactical disadvantage in enforcing and litigating its rights; (c) that LEAP has shown that public disclosure of the materials would result in clearly defined and serious injury to the parties, and that this threat is imminent as demonstrated by requests already made seeking the material; and (d) that LEAP has shown that no less restrictive alternative to sealing the materials is available, as LEAP only requests that portions of the Recording be sealed or redacted and does not ask that any reference to their existence be sealed or that non-confidential information be protected.

*5 Sealing Order dated May 9, 2008 at pp. 1-2.

In addition to the Court's Order on this subject, during the settlement conference, the Court reinforced the confidential nature of the parties' agreement:

> First, of all, with regard to the confidentiality provisions of the settlement ..., since you appear to want to submit this to me by an order, it's not going to happen because I cannot seal or make any order that I enter confidential. So my suggestion to you people is that you place all of the terms of the settlement in a separate agreement and you can have me enter an order that simply dismisses the case and acknowledges that ... the parties have entered into a separate agreement which they placed on the record.

Court Transcript dated March 25, 2008 at p. 11.
> I don't see any reason to have the settlement itself, the terms of it, filed. That's why I'm suggesting you not do that by way of order. You can simply submit an order to me dismissing everything with prejudice and acknowledging that the parties have entered into a separate written settlement agreement which also the terms of

which were placed on the record in open court on March 25, 2008.

*Id.* at p. 12.

On appeal, Langford urges this Court to unseal the transcript pursuant to his "pervasive common law right" to gain access to the transcript of the proceeding. Langford characterizes the settlement conference as a judicial proceeding in the following manner:

> At about 6:30 PM, on March 25, 2008, this Court, in its robes, assumed the bench. The parties appeared by counsel, all of whom noted their appearances, and the presence of the parties, on the record. The Court having been advised that the parties had settled, and that they wished to read the terms of their settlement into the record, then asked, "And who will be placing the terms on the record?" LEAP's attorney then read into the record the two agreements which had been reached that day settling the action as between LEAP and Norman Baker, on the one hand, and LEAP and MoneyTrax, on the other.

Langford's Letter Brief at p. 10. Moreover, Langford points out that the Court referenced "on the record" several times during the conference. Accordingly, Langford posits that the transcript at issue memorialized a judicial proceeding.

To begin the analysis, the right of the public to inspect and copy judicial records antedates the Constitution. *United States v. Criden,* 648 F.2d 814, 819 (3d Cir.1981). As a general matter, there is a "strong presumption" in favor of access to judicial records and proceedings in civil cases. *Bank of America v. Hotel Rittenhouse Assoc.,* 800 F.2d 339, 343 (3d Cir.1986). With respect to access, the public is entitled to attend open court proceedings, as well as the right to inspect and copy judicial records, *see Criden,* 648 F.2d at 819, which include transcripts of civil proceedings. *Littlejohn v. BIC Corp.,* 851 F.2d 673, 678-80 (3d Cir.1988). These rights promote public confidence in the judicial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

system. *Id.* at 678. However, the right of access is not absolute.

**\*6** In *Pansy,* the Third Circuit delineated the boundaries of the doctrine. The court explained that "the Settlement Agreement which is subject to the Order of Confidentiality was never filed with, interpreted or enforced by the district court. The district court has not ordered any of the terms of the Settlement Agreement to be complied with. Accordingly ... the Settlement Agreement is not a judicial record." 23 F.3d at 781. In so doing, the court rejected an argument that because the settlement agreement was subject to a confidentiality order, the agreement had been somehow converted to a judicial record. The Third Circuit advised that district courts "have inherent power to grant orders of confidentiality over materials not in the court file." *Id.* at 782, 785. More importantly, "[s]imply because a court has entered a confidentiality order over documents does not automatically convert those documents into 'judicial records' accessible under the right of access doctrine. For example, when a court enters an order of protection over documents exchanged during discovery, and these documents have not been filed with the court, such documents are not, by reason of the protective order alone, deemed judicial records to which the right of access attaches." *Id.* at 782.

To demonstrate the applicability of *Pansy,* the Court finds *Jackson v. The Delaware River and Bay Auth.,* 224 F.Supp.2d 834 (D.N.J.2002), instructive. In that case, during trial, the parties reached a settlement agreement. Then, they placed on the record their understanding of the terms of the agreement by referencing a draft settlement agreement, and agreed to its terms. *Id.* at 836. As in this case, the parties there understood that the terms of the settlement agreement were confidential, and the court proceeding was not formally closed, however, no one was present except the interested parties. *Id.* Subsequently, the court entered an order dismissing the action. After the case was dismissed, a member of the press filed a motion to intervene for the pur-

pose of accessing the settlement terms. *Id.* at 837. Pursuant to *Pansy,* the court held that the transcript of the settlement proceeding was a part of the judicial record. On the other hand, the actual settlement agreement which the parties prepared amongst themselves was not. *Id.* at 839. This line of reasoning is applicable to this case.

Here, like the *Jackson* court, this Court presided over the settlement conference, and indeed, facilitated the parties in settling the underlying case. Just like in *Jackson,* the parties here placed on the record their agreement to settle the case and their understanding of the terms of the agreement. The parties also intended those terms to be confidential. The parties never reduced the terms to a separate settlement agreement in writing. As such, while the terms of a private settlement agreement was placed on the record, this does not preclude a finding that the March 25, 2008 proceeding was judicial in nature, particularly since the parties chose to place their assent and understanding of those terms on the record in open court. *See In re: Peregrine Sys. Inc.,* 311 B.R. 679, 688 (D.Del.2004) ("even though the public may not have a right of access to a sealed document, a document filed under a blanket sealing order is still a judicial record that is at least subject to the assertion of a right of access" (*citing Leucadia v. Applied Extrusion Technologies, Inc.,* 998 F.3d 157, 165 (3d Cir.1993)).[FN3] In addition, a certified copy of the transcript was filed on the Court's docket, *see* Docket No. 54, and indeed, the Court subsequently entered an order sealing the transcript, further demonstrating that the transcript was made a part of the Court's file. *See Jackson,* 224 F.Supp.2d at 839; *Leucadia,* 998 F.2d at 161-162 ("The filing of a document gives rise to a presumptive right of access"); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 529 F.Supp. 866, 897 (E.D.Pa.1981) ("The right [of public access] undoubtedly attaches to all materials that are filed with the clerk of court, unless filed under seal pursuant to court order, because they are so clearly records within the meaning of the doctrine"); *see also Pansy,* 23 F.3d at 783 (documents not even

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

part of the court file were accessible under the right of access doctrine because "they were duly submitted to the court" and were "relevant and material to the matters *sub judice"* ). Accordingly, the Court finds that the transcript of the settlement proceeding on March 25, 2008, is part of the judicial record. The Court notes that the Magistrate Judge's decision in this respect is based upon this Court's language in the Sealing Order, and to the extent this Court modifies its prior Order, the Magistrate Judge's decision is therefore modified to be consistent with this Opinion.

> FN3. The Court is cognizant that the Sealing Order expressly states that the transcript was not part of the official record. However, because the parties in this action consented to sealing the transcript, this Court did not engage in an in-depth analysis of the legal issues involved.

**\*7** Since the Magistrate Judge never reached the determination of whether the terms of the Settlement should remain confidential, the Court will consider this issue on appeal. The Court notes that in its Sealing Order, it has previously decided that there was good cause then to seal the terms of the parties' agreement. The Court will address whether the private terms of the Settlement should remain confidential.

**III. Whether the Terms of the Settlement Should Remain Confidential**

Although there is a general common law right to inspect and to copy judicial records and documents, the right is not absolute. *Nixon v. Warner Communications, Inc.,* 453 U.S. 589, 598 (1978). "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Id.* Hence, the common law merely establishes a presumption of public access to court proceedings and court records. *Id.* at 602. When determining access to judicial record, "the strong

common law presumption of access must be balanced against the factors militating against access." *Littlejohn,* 851 F.2d at 678 (citation omitted). In this endeavor, the Court may consider the following factors:

> 1. Whether disclosure will violate any privacy interest;

> 2. Whether the information is being sought for a legitimate purpose or for an improper purpose;

> 3. Whether disclosure of the information will cause a party embarrassment;

> 4. Whether confidentiality is being sought for information important to public health and safety;

> 5. Whether the haring of information among litigants will promote fairness and efficiency;

> 6. Whether a party benefitting from the order of confidentiality is a public entity or official; and

> 7. Whether the case involves issues important to the public.

*Shingara v. Skiles,* 420 F.3d 301, 306 (3d Cir.2005) . These factors are neither exhaustive nor mandatory. *Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir.1995). The discretion is always left to the district court to evaluate the competing considerations in light of the facts of the individual cases. *Pansy,* 23 F.3d at 789.

Likewise, when considering the modification of a confidentiality order, the court should use the same balancing test, with one difference:

> One of the factors the court should consider in determining whether to modify the order is the reliance by the original parties on the confidentiality order. The parties' reliance on an order, however, should not be outcome-determinative, and should only be one factor that a court considers when determining whether to modify an order of confidentiality....Reliance on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

[confidentiality] orders [will] not insulate those orders from subsequent modification or vacating if the orders were improvidently granted *ab initio* ....Improvidence in the granting of a protective order is [a] justification for lifting or modifying the order.

**\*8** *Pansy,* 23 F.3d at 790 (internal citations and quotation marks omitted). Accordingly, whether a record remains sealed is within the discretion of the district court, and the court must: (1) recognize the common law presumption of public access; (2) apply a balancing test to determine prospectively whether the material to be sealed was "the type of information normally protected ... or whether there [is] a clearly defined injury to be prevented" and (3) provide and explain its clear reasoning for sealing the record. *See In re Cendant,* 260 F.3d 183, 198 (3d Cir.2001); *Zurich American Ins. Co. v. Rite Aid Corp.,* 345 F.Supp.2d 497, 504 (E.D.Pa.2004).

To overcome the common law right of access to judicial materials, "the party seeking closure of a hearing or the sealing of part of the judicial record bears the burden of showing that the material is the kind of information that the courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Cendant,* 260 F.3d at 194. The Third Circuit has held that the interest in privacy is important to the balancing test. *Pansy,* 23 F.3d at 787 (citation omitted). In this regard, courts should ensure that there is no infliction of "unnecessary or serious pain on parties." *Id.* Accordingly, the Court may deny access to judicial records, for example, where they are sources of business information that might harm a litigant's competitive standing, *see Nixon,* 435 U.S. at 598, or when disclosure might violate some other important privacy interests. *See, e.g., Leucadia,* 998 F.3d at 165-67.

Furthermore, the Court must remain cognizant of changed circumstances since the sealing of the particular record:

The strong presumption of public access forces

district courts to be cognizant of when the reasons supporting sealing in a specific case (if any are found) have either passed or weakened, and to be prepared at that time to unseal [the record] and allow pubic access. Even if sealing was proper at the time when it was initially imposed, the sealing order must be lifted at the earliest possible moment when the reasons for sealing no longer obtain.... Continued sealing must be based on current evidence to show how public dissemination of the pertinent materials now would cause the [harm claimed].

*In re Cendant,* 260 F.3d at 196. (emphasis removed).

Here, the terms of the settlement agreement placed on the record, reflected in the transcript, shall remain confidential. The Court will first briefly summarize the factual background of this now-closed action: LEAP created a proprietary system through which the efficacy of personal financial decisions can be analyzed on both a micro and macro economic basis (the "LEAP System"). The LEAP System is a process that coordinates and integrates specialized money moves and strategies. LEAP commenced this action against MoneTrax, a business competitor, and Baker, a former employer, alleging that these defendants misappropriated proprietary and confidential information. As indicated earlier, the parties attempted to settle on numerous occasions, in and out-of-court, but they were unable to agree to the precise terms. Only after this Court's intervention and assistance, did the parties finally agreed to a set of specific terms, based upon certain treatment of the LEAP license. The Court presided over the settlement conference when these terms were placed on the record. These terms contain proprietary information. Hence, the parties agreed that the terms should be kept confidential.

**\*9** At the time when this Court entered the Sealing Order, it made specific findings of fact. Notably, the Court found that "LEAP has a privacy interest in keeping this information from becoming public record as it contains sensitive business information

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

of a private agreement between the parties." Sealing Order at ¶ 4. "Upon consideration of the Declaration submitted by LEAP and the materials that LEAP seeks to have the Court seal, the Court conclude[d] that LEAP ha[d] met its burden of proving, under L. Civ. R. 5.3 and applicable case law, that the materials described above should be filed under seal." *Id.* at ¶ 5. Specifically, the Court reasoned that "the parties have a legitimate interest in maintaining the confidentiality of the materials in order to protect themselves from their competitors who could use the materials and the information contained therein to unfairly compete with the parties and that would put LEAP at a severe tactical disadvantage in enforcing and litigating its rights." *Id.* Importantly, the Court was satisfied that "LEAP [had] shown that public disclosure of the materials would result in clearly defined and serious injury to the parties, and that this threat is imminent as demonstrated by requests already made seeking the material." *Id.*

On this appeal, Langford wants access to these terms, for the purpose of presenting his defenses in a separate state infringement action, to show, *inter alia,* that LEAP had placed its proprietary information in the public domain. In response, LEAP argues that the public's right of access does not outweigh the irreparable harm that it would suffer if the terms were unsealed. The Court is satisfied that LEAP has shown, on this appeal, that the terms are confidential information, and if they were revealed to the public, it would cause serious injury to LEAP-business competitors may use the information to unfairly compete with LEAP, thereby placing LEAP at a severe tactical disadvantage. *See Nixon,* 435 U.S. at 598. Moreover, Langford's use of the information is not for the public's interests, but rather for his own private interests; as such, this matter does not involve issues important to the public. More importantly, as this Court knows firsthand, settlement in this case would not have been reached but for the confidentiality agreement between the parties, and the parties' reliance that the Settlement would not be subject to public dis-

closure. Indeed, the Settlement took many months to materialize and confidentiality was a material term.[FN4] In this respect, disclosure will not promote fairness and efficiency and, in fact, would unfairly remove a material term of a private contract upon which LEAP based its decision to settle. *See Mar, Inc. v. JCM Am. Corp.,* 2007 U.S. Dist. LEXIS 9819, at *2, 2007 WL 496816 (D.N.J. Feb. 13, 2007) (finding a legitimate privacy interest in maintaining the confidentiality of terms to a business agreement that are not available to the public because otherwise the parties to the agreement could lose their future competitive negotiating positions and strategies, causing them to suffer serious injury); *see also Vist Inda, Inc. v. Raaga,* LLC, 2008 U.S. Dist. LEXIS 24454, at *9, 2008 WL 834399 (D.N.J. Mar. 27, 2008) (finding a legitimate privacy interest in settlement agreements between third parties that, if made public, would reflect negotiation strategies and pricing terms and would impair future negotiations and give competitors an advantage).

> FN4. Certainly, Langford's counsel, Mr. Ullman, who participated in the previous settlement discussions, is aware of the importance of the confidentiality nature of the Settlement.

**\*10** The Court also does not find at this time that there has been any material change since sealing the terms of the Settlement that would serve as a legitimate basis for the Court not to continue sealing these terms. Consequently, having balanced all the appropriate interests and factors, the Court finds that there is no basis for modifying or vacating the Sealing Order. The Court notes, however, any portion of the transcript of the judicial proceeding on March 28, 2008, which does not reflect confidential terms may be unsealed. As stated *supra,* any sensitive business information is to remain sealed. However, colloquy between the Court and the parties regarding their understanding and assent to the terms of the Settlement, for example, is the type of information that is not confidential and thus,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2232715 (D.N.J.)
**(Cite as: 2010 WL 2232715 (D.N.J.))**

should be unsealed. LEAP shall review the entire
transcript and redact those portions of the transcript
that reflect confidential information and make
available the redacted version to Langford.

The Magistrate Judge's decision is hereby AF-
FIRMED and MODIFIED.

D.N.J.,2010.
Leap Systems, Inc. v. Moneytrax, Inc.
Slip Copy, 2010 WL 2232715 (D.N.J.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.