# EXHIBIT 1

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
2    _____
     CHAYA GROSSBAUM, et al.,        :   Case No. 07-cv-1359(GEB)
3                                    :
            Plaintiffs,              :
4                                    :
        vs.                          :
5                                    :
     GENESIS GENETIC INSTITUTE,      :   Newark, New Jersey
6    LLC, of the State of            :   Monday, September 21, 2009
     Michigan, et al.,               :   2:29 p.m.
7                                    :
     _____
            Defendants.
8
                 TRANSCRIPT OF CASE MANAGEMENT CONFERENCE
9             BEFORE THE HONORABLE ESTHER SALAS, U.S.M.J.

10
     APPEARANCES:
11   For the Plaintiffs:              LEWIS STEIN, ESQ.
                                      (Nusbaum, Stein, Goldstein,
12                                    Bronstein & Kron, PA)
                                      20 COMMERCE BOULEVARD
13                                    SUCCASUNNA, NJ 07876

14   For the Defendants:
     Genesis Genetic Institute,      SARAH LYNN BLAINE, ESQ.
15   LLC, and Mark R. Hughes         (Lowenstein Sandler, PC)
                                      65 LIVINGSTON AVENUE
16                                    ROSELAND, NJ 07068

17                                    STEPHEN N. LEUCHTMAN, ESQ.
                                      (Stephen N. Leuchtman, P.C.)
18                                    1380 East Jefferson Ave
                                      Detroit, MI 48207
19
     New York University             JAMELE A. HAMAD, ESQ.
20   Hospitals Center                (Marshall, Dennehey, Warner,
     (Telephonically)                Coleman & Goggin)
21                                    425 Eagle Rock Avenue - Suite 302
                                      Roseland, NJ 07068
22
     Transcription Company:          KLJ Transcription Service
23                                    246 Wilson Street
                                      Saddle Brook, NJ  07663
24                                    (201)703-1670 - Fax (201)703-5623

25   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.

2

1

I N D E X
9/21/09

2

Page

3  REVIEW OF PREVIOUS CMO                          3

4

   ARGUMENT
5    By Mr. Stein                                   5
     By Mr. Leuchtman                              16
6    By Ms. Blaine                                 21
     By Mr. Hamad                                  22

7

8  COURT DECISION                                  24

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                  3

1              (Proceedings begin at p.m.)

2              THE COURT:  Be seated.

3              Okay.  We're on the record in the matter of Grossbaum

4    v Genesis Genetics, et al., Civil Action Number -- Civil Action

5    Number 07-1359.

6              Can I have appearances of counsel please?

7              MR. STEIN:  Yes.  For the plaintiff, Lewis Stein of

8    Nusbaum, Stein, Goldstein, Bronstein & Kron.

9              THE COURT:  For the defendants.

10             MS. BLAINE:  For the defendants Sarah Blaine of

11   Lowenstein Sandler.

12             MR. LEUCHTMAN:  Stephen Leuchtman of Stephen N.

13   Leuchtman, PC, appearing pro hac vice on behalf of defendants

14   Genesis Genetics and Hughes.

15             MR. HAMAD:  (Telephonically) . . . Hamad from the law

16   firm of Marshall Dennehey on behalf of the NYU defendants.

17             THE COURT:  All right.  And Mr. Hamad is joining us

18   telephonically today due to a conflict.

19             The Court would note that I conducted an in-chambers

20   conference with the attorneys to address a series of letters

21   that I received.  I would note that, indeed, discovery in this

22   case, pursuant to my last scheduling order which is dated June

23   10th, 2009, I had ordered that all fact discovery, including

24   depositions is to be concluded no later than August 3rd, 2009.

25   Plaintiff is to provide all liability and damage expert reports

Colloquy                                4

1   no later than August 14th, 2009.  Defendants' expert reports

2   are to be served on later -- no later than October 1.  And a

3   telephonic conference was to be held on Wednesday, October 7th

4   at 10:30 before this Court.

5           I would note that in light of the August 25th letters

6   and the series of letters that came thereafter, I moved up the

7   conference from the 7th of October to today to address -- to

8   address the -- the nature of these letters, in particular, Mr.

9   Stein's advising the court that he was not going to be able to

10  make the August 14th deadline that is set forth in the last

11  scheduling order that was issued in this case and that August

12  14th letter, again -- August 14th deadline, again, was for all

13  liability and damage expert reports.  I only received notice

14  that, indeed, that deadline was not met through the -- the,

15  rather, August 25th letter.  And that, of course, I addressed

16  off the record with counsel.

17          I would also note that I have advised counsel that

18  it's my intention to allow each side to make their respective

19  argument, however, I was going to permit Mr. Stein, over the

20  objections of defendants, additional time to submit his

21  liability and damages expert.  There's also an issue that was

22  raised, apparently by Mr. Stein to a letter to counsel with

23  respect to requesting to -- to open or reopen fact discovery,

24  which as I said earlier, closed on August 3rd of this year and

25  I have already advised Mr. Stein that I am not inclined, in

Argument - Stein                              5

1    light of the procedural history of this case and in light of

2    the fact that, quite frankly, I have had to set a number of

3    scheduling orders in this case, that there is no way I was

4    going to reopen fact discovery, which, again, closed on August

5    3rd.   And I have yet to have any formal notification of that

6    intention.

7            So, Mr. Stein, I'll let you make whatever arguments

8    you want to make, but I've pretty much indicated to decide

9    where I'm going with this one.  Now it's just an issue of

10   timing and getting these reports in and allowing -- counsel has

11   already requested -- defense counsel, that is, has already

12   requested 60 days, which was the original agreement to respond

13   to any and all expert reports that are served upon them.

14           I'll hear you now, sir.

15           MR. STEIN:  Thank you, Your Honor.

16           Your Honor, I don't need -- think it's necessary for

17   me to repeat everything that was said in our conference in

18   chambers; however, I would just like to point out one aspect of

19   the adherence to the discovery orders that the Court -- to the

20   management orders that the Court has entered.

21           I take note that the Court's initial scheduling order

22   was entered in, I believe, March of 2008.

23           THE COURT:  No.  December 12th was the original one.

24           MR. STEIN:  Okay.  Well, I had a second pretrial

25   scheduling order.  I'm sorry, I misread that.

Argument - Stein                                6

1       THE COURT:  December 12th, '07 was the first

2  scheduling order --

3       MR. STEIN:  Okay.

4       THE COURT:  -- ever issued in this case.

5       MR. STEIN:  All right.  Then on -- on -- in March of

6  2008, I have a second pretrial scheduling order, which provided

7  that interrogatories -- the parties may serve limited 25 single

8  -- number five questions, which shall be responded to by May

9  12th of 2008.  That was the Court's order.

10       I take note that on November 18th -- I have a letter

11  here, I don't know if I provided it to the Court, to Mr.

12  Leuchtman, it was a three-line letter which said that "My

13  attention is to notify Judge Salas tomorrow that we do not have

14  answers to interrogatories on behalf of the defendants Mark

15  Hughes and Genesis Genetics in the above referenced matter.

16  That letter was faxed on November 18th, 2008."

17       That's just an example of some of the delay in

18  pretrial discovery that was entered into in this case.

19       In addition to that, I have sent -- I think four

20  letters to the Court over the life of the discovery case

21  management advising the Court of the difficulties that we were

22  having in obtaining discovery in this case, indicating that,

23  first, we did not at any time disrespect the Court's orders and

24  ignore it, and at one time even expressed our concern that the

25  plaintiff should not be harmed as a result of the delays in the

Argument - Stein                                   7

1    presentation of our case.

2         Now with that background, and I think -- and I ask the

3    -- and, in fact, I sent a letter to the Court early on that I

4    was reading here, I forgot the date of it, which I -- I have

5    the date of it, in January of 2008, I sent the Court a letter

6    which I believe was a confidential letter, total pages three,

7    because I don't see any copies, it was faxed, in which I

8    summarized for the Court some of the difficulties that the

9    plaintiff was having in obtaining expertise.

10        To draw the picture here of expert, as I indicated to

11   the Court, there are only three laboratories in the United

12   States that I knew of and there may be four, which have the --

13   which do the same kind of analysis that this defendant does.

14   And we were running into a problem with getting expertise in

15   that context because when I contacted the people in Chicago --

16   there's one in Chicago, one in Detroit, on e in -- and one was

17   in New Jersey at St. Barnabas.  And I understand the St.

18   Barnabas Laboratory didn't do the same kind of testing

19   entirely, but they had a relationship with NYU that made it

20   improbable that NYU was going -- that they were going to be

21   available to me as an expert.  But I was even -- it was even

22   suggested I might have to go to Europe.

23        We have been able to -- we have been able to get

24   consultation with Dr. Cutting, who I believe I describe to the

25   Court at one point as being the -- the director at Johns

Argument - Stein                                8

1   Hopkins of the infertility clinic and that process, and have

2   him advise us, in view of the very specialized nature of the

3   issues connected to this case.

4          We, at the present -- and I would also only mention to

5   the Court by way of personal privilege, that for many years,

6   and since the time when the state court system was essentially

7   quiet and -- in August, I have -- I take my vacation during the

8   month of August to a home in the Berkshires, I come down two

9   days a week just to try to keep things going, but I'm away five

10  nights a week during August, so when this -- these things were

11  all happening.

12         I did not want to inject my own personal needs, but I

13  think that in light of some of the other comments that were

14  made, I think the Court should recognize in this case that the

15  last thing that we are, are disrespectful of the Court or its

16  court orders, as indicated by our numerous that we've made.  We

17  work at these cases and we try to put them together and we --

18  and we appreciate that delay -- that this Court and the role of

19  the court system and the magistrate judge system is to reduce

20  the time between litigation events, so as to reduce delay in

21  connection with the courts.

22         Another personal aside, I had privilege to be at the

23  National Conference on Court Delay Reduction in Denver in 1981

24  or '2, which first set up this system of moving cases by

25  reducing the time.

Argument - Stein                                    9

1        So I have full respect for what you're doing, but I

2   ask the Court only to respect the fact that we -- we, too, are

3   doing our best.

4        Now here's where we're at in this case.  I have -- I

5   have Dr. Cutting, and I believe as a result of a phone call I

6   had last week that I should be able to have his report, I

7   should be able to have his report within the next ten days to

8   two weeks, Dr. Cutting's report.

9        I have -- I have been advised as a result of

10  information that's come to me recently that there are -- there

11  is a wealth of knowledge about this subject matter that has not

12  been available to me, and that involves microbiologists and the

13  people who were very early on in the development of this type

14  of what we call PGD studying, that's all new and much of the

15  literature since 1998.  I only this last week -- I was promised

16  two weeks ago a battery of materials that I did not have and I

17  was not exposed to, which discussed PGD testing and the

18  involvement of Dr. Hughes in the -- who is a national figure in

19  terms of producing this kind of material.

20       So I now have these materials.

21       THE COURT:  Who was -- where did you get these

22  materials from?  Are you saying that the defendants owed you

23  these materials?

24       MR. STEIN:  No, I'm not saying -- the defendants

25  didn't owe me that material.  What the defendant owed me and

1    what we mentioned in chambers that this is -- that these pages

2    were only a small element, I can explain that to you.  The

3    testing of these gene mutations is done on graphs which show

4    what's called -- and it's a very technical term, allele drop

5    out; meaning, the cells that are studied sometimes are not

6    available in the study.  They drop out of the study and when

7    that happens, that increases the risk that there -- that the

8    mutation will not be identified, when they approve of the

9    embryo.

10           And so when they -- when they do these studies, they

11   do of both the father and the mother.  And when they do these

12   studies, the studies are reflected in this graph of two colors.

13   Well, we didn't get -- maybe only a few pages, but we didn't

14   get from -- and I would not know this, from the defendant

15   Genesis Genetics the father's study of the -- of these genes.

16   We got only the mothers.  So I was then told after Dr. Cutting

17   got the records, that you don't have the whole record and if

18   they don't -- if they didn't study the father and if they

19   didn't do appropriate work on the father's, then that's a major

20   -- it was incomprehensible that you could have his final report

21   without doing that, that's what I was told.

22           So that's why it's not an insignificant matter, what

23   they were -- what we didn't get, whether it was wilful or

24   inadvertent from Genesis Genetics.  And so that's why it's --

25   we didn't get from our own expert a concrete opinion as to the

Argument - Stein                                     11

1    standard of care that was being used by the laboratory.

2          There's another issue, too.  There is a strong

3    indication that Dr. Hughes did not use the state of the art

4    methodology that was being used to analyze these embryos, and

5    so we have been -- and that's what we were focusing on and the

6    -- when Dr. Hughes explained why he didn't use these things at

7    his deposition in February -- and, you know, we take a

8    deposition February 18th, we don't get the transcript back for

9    two or three weeks, so we're working in the middle of March on

10   this subject.  And that's when we didn't -- that's when it

11   became important for us to have the rest of the records and

12   that's when I first began to understand some of the issues in

13   the case.

14         THE COURT:  So you're telling me in March.

15         MR. STEIN:  In March is the first time I began to

16   understand some of the issues, but I didn't have a complete

17   understanding of the issues until the January -- the July

18   meeting with Dr. Cutting, where I traveled to Baltimore to meet

19   with him and he explained to us what was going on.

20         In fact, even at that time he said he had to consult

21   with one of his laboratory technicians about the nature of the

22   -- of the graphs that we had.

23         So, you know, while -- it is easy for the Court to

24   look retrospectively and say you could have done this and you

25   could have done that, we're working in an area where we don't

1   always appreciate the significance of what we're getting.

2   Where does this lead us?

3           I am exposing now to the defendants a fact that --

4   that probably to their benefit, but to -- it does involve a

5   knowledge of what's going on.

6           I said there are only three laboratories in the United

7   States.  I was under the impression until last week that the

8   laboratory in Chicago would provide me with an expert whose

9   name I mentioned in the letter to you, Dr. Sharitzki

10  (phonetic).  I had spoken to her and she had indicated that she

11  would be available to us.  But, candidly, she's not -- her

12  employer, the laboratory, said uh-uh, we're too close to Dr.

13  Hughes, we're a competitor of Dr. Hughes, we meet him on too

14  many occasions, they backed down.  But I got enough -- before

15  they backed down, I got enough information about the literature

16  and other persons that I have been in contact with another --

17  the other laboratory in California, who appears to be willing

18  to -- to help us.

19          So because of the limited places we could go for

20  expertise, and it became -- that's where I'm at now with regard

21  to the liability.

22          I would hope that -- and expect that I will have -- as

23  I said, Dr. Cutting's report within two weeks.  I would ask the

24  Court for 45 days to get whatever subsequent expert report

25  report I needed from -- from the laboratory in California.  I

Argument - Stein                                    13

1   would ask the Court -- now I've also met -- after my meeting

2   with Dr. Cutting in July, I met with Dr. Atlas, who was the

3   treating doctor at the Cystic Fibrosis Center at Morristown

4   Memorial Hospital, who I'm confident -- I believe would give me

5   a letter within the next 30 days so I would have the treating

6   doctor's evaluation and prognosis.

7               I've also spoken to the life care planner at -- at --

8   I forgot her name, but it's a North Jersey life care planner

9   who has previous experience in cystic fibrosis.  And I would

10  think that I could have her analysis and report within 60 days,

11  Your Honor.

12              And I ask for only one other --

13              THE COURT:  Wait a minute.  I'm trying to understand

14  even for the request that you're making.  You're asking for --

15  for not 60 days from the date in which you receive other days.

16              MR. STEIN:  No.  Sixty --

17              THE COURT:  Sixty days from --

18              MR. STEIN:  -- days from today.

19              THE COURT:  -- today.

20              MR. STEIN:  Absolutely.

21              THE COURT:  Okay.

22              MR. STEIN:  Yes.

23              THE COURT:  For everything?

24              MR. STEIN:  For everything.

25              THE COURT:  Okay.

1        MR. STEIN:  And I asked for only one opportunity,

2   within the next two weeks, I would like to -- and this is not

3   an extensive request to open discovery.  I indicated that I --

4   I asked for the person who -- the laboratory -- did the

5   laboratory -- was in charge of the laboratory work at Genesis

6   Genetics.  I would just like to go to Detroit and take that

7   deposition so that I could fill in one -- there is one -- when

8   it was explained to me, and just last week, when -- because I

9   was trying to find out why Dr. Hughes didn't do the testing.

10  It was explained to me that there were various possibilities

11  and I wanted to go to Detroit and find that out.

12        So it's not a -- you know, as I said in my last letter

13  to you, in a lot of respects, whether it fits into the -- I

14  know the Court has guidelines and dates and God forbid a case

15  should be started in 2007, but we really didn't start a lot of

16  this case until the beginning of May of 2009.  So I ask the

17  Court to be considerate in that regard, under -- taking into

18  consideration the uniqueness of the medicine that's involved in

19  this case and give us the privilege of undertaking discovery in

20  the fashion that we have.

21        And I'm sure the Court would recognize that we are not

22  and were not dilatory.  The biggest piece of dilatoriness that

23  we did, as I would freely admit to having made a mistake on, is

24  not having that written that letter ten days earlier to Your

25  Honor when that last date came.  And that -- you know, it was

1   August and I was otherwise occupied.

2          THE COURT:  All right.  The record will reflect there

3   are five -- actually, six scheduling orders that were issued in

4   this case; and then, of course, I'll hear from defense counsel.

5          The first scheduling order was issued on December

6   12th, 2007.  The second scheduling order was issued on March

7   3rd, 2008.  The third scheduling order was issued on June 4th,

8   2008.  The fourth scheduling order, amended scheduling order

9   was issued on October 14th, 2008.  The fifth amended scheduling

10  order was issued on February 19th, 2009.  The sixth amended

11  scheduling order was issued on June 10, 2009.

12          And I would also note that, quite frankly, I think the

13  Court has done the exact opposite.  Whenever counsel on either

14  side has expressed a problem with respect to scheduling,

15  whether, indeed, they were in receipt of all discovery and so

16  forth, I gladly entered into amended scheduling orders with the

17  parties, I gladly held conference calls.  And, in fact, the

18  record will also reflect that this Court, upon notification by

19  either side made itself ready, willing, and able to address any

20  and all issues.  In fact, I held a conference call on May 27th,

21  2007.  I held another conference call on October 6th, 2007.  I

22  held another conference call on -- on February 11th, 2009.  And

23  I held another conference call on June 3rd, 2009, of which I

24  discussed with counsel that day what remained, what we needed

25  time on.  And I set what I thought all counsel were in

1   agreement with, which was a -- a final scheduling order.  I

2   come to find out that, indeed, it's not, that we yet again have

3   additional problems with respect to discovery.

4          But I think -- I wanted to make sure that the record

5   did reflect that this Court has entered and set six different

6   scheduling orders based on counsel's request.

7          I'll hear from you now, Counsel.

8          MR. LEUCHTMAN:  Your Honor, thank you.

9          If I may, I just want to -- for the record Stephen

10  Leuchtman on behalf of Genesis and Hughes.

11         I would like to address a couple of points and then if

12  I may turn the floor over to Ms. Blaine, who has a more

13  detailed response.

14         But something came up -- if I may.  Is that okay?

15         THE COURT:  Absolutely.

16         MR. LEUCHTMAN:  All right.  Two things, and I think we

17  can probably dispose of this quickly.  The last deposition

18  taken in this case was of Alexis Adler, who is an embryologist

19  at NYU, and that deposition was taken in the afternoon of July

20  13.  At that time, Mr. Stein mentioned to me that he would like

21  to take the deposition of some employee of Genesis Genetics,

22  and I said, well, all right, and then I never heard anything

23  since.  And this conversation -- it's the only time Mr. Stein

24  and I ever talked about any further depositions of any Genesis

25  personnel.  And that conversation was held exactly three weeks

1    before the discovery cutoff.  I got no letter.  I got no

2    notice.  I got no follow-up phone call.  And I figured that we

3    had all just moved on and the discovery deadline not only came

4    and went on August 3rd, but it's very long gone.

5         The other thing -- and I'm not exactly sure what

6    context to put this in, but as Mr. Stein has been talking about

7    his contact with various experts, there is a practice that I

8    have witnessed that is disturbing to me,  I've seen it happen

9    other times, where there are a limited number of experts in a

10   field.  It may be, let's say, pediatric endocrinology, or some

11   very narrow subspecialty of a subspecialty, where an attorney

12   representing someone will go out and consult and there may be

13   only three or four experts available nationwide, or people at

14   least who will do forensic work.  And so at least a couple of

15   which are typically hired by defendants.  So plaintiffs will

16   send records to all of them, and this practice is known as

17   burning experts.  And I now know that of the three or maybe

18   four people in North America who do this work, besides Mark

19   Hughes, Mr. Stein has talked to one, who begged off, and now

20   he's approached another and shared facts with that person.

21        So I'm concerned that two potential experts for the

22   defendant have been burned, have been put in a position where

23   if we go to them after we get an affirmative report, assuming

24   we ever get one, and we go to these experts and say, well, we

25   would like you to help Mark Hughes out and they say, well,

Argument - Leuchtman                              18

1   geeze, sorry, we ethically can't do that because we talked to

2   Lewis Stein.

3          And even on this late date, we don't know the name of

4   the lab in California or the name of the individual there who

5   does PGD, and I'd certainly at least like to know that, but I'm

6   more concerned, and this is why we think summary judgment is

7   perhaps appropriate at this juncture in this case, with the

8   fact that not only has the Court had the plaintiff's nose

9   thumbed at it, but the bridges to our potential experts have

10  been burned in the process.  And at the very least, do what

11  I've already done, is state on the record that this is a major

12  concern in this case with a limited availability of experts,

13  but also ask Mr. Stein on the record, who is this lab in

14  California and who is the physician or Ph.D. who he intends to

15  potentially use as an expert.  That's information that's vital

16  before we do anything else.  And with that said, I'll ask that

17  the Court ask counsel for that information and then turn the

18  Court over to Ms. Blaine.

19         THE COURT:  Mr. Stein, identify for the record the lab

20  in California and the physician you spoke to.

21         MR. STEIN:  Yes.  His name is Charles Sturm.  And

22  it's --

23         THE COURT:  Charles what?

24         MR. STEIN:  Sturm, I believe it is, S-t-u-r-m.

25         And I'll be candid with the Court, exactly what Dr.

1    Sturm told me.  Dr. Sturm said that he wants to help me;

2    however, he is chief of genetic medicine for Quest Laboratories

3    in the United States and that he would have to get permission

4    from his board to be an expert in my case.  He knows -- when I

5    -- he knows about some of the problems associated with genetic

6    -- Genesis Genetics and he said if his board doesn't allow him,

7    he will give me the name of someone else connected to that

8    program and I will have it.

9           Now that conversation took place ten days ago and I

10   haven't heard back from Dr. Sturm to indicate that the board at

11   Genesis -- you know, the Quest Laboratories --

12          THE COURT:  So you don't have an expert, as you stand

13   here be -- today?

14          MR. STEIN:  I expect to have the name of the person

15   there who will help me, but I can't say to the Court, other

16   than that they've indicated that they will help me in a matter

17   of a week.  So, you know, I would expect that I could -- it's

18   been ten days since we sent the letter out to California and I

19   expect that I would -- I didn't get a chance to call him today,

20   but I will be calling there tomorrow to find out, you know, the

21   fact that --

22          THE COURT:  Wouldn't it have been prudent for you to

23   call?

24          I mean, we started this conference today at 1:30.

25   Wouldn't it have been prudent?  Not only have we blown the

Colloquy                                20

1   expert deadline, which was August 14th, as you stand here today

2   you're telling me you don't have an expert; and, yet, you're

3   making representations to me that you're going to be able to

4   have a report within a specified period and we still don't know

5   who the expert is.

6           MR. STEIN:  Precisely -- that's correct.  Precisely,

7   no.  But I do know -- I do have some identification of where

8   the expert is coming from.  And, frankly, I didn't choose to

9   call California before I left, 12 o'clock, to come down here --

10  until after 12 to come down here and knowing the three-hour

11  difference.  It occurred to me to call California this morning,

12  but because of the time difference, I deferred on that.

13          And I would ask the Court for a matter of personal

14  privilege.  There was a doctor's deposition scheduled.  I

15  didn't appreciate that I had to be -- that our -- that our

16  meeting would be taking -- can I make a phone call?

17          THE COURT:  Not right now.

18          MR. STEIN:  Okay.

19          THE COURT:  Counsel, we're in the middle of oral

20  argument --

21          MR. STEIN:  All right.

22          THE COURT:  -- in which I'm trying to get to the

23  bottom.  I still have an oral argument on a patent case in

24  about 45 minutes, I didn't anticipate that on a status

25  conference I'd be now well into three o'clock now.

1          So, quite frankly, I'm going to allow Miss Blaine -- I

2   have some serious reservations as to whether, indeed, any --

3   any time frame that I afford counsel in this case is going to -

4   - to be reached, in light of what I just found out, which is we

5   really don't have an identifiable expert at the -- at the

6   current moment.

7          Miss Blaine.

8          MS. BLAINE:  Yes, Your Honor.

9          THE COURT:  I'll hear you now.  I'm going to ask

10  counsel to be brief because I am going to go ahead and set some

11  dates.  And if these dates aren't met, there will be no other

12  dates offered.

13         MS. BLAINE:  Yes, Your Honor.

14         MR. HAMAD:  Will I have an opportunity to be heard, as

15  well, or --

16         THE COURT:  Yes, Mr. Hamad, you will.

17         MR. HAMAD:  Thank you.

18         MS. BLAINE:  Yes, Your Honor.  We just have two points

19  to make.  The first point is just on the issue of the missing

20  chart that Mr. Stein has tried to make a big issue of this.

21  However, this first came up in February of 2009, it was quickly

22  remedied, we weren't aware that there was a color copy issue.

23  As soon as we were made aware that there was a color copy issue

24  in late April, we provided that in early May.  And that

25  happened almost a month before the conference call that led to

Argument - Blaine / Hamad                    22

1   the June scheduling order.  So everybody had all of the facts

2   available to them, all of the written discovery was available

3   at that time, and we were under the impression that at that

4   time that was a final scheduling order and those dates were

5   real dates that needed to be met by all counsel.  And we

6   proceeded as if that was the case.

7          The second point is that that happened, fact discovery

8   closed on August 3rd.  We anticipated receiving expert reports

9   on August 14th.  On August 17th, when we hadn't seen anything,

10  we sent a letter to Mr. Stein asking for the status.  We did

11  not hear back from him for another week.  By that point, he

12  said that he did not have experts available and he wrote to the

13  Court the next day.

14         It's now a month after that, it's September 21st, and

15  we do not have any expert reports, no dates for expert reports

16  and we believe, Your Honor, that after -- that we respectfully

17  request after six scheduling orders that at this time Your

18  Honor enter an order barring plaintiffs from producing experts.

19         THE COURT:  All right.  Thank you, Miss Blaine.

20         Mr. Hamad.

21         MR. HAMAD:  Judge, I'll keep it very brief and simple.

22  I think while we -- I appreciate your kind order in allowing

23  Mr. Stein additional time to get his order, I must, just for

24  the record, stipulate that my client is prejudiced

25  significantly by the delay because as Mr. Leuchtman astutely

1  pointed out, we don't have an infinite number of these experts

2  out there.  So if he's taking an extra two months to talk to

3  this guy and another person all over the country, we're out

4  experts and that limits our ability to defend the case for our

5  client.

6           Now with that being said, I have a couple suggestions

7  if Your Honor would be so -- if Your Honor's willing to include

8  them.

9           Now the thing I really care about, Judge, is the fact

10  that we need to know who his experts are.  Now if he wants 60

11  days or 45 days to get experts and get -- Your Honor's willing

12  to do that, apparently, that's fine; however, within a certain

13  amount of -- within a week or ten days I would request that Mr.

14  Stein have the -- must identify his experts.  And he can't go

15  beyond these experts.  And the reason why I'd ask that, Judge,

16  is because the minute I get their CV's I want to start looking

17  to hire my own experts so that I don't blow deadlines.  I would

18  request that the Court enter an order demanding that Mr. Stein

19  identify and produce CVs of any and all experts he's going to

20  call in this case regarding any and all issues, be it

21  causation, damages, or liability.

22           And last, but not least, Judge, as far as the issue of

23  -- you know, record production or discovery -- discovery

24  process in this case.  I just want to stipulate for the record,

25  my client has complied.  We have produced five people, very

Argument - Hamad / Court Decision                    24

1    busy, very well -- highly thought of people, all for

2    depositions for Mr. Stein.    We have produced records.   We

3    have been -- we have complied with any and all requests; and,

4    yet, here it is, it's a month after for expert reports and we

5    left here with nothing.  So that's just our position.

6              THE COURT:  All right.  I appreciate everybody's

7    positions.

8              Here's --

9              MR. STEIN:  Excuse me.

10             THE COURT:  Mr. Stein, how long did you need for Mr. -

11   - your expert, Cutting's report?

12             MR. STEIN:  I asked for -- well, I was hoping to have

13   it in 10 to -- 10 to 14 days.  If the Court setting fixed

14   orders, then I would ask for 20 days.

15             THE COURT:  And how long -- you're going to identify

16   your expert, along with the -- their CVs no later than the end

17   of business day on September 25th.  That's Friday.

18             MR. STEIN:  Thank you.

19             THE COURT:  You have five days to do that, Mr. Stein.

20   You don't identify those experts and you will be limited to

21   those experts.

22             MR. STEIN:  Thank you.

23             THE COURT:  You have until September 16th to come up

24   with Dr. Cuttings' report.

25             MR. STEIN:  I'm sorry, September?

1      THE COURT:  I'm sorry, October 16th, rather.

2      MR. STEIN:  Right.

3      THE COURT:  For Cutting's report.  And you have an

4  additional -- you have until November 20th to get all your

5  expert reports in.  That includes your damages, the life plan

6  report, as well as any and all other reports that need to be

7  provided.  All affirmative reports, the firm cutoff is November

8  20th.  Counsel will have 60 days to do their responsive

9  reports; however they'll have the CVs in hand to address any of

10  Mr. Hamad's concerns by the end of this week.

11      MR. HAMAD:  Thank you, Judge.

12      THE COURT:  All right.  And we have -- that brings us

13  to January 20th for responsive reports.  And, finally, February

14  26th to depose experts.

15      MR. HAMAD:  Judge, on the issue of depositions, if I

16  may be heard, I'll make it very brief.

17      THE COURT:  Sure, Mr. Hamad.

18      MR. HAMAD:  These experts may be all over the country

19  and I don't know about in Federal Court if the Court is so

20  inclined, but in State Court, generally, plaintiffs' experts

21  have to be deposed first, then the defense experts.  If we

22  could split it up, if we can have maybe 45 days, 25 to depose

23  the plaintiffs, 25 to depose the defendants.  I guess that

24  makes -- that's adds up to 50 and I said 45, obviously, you

25  know, I'm a lawyer, not a mathematician.

1      THE COURT:  I am -- so what you're asking for is 20

2  days to depose plaintiffs and then what -- an additional what?

3      MR. HAMAD:  Not additional.  Twenty days for us -- 20

4  or 30 days for us to depose the plaintiffs' experts, maybe by

5  February 20th, and then a month for the plaintiff to depose our

6  experts.

7      MR. LEUCHTMAN:  Your Honor, if I might, may I amplify

8  what Mr. Hamad has said?

9      THE COURT:  Go ahead.

10      MR. LEUCHTMAN:  And he makes a good point.  Typically,

11  as I'm sure Your Honor knows, claims experts are deposed, the

12  depositions are transcribed, they're given to defense experts

13  and then the defendants' experts are deposed.

14      THE COURT:  That's not what typically happens in

15  Federal Court, Counsel, but, okay.

16      MR. LEUCHTMAN:  Okay.

17      THE COURT:  At least in this district.

18      MR. LEUCHTMAN:  All right.  Typically, in my

19  experience, which is limited.

20      All right.  Forgetting whether the deps are

21  transcribed and given to the experts, there's at least time to

22  inform the defense experts of what took place in the

23  plaintiffs' experts' deps, and I would respectfully suggest

24  that the cutoff for plaintiffs' experts' depositions be a month

25  after the January 20 --

Court Decision                                        27

1          THE COURT:  I have February 19th for plaintiffs'

2   experts and I have March 19th for defendants' experts.

3          MR. LEUCHTMAN:  Perfect.  Thank you.

4          MR. HAMAD:  Thank you, Judge.

5          THE COURT:  Okay.  We need to address dispositive

6   motions because I will not be entertaining any further

7   extensions in this case.

8          When will counsel be ready to submit dispositive

9   motions?

10         MR. HAMAD:  Judge, I think if we can have a 20 days

11  after the expert depositions are concluded in order to account

12  for any potential causation arguments that may give rise to

13  motions for summary judgment motion.

14         THE COURT:  Counsel, how many days after March 19th?

15         MR. HAMAD:  That would be great, Your Honor.

16         MR. LEUCHTMAN:  Okay.  Yeah, that works for us.

17         THE COURT:  All right.  We have dispositive motions

18  due and owing, opening briefs, let's make it April 19th.  We

19  have opposition May 3rd.  And we have reply May 10th.

20         Has counsel ever engaged in settlement negotiations?

21         MR. HAMAD:  No, Judge.

22         THE COURT:  I take it that, indeed, we wouldn't even

23  be close to entertaining settlement negotiations until the

24  reports are done, expert reports.

25         MR. HAMAD:  Judge, we don't know what the liability is

Court Decision                                    28

1    at this point.  We don't have an idea as to what the claim is,

2    actually.

3         THE COURT:  All right.  Well, we're going to have

4    another conference call in any event.  I'm going to make sure

5    that you all are keeping these dates and I'm going to tell

6    counsel on the record right now, I am not adjourning any of

7    these dates unless there are exigent circumstances.  And

8    exigent, quite frankly, Counsel, obviously, things happen.  I

9    would never want anything terrible to happen, so I won't even

10   venture to put examples of exigent circumstances on, but I

11   think the record is very clear that, indeed, this will be our

12   seventh scheduling order.

13         As I've indicated already to counsel off the record,

14   Judge Brown is now the District Judge assigned this matter.  He

15   has given this case some priority in the date of -- the case

16   number is 07-1359.  I have advised counsel that I have set

17   these dates.  I will not deviate from these dates.  And for

18   whatever reason we have non-compliance with these dates, I want

19   to know immediately, on either side.

20         I'm going to ask that -- yes, Mr. Stein.

21         MR. STEIN:  Your Honor, just one other item.  May I go

22   into the next three to Detroit to take that one request --

23         THE COURT:  Oh, the request for -- to reopen fact

24   discovery is denied.  There will be no additional fact

25   discovery taken in this case.

1          So we now have the following dates.  September 25th,

2    2009, that's this Friday, by the end of business, the

3    identification of any and all experts, along with the CVs.  We

4    have Dr. Cutting's reports -- report that is due on October

5    16th, '09.  We have any and all other affirmative expert

6    reports due on November 20th, '09.  We have responsive reports

7    due in this case by January 20, 2010.  We have defendant --

8    plaintiffs' experts that must be deposed no later than February

9    19th, 2010.  We have experts for the defendants that need to be

10   deposed, if, indeed, they are going to be deposed, by March 19,

11   2010.  We have dispositive motions that are set for April 19th,

12   opening brief, May 3rd opposition, and May 10th reply.

13          I am going to ask that the defendants in this case do

14   the order memorializing all the dates, as well as my rulings

15   here today.

16          Anything further?

17          MR. HAMAD:  No.  Thank you, Judge.

18          MR. LEUCHTMAN:  Your Honor, you said you wanted to

19   have a conference call and I didn't --

20          THE COURT:  Oh, my law clerk will set a conference

21   call.  I want to have a conference call when all reports are

22   in.  So let's go ahead and have a conference call towards the

23   end of January.  Jamie Lieberman, my law clerk, who is seated

24   in front of me, will come out with a day at the end of January

25   for our call.  And that call is to be initiated -- who

1    initiated our last call?  Does anyone recall?

2           MR. LEUCHTMAN:  I think it was our responsibility, but

3    I'm not sure.

4           THE COURT:  All right.  Well, let's go ahead and have

5    -- Mr. Hamad, have you initiated a call yet?

6           MR. HAMAD:  I don't think so, but I'll be more than

7    happy to do so, Judge.

8           THE COURT:  Thank you so much.  NYU -- defendant NYU

9    will initiate.

10          Thank you so much, Counsel.  Have a good day.

11          MR. LEUCHTMAN:  Thank you, Your Honor.

12          MR. HAMAD:  Thank you, Judge.

13              (Proceedings concluded at 3:21 p.m.)

14          I, certify that the foregoing is a correct transcript

15    from the electronic sound recording of the proceedings in the

16    above-entitled matter.

17    9/30/09                      **S / Lisa Mullen**
      Date                        Lisa A. Mullen
18                                KLJ Transcription Service

19

20

21

22

23

24

25