# NUSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON

A Professional Corporation
Counsellors At Law

LEWIS STEIN*
ALAN D. GOLDSTEIN
RONALD W. BRONSTEIN
PATRICIA E. ROCHE°
LARRY I. KRON
ROBERT D. KOBIN¤
SHARON L. FREEMAN+ ^
SUSAN B. REED
STEVEN J. LOEWENTHAL ◊

20 Commerce Boulevard, Suite E
Succasunna, New Jersey  07876
973-584-1400
Fax: 973-584-8747
Email: nsgbk.office@verizon.net

- Of Counsel -
PAUL R. NUSBAUM

CERTIFIED BY THE SUPREME COURT OF
NEW JERSEY AS A
 *Civil Trial Attorney
 °Matrimonial Attorney
 ^Workers' Compensation Attorney
¤Member Florida Bar
◊Member New York Bar
+Member Pennsylvania Bar

August 31, 2010

Hon. Garrett E. Brown Jr., Chief Judge
Clarkson S. Fisher Federal Building
& U.S. Courthouse
402 E. State Street
Trenton, NJ 08608

> Re: Grossbaum v. Genesis Genetics Institute, LLC, et al.
> Case # 07-CV-1359 (GEB)
> Motion Returnable 9/7/10

Dear Judge Brown:

Kindly accept this letter memorandum in rebuttal to Defendants' responses to the Motion under consideration.

Preliminarily it may be important to point out to the Court, as it peruses the 22 page brief and 123 page submission on behalf of Defendant Genesis Genetics submitted by Lowenstein Sandler and the brief submission on behalf of Defendant NYU, that the subject of this Motion results from an order barring further fact discovery entered on September 21, 2009, as it relates to subsequently developed factual issues that occurred during expert report submissions and their scrutiny at

depositions. More significantly, it must be recognized that in medical malpractice litigation, the patients, the plaintiffs, rarely have knowledge of the events relating to the allegedly defective treatment and therefore, they must rely on a full and open disclosure made during discovery to establish the basis of a claim. To deny or limit any reasonable request for discovery is to deny access to evidence, which is no different than barring factual evidence or expert opinion.

And, to what end? Absent any evidence that Plaintiffs were dilatory or motivated to harass, to apply the order of September 21, 2009 made by the Magistrate Judge under different circumstances would suggest that the Court is more interested in its calendar status than in giving access to a just result on the merits.

THE DETAILS

Turning to the minutia of Defendants' arguments, and ignoring the *ad hominem* attack on Plaintiffs' counsel, we make the following comments:

(1) Defendant Genesis' brief asserts (P. 11):

> One cannot possibly infer that Dr. Xu lied about writing his own report from the mere fact that Dr. Hughes' March 2, 2010 report quoted Dr. Xu's earlier report. Plaintiffs' attempt to convince the court to order Dr. Leuchtman's deposition to allow Plaintiffs to attempt to 'establish[ ] that Dr. Xu's report was also authored in large measure by Attorney Leuchtman,' is nothing more than

2

garden variety harassment.

Defense counsel's claim that Dr. Hughes' opinion letter authored by Mr. Leuchtman copied Dr. Xu's report and not vice versa ignores: (a) the idiosyncrasies in syntax in Dr. Xu's report; and (b) Dr. Xu's report is identical in form, content and erroneous punctuation to significant parts of the "Leuchtman report." Calling it harassment when all Plaintiffs are trying to do is to get to the bottom of the similarities is at best disingenuous, and at worst, an attempt at a cover-up as to how these two reports were actually created. Who is trying to mislead the Court?

(2) Defendant Genesis' brief asserts (P. 13):

> However, once Plaintiffs attempted to move beyond the discussion of how the report came to be written and into discussions of Mr. Leuchtman's and Dr. Hughes' communications about their legal theories, case strategy, and other privileged information, Mr. Leuchtman asserted that these communications were protected by the attorney-client privilege and the work product doctrine.

A reading of the actual questions put to Dr. Hughes discloses that there is no support in the record for these exaggerated claims of defense counsel. Plaintiffs only sought the details of the creation of the Hughes report.

(3) Defendant Genesis' brief further asserts (P. 16):

> Plaintiffs contend that they are entitled to re-depose at least two NYU witnesses because, in reviewing the facts with Dr.

3

> Hughes at his expert deposition they, for the first time, asked him questions about procedures between NYU and Genesis concerning Genesis's practice of issuing preliminary and final reports to NYU.…All parties were aware of the existence of these two reports during the fact discovery period, and had ample opportunity to depose the fact witnesses concerning the reports. Indeed, this court afforded Plaintiffs approximately two years for fact discovery, and Plaintiffs have not set forth a shred of evidence in support of the idea that they could not have obtained this evidence sooner.

In fact, perusal of the deposition of Dr. Licciardi of Defendant NYU (see excerpt of dep. trans. dated March 11, 2009 at T:43-26 to 44-18 and 64-1 to 66-18 annexed hereto) indicates that Plaintiffs explored in detail the circumstances of the two reports. NYU claimed never to have received the second report which Dr. Hughes claims to have sent, and NYU relied solely on a report which Dr. Hughes now says was not in fact signed by him and was preliminary by design. Thus, the record is that Plaintiffs' counsel did explore the circumstances of the two reports, but at no time did anyone at anytime give any indication that there was a private agreement that there be two reports, and that was the pre-arrangement of the parties. If that was so, why wouldn't the second, final and formal report not appear in the NYU chart?

(4) Defendant Genesis' brief further asserts (P. 17) regarding Dr. Zev Rozenwaks' deposition:

4

> That, however, is not the argument Plaintiffs made to Magistrate Salas.

Defense counsel again has distorted the nature of the Plaintiffs' argument as it has in several references to Plaintiffs' argument to Magistrate Judge Salas. If Defendants' expert witness, Dr. Xu, relied in his deposition testimony for the first time on factual circumstances relating to the Weill Cornell experience, should Plaintiffs not be entitled to investigate the Weill Cornell experience? How would Defendants suggest that Plaintiffs go about investigating these assertions made for the first time during Defendants' expert's deposition without further investigation into the Weill Cornell experience as reflected in the knowledge of the head of the department?

(5) Defendant Genesis' brief further asserts (P. 13):

> Plaintiffs never challenged Genesis Genetics' assertions of privilege over these communications before the Magistrate Judge.

Continuing at P. 19:

> Because Plaintiffs did not make these arguments before the Magistrate Judge, who heard the application in the first instance, these new arguments are waived on appeal.

Continuing at P. 17:

> That, however, is not the argument Plaintiffs made to Magistrate Salas.

It should not escape this Court that Plaintiffs sought leave to file a formal motion with respect to the issues that were raised

5

in our letter of June 2, 2010 (Doc. No. 62). However, Magistrate Judge Salas disregarded our request to file a formal motion. In light of the fact that no formal motion was allowed, and the Court entered its blanket order, Plaintiffs fail to see how the Defendants can urge these arguments on the informal nature of the proceedings that took place below.

(6) In its brief regarding Dr. Cutting's further deposition, Defendant NYU asserts (P. 3):

> Almost two years prior to his deposition, on March 24, 2008, Dr. Cutting responded to Mr. Stein's request for a report regarding causation.

The use of the term "report" is loaded in connection with this Defendant's argument. Plaintiffs had asked for some education about the potential facts of the case before any discovery was undertaken. Clearly, this letter of March 24, 2008 was not a "report" as that term is used in Federal practice. To the extent that this Defendant sought an explanation of what it believes to be inconsistencies between the prior letter of Dr. Cutting and his report, the Defendants can certainly explore inconsistent statements at trial. However, Plaintiffs, in the interest of allowing the Defendant a complete exposure to the opinions of Dr. Cutting, Plaintiffs do not object to the further questioning of Dr. Cutting. However, those questions should be under reasonable circumstances because of its limited scope.

6

Plaintiffs' fail to see why it is necessary to impose on both the witness and counsel to travel from New Jersey to Baltimore to make such inquiry through the use of either telephone or videoconferencing facilities would serve adequately for such limited exploration.

Respectfully submitted,

Lewis Stein

LS:svd

---

Page 1

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
                    DOCKET NO. 07-CV-359

CHAYA GROSSBAUM and MENCHEM      )
GROSSBAUM, her spouse,           )
individually, as guardians ad    )
litem of the infant, ROSIE       )
GROSSBAUM,                       )
                                 )
                     Plaintiffs, ) DEPOSITION OF:
                                 )
       v.                        ) FREDERICK LICCIARDI
                                 )
GENESIS GENETICS INSTITUTE,      )
L.L.C., of the State of Michigan,)
MARK R. HUGHES, M.D., NEW YORK   )
UNIVERSITY SCHOOL OF MEDICINE and)
NEW YORK UNIVERSITY HOSPITALS    )
CENTER, both corporations in the )
State of New York, ABC           )
CORPORATIONS 1-10 and JOHN DOE   )
1-10,                            )
---------------------------------
```

     T R A N S C R I P T of the stenographic notes of
the proceedings in the above-titled matter, as taken by
PHILIP A. FISHMAN, a Certified Shorthand Reporter and
Notary Public of the State of New Jersey, held at the
offices of Dr. Frederick Licciardi, 660 First Avenue,
New York, New York, on Wednesday, March 11, 2009,
commencing at 3:00 in the afternoon.

                PHILIP A. FISHMAN
                COURT REPORTING AGENCY
                89 Headquarters Plaza North
                14th Floor
                Morristown, New Jersey 07960
                (973)285-5331 - FAX (732)605-9391

---

Page 2

APPEARANCES:

NUSSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON, ESQS.
BY: LEWIS STEIN, ESQ.
Appearing on behalf of the Plaintiffs

STEPHEN N. LEUCHTMAN, P.C.
BY: STEPHEN N. LEUCHTMAN, ESQ.
Appearing on behalf of the Defendant Genesis Genetics
   Institute, L.L.C., and Dr. Hughes

MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.
BY: R. SCOTT EICHHORN, ESQ.
Appearing on behalf of the Defendants New York
   University School of Medicine and New York University
   Hospitals Center

                  *    *    *

---

Page 3

                          I N D E X

WITNESS              DIRECT   CROSS   REDIRECT  RECROSS

FREDERICK LICCIARDI

by Mr. Stein            4               78

by Mr. Eichhorn                 77


                    I N D E X  O F  E X H I B I T S

EXHIBIT        DESCRIPTION                        PAGE

P-1            CV                                  11
P-2            Yellow Cover Chart                  17
P-3            Blue Cover Chart                    17
P-4            Page                                23
P-5            E-mail from Mark Hughes to Francis
               Hooper, dated March 25, 2004        27
P-6
P-7            Genesis Genetics Institute Fax Page 45
P-8            Document entitled "Genomics Center
               at Samaritan"                       65
P-9            Document entitled "Genesis Genetics
               Institute"                          65

---

Page 4

14:41:29   FREDERICK L I C C I A R D I, 660 First Avenue,
14:41:33   New York, New York, having been duly sworn according to
14:41:33   law, testifies under oath as follows:
14:41:34               DIRECT-EXAMINATION BY MR. STEIN:
14:41:34       Q.  Dr. Licciardi, obviously, we are here to take
14:43:05   your deposition, which is just a multi-syllable word for
14:43:09   a question and answer session, in which my questions and
14:43:13   your answers are being transcribed by the gentleman who
14:43:15   sits to my left and your right, who is a Certified
14:43:19   Shorthand Reporter.
14:43:20               And if this case goes to trial, what you say here
14:43:24   may be used in court as evidence, so with those
14:43:30   instructions, let me tell you that you should treat this
14:43:33   question with the same seriousness as if you were giving
14:43:36   testimony in open court.
14:43:37               Do you understand that?
14:43:38       A.  Yes.
14:43:39       Q.  And, likewise, that's the reason you have been
14:43:43   placed under oath, and I am sure you understand the
14:43:46   meaning and significance of taking an oath before giving
14:43:49   testimony.
14:43:49               Is that correct?
14:43:50       A.  Yes.
14:43:50       Q.  Have you had the opportunity to give a deposition
14:43:56   in any other case before this?

41

```
15:54:51  1   as to the suitability of any embryos for invitro
15:54:58  2   fertilization?
15:54:58  3       A. That determination is made in conjunction with
          4   myself and the laboratory person who is in charge of the
          5   case.
15:55:06  6       Q. And who was the person -- laboratory person in
15:55:10  7   charge of the eggs here?
15:55:11  8       A. Alexis Adler.
15:55:15  9           MR. LEUCHTMAN: I am sorry.
15:55:16 10           I didn't catch that.
15:55:17 11           THE WITNESS: Alexis Adler.
15:55:19 12           MR. LEUCHTMAN: Thank you.
15:55:20 13       Q. Can you tell me a little bit Alexis Adler, what
15:55:22 14   is her background and qualifications?
15:55:24 15       A. Alexis Adler has been doing invitro fertilization
15:55:28 16   since before 1992, probably before 1988.
15:55:33 17           I don't know the exact date.
15:55:36 18       Q. Okay. And is she a nurse? Is she -- does she
15:55:42 19   have any other special training other than experience
15:55:47 20   here in the invitro fertilization laboratory?
15:55:50 21       A. That's her role, laboratory personnel.
15:55:52 22       Q. Okay. So then -- but you are, I take it, the
15:55:56 23   ultimate determinant as to whether the embryos are
15:56:00 24   suitable for invitro fertilization. Is that correct?
15:56:04 25       A. That is correct.
```

42

```
15:56:05  1       Q. Okay. Do you have the record of what was
15:56:07  2   reported to you by Genesis Genetics?
15:56:12  3       A. Yes.
15:56:13  4           MR. EICHHORN: I wonder if we should close
15:56:15  5   that window. It's getting pretty loud.
15:56:19  6           MR. STEIN: Were you -- if you would like to
15:56:21  7   do it.
15:56:22  8           MR. LEUCHTMAN: Some kind of interference.
15:56:24  9           I am getting a sort of buzzing kind of
15:56:26 10   noise.
15:56:26 11           Does somebody have something near the
15:56:28 12   speaker?
15:56:29 13           THE WITNESS: A jackhammer.
15:56:31 14           MR. EICHHORN: Yes. Some power equipment
15:56:34 15   outside.
15:56:37 16           MR. LEUCHTMAN: Okay. It's only been doing
15:56:39 17   it the last couple --
15:56:41 18           MR. EICHHORN: The doctor closed the window.
15:56:44 19           MR. LEUCHTMAN: That's much better.
15:56:48 20           MR. EICHHORN: Thank you.
15:56:49 21           THE WITNESS: Sure.
         22           MR. EICHHORN: Did we have a question
15:56:53 23   pending?
15:56:54 24           MR. STEIN: Yes.
15:57:41 25           MR. STEIN: Would you mark this a number,
```

43

```
15:57:42  1   please.
15:58:21  2           MR. LEUCHTMAN: You are marking the page.
15:58:23  3           Is this the page, Morganstern Grossbaum
15:58:26  4   results?
15:58:29  5           MR. STEIN: That's correct.
15:58:30  6       Q. Doctor, I show you a document which we have
15:58:32  7   marked P-6 for identification and ask you if you have
15:58:38  8   the actual chart copy of that document?
15:58:41  9       A. Yes, I do.
15:58:41 10       Q. And is that an accurate photocopy?
15:58:43 11       A. It is.
15:58:44 12       Q. Okay. Now, Doctor, is this the report that you
15:58:50 13   received from Genesis Genetics?
15:58:53 14       A. Yes.
15:58:53 15       Q. Did you receive anything else from Genesis
15:58:57 16   Genetics regarding the studies that were done at Genesis
15:59:02 17   Genetics?
15:59:02 18       A. This was the page that I used.
15:59:05 19       Q. Okay. But you didn't answer the question.
15:59:08 20       A. Yes, there are other records from Genesis in the
15:59:12 21   chart.
15:59:13 22       Q. Okay. Regarding the results of this study?
15:59:15 23       A. Yes.
15:59:15 24       Q. Could you show me what they are?
15:59:17 25       A. Sure.
```

44

```
16:01:25  1           MR. EICHHORN: I think those were these.
16:01:27  2           He is referring to these, which I sent to
16:01:30  3   him.
16:01:31  4           THE WITNESS: I see.
16:01:32  5           MR. STEIN: Okay. Let me see what you are
16:01:34  6   referring to.
16:01:34  7           MR. EICHHORN: Well, there is a letter here.
16:01:36  8   I can show you what the documents are.
16:01:39  9           The letter is from the person at the
16:01:40 10   hospital, so I will take that off, but these are
16:01:47 11   the records I sent to him.
16:01:57 12           MR. STEIN: Well, at this juncture there is
16:01:59 13   a question on the table.
16:02:00 14       Q. And that question is, what is in the chart from
16:02:05 15   Genesis Genetics regarding their studies of this
16:02:10 16   patient's embryos other than the page which we have
16:02:14 17   marked P-6 for identification?
16:02:16 18       A. There is nothing else.
16:02:17 19       Q. Okay. May I see -- may I see the chart, please.
16:02:27 20           MR. EICHHORN: Don't forget to give those
16:02:29 21   back to me.
16:02:30 22           MR. STEIN: We won't.
16:02:36 23       Q. Okay.
16:02:45 24           MR. STEIN: I am going to put a sticker on
16:02:47 25   this page and then I am going to show it to you.
```

## Page 61

```
 1    A.  I don't know, because I am not completely
 2  familiar with the techniques that Dr. Hughes is using in
 3  his laboratory, so I don't know.
 4    Q.  Well, is it common for other laboratories to get
 5  back or report that seven out of ten of one of the
 6  mutations is not available for analysis?
 7    A.  It's more than average.
 8    Q.  Okay.  Does the -- taking into consideration the
 9  risk of allele drop out, does the fact that seven out of
10  ten of the samples did not allow a DNA analysis,
11  increase the risk of a false diagnosis?
12    A.  This is something which Dr. Hughes would be an
13  expert on, and I am not sure.
14    Q.  It doesn't fall within your expertise?
15    A.  It does not.
16    Q.  Well, suppose only one of the ten were reported
17  as having a DNA signal, would you be troubled by that
18  analysis by the laboratory in the advising of your
19  patient as to whether to go ahead with invitro
20  fertilization?
21         MR. EICHHORN:  Objection to the form.
22         I think it's improper.
23         MR. LEUCHTMAN:  I will join in that.
24         MR. EICHHORN:  I think a hypothetical is an
25      improper question, but you can answer it if you
```

## Page 62

```
 1  can.
 2    A.  I can't answer.
 3    Q.  Why can't you answer it?
 4    A.  Because every case is different.
 5    Q.  In what way?
 6    A.  Well, there may be certain circumstances which
 7  may lead to a laboratory telling me that they only have
 8  analysis on one.
 9    Q.  Let me ask you this:  In this meeting that you
10  have indicated took place with Chaya Grossbaum and her
11  husband, I take it, both were present?
12    A.  Yes.
13    Q.  And what did you tell them?
14    A.  Do you want me to go through the whole hour
15  consultation?
16         MR. EICHHORN:  Well, I don't think he means
17      that meeting.
18         Do you mean the day of implantation?
19         MR. STEIN:  Yes.
20         MR. EICHHORN:  Or the first meeting?
21    Q.  I mean after you got the report --
22    A.  I see.
23    Q.  -- from Genesis Genetics, you said you had a
24  meeting --
25    A.  Yes.
```

## Page 63

```
 1    Q.  -- with the parents, Mrs. Grossbaum and Mr.
 2  Grossbaum, regarding invitro fertilization of the
 3  embryos that had been retrieved.  Is that correct?
 4    A.  That is correct.
 5    Q.  And that meeting took place here in your office?
 6    A.  Yes.
 7    Q.  And what did you tell them at that time?
 8    A.  I told them that there are -- we see the results
 9  for the analysis and there are embryos that had been
10  determined to be carriers, and according to the report,
11  Dr. Hughes' lab, they are carriers at worst and,
12  therefore, we feel comfortable transferring them.
13    Q.  And that was -- and that was the extent of the
14  discussion --
15    A.  Yes.
16    Q.  -- you had with them?  Is that correct?
17    A.  That's correct.
18    Q.  Do you know -- I may be asking this in a
19  different way, but I do -- do I understand you don't
20  have the expertise to explain why there is an inability
21  to get a signal from a particular gene cell that's being
22  analyzed?
23    A.  I can tell you that I cannot be an expert in
24  everything that goes on in Dr. Hughes' lab and he can't
25  be an expert in everything that goes on here, so the
```

## Page 64

```
 1  answer is I am not an expert in embryo biopsy DNA
 2  genetics.
 3    Q.  Well, when you receive a report from a laboratory
 4  such as Genesis Genetics, were you concerned about
 5  allele drop out?
 6    A.  Allele drop out is a possibility.  However, that
 7  was signaled in Sample 2.
 8         It said "ADO Paternal," allele drop out.
 9    Q.  Well, does that concern about allele drop out
10  apply to all of the samples that are being reported on?
11         We are waiting your answer.
12    A.  Yes, you are.
13         I am sorry.
14    Q.  That's okay.
15    A.  Can you repeat -- repeat the question, please?
16         (Whereupon, the court reporter reads as
17      requested.)
18    A.  I would have followed the recommendations of Dr.
19  Hughes, and if he told me that allele drop out was a
20  concern, I would have been concerned about it.
21    Q.  And would you have advised the family of your
22  concerns in that case?
23    A.  Yes.
24    Q.  Okay.
25         MR. STEIN:  Next one.
```

## Page 65

1  Would you mark each one of these.
2  (Document entitled "Genomics Center at
3  Samaritan" is marked as Exhibit P-8 for
4  identification.)
5  (Document entitled "Genesis Genetics
6  Institute" is marked as Exhibit P-9 for
7  identification.)
8  Q. Doctor, I would like to show you two documents.
9  MR. LEUCHTMAN: I didn't hear you.
10  MR. EICHHORN: By six o'clock he will be
11  done.
12  MR. LEUCHTMAN: Okay. Great. That's no
13  problem at all.
14  MR. STEIN: My time estimates are not the
15  greatest.
16  MR. LEUCHTMAN: No lawyer's is, but I will
17  accept that.
18  MR. STEIN: You will go by that.
19  Q. Doctor, I show you two documents, which we have
20  marked P-8 for identification and P-9.
21  I ask you to look at them and see if you have
22  ever seen them before this litigation started.
23  MR. LEUCHTMAN: Could we note for the record
24  and my benefit what eight and nine are?
25  MR. EICHHORN: Yes.

## Page 66

1  The doctor is looking at them, but, Lew, you
2  probably should identify them.
3  Q. Okay. P-8 appears to be a document entitled
4  "Message from Dr. Hughes" dated --
5  MR. LEUCHTMAN: "Message"?
6  MR. STEIN: "Message."
7  MR. LEUCHTMAN: Yes.
8  MR. STEIN: The Genomics Centers at
9  Samaritan, and it carries a date of 7/19/2004,
10  and, likewise, a three-page letter dated July 19,
11  2004, addressed to the NYU Reproductive Center,
12  which is -- I think you are familiar with the
13  letters -- electronically signed by Dr. Hughes.
14  A. I did not see these before, no.
15  Q. And it's fair to say that these documents, P-8
16  and P-9, did not appear anywhere in the records of NYU.
17  Is that right?
18  A. It is correct.
19  Q. And have you read these documents now?
20  A. I did not.
21  Q. Now, Doctor, according to the Answer to
22  Interrogatories that's been provided to me by NYU and
23  particularly the question -- answer to Question No. 1,
24  which is: "State whether NYU has had any involvement
25  with other patients prior to the plaintiffs who had PGD

## Page 67

1  testing performed by defendant Genesis Genetics and/or
2  defendant Mark Hughes, and, if so, indicate by numerical
3  designation in leu of proper names, the date of such
4  testing, which would be the date of implantation."
5  And I have been provided in that answer with the
6  dates, by my count number, are approximately 65.
7  Now, I take it that represents the entire
8  department here. Is that correct?
9  A. Correct.
10  Q. And also, can I assume that it would be involved
11  in PGD testing for reasons other than the presence of a
12  cystic fibrosis mutation gene? Is that right?
13  MR. EICHHORN: "Other than," you mean
14  excluding CF or including --
15  MR. STEIN: I didn't exclude them.
16  MR. EICHHORN: Objection to the form.
17  "Other than" seems to exclude it.
18  MR. STEIN: Okay.
19  The intent of the question is to determine
20  whether or not these -- the use of Genesis
21  Genetics were for testing of embryos for reasons
22  related to the cystic fibrosis mutation as well
23  as other reasons. Is that correct.
24  A. Right.
25  Q. Can you tell me approximately how many -- what

## Page 68

1  percentage of your practice and the PGD studies that are
2  done, relate to the cystic fibrosis gene?
3  MR. EICHHORN: You mean of those PGD cases,
4  what percentage are CF?
5  MR. STEIN: Yes. He can tell me only what
6  his experience is.
7  A. I am not sure.
8  Q. Well, can you give me any idea as to what
9  percentages are tested for the cystic fibrosis gene?
10  A. I don't know.
11  Q. Okay. Can you tell me approximately how many
12  people you see annually who come to you with the
13  diagnosis of cystic fibrosis mutation carriers in both
14  parents?
15  A. Less than one.
16  Q. Less than one.
17  Sometimes a whole year goes by and you don't see
18  people with the cystic fibrosis gene?
19  A. Correct.
20  MR. EICHHORN: For both of them?
21  MR. STEIN: Pardon me?
22  MR. EICHHORN: For both of them?
23  MR. STEIN: For both of them.
24  THE WITNESS: Hello, Steve.
25  MR. LEUCHTMAN: I got interrupted again.