# EXHIBIT D

1  *2981.101*  I N D E X          3

2

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
DOCKET NO. 07-CV-359

1

2

3 --------------------------
CHAYA GROSSBAUM and MENCHEM
4 GROSSBAUM, her spouse,
individually, as guardians ad
5 litem of the infant, ROSIE
GROSSBAUM,
6
Plaintiffs, )  DEPOSITION OF:
7
v.                      )  FREDERICK LICCIARDI
8
GENESIS GENETICS INSTITUTE,
9 L.L.C., of the State of Michigan, )
MARK R. HUGHES, M.D., NEW YORK
10 UNIVERSITY SCHOOL OF MEDICINE and )
NEW YORK UNIVERSITY HOSPITALS
11 CENTER, both corporations in the
State of New York, ABC
12 CORPORATIONS 1-10 and JOHN DOE
1-10,
13 --------------------------

14      T R A N S C R I P T of the stenographic notes of

15 the proceedings in the above-titled matter, as taken by

16 PHILIP A. FISHMAN, a Certified Shorthand Reporter and

17 Notary Public of the State of New Jersey, held at the

18 offices of Dr. Frederick Licciardi, 660 First Avenue,

19 New York, New York, on Wednesday, March 11, 2009,

20 commencing at 3:00 in the afternoon.

21

22

PHILIP A. FISHMAN
23        COURT REPORTING AGENCY
89 Headquarters Plaza North
24             14th Floor
Morristown, New Jersey 07960
25   (973)285-5331 - FAX (732)605-9391

*(Corrected Version)*

---

WITNESS       DIRECT   CROSS   REDIRECT RECROSS

4  FREDERICK LICCIARDI

5  by Mr. Stein      4              78

6  by Mr. Eichhorn   77

7

8

9

10

11            I N D E X   O F   E X H I B I T S

12

13  EXHIBIT          DESCRIPTION               PAGE

14  P-1       CV                          11

15  P-2       Yellow Cover Chart          17

16  P-3       Blue Cover Chart            17

17  P-4       Page                        23

18  P-5       E-mail from Mark Hughes to Francis
                Hooper, dated March 25, 2004    27
19
    P-6
20
    P-7       Genesis Genetics Institute Fax Page  45
21
    P-8       Document entitled "Genomics Center
22                at Samaritan"                65

23  P-9       Document entitled "Genesis Genetics
                Institute"                  65
24
25

---

2

1  A P P E A R A N C E S :

2

3  NUSSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON, ESQS.
   BY: LEWIS STEIN, ESQ.
4  Appearing on behalf of the Plaintiffs

5

6  STEPHEN N. LEUCHTMAN, P.C.
   BY: STEPHEN N. LEUCHTMAN, ESQ.
7  Appearing on behalf of the Defendant Genesis Genetics
   Institute, L.L.C., and Dr. Hughes
8

9

MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.
10 BY: R. SCOTT EICHHORN, ESQ.
   Appearing on behalf of the Defendants New York
11 University School of Medicine and New York University
   Hospitals Center
12

13

14            *     *     *

15

16

17

18

19

20

21

22

23

24

25

---

4

14:41:29  1  F R E D E R I C K   L I C C I A R D I, 660 First Avenue,

14:41:33  2  New York, New York, having been duly sworn according to

14:41:33  3  law, testifies under oath as follows:

14:41:34  4       DIRECT-EXAMINATION BY MR. STEIN:

14:41:34  5  Q.  Dr. Licciardi, obviously, we are here to take

14:43:05  6  your deposition, which is just a multi-syllable word for

14:43:10  7  a question and answer session, in which my questions and

14:43:13  8  your answers are being transcribed by the gentleman who

14:43:15  9  sits to my left and your right, who is a Certified

14:43:19 10  Shorthand Reporter.

14:43:20 11       And if this case goes to trial, what you say here

14:43:24 12  may be used in court as evidence, so with those

14:43:30 13  instructions, let me tell you that you should treat this

14:43:33 14  question with the same seriousness as if you were giving

14:43:36 15  testimony in open court.

14:43:37 16       Do you understand that?

14:43:38 17  A.  Yes.

14:43:39 18  Q.  And, likewise, that's the reason you have been

14:43:43 19  placed under oath, and I am sure you understand the

14:43:46 20  meaning and significance of taking an oath before giving

14:43:49 21  testimony.

14:43:49 22       Is that correct?

14:43:50 23  A.  Yes.

14:43:52 24  Q.  Have you had the opportunity to give a deposition

14:43:56 25  in any other case before this?

---

**9**

1       Is your compensation calculated in any way on the

2 services rendered to a patient in which you are not

3 personally involved even though they may be your

4 patient?

5     A. Yes.

6     Q. And what is your present title?

7     A. Associate Professor of OB-GYN.

8     Q. And do you have any directorships?

9     A. I am the Director of Egg Donation.

10     Q. And -- okay.

11       Tell us what your duties are here in your

12 capacity as Associate Professor.

13     A. I am a physician here at the NYU Fertility

14 Center.

15     Q. And what duties do you perform in that capacity?

16     A. I perform new patient consultations, ultrasounds,

17 reproductive surgery, invitro fertilization procedures.

18     Q. Now, the patients that you see are on occasion

19 referred for PDG testing. Is that correct?

20     A. Correct.

21     Q. Have you had any special testing in the PDG

22 testing and what is done to accomplish that?

23     A. I have done research in PGD.

24     Q. And what is -- what form of research did you do?

25     A. I perform research looking at methods for

**10**

1 performing the biopsy procedure.

2     Q. And where did you do that research?

3     A. When I was a fellow at Cornell.

4     Q. And that would have been in the early 1900's?

5     A. Correct.

6     Q. Did you publish anything in that field?

7     A. I did.

8     Q. And what did you publish?

9     A. I would have to check my records.

10     Q. Do you have, very handily and without much

11 difficulty, your CV available for us to look at?

12     A. No.

13     Q. But you do have a CV which would list your

14 publications?

15     A. Yes.

16       MR. EICHHORN: I think I have it here, Lew.

17 I do have it, but I think it's in my

18 briefcase, which I think is over there.

19 I am quite sure I brought it with me.

20       MR. STEIN: This will save the necessity of

21 us returning to that subject at some later time.

22       THE WITNESS: I can call my assistant and

23 she can produce it if you want.

24       MR. EICHHORN: Here it is.

25       MR. STEIN: Thank you.

**11**

1       Suppose you mark this P-1 with today's date,

2 and I will quickly go over it -- deal with it.

3       (CV is marked as Exhibit P-1 for

4 identification.)

5       (Whereupon, a discussion takes place off the

6 record.)

7     Q. Doctor, in the year 2003 you were a coauthor of a

8 paper or an abstract, "The Prognosis for Patients with a

9 Canceled IVF Cycle, American Society of Reproductive

10 Medicine," that may have been listed under "Abstract."

11       Was there any significance if you had a canceled

12 IVF cycle?

13     A. The object of that study was to let a patient --

14 give a patient a prognosis. The patient came through

15 for an IVF cycle and it was canceled. She naturally

16 wanted to know would she be canceled next time, what

17 does this mean for her long-term reproductive history,

18 and what we found is that most people who were canceled

19 actually went on to have a successful -- have a

20 retrieval and some of them were successful.

21     Q. And did the calculation occur as a result of any

22 particular medical condition or medical reason?

23     A. They were canceled because after being placed on

24 the medications to stimulate their ovaries for invitro

25 fertilization, it was deemed they did not produce enough

**12**

1 follicles for retrieval.

2     Q. Doctor, once a patient has invitro fertilization

3 and had an implantation, can they become pregnant from

4 other sources than the implementation in the first

5 couple of weeks after that?

6     A. Yes.

7     Q. During the period of time from retrieval to

8 implementation in an amount of a week's time, can they

9 become pregnant from other sources during that period?

10     A. Yes.

11     Q. Doctor, in my quick review of your curriculum

12 vitae, which we marked P-1, I didn't see anything in

13 which -- any listing in which you published a peer

14 review journal or gave an abstract on PGD analysis.

15       Is that accurate?

16     A. No.

17     Q. Okay. Could you tell us what you published in

18 PGD or what abstract you have given on that?

19     A. Publication No. 3.

20     Q. All right.

21       Does that complete your answer?

22       Is there anything else in which you published on

23 PGD?

24     A. Yes, that completes my answer.

25     Q. Okay. Doctor, you have had an opportunity to

37

15:49:30 1   fragmentation or granularity?

15:49:33 2       A.  Yes.

15:49:33 3       Q.  What does "granularity" mean?

1  15 4       A.  "Granularity" means if you look inside a cell and

7 5   see dark areas or granular areas.

15:49:40 6       Q.  And that's a negative characteristic for ultimate

15:49:45 7   gestation?

15:49:45 8       A.  We are not sure.  We make note of it, but we are

15:49:48 9   not sure if that means much.

15:49:51 10      Q.  Okay.  And what about after "Embryo Description,"

15:49:58 11  we have a column known as "AH"?

15:50:01 12      A.  That stands for "assessed hatching," which

15:50:05 13  "assessed hatching" means opening the shell, as I have

15:50:08 14  described, and it also in handwritten is "right biopsy"

15:50:13 15  above that.

15:50:15 16      Q.  Okay.  And we only have checkmarks.

15:50:18 17          Can I assume then that those cells with

15:50:24 18  checkmarks were biopsied?

15:50:25 19      A.  Yes.

15:50:25 20      Q.  What's the last column?

15:50:27 21      A.  "Disposition," what do we end up doing with the

15:50:31 22  embryo, and "C" means "culture" and "D" means "discard"

15:50:36 23  and "R" means "research."

15:50:36 24      Q.  Okay.  Now, we have a day four?

15:51:13 25          MR. EICHHORN:  What does "R" mean?

38

15:51:15 1           MR. STEIN:  "Research."

15:51:18 2           THE WITNESS:  "Research."

15:51:28 3       I don't have a day four.

15:51:27 4           Generally, we do not assess the embryos on

15:51:31 5   day four.  Sometimes we do, but we may not.

15:51:33 6       Q.  Would day three, when there is a biopsy, would

15:51:37 7   those cells then be sent to the laboratory, Genesis

15:51:41 8   Genetics, for analysis?

15:51:42 9       A.  Yes.

15:51:42 10      Q.  Now, at that time all of the cells are just

15:51:49 11  single cells from each embryo.  Is that correct?

15:51:53 12          MR. EICHHORN:  I am sorry.

15:51:54 13          Could you read that back?

15:51:55 14          (Whereupon, the court reporter reads as

15:52:05 15  requested.)

15:52:05 16          MR. STEIN:  Let me withdraw that question.

15:52:07 17      I am going to make it a more precise

15:52:08 18  question.

15:52:09 19          MR. EICHHORN:  Okay.

15:52:10 20      Q.  Do I understand then, when the biopsy takes

15:52:12 21  place, a single cell has been retrieved from each of the

.   22  embryos that are designated and sent for analysis to

15:52:20 23  Genesis Genetics?

15:52:21 24      A.  Yes.

15:52:21 25      Q.  Is there any evaluation of the quality of the

39

15:52:29 1   cells or the quality of the embryos at the time that the

15:52:36 2   cells are sent to Genesis Genetics for evaluation?

15:52:42 3       A.  We just make note if they are intact or not, in

15:52:45 4   other words, if the cell was ruptured or not during the

15:52:47 5   biopsy procedure.

15:52:50 6       Q.  Are there any other characteristics of those

15:52:53 7   cells that are sent that are important to determine

15:52:56 8   their utility and later implantation?

15:52:58 9       A.  No.

15:52:58 10      Q.  Okay.  What is the -- after the biopsy is taken

15:53:13 11  and the cells sent to Genesis Genetics -- by the way,

15:53:17 12  how are they sent?

15:53:18 13      A.  I don't know.

15:53:22 14      Q.  I take it that you, as a doctor, are not involved

15:53:26 15  in that mechanism by which these things go from a

15:53:30 16  laboratory to laboratory?

15:53:30 17      A.  Correct.

15:53:32 18      Q.  What's the next involvement of NYU in connection

15:53:37 19  with the cells that are sent to Genesis Genetics?

15:53:49 20          MR. EICHHORN:  You mean after they send them

15:53:49 21      what do they do next with them?

15:53:49 22          MR. STEIN:  Right.

15:53:49 23          What's the next involvement of NYU with

15:53:49 24      regard to either those cells or the results of

15:53:50 25      the analysis?  What's the next thing that

40

15:53:53 1   happens?

15:53:53 2       A.  We receive information from the testing

15:53:55 3   laboratory about the cells.

15:53:56 4       Q.  And who gets that information?

15:53:59 5       A.  The laboratory.

15:54:00 6       Q.  The laboratory here at NYU?

15:54:02 7       A.  Yes.

15:54:03 8       Q.  What does the laboratory do with that

15:54:04 9   information?

15:54:05 10      A.  They examine the information and then they will

15:54:09 11  bring the findings to one of the physicians.

15:54:11 12      Q.  Okay.  In connection with Mrs. Grossbaum, to whom

15:54:18 13  were those findings brought?

15:54:21 14      A.  To me.

15:54:21 15      Q.  And are those findings of the laboratory, that

15:54:27 16  is, the laboratory that did the genetic analysis,

15:54:30 17  included in the chart?

15:54:31 18      A.  Yes.

15:54:33 19      Q.  And do you have those results in this chart?

15:54:35 20      A.  Yes.

15:54:36 21      Q.  And after you get the results, do you make a

15:54:39 22  determination as to whether the embryos are -- where was

15:54:44 23  that?

15:54:44 24          After you get the results of the analysis by

15:54:48 25  Genesis Genetics, was it you who made the determination

41

```
15:54:51   1   as to the suitability of any embryos for invitro
15:54:58   2   fertilization?
15:54:56   3       A.  That determination is made in conjunction with
15:54:56   4   myself and the laboratory person who is in charge of the
   .5   5   case.
15:55:06   6       Q.  And who was the person -- laboratory person in
15:55:10   7   charge of the eggs here?
15:55:11   8       A.  Alexis Adler.
15:55:15   9           MR. LEUCHTMAN:  I am sorry.
15:55:16  10           I didn't catch that.
15:55:17  11           THE WITNESS:  Alexis Adler.
15:55:18  12           MR. LEUCHTMAN:  Thank you.
15:55:20  13       Q.  Can you tell me a little bit Alexis Adler, what
15:55:22  14   is her background and qualifications?
15:55:24  15       A.  Alexis Adler has been doing invitro fertilization
15:55:28  16   since before 1992, probably before 1988.
15:55:33  17           I don't know the exact date.
15:55:36  18       Q.  Okay.  And is she a nurse?  Is she -- does she
15:55:42  19   have any other special training other than experience
15:55:47  20   here in the invitro fertilization laboratory?
15:55:50  21       A.  That's her role, laboratory personnel.
15:55:52  22       Q.  Okay.  So then -- but you are, I take it, the
15:55:55  23   ultimate determinant as to whether the embryos are
15:56:00  24   suitable for invitro fertilization.  Is that correct?
15:56:04  25       A.  That is correct.
```

42

```
15:56:06   1       Q.  Okay.  Do you have the record of what was
15:56:07   2   reported to you by Genesis Genetics?
15:56:12   3       A.  Yes.
15:56:13   4           MR. EICHHORN:  I wonder if we should close
15:56:15   5       that window.  It's getting pretty loud.
15:56:21   6           MR. STEIN:  Were you -- if you would like to
15:56:21   7       do it.
15:56:22   8           MR. LEUCHTMAN:  Some kind of interference.
15:56:24   9       I am getting a sort of buzzing kind of
15:56:26  10       noise.
15:56:26  11           Does somebody have something near the
15:56:28  12       speaker?
15:56:29  13           THE WITNESS:  A jackhammer.
15:56:31  14           MR. EICHHORN:  Yes.  Some power equipment
15:56:34  15       outside.
15:56:37  16           MR. LEUCHTMAN:  Okay.  It's only been doing
15:56:39  17       it the last couple --
15:56:41  18           MR. EICHHORN:  The doctor closed the window.
15:56:44  19           MR. LEUCHTMAN:  That's much better.
15:56:48  20           MR. EICHHORN:  Thank you.
15:56:49  21           THE WITNESS:  Sure.
          22           MR. EICHHORN:  Did we have a question
15:56:53  23       pending?
15:56:54  24           MR. STEIN:  Yes.
15:57:41  25           MR. STEIN:  Would you mark this a number,
```

43

```
15:57:42   1       please.
15:57:21   2           MR. LEUCHTMAN:  You are marking the page.
15:58:23   3           Is this the page, Morganstern Grossbaum
15:58:26   4       results?
15:58:29   5           MR. STEIN:  That's correct.
15:58:30   6       Q.  Doctor, I show you a document which we have
15:58:32   7   marked P-6 for identification and ask you if you have
15:58:38   8   the actual chart copy of that document?
15:58:41   9       A.  Yes, I do.
15:58:41  10       Q.  And is that an accurate photocopy?
15:58:43  11       A.  It is.
15:58:44  12       Q.  Okay.  Now, Doctor, is this the report that you
15:58:50  13   received from Genesis Genetics?
15:58:53  14       A.  Yes.
15:58:53  15       Q.  Did you receive anything else from Genesis
15:58:57  16   Genetics regarding the studies that were done at Genesis
15:59:02  17   Genetics?
15:59:02  18       A.  This was the page that I used.
15:59:05  19       Q.  Okay.  But you didn't answer the question.
15:59:08  20       A.  Yes, there are other records from Genesis in the
15:59:12  21   chart.
15:59:13  22       Q.  Okay.  Regarding the results of this study?
15:59:15  23       A.  Yes.
15:59:15  24       Q.  Could you show me what they are?
15:59:17  25       A.  Sure.
```

44

```
16:01:25   1           MR. EICHHORN:  I think those were these.
16:01:27   2       He is referring to these, which I sent to
16:01:30   3       him.
16:01:31   4           THE WITNESS:  I see.
16:01:32   5           MR. STEIN:  Okay.  Let me see what you are
16:01:34   6       referring to.
16:01:34   7           MR. EICHHORN:  Well, there is a letter here.
16:01:36   8       I can show you what the documents are.
16:01:39   9           The letter is from the person at the
16:01:40  10       hospital, so I will take that off, but these are
16:01:47  11       the records I sent to him.
16:01:57  12           MR. STEIN:  Well, at this juncture there is
16:01:59  13       a question on the table.
16:02:00  14       Q.  And that question is, what is in the chart from
16:02:05  15   Genesis Genetics regarding their studies of this
16:02:10  16   patient's embryos other than the page which we have
16:02:14  17   marked P-6 for identification?
16:02:18  18       A.  There is nothing else.
16:02:17  19       Q.  Okay.  May I see -- may I see the chart, please.
16:02:27  20           MR. EICHHORN:  Don't forget to give those
16:02:29  21       back to me.
16:02:30  22           MR. STEIN:  We won't.
16:02:36  23       Q.  Okay.
16:02:45  24           MR. STEIN:  I am going to put a sticker on
16:02:47  25       this page and then I am going to show it to you.
```

45

1    The next number.

2        MR. EICHHORN:  It's a different page.

3        MR. STEIN:  A different page, yes.

4        (Genesis Genetics Institute Fax Page is

5    marked as Exhibit P-7 for identification.)

6    Q.  Doctor, in the yellow folder I show you one of

7    the pages, which we have marked as P-7 for

8    identification, and ask you if you can tell me what that

9    is.

10   A.  This is a fax cover sheet.

11   Q.  Okay.  And it appears to be a fax cover sheet

12   from Genesis Genetics transmitting their report, does it

13   not?

14   A.  Yes.

15   Q.  And according to that fax cover sheet, including

16   the cover, two pages were faxed.  Is that correct?

17   A.  That's what it says.

18   Q.  And we have the cover sheet as one page, and we

19   have what appears to be P-6, which is the report that

20   you referred to.  Is that correct?

21   A.  Yes.

22   Q.  Okay.

23       MR. EICHHORN:  What's the date on that?

24       MR. STEIN:  7/19/2004.

25   Q.  What's the date on the cover sheet?

46

1    A.  7/19/2004.

2    Q.  Okay.  Doctor, I spent some time with you on the

3    report.

4    A.  Sure.

5    Q.  Now, the patient is identified as "Chaya

6    Morganstern Grossbaum, a carrier, and Exon 11" as the

7    number.

8        Can you just tell me what "Exon 11" means?

9    A.  That's the portion of the DNA that has the

10   genetic abnormality.

11   Q.  And the genetic abnormality has a label, and it's

12   "G542X abnormality."  Is that correct?

13   A.  Correct.

14   Q.  What does "Nt 175 bg, greater and one" mean?

15   A.  I don't know.

16       MR. EICHHORN:  Greater than small "t."

17   Q.  That's right.

18       You don't know?

19   A.  No.  Correct.

20   Q.  And the husband, obviously, is listed as Menachem

21   and has the abnormality labeled dF508, again, with the

22   number attached to it.  Is that correct?

23   A.  Yes.

24   Q.  And what does "CTT" mean?

25   A.  Those are designations for portions of DNA.

47

1    Q.  Okay.  So now we have a documentation of when the

2    biopsy was done according to the information provided by

3    NYU to Genesis Genetics.  Is that right?

4    A.  Yes.

5    Q.  And they refer to quality designations on a one

6    to four scale where one is best and, of course, the 20

7    total tubes are "10 cells" and "10 blanks," and I assume

8    that the blanks are sent to rule out contamination?

9    A.  Correct.

10   Q.  Now, in the first column each of the samples has

11   a designated number, and only those cells in embryos,

12   which were deemed useful are sent, I take it.  Is that

13   correct?

14   A.  Yes.

15   Q.  Now, then we have "Quality."  We see numbers

16   "2-8C, 2-3C."

17       What does that mean?

18   A.  I don't know.

19   Q.  Well, we have a column "CF 10," as we go down

20   we see the words "no deletion."

21       What does that mean?

22   A.  "No deletion" means no deletion.

23   Q.  What does that --

24   A.  Nothing about that Exon 10 showed that there was

25   a deletion there, because Exon 10, that's the problem.

48

1    There is a deletion in the CCT region and that was not

2    detected.

3    Q.  Okay.  Help us understand what the words "no

4    deletion" refer to.

5        Could you be more expressive, please?

6    A.  Well, there are many, many reasons.

7        Cystic fibrosis is a very large gene and any

8    problem anywhere along that gene could cause the gene

9    faulty, it could render the gene faulty.

10   Q.  By "faulty" you mean?

11   A.  Nonfunctioning.

12   Q.  Abnormal, nonfunctioning?

13   A.  Not functioning properly.

14   Q.  Could that mean that the gene would be

15   susceptible to communicating the cystic fibrosis

16   deformity to any baby that was born?

17   A.  Correct, and in the case where it says "CF 10,"

18   according to the designation here, it's caused by a

19   deletion in the CCT region and, therefore, they tested

20   for the deletion in that CCT region, and if there was no

21   deletion, it was deemed normal.

22   Q.  Okay.  So the CF -- so Sample No. 2 was deemed

23   normal on the husband's cells.  Is that right?

24   A.  That is correct.

25   Q.  Okay.  Now, with regard to Samples 3, 4 and 7, we

1 see the words "no amp."

2     What does that mean?

3   A. That means there was no amplification.

4     There was no -- there was no -- the tests -- test

5 was run of that region of the DNA; however, an answer

6 was not determined.

7   Q. Do you know the nature of the test that's run?

8   A. I do not.

9   Q. Are you familiar with testing of cells to

10 determine the presence of a cystic fibrosis mutation?

11   A. I am aware of some methods, but I am not aware of

12 all the methods used.

13   Q. Okay. Can you describe what methods you are

14 aware of?

15   A. Well, one way to test would be to amplify the DNA

16 using PCR technology and then analyzing that DNA that's

17 been amplified to see if it contains a problem in the

18 region that you are looking for.

19   Q. Okay. So if there is no amplification, that

20 means you can't look at the gene to determine whether or

21 not there is amplification. Is that correct?

22   A. Right.

23   Q. So with regard to the husband's genes, they were

24 only able to determine the presence of the cystic

25 fibrosis mutation or absence of it in one, two, three,

1 four -- three of the ten samples. Is that correct?

2   A. Correct.

3   Q. Okay. Now, with regard to the mother, we see --

4 the mother is CF11. Is that right?

5   A. Correct.

6   Q. We see, with regard to Sample 2, "T only."

7     What does "T only" mean?

8   A. I don't know.

9   Q. Regarding three, there was no amplification.

10     No regarding four and seven, the letter "G"

11 appears there.

12     What does "G" mean?

13   A. I don't know.

14   Q. And with regard to eight, there is a "G/T."

15     What does that mean?

16   A. I don't know.

17   Q. And regarding -- now, we move over to "Call."

18 What's the meaning of "Call"?

19   A. I am sorry. Where is "Call"?

20     MR. EICHHORN: The last --

21     THE WITNESS: I see.

22   Q. What does "Call" mean?

23   A. What is their assessment of that embryo that was

24 tested.

25   Q. Okay. So Sample 2 is "Possibly affected," and it

1 says "ADO paternal," and I assume the letters "ADO" mean

2 allele drop out?

3   A. Yes.

4   Q. What is the mechanism of allele dropout?

5   A. When the test is performed and you don't get your

6 answer, the feeling is you were unable to test for one

7 of the alleles.

8   Q. No. 3, "No molecular signal," I take it that's

9 not an embryo that can be successfully used for invitro

10 fertilization. Is that right?

11   A. Correct.

12   Q. No. 4 says "Carrier at worst."

13     What does that mean?

14   A. That means that one gene has been determined to

15 be a cystic fibrosis gene and one gene has not, or it

16 means that there was one gene assessed that is not a

17 carrier and the other gene was unable to be assessed.

18   Q. Okay.

19     MR. EICHHORN: Can you read that answer

20     back, please?

21     (Whereupon, the court reporter reads as

22     requested.)

23     MR. EICHHORN: Thank you.

24   Q. With regard to a -- to Sample 4, what are you

25 told about the suitability for implantation?

1     THE WITNESS: I am sorry for interrupting.

2     I notice that we don't have our call.

3     MR. EICHHORN: You're right.

4     We lost him.

5     (Whereupon, a discussion takes place off the

6     record.)

7     MR. EICHHORN: The reporter will read you

8     back -- did you hear the answer to the question?

9     MR. LEUCHTMAN: I believe I did.

10     MR. EICHHORN: Okay. Good.

11     Then we will go on.

12     MR. LEUCHTMAN: All right.

13   Q. Is Sample No. 4 suitable for implantation?

14   A. It states "Carrier at worst."

15   Q. How about my question?

16   A. Yes.

17   Q. Is it suitable for implantation?

18   A. If after discussion with the couple and the

19 laboratory director, it's deemed that it's suitable for

20 transfer, then, yes, we will transfer that embryo.

21   Q. And the discussion with the couple and the

22 laboratory director -- who is the laboratory director in

23 this case?

24   A. Alexis Adler.

25   Q. Okay. And that discussion involved you as well?

53

1   A. Yes.

2   Q. Did that discussion take place?

3   A. Yes.

4   Q. And is there a record of that discussion in your

5   chart?

6   A. There is not, but it's -- I wouldn't do a

7   transfer in a scenario like this without having a

8   discussion about it.

9   Q. And what does the "scenario like this" mean?

10  A. Where there is an embryo biopsy and results need

11  to be discussed, et cetera.

12  Q. Do you discuss it with every family that has an

13  analysis of PGD testing for a potential cystic fibrosis

14  baby?

15  A. Yes.

16  Q. And what did you tell the family here?

17  A. That she has had an analysis of her embryos and

18  there are really two analysis.

19      There is the genetic analysis that Dr. Hughes

20  provided, but there is also our analysis how well the

21  embryos are growing, and we need to use both of those

22  specific information to determine which embryos to

23  transfer.

24      In other words, if we have an embryo that's a

25  nonaffected cystic fibrosis embryo, but it's a very poor

54

1   looking embryo, then that embryo will have a low

2   priority for transfer.

3       If we have a beautiful embryo that's a cystic

4   fibrosis embryo, that embryo will not be transferred.

5       If we have an embryo that looks very nice and

6   maybe a carrier or is a carrier, then that transfer may

7   be -- that embryo may be a candidate for transfer.

8   Q. That's because only one of the two genetic

9   materials is a carrier. Is that right?

10  A. Abnormal. Only one of the two is abnormal.

11  Q. Okay. Four and seven samples are described, four

12  and seven samples are described by Dr. Hughes as

13  "Carrier at worst." Is that right?

14  A. Yes.

15  Q. And is it -- does it ever say "carrier at best"?

16  A. I don't see that written here.

17  Q. Does that mean anything, the words "Carrier at

18  worst," to you?

19      MR. EICHHORN: "Carrier at worst"?

20      MR. STEIN: Yes.

21      MR. EICHHORN: Does it mean anything?

22  A. Yes.

23  Q. It means it's suitable for transplant?

24  A. It means the worst-case scenario would be that

25  that embryo is a carrier.

1   Q. A "carrier," a ...

2   A. By one or the ot...

3   Q. But not both?

4   A. Correct.

5   Q. Okay. Now we get do...

6   "Carrier maternal okay for tra...

7       What does that mean?

8   A. That means that that embry...              ...ey

9   had completed genetic -- they had ...      ...tic

10  results on both the CF10 and CF11.

11  Q. And that one is okay for transfer?

12  A. According to Dr. Hughes, yes.

13  Q. But he doesn't say that seven is okay for

14  transfer or that four is okay for transfer?

15  A. No, he doesn't say it's not okay for transfer.

16  Q. Okay.

17      MR. STEIN: Can someone tell me what the

18  bells are?

19      MR. EICHHORN: It's my phone.

20      I am sorry.

21      MR. STEIN: That's okay.

22  Q. In this case an election was made to transfer not

23  eight and ten, but two other -- but other embryos. Is

24  that right?

25  A. That's right.

56

1       MR. EICHHORN: Objection to the form.

2   Q. What embryo samples were implanted in invitro

3   fertilization?

4   A. Embryo No. 7 and Embryo No. 8.

5   Q. And ten was not acceptable because of the

6   condition of the embryos at the time you determined

7   implantation. Is that right?

8   A. That's correct.

9   Q. Now, did the cells continue to divide while in

10  the possession of Genesis Genetics?

11  A. I don't know.

12  Q. Well, would Genesis Genetics have more than one

13  cell to examine from each of the embryos?

14  A. Occasionally they do, but I don't see the

15  document that shows that one cell was sent per embryo.

16  Q. I am sorry?

17  A. One cell was sent per embryo.

18  Q. So then Dr. Hughes would only have one cell per

19  embryo to examine and report on?

20  A. That's correct.

21  Q. On an occasion do you send more than one cell per

22  embryo?

23  A. On occasion.

24  Q. What determines whether you send more than one?

25  A. I am not sure.

61

1     A. I don't know, because I am not completely
2     familiar with the techniques that Dr. Hughes is using in
3     his laboratory, so I don't know.
4     Q. Well, is it common for other laboratories to get
5     back or report that seven out of ten of one of the
6     mutations is not available for analysis?
7     A. It's more than average.
8     Q. Okay. Does the -- taking into consideration the
9     risk of allele drop out, does the fact that seven out of
10     ten of the samples did not allow a DNA analysis,
11     increase the risk of a false diagnosis?
12     A. This is something which Dr. Hughes would be an
13     expert on, and I am not sure.
14     Q. It doesn't fall within your expertise?
15     A. It does not.
16     Q. Well, suppose only one of the ten were reported
17     as having a DNA signal, would you be troubled by that
18     analysis by the laboratory in the advising of your
19     patient as to whether to go ahead with Invitro
20     fertilization?
21     MR. EICHHORN: Objection to the form.
22     I think it's improper.
23     MR. LEUCHTMAN: I will join in that.
24     MR. EICHHORN: I think a hypothetical is an
25     improper question, but you can answer it if you

62

1     can.
2     A. I can't answer.
3     Q. Why can't you answer it?
4     A. Because every case is different.
5     Q. In what way?
6     A. Well, there may be certain circumstances which
7     may lead to a laboratory telling me that they only have
8     analysis on one.
9     Q. Let me ask you this: In this meeting that you
10     have indicated took place with Chaya Grossbaum and her
11     husband, I take it, both were present?
12     A. Yes.
13     Q. And what did you tell them?
14     A. Do you want me to go through the whole hour
15     consultation?
16     MR. EICHHORN: Well, I don't think he means
17     that meeting.
18     Do you mean the day of implantation?
19     MR. STEIN: Yes.
20     MR. EICHHORN: Or the first meeting?
21     Q. I mean after you got the report --
22     A. I see.
23     Q. -- from Genesis Genetics, you said you had a
24     meeting --
25     A. Yes.

63

1     Q. -- with the parents, Mrs. Grossbaum and Mr.
2     Grossbaum, regarding invitro fertilization of the
3     embryos that had been retrieved. Is that correct?
4     A. That is correct.
5     Q. And that meeting took place here in your office?
6     A. Yes.
7     Q. And what did you tell them at that time?
8     A. I told them that there are -- we see the results
9     for the analysis and there are embryos that had been
10     determined to be carriers, and according to the report,
11     Dr. Hughes' lab, they are carriers at worst and,
12     therefore, we feel comfortable transferring them.
13     Q. And that was -- and that was the extent of the
14     discussion --
15     A. Yes.
16     Q. -- you had with them? Is that correct?
17     A. That's correct.
18     Q. Do you know -- I may be asking this in a
19     different way, but I do -- do I understand you don't
20     have the expertise to explain why there is an inability
21     to get a signal from a particular gene cell that's being
22     analyzed?
23     A. I can tell you that I cannot be an expert in
24     everything that goes on in Dr. Hughes' lab and he can't
25     be an expert in everything that goes on here, so the

64

1     answer is I am not an expert in embryo biopsy DNA
2     genetics.
3     Q. Well, when you receive a report from a laboratory
4     such as Genesis Genetics, were you concerned about
5     allele drop out?
6     A. Allele drop out is a possibility. However, that
7     was signaled in Sample 2.
8     It said "ADO Paternal," allele drop out.
9     Q. Well, does that concern about allele drop out
10     apply to all of the samples that are being reported on?
11     We are waiting your answer.
12     A. Yes, you are.
13     I am sorry.
14     Q. That's okay.
15     A. Can you repeat -- repeat the question, please?
16     (Whereupon, the court reporter reads as
17     requested.)
18     A. I would have followed the recommendations of Dr.
19     Hughes, and if he told me that allele drop out was a
20     concern, I would have been concerned about it.
21     Q. And would you have advised the family of your
22     concerns in that case?
23     A. Yes.
24     Q. Okay.
25     MR. STEIN: Next one.

# EXHIBIT E

2981.101

Grossbaum v.
Genesis Genetics

Mark Hughes, M.D.
February 19, 2009

---

Page 1

[1]     UNITED STATES DISTRICT COURT
        DISTRICT OF NEW JERSEY

[2]                   CASE NO. 07-CV-1359 (HAA)

[3] CHAYA GROSSBAUM and
MENACHEM GROSSBAUM, her

[4] spouse, individually and as    DEPOSITION UPON ORAL
guardians ad litem of the       EXAMINATION OF:

[5] infant ROSIE GROSSBAUM,      MARK R. HUGHES, M.D.

[6]        Plaintiffs,

[7] vs.

[8] GENESIS GENETICS INSTITUTE, LLC,
of the State of Michigan,

[9] MARK R. HUGHES, NEW YORK
UNIVERSITY SCHOOL OF MEDICINE

[10] and NEW YORK UNIVERSITY HOSPITAL
CENTER, both corporations in the

[11] State of New York, ABC CORPS,
1-10, and JOHN DOES 1-10

[12]       Defendants.

[13] - - - - - - - - - - - - - - - - x

[14]

[15]      TRANSCRIPT of the deposition of the witness,
called for Oral Examination in the above-captioned

[16] matter, said deposition being taken pursuant to Notice,
taken by and before KATHLEEN HAGEN, a Notary Public and

[17] Certified Shorthand Reporter of the State of New
Jersey, at the law offices of NUSBAUM, STEIN,

[18] GOLDSTEIN, BRONSTEIN & KRON, P.A., 20 Commerce
Boulevard, Succasunna, New Jersey, on Thursday,

[19] February 19, 2009, commencing at 10:30 a.m.

[20]

[21]          PHILIP A. FISHMAN
       COURT REPORTING AGENCY

[22]         89 Headquarters Plaza
    4 Speedwell Avenue, Suite 440

[23]      Morristown, New Jersey   07960
         (973) 285-5331

[24]       Fax (732) 605-9391

[25]

---

Page 2

[1] A P P E A R A N C E S :

[2] NUSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON, P.A.
By: Lewis Stein, Esq. and Lynn Harris, Paralegal

[3] 20 Commerce Boulevard
Succasunna, New Jersey   07676

[4] (973) 584-1400
Appearing on behalf of Plaintiffs

[5]
STEPHEN N. LEUCHTMAN, P.C.

[6] 23855 Northwestern Highway
Southfield, Michigan   48075

[7] (248) 948-9696, Ext. 143
Appearing on behalf of Defendant, Mark R. Hughes, M.D.

[8]
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.

[9] By: Jay A. Hamad, Esq.
425 Eagle Rock Ave., Suite 302

[10] Roseland, New Jersey   07068
(973) 618-4158

[11] jahamad@mdwcg.com
Appearing on behalf of Defendant, NYU

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Page 3

[1]               INDEX

[2] WITNESS            DIRECT     CROSS    REDIRECT

[3] MARK R. HUGHES, M.D., PhD
By Mr. Stein         4                   63

[4] By Mr. Hamad                 61

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Direct - Mark R. Hughes, M.D., Ph.D.

Page 4

[1] M-A-R-K R. H-U-G-H-E-S, M.D., Ph.D., having offices

[2] at Genesis Genetics Institute, LLC, 5555 Conner Avenue,

[3] A22064, Detroit, Michigan, 48213, called as a witness,

[4] having been duly sworn, was examined and testified as

[5] follows:

[6]     DIRECT EXAMINATION BY MR. STEIN:

[7] Q  Dr. Hughes, as you know, we're here to

[8] take your deposition.  I take it that you have

[9] previously submitted to a deposition?

[10] A  Yes.

[11] Q  About how many occasions?

[12] A  Twice.

[13] Q  Well, before I ask you about those,

[14] permit me to give you some guidelines and instructions,

[15] which we should operate under during this question and

[16] answer session.  First, I should tell you that my

[17] questions and your answers are being recorded by the

[18] lady who sits to my right and your left, who is a

[19] Certified Shorthand Reporter, and if this case goes to

[20] trial, what you say here may be used at trial, so you

[21] should treat this question and answer session with the

[22] same onus as if you were giving testimony in open

[23] court, even though we're here in the law office.  Do

[24] you understand that?

[25] A  Um-hum, I do.

---

Mark Hughes, M.D.
February 19, 2009

Grossbaum v.
Genesis Genetics

---

Direct - Mark R. Hughes, M.D., Ph.D.                     Page 21

[1] the New York area that funds their care, and so I'm
[2] aware, either because of their name it's likely or
[3] because this charity is funding their PGD, and then I
[4] would know that they're Jewish.
[5] Q   So in references that come out of New York
[6] City, are there a large number of people who you are
[7] referred to whose identity is Jewish, this comes to
[8] your attention?
[9] A   Not any more than any other ethnic background,
[10] but I don't ask if they're Jewish any more than I ask
[11] if they're Lutheran.
[12] Q   Okay, Doctor, let's now turn to your chart
[13] so that we can ask some questions about it.  I notice
[14] that, in the box that appears on the pre-case folder
[15] PGD consent form, which I believe you have opened to
[16] your chart at the moment, is that correct?
[17] A   Yes.
[18] Q   I'm just curious, what is the diagram
[19] across the top, that starts with the left -- with a
[20] circle which says "day 0"?
[21] A   Yup.
[22] Q   Day 1, day 3, and can you tell me what the
[23] purpose of that is?
[24] A   Yes.  What I learned early on is that IVF
[25] doctors do not understand genetics very well, any more

---

Direct - Mark R. Hughes, M.D., Ph.D.                     Page 22

[1] than I understand IVF.  Generally, laboratories don't
[2] interact with patients.  You could have a tumor from a
[3] cancer and send it to a lab, and there's no way you'd
[4] ever get to talk to the lab as a patient.  Their job is
[5] to do their test, write a report, send it to the
[6] physician who referred it, interpret it, and tell you
[7] what it means.  We found years ago that some
[8] involvement by the laboratory in educating the patient
[9] about the complexities of what they're asking for, and
[10] the reasonable risks and benefits, were important, and
[11] so, every patient that goes through our laboratory, we
[12] spend an hour on the phone with them in an educational
[13] session, making sure that they're aware of all of the
[14] steps that are involved, and that we're all on the same
[15] page.  So this is a -- my notes from a phone
[16] conversation that I had with them on March 25, 2004, at
[17] noon, in which I explained to them in steps exactly
[18] what it is that we would do or what would be done.  So
[19] the first little circle is an ovary, and I'm explaining
[20] to her that she has little dots, little eggs inside of
[21] her ovary since she was a fetus, and that they're going
[22] to give her hormones to cause some of those eggs to
[23] mature, that's what those arrows are for, and that
[24] they're going to move to the surfaces of her ovaries as
[25] something called a "follicle", the doctors would follow

---

Direct - Mark R. Hughes, M.D., Ph.D.                     Page 23

[1] that with an ultrasound, count them, adjust the
[2] hormones until it was time to collect them with a
[3] little needle in a surgical suite at the hospital.  So
[4] I'm explaining what they're doing, the doctors are
[5] going to do, in order to explain to them how the IVF --
[6] how the PGD fits into the IVF process.  So on that day
[7] 0, the eggs are collected, they're put into a dish,
[8] that's what the next little picture is, an
[9] intracytoplastic sperm injection is performed on them,
[10] and on day 1, they do a fertilization check to see how
[11] many of those eggs actually fertilize.  Now, while I'm
[12] explaining that and making notes on other pages,
[13] usually, I'm also running some numbers by them, which
[14] is the box on the left, so I'm saying, suppose it's
[15] reasonable, at this high quality IVF center, that
[16] you're going to take 6 eggs on each ovary for a total
[17] of 12 of them, and that maybe 10, making up numbers,
[18] but maybe 10 of those would actually fertilize, that's
[19] what the wavy ink equal sign is, it's like made up
[20] numbers, but to give them a sense how this works, the
[21] fact that you lose along the way as you go, then the
[22] next day, day 2 nothing happens, and then day 3, we
[23] should have 8 little cells in a cluster, pluripotent,
[24] p-l-u-r-i-p-o-t-e-n-t, cells, and that at this time the
[25] clinic would take a micro-pipette about 1/26th and

---

Direct - Mark R. Hughes, M.D., Ph.D.                     Page 24

[1] 1/33nd the diameter of a human hair, and go in and
[2] biopsy and remove the smallest units of life, one cell
[3] from that cluster of cells.  Now I have a branch point,
[4] the embryo stays at NYU and continues to grow into the
[5] incubator, in the incubator water, and that picture on
[6] the right is what a blastocyst looks like, I explained
[7] to them, and the little cell is put into a little tube,
[8] and there's some little dashes on the tube, that's a
[9] bar code, and there might be like eight of those tubes
[10] representing one cell marked carefully from each of
[11] those 8 embryos that they made up numbers, they send
[12] the cell to us, that double stranded thing coming out
[13] of the lower right-hand corner of that circle is DNA, I
[14] then explain to them that -- do you want me to keep
[15] going like this?
[16] Q   You might as well.  In the box.
[17] A   Yeah, I explain to them that -- I explain to
[18] them basic genetics, at this point, so I tell them
[19] that, if you take any cell from your body, in fact, I
[20] can tell you exactly what I told them, because I said
[21] this hundreds of times, I can just spiel it forth for
[22] you, if you take any cell from your body, a skin cell
[23] or a brain cell, a liver cell or a cell from your
[24] embryo, and you pull out the DNA, the genetic
[25] information in there, the first thing that you'll

---

Mark Hughes, M.D.
February 19, 2009

Grossbaum v.
Genesis Genetics

Direct - Mark R. Hughes, M.D., Ph.D.                                    Page 29

[1] pre-implantation genetic diagnosis, and you can get
[2] pregnant and assume the risks that are inherent to the
[3] disease." You tell them that, is that right?
[4] A  Yes.
[5] Q  Now, you also seem to indicate that --
[6] numerous times throughout your communication with the
[7] people, you suggest the requirement that they undergo
[8] amniocentesis or CV testing to confirm the information
[9] provided through PGD testing, is that correct?
[10] A  That's correct.
[11] Q  What -- if people are going to undergo
[12] amniocentesis or CV testing to protect themselves
[13] against having to endure the birth of a CF baby, what
[14] would be the reason for them to undergo the expense and
[15] inconvenience of PGD testing?
[16] A  To dramatically lower their risk.  These couples
[17] will tell you, especially if they already have a child
[18] with the disease, that they are coming in saying, We
[19] know our risks are 25 percent, and we take this
[20] personally, we gave this to our baby, we don't want it
[21] to happen again, and 1 in 4 is pretty high odds, and so
[22] we want those risks reduced.
[23] Q  Well, they're still protected against
[24] having the baby if they do amniocentesis or CV testing,
[25] aren't they?

Direct - Mark R. Hughes, M.D., Ph.D.                                    Page 30

[1] A  They are, but they've got 15 weeks of incredibly
[2] high anxiety while they're waiting to have the
[3] procedure, and then, after you do an amniocentesis or a
[4] CVS, the sample for which you have hundreds of
[5] thousands of cells is taken to a laboratory and
[6] cultured for another week, and then it's tested in the
[7] laboratory, over the course of another week, so all of
[8] a sudden, they're at 16, sometimes 17, sometimes longer
[9] weeks waiting for the results of their pregnancy, and
[10] nobody wants to go through that, if they can help it,
[11] so by starting their pregnancy knowing that their risks
[12] are dramatically reduced, it makes it all that much
[13] more tenable; these couples will tell you that the risk
[14] is so high, that they're afraid to even have sex,
[15] oftentimes, because the risks are high.  Not all
[16] patients say that, but many do, and so they come to
[17] this pretty amazing hoop jumping to build a family, and
[18] they don't need this, they go through it to lower their
[19] risks, not to zero, but a lot.
[20] Q  Well, in connection with your experience,
[21] to what number do they lower it?
[22] A  Less than 2 percent, significantly less than 2
[23] percent, but it depends on the disease.
[24] Q  Well, we're talking here today only about
[25] CF.

Direct - Mark R. Hughes, M.D., Ph.D.                                    Page 31

[1] A  Well, if we've had four errors in 1000 cases,
[2] it's significantly less than 1 percent.
[3] Q  And you figure you tell the people that?
[4] A  Yeah, we'll tell them -- the field of PGD quotes
[5] a risk of 3 to 5 percent error for this kind of
[6] testing, and for chromosome testing, it's even higher,
[7] and now as we are learning about the amazing
[8] discrepancies of cells inside of an embryo, we're
[9] learning that there's all sorts of reasons why a cell
[10] that you biopsy might not represent the whole embryo,
[11] so the field across the world quotes risks in 3, 4, 5
[12] percent.  In our personal program, it's less than 2,
[13] actually less than 1.
[14] Q  Okay.  Do you have a reason as to why your
[15] program experiences, as you indicated, even less than 1
[16] percent in the field and the field is quoting 3 to 5?
[17] A  Well, we do more of this than any other
[18] laboratory in the world, we've been doing it longer
[19] than any other laboratory in the world, so I think
[20] experience has something to do with it, but we know
[21] that in each family, so none of these tests are off the
[22] shelf, every one of them is custom designed for the
[23] unique DNA of each couple, because your DNA is unique
[24] on the planet, and the DNA that you and your partner
[25] mix together to make a baby is unique, and every time

Direct - Mark R. Hughes, M.D., Ph.D.                                    Page 32

[1] you do it, it's different and unique, and so the test
[2] that we make for you is designed specifically for you,
[3] so to tell somebody that a particular test has been
[4] done so many thousands of times and the liability is
[5] such and such, is true to a point of all of the PGD
[6] that's been done, but we tell them that your test will
[7] never have been used before on embryos that the two of
[8] you have made, for the mutations that you have, and
[9] it's not likely that it will ever be used again.
[10] Q  Well, even though the test may be unique
[11] to the individual DNA of a particular couple, is the
[12] formula by which you approach and design the test the
[13] same?
[14] A  The formula for the mutations that the couple
[15] has starts out the same, and then it's modified, based
[16] on their DNA sequences.
[17] Q  Okay.
[18] A  So we spend some weeks optimizing their test,
[19] prior to the case, to be sure that it will work.
[20] Q  When you, as you indicate, spend weeks
[21] prior to the test, I take it, designing the test that's
[22] going to work with this family, is that what you're
[23] saying?
[24] A  Yes.
[25] Q  And what do you -- I take it that you

# EXHIBIT F

00001

1    IN THE UNITED STATES DISTRICT COURT

2    IN THE DISTRICT OF NEW JERSEY

3    ------------------------------------/

4    CHAYA GROSSBAUM and MENCHEN

5    GROSSBAUM, Her Spouse, Individually, and

6    as Guardian ad litem of the Infant, ROSIE

7    GROSSBAUM,

8                    Plaintiffs,

9    -vs-                        Index No. 07-CV-359

10   GENESIS GENETICS INSTITUTE, LLC,

11   OF THE STATE OF MICHIGAN, MARK R.

12   HUGHES, M.D., NEW YORK UNIVERSITY

13   SCHOOL OF MEDICINE, and NEW YORK

14   UNIVERSITY HOSPITALS CENTER, both

15   Corporations of the State of New York,

16   ABC CORPORATIONS:  1-10 and John Doe,

17        Defendants.

18   _____/

19

20   PAGE 1 - 82

21

22        The Deposition of DR. MARK HUGHES,

23        Taken at 1380 Trowbridge Place,

24        Detroit, Michigan,

25        Commencing at 12:55 p.m.,

00028

1   Q.   Okay.  And I take it that you suggested that is not a

2        contact with a patient in the sense that a doctor has

3        contact with patients, is that correct?

4   A.   In general laboratories never talk to patients.  They do

5        the test that was ordered, they write a report, they send

6        it to the person who ordered the test, and that's the

7        extent of it.  In the field of PGD, the few of us that do

8        this feel that it's more important to communicate

9        beforehand with the patient about the risks and benefits

10       of the procedure.  Because sometimes the doctors at the

11       clinics don't necessarily know the nuances of the latest.

12       They're IVF experts, not genetic experts.  So from a

13       perspective of an informed consent, we take and go the

14       extra mile and spend time with them, a significant amount

15       of time with them, explaining to them the steps involved.

16  Q.   Now, have you ever encountered the issue with regard to

17       practicing medicine in the State of Michigan under its

18       rules and regulations for the medical profession?

19            MR. LEUCHTMAN:  Encountered what issue?  Object

20       to the form of the question as vague and ambiguous.

21            MR. STEIN:  I'll rephrase it.

22  BY MR. STEIN:

23  Q.   Has the issue ever been raised with the regulatory

24       authorities in Michigan who regulate the practice of

25       medicine as to whether or not the contacts that you have

00030

1       letter, a single molecule.  And 100 years from now the

2       technology can't be smaller than that.  And we have to do

3       it overnight.  So the point that we make to the patients,

4       which is the reason why not only does the laboratory have

5       an informed consent, but the clinic does, is to reiterate

6       recovery and over that this is the limits of medical

7       diagnostic testing.  In fact, it's been that way for 20

8       years.

9   Q.  Well, I think you've indicated in Hughes 1 that at the

10      time of that deposition you had done over a thousand

11      cases, is that right?

12  A.  Oh, yeah.

13  Q.  And you're aware of the clinic that Dr. Xu -- that is the

14      laboratory that Dr. Xu is connected with, the Center For

15      Reproductive Medicine and Infertility in New York, are

16      you not?

17  A.  Um-hum (affirmatively).  I am.

18  Q.  And are you aware that that laboratory and that clinic

19      has done over 3,000 cases of PGD?

20  A.  Well, there's a nomenclature issue here.

21  Q.  Okay.  And what is that?

22  A.  Cornell does a technique called PGS, Preimplantation

23      Genetic Screening.  This is a technique that was in vogue

24      in the mid-2000's, in which you look at chromosomes.  But

25      they send almost all of their single-gene tests to us.

00041

1  between three and five percent, is that correct?

2 A. That's the risk that's quoted around the world in other

3  PGD programs, and in general the genetic counselors quote

4  that number.  In our group it isn't that high, but that's

5  the number that's been sort of announced by --

6 Q. Okay.  Can you tell me, when you say that's announced by

7  other groups and around the world, where are these

8  announcements made?  What specifically are you referring

9  to?

10 A. So at scientific meetings people stand up and talk about

11  the error rates that they see.

12 Q. And you have a specific recollection of people standing

13  -- of particular people standing up?

14 A. Sure.

15 Q. Okay.  What group or what person in these meetings do you

16  recall standing up and they have an error rate of three

17  to five percent?

18 A. They don't necessarily say that they have an error rate.

19  They quote that as the rate in the field.

20 Q. Okay.

21 A. And I've always thought that was high.

22 Q. Okay.  In other words, individuals have stated at

23  meetings, who are attending the meetings and are working

24  in the field, that the error rate in the field in general

25  is three to five percent, is that correct?

00043

1    Q.   And your rate is less than one-half of one percent, is it

2         not?

3    A.   No.  Our rate runs between one and two, depending on the

4         year.

5    Q.   So each year you have one to two percent misdiagnosis?

6    A.   1.2, 1.3, 1.4, 1.5.

7    Q.   Now, is that specifically with respect to cystic

8         fibrosis, or is that with respect to all --

9    A.   No.  That's all diseases.

10   Q.   And how many do you do a year?

11   A.   I can tell you what we did in 2004.

12   Q.   How many did you do in 2004?

13   A.   I wrote the numbers down.  We did 582 cycles.

14   Q.   And you have that specifically available to you, you

15        wrote it down?

16   A.   I wrote it down before I came over here.  Because I

17        figured you'd ask.

18   Q.   Okay.  And what did you write it down on?

19   A.   (No response).

20   Q.   What did you write it down on?

21   A.   I just wrote it in the corner here on this piece of

22        paper.

23   Q.   Before you came over here?

24   A.   No.  I had it in my mind.  But I knew the question was

25        coming, so I scribbled it over here so I wouldn't forget

00062

1              MR. STEIN:  Okay.

2    BY MR. STEIN:

3    Q.  Can you answer the question, please?

4    A.  A formal report is done on stationery with an explanation

5        with lots more information.  This was -- the purpose of

6        this was for the NYU team to be able to see that there

7        were embryos predicted suitable to be transferred, and

8        act on it if they wish.  So it's not like it's wrong,

9        it's that it's not complete.  And it takes a while to do

10       a longer one.  And so we sent this to them fully

11       expecting them to read it and act on it.  That's fine.

12       There's nothing wrong with it.

13   Q.  This bears electronically signed your signature.  Can we

14       understand that by the presence of your electrically

15       signed signature this is a document that you endorse by

16       way of the content, or either created yourself or had

17       someone create and then have you read it and endorse it?

18   A.  This was put together by a lab person who electronically

19       puts my name on it and sends it to the clinic.

20   Q.  Now, in connection with reporting the results of lab

21       studies , is it important in the custom and habit of the

22       laboratory to document the transmittal of your report to

23       the clinic?

24   A.  I'm not sure what you mean.

25   Q.  Well, is it customary -- withdraw that.

00069

1   A.  Yes.

2   Q.  Now, in the preliminary report that you sent, as you

3       described it, we've marked P5, you discuss allele

4       dropout, don't you?

5   A.  Yes.  Well, I mentioned it in -- it's mentioned in sample

6       two.

7   Q.  Now, just so I'm clear, is it not anticipated that the

8       clinic will proceed with IVF based on the form of report

9       that is present and marked P5?

10          MR. HAMAD:  Asked and answered, three questions

11      ago.

12          THE WITNESS:  This report is sent to them just

13      like any laboratory report.  They review it, they make a

14      decision in the best interests of the patient, I hope,

15      and I don't have any assumptions about which ones they're

16      going to transfer.  In fact, earlier this week a couple

17      elected to take two embryos that were affected, so --

18  BY MR. STEIN:

19  Q.  Aside from what the couples intend to do as a result of

20      the decision, you are presuming when you send P5 that the

21      fertility clinic will act on the content of the

22      information contained in P5, are you not?

23  A.  No.  I'm sending them information.  What they do with it

24      at that point is completely up to them.  They can say we

25      don't like any of this, they can say we're going to

00070

1  transfer five embryos, they can say we're going to freeze

2  all of them, or we're going to discard all of them, or

3  they can have a conversation with the patient.  They're

4  going to decide what they want to do with the data.

5 Q. But they're going to rely on the information in the form

6  presented on P5, are they not?  Wouldn't you anticipate

7  that?

8 A. I would anticipate that that would be a piece of their

9  decision-making process, yes.

10 Q. And in that piece you write with respect to embryo sample

11  number two that possibly affected was ADO paternal, is

12  that right?

13 A. Yes.

14 Q. And that's because there was no deletion, is that right?

15 A. It's because we're seeing the mutation in exon 11.

16 Q. All right.

17 A. And there could be a little dropout of 10.

18 Q. But as far as you know from 10, what you've got in the

19  results of your analysis was that the mutation was not

20  present in 10, is that right?

21 A. The mutation is present in 11.

22 Q. Right.

23 A. And we couldn't see the mutation in 10.

24 Q. So if the mutation is present only in 11 and you don't

25  see the mutation in 10, then why would that sample number

# EXHIBIT G

Morganstern-Grossbaum results – 07/19/2004

Patient: Chaya Morganstern-Grossbaum – carrier - Exon 11, G542X Nt1756g>t
Partner: Menachem Grossbaum – carrier - Exon 10, dF508Nt1652 delCTT

Locus ID: 1080          Chromosome: 7q31.2          Gene: CFTR
OMIM: 602421

Biopsy done 7/17/2004 – began 10 am EDT, completed 11 am EDT
Quality is 1-4, where 1 is best
20 total tubes – 10 cells, 10 blanks

| Sample | Quality | CF 10 | CF 11 | Call |
|--------|---------|-------|-------|------|
| 2 | 2-8c | No deletion | T only | Possibly affected – ADO paternal |
| 3 | 2-3c | No amp | No amp | No molecular signal |
| 4 | 2-4c | No amp | G | Carrier at worst |
| 7 | 2-7c | No amp | G | Carrier at worst |
| 8 | 2-8c | No deletion | G/T | Carrier maternal – OK for transfer |
| 9 | 2-4c | No amp | No amp | No molecular signal |
| 10 | 2-4c | No deletion | G/T | Carrier maternal – OK for transfer |
| 13 | 2-4c | No amp | G | Carrier at worst |
| 14 | 2..7c | No amp | No amp | No molecular signal |
| 15 | 2-4c | No amp | G | Carrier at worst |
| CG | | No deletion | G/T | Control – as expected |
| MG | | Het. deletion | G | Control – as expected |

Note: For sample 2, since only the mutant maternal allele was observed, it is possible that
the paternal allele also dropped out of CF 10, and could be affected.

All controls and media blanks worked as expected. These data are very clear. All media
blanks showed no evidence of exogenous DNA contamination.

Electronically signed,

Mark Hughes, M.D. Ph.D.

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
DOCKET NO. 07-CV-359

CHAYA GROSSBAUM and MENCHEM )
GROSSBAUM, her spouse, )
individually, as guardians ad )
litem of the infant, ROSIE )
GROSSBAUM, )
                                          )
                    Plaintiffs,  ) DEPOSITION OF:
                                          )
         v.                            ) JAMES GRIFO
                                          )
GENESIS GENETICS INSTITUTE, )
L.L.C. of the State of Michigan, )
MARK R. HUGHES, M.D., NEW YORK )
UNIVERSITY SCHOOL OF MEDICINE and )
NEW YORK UNIVERSITY HOSPITALS )
CENTER, both corporations in the )
State of New York, ABC )
CORPORATIONS 1-10 and JOHN DOE )
1-10, )
---------------------------------

T R A N S C R I P T of the stenographic notes of
the proceedings in the above-titled matter, as taken by
PHILIP A. FISHMAN, a Certified Shorthand Reporter and
Notary Public of the State of New Jersey, held at the
offices of DR. JAMES GRIFO, 660 First Avenue, New York,
New York, on Wednesday, June 24, 2009, commencing at
4:00 in the afternoon.

PHILIP A. FISHMAN
COURT REPORTING AGENCY
89 Headquarters Plaza North
14th Floor
Morristown, New Jersey 07960
(973)285-5331 - FAX (732)605-9391

---

A P P E A R A N C E S :

NUSSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON, ESQS.
BY: LEWIS STEIN, ESQ.
Appearing on behalf of the Plaintiffs

STEPHEN N. LEUCHTMAN, P.C.
BY: STEPHEN N. LEUCHTMAN, ESQ.
Appearing on behalf of the Defendant Genesis Genetics
Institute, L.L.C., and Dr. Hughes

MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.
BY: JAMELE A. HAMAD, ESQ.
Appearing on behalf of the Defendants New York
School of Medicine and New York University
Hospitals Center

---

I N D E X

WITNESS    DIRECT   CROSS   REDIRECT RECROSS

JAMES GRIFO

by Mr. Stein          4

I N D E X   O F   E X H I B I T S

EXHIBIT        DESCRIPTION          PAGE

---

J A M E S  G R I F O, 660 First Avenue, New York, New
York, having been duly sworn according to law, testifies
under oath as follows:

         DIRECT-EXAMINATION BY MR. STEIN:

   Q.   All right.

        Dr. Grifo, good afternoon.

        As you know, my name is Lewis Stein.

        I represent the plaintiffs, the Grossbaums, in
this lawsuit in which Genesis Genetics Institute and the
NYU Medical Center has been named as a defendant.

        We are here today to take your deposition.

        Have you ever had the pleasure of giving a
deposition before today?

   A.   Yes, sir.

   Q.   Could you just tell me generally what the
circumstances were in which -- in other words, what type
of case were you deposed in?

   A.   I don't recall the specifics. It was a medical
malpractice case.

   Q.   Did it involve the NYU School of Medicine program
for invitro fertilization and reproductive surgery and
fertility?

   A.   Yes, sir.

   Q.   About how long ago was that?

   A.   I don't recall. Several years. I don't recall.

1 court rules are clear, the party noticing the
2 deposition has to inform everybody, every other
3 party, of the deposition.
4 This date was provided a long time ago.
5 THE WITNESS: Three weeks ago.
6 MR. HAMAD: Whether it was going to be one
7 or two witnesses, that's immaterial.
8 You knew the deposition was going to take
9 place here.
10 MR. LEUCHTMAN: Never.
11 MR. HAMAD: And that is the responsibility
12 of the party taking the deposition.
13 This is my client. I am producing him.
14 That's all I have to do.
15 With that being said -- you know --
16 yesterday at two PM was the first time this
17 deposition was confirmed.
18 As per the court rules, 24 hours before the
19 deposition at least we gave you proper notice,
20 Mr. Stein -- you know -- if you did not notify
21 Mr. Leuchtman, please don't put that on myself,
22 my firm or my staff.
23 With that being said, what's the next
24 question?
25 MR. STEIN: I disagree with 90 percent of

1 what you just said.
2 MR. HAMAD: As always. Let's move on.
3 MR. STEIN: Okay.
4 Q. Now, you have a document in your hand?
5 A. Yes, sir.
6 Q. Okay. Can you tell me from that document how
7 many embryos were suitable for implantation?
8 MR. HAMAD: Objection to form.
9 According to this document, what this
10 document says about that, that's it.
11 He is not making a clinical decision. He
12 can read it for you, what it says about that.
13 That's it.
14 You can't ask him opinion questions.
15 A. This document says that Embryo 4 is a carrier at
16 worst. The patients are carriers. They are healthy.
17 Embryo 7 is a carrier at worst.
18 Embryo 8 is a carrier, maternal.
19 Embryo 13 is a carrier, and Embryo 15 is a
20 carrier.
21 Q. Okay.
22 A. That's what this document says.
23 It also says -- the data are very clear. It also
24 says the media blanks show no evidence of DNA
25 contamination, which is one source of error.

1 Q. The fact that there was no DNA contamination, is
2 that reported on the report or is that a decision made
3 as a result of a conclusion you drew from reading the
4 document?
5 MR. HAMAD: I think it's the last --
6 A. All media blanks showed no evidence of exogenous
7 DNA contamination.
8 There were a number of media blanks that were
9 sent along amplification which documents no
10 contamination.
11 Do you want me to show that to you? I know what
12 you are looking for.
13 Q. Do you have a copy of the chart, Doctor?
14 MR. HAMAD: What's the question pending?
15 What exactly are you asking for?
16 MR. STEIN: I asked the doctor to have the
17 chart available.
18 MR. HAMAD: It's available.
19 What would you like him to find?
20 MR. STEIN: You will find out when I ask my
21 question.
22 MR. HAMAD: Okay. So then he will wait.
23 What's there? Okay.
24 Sorry.
25 Q. Doctor, within the NYU chart, is there an

1 indication as to which embryos were deemed suitable for
2 implantation by the NYU staff at the time that they were
3 implanted?
4 A. Yes, and they correspond exactly what the
5 document that we received from Mark Hughes' lab that we
6 just reviewed.
7 Q. Okay. And, I think, you indicated that there
8 were two determinations to be made, one, whether the
9 genetic studies allowed the embryos under -- to be used
10 based on the finding that they would not create a
11 substantial risk of cystic fibrosis, and then there is
12 another analysis made on the suitability of the embryo
13 for survival purposes. Is that correct?
14 A. That is correct.
15 On the embryo tracking record it states that
16 Embryo 4 is a carrier.
17 However, if you look at the embryologist's
18 assessment, it's a cleavage embryo, which means it
19 stopped developing and it's not likely to make the
20 patient pregnant.
21 Embryo 7 was a more advanced embryo, and that was
22 selected for transfer because it was the second most
23 advanced embryo, and it was also listed as a carrier on
24 the record.
25 Embryo No. 8, which is the most likely embryo to

45

1 have produced the pregnancy based on its morphology, was
2 the most advanced embryo, and that was selected for
3 transfer because it was listed as a carrier.
    Embryos 10, 13 and 15 were embryos that were
still viable but had limited ability to make the patient
6 pregnant, and they were not selected for transfer, and,
7 indeed, the embryos that were not selected for transfer
8 were looked at the following day, and none of them had
9 continued to develop, and they were not going to make a
10 pregnancy, and it was wise that we chose them not to be
11 transferred, but if you look at the embryo morphology,
12 Embryo No. 8 is the most likely embryo that made the
13 pregnancy.
14   Q.  Okay.
15       From your review of the chart that you just
16 discussed, did you find any reason to believe that an
17 allele drop out was a distinct concern in this sample
18 set?
19       MR. HAMAD:  Objection to form; asked and
20       answered.
21       You can answer the question again providing
22       the subject matter.
23   A.  Which sample set are you talking about?
24   Q.  The sample set received from Genesis Genetics
25 with respect to this patient.

46

1   A.  I don't know what you are asking.
2   Q.  Okay.
3       MR. HAMAD:  Are you asking if allele drop
4       out is a concern?
5   A.  Allele drop out is always a concern.
6   Q.  So you would not understand a comment describing
7 this set of embryos of the Grossbaums as being a
8 distinct concern for allele drop out.  You wouldn't have
9 any reason to characterize it in that fashion.  Is that
10 right?
11       MR. HAMAD:  Objection to form.
12       MR. STEIN:  Okay.  You made your objection.
13       MR. HAMAD:  Okay.  And he just answered it.
14       You can answer it again.
15   A.  I don't understand the question.  I know what you
16 are driving at.  Why don't you just ask me the question.
17   Q.  Well, I thought I did.
18       MR. HAMAD:  Apparently, it's not good.
19       MR. STEIN:  Frankly, I was reading from a
20       letter that Dr. Hughes said he sent to NYU, in
21       which I quote, "Allele drop out is a distinct
22       concern in the sample set."
23       MR. HAMAD:  Mr. Stein, where are you reading
24       from, counsel?
25       I am entitled to know what you're reading

47

1 from, this language.
2       Where are you?
3       MR. STEIN:  Well, if you would turn to the
4 second page of P-6 for identification --
5       MR. HAMAD:  Uh-huh.
6       MR. STEIN:  -- and look at the last
7 paragraph, you would see those words.
8       Okay, counsel?
9       MR. HAMAD:  Sure.
10      Thank you.
11   Q.  Now, that was the statement that I read to you,
12 and I am asking you whether or not -- that's the
13 formulation which caused me to ask the question in that
14 way, so my question to you again is, do you have any
15 reason to believe or understand allele drop out is a
16 distinct concern in this sample set referring to the
17 Grossbaums' sample set?
18       MR. HAMAD:  I am going to put an objection
19       on the record, only because you read him --
20       excuse me -- a six-letter -- a six-word --
21       seven-word sentence.
22       MR. STEIN:  Fine.
23       MR. HAMAD:  If you are going to ask him a
24       question, let's be fair.  Read him this
25       three-line paragraph.

48

1       MR. STEIN:  I have decided to ask the
2 question.
3       If you object, say "I object as to
4 form," and then you place on the record your
5 objection, and you can raise it at any time in
6 any courtroom you want, counsel.
7       MR. HAMAD:  Mr. Stein, with all due respect,
8 you have been doing this a lot, I think.
9       I have a lot of respect for you.
10      This is a question to my client.  You are
11 asking him about a subpart of a three-line
12 paragraph.
13      MR. HAMAD:  Can you step outside for a
14 moment and go off the record?
15      We are off the record for a second.
16      (Whereupon, a discussion takes place off the
17 record.)
18      MR. HAMAD:  Doctor, this is the quotation he
19 is directing you to read.
20      MR. LEUCHTMAN:  What is the quotation from?
21      MR. HAMAD:  The quotation is from the second
22 page of a report, which has three pages, which we
23 did not receive, marked as P-9 on March 11, 2009.
24      MR. LEUCHTMAN:  Who is the author of this?
25      MR. STEIN:  Dr. Hughes.

# EXHIBIT I

02981. 00101

1

1
2    IN THE UNITED STATES DISTRICT COURT                11:00:35
     FOR THE DISTRICT OF NEW JERSEY
3    ------------------------------------------- x
4    CHAYA GROSSBAUM and MENCHEN
     GROSSBAUM, Her Spouse, Individually, and
5    as Guardian ad litem of the Infant, ROSIE
     GROSSBAUM,
6
                     Plaintiffs,
7
8     -against-           Index No. 07-CV-359
9
     GENESIS GENETICS INSTITUTE, LLC,
10   OF THE STATE OF MICHIGAN, MARK R.
     HUGHES, M.D., NEW YORK UNIVERSITY
11   SCHOOL OF MEDICINE, and NEW YORK
     UNIVERSITY HOSPITALS CENTER, both
12   Corporations of the State of New York,
     ABC CORPORATIONS:  1-10 and John Doe
13
                     Defendants.
14   ------------------------------------------- x
15
                     132-26 Conduit Avenue
16                   Jamaica, New York
17                   May 4, 2010
                     10:30 a.m.
18
19
     DEPOSITION of CHARLES STROM, M.D., PhD.,
20   an expert witness on behalf of the Plaintiff
     herein, taken by the Defendants pursuant
21   to Article 31 of the Civil Practice Law and Rules
     of Testimony, and Notice, held at the
22   above-mentioned time and place before
     Valerie Cannata, Shorthand Reporter and
23   Notary Public of the State of New York.
24
25

**2**

```
 1
 2            A P P E A R A N C E S
 3   NUSBAUM, STEIN, GOLDSTEIN
     BRONSTEIN & KRON, P.A.
 4        Attorneys for Plaintiffs
 5        20 Commerce Boulevard
          Succasunna, New Jersey  07876
 6
          BY: LEWIS STEIN, ESQ.
 7        BY: LYNN HARRISON, PARALEGAL
 8
 9   TROWBRIDGE LAW FIRM
          Attorneys for Defendants
10        Genesis Genetics Institute , LLC
          And Mark R. Hughes, M.D.
11
          1380 East Jefferson Avenue
12        Detroit, Michigan  48207
13        BY: STEPHEN LEUCHTMAN, ESQ.
14
15   MARSHALL, DENNEHEY, WARNER
     COLEMAN & GOGGIN
16        Attorneys for Defendants
          New York University School of
17        Medicine and New York University
          Hospitals Center
18
          425 Eagle Rock Avenue, Suite 302
19        Roseland, New Jersey  07068
20        BY: JAY A. HAMAD, ESQ.
21
22         A L S O   P R E S E N T
23
     WAYNE SALINE, VIDEOGRAPHER
24   VERITEXT, LLC
25   STANLEY DICKSON, GENESIS GENETICS
```

**3**

```
 1            S T I P U L A T I O N S
 2        IT IS HEREBY STIPULATED by and between
 3   the attorneys for the respective parties hereto that:
 4        All rights provided by the C.P.L.R. and Part 221 of the
 5   Uniform Rules for the Conduct of Depositions, including the right
 6   to object to any question, except as to form, or to move to strike any
 7   testimony at this examination is reserved; and in addition, the
 8   failure to object to any question or to move to strike any testimony
 9   at this examination shall not be a bar or waiver to make such
10   motion at, and is reserved to, the trial of this action.
11        This deposition may be sworn to by the witness being
12   examined before a Notary Public other than the Notary Public before
13   whom this examination was begun, but the failure to do so or to
14   return the original of this deposition to counsel, shall not be deemed
15   a waiver of the rights provided by Rule 3116 of the C.P.L.R., and
16   shall be controlled thereby.
17        The filing of the original of this deposition is waived.
18        IT IS FURTHER STIPULATED that a copy of this
19   examination shall be furnished to the attorney for the witness
20   being examined without charge.
21
22
23
24
25
```

**4**

```
 1   C. STROM, M.D., PhD.
 2        THE VIDEOGRAPHER:  My name is       11:00:38
 3   Wayne Saline of Veritext.  The date today   11:00:39
 4   is May 4, 2010.  The time is approximately  11:00:43
 5   11:00.  This deposition is being held at the  11:00:45
 6   Sheraton JFK located at 132-26 South      11:00:49
 7   Conduit Avenue, Jamaica, New York.        11:00:54
 8        The caption of this case is Chaya       11:00:57
 9   Grossbaum and Menchen Grossbaum, her     11:01:01
10   spouse individually and as guardians        11:01:05
11   ad litem of the infant, Rosie Grossbaum,     11:01:09
12   in the United States District Court of        11:01:10
13   the District of New Jersey, docket           11:01:13
14   number 07 CV 359.  The name of the        11:01:15
15   Witness is Dr. Charles Strom.              11:01:19
16        At this time, the Attorneys will          11:01:21
17   introduce themselves and the parties        11:01:21
18   they represent, after which our Court        11:01:24
19   Reporter, Valerie Cannata, of Veritext       11:01:28
20   will swear in the Witness and we can        11:01:31
21   proceed.                                 11:01:32
22        MR. LEUCHTMAN:  Stephen Leuchtman,    11:01:34
23   taking the deposition today on behalf of     11:01:36
24   Genesis Genetics and Dr. Mark Hughes.      11:01:38
25   Also with me is Stanley Dickson, an officer   11:01:41
```

**5**

```
 1   C. STROM, M.D., PhD.
 2   in Genesis Genetics.                        11:01:44
 3        MR. HAMAD:  Jay Hamad of the Law       11:01:46
 4   Firm of Marshall, Dennehey, Warner,        11:01:46
 5   Coleman and Goggin.  I'm on behalf of        11:01:48
 6   N.Y.U. Defendants.                         11:01:49
 7        MR. STEIN:  Lewis Stein; Nusbaum,       11:01:50
 8   Stein, Goldstein, Bronstein and Kron on       11:01:53
 9   behalf of the Plaintiffs and before we swear   11:01:56
10   the Witness, I'd just like to confirm on the   11:01:59
11   record a conversation I had with Counsel for  11:02:03
12   N.Y.U. that Dr. Strom having offered his      11:02:05
13   opinion letter in the case did not mention     11:02:10
14   any standard of care issues as to N.Y.U.  He  11:02:12
15   will not be offering any testimony regarding   11:02:15
16   standard of care of N.Y.U. or members       11:02:18
17   of the N.Y.U. community in connection       11:02:22
18   with this deposition.                       11:02:23
19   C H A R L E S   S T R O M, M.D. PhD., the    11:02:36
20   Witness herein, having first been duly
21   sworn by a Notary Public of the State of
22   New York, was examined and testified as
23   follows:
24        THE REPORTER:  What is your full
25   name?
```

2 (Pages 2 to 5)

122

C. STROM, M.D., PhD.

1
2    A.   Yes.                          13:21:06
3    Q.   Reprogenetics in New Jersey?        13:21:06
4    A.   Don't know.                    13:21:11
5    Q.   Genetics and I.V.F. in         13:21:12
6    Virginia?                          13:21:12
7    A.   Don't know.                    13:21:12
8    Q.   Cornell Medical Center in New  13:21:14
9    York City?                         13:21:16
10   A.   Don't know.                    13:21:16
11   Q.   Genesis Genetics?              13:21:17
12   A.   Don't know.  Oh, no.  Genesis  13:21:18
13   wasn't.  He said he wasn't.         13:21:22
14   Q.   Shady Grove?                   13:21:22
15   A.   No.                            13:21:24
16   Q.   No, you don't know; or no, they  13:21:24
17   weren't?                           13:21:24
18   A.   No, I don't know.              13:21:27
19   Q.   Baylor?                        13:21:28
20   A.   Don't know.                    13:21:29
21   Q.   And the lab in Florida we      13:21:32
22   talked about?                      13:21:40
23   A.   Don't know.                    13:21:41
24   Q.   Do you agree with Drs. Kangpu  13:21:42
25   Xu and Mark Hughes that under the circumstances  13:21:50

123

C. STROM, M.D., PhD.

1
2    existing at the time in this case it was proper  13:21:52
3    to recommend embryos seven and eight for  13:21:54
4    transfer?                          13:21:58
5    A.   No.                            13:21:58
6    Q.   What should have been done,    13:22:01
7    given -- you've seen the analysis of the embryos,  13:22:07
8    correct?                           13:22:11
9    A.   Yes.                           13:22:11
10   Q.   All right.  What recommendations,  13:22:13
11   if any, should Dr. Hughes have made at that  13:22:15
12   time?                              13:22:19
13   A.   He should have had the         13:22:19
14   conversation either with the physician or  13:22:20
15   with the Grossbaums saying that given the  13:22:22
16   details of this case, that these diagnoses could  13:22:24
17   not be considered reliable in that the Grossbaums  13:22:28
18   should make the decision based on that data.  13:22:34
19   Q.   So you do not believe that any  13:22:49
20   different embryos should have been transferred?  13:23:02
21   A.   No.                            13:23:05
22   Q.   Do you believe the procedure   13:23:06
23   should have been cancelled or postponed  13:23:10
24   or is it just your testimony that was up to the  13:23:12
25   Grossbaums?                        13:23:15

124

C. STROM, M.D., PhD.

1
2    A.   Correct.                       13:23:16
3    Q.   Do you have an opinion as to   13:23:17
4    what they would have agreed or not agreed  13:23:22
5    to do?                             13:23:25
6    A.   No opinion.                    13:23:27
7    Q.   Do you agree that the two      13:23:28
8    embryos Dr. Hughes said were okay for  13:23:42
9    transfer were eight and ten?        13:23:45
10   A.   That's what I was told.        13:23:47
11   Q.   Well, you have it in front of  13:23:48
12   you.                               13:23:50
13   A.   I was told that those were the  13:23:53
14   ones that were transferred.         13:23:55
15        MR. STEIN:  Look at the report.  13:23:57
16        THE WITNESS:  I'm sorry.  You  13:23:59
17   took something from me.  Oh, here.  13:24:05
18        (The Witness perused the       13:24:11
19   exhibit.)                          13:24:12
20   A.   Well, in this particular report,  13:24:12
21   embryos four, seven, eight, thirteen and  13:24:24
22   fifteen would be considered eligible for  13:24:31
23   transfer.                          13:24:35
24   Q.   On the right-hand column, do    13:24:36
25   you agree that the two that Dr. Hughes or  13:24:40

125

C. STROM, M.D., PhD.

1
2    his lab said okay for transfer were seven  13:24:44
3    and eight?                         13:24:47
4        MR. HAMAD:  Objection to form,  13:24:48
5    asked and answered.                13:24:49
6    A.   That's actually incorrect.  The  13:24:50
7    two that he's got are ten --       13:24:52
8    Q.   I'm sorry, I meant eight and   13:24:54
9    ten.  I apologize.  Seven and eight were  13:24:56
10   transferred and do we agree that the two  13:24:59
11   he said were okay for transfer were eight  13:25:01
12   and ten?                           13:25:04
13        MR. HAMAD:  Objection to form.  13:25:05
14   Asked and answered.  He already said  13:25:07
15   which ones were eligible for transfer; but  13:25:07
16   beyond that, you can answer it again.  13:25:08
17   A.   I think what's interesting to   13:25:10
18   me is that he's got several that say carrier at  13:25:14
19   worst.                             13:25:18
20   Q.   No, I didn't ask what interests  13:25:19
21   you.  I asked you do you agree that the two  13:25:21
22   embryos that are said in that report to be okay  13:25:24
23   for transfer are eight and ten?     13:25:29
24   A.   Yes.                           13:25:32
25   Q.   All right.  Do you agree that   13:25:33

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400

126

C. STROM, M.D., PhD.

1    C. STROM, M.D., PhD.
2    other than control samples CG and MG, the    13:25:36
3    only cells that were biopsied that had no    13:25:40
4    deletion on the paternal side were samples    13:25:44
5    two, which had a mutant maternal allele    13:25:47
6    and therefore possible paternal A.D.O.,    13:25:51
7    eight and ten?    13:25:57
8        MR. HAMAD: I have an objection    13:25:58
9    to this line of question, in that you stopped    13:26:01
10   him from answering the question, the    13:26:04
11   prior question, and also in the fact that I    13:26:06
12   think you're asking the question --    13:26:08
13       MR. LEUCHTMAN: No, I didn't    13:26:09
14   stop him from answering the question.    13:26:10
15       MR. HAMAD: He wasn't finished.    13:26:11
16       MR. LEUCHTMAN: I encouraged him    13:26:13
17   to answer the question and not to ramble on.    13:26:14
18       MR. STEIN: I object to the    13:26:19
19   characterization of the Doctor rambling on.    13:26:23
20   He's responding to your questions.    13:26:25
21       MR. LEUCHTMAN: Once encouraged,    13:26:26
22   yes, I agree, and I'd like an answer to this    13:26:28
23   one.    13:26:29
24   A.    Okay.  Column two, no deletion,    13:26:29
25   sample number two; no deletion, sample    13:26:33

127

1    C. STROM, M.D., PhD.
2    number eight; no deletion sample number    13:26:35
3    ten.    13:26:38
4    Q.    What does no deletion mean?    13:26:38
5    A.    It means, the Delta F 508    13:26:40
6    mutation was not observed in those samples.    13:26:46
7    Q.    What does no amp mean?    13:26:50
8    A.    No amp means no amplification.    13:26:53
9    Means no analysis.    13:26:57
10   Q.    Doctor, I'm going to ask you    13:26:58
11   questions about two embryos, eight and    13:27:00
12   ten and I want to make it clear it that I'm    13:27:02
13   not asking whether one was more likely    13:27:06
14   than the other, but whether you can say    13:27:08
15   without engaging in guess, speculation,    13:27:10
16   or conjecture that either one in and of    13:27:12
17   itself was more likely than not the involved    13:27:14
18   embryo.  Do you follow me?    13:27:18
19   A.    No.  That's a stupid question.    13:27:19
20       There are higher risks to one    13:27:22
21   of these embryos than the other embryo,    13:27:25
22   but that doesn't mean it's more likely than not    13:27:28
23   to have been the one that caused the    13:27:32
24   pregnancy.    13:27:34
25   Q.    That's what I'm trying to ask    13:27:34

128

1    C. STROM, M.D., PhD.
2    you now.    13:27:36
3    A.    There's no way to know which of    13:27:36
4    those embryos resulted in the pregnancy.    13:27:39
5    Q.    There's no way to know.    13:27:41
6    A.    No.    13:27:44
7    Q.    All right.  Do you have an    13:27:49
8    opinion as to the percentage chances of --    13:28:44
9    strike that.    13:28:48
10       Now, this is an issue we    13:28:51
11   touched on earlier.  Was it reasonable for    13:28:58
12   Dr. Hughes to set as a condition to Genesis    13:29:01
13   doing P.G.D. the undergoing by a couple    13:29:05
14   of C.V.S. or amniocentesis?    13:29:08
15   A.    A requirement?  I don't think    13:29:14
16   that's reasonable.    13:29:16
17   Q.    As a precondition of his    13:29:17
18   getting involved.    13:29:18
19   A.    Well, that's up to him.  It's    13:29:19
20   his decision.    13:29:22
21   Q.    Do you agree or disagree that    13:29:23
22   it's important scientifically for a lab doing    13:29:25
23   single cell P.G.D. to learn that there's    13:29:29
24   been a failure or a misdiagnosis ten to    13:29:34
25   fifteen weeks into a pregnancy as opposed    13:29:37

129

1    C. STROM, M.D., PhD.
2    to after the baby has been born?    13:29:41
3    A.    No.    13:29:43
4    Q.    Do you agree that as of early    13:29:44
5    to mid 2004, Genesis consisted of scientists    13:29:49
6    trying to develop a complicated single cell test?    13:29:52
7        MR. STEIN: I object to the form    13:29:58
8    of the question.  How is he supposed    13:29:59
9    to know what was going on at Genesis    13:30:02
10   Genetics?    13:30:04
11       MR. LEUCHTMAN: I guess especially    13:30:04
12   now that he's coached, he can say I don't    13:30:07
13   know.    13:30:10
14       MR. STEIN: You know, when you    13:30:10
15   ask a question that is loaded with    13:30:11
16   presumptions and assumptions that on    13:30:14
17   its face is beyond the canon of anything    13:30:16
18   who's not intimately involved in the    13:30:22
19   operation of Genesis Genetics, the    13:30:26
20   question speaks for itself as being    13:30:27
21   inappropriate and if you couch it in    13:30:30
22   those terms, you get an objection from    13:30:33
23   me.    13:30:37
24       MR. LEUCHTMAN: Noted.    13:30:37
25       MR. STEIN: Thank you.    13:30:38

33 (Pages 126 to 129)

VERITEXT REPORTING COMPANY

212-267-6868                                                           516-608-2400

# EXHIBIT J

Chaya Grossbaum and Menachem Grossbaum vs.
Genesis Genetics Institute, LLC, et al.

Samuel C. Pang, M.D.
November 23, 2010

---

**Page 1**

Volume I
Pages 1 to 124
Exhibits 1 - 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - -x
CHAYA GROSSBAUM and MENACHEM          :
GROSSBAUM, her spouse,               :
individually and as guardians        :
ad litem of the infant ROSIE         :
GROSSBAUM,                           :
              Plaintiffs,            :   Civil Action No.
      vs.                            :   07-CV-1359 (GEB)
GENESIS GENETICS INSTITUTE,          :
LLC, of the State of                 :
Michigan; MARK R. HUGHES,            :
M.D., NEW YORK UNIVERSITY            :
SCHOOL OF MEDICINE and NEW           :
YORK UNIVERSITY HOSPITALS            :
CENTER, both corporations in         :
the State of New York; ABC           :
CORPS. 1-10; JOHN DOES 1-10,         :
              Defendants.            :
- - - - - - - - - - - - - -x

DEPOSITION OF SAMUEL C. PANG, M.D., a
witness called on behalf of the Plaintiffs, taken
pursuant to the Federal Rules of Civil Procedure,
before Carol H. Kusinitz, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Reproductive Science Center, One Forbes Road,
Lexington, Massachusetts, Massachusetts, on Tuesday,
November 23, 2010, commencing at 3:35 p.m.

PRESENT:

Nusbaum, Stein, Goldstein, Bronstein & Kron,
    P.A. (by Lewis Stein, Esq.)
    20 Commerce Boulevard, Suite E, Succasunna,
    NJ 07876, for the Plaintiffs.

(Continued on Page 2)

---

**Page 2**

PRESENT (Continued):

Stephen N. Leuchtman, P.C.

    (by Stephen N. Leuchtman, Esq.)

    1380 E. Jefferson Avenue, Detroit, MI

    48207, for the Defendants Genesis Genetics

    Institute, LLC, and Mark R. Hughes, M.D.

Marshall, Dennehey, Warner, Coleman & Goggin,

    P.C. (by Jay A. Hamad, Esq.)

    425 Eagle Rock Avenue, Suite 302, Roseland,

    NJ 07068, for the Defendants New York

    University School of Medicine and New York

    University Hospitals Center.

* * * *

---

**Page 3**

|  | I N D E X |  |  |
|---|---|---|---|
| WITNESS | DIRECT  CROSS | REDIRECT | RECROSS |
| SAMUEL C. PANG, M.D. |  |  |  |
| BY MR. STEIN | 4 | 118 |  |
|  | 104 |  |  |
| BY MR. LEUCHTMAN | 103 |  | 121 |
|  | 111 |  |  |

* * * *

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Document headed "Morganstern-Grossbaum results - 07/19/2004" | 26 |
| 2 | Four-page letter from Samuel C. Pang, M.D., to Jamela A. Hamad dated February 25, 2010 | 30 |
| 3 | Document entitled "IVF Consent," with attached three-page document entitled "Reproductive Science Center Consent to In Vitro Fertilization (IVF) Treatment" | 39 |
| 4 | Three-page document entitled "The Reproductive Science Center Consent to Embryo Biopsy" | 39 |

* * * *

---

**Page 4**

P R O C E E D I N G S

SAMUEL C. PANG, M.D.

a witness called for examination by counsel for the
Plaintiffs, having been satisfactorily identified by
the production of his driver's license and being
first duly sworn by the Notary Public, was examined
and testified as follows:

**DIRECT EXAMINATION**

BY MR. STEIN:

Q.   Dr. Pang, as you know, my name is Lewis
Stein.  I represent the Plaintiffs Chaya and
Menachem Grossbaum in this lawsuit against NYU as
well as Genesis Genetics and Dr. Hughes.  You have
been offered as an expert on behalf of NYU, and
we're here to take your deposition.

     "Deposition" is merely a three-syllable
word that means a question-and-answer session in
which you have been placed under oath here today,
and my questions and your answers are going to be
recorded by the lady who sits to my left and your
right.  And if the matter goes to trial, what you
say here, to the extent that it may be inconsistent
with anything that you testify at trial, we can use
the deposition here today, that you give today.

---

Samuel C. Pang, M.D.
November 23, 2010

Chaya Grossbaum and Menachem Grossbaum vs.
Genesis Genetics Institute, LLC, et al.

Page 69

1   Q.  Doctor, isn't it your testimony that you
2   need the mother's contribution to the cell, you need
3   to know the nature of that contribution before you
4   can determine the suitability of that particular
5   embryo for implantation?  Is that correct?
6   A.  No.
7   Q.  What are you saying?
8   A.  You need information from both the paternal
9   and maternal components to judge whether or not that
10  embryo may be suitable for transfer.
11  Q.  Okay.  And why do you need information from
12  both?
13      MR. HAMAD: Objection to form.  You can
14  answer.
15  A.  Because this is an autosomal recessive
16  disease, and in order for a pregnancy to be affected
17  with the disease, you need to have the CF mutation
18  from both the maternal and the paternal gametes to
19  result in a baby that is affected with CF.
20  Q.  Or to determine whether a baby will not be
21  affected with CF; isn't that right?
22  A.  Not completely, no.
23  Q.  Well, tell me why it's not complete.
24  A.  Because...

Page 70

1       MR. HAMAD: Belated objection.
2   A.  If you know that one component is normal
3   for sure, but you don't have information from the
4   other component, that embryo would then potentially
5   be a carrier in the worst case, just like the
6   parents.
7   Q.  And would a child or a baby born of that
8   embryo not be an affected child, but merely a
9   carrier at worst?
10      MR. HAMAD: Objection to form.  You're
11  being unfair, because now you're comparing -- you're
12  using the Doctor's testimony about analysis --
13      MR. STEIN: Okay.  You have an objection.
14      MR. HAMAD: All right.  Objection.
15  A.  Please restate your question.
16  Q.  Sure.  You indicate that if you have
17  information that the contribution of one parent is
18  normal, and you don't know what the contribution of
19  the second parent is, that that child would be a
20  carrier at worst; is that correct?
21  A.  That is correct.  The child could also be
22  completely normal, with two normal genes.
23  Q.  But it would not be an affected child; is
24  that correct?

Page 71

1   A.  It can only be affected if it has two CF
2   mutation genes, one from each parent.
3   Q.  So then once you have -- by the way, when
4   you have a CF 10 exon known to have no deletion,
5   then that would be a normal gene; isn't that
6   correct?
7   A.  No, it is not correct.
8   Q.  Why not?
9   A.  Because you need information from the
10  maternal component before you can make that
11  conclusion.
12  Q.  In other words -- I thought you said
13  recently that because it was a recessive gene --
14  withdraw that -- because cystic fibrosis is a
15  recessive genetic disorder, that you need to have an
16  affected contribution from both parents in order to
17  get an affected baby; is that correct?
18  A.  Yes.
19  Q.  So does Sample No. 2 show that the
20  contribution of the father is normal?
21  A.  It says that the deletion was not detected,
22  no deletion detected.
23  Q.  Well, does "no deletion detected" mean that
24  the gene mutation is absent from that cell -- from

Page 72

1   the father's contribution?
2       MR. HAMAD: Objection to form.
3   A.  Not necessarily.
4   Q.  Not necessarily?  Well, since the only --
5   under "CF 10," which is the father's contribution,
6   there is, if you look down the column from the
7   sample studied, there is only two entries, either
8   "No amp," meaning they don't have any kind of a
9   reading of the nature of the genetic contribution of
10  the father, or they have "No deletion"?
11  A.  Correct.
12  Q.  * So that means that, according to what you
13  just testified, none of the father's contribution
14  would be normal; is that right?
15      MR. HAMAD: Objection to form.  You ask him
16  if there is a G or a T.
17      MR. STEIN: I didn't ask him anything about
18  that.
19      MR. HAMAD: Can you read counsel's prior
20  question when he asked him if "No deletion" would
21  mean --
22      MR. STEIN: Well, let's see if the Doctor
23  needs to have the question reread.
24  Q.  Do you understand the questioning, Doctor?

Chaya Grossbaum and Menachem Grossbaum vs.
Genesis Genetics Institute, LLC, et al.

Samuel C. Pang, M.D.
November 23, 2010

---

Page 73

1  A. No. There was -- there's been too many
2  questions.
3  Q. Too many questions?
4  A. And I'm now confused by what your final
5  question was. So....
6  Q. You want it read back?
7  A. Yes, please.
8  (* Question read)
9  A. No, that's not necessarily the case.
10  Q. ** Which samples of the list, those listed
11  in the left column, 2, 3, 4, 7, 8, 9, 10, 13, 14 and
12  15, which of those samples are normal from the
13  father's contribution to the cell?
14  MR. HAMAD: Objection to form. You can
15  answer if you understand it.
16  MR. LEUCHTMAN: Same objection.
17  MR. HAMAD: It doesn't make sense
18  medically, but you can answer it.
19  MR. STEIN: Is that your declaration?
20  MR. HAMAD: That's my declaration.
21  MR. LEUCHTMAN: Which are normal from the
22  father, judging only from the father's contribution?
23  Lew, I'm trying to figure out what you're asking.
24  Then he can answer the question.

---

Page 74

1  MR. STEIN: You guys go figure it out, and
2  then --
3  Q. Doctor, do you understand what I just asked
4  you?
5  MR. HAMAD: I just object to this whole
6  line of questioning of parsing these things out in a
7  way that does not medically make sense to the
8  Doctor. He's telling you he's confused by your
9  question. Ask him to analyze one of these things,
10  the whole embryo analysis. Ask him to do something
11  that makes medical sense.
12  MR. STEIN: Okay.
13  MR. HAMAD: Go ahead.
14  What's the question?
15  MR. LEUCHTMAN: Yes.
16  Q. Do you now understand the question, Doctor?
17  MR. HAMAD: We've had too much colloquy. I
18  would rather have him hear it again.
19  MR. STEIN: Well, you don't have to rather
20  have him hear it again.
21  Q. I asked the Doctor, do you understand the
22  question?
23  THE WITNESS: Could you please read the
24  question again.

---

Page 75

1  MR. STEIN: For the third time, please read
2  the question.
3  (** Question read)
4  MR. HAMAD: Objection to form. Only? You
5  can answer if you understand. Go ahead.
6  A. In order to determine whether or not an
7  embryo is normal or at least the cell is normal, you
8  need information from both the paternal and the
9  maternal. You cannot make a decision about the
10  normality of the embryo based only on information
11  from one set of parents without taking into
12  consideration information from the other parent.
13  Q. And when you say an embryo is not normal,
14  does that mean that you're calling the embryo free
15  of any mutation material from either parent, or are
16  you considering it to include where one of the two
17  parents contribute their mutation, that cell would
18  be considered suitable for transfer?
19  MR. LEUCHTMAN: Objection.
20  MR. HAMAD: Objection. I don't understand
21  the question. If you understand it, you can answer.
22  A. I completely do not understand that
23  question.
24  MR. HAMAD: Are you asking about

---

Page 76

1  information or conclusion from both? That's what
2  I'm trying to figure out. It doesn't make sense to
3  either one of us who are sitting here.
4  A. I'm sorry, it was rambling. No offense,
5  but I just didn't get what you were trying to ask.
6  Q. Let's go back to CF 10.
7  * "No deletion" under -- that's the
8  father's exon. That's the location on --
9  A. The paternal contribution.
10  Q. The paternal contribution. Does that
11  indicate the presence of a CF gene mutation?
12  MR. HAMAD: Objection to form. You can
13  answer if you understand.
14  A. Are we talking about Sample 2 again?
15  Q. Yes. **
16  MR. HAMAD: I'm going to object to this
17  line of questioning.
18  A. The report says, "No deletion" --
19  MR. HAMAD: On second. This is unfair to
20  the Doctor. Are you asking about the entire --
21  MR. STEIN: Will you stop interrupting, or
22  I'm going to walk out of this deposition right now
23  and ask the Court to enter an order declaring that
24  you should not interfere with the questioning.

---

Samuel C. Pang, M.D.
November 23, 2010

Chaya Grossbaum and Menachem Grossbaum vs.
Genesis Genetics Institute, LLC, et al.

---

**Page 101**

1    Same answer?
2    A.   Same answer.
3    Q.   And did you see any evidence in the record
4 provided by NYU as to what kind of counseling the
5 Grossbaums got, after the report came back from
6 Genesis Genetics, before implantation?
7          MR. HAMAD: Objection to form.
8    A.   I cannot remember specifically. I read
9 those -- I read the reports over a year ago -- about
10 a year ago, I would say.
11   Q.   So you don't know --
12   A.   I would have to go through and look to see
13 whether or not that was done. But I can't
14 remember -- I don't remember specifically, shall we
15 say.
16   Q.   * And if no counseling was done by the
17 physician in charge of implantation who received the
18 genetic report from the laboratory, would that be a
19 departure from standard of care?
20         MR. HAMAD: Objection to form. At what
21 point in time are we talking about here?
22   Q.   Answer the question, Doctor.
23         MR. HAMAD: If you understand the
24 question -- can you repeat the question. My

**Page 102**

1 objection, please. And, Doctor, if can you
2 understand it, you can answer it.
3          MR. STEIN: I can guarantee that this
4 transcript is going to Salas, guarantee.
5          (* Question read)
6    A.   Well, I wasn't there, so I can't tell you
7 whether or not counseling was done. But I would say
8 that in my opinion, the time for counseling is not
9 in the embryo transfer room when the woman has her
10 legs up in stirrups. The time for counseling is at
11 the very beginning, before they begin this process,
12 so that they have a full understanding of that risk
13 before they go into the process and not at the end
14 of the process.
15   Q.   Do you subscribe to a standard for
16 interpreting medical records that, if it wasn't
17 recorded, it did not happen?
18         MR. HAMAD: Objection to form.
19         MR. LEUCHTMAN: I'll join in that
20 objection.
21         MR. HAMAD: If you understand the question,
22 you can answer.
23   A.   Could you please restate the question.
24   Q.   Do you subscribe to the standard for

**Page 103**

1 interpreting medical records that, if it wasn't
2 recorded, it did not happen?
3    A.   Well, I don't subscribe to it, but I
4 understand that that is what --
5          MR. HAMAD: Objection to the form. You can
6 answer.
7    A.   I don't subscribe to it, because I know
8 that a lot of things happen, and if we spent all our
9 time documenting everything that happened, we would
10 spend more time documenting than we would doing
11 things. So for personal reasons, I don't subscribe
12 to it, but I understand that that is something that
13 is generally accepted as a standard.
14         MR. STEIN: I think I'm almost done.
15         MR. HAMAD: Take your time.
16         MR. LEUCHTMAN: If you don't mind, Mr.
17 Stein, while you're looking.
18         MR. STEIN: Go ahead.
19         CROSS EXAMINATION
20   BY MR. LEUCHTMAN:
21   Q.   Relatively speaking, how well developed
22 were Embryos 7, 8 and 10, and is that a factor in
23 anybody's approach to implantation, or should it be?
24   A.   Looking at Embryos 7, 8 and 10, Embryo 7

**Page 104**

1 was an early blastocyst, Embryo 8 was a full
2 blastocyst, and Embryo 10 was an early morula, which
3 is the least developed of them. So in looking at
4 this, the most advanced embryo that was transferred
5 was Embryo No. 8, which was the full blastocyst, and
6 in all -- and then, of course, there is Embryo 7,
7 which is an early blastocyst.
8          Does that answer your question?
9    Q.   Yes, sir. Thank you.
10         MR. LEUCHTMAN: I'm not necessarily done
11 with the questions.
12         MR. HAMAD: Are you done?
13         MR. STEIN: Are you finished?
14         MR. LEUCHTMAN: I said I'm not necessarily
15 done with my questions. I just did that while you
16 were looking through your notes.
17         MR. HAMAD: Unless you want to follow up on
18 that.
19         MR. STEIN: Why don't you finish -- I just
20 have one question.
21         MR. LEUCHTMAN: Go ahead and ask it.
22         DIRECT EXAMINATION, Continued
23   BY MR. STEIN:
24   Q.   In your review of these records, did you

---

Doris O. Wong Associates, Inc.
www.doriswong.com   (617) 426-2432

Chaya Grossbaum and Menachem Grossbaum vs.
Genesis Genetics Institute, LLC, et al.

Samuel C. Pang, M.D.
November 23, 2010

Page 113

1  information was provided by Menachem Grossbaum, does
2  that enhance the risk in this case of pregnancy with
3  a nonimplanted embryo?
4      A.  That certainly increases the likelihood
5  that that could have been a reason for the
6  nonimplanted embryo.
7      Q.  Now, you have stated, and I won't go back
8  over it, that 10 and 8 had different risks of
9  leading to an affected baby.  My question to you is
10  not if one of those -- one of the embryos was more
11  likely than the other to have been affected, but
12  whether you can say, without engaging in speculation
13  or guess or conjecture, that any particular one of
14  the two embryos is the one that led to the birth of
15  Rosie Grossbaum.
16     A.  I believe you meant Embryo 7 and 8?
17     Q.  Yes.  Did I say --
18     A.  You said 8 and 10.
19     Q.  I'm sorry.  Let me restate the question,
20  because I for some reason seem to do that, get these
21  numbers confused.
22         8 and 10 were implanted, correct?
23         MR. HAMAD:  No, 7 and 8.
24     Q.  I'm sorry, 7 and 8.  It's late.

Page 114

1         7 and 8 were implanted?
2      A.  Correct.
3      Q.  Is it fair to say that, without engaging in
4  guesswork, since the odds were way less than 50
5  percent as to either one of them, that it would be
6  speculation to say which of those two embryos, if
7  either of them, led to the birth of Rosie Grossbaum?
8      A.  Well, given that Embryo 8 is a much more
9  advanced embryo, it was a full blastocyst, I would
10  say that the medical probability that Embryo 8 would
11  have implanted over Embryo 7 is higher.
12     Q.  But you can't say without guessing that it
13  was 8 as opposed to 7, correct?
14         MR. HAMAD:  Objection to form.  Asked and
15  answered.
16     Q.  Well, you said the risk was higher, but you
17  can't say that it's more likely than not that either
18  one of those embryos --
19         MR. HAMAD:  Objection to form.  You can
20  answer again.
21     A.  Well, if indeed one of those two embryos
22  implanted, I would say that the probability that the
23  embryo which implanted was Embryo 8 is higher than
24  the probability that Embryo 7 implanted, just based

Page 115

1  on the fact that the Embryo 8 was a full expanded --
2  actually a full blastocyst as opposed to Embryo 7,
3  which was an early blastocyst.
4      Q.  Well, we don't know with any degree of
5  certainty which embryo ended up being this child,
6  correct?
7         MR. HAMAD:  Objection to form.  Asked and
8  answered.  Certainty or probability?
9      Q.  I'm not talking about one versus the other.
10  But in looking at any one embryo, we can't say that
11  it was more likely than not, can we, that that
12  embryo led to the birth of Rosie Grossbaum?
13         MR. HAMAD:  I'm going to object.  Asked and
14  answered.  You can answer it again.
15     A.  If we assume that one of the two embryos
16  that was transferred resulted in the birth of Rosie,
17  the medical probability is that Embryo 8 was the one
18  that implanted, based on the fact that it was a more
19  advanced embryo, it was a full blastocyst, as
20  opposed to Embryo 7, which was an early blastocyst.
21     Q.  Okay.  So what you're saying is that one
22  of those embryos is more probable than the other,
23  but we don't know whether either of those or an
24  embryo from a -- a nonimplanted embryo led to the

Page 116

1  birth of this child?
2         MR. HAMAD:  Objection to the form.  Asked
3  and answered.  You can answer it again.
4      A.  We don't know which embryo implanted.
5      Q.  All right.  Thank you.  Led to the child's
6  birth?
7         MR. HAMAD:  Objection to the form.
8         MR. LEUCHTMAN:  Let him answer it.
9         MR. HAMAD:  Okay, but asked and answered
10  three times.
11     A.  We don't know which embryo which was
12  transferred resulted in the birth of Rosie.  But as
13  I've stated before, based on the embryo development,
14  the medical probability is that Embryo 8 would be
15  more likely to implant than Embryo 7.
16     Q.  One is more likely than the other, but we
17  don't know which did, right?
18         MR. HAMAD:  Objection.  Asked and answered.
19  He told you the medical probability was --
20         MR. LEUCHTMAN:  Would you quit coaching the
21  witness, please.
22         MR. HAMAD:  I'm not coaching the witness.
23  You asked the same question.  Did he not ask the
24  same question five times now?  You're sitting here.

Samuel C. Pang, M.D.
November 23, 2010

Chaya Grossbaum and Menachem Grossbaum vs.
Genesis Genetics Institute, LLC, et al.

---

**Page 117**

1  MR. STEIN: I don't sit here as a judge.
2  MR. HAMAD: Okay. Well --
3  MR. STEIN: This is just a continuation of
4  the same fighting that's been going on for the last
5  three hours. So go fight with him.
6  MR. HAMAD: Ask him the same question
7  again. Put it a sixth time.
8  A. I have answered the question. I don't know
9  how else you want me to answer the question.
10  MR. LEUCHTMAN: All right. Thank you.
11  MR. STEIN: Are you done?
12  MR. HAMAD: Do you have any questions?
13  MR. STEIN: I have more. I want to know --
14  MR. LEUCHTMAN: Yes. You asked the
15  question am I done, and my answer is --
16  MR. STEIN: You are done?
17  MR. LEUCHTMAN: Unless I have redirect --
18  MR. STEIN: Based on what I ask. Okay.
19  MR. HAMAD: Actually, let's take a minute
20  break. Let's step outside for one second.
21  (Brief recess)
22  MR. STEIN: I just have a few more
23  questions.
24

---

**Page 118**

1  REDIRECT EXAMINATION
2  BY MR. STEIN:
3  Q. Doctor, do the embryos continue to develop
4  during the period that the single cells are being
5  studied at the laboratory?
6  A. Some of them do, yes.
7  Q. And can you tell -- is there any scientific
8  or medical information that would tell you which
9  ones continue to develop and which ones don't?
10  A. Based on the embryo morphology we can
11  determine whether or not the embryo has continued to
12  grow. Typically two days later, they get to the
13  blastocyst stage. If they do not, we consider them
14  to be arrested in development, either in the
15  cleavage stage or the morula stage.
16  Q. So then if the embryos do reach the
17  blastocyst stage, then don't the embryos have the
18  same chance of implantation?
19  MR. HAMAD: Objection to form. You can
20  answer, if you understand the question.
21  MR. LEUCHTMAN: Of implantation?
22  MR. HAMAD: Development?
23  MR. STEIN: Development, yes. It's the
24  same chance of giving birth to the baby.

---

**Page 119**

1  MR. LEUCHTMAN: Why don't you start the
2  question from scratch.
3  A. Are you asking the same question that he
4  asked?
5  Q. No, I'm only refining it by asking whether
6  or not, if the baby reaches the blastocyst stage --
7  if the embryo reaches the blastocyst stage, whether
8  or not, by reaching that stage, they both arrive at
9  the same status to predict their ability to result
10  in a successful pregnancy.
11  MR. HAMAD: This was asked and answered six
12  times.
13  Q. And the answer -- is your answer no?
14  MR. HAMAD: You can answer it again.
15  A. Okay. Well, my answer is going to be the
16  same restated a different way. Either one of those
17  blastocysts could have implanted --
18  Q. All right.
19  MR. HAMAD: I don't think the Doctor is
20  done. You cut him off.
21  A. But based on the stage of development,
22  given that Embryo 8 was a full blastocyst and Embryo
23  7 was an early blastocyst -- it had been a morula at
24  ten o'clock that morning -- the medical probability

---

**Page 120**

1  is that Embryo 8 was more likely to implant than
2  Embryo 7.
3  Q. And that's based on what medical theory or
4  science or whatever?
5  A. Based on the developmental stage of the
6  blastocyst. There are blastocysts and there are
7  blastocysts and there are blastocysts. And there
8  are early blastocysts and there are full blastocysts
9  and there are expanded blastocysts.
10  Q. Is there any statistical reporting -- is
11  this your opinion, or is this something that is
12  discussed in the literature?
13  MR. HAMAD: Objection to the form.
14  A. It is something that has been studied, yes,
15  when people do single embryo transfers and look at
16  the statistical odds of implantation of blastocysts
17  based on the various stages of the embryo
18  development.
19  Q. You said that one of the probable causes --
20  or possible causes of this missed diagnosis was
21  mosaicism; is that correct?
22  A. That is one of the possible explanations,
23  yes.
24  Q. Now, can you tell me why you say that

---

Doris O. Wong Associates, Inc.
www.doriswong.com   (617) 426-2432

Min-U-Script®

# EXHIBIT K

# JOHNS HOPKINS
## U N I V E R S I T Y

**Institute of Genetic Medicine**
733 N. Broadway
BRB Suite 551/Room 559
Baltimore, MD 21205
PHONE: 410-955-1773/FAX: 410-614-0213
EMAIL: gcutting@jhmi.edu

*0 2981-101*
*6-L*

Garry R. Cutting, MD
Professor, Pediatrics and Medicine
Aetna/U.S. Healthcare Professor of Medical Genetics

September 29, 2009

Mr. Lewis Stein
Nusbaum, Stein, Goldstein, Bronstein & Kron
Counsellors at Law
20 Commerce Boulevard
Succasunna, NJ 07876

RE: Grossbaum vs Genesis Genetics et al

Dear Mr. Stein,

You have asked me to provide an opinion in the above referenced case. I have reviewed records that were provided by Genesis Genetics and New York University School of Medicine, as well as depositions of Dr. Mark Hughes, Dr. Licciardi and Alexis Adler, and publications regarding multiplex marker analysis provided by Dr. Rechitsky. As I understand, the Grossbaums underwent preimplantation genetic diagnosis in which egg retrieval, *in vitro* fertilization, and embryo biopsy performed at NYU IVF Clinic. Genetic diagnosis for cystic fibrosis was performed by Genesis Genetics on samples provided by NYU. The child that was born to the Grossbaums as a result of this procedure was found to be affected with cystic fibrosis.

I have formed the opinion that there are two areas where Genesis Genetics and the NYU IVF Clinic failed to offer a reasonable level of care. The first is in the counseling of the Grossbaums regarding alternatives for embryo transfer after it was discovered that the embryos recommended for transfer by Genesis Genetics were not suitable for transfer. Allele dropout (aka ADO) is a well established source of error in preimplantation genetic diagnosis. From the deposition of Dr. Licciardi, it was apparent that he was not aware of this potential cause for error. Dr. Licciardi indicated during his deposition that he did not understand the results of the genetic testing results transmitted by Genesis Genetics. There is also no documentation of what was said during the counseling session between Dr. Licciardi and the Grossbaums regarding the risks of potential sources of error. Thus, Dr. Licciardi failed to adequately appraise the Grossbaums of the potential risks of using alternative embryos for transfer.



The second area of concern relates to the diagnostics performed by Genesis Genetics. The use of additional markers encompassing a gene such as CFTR has been shown to reduce errors due to allele dropout. Numerous manuscripts had been published and abstracts presented at national and international meetings before the date of the Grossbaums' procedure indicating the value of including genetic markers to minimize errors due to ADO. Genesis Genetics is a high profile provider of PGD services and has by their report, performed many cases of PGD for cystic fibrosis. Thus, it is reasonable to expect that Genesis Genetics would have offered multiplex DNA markers to minimize the risk of error due to ADO in the Grossbaum case. If the laboratory was unable to offer this service, then the Grossbaums should have been informed so that they would have the option to select other services that offered PGD using multiplex markers.

Please contact me should you have any further questions regarding this case.

Sincerely,

Garry R. Cutting, MD
Professor, Pediatrics and Medicine
Director, Post-Doctoral Training Program
Director, DNA Diagnostic Laboratory