# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CHAYA GROSSBAUM and
MENACHEM GROSSBAUM, her
spouse, individually and as
*guardians ad litem* of the infant
ROSIE GROSSBAUM,

|  |
|---|

CIVIL ACTION NO.
07-CV-1359 (GEB)(ES)

Oral Argument Requested

Plaintiffs,

-vs-

GENESIS GENETICS INSTITUTE,
LLC, of the State of Michigan,
MARK R. HUGHES, NEW YORK
UNIVERSITY SCHOOL OF MEDICINE and
NEW YORK UNIVERSITY HOSPITALS
CENTER, both corporations in the
State of New York, ABC CORPS. 1-10,
JOHN DOES 1-10,

Defendants.

---

## GENESIS GENETICS INSTITUTE, LLC AND MARK R. HUGHES'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

Thomas E. Redburn, Jr.
Sarah Blaine
**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, New Jersey  07068
Tel: 973.597.2500
Fax: 973.597.2400

**TROWBRIDGE LAW FIRM, P.C.**
Stephen N. Leuchtman, Of Counsel
1380 East Jefferson Avenue
Detroit, MI 48207
313 259-6900, ext. 126
(*admitted pro hac vice*)

*Attorneys for Defendants Genesis Genetics Institute, LLC and Mark R. Hughes*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................... iii

PRELIMINARY STATEMENT .............................................................. 1

STATEMENT OF FACTS ...................................................................... 3

    I.    PLAINTIFFS USED REPRODUCTIVE TECHNOLOGY TO
          REDUCE THE RISK THAT THEIR CHILD WOULD HAVE
          CYSTIC FIBROSIS ................................................................... 3

    II.   THE IVF/PGD PROCESS ....................................................... 7

LEGAL STANDARD ........................................................................... 10

          ARGUMENT ..................................................................... 11

    I.    PLAINTIFFS' CLAIMS, ALTHOUGH PLED AS
          "NEGLIGENCE" CLAIMS, ARE ACTUALLY CLAIMS FOR
          WRONGFUL BIRTH AND WRONGFUL LIFE. ................................. 11

    II.   MICHIGAN LAW -- WHICH REJECTS BOTH PLAINTIFFS'
          WRONGFUL BIRTH AND WRONGFUL LIFE CAUSES OF
          ACTION -- GOVERNS PLAINTIFFS' CLAIMS AGAINST
          GENESIS. ............................................................................ 13

          A.   This Court Must Apply New Jersey's Governmental-
               Interest Approach To Determine Which State's Law
               Governs Plaintiffs' Claims Against Genesis. ............................... 13

          B.   There Are Actual Conflicts Among Michigan, New York,
               And New Jersey Law Concerning The Viability Of
               Plaintiffs' Wrongful Birth And Wrongful Life Claims. ............... 15

          C.   Michigan Has The Strongest Interest In Applying Its Own
               Law And The Most Significant Relationship To Plaintiffs'
               Claims Against Genesis. ............................................................. 17

D.   Should The Court Find That Michigan Law Is Not
Applicable, New Jersey's Choice Of Law Rules Require It
To Apply New York Law ............................................................ 28

III.   EVEN IF THIS COURT FINDS THAT NEW JERSEY LAW
APPLIES, PLAINTIFFS' WRONGFUL BIRTH CLAIMS ARE
BARRED BY NEW JERSEY'S STATUTE OF LIMITATIONS. .......... 31

IV.   PLAINTIFFS CANNOT PROVE THE CAUSATION ELEMENT
OF THEIR WRONGFUL BIRTH AND WRONGFUL LIFE
CLAIMS ............................................................................................ 32

V.   PLAINTIFFS HAVE FAILED TO ESTABLISH THAT
GENESIS'S CONDUCT DEPARTED IN ANY WAY FROM
THE 2004 STANDARD OF CARE FOR PGD TESTING FOR
CYSTIC FIBROSIS. ........................................................................... 35

A.   Because Genesis's Daubert Motion Should Be Granted,
Plaintiffs Cannot Proffer Sufficient Evidence To Establish
The Early-To-Mid 2004 Standard Of Care ................................. 35

B.   Even If Genesis's Daubert Motion Is Only Granted As To
Dr. Strom, Plaintiffs Cannot Proffer Sufficient Evidence To
Establish That The Risk Of Giving Birth To A Baby
Affected With Cystic Fibrosis Materially Exceeded That
Agreed To By Plaintiffs In The Informed Consent Process ......... 36

C.   Even If Genesis's Daubert Motion Is Denied, The Reliance
Of Plaintiffs' Experts On European Studies And Practices
Is Irrelevant To Establishing That The Genesis Defendants
Departed From The Nationwide Standard Of Care ...................... 37

CONCLUSION ................................................................................. 40

# TABLE OF AUTHORITIES

**Pages**

C<span style="font-variant:small-caps">ASES</span>

*Alquijay v. St. Luke's-Roosevelt Hospital Center*,
   63 N.Y.2d 978 (1984) ...................................................................... 16

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ......................................................................... 11

*Bahr v. Harper-Grace Hosps.*,
   497 N.W.2d 526 (1993), *rev'd in part on other grounds*, 528 N.W.2d 170
   (Mich. 1994) ..................................................................................... 38

*Bani-Esraili v. Lerman ex rel. Wald*,
   69 N.Y.2d 807 (1987) ...................................................................... 16

*Becker v. Schwartz*,
   46 N.Y.2d 401 (1978) ............................................................... passim

*Berman v. Allen*,
   80 N.J. 421 (1979) ............................................................ 13, 17, 22

*Branigan v. DeBrovner*,
   612 N.Y.S.2d 119 (1st Dept. 1994) ........................................... 29, 30

*Canesi v. Wilson*,
   158 N.J. 490 (1999) .................................................... 12, 32, 33

*Carter v. UMDNJ*,
   838 F. Supp. 957 (D.N.J. 1993) ....................................................... 31

*Celotex Corp v. Catrett*,
   477 U.S. 317 (1986) ......................................................................... 10

*Clark v. University Hospital-UMDNJ*,
   390 N.J. Super. 108 (App. Div. 2006) ............................................. 38

*Crymes v. Atl. County Gov't*,
   2006 U.S. Dist. LEXIS 77232 (D.N.J., Oct. 13, 2006) ................... 35

*Curley v. Klem,*
  298 F.3d 271 (3d Cir. 2002) ............................................................ 11

*DeChico v. Northern Westchester Hosp. Ctr.,*
  73 A.D.3d 838 (2d Dept. 2010) ....................................................... 16

*Fu v. Fu,*
  160 N.J. 108 (1999) .................................................................. 14, 23

*Gardner v. Pawliw,*
  150 N.J. 359 (1997) .................................................................. 12, 35

*Jorge v. New York Health & Hospitals Corp.,*
  79 N.Y.2d 905 (1992) ............................................................... 29, 30

*Kreschollek v. Southern Stevedoring Co.,*
  223 F. 3d 202 (3d Cir. 2000) .......................................................... 11

*Lebegern v. Forman,*
  471 F.3d 424 (3d Cir. 2006) .................................................... passim

*Lopez v. Swyer,*
  62 N.J. 267 (1973) ................................................................... 31, 32

*Naccarato v. Grob,*
  384 Mich. 248 (1970) ................................................................... 38

*Orme-Ellis v. Estate of Stubee,*
  No. 10-0543(JBS/AMD), 2010 U.S. Dist. LEXIS 123447 (D.N.J. Nov.
  22, 2010) ..................................................................................... 14

*Procanik v. Cillo,*
  97 N.J. 339 (1984) ................................................................. passim

*Saldana v. Kmart Corp.,*
  260 F.3d 228 (3d Cir. 2001) ............................................... 33, 35, 39

*Sample v. Levada,*
  8 A.D.3d 465 (2d Dept. 2004) ........................................................ 16

*Schroeder v. Perkel,*
  87 N.J. 53 (1981) ..................................................................... 17, 22

*Taylor v. Kurapati*,
600 N.W.2d 670 (1999) .......................................................................... passim

*Yerzy v. Levine*,
57 N.J. 234 (1970) .......................................................................... 31

*Yocham v. Novartis Pharms. Corp.*,
No. 07-1810 (JBS/AMD), 2010 U.S. Dist. LEXIS 90005 (D.N.J. Aug.
31, 2010) .......................................................................... 13


**STATUTES**

MCL § 600.2971 .......................................................................... 15, 17, 18

CPLR 214-a .......................................................................... 29, 30

N.J.S.A. 2A:14-2 .......................................................................... 31, 32


**RULES**

Fed. R. Civ. P. 5.2 .......................................................................... 7

Fed. R. Civ. P. 56 .......................................................................... 3, 10, 11

Fed. R. Evid. 201 .......................................................................... 34


**OTHER AUTHORITIES**

American Heritage Dictionary of the English Language, 3d ed. (1996) ............... 38

*Restatement (Second) of Conflict of Laws* .......................................................................... 25, 28

## PRELIMINARY STATEMENT

This wrongful birth and wrongful life case against defendants Genesis Genetics Institute, LLC and Mark R. Hughes (collectively "Genesis" or the "Genesis Defendants") is fatally flawed and should be dismissed.

First, New Jersey's rules regarding choice of law require that either Michigan law be applied in this case. Genesis, a Michigan laboratory, conducted pre-implantation genetic testing ("PGD") on Plaintiffs' cells at its Michigan facility. The State of Michigan has a paramount interest in regulating the conduct and tort liability of a Michigan laboratory—neither New York nor New Jersey has such an interest. Indeed, this case was filed in New Jersey only because Plaintiffs happened to relocate to New Jersey following the infant plaintiff's birth. Under Michigan law, Plaintiffs' causes of action are not viable because Michigan does not recognize either tort. Alternatively, New York law applies, which still mandates dismissal of Plaintiffs' claims. At the time of the events in question, Plaintiffs lived in New York, where they received in vitro fertilization ("IVF") at the NYU Fertility Clinic. Under New York law, Plaintiffs' wrongful life claim is not viable and Plaintiffs' wrongful birth claim is time barred because suit was filed more than two-and-one-half years after the cause of action accrued.

Second, the sine qua non of "wrongful birth" and "wrongful life" cases in any jurisdiction where they exist, including New Jersey, is that a family presented with the increased risk of having a child with a birth defect be given the opportunity to terminate or avoid the pregnancy, and that the culpable failure of a health care provider to present such an alternative creates legal liability. In this case, the adult plaintiffs resolutely rejected the idea of termination to the point that they refused to have prenatal testing to which they had agreed. Moreover, they had intercourse during the fertility treatment cycle, thus failing to insure that the baby

carried by Chaya Grossbaum actually developed from an implanted embryo. Moreover, even if the Court applies New Jersey law, Plaintiffs' wrongful birth claim is time barred.

Third, as set forth in the contemporaneously-filed <u>Daubert</u> motions, the liability experts retained by the plaintiffs are unqualified; and their opinions, reports and prospective testimony should be struck. Without liability experts, the plaintiffs cannot proceed in this medically and scientifically complex case. Indeed, even assuming *arguendo* that Plaintiffs' liability theory against Genesis is valid, Plaintiffs' own experts disagree over whether the additional risk created by Genesis's purported negligence exceeded the level of risk Plaintiffs had accepted during the informed consent process.

Fourth, Plaintiffs have failed to prove that Genesis failed to comply with the relevant standard of care governing its conduct at the time of Plaintiffs' July 2004 IVF cycle. In fact, the prevailing standard of care required single-cell testing, which is what Genesis was doing. The Grossbaums' experts are admittedly unfamiliar with what the average PGD lab in the United States was doing by way of testing for birth defects, and, consequently, their opinions as a matter of law are insufficient to carry Plaintiffs' burden of proving that the applicable standard of care required Genesis to perform something other than single-cell testing. Moreover, Plaintiffs' reliance on testing protocols reported by some European laboratories to fault Genesis's single-cell methodology is unavailing because (1) international practices do not govern the U.S. standard of care for PGD laboratory services, and (2) Plaintiffs have proffered no evidence that the average European PGD laboratory utilized a testing methodology different from Genesis's.

For all of these reasons, as set forth in greater detail below, this Motion for Summary Judgment should be granted and Plaintiffs' claim against Genesis dismissed.[1]

## STATEMENT OF FACTS

### A.      Plaintiffs' Interactions with Genesis and NYU

Due to a community screening program, before they decided to get engaged, Plaintiffs Chaya and Menachem Grossbaum learned that they were both carriers of recessive genetic mutations that cause cystic fibrosis ("CF"). (SUF ¶ 1.)[2] Where both parents are carriers of CF mutations, there is a 25% chance that any child they conceive together will have CF. (SUF ¶ 2.)  Upon learning of their carrier status, the Grossbaums consulted a number of rabbis for advice on (1) whether to get married, and, if they did choose to get married, (2) what reproductive options were available to them under Jewish law.   (SUF ¶ 3.)   Because of their religious convictions, Chaya and Menachem Grossbaum are both opposed to abortion, and their deposition testimony reflects that, in accordance with their understanding of Jewish law, they would not opt to abort if they learned that Chaya Grossbaum was carrying a child with CF.  (SUF ¶ 4.)  They reached this conclusion based on advice they received from Rabbi Tendler, a leading authority in applying Jewish religious law to reproductive issues.  (*Id.*)  Rabbi Tendler confirmed that Jewish law would not condone a decision to abort a fetus that had CF, but suggested that

---

[1]   Because NYU's cross-claim against Genesis for contribution is dependent on a finding that Genesis could be held legally liable for its alleged negligence vis-à-vis Plaintiffs, should the Court find that Plaintiffs' claims against Genesis are legally insufficient or barred, any claim by NYU for contribution necessarily fails as well, and should also be dismissed.

[2]   References to "SUF ¶ __" are to Genesis's Statement Of Undisputed Material Facts Pursuant To Rule 56.1 submitted in support of Genesis's motion.

Plaintiffs could get married and then reduce their risk of becoming the parents of a child with CF by undergoing IVF and PGD to build their family. (SUF ¶ 5.)

The Grossbaums got married on August 22, 2002. (SUF ¶ 6.) From the date of their wedding until after the birth of the infant plaintiff, Rosie Grossbaum, the Grossbaums lived in Brooklyn, New York. (SUF ¶ 7.) Because of their status as CF carriers, in late 2003 or early 2004, when the Grossbaums decided they were ready to start a family, they sought out the Program for IVF, Reproductive Surgery and Infertility at New York University School of Medicine (together with co-defendant New York University Hospitals Center, hereinafter "NYU" or the "NYU Defendants"). (SUF ¶ 8.) NYU is located on First Avenue in New York, New York. (SUF ¶ 9.) Plaintiffs agreed to undergo IVF treatment at NYU, and then to have cells from the embryos they created through IVF biopsied and sent to Genesis for genetic analysis intended to determine which embryos were affected with CF. (SUF ¶ 10.)

Genesis Genetics Institute, LLC is a Michigan limited liability corporation with its sole place of business in Detroit, MI. (SUF ¶ 11.) Mark R. Hughes, its founder and director, has been a Michigan resident since 1998, and has been employed by Genesis at its sole place of business in Detroit, Michigan since he founded it in 2003. (*Id.*) Genesis specializes in testing embryos of couples who are carriers for genetic diseases in an effort to help those couples reduce their risk of having children affected with those diseases. (*Id.*)

The Grossbaums, upon NYU's referral, called Genesis's Michigan laboratory on March 25, 2004 for an approximately one-hour phone conversation with Hughes to review the PGD procedure as part of the informed consent process. (SUF ¶ 12.) Following the March 25, 2004 discussion, the Grossbaums executed Genesis's informed consent document, which was sent to Genesis for its files.

(SUF ¶ 13.)  Pursuant to NYU's instructions, the Grossbaums sent their payment for the PGD testing directly to Genesis at its Michigan facility.  (SUF ¶ 14.)

In late June and July of 2004, the Grossbaums underwent IVF with NYU, and PGD with Genesis.  (SUF ¶ 15.)  Chaya Grossbaum took the fertility medications required as part of the IVF process, which increased the number of mature eggs her body produced that month.  (SUF ¶ 16.)  Despite Chaya Grossbaum's significantly increased fertility, the Grossbaums chose not to abstain from intercourse during the fertility treatment cycle, even though abstaining, of course, was the only 100% reliable method of assuring that any ensuing pregnancy would develop from an embryo tested by Genesis.  (SUF ¶ 17.)  Instead, during their IVF cycle the Grossbaums used an over-the-counter spermicide without a second form of protection, such as a condom, in an attempt to prevent a non-IVF pregnancy.  (SUF ¶ 18.)  Spermicide, used alone, of course, is a notoriously ineffective contraception method, even where the woman is not also on fertility medications.  (SUF ¶ 19.)  Menachem Grossbaum's IVF Semen Collection Record reflects that the Grossbaums had intercourse on at least July 12, 2004 and July 14, 2004.  (SUF ¶ 17.)  The July 12, 2004 intercourse was, according to Chaya Grossbaum's testimony, with spermicide, used alone, and the IVF Semen Collection Record reflects that the July 14, 2004 intercourse was with a condom that did not contain spermicide, as this condom was used to collect the sperm to be used to fertilize Chaya Grossbaum's retrieved eggs.  (SUF ¶ 20.)  Condoms, especially used without spermicide, have a significant failure rate, which is not always observable to the naked eye.  (*Id.*)

Later on July 14, 2004, an NYU physician retrieved 33 eggs from Chaya Grossbaum's ovaries as part of the IVF process.  (SUF ¶ 21.)  That same day, ten of Chaya Grossbaum's retrieved eggs were successfully fertilized with Menachem Grossbaum's sperm at NYU's facility.  (*Id.*)  On July 17, 2004, an NYU

embryologist, as requested by the Grossbaums, biopsied their embryos and sent one cell from each embryo to Genesis's Michigan laboratory for analysis. (SUF ¶ 22.) Genesis tested the cells at its Michigan laboratory. (*Id.*) On July 19, 2004, Genesis faxed to NYU a document addressing the potential transfer of several embryos. (SUF ¶ 23.) In this document, Genesis stated "OK for transfer" as to two (2) of the embryos, designated as nos. 8 and 10. (*Id.*) The embryos themselves remained physically located at the NYU Fertility Clinic throughout the IVF process. (*Id.*) On July 19, 2004, only NYU personnel, and through them the Grossbaums, had knowledge of the quality of the embryos. (*Id.*)

The determination as to the suitability of embryos for in vitro fertilization based upon the results from Genesis was made by NYU reproductive endocrinologist Dr. Frederick Licciardi and NYU embryologist Alexis Adler. (SUF ¶ 24.) Without consulting anyone at Genesis, Licciardi and Adler decided to replace embryo no. 10 with embryo no. 7. (*Id.*) The Grossbaums concurred in this decision. (*Id.*) That same day, July 19, 2004, embryos no. 7 and 8 were implanted in Chaya Grossbaum. (SUF ¶ 25.) Genesis did not learn that NYU had substituted embryo 7 for embryo 10 prior to the embryo transfer. (*Id.*) In fact, following its July 19, 2004 report of its results, Genesis had no further involvement with Chaya Grossbaum's IVF cycle or subsequent pregnancy. (*Id.*)

Genesis has always required that a couple undergoing PGD with it agree that if a pregnancy ensues from IVF, the mother will undergo prenatal testing in the form of chorionic villus sampling ("CVS") or amniocentesis ("amnio"). (SUF ¶ 26.) CVS is performed in the 11th or 12th week of pregnancy, and amnio is performed between the 14th and 16th weeks of pregnancy -- here, then, this testing should have been completed by October 25, 2004. (*Id.*) The Grossbaums gave signed agreements that they would undergo amnio or CVS to both the Genesis defendants and NYU. (SUF ¶ 27.) Despite their written agreements to undergo

-6-

CVS or amnio, however, it was never the intent of the Grossbaums to follow through on this promise; and, in fact, Chaya Grossbaum never underwent either amnio or CVS.  (*Id.*)  Both Menachem and Chaya Grossbaum testified that they saw no point in having the agreed-upon testing since they were certain that if the results indicated that the child had CF, they would not have aborted it, and that they would rather remain ignorant of the fetus's CF status during the pregnancy than find it out sooner and spend the rest of the pregnancy anxious about the prospect of parenting a child with CF.[3]  (*Id.*)

On March 25, 2005, Chaya and Menachem Grossbaum, who remained New York residents, became the parents of Rosie Grossbaum.[4]  (SUF ¶ 28.)  Rosie Grossbaum was born in Denville, New Jersey.  (*Id.*)  About two weeks after her birth, Rosie Grossbaum was diagnosed with CF.  (*Id.*)  At some point after Rosie Grossbaum's birth -- but prior to Plaintiffs' March 23, 2007 filing of this lawsuit -- Plaintiffs moved to New Jersey.  (SUF ¶ 29.)

### B.        The IVF/PGD Process

IVF is a process in which the mother takes fertility medications to encourage her ovaries to produce multiple mature eggs at once.  (SUF ¶ 30.)  These eggs are

---

[3]  Whether the Grossbaums communicated their refusal to undergo CVS or amnio to Hughes or NYU is one of the most hotly contested fact disputes in this litigation.  For summary judgment, however, resolution of this issue is unnecessary -- the Court need only accept the uncontested fact that the Grossbaums chose not to have CVS or amnio testing during the pregnancy.

[4]  Although Fed. R. Civ. P. 5.2 normally requires litigants to redact the names of minor children and birth dates of all litigants, here, where the minor child's full name appears in the caption and Complaint, and the minor child's birth date is not only pled in the Complaint at ¶ 8, but is also potentially relevant to this Court's statute of limitations analysis, Plaintiffs' counsel has agreed to waive Fed. R. Civ. P. 5.2's redaction provisions as to these facts.  Other than these consented-to exceptions, we have redacted in accordance with Fed. R. Civ. P. 5.2.

then harvested from the mother.  (*Id.*)  Each egg is then fertilized with sperm from the father to create an embryo.  (*Id.*)  In typical IVF, one or two of the embryos are implanted into the mother on the fifth day of their existence, the selection of the embryos being dependent upon the extent of their cellular development.  (*Id.*)  IVF is typically utilized to overcome fertility problems.  (*Id.*)  If, however, a couple is seeking to avoid a congenital problem, PGD is superimposed upon the IVF process.  (*Id.*)

Preimplantation genetic diagnosis, as its name implies, involves the diagnosis before implantation of embryos to determine whether the embryo is affected with the disease or condition sought to be prevented, whether it is a carrier of the condition, or whether it is unaffected.  (SUF ¶ 31.)  One cell is biopsied from each of the embryos created in the IVF lab, and those individual cells -- one from each embryo -- are then sent to the PGD lab for analysis.  (*Id.*)  After the cells are analyzed, their condition is reported to the IVF clinic.  (*Id.*)  The IVF clinic and the involved would-be parents then collaboratively make the decision as to which embryos, if any, will be implanted.  (*Id.*)  This decision takes into account both the analysis of the biopsied cells and the quality of the embryos.  (*Id.*)

In early-to-mid 2004, when the events occurred that are the subject of this case, there were approximately eight laboratories in the United States that were doing PGD.  (SUF ¶ 32.)  Only a few of these laboratories, however, were performing PGD analyses in any significant volume.  (*Id.*)  PGD was then, and is now, a highly sophisticated, rapidly evolving technology.  (*Id.*)  There are thousands of genetic mutations; and it is necessary to devise a separate PGD test for each such mutation, often in an extremely short period of time.  (*Id.*)

There were two primary ways in which labs in the United States did PGD in early-to-mid 2004.  (SUF ¶ 33.)  All but one lab, including Genesis, routinely performed PGD with single cell testing.  (*Id.*)  One laboratory, Reproduction

Genetics Institute ("RGI"), performed multiplex (or genetic marker) testing.  (*Id.*) Multiplex testing was in its infancy in the United States at that time.  (*Id.*)  It involves obtaining one embryonic cell after IVF, and then comparing the cell with cells taken from other family members of the involved couple.  (*Id.*)  Various other laboratories, including Genesis, were trying to develop this technology in America; but as of July 2004, the success rate they achieved in trial runs was not sufficiently high for the technique to be used on a regular basis.  (*Id.*)

Dr. Kangpu Xu ("Xu"), the retained liability expert for the Genesis defendants, was actively involved in the PGD laboratory at Weill Cornell School of Medicine in New York City at the time the incidents that form the subject matter of this lawsuit took place.  (SUF ¶ 34.)  Dr. Xu opined that using linkage markers (another term for multiplex testing) was not the standard of care in 2004.  (*Id.*) Indeed, he explained that during the relevant time period, those linkage markers were not necessarily used, even where the risk of misdiagnosis was significantly higher than that faced by the Grossbaums:

> **Finding informative linkage markers is not trivial task or an overnight procedure.  Building whole sets of linkage markers for each disorder/mutation is a continuing process.**  In 2004, not all the laboratories were using linkage markers and not for every single mutation; in other words, multiplex PCR was not the standard in 2004. During a period from 2001 to 2005, we successfully performed PGD for RB, an autosome disorder with 50% risk without using markers.  The reason was not that we were ignorant, but with the limitation that we had because we could not find markers that were informative for the couple. Three healthy singletons were born from 4 different IVF-PGD attempts.  **I believe tests conducted by Dr. Hughes were proper, appropriate and within the standard of practice existing at the time for this couple.**

(*Id.*)

The failure rate of single cell PGD was less than five percent (5%) in early-to-mid 2004, although Genesis enjoyed a far smaller failure rate, in the area of two percent (2%) or less.  (SUF ¶ 35.)  The main problem with single cell testing was that it was difficult to predict allele drop out ("ADO"), a known complication in PGD.  (*Id.*)  During their telephone conversation with Dr. Hughes, the five percent rate was quoted to the Grossbaums, and they were otherwise fully informed as to the nature and risks of PGD.  (*Id.*)

The plaintiffs' liability experts, Dr. Charles Strom ("Strom") and Dr. Garry Cutting ("Cutting"), have both testified that the standard of care required that defendants Hughes and Genesis perform genetic marker, or multiplex, testing in the PGD done for the Grossbaums, and that their failure to do so was the likely proximate cause of the infant plaintiff being born with cystic fibrosis.  (SUF ¶ 36.)

At the time in question, only RGI was regularly doing multiplex testing for cystic fibrosis in the United States.  (SUF ¶ 37.)  Literature in Europe suggested that this technique was promising, but the average reasonably prudent PGD lab in America was not performing such testing.  (*Id.*)  At his deposition, Hughes explained that the fact that a few papers had been published touting the advantages of multiplex testing did not instantly establish such testing as the new standard for mainstream clinical practice in the United States, given that such results needed to be validated.  (*Id.*)  Indeed, with the exception of RGI, Plaintiffs have not offered any evidence of what the standard practice was at the other U.S. PGD laboratories. (*Id.*)

## **LEGAL STANDARD**

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp v. Catrett,* 477 U.S. 317, 322

(1986); *Kreschollek v. Southern Stevedoring Co.,* 223 F. 3d 202, 204 (3d Cir. 2000).   In deciding whether summary judgment should be granted, the Court considers "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" Fed. R. Civ. P. 56 (c), and construes all facts and inferences in the light most favorable to the nonmoving party. *Curley v. Klem,* 298 F.3d 271, 276-77 (3d Cir. 2002).  The Court's function "at the summary judgment stage . . . is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).   To successfully defend against a motion for summary judgment, a plaintiff cannot merely rely on the unsupported allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor. Id. at 252.  "If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted [to the moving party]."  Id. at 252 (citations omitted).

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS, ALTHOUGH PLED AS "NEGLIGENCE" CLAIMS, ARE ACTUALLY CLAIMS FOR WRONGFUL BIRTH AND WRONGFUL LIFE.

Plaintiffs' complaint purports to plead their case as straightforward "negligence" claims against Genesis and NYU, but even a cursory reading of Plaintiffs' complaint reveals that Plaintiffs have not stated a valid negligence cause of action.  (Ex. 22 (Complaint) at  Count Two.)[5]  To succeed on a negligence claim, Plaintiffs need to prove actual causation: that is, that something that Genesis did or failed to do was a proximate cause of Rosie Grossbaum's CF.  *See, e.g.,*

---

[5]   References to "Ex. __" are to the Exhibits to the Declaration Of Sarah Blaine, Esq. In Support Of Genesis Genetics Institute, LLC And Mark R. Hughes's (1) Motion For Summary Judgment And (2) Motion To Strike Plaintiffs' Liability Experts, submitted herewith.

*Gardner v. Pawliw*, 150 N.J. 359 (1997) ("To establish a *prima facie* case of negligence in a medical-malpractice action, a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury.").  Here, Plaintiffs cannot allege that Genesis's actions caused the infant plaintiff, who would otherwise be healthy, to develop CF; Rosie Grossbaum's condition is solely the result of the genes she inherited from her parents.  Genesis's role was only to determine whether the Grossbaums' embryos -- including, allegedly, the one that developed to become Rosie Grossbaum -- had this disorder, not to treat the disorder or modify the embryos' genetic makeup.  (SUF ¶ 31.)  Because Plaintiffs cannot prove that Genesis's actions caused Rosie Grossbaum's CF, they have no claim for medical malpractice against Genesis.  (*Id.*)

Similarly, to the extent that Plaintiffs are attempting to formulate this case as an "informed consent" medical malpractice case, that approach is also unworkable. In *Canesi v. Wilson*, the New Jersey Supreme Court expressly drew a distinction between informed consent cases, which require Plaintiffs to prove "medical causation" from wrongful birth cases, which do not require such proof.  158 N.J. 490, 506 (1999).  Again, because Plaintiffs cannot allege -- much less prove -- that Genesis's allegedly negligent testing was the medical "cause" of Rosie Grossbaum's CF, an informed consent claim will necessarily fail as a matter of law.

Instead, Plaintiffs' claims, properly construed, are wrongful birth and wrongful life claims.  Chaya and Menachem Grossbaums allege that Genesis failed to accurately diagnose one or both of the embryos transferred to Chaya Grossbaum as affected by CF.  (Ex. 22 at Count Two.)  Had the Grossbaums been accurately informed as to the CF status of the affected embryo(s), the argument goes, they would not have agreed to transfer and implant the affected embryo(s) and therefore

-- they claim -- Rosie Grossbaum would never have been born and they would not have become the parents of a child with CF.[6]  (*Id.*)  That is a classic wrongful birth claim.  *Berman v. Allen*, 80 N.J. 421 (1979).  Similarly, the infant plaintiff, Rosie Grossbaum, claims that she is entitled to damages from Genesis because Genesis's allegedly negligent conduct in performing the CF test is the reason that she -- a person with CF -- was born at all.  (*Id.*)  That is, Rosie Grossbaum argues that she is entitled to damages because her parents never would have implanted the embryo that allegedly developed to become her if that embryo had been properly diagnosed as affected with CF.  (*Id.*)  That is a classic wrongful life claim.  *Procanik v. Cillo*, 97 N.J. 339 (1984).

## II.   MICHIGAN LAW -- WHICH REJECTS BOTH PLAINTIFFS' WRONGFUL BIRTH AND WRONGFUL LIFE CAUSES OF ACTION -- GOVERNS PLAINTIFFS' CLAIMS AGAINST GENESIS.

### A.   This Court Must Apply New Jersey's Governmental-Interest Approach To Determine Which State's Law Governs Plaintiffs' Claims Against Genesis.

Three states -- Michigan, New York, and New Jersey -- are potentially interested in the outcome of this litigation, and therefore the Court must first undertake a choice of law analysis to determine which state's law governs.  "In a diversity case filed in New Jersey, New Jersey choice of law rules govern."  *Yocham v. Novartis Pharms. Corp.*, No. 07-1810 (JBS/AMD), 2010 U.S. Dist. LEXIS 90005 at *8 (D.N.J. Aug. 31, 2010) (citing *Lebegern v. Forman*, 471 F.3d

---

[6]   As set forth in Part IV, *infra*, even if New York or New Jersey law applies to the claims against Genesis, Plaintiffs cannot defeat this summary judgment motion as they have failed to offer evidence supporting their claim that Rosie Grossbaum developed from an embryo tested by Genesis rather than as a result of the intercourse the Grossbaums had while Chaya Grossbaum was taking fertility medications.

424, 428 (3d Cir. 2006)).  New Jersey applies the Restatement (Second) of Conflict of Laws' "flexible governmental-interest approach" to choice of law questions. *Lebegern*, 471 F.3d at 428.  This test essentially has two prongs: first, the Court must analyze whether there is a true conflict between the laws of the states, and second, if a conflict exists, "the court must assess the interests each state has in applying its own law and determine which state has the most significant relationship to the parties and the event."  *Orme-Ellis v. Estate of Stubee*, No. 10-0543(JBS/AMD), 2010 U.S. Dist. LEXIS 123447 at *5 (D.N.J. Nov. 22, 2010).

In *Lebegern*, 471 F.3d at 428, the Third Circuit listed New Jersey's five broad factors for applying the governmental interest test.  They are: (1) interstate comity, (2) the interests of the parties, (3) the interests underlying the substantive body of law, (4) the interests of judicial administration, and (5) the competing interests of the states.  *Id.*  428-429.  Beyond these broad factors, in *Fu v. Fu*, 160 N.J. 108, 125 (1999), the New Jersey Supreme Court held that four specific factors articulated in *Section 145(2)* of the *Restatement* are most germane to application of the governmental-interest test in cases based on alleged torts.  They are:  (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered.  *Id.*

The *Lebegern* court expressly held that a New Jersey choice of law analysis must be conducted on an issue-by-issue basis, because different issues may implicate different fact and policy considerations.  *Lebegern*, 471 F.3d at 428. Indeed, one state's law may apply to certain parties or claims in the litigation, and another state's law may apply to other parties or claims.  *Id.*  Here, although we take no position on what law applies to the claims against NYU, New Jersey's

-14-

choice of law rules require this Court to apply Michigan law to the claims against Genesis.

**B.       There Are Actual Conflicts Among Michigan, New York, And New Jersey Law Concerning The Viability Of Plaintiffs' Wrongful Birth And Wrongful Life Claims.**

There is no question that the laws of Michigan, New York, and New Jersey actually conflict concerning whether litigants may recover (and if so, what categories of damages are recoverable) for their wrongful birth and wrongful life claims.  Michigan, in both case law and through the legislative process, affirmatively rejects such claims as inimical to its public policy.  Specifically, in 2000, the Michigan legislature passed MCL § 600.2971, which was enacted to codify a prior appellate court decision, *Taylor v. Kurapati*, 600 N.W.2d 670 (1999), which rejected wrongful birth as a viable cause of action in Michigan. MCL § 600.2971 expands the holding in *Taylor* to expressly forbid plaintiffs from bringing wrongful birth, wrongful life, wrongful pregnancy, or wrongful conception claims.

In *Taylor,* the court undertook a comprehensive analysis of the wrongful birth tort, and ultimately rejected prior Michigan case law allowing such suits to go forward on the grounds that included, *inter alia*, a passionate rejection of eugenics as well as the very idea of imposing tort liability on medical services providers who fail to notify parents of conditions that might justify eugenic abortions.  The *Taylor* court wrote that wrongful birth claims should not be allowed under any circumstances, because to do so might allow the wrongful birth tort to be improperly "extended to physicians who neglect or misinterpret genetic evidence and thereby fail to extend the option of a eugenic abortion to the unsuspecting parents of a genetically 'unfit' and 'defective' child."  *Id.* at 354.

In contrast, in 1978 the New York Court of Appeals rejected the wrongful life cause of action but recognized the validity of the wrongful birth cause of action. *Becker v. Schwartz*, 46 N.Y.2d 401, 412-415 (1978). Specifically, the Court of Appeals held that the parents could recover the pecuniary expenses they incurred for the care and treatment of their disabled infants. *Id.* at 414. The *Becker* court, however, expressly rejected the parents' claims for emotional distress relating to the birth of their children "in an impaired state," explaining that "calculation of damages for plaintiffs' emotional injuries remains too speculative to permit recovery notwithstanding the breach of a duty flowing from defendants to themselves." *Id.* The *Becker* decision remains good law in New York. *See, e.g.*, *Alquijay v. St. Luke's-Roosevelt Hospital Center*, 63 N.Y.2d 978 (1984) (rejecting plaintiff infant's wrongful life cause of action but noting in dicta that if plaintiffs' parents had timely filed, they could have recovered on a wrongful birth claim); *Bani-Esraili v. Lerman ex rel. Wald*, 69 N.Y.2d 807 (1987) (holding that parents' recovery on wrongful birth claim could not include parents' "postmajority extraordinary expenses" for the child's care); *DeChico v. Northern Westchester Hosp. Ctr.*, 73 A.D.3d 838, 840 (2d Dept. 2010) ("Although a child may not maintain a wrongful life cause of action, a parent may, under some circumstances, maintain a cause of action on his or her own behalf for the extraordinary costs incurred in raising a child with a disability."); *Sample v. Levada*, 8 A.D.3d 465 (2d Dept. 2004). Thus, there is no conflict between New York and Michigan law concerning the wrongful life cause of action (it is barred in both states); but New York, unlike Michigan, does allow the parents limited recovery under a wrongful birth cause of action (*i.e.*, extraordinary expenses of raising the child to majority are recoverable, but emotional distress damages relating to learning that their child was born disabled and extraordinary expenses incurred following the child's 18th birthday are not).

-16-

New Jersey law is in conflict with the laws of both Michigan and New York. New Jersey courts recognize both the wrongful life and wrongful birth causes of action. *See Berman v. Allen*, 80 N.J. 421 (1979) (allowing parents to recover emotional distress damages on wrongful birth claim); *Schroeder v. Perkel*, 87 N.J. 53 (1981) (allowing parents to recover extraordinary medical expenses in a wrongful birth case); *Procanik v. Cillo*, 97 N.J. 339 (1984) (allowing wrongful life claim to go forward to extent it sought recovery of extraordinary medical expenses relating to disability). Therefore, New Jersey law, which recognizes both the wrongful life and wrongful birth causes of action, is in direct conflict with Michigan law, which does not. Furthermore, New Jersey law is also in direct conflict with New York law because New Jersey (1) recognizes a wrongful life cause of action, where New York does not and (2) allows plaintiffs in a wrongful birth cause of action to recover emotional distress damages, which New York does not. Thus, there is no question that this Court must complete a choice-of-law analysis to determine which state's laws will govern Plaintiffs' claims.

### C. Michigan Has The Strongest Interest In Applying Its Own Law And The Most Significant Relationship To Plaintiffs' Claims Against Genesis.

Michigan has the strongest interest in applying its own law to the claims against Genesis, as well as the most significant relationship to the parties and the events vis-à-vis Genesis. Michigan has a strong and clearly articulated policy prohibiting recovery to plaintiffs in wrongful birth and wrongful life causes of action. Indeed, as discussed above, the Michigan legislature affirmatively rejected wrongful birth and wrongful life claims when it enacted MCL § 600.2971, which codified the *Taylor* decision. Sections (1) and (2) of MCL § 600.2971 provide, in relevant part:

-17-

(1) A person shall not bring a civil action on a wrongful birth claim that, but for an act or omission of the defendant, a child or children would not or should not have been born.

(2) A person shall not bring a civil action for damages on a wrongful life claim that, but for the negligent act or omission of the defendant, the person bringing the action would not or should not have been born.

Furthermore, MCL § 600.2971(4) expressly notes that "The prohibition . . . applies regardless of whether the child is born healthy or with a birth defect or other adverse medical condition." The December 5, 2000 House Legislative Analysis of the bill that became MCL § 600.2971 explains that the bill "would codify a recent Michigan appeals court decision (*Taylor v. Kurpati*, [sic] 236 Mich App 315 [1999])" and states a number of arguments for and against the proposed bill, including the problems inherent in allowing parents to sue for "failure to accurately predict something about the child-to-be." (Ex. 30.) Michigan's legislative enshrinement of the holding in *Taylor* illustrates Michigan's strong public policy interest in prohibiting wrongful birth and wrongful life claims.

In *Taylor*, the Michigan Court of Appeals explicitly rejected prior case law affirming wrongful birth as a viable cause of action. 600 N.W.2d 670 (Mich. Ct. App. 1999.) The *Taylor* court predicated its opinion on two grounds. First, because Michigan courts had previously held that the benefit of raising a healthy child always outweighed the cost of raising that child, it found that a wrongful birth cause of action, which requires a court to find that the cost of raising a disabled child potentially outweighs the benefit of raising that child, was inherently discriminatory against the disabled by valuing their lives less than those of healthy children. Second, it held that making a wrongful birth cause of action available to litigants promotes eugenics:

> The very phrase 'wrongful birth' suggests that the birth of a disabled child was wrong and should have been prevented. If one accepts the premise that the birth of one 'defective' child should have been prevented, then it is but a short step to accepting the premise that the birth of classes of 'defective' children should be similarly prevented, not just for the benefit of the parents but also for the benefit of society as a whole through the protection of the 'public welfare.' This is the operating principle of eugenics.

*Id.* at 688. The Court argued that Michigan had a duty to reject any return to pre-World War II advocacy of eugenics principles and posited that the mapping of the human genome coupled with a cause of action that allowed parents to bring suit based on the birth of a child affected with a genetic disorder was modern advocacy of eugenics:

> To our ears, at the close of the twentieth century, this talk of the "unfit" and of "defectives" has a decidedly jarring ring; we are, after all, above such lethal nonsense. But are we? We know now that we all have at least five recessive genes but, according to Bowman, when scientists map the human genome, they will unveil many more potentially harmful genes in each of us. Bowman states that "psychoses, hypertension, diabetes, early- and late-appearing cancers, degenerative disorders, susceptibility genes for communicable diseases, genes for various mental deficiencies, aging genes, and other variations and disorders will be ascertained." Will we then see the tort of wrongful birth extended to physicians who neglect or misinterpret genetic evidence and thereby fail to extend the option of a eugenic abortion to the unsuspecting parents of a genetically "unfit" and "defective" child? Our current acceptance of the wrongful birth tort would require the answer to this question in Michigan to be: yes.

*Id.* at 690.

Michigan's governmental interest is in discouraging eugenic practices by,

*inter alia*, prohibiting suits against providers of pre-natal genetic testing.  Michigan has expressly held that it has an interest in protecting "physicians who neglect or misinterpret genetic evidence" and that these providers should be shielded from legal action by "parents of a genetically 'unfit' and 'defective' child."  *Id.*  Here, Genesis and its director, Dr. Hughes, are accused of precisely the conduct that Michigan courts -- and the Michigan legislature -- have said should not (as a matter of public policy) give rise to liability.

In contrast, the New York Court of Appeals recognized the problematic nature of the wrongful life and wrongful birth torts, and noted that reasonable minds may differ on whether these should be viable causes of action:

> Even as a pure question of law, unencumbered by unresolved issues of fact, the weighing of the validity of a cause of action seeking compensation for the wrongful causation of life itself casts an almost Orwellian shadow, premised as it is upon concepts of genetic predictability once foreign to the evolutionary process.  It borders on the absurdly obvious to observe that resolution of this question transcends the mechanical application of legal principles.  Any such resolution, whatever it may be, must invariably be colored by notions of public policy, the validity of which remains, as always, a matter upon which reasonable men may disagree.

*Becker*, 46 N.Y.2d at 408.

The New York Court of Appeals continued this analysis to definitively reject a "wrongful life" cause of action because the infant plaintiffs had not "suffered any legally cognizable injury" even assuming that the physician's duty ran to the unborn child as well as its parents.  As the Court explained:

> There is no precedent for recognition at the Appellate Division of the fundamental right of a child to be born as a whole, functional human being. . . .  Whether it is better never to have been born at all than to have been born with

> even gross deficiencies is a mystery more properly to be left
> to the philosophers and the theologians. Surely the law can
> assert no competence to resolve the issue, particularly in
> view of the very nearly uniform high value which the law
> and mankind has placed on human life, rather than its
> absence. Not only is there to be found no predicate at
> common law or in statutory enactment for judicial
> recognition of the birth of a defective child as an injury to
> the child; the implications of any such proposition are
> staggering. Would claims be honored, assuming the breach
> of an identifiable duty, for less than a perfect birth? And by
> what standard or by whom would perfection be defined?

*Id.* at 411 (citations and internal quotations omitted). The Court of Appeals further reasoned that there is no way to calculate damages where the Court is comparing "the Hobson's choice of life in an impaired state and nonexistence." *Id.* The *Becker* court, however, recognized that the impaired children's parents did have causes of action sounding in "negligence or medical malpractice" because the defendants did have a duty to the plaintiff parents, the defendants allegedly breached that duty, and the plaintiffs suffered readily fixed damages in the form of the extraordinary expenses required to care for their disabled children. *Id.* Nevertheless, the Court of Appeals held, "calculation of damages for plaintiffs' emotional injuries remains too speculative to permit recovery notwithstanding the breach of a duty flowing from defendants to themselves." *Id.* at 415.

Like the Michigan Court, the New York Court of Appeals was concerned with the pro-eugenics policies potentially underlying a wrongful birth or wrongful life cause of action. Given the tension between the eugenics implications of the birth-related torts and the courts' responsibility to ensure that tort plaintiffs suffering legally cognizable injuries inflicted by a party that had a duty to the plaintiffs have a means of recovery, the New York Court of Appeals attempted to chart a middle ground while simultaneously and repeatedly commenting that "[a]s

in the case of plaintiffs' causes of action for damages on behalf of their infants for wrongful life, the cognizability of their actions for emotional harm is a question best left for legislative address." *Id.* Unlike the Michigan legislature, the New York legislature has never responded to the *Becker* court's invitation to act by enacting legislation authorizing or proscribing any birth-related torts.

New Jersey, unlike Michigan and New York, recognizes both the wrongful birth and the wrongful life causes of action. *See Berman,* 80 N.J. 421; *Schroeder,* 87 N.J. 53; *Procanik,* 97 N.J. 339. New Jersey predicated its recognition of the wrongful birth cause of action on a post *Roe v. Wade* analysis that found that because the mother has a Constitutional right to choose eugenic abortion, her care providers have a duty to provide her with sufficient information to make an informed choice as to whether to continue a pregnancy. *Berman*, 80 N.J. at 431-32. Michigan's *Taylor* court, however, expressly rejected this argument, and instead held that a woman's privacy interest in deciding whether to abort a fetus did not rise to the level of requiring the state to allow her a cause of action against healthcare professionals who failed to provide her with complete or accurate information on which to base her decision about whether to seek eugenic abortion. *Taylor*, 600 N.W.2d at 687.

Applying the five broad *Restatement* factors embraced by the New Jersey Supreme Court and Third Circuit in *Fu* and *Lebegern*, respectively, it is clear that Michigan law should govern this dispute. The first factor, interstate comity, weighs heavily in favor of Michigan, which has articulated its unequivocal public policy both legislatively and judicially. Michigan's policy would be frustrated by applying New Jersey's wrongful birth and wrongful life jurisprudence to this claim, especially here, where New Jersey's contacts with the actions that constitute the alleged tort are virtually nonexistent. The second factor asks courts to consider the interests of the parties and requires courts to focus on the parties' "justified

-22-

expectations and their needs for predictability of result." *Fu*, 160 N.J. at 123. Here, as in *Fu*, this factor is of significant importance because neither Genesis nor Plaintiffs had any expectation -- justified or not -- that Genesis's provision of laboratory services to Plaintiffs in New York from its Michigan facility might give rise to a liability claim governed by New Jersey law.  To the contrary, Genesis's justified expectations as a laboratory headquartered and performing its testing services in Michigan was that it was immune from such a suit in accord with Michigan law.  (SUF ¶ 11.)  Furthermore, even as between Michigan and New York, this factor weighs in favor of applying Michigan law, given that both NYU and Plaintiffs affirmatively sought out the services of this Michigan laboratory.[7] (SUF ¶¶ 10-12.)

The third factor, which asks courts to analyze the interests underlying the substantive body of law, has been discussed above, but, in sum, Michigan's policy interest in applying its law to govern the conduct of a laboratory within its borders outweighs New York's interest in ensuring that Plaintiffs can recover economic losses they allegedly suffered due to Genesis's purported negligence.  The fourth factor is largely irrelevant to the case at bar, because New Jersey's connection to this case is so weak that the forum state's law cannot apply to Plaintiffs' claims against Genesis.   Those claims arose from conduct that occurred entirely in Michigan and New York, and the fortuitous circumstances that Rosie Grossbaum was born in New Jersey (which Genesis did not learn until this lawsuit was filed) and that her parents subsequently moved to this state long after the events in

---

[7]   The fact that Plaintiffs and NYU did not choose to use the services of Reprogenetics, one of the two other major providers of PGD services, which happens to be located in New Jersey, highlights that Plaintiffs -- knowingly or not -- choose to subject themselves to Michigan's unfavorable (from their perspective) wrongful birth law.  (SUF ¶ 10-12.)

question do not provide New Jersey with a meaningful interest in seeing its law applied. Indeed, such a result would reward forum shopping. (SUF ¶¶ 28, 29.)

The fifth factor, the competing interests of the states, requires the Court to analyze which state has the most significant relationship to the complained of acts. As set out in *Fu* and *Lebegern*, the Court should apply the factors articulated in § 145(2) in order to determine which state has the most significant relationship to the alleged tort. Here, not only is Michigan's policy interest in applying its law paramount, but it has the most substantial relationship to Plaintiffs' tort claims against Genesis. The facts relating to the choice of law determination are undisputed: Plaintiffs Chaya and Menachem Grossbaum, who were New York residents, engaged a New York fertility clinic (the NYU Defendants) to assist them with reducing their risk of becoming the parents of a baby with CF. (SUF ¶¶ 7-9.) NYU and the Grossbaums then reached out to Genesis, which is a Michigan limited liability company with its sole place of business in Detroit, Michigan,[8] to request that Genesis perform PGD testing on the Grossbaum's embryos. (SUF ¶¶ 10-12.) The Grossbaums were aware that Genesis was located in Michigan, and even sent payment directly to Genesis in Michigan. (SUF ¶¶ 12, 14.) When the Grossbaums spoke with Mark Hughes by telephone as part of the informed consent process, they knew that Mark Hughes and Genesis were located in Michigan. (SUF ¶ 12.)

Furthermore, although the Grossbaum's embryos were biopsied in New York, the cells removed from those embryos as a result of the biopsy were, with the Grossbaum's knowledge and consent, shipped overnight to Genesis's Michigan laboratory, where Genesis performed the PGD testing (the results of which are at

---

[8]   Defendant Mark Hughes, Genesis's laboratory director, who was individually named as a defendant in this litigation, has been a Michigan resident at all times relevant to this litigation.

-24-

issue in this litigation).  (SUF ¶ 22.)  Genesis then, from its laboratory in Michigan, reported the results of its testing to NYU in New York, which passed that information along to the Grossbaums.  (SUF ¶ 23.)  Genesis thereafter had no further involvement in the Grossbaum's IVF cycle and subsequent pregnancy. (SUF ¶ 25.)  The NYU Defendants, independently and with no further input from Genesis, advised Plaintiffs concerning which embryos to transfer and performed the actual transfer.[9]  (SUF ¶ 24.)  Although Chaya Grossbaum happened to deliver Rosie Grossbaum in New Jersey, Chaya and Menachem Grossbaum remained New York residents at the time of Rosie's birth (although the Grossbaums moved to New Jersey before filing this action).  (SUF ¶¶ 28, 29.)

The *Lebegern* court, in reliance on § 145(2) of the *Restatement (Second) of Conflict of Laws* sets out the four most relevant contacts for determining which state has the greatest governmental-interest in tort cases.  The first factor is the place where the injury occurred.  Here, Genesis's last point of contact with the Grossbaums was its July 19, 2004 issuance of its report concerning the Grossbaums' embryos, which allegedly contained incorrect results.  (SUF ¶¶ 23, 25.)  Genesis created this report in Michigan based on tests it performed in Michigan, and therefore the place of the injury was in Michigan.  (*Id.*)  Plaintiffs will likely respond that the injury occurred in New Jersey, where Rosie Grossbaum was born.  But Plaintiffs' injury vis-à-vis Genesis was not the *birth* of Rosie Grossbaum; rather, it was the receipt of advice from Genesis concerning the CF status of the embryos leading to the decision to transfer embryos 7 and 8 that allegedly injured the Grossbaums.  Because the "injury" in a wrongful birth claim is the deprivation of the facts required to make an informed choice concerning

---

[9]   In fact, although Genesis recommended transfer of embryos 8 and 10; Plaintiffs and NYU, with no additional input from Genesis, made the decision to transfer embryos 7 and 8.

whether to terminate (or, in the case at bar, initiate) a pregnancy, the "injury" at bar occurred at the time of the embryo transfer, not at the child's birth nine months later.  Furthermore, because a child's wrongful life claim is essentially derivative of the facts and circumstances that form the basis of the parents' wrongful birth claim, the same injury underlies the child's claim, in that the child plaintiff exists only because the parents were deprived of their right to make an informed decision regarding termination.  *Procanik*, 97 N.J. at 348-349 (infant's cause of action derived from negligence that deprived parents of choice to terminate pregnancy and therefore prevent the birth of the infant plaintiff).

Thus, the injury occurred either in Michigan (where Genesis created and transmitted the report to NYU) or, alternatively, in New York (where the Grossbaums and NYU made the decision concerning which embryos to transfer) in July 2004, nine months before Rosie Grossbaum was born in New Jersey.  (SUF ¶¶ 23-25.)  The Grossbaums' IVF cycle and embryo transfer had no nexus to New Jersey as of July 19, 2004: the Grossbaums were New York residents being treated by a New York IVF clinic who had reached out to a Michigan laboratory to obtain PGD testing not available in New York.  (SUF ¶¶ 7-12.)  Therefore, their wrongful birth and wrongful life claims, which are grounded in their right to choose whether to undergo the embryo transfer, are not logically connected to New Jersey.  It was entirely fortuitous and thus irrelevant to the choice-of-law analysis against Genesis that Rosie Grossbaum was delivered at a New Jersey hospital approximately nine months after Genesis provided laboratory services to Plaintiffs, and that Plaintiffs then happened to relocate to here.  (SUF ¶¶ 28, 29.) Plaintiffs' choice of New Jersey as the venue for this suit is also irrelevant.  Their claims arose entirely in Michigan and New York, and should not be resolved under the law of New Jersey.

The second factor relevant to the governmental-interest test in cases based on an alleged tort is the place where the conduct causing the injury occurred.  Here,

as it pertains to the claims against Genesis, there is no question that the conduct --
*i.e.*, the allegedly negligent PGD testing of the embryos, which resulted in Genesis
creating an allegedly inaccurate report of the CF status of those embryos --
occurred entirely in Michigan.  (SUF ¶¶ 22, 23.)   Therefore, the second factor
weighs strongly in favor of applying Michigan law to the claims against Genesis.
The third factor looks to the domicile, residence, nationality, place of
incorporation, and place of business of the parties.  At all times, Genesis was and is
a Michigan limited liability corporation with its primary -- indeed its only -- place
of business in Detroit, Michigan.  (SUF ¶ 11.)  The Grossbaums were New York
residents from before their first contact with Genesis through the birth of Rosie
Grossbaum.  (SUF ¶¶ 7, 29.)   Therefore, this factor is not dispositive of the
question as to whether Michigan or New York law applies, although it does again
eliminate New Jersey from consideration.   Finally, the relationship between
Genesis and the Grossbaums was centered in Michigan, given that the Grossbaums
(through NYU) sought out Genesis's services, which were then performed entirely
in Michigan.  (SUF ¶¶ 10-12, 22-23.)   Indeed, the Grossbaums had to have the
biopsied cells from their embryos sent by courier to Michigan so that they could be
tested in Genesis's laboratory.  (SUF ¶ 22.)  Furthermore, the Grossbaums sent
their payment for the PGD procedure directly to Genesis in Michigan.  (SUF ¶ 14.)
Although the final decisions concerning whether to transfer embryos and if so,
which ones, were made and carried out in New York, those decisions did not
involve Genesis, and therefore, they are of no consequence to the choice of law
analysis against Genesis.  (SUF ¶ 24.)

Because the first factor (the place of injury), the second factor (the place of
the conduct that caused the injury), and the fourth factor (the place where the
relationship between the parties was centered) all favor Michigan, and the third
factor (the residence or place of incorporation of the parties) is neutral, the

*Restatement* § 145(2) factors for analyzing which state has the most significant relationship to the alleged tort strongly favor Michigan.  Therefore, the *Fu* court's governmental interest analysis paradigm, which looks to (1) interstate comity (favors Michigan), (2) the parties' justified expectations (favors Michigan), (3) the public policy considerations underlying each state's law (favors Michigan), (4) judicial administration concerns (neutral) and (5) the state with the most significant relationship to the claim (favors Michigan), requires this Court to conclude that Michigan law applies to Plaintiffs' claims against Genesis.  Because Michigan has definitively rejected both wrongful birth and wrongful life causes of action, Plaintiffs' claims against Genesis must be dismissed as a matter of law.

> **D.**      **Should The Court Find That Michigan Law Is Not Applicable, New Jersey's Choice Of Law Rules Require It To Apply New York Law**

After Michigan, New York has the second strongest interest in applying its law to the facts at bar.  Plaintiffs were New York residents at the time that Genesis performed its PGD testing of their embryos, and the embryos at issue were created in a New York laboratory, biopsied for analysis in a New York laboratory, and transferred to Chaya Grossbaum in a New York laboratory.  (SUF ¶¶ 7, 9, 25.)  Furthermore, at the time of Rosie Grossbaum's birth, the Grossbaums were still New York residents, and so it was New York, not New Jersey, that had the strongest interest in ensuring that Plaintiffs received the fullest recovery appropriate under the law.  (SUF ¶ 29.)  Rosie Grossbaum's birth in New Jersey does not negate this analysis.  As set forth in Section II. C., *supra*, the fortuitous circumstance of Rosie Grossbaum's birth in -- and her family's subsequent move to -- New Jersey, which happens to have more liberal rules governing recovery for birth-related torts, do not justify applying New Jersey law to this tort, especially

vis-à-vis Genesis, which had no justifiable expectation that New Jersey law might govern its provision of laboratory services to Plaintiffs.

If this Court holds that New York law governs the relationship between the Grossbaums and Genesis, then this Court must grant summary judgment to the Genesis defendants.  New York law does not recognize infant plaintiff Rosie Grossbaum's wrongful life claim, and Chaya and Menachem Grossbaum's wrongful birth claims are time barred under New York law.

Under New York law, CPLR 214-a, which imposes a two-and-one-half year statute of limitations on medical malpractice actions, governs wrongful birth claims against providers of medical services.  *See Branigan v. DeBrovner*, 612 N.Y.S.2d 119, 121 (1st Dept. 1994) (holding that CPLR 214-a applies to wrongful birth cause of action). These claims accrue at the time of the allegedly malpractice, **not** upon the baby's birth.  In *Jorge v. New York Health & Hospitals Corp.,* 79 N.Y.2d 905 (1992), the plaintiff was the mother of a child born with sickle cell anemia.  *Id.* at 906.  The plaintiff knew that she was a sickle cell anemia carrier, so upon learning that she was pregnant, she arranged to have the baby's father tested to see whether he was also a sickle cell anemia carrier.  *Id.*  The defendant erroneously read the father's sickle cell anemia test as indicating that the father was not a carrier when, in fact, he was.  *Id.*  The New York Court of Appeals held that the tort accrued when the defendant erroneously read the father's test (thus depriving plaintiff of her right to make an informed choice concerning whether to continue the pregnancy), not when the baby was born.  *Id.* Furthermore, the Court held, the continuous care exception did not save plaintiff's claim against her obstetrician even though he continued to care for her throughout the pregnancy, because the obstetrician's provision of care to the baby's father was a discrete act that "was simply not committed in relation to the ongoing obstetric care that plaintiff received."  *Id.*  Similarly, in *Branigan*, 612 N.Y.S.2d at 119-121, New

York's Appellate Division held that a wrongful birth claim accrued when the defendant obstetrician misdiagnosed the newly pregnant plaintiff with food poisoning instead of rubella, and therefore deprived her of the choice to terminate due to rubella's propensity for causing fetuses to be born with severe birth defects. *Id.* However, on facts substantially at variance with those at bar, the *Branigan* court held that the continuing care exception did apply to the toll plaintiff's claim. It found that defendant's failure to diagnose the rubella fell within his obligation to treat complications of plaintiff's pregnancy, and therefore defendant's continuous care of plaintiff during the pregnancy encompassed the misdiagnosis. *Id.*

As in both *Jorge* and *Branigan*, there is no question that Genesis's alleged misdiagnosis occurred on July 19, 2004, and that Plaintiffs' wrongful birth claim accrued on that date. (SUF ¶ 23.) Furthermore, the continuous care doctrine does not apply to Genesis, which, unlike the defendants in both *Jorge* and *Branigan*, had no further connection to the Grossbaums or their pregnancy. (SUF ¶ 25.) Additionally, as in *Jorge*, the alleged misdiagnosis of Plaintiffs' embryos was not related to the ongoing post-IVF early pregnancy care Chaya Grossbaum received from NYU (not Genesis), and certainly not to that received from the non-NYU prenatal care provider Chaya Grossbaum chose once NYU released her as a patient following its determination that her pregnancy was well-established. As a result, there is no question that New York's two-and-one-half year statute of limitations, as interpreted by New York's highest court, began to run against Genesis on July 19, 2004. Plaintiffs' Complaint, however, was not filed until March 23, 2007, which was more than two-years-and-half-years after the claim accrued. As a result, if New York law applies, Chaya and Menachem Grossbaums' wrongful birth claim against Genesis is barred by CPLR 214-a. Furthermore, because, as established in Part II-C, *infra*, New York does not recognize wrongful life claims, Genesis's summary judgment motion on Rosie Grossbaum's wrongful life claim

also must be granted. *See Becker*, 46 N.Y.S.2d at 412 (refusing to recognize children's wrongful life claims without legislative authority to do so).

### III.   EVEN IF THIS COURT FINDS THAT NEW JERSEY LAW APPLIES, PLAINTIFFS' WRONGFUL BIRTH CLAIMS ARE BARRED BY NEW JERSEY'S STATUTE OF LIMITATIONS.

Even if Plaintiffs' wrongful birth claim against Genesis is not governed by Michigan or New York law, it must be dismissed because it is untimely pursuant to New Jersey's statute of limitations.  Genesis properly preserved its statute of limitations defense in its Answer.  (Ex. 23 at First Separate Defense.)  Even if New Jersey law and New Jersey's statute of limitations applies, Plaintiffs' wrongful birth claim must be dismissed.

In New Jersey, wrongful birth causes of action are governed by the two year statute of limitations set forth in N.J.S.A. 2A:14-2; *see Carter v. UMDNJ*, 838 F. Supp. 957 (D.N.J. 1993) (noting that the New Jersey Supreme Court had twice applied N.J.S.A. 2A:14-2's two year statute of limitations to wrongful birth actions).  These causes of action are, nevertheless, subject to New Jersey's discovery rule, as set out in *Lopez v. Swyer*, 62 N.J. 267 (1973).  *Lopez* teaches that the statute of limitations does not begin to run where Plaintiff "had not previously known, **nor could she have previously known**, that she might have a basis for an actionable claim."  *Id.* at 273 (citing *Yerzy v. Levine*, 57 N.J. 234 (1970)) (emphasis added).

Although the New Jersey wrongful birth cases that have considered the application of the statute of limitations to wrongful birth causes of action have generally held that the cause of action accrued no later than when the child's condition was discovered post-birth, those cases are not on all fours with the facts currently before the Court.  Specifically, here the Court must consider the proper accrual of the cause of action against Genesis where (1) Genesis completed its

testing of the embryos -- and communicated its results to NYU and the Plaintiffs -- no later than July 19, 2004, approximately nine months before Rosie Grossbaum's birth and (2) Plaintiffs, despite signing an informed consent with Genesis in which they committed to undergo CVS or amnio to confirm the test results, did not in fact undergo this testing, which would have revealed whether Rosie Grossbaum was affected with CF by October 25, 2004.  (SUF ¶¶ 23, 26-27.)  Given that Plaintiffs not only "could previously have known" that they might have a basis for an actionable claim by October of 2004, but also failed to discover this fact only because the Grossbaums elected not to actually undergo the amnio or CVS testing that they had previously assured Genesis -- in writing -- that they would complete, the discovery rule as articulated in *Lopez* and its progeny dictates that Plaintiffs' wrongful birth cause of action accrued under New Jersey law no later than October 25, 2004 (the last week in which Plaintiffs would have undergone the previously agreed to CVS or amnio testing).  (SUF ¶¶ 26-27.)  Therefore, Plaintiffs' wrongful birth claim is barred by N.J.S.A. 2A:14-2, which required them to file their claim by October 25, 2006.

## IV.   PLAINTIFFS CANNOT PROVE THE CAUSATION ELEMENT OF THEIR WRONGFUL BIRTH AND WRONGFUL LIFE CLAIMS.

The New Jersey Supreme Court normally requires Plaintiffs in a wrongful birth cause of action to prove proximate cause by affirmatively alleging that they would have aborted the fetus if they had known of the increased risk that the child would be born with a defect.  *See, e.g.*, *Canesi v. Wilson*, 158 N.J. 490, 515 (1999) ("In addition, in establishing proximate cause for wrongful birth, plaintiffs must show that the resulting birth defect was reasonably foreseeable, that is, not too remote in relation to defendants' negligence, and that had defendants not been negligent, the pregnancy would have been terminated.").  Here, however, Plaintiffs

unequivocally testified that they would not have aborted a fetus diagnosed with CF.  (SUF ¶ 4.)  Therefore, under New Jersey law, Plaintiffs cannot establish proximate causation and their wrongful birth claim must be dismissed.  Because, as discussed above, a wrongful life claim is derivative of a wrongful birth claim, *Procanik*, 97 N.J. at 348-349, Rosie Grossbaum's wrongful life claim also fails.

Irrrespective of the *Canesi* court's holding, Plaintiffs also have failed to establish proximate cause at a far more basic level: *i.e.*, whether analyzed under New Jersey or New York law, they have not mustered sufficient evidence to allow a jury to do more than speculate as to whether the embryo that became Rosie Grossbaum was one tested by Genesis.  The Third Circuit, in *Saldana v. Kmart Corp.*, 260 F.3d 228, 234 (3d Cir. 2001), explained that a plaintiff's case which rests solely on speculation that defendant acted negligently is not legally sufficient: "There was a complete absence of relevant evidence -- from either side -- on the critical question of how long the wax was on the floor, and the mere possibility that something occurred in a particular way is not enough, **as a matter of law**, for a jury to find that it probably happened that way." (Emphasis added.)

Here, Plaintiffs' actions during Chaya Grossbaum's IVF cycle reveal that they cannot make out a *prima facie* case establishing that a failure of Genesis's testing was the proximate cause of their becoming parents of a child with CF.  Specifically, during Chaya Grossbaum's IVF cycle, the Grossbaums testified that they continued to have sex while Chaya Grossbaum was being treated with powerful fertility drugs but used no contraception other than spermicide used alone or a collection condom, also used alone.  (SUF ¶¶ 16-20.)  Both condoms used alone and spermicides used alone have high failure rates -- the failure rate for condoms used alone is approximately 17% and the failure rate for spermicide used

alone has been reported as between 10% and 28%.[10]  (SUF ¶¶ 19, 20; Ex. 26.)

The Grossbaums, therefore, have not (because they cannot) offered any proof that Genesis's test results for embryos 7 and 8 were incorrect; indeed, they have offered no proofs at all (in the form of expert testimony or otherwise) concerning whether Rosie Grossbaum grew from an embryo naturally created by the couple's July 2004 intercourse while taking fertility medications or from one of the embryos tested by Genesis.  (SUF ¶¶ 16-20.)  Given the undisputed evidence of the Grossbaums' inadequately protected sexual relations, Plaintiffs cannot simply assume that Rosie Grossbaum developed from one of the Genesis-tested embryos and hope to survive summary judgment.  It is Plaintiffs' burden to prove this happened by a preponderance of the evidence, and they have marshaled no proof with which to meet that burden.  Dr. Xu's report highlighted this point: "[I]t is speculation to say that the bad result in this case was caused by the implantation of an affected embryo, as opposed to any of a number of other causes, including intercourse or unprotected sex by the Grossbaums."  (Ex. 5 at 3.)

Given the Grossbaum's failure to abstain from intercourse during Chaya Grossbaum's fertility treatments, it is nothing more than rank speculation to posit that Genesis's actions -- rather than the Grossbaums' own assumption of the risk that they would conceive a child affected with CF by having intercourse during their fertility treatments -- deprived them of their choice regarding whether to risk parenting a CF baby.  Because the Plaintiffs cannot demonstrate that their own conduct did not cause the "harm" alleged, they cannot establish even a *prima facie* showing of proximate cause.  Where Plaintiffs cannot set out facts sufficient to

---

[10]  Pursuant to *Fed. R. Evid.* 201, this court may take judicial notice of facts "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

establish proximate cause, summary judgment is appropriate.  *See Saldana*, 260 F.3d at 235 (granting summary judgment where plaintiff's claim that defendant acted negligently was unsupported speculation); *Crymes v. Atl. County Gov't,* 2006 U.S. Dist. LEXIS 77232, at *14 (D.N.J., Oct. 13, 2006) (granting summary judgment where "Plaintiff concedes that there is no genuine issue of material fact regarding . . . the proximate cause of his finger deformity.").

Therefore, even under New Jersey (and New York law), the Grossbaums' wrongful birth and wrongful life claims must be dismissed for failure to establish proximate cause.

### V.  PLAINTIFFS HAVE FAILED TO ESTABLISH THAT GENESIS'S CONDUCT DEPARTED IN ANY WAY FROM THE 2004 STANDARD OF CARE FOR PGD TESTING FOR CYSTIC FIBROSIS.

#### A.  Because Genesis's *Daubert* Motion Should Be Granted, Plaintiffs Cannot Proffer Sufficient Evidence To Establish The Early-To-Mid 2004 Standard Of Care

Genesis's separately filed *Daubert* motion to disqualify Plaintiffs' liability experts as to the Genesis defendants sets out the reasons that Plaintiffs' liability experts should be disqualified.  Because wrongful birth and wrongful life causes of action are analogous to medical-malpractice actions, plaintiffs in these cases must present expert testimony establishing both the applicable standard of care and that defendants actions deviated from that standard of care.  *Gardner v. Pawliw*, 150 N.J. 359, 375 (1997).  Here, for the reasons set forth in Genesis's *Daubert* motion, Plaintiffs' liability experts, Dr. Cutting and Dr. Strom, must be disqualified from testifying as experts against Genesis.  As a result, Plaintiffs cannot establish either the prevailing standard of care for performing PGD in July of 2004, nor that Genesis deviated from the July 2004 standard of care.  Therefore, Plaintiffs' complaint must be dismissed against the Genesis defendants.

-35-

**B.      Even If Genesis's *Daubert* Motion Is Only Granted As To Dr. Strom, Plaintiffs Cannot Proffer Sufficient Evidence To Establish That The Risk Of Giving Birth To A Baby Affected With Cystic Fibrosis Materially Exceeded That Agreed To By Plaintiffs In The Informed Consent Process**

As can be seen from the March 25, 2004 "Pre-Case Phone Review of PGD Informed Consent," the adult plaintiffs had an extended telephone conversation with Hughes, in which the process of PGD was explained to them in great detail. (Ex. 7; SUF ¶ 12.)  Specifically, the Grossbaums understood and acknowledged that the technology of PGD is not perfect, that PGD is a process that is to a large extent experimental in nature, that the objective of PGD is to reduce risk from the naturally-occurring twenty-five percent, and that zero percent risk is neither realistic nor possible.  (*Id.*)  In their deposition testimony, both Chaya and Menachem Grossbaum acknowledged that they were aware of these risks.  (*Id.*)

In proceeding with PGD, the Grossbaums expressed a desire to reduce the risk of having a child afflicted with cystic fibrosis from the naturally-occurring 25% to something approaching the 5% that was quoted to them by Hughes as the likely risk.  (SUF ¶ 35.)  In their depositions, Menachem and Chaya Grossbaum would not commit to a number between 5% and 25% that would have been acceptable to them for them to go forward, but the PGD informed consent they signed for NYU stated that the risk of misdiagnosis could be as high as 10%. (SUF ¶ 35, Ex. 10.)  The fact is, though, that according to the all of the experts in this case aside from Strom, the actual risk that was undertaken by the Grossbaums was within the 5% range of that to which they consented.  (SUF ¶ 36.)  Indeed, Plaintiffs' own experts disagree as to whether there was a more than 5% risk that embryo 7 or 8 were likely to be affected.  (*Id.*)  Both Plaintiffs' expert, Cutting, and Genesis's expert, Xu, objectively calculate the risks faced by the Grossbaums as being within the 5% range that was quoted to them by Hughes.  (SUF ¶ 36.)

Only Dr. Strom testified to the contrary.  (*Id.*)  Therefore, if Genesis's *Daubert* motion is granted only as to Strom, Plaintiffs' claims must fail.

It is unfortunate that Rosie Grossbaum fell within the 5% risk range, but by definition one person in twenty will do so.  The consequences that have befallen the plaintiffs are the result of a calculated risk taken by Chaya and Menachem Grossbaum, who were fully informed of the approximately 5% risk that even IVF and PGD would result in a baby affected by CF.  The costs of the Grossbaum's fully informed risk should not be visited upon these defendants.  See NJ CHARGE 5.50C.

### C.   Even If Genesis's *Daubert* Motion Is Denied, The Reliance Of Plaintiffs' Experts On European Studies And Practices Is Irrelevant To Establishing That The Genesis Defendants Departed From The Nationwide Standard Of Care

According to Plaintiffs, in early-to-mid 2004, there were eight laboratories in the United States which were in any way directly involved in the performance of PGD.  They were:  1) RGI, in Chicago; 2) Reprogenetics, in New Jersey; 3) Genetics and I.V.F., in Virginia; 4) Cornell Medical Center, in New York City; 5) Genesis Genetics, in Detroit; 6) Shady Grove; 7) Baylor University, in Texas; and 8) a lab in Florida, the name of which Plaintiffs' expert Dr. Strom was unable to remember.  With the exception of RGI, Plaintiffs have offered no evidence concerning whether these laboratories were routinely doing multiplex testing for cystic fibrosis in July of 2004.  (SUF ¶ 37.)  To the contrary, the only evidence adduced by Plaintiffs is that their experts did not know what the other PGD laboratories were doing with respect to PGD in July of 2004.  (SUF ¶¶ 32, 37-40, 53-55.)   In contrast, the Declaration of Mark Hughes establishes that neither Genesis nor Baylor was routinely providing multiplex testing for cystic fibrosis.

(SUF ¶ 64.)  Plaintiffs have therefore failed to meet their burden of establishing the relevant standard of care.

New Jersey CHARGE 5.50A, Option A, requires specialists in a field of medicine to represent "that they have and will employ the knowledge and skill normally possessed and used by the average specialist in the field."[11]  Specialists are ordinarily held to a nationwide standard of care.  *See Clark v. University Hospital-UMDNJ*, 390 N.J. Super. 108, 115 (App. Div. 2006) ("although the applicable standard of care for general practitioners is that of the local community or similar communities, the standard of care for a specialist is nationwide") (quoting *Bahr v. Harper-Grace Hosps.*, 497 N.W.2d 526, 528 (1993), *rev'd in part on other grounds*, 528 N.W.2d 170, 171 (Mich. 1994)); *see also Naccarato v. Grob,* 384 Mich. 248, 253 (1970) (Michigan Supreme Court case stating that "[a]lmost 40 years ago this Court recognized the burgeoning *national community* of specialists." (emphasis added)).

"National" means exactly what one would expect:  A specialist, whether practicing in New York City, Detroit, or a rural geographic area is held to the prevailing standard in the United States.  Thus, health care practitioners cannot shield themselves from liability because the average practitioner in a less developed country is not as well-trained or well-equipped.  Conversely, if Europe is ahead of the United States in a specialty, a U.S. specialist cannot be held to the European standard.  PGD practices in particular are country-specific.  For example, some countries have laws that prohibit embryo biopsies, effectively prohibiting both single-cell and multiplex PGD.  Such laws force some foreign PGD labs to perform polar body biopsies, which are not mainstream practice here.

---

[11]   The American Heritage Dictionary of the English Language, 3d ed. (1996) defines average as "The usual or ordinary kind or quality: *Although the wines vary, the average is quite good.*"

-38-

In addition, Plaintiffs have proffered no evidence as to what tests the average European PGD laboratory was performing during the relevant time period. The mere fact that literature existed in Europe reporting positive results from multiplex testing hardly establishes it was standard of care even there, let alone in the U.S. This failure of proof is all the more striking given the unrefuted testimony of Hughes, discussed in the Genesis Defendants' *Daubert* motion, that Genesis in 2004 was unable to satisfactorily reproduce in its own laboratory the results being claimed for multiplex testing.

In short, Plaintiffs' failure to establish the practices of the average U.S. PGD laboratory cannot be salvaged by citations to European PGD practices. Plaintiffs' claims must be dismissed because they cannot establish the relevant standard of care. *See Saldana*, 260 F.3d at 234-235. Accordingly, Genesis's summary judgment motion should be granted.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion for Summary Judgment filed by Genesis Genetics Institute, LLC and Mark R. Hughes in its entirety, and dismiss these defendants from the litigation.

Respectfully submitted,

**TROWBRIDGE LAW FIRM, P.C.**
Stephen N. Leuchtman, Of Counsel
1380 East Jefferson Avenue
Detroit, Michigan  48207
313 259-6900, ext. 126

-and-

Thomas E. Redburn, Jr.
Sarah Blaine
**LOWENSTEIN SANDLER PC**
Attorneys At Law
65 Livingston Avenue
Roseland, New Jersey  07068
973.597.2500

s/     Thomas E. Redburn, Jr.

*Attorneys for Defendants Genesis Genetics
Institute, LLC and Mark R. Hughes*