# PART 1

# EXHIBITS TO DECLARATION OF SARAH BLAINE

# EXHIBIT 1

1

1   IN THE UNITED STATES DISTRICT COURT                    11:00:35
2   FOR THE DISTRICT OF NEW JERSEY
3   ------------------------------------------ x
4   CHAYA GROSSBAUM and MENCHEN
    GROSSBAUM, Her Spouse, Individually, and
5   as Guardian ad litem of the Infant, ROSIE
    GROSSBAUM,
6
                      Plaintiffs,
7
8    -against-              Index No. 07-CV-359
9
    GENESIS GENETICS INSTITUTE, LLC,
10  OF THE STATE OF MICHIGAN, MARK R.
    HUGHES, M.D., NEW YORK UNIVERSITY
11  SCHOOL OF MEDICINE, and NEW YORK
    UNIVERSITY HOSPITALS CENTER, both
12  Corporations of the State of New York,
    ABC CORPORATIONS:  1-10 and John Doe
13
                      Defendants.
14  ------------------------------------------ x
15
                      132-26 Conduit Avenue
16                    Jamaica, New York
17                    May 4, 2010
                      10:30 a.m.
18
19
    DEPOSITION of CHARLES STROM, M.D., PhD.,
20  an expert witness on behalf of the Plaintiff
    herein, taken by the Defendants pursuant
21  to Article 31 of the Civil Practice Law and Rules
    of Testimony, and Notice, held at the
22  above-mentioned time and place before
    Valerie Cannata, Shorthand Reporter and
23  Notary Public of the State of New York.
24
25

**6**

```
 1          C. STROM, M.D., PhD.
 2       THE WITNESS: Charles Martin    11:02:42
 3    Strom.                            11:02:43
 4       THE REPORTER: What is your     11:02:46
 5    current address?                  11:02:46
 6       THE WITNESS:                   11:02:47
 7              , San Clemente, California,  11:02:51
 8    92673.                            11:03:02
 9       MR. LEUCHTMAN: Dr. Strom, my   11:03:04
10    name is Stephen Leuchtman. I represent  11:03:06
11    Genesis Genetics and Mark Hughes.  11:03:07
12    We're here to take your discovery deposition  11:03:10
13    today. The only -- there are a lot of  11:03:12
14    admonitions that can be set forth before a  11:03:14
15    deposition. The only one or two that  11:03:18
16    I'm concerned about are first, I don't  11:03:21
17    want you to engage in speculation, guess or  11:03:23
18    conjecture. Estimates are fine, as long as  11:03:26
19    you say they are estimates, but guesses  11:03:30
20    are not permitted in depositions; or  11:03:33
21    at least I don't want you to engage in  11:03:37
22    any guesswork.                    11:03:39
23       The other thing is if you don't  11:03:40
24    understand the question, please tell  11:03:42
25    me and I will rephrase it. Otherwise  11:03:44
```

**7**

```
 1          C. STROM, M.D., PhD.
 2    anybody reading the transcript or  11:03:46
 3    seeing the videotape has the right to  11:03:49
 4    assume that you understood the  11:03:51
 5    question and answered it, okay?  11:03:53
 6       THE WITNESS: Yes.             11:03:55
 7       MR. LEUCHTMAN: And that's the  11:03:56
 8    other thing, please answer verbally so  11:03:59
 9    the Court Reporter can get it down.  11:04:02
10       THE WITNESS: Yes.             11:04:04
11       MR. LEUCHTMAN: You have in     11:04:05
12    front of you what appear to be file  11:04:07
13    materials. May I see those, please?  11:04:09
14       THE WITNESS: Yes.             11:04:12
15       (The Witness produced documents.)  11:04:18
16       MR. LEUCHTMAN: Thank you.     11:04:19
17       THE WITNESS: You're welcome.  11:04:20
18       MR. LEUCHTMAN: I'd like the    11:05:07
19    file to be marked as an exhibit. We  11:05:08
20    can do it now or later on.        11:05:12
21       (Defendant's Exhibit A was     11:05:12
22    marked for identification.)        11:05:15
23    EXAMINATION BY                     11:05:15
24    MR. LEUCHTMAN:                     11:05:15
25       Q.  Is this your entire file?  11:05:16
```

**8**

```
 1          C. STROM, M.D., PhD.
 2       A.  No.                        11:05:18
 3       Q.  What else is contained within  11:05:18
 4    your file?                        11:05:21
 5       A.  I'm sorry. I have no file.  11:05:22
 6    This is a stack. This is my stack.  11:05:23
 7       Q.  Is this your entire stack?  11:05:28
 8       A.  At the moment, yes.        11:05:31
 9       Q.  What do you mean by at the  11:05:32
10    moment?                           11:05:35
11       A.  It's what I have now.      11:05:36
12       Q.  Is it all the materials you've  11:05:37
13    received on this case?            11:05:40
14       A.  Yes.                       11:05:41
15       Q.  So the only deposition you've  11:05:42
16    been provided with is that of Mark Hughes?  11:05:43
17       A.  What's in that stack. I was --  11:05:46
18    actually, I was given an electronic copy of the  11:05:48
19    deposition of Gary Cutting that I read on my  11:05:53
20    computer, but there's no hard copy of that.  11:05:57
21       Q.  Have you gotten anybody else's  11:06:01
22    deposition transcripts?           11:06:03
23       A.  No.                        11:06:04
24       Q.  You don't have Lucciardi   11:06:04
25    (phonetic) or anybody from N.Y.U.?  11:06:08
```

**9**

```
 1          C. STROM, M.D., PhD.
 2       A.  No.                        11:06:09
 3       Q.  And you have not read any   11:06:09
 4    transcript of any of the other parties,  11:06:12
 5    including the Plaintiffs, Menchen Grossbaum  11:06:13
 6    and Chaya Grossbaum?              11:06:16
 7       A.  Correct.                   11:06:17
 8       Q.  Would you tell us for the   11:06:18
 9    record what articles you have in your  11:06:24
10    stack? Feel free to refer to them.  11:06:28
11       (The Witness perused the       11:06:34
12    exhibit.)                         11:06:35
13       A.  I have several articles and  11:06:35
14    then I had several abstracts that I had  11:06:54
15    printed from Med Line. Do you want everything  11:07:03
16    the whole, everything? The title and all  11:07:08
17    the authors? That will take forever.  11:07:10
18       Q.  A shorthand reference is fine.  11:07:13
19    I don't think it will take forever.  11:07:15
20       A.  How about Goosens,         11:07:15
21    G-O-O-S-E-N-S, et. al.            11:07:22
22       Q.  That's fine.              11:07:24
23       A.  Improving Clinical         11:07:24
24    Preimplantation Genetic Diagnosis... The  11:07:30
25    Journal of Molecular Reproduction, volume 9,  11:07:42
```

10

```
1         C. STROM, M.D., PhD.
2   number 9, pages 559 to 567, 2003.        11:07:48
3         Thornhill and Snow, Journal of      11:07:54
4   Molecular Diagnostics, volume 4, number 1,   11:07:59
5   February, 2002.                          11:08:06
6         MR. LEUCHTMAN:  That's a            11:08:07
7   sufficient reference.                    11:08:08
8      A.  Rechitsky, R-E-C-H-I-T-S-K-Y,     11:08:10
9   et. al. Journal of Assisted Reproduction  11:08:16
10  and Genetics, volume 16, number 4, pages  11:08:20
11  192 to 199.                              11:08:27
12        The same Rechitsky et. al.,        11:08:30
13  Fetal Cells and Fetal DNA in Maternal    11:08:37
14  Blood, New Developments for a New        11:08:42
15  Millennium, edited by the 11th Fetal Cell  11:08:47
16  Workshop, Basel, 2000.                   11:08:52
17        Moutou, M-O-U-T-O-U, et. al.       11:08:59
18  European Journal of Human Genetics, 2002,  11:09:04
19  volume 10, 231 to 238.                   11:09:11
20        Vrettou, V-R-E-T-T-O-U, et. al.    11:09:17
21  Molecular Human Reproduction, volume 8,   11:09:20
22  number 9, pages 880 to 886.              11:09:24
23        Eftedal, E-F-T-E-D-A-L, et. al.    11:09:30
24  Molecular Human Reproduction, volume 7,   11:09:34
25  number 3, pages 307 to 312, 2001.        11:09:39
```

11

```
1         C. STROM, M.D., PhD.
2         Harper and Bui, B-U-I, Best       11:09:46
3   Practice Research Clinical Obstetrics and  11:09:57
4   Gynecology, 2002, October 16th, volume 5,  11:10:03
5   659 to 70.                               11:10:09
6         Verlinsky, V-E-R-L-I-N-S-K-Y,      11:10:14
7   et. al.                                  11:10:17
8      Q.  These are abstracts you're        11:10:19
9   referring to now?                        11:10:21
10     A.  Right.  Of articles.              11:10:22
11     Q.  Yes.                              11:10:22
12     A.  These are published articles.     11:10:24
13  Reproductive Biomed Online, 2002.        11:10:25
14  January to February, volume 4, number 1,  11:10:29
15  38 to 42.                                11:10:34
16        Rechitsky, et. al, Molecular       11:10:38
17  Cellular Endocrinology, 2001, October 22nd  11:10:45
18  supplement, S 65 to 8.                   11:10:49
19        Apessos, A-P-E-S-S-O-S, A          11:10:59
20  Prenatal Diagnosis, 2001, June, volume 21,  11:11:04
21  number 6, 504 to 11.                     11:11:11
22        Dreesen, D-R-E-E-S-E-N, et. al.    11:11:17
23  Molecular Human Reproduction, 2000, May,  11:11:21
24  volume 6, number 5, 391 to 396.          11:11:27
25        Rechitsky again, et. al.           11:11:34
```

12

```
1         C. STROM, M.D., PhD.
2   Journal of Assisted Reproduction in       11:11:38
3   Genetics, 1999, April, volume 16, number 4,  11:11:42
4   192 to 198.                              11:11:48
5         Again Rechitsky et. al.,           11:11:52
6   Journal of Assisted Reproductive in Genetics,  11:11:54
7   1998, May, volume 15, number 5, 253 to   11:12:02
8   257.                                     11:12:06
9      Q.  Is there any other literature     11:12:06
10  that forms the basis of your opinion besides the  11:12:08
11  ones in your stack there that you just    11:12:13
12  identified for the record?               11:12:14
13     A.  No.                               11:12:15
14     Q.  Now, did you ask Mr. Stein for    11:12:16
15  any materials that you have not received?  11:12:27
16     A.  No.                               11:12:29
17     Q.  Do intend to do any further       11:12:30
18  work on this case?                       11:12:33
19     A.  Yes.                              11:12:35
20     Q.  What do you intend to do?         11:12:35
21     A.  Whatever I'm asked.               11:12:37
22     Q.  You have authored a report in     11:12:38
23  this case?                               11:12:44
24     A.  Yes.                              11:12:44
25     Q.  Does that report contain all of   11:12:45
```

13

```
1         C. STROM, M.D., PhD.
2   your opinions?                           11:12:47
3         MR. STEIN:  Objection to the       11:12:48
4   form of the question.                    11:12:49
5   BY MR. LEUCHTMAN:                        11:12:49
6      Q.  About this case that you expect   11:12:51
7   to offer at trial?                       11:12:53
8      A.  I can't speculate.                11:12:54
9      Q.  I didn't ask you to speculate.    11:12:55
10     A.  You asked me to speculate what    11:12:56
11  you might do at trial.                   11:12:58
12     Q.  I asked what you intend to do     11:13:00
13  at the present time at trial?            11:13:02
14     A.  I have no intention to do         11:13:03
15  anything at trial. I will ask the questions that  11:13:04
16  I am answered at trial.                  11:13:04
17     Q.  Or vice versa.                    11:13:04
18     A.  I will answer the questions that  11:13:06
19  I am asked at trial.                     11:13:07
20     Q.  Have you reviewed any             11:13:09
21  information about Mark Hughes or Genesis  11:13:11
22  Genetics other than in your stack or     11:13:15
23  involving this case?                     11:13:17
24     A.  No.                               11:13:17
25     Q.  You've expressed opinions in      11:13:18
```

4  (Pages 10 to 13)

**14**

C. STROM, M.D., PhD.

1    C. STROM, M.D., PhD.
2    your report about things that the Grossbaums    11:13:23
3    were advised by Dr. Hughes and others,    11:13:25
4    correct?    11:13:29
5    A.    I reviewed his note from his    11:13:29
6    telephone conversations, yes.    11:13:34
7    Q.    All right.    11:13:36
8    A.    Conversation.    11:13:40
9    Q.    And you expressed opinions in    11:13:41
10   your report as to the adequacy of advice    11:13:44
11   given to the Grossbaums and how they    11:13:49
12   would have understood that advice?    11:13:52
13   A.    Yes.    11:13:54
14   Q.    Why then did you not seek to    11:13:54
15   read their transcripts as to what they were told    11:13:56
16   and what they understood from their perspective?    11:13:59
17   A.    I did not choose what I sought.    11:14:02
18   I accepted the packet from Counsel and I    11:14:05
19   reviewed it.    11:14:08
20   Q.    You knew their depositions had    11:14:09
21   been taken, didn't you?    11:14:12
22   A.    No, I didn't.    11:14:13
23   Q.    Didn't you suspect their    11:14:14
24   depositions had been taken?    11:14:18
25   A.    Never occurred -- no.    11:14:20

**15**

C. STROM, M.D., PhD.

1    C. STROM, M.D., PhD.
2    Q.    Did you ask whether their    11:14:21
3    depositions had been taken?    11:14:23
4    A.    No.    11:14:23
5    Q.    You weren't interested in their    11:14:23
6    perspective on what they were told, how    11:14:25
7    they understood it and how they processed    11:14:28
8    that information then?    11:14:32
9    A.    I wasn't interested or not    11:14:33
10   interested.  I reviewed the materials I    11:14:36
11   was given to review.    11:14:40
12   Q.    And if I were to tell you that    11:14:40
13   before the expert part of this deposition, there    11:14:42
14   were nine depositions of this case there    11:14:45
15   were nine depositions taken in this case.    11:14:48
16   You've read one of those depositions,    11:14:51
17   correct?  The one of Dr. Hughes?    11:14:54
18   A.    Two.  And the one from    11:14:56
19   Dr. Cutting.    11:14:58
20   Q.    That was a tenth deposition; of    11:14:59
21   the other eight, various other N.Y.U.    11:15:01
22   employees and the Grossbaums, you haven't    11:15:04
23   read any of those depositions.    11:15:06
24   A.    That's correct.    11:15:06
25   Q.    You haven't asked for any of    11:15:07

**16**

C. STROM, M.D., PhD.

1    C. STROM, M.D., PhD.
2    those depositions.    11:15:07
3    A.    That's correct.    11:15:09
4    Q.    And Mr. Stein has not provided    11:15:09
5    you with any of those transcripts?    11:15:12
6    A.    That's correct.    11:15:14
7    Q.    And you're telling us you    11:15:15
8    didn't suspect that others were deposed    11:15:17
9    in this case, even though N.Y.U. is a    11:15:20
10   party defendant?    11:15:22
11   A.    It's none of my business.    11:15:23
12   Q.    What is your business, then?    11:15:27
13   How would you define it in this case?    11:15:30
14   A.    I was asked to give an opinion    11:15:30
15   based on these facts and I was sent a    11:15:32
16   packet and I reviewed it and I gave my    11:15:34
17   opinion.    11:15:37
18   Q.    As a scientist, don't you want    11:15:38
19   to know the entire universe of what might    11:15:41
20   comprise that opinion?    11:15:46
21   A.    I know that there's a    11:15:47
22   difference between law and science and in    11:15:49
23   law, you do what you're told.    11:15:50
24   Q.    How many depositions have you    11:15:53
25   given before today?    11:15:55

**17**

C. STROM, M.D., PhD.

1    C. STROM, M.D., PhD.
2    A.    Maybe a dozen or so.    11:15:56
3    Q.    As an expert witness?    11:15:58
4    A.    Some as expert witness, some in    11:16:00
5    criminal trials as an expert witness, so all as    11:16:02
6    an expert witness.    11:16:07
7    Q.    So you've given about a dozen    11:16:08
8    depositions?    11:16:11
9    A.    Give or take, yes.    11:16:11
10   Q.    Have any of those been P.G.D.    11:16:13
11   I.V.F. cases?    11:16:20
12   A.    No.    11:16:21
13   Q.    Have any of the cases where    11:16:25
14   you've given depositions been non P.G.D.,    11:16:37
15   non I.V.F. cases involving cystic fibrosis?    11:16:41
16   A.    No.    11:16:46
17   Q.    What has been the subject    11:16:47
18   matter of first of all depositions in medical    11:16:50
19   legal cases as opposed to criminal cases    11:16:53
20   where you have offered opinions?    11:16:57
21   A.    I have testified in several    11:16:58
22   child abuse cases as a practicing pediatrician.    11:17:01
23   I have testified in a wrongful birth due    11:17:06
24   to maternal serum screening.  I've done    11:17:11
25   several depositions in forensic cases    11:17:18

5 (Pages 14 to 17)

18

C. STROM, M.D., PhD.

1
2  regarding DNA evidence admitted in courts    11:17:21
3  and criminal trials.    11:17:25
4    Q.  The wrongful birth case, where    11:17:27
5  was that?    11:17:30
6    A.  The wrongful birth was in    11:17:30
7  Chicago.    11:17:33
8    Q.  Were you an expert witness or a    11:17:34
9  party in that case?    11:17:36
10   A.  I was an expert witness.    11:17:37
11   Q.  For the plaintiff or the defendant?    11:17:39
12   A.  Plaintiff.    11:17:41
13   Q.  In civil cases, how many times    11:17:41
14 have you been asked by percentage to    11:17:50
15 review cases for the plaintiff as opposed    11:17:53
16 to for the defendant?    11:17:56
17   A.  More for defendants than    11:17:57
18 plaintiffs.    11:17:59
19   Q.  You've given twelve depositions,    11:18:00
20 give or take.  How many times have you    11:18:06
21 testified at trial?    11:18:09
22   A.  Perhaps four or five.    11:18:09
23   Q.  In what states?    11:18:13
24   A.  All in Illinois.    11:18:18
25   Q.  What percentage, as of 2010, of    11:18:20

19

C. STROM, M.D., PhD.

1
2  your time is spent doing what we might call    11:18:32
3  forensic work?    11:18:35
4    A.  Zero.    11:18:36
5    Q.  Well, it can't be zero, you're    11:18:37
6  doing it now.    11:18:40
7    A.  In the last ten years, I've    11:18:41
8  spent two hours, so it's close to zero.    11:18:43
9    Q.  You spent two hours on this    11:18:46
10 case?    11:18:48
11   A.  However time I spent.    11:18:48
12   Q.  How much time have you spent?    11:18:49
13   A.  Probably five hours.  So five    11:18:52
14 hours divided by ten years is still close to    11:18:54
15 zero, but not zero.    11:18:58
16   Q.  What do you charge as an    11:18:59
17 expert?    11:19:02
18   A.  Five hundred dollars an hour.    11:19:03
19   Q.  Is that for review and    11:19:04
20 deposition and trial testimony or is it    11:19:06
21 more for testifying?    11:19:08
22   A.  It's more for deposition and    11:19:09
23 trial.    11:19:13
24   Q.  What is it for deposition and    11:19:13
25 trial?    11:19:14

20

C. STROM, M.D., PhD.

1
2    A.  Deposition it's two thousand    11:19:14
3  dollars for four hours.  If it's travel involved,    11:19:17
4  it's three thousand dollars a day.    11:19:21
5    Q.  And for trial?    11:19:30
6    A.  Same.  Three thousand dollars a    11:19:31
7  day if travel is involved, two thousand dollars a    11:19:32
8  day if not.    11:19:37
9    Q.  What percentage of your income    11:19:37
10 is derived from forensic work?    11:19:39
11   A.  Zero.  Excuse me; .001.    11:19:43
12   Q.  Now, I'm looking at your    11:19:49
13 curriculum vitae and it covers various    11:19:54
14 faculty position, grants, memberships, et    11:19:57
15 cetera, but I don't see a chronology of    11:20:00
16 employment that I can follow.  Let's do    11:20:02
17 that working backwards from Quest    11:20:06
18 Diagnostics.  When did you start at Quest    11:20:09
19 Diagnostics?    11:20:09
20   A.  I started in October, 2000.    11:20:09
21   Q.  At what location?    11:20:11
22   A.  In San Juan Capistrano,    11:20:13
23 California, where the swallows return.    11:20:18
24   Q.  According to your C.V., from    11:20:23
25 October, 2000, to June, 2002, you were    11:20:26

21

C. STROM, M.D., PhD.

1
2  the medical director molecular genetics    11:20:29
3  and biochemical genetics laboratories at    11:20:34
4  Quest.  And then from June, 2002, to the    11:20:38
5  present, medical director, genetic testing    11:20:41
6  center.  Can you describe those two    11:20:45
7  functions?  Starting first with the one    11:20:48
8  you did from October of 2000, to June of    11:20:49
9  2002, what did you do as molecular    11:20:52
10 genetics and biochemical genetics medical    11:20:52
11 director?    11:20:56
12   A.  Genetics at San Juan Capistrano    11:20:56
13 is divided into at that time three departments;    11:20:59
14 cytogenetics and molecular genetics and    11:21:03
15 biochemical genetics.  I was the highest    11:21:11
16 ranking member of both the molecular    11:21:13
17 genetics department and the biochemical    11:21:19
18 genetics department.  I was responsible    11:21:21
19 for all medical consultation, quality    11:21:22
20 assurance, all licenses, the research and    11:21:25
21 development program and obviously the    11:21:29
22 people in the laboratory reported up to    11:21:32
23 me.    11:21:34
24   I reported up to my boss, who    11:21:35
25 was the medical director of the genetic testing    11:21:37

6  (Pages 18 to 21)

**22**

C. STROM, M.D., PhD.

1
2  center.                                    11:21:41
3      Q.   Who was your boss?                11:21:41
4      A.   Dr. Beverly White.               11:21:42
5      Q.   During that period of time, did  11:21:44
6  Quest do P.G.D.?                          11:21:47
7      A.   No.                              11:21:49
8      Q.   How did your responsibilities    11:21:50
9  change when in June of 2002 you became    11:22:00
10  the medical director of the genetic testing  11:22:04
11  center?                                  11:22:10
12     A.   That was a promotion, so I got   11:22:10
13  my boss's job and she retired. Actually, she  11:22:12
14  reported to me for a period of time.     11:22:18
15     Q.   During that period of time, did  11:22:19
16  you do any P.G.D. or did the lab?        11:22:21
17     A.   No.                              11:22:23
18     Q.   So you have not had hands-on     11:22:24
19  experience or directorial experience with  11:22:28
20  preimplantation genetics diagnosis since  11:22:33
21  October, 2002, or before?               11:22:38
22     A.   That's correct.                  11:22:40
23     Q.   While you were at Quest, up to   11:22:50
24  today, have you had teaching responsibilities at  11:22:53
25  any university?                          11:22:56

**23**

C. STROM, M.D., PhD.

1
2      A.   I teach -- I have a faculty     11:22:58
3  appointment at U.C.S.D. I teach intermittently  11:22:59
4  there and I also obviously give lectures across  11:23:06
5  the country.                             11:23:09
6      Q.   What do you teach at U.C.S.D.?   11:23:10
7      A.   Everything genetics.            11:23:12
8      Q.   Does this touch on P.G.D.?       11:23:15
9      A.   Sometimes.                       11:23:18
10     Q.   What percentage of your          11:23:29
11  teaching responsibilities involve preimplantation  11:23:31
12  genetic diagnosis?                       11:23:34
13     A.   Probably less than five         11:23:34
14  percent.                                 11:23:36
15     Q.   So it's fair to say that during  11:23:41
16  the time that this case unfolded, which is in  11:23:43
17  early 2004, primarily, you were not      11:23:49
18  involved either as a director of a P.G.D.  11:23:54
19  lab, hands-on with P.G.D. or teaching    11:23:58
20  P.G.D. to any significant extent?        11:24:03
21         MR. STEIN:  Objection to the      11:24:05
22  form of the question.                    11:24:06
23     A.   No. That wouldn't be true        11:24:07
24  anyway.                                  11:24:09
25     Q.   Why not?                         11:24:09

**24**

C. STROM, M.D., PhD.

1
2      A.   Because my teaching             11:24:10
3  responsibilities are different than my   11:24:11
4  lecturing.                               11:24:14
5      Q.   Okay.                            11:24:15
6      A.   I lecture around the country     11:24:16
7  and often give talks on preimplantation  11:24:19
8  genetics.                                11:24:23
9      Q.   In a university setting, your    11:24:23
10  teaching is less than five percent of P.G.D.?  11:24:26
11     A.   Yes.                             11:24:31
12     Q.   How much time do you spend       11:24:32
13  going around the country lecturing about P.G.D.,  11:24:34
14  per se?                                  11:24:36
15     A.   About two or three percent of    11:24:36
16  my time.                                 11:24:38
17     Q.   Was this true in 2004?           11:24:39
18     A.   Probably more so in 2004.        11:24:44
19     Q.   How much more so?                 11:24:47
20     A.   I don't know.                    11:24:49
21     Q.   Less than ten percent?           11:24:50
22     A.   I don't know.                    11:24:51
23     Q.   Less than 25?                    11:24:52
24     A.   I don't know. I just don't       11:24:54
25  remember.                                11:24:56

**25**

C. STROM, M.D., PhD.

1
2      Q.   Well, give me a ballpark         11:24:57
3  estimate, not a guess.                   11:24:58
4      A.   I'm sorry, I just don't          11:24:59
5  remember.                                11:25:01
6      Q.   At all?                          11:25:01
7      A.   At all. It's a long time ago,    11:25:02
8  for me.                                  11:25:06
9      Q.   So you probably don't remember   11:25:06
10  the standard of care for preimplantation  11:25:12
11  genetic diagnosis back in 2004 either?   11:25:15
12     A.   I remember it very well.         11:25:18
13     Q.   But you don't remember how much  11:25:20
14  of your lecture time was devoted to P.G.D.?  11:25:22
15     A.   No, I don't remember.            11:25:26
16     Q.   Was it less than half then?      11:25:27
17     A.   I don't remember.                11:25:31
18     Q.   When you went to Quest          11:25:34
19  initially, what were your responsibilities? I  11:25:35
20  think you started to tell me.            11:25:37
21     A.   I told you.                      11:25:39
22     Q.   You did tell me. All right.      11:25:39
23  What are they now?                       11:25:41
24     A.   Now I oversee all of the         11:25:42
25  genetic testing that goes on in San Juan  11:25:47

7  (Pages 22 to 25)

**26**

```
1          C. STROM, M.D., PhD.
2   Capistrano.                    11:25:50
3       Q.  And again, just to reiterate,   11:25:50
4   you do not now do P.G.D. at Quest and you   11:25:53
5   have not ever done P.G.D. at Quest?   11:25:56
6       A.  Correct.                11:25:58
7       Q.  Previous to Quest, you worked   11:25:58
8   for Reproductive Genetics Institute in   11:26:03
9   Chicago?                        11:26:08
10      A.  No. That's actually not   11:26:08
11  correct.                        11:26:10
12      Q.  It is, but maybe not directly   11:26:11
13  previous?                       11:26:13
14          MR. STEIN:  Let's not argue,   11:26:14
15  please.                         11:26:16
16      A.  I worked for Illinois Masonic   11:26:16
17  Medical Center as the director of genetics in the   11:26:19
18  department of obstetrics and gynecology   11:26:24
19  with co-appointments in the department of   11:26:27
20  pathology and the department of pediatrics. I   11:26:30
21  also held a nonpaid appointment as the   11:26:35
22  medical director and the director of the   11:26:38
23  DNA laboratory at the Reproductive   11:26:41
24  Genetics Institute in Chicago.   11:26:46
25      Q.  What years were you connected   11:26:49
```

**27**

```
1          C. STROM, M.D., PhD.
2   with Illinois Masonic Medical Center?   11:26:51
3       A.  You have my C.V. I'm not good   11:26:54
4   with years or dates.            11:26:57
5       Q.  You don't remember?       11:27:02
6       A.  No. I started somewhere around   11:27:03
7   1990, but I'm not completely sure.   11:27:07
8       Q.  And you left to go to Quest   11:27:10
9   Diagnostic?                     11:27:20
10      A.  Correct.                11:27:21
11      Q.  Now, putting R.G.I. aside, did   11:27:26
12  you do any P.G.D. at Masonic Medical   11:27:30
13  Center?                         11:27:34
14      A.  How can you put R.G.I. aside?   11:27:34
15  That's where we did --           11:27:38
16      Q.  Putting R.G.I. aside for the   11:27:39
17  moment.                         11:27:40
18      A.  We were at Illinois Masonic, so   11:27:40
19  yes, we did P.G.D. at Illinois Masonic   11:27:43
20  Medical Center.                  11:27:43
21      Q.  Explain to me, then, the   11:27:47
22  relationship between Reproductive   11:27:48
23  Genetics Institute, R.G.I. and Illinois   11:27:51
24  Masonic Medical Center.         11:27:55
25      A.  I really can't, because I   11:27:55
```

**28**

```
1          C. STROM, M.D., PhD.
2   wasn't part of the management team, but   11:27:57
3   we were physically located in Masonic.   11:27:59
4   Whatever financial relationships that were   11:28:03
5   between the director of the Institute and   11:28:06
6   Illinois Masonic, I was not privy to, but I had   11:28:08
7   a single office for both functions and that's the   11:28:12
8   best I can do.                   11:28:17
9       Q.  In 2004, how much of your time   11:28:18
10  was spent -- I'm sorry, not 2004. We've   11:28:22
11  already established that.        11:28:35
12          When you left R.G.I. in 2000,   11:28:36
13  how much of your time was spent actively   11:28:42
14  involved in P.G.D.?              11:28:44
15      A.  About 80 percent.        11:28:46
16      Q.  I've asked you this, I guess;   11:28:48
17  you don't know the connection between   11:29:00
18  Illinois Masonic Medical Center and   11:29:01
19  R.G.I.?                         11:29:06
20      A.  You did ask me.          11:29:07
21      Q.  And you do not know?      11:29:09
22      A.  Correct.                11:29:11
23      Q.  R.G.I. is not specifically   11:29:11
24  listed on your curriculum vitae. Why not?   11:29:14
25      A.  Because it wasn't a salaried   11:29:16
```

**29**

```
1          C. STROM, M.D., PhD.
2   position.                       11:29:18
3       Q.  During the entire time you were   11:29:18
4   at Masonic Medical Center, did R.G.I. exist and   11:29:23
5   did you work with them?          11:29:27
6       A.  No. R.G.I. came into being   11:29:29
7   while I was there. The original program   11:29:32
8   chief there was an individual named Gene   11:29:36
9   Pergament and when Gene Pergament left   11:29:42
10  Illinois Masonic, Yury, Y-U-R-Y, Verlinsky, took   11:29:50
11  over and created the entity known as   11:29:59
12  Reproductive Genetics Institute.   11:30:01
13      Q.  When?                   11:30:01
14      A.  Somewhere in the early '90s.   11:30:03
15  Excuse me, sometime in the early '90s.   11:30:07
16      Q.  What were your responsibilities   11:30:10
17  in your volunteer position with R.G.I.?   11:30:14
18      A.  I was the medical director. I   11:30:17
19  was responsible for all clinical services,   11:30:19
20  including genetic counselling. I was also the   11:30:21
21  director of the DNA diagnostic laboratory.   11:30:24
22      Q.  Did you do -- well, you did   11:30:34
23  P.G.D. at R.G.I. What was your reason   11:30:37
24  for leaving R.G.I.?              11:30:40
25      A.  Well, it was severalfold. Most   11:30:42
```

8 (Pages 26 to 29)

42

C. STROM, M.D., PhD.

1
2  misdiagnosis due to allele dropout, then we began   11:44:50
3  to use it clinically and it's only when you use   11:44:56
4  it clinically that you really can develop the   11:44:58
5  data that shows you that you've improved   11:44:59
6  the situation.   11:45:03
7      Q.   Once you — I'm sorry. I   11:45:04
8  didn't mean to interrupt you.   11:45:06
9      A.   That was the evolution of the   11:45:08
10  linked marker testing. Simultaneously, we did   11:45:10
11  studies to determine what the rates of   11:45:16
12  allele dropout were in various cells and   11:45:19
13  we looked at cultured fibroblasts, which   11:45:21
14  was the experimental technique we were   11:45:25
15  using. Some people in the literature   11:45:29
16  have used single lymphocytes. We never   11:45:30
17  used single lymphocytes to develop the   11:45:33
18  technology, but then also polar bodies   11:45:34
19  and blastomeres and what we discovered   11:45:38
20  was that the allele dropout rate in blastomeres   11:45:41
21  was much higher than in either single fibroblasts   11:45:43
22  and in literature single lymphocytes, and   11:45:48
23  in polar bodies. In those other three   11:45:50
24  cell types, the allele dropout rate was   11:45:53
25  less than ten percent; but in blastomeres   11:45:56

43

C. STROM, M.D., PhD.

1
2  we and others have found that the allele   11:45:58
3  dropout rate can be as high as twenty to   11:46:02
4  thirty percent.   11:46:06
5      So during that period of time   11:46:06
6  is when all these things coalesced and   11:46:08
7  then we have a series of publications   11:46:12
8  that are referenced in what you're saying.   11:46:17
9      The other issue in terms — the   11:46:17
10  other issue we began reporting on this, I   11:46:27
11  believe, as early as 1996, '97 at the   11:46:30
12  International P.G.D. meetings and we   11:46:34
13  reported our results. Other people began   11:46:36
14  to try.   11:46:37
15      The other interesting   11:46:37
16  phenomenon is that obviously you need to   11:46:42
17  have a certain number of cases before you   11:46:44
18  can develop enough data and in the P.D.G.   11:46:47
19  centers that weren't doing as many cases   11:46:47
20  it took them perhaps to 2000, 2002, to   11:46:50
21  finally publish their results.   11:46:53
22      Q.   So you will agree with me that   11:46:57
23  let's say you are aware that a lab in Europe is   11:46:57
24  doing multiplex P.C.R. testing. You can't just   11:47:01
25  based on that knowledge implement it in   11:47:07

44

C. STROM, M.D., PhD.

1
2  your lab. You have to go through a tedious   11:47:10
3  time-consuming process to make sure that   11:47:13
4  it works in the setting of your lab with   11:47:16
5  the people that you're analyzing?   11:47:18
6      A.   Well, once it's established in   11:47:20
7  literature and the primers have been   11:47:22
8  published and methods have been   11:47:22
9  published, it's a relatively straightforward   11:47:25
10  thing to implement if you have a lab   11:47:28
11  that's capable of doing preimplantation genetics   11:47:30
12  once the primers and the probes and the   11:47:32
13  conditions were published and we did   11:47:35
14  everything meticulously. We published   11:47:38
15  our materials and methods, showed people   11:47:38
16  how to do it, it should only have taken a   11:47:42
17  matter of months for another laboratory   11:47:44
18  to introduce the concepts.   11:47:47
19      Q.   What is amplification — let me   11:47:50
20  ask you this first. Did the development   11:47:55
21  of the use of genetics differ depending   11:47:57
22  on the disease or condition involved?   11:48:01
23      A.   The general concept was the   11:48:03
24  same, but the linked markers were different.   11:48:06
25      Q.   Is cystic fibrosis one of the   11:48:09

45

C. STROM, M.D., PhD.

1
2  more different conditions to develop   11:48:20
3  linked markers for?   11:48:24
4      A.   No. Actually, it's the   11:48:25
5  easiest.   11:48:28
6      Q.   Why do you say that?   11:48:28
7      A.   Because more was known about   11:48:29
8  the gene and its gene sequence. This was   11:48:31
9  prior to the completion of the human genome   11:48:36
10  project, so you had to have the sequences   11:48:40
11  available and cystic fibrosis was such a   11:48:42
12  well-studied gene that all these polymorphic   11:48:43
13  markers had been published.   11:48:46
14      Q.   How many different mutations   11:48:46
15  are there of the cystic fibrosis gene?   11:48:49
16      A.   There's over 1500 at the moment   11:48:51
17  that have been described associated with   11:48:54
18  cystic fibrosis.   11:48:57
19      Q.   What is amplification in the   11:48:58
20  context in the use of genetic markers in   11:49:01
21  P.G.D.?   11:49:04
22      A.   There's a technique known as   11:49:04
23  polymerase chain reaction. P-O-L-Y-M-E-R-A-S-E.   11:49:12
24  I'll never say the word again. From now on it's   11:49:17
25  P.C.R., which takes a sample of DNA and   11:49:21

12  (Pages 42 to 45)

50

C. STROM, M.D., PhD.

2  something like surgery, which has been        11:53:39
3  shown multiple times that a more               11:53:41
4  experienced surgeon is a better surgeon,       11:53:43
5  to laboratory testing, where if you have       11:53:46
6  the appropriate quality controls in place,     11:53:49
7  there's no reason why a small volume           11:53:54
8  laboratory can't do a quality job.             11:53:56
9      Q.   When you were at R.G.I., did          11:53:59
10  you use gene chips or micro beads at that     11:54:17
11  time?                                         11:54:22
12      A.   No.                                  11:54:22
13      Q.   Are you involved in any way         11:54:23
14  indirectly with the use of gene chips or      11:54:26
15  micro beads at the present time?              11:54:28
16      A.   Yes.  We run micro beads.           11:54:31
17      Q.   When you did P.G.D. at R.G.I.,       11:54:34
18  was most of it for cystic fibrosis?           11:54:57
19      A.   I don't know most of it.            11:55:00
20  Certainly a decent percentage of it was.      11:55:03
21      Q.   In how many instances would         11:55:14
22  you say you've performed P.G.D. for cystic    11:55:19
23  fibrosis?                                     11:55:24
24      A.   Probably a couple of hundred.       11:55:24
25      Q.   Over what period of time?           11:55:26

51

C. STROM, M.D., PhD.

2      A.   Over the eight-year span            11:55:28
3  between 1992 and 2000.                        11:55:32
4      Q.   Do you know how many of the          11:55:34
5  couples that were involved in that P.G.D.     11:55:40
6  actually got pregnant?                        11:55:44
7      A.   Probably when I was there,           11:55:45
8  we've had probably thirty births, I would     11:55:49
9  guess.  Thirty to forty births.              11:55:52
10      Q.   Do you receive P.G.D. biopsy        11:55:58
11  samples from clinics?                         11:56:02
12      A.   I told you, I don't do P.G.D.       11:56:03
13      Q.   How many labs in the country        11:56:06
14  currently do P.G.D.?                          11:56:10
15      A.   There's two kinds of P.G.D.         11:56:11
16  there's P.G.D. by fluorescent in situ         11:56:13
17  hybridization, which I won't say again,       11:56:13
18  either.  That's FISH.                        11:56:25
19      Then there's P.G.D. for                   11:56:25
20  mendelian genetic disorders, which are        11:56:27
21  done usually by P.C.R.                        11:56:33
22      In terms of FISH laboratories,           11:56:42
23  at the moment, I'm only aware of the Reproductive 11:56:42
24  Genetics Institute, Mark Hughes and           11:56:50
25  Genetics and I.V.F. Institute in Fairfax,     11:56:52

52

C. STROM, M.D., PhD.

2  Virginia that's doing DNA-based                11:56:55
3  preimplantation genetics.                      11:56:59
4      FISH-based diagnosis is also              11:56:59
5  Saint Barnabas in New Jersey with Santiago    11:57:01
6  Munee, M-U-N-E-E, and I believe he has        11:57:08
7  opened a satellite facility in southern       11:57:13
8  California, also.                             11:57:17
9      Q.   So as far as you can tell,           11:57:17
10  there are perhaps five labs today who are    11:57:20
11  doing P.G.D.?                                 11:57:24
12      A.   In the United States.               11:57:26
13      Q.   In the United States, right.        11:57:26
14      A.   Worldwide it's much larger.         11:57:30
15      Q.   As of 2004, was it the same         11:57:32
16  five labs, as far as you know?               11:57:35
17      A.   Yes.                                11:57:37
18      Q.   Do you agree that the objective     11:57:38
19  of P.G.D. is to lower the risk of a bad result 11:57:45
20  from the naturally occurring 25 percent       11:57:49
21  to a number approaching the impossible        11:57:54
22  rate of zero?                                 11:57:57
23      A.   Yes.                                11:57:58
24      Q.   Of the labs that are doing          11:57:58
25  P.G.D., which ones are doing FISH now?       11:58:10

53

C. STROM, M.D., PhD.

2  If you know?                                  11:58:13
3      A.   I wouldn't.                          11:58:14
4      Q.   Do you know as of -- FISH            11:58:15
5  wasn't done as of 2004, was it?              11:58:19
6      A.   Oh, yes, it was.                     11:58:21
7      Q.   It was.  Okay.                       11:58:21
8      A.   It was done in the '90s.            11:58:22
9      Q.   What labs were doing FISH in         11:58:25
10  2004, if you know?                           11:58:27
11      A.   I don't know.  Certainly           11:58:28
12  Reproductive Genetics Institute was and       11:58:32
13  Saint Barnabas in New Jersey was; but who     11:58:33
14  else was doing it, I can't say.              11:58:36
15      Q.   When you did P.G.D. in 2000, I      11:58:37
16  guess was the last time you did it, what did your 11:58:43
17  lab tell physicians and/or patients the       11:58:47
18  failure rate was?                            11:58:51
19      A.   Failure or misdiagnosis?           11:58:53
20  Please clarify.                              11:58:56
21      Q.   The misdiagnosis.                   11:58:57
22      A.   We told them it varied from         11:58:57
23  case to case and embryo to embryo and        11:59:01
24  each case was evaluated separately and we     11:59:06
25  would tell people that at the time of transfer, 11:59:09

14  (Pages 50 to 53)

66

C. STROM, M.D., PhD.

2  A.  Yes.  12:12:05
3  Q.  Where?  12:12:05
4  A.  Just colleagues in the same  12:12:05
5  field.  We didn't work in the same lab.  12:12:07
6  Q.  Did you and he ever work  12:12:09
7  together on a paper?  12:12:11
8  A.  I don't think I did.  I know  12:12:13
9  Yury did, Verlinsky.  Or I think Yury did.  I'm  12:12:17
10  under oath.  12:12:24
11  Q.  Have you reviewed any other  12:12:27
12  cases, whether or not you offered an opinion,  12:12:35
13  involving Mark Hughes, either against him  12:12:37
14  or for him?  12:12:40
15  A.  No.  12:12:42
16  MR. LEUCHTMAN:  Off the record.  12:12:48
17  (Thereupon an off-the-record  12:13:01
18  discussion was held.)  12:13:01
19  MR. LEUCHTMAN:  Back on the  12:13:01
20  record.  12:13:01
21  Q.  Do you have in front of you --  12:13:08
22  I think you do, you have the Genesis records,  12:13:09
23  correct?  12:13:13
24  A.  Yes, I do.  12:13:13
25  Q.  Would you look at the precase  12:13:14

67

C. STROM, M.D., PhD.

2  phone review of P.G.D. informed consent.  12:13:16
3  (The Witness perused the  12:13:27
4  exhibit.)  12:13:28
5  A.  Sorry.  I didn't need these in  12:13:28
6  2000 (indicated).  Yes.  12:13:35
7  Q.  Now, were there any errors or  12:13:40
8  omissions in that protocol form that you have  12:13:49
9  found?  12:13:52
10  MR. STEIN:  Do you mean  12:13:53
11  omissions against a standard?  Is that  12:13:54
12  what you're referring to?  12:13:55
13  BY MR. LEUCHTMAN:  12:13:55
14  Q.  Do you have an opinion whether  12:13:56
15  there were any errors or omissions in that form?  12:13:58
16  MR. STEIN:  I object to the form  12:14:02
17  of the question.  It's ambiguous.  12:14:04
18  MR. LEUCHTMAN:  Okay.  Swell.  12:14:07
19  You can answer the question.  12:14:09
20  (The Witness perused the  12:14:29
21  exhibit.)  12:14:30
22  MR. LEUCHTMAN:  I promise you  12:14:30
23  sooner or later we'll talk about standards  12:14:32
24  and care.  12:14:35
25  MR. STEIN:  When you say errors  12:14:35

68

C. STROM, M.D., PhD.

2  or omissions, are you talking about whether  12:14:38
3  there's an accurate transcription of what's  12:14:39
4  there or what was originally there or a typo?  12:14:42
5  MR. LEUCHTMAN:  The minute the  12:14:46
6  Witness says he doesn't understand the  12:14:47
7  question, I'll be happy to rephrase it.  12:14:52
8  MR. STEIN:  All right.  12:14:56
9  A.  I don't see anything obvious.  12:15:26
10  MR. LEUCHTMAN:  Okay.  12:15:43
11  BY MR. LEUCHTMAN:  12:15:47
12  Q.  I'm jumping ahead of both of  12:15:49
13  us, I guess, to ask you this question, but you  12:15:53
14  say in the report that one of your criticisms are  12:15:56
15  that the Grossbaums should have been  12:16:01
16  advised by Dr. Hughes as to the nature of  12:16:04
17  allele dropout and as to polar body biopsy  12:16:08
18  and/or genetic marker testing, correct?  12:16:09
19  A.  Yes.  12:16:12
20  Q.  We'll get to that, but other  12:16:12
21  than that, did Dr. Hughes fail to advise  12:16:15
22  the Grossbaums of anything of which he  12:16:19
23  should have advised them, as far as you  12:16:21
24  can tell from his deposition, from his  12:16:23
25  records or from this precase phone review  12:16:25

69

C. STROM, M.D., PhD.

2  which memorializes his conversation, his  12:16:29
3  one and only conversation with them?  12:16:35
4  A.  Other than those notable  12:16:37
5  exceptions.  12:16:39
6  Q.  None?  12:16:40
7  A.  None.  12:16:41
8  Q.  So did Dr. Hughes advise the  12:16:41
9  Grossbaums of anything he should not have  12:16:44
10  advised them?  12:16:47
11  A.  No.  12:16:48
12  Q.  Now, we talked about the one  12:16:48
13  misdiagnosis.  You are also a practicing  12:16:52
14  physician and have been ever since you  12:16:58
15  got your board certification in pediatrics,  12:17:00
16  correct?  12:17:04
17  A.  Prior.  12:17:04
18  Q.  If not before?  12:17:05
19  A.  Yes.  12:17:06
20  Q.  Have you ever been sued for  12:17:07
21  medical malpractice?  12:17:09
22  A.  No.  And you can look it up.  12:17:12
23  Q.  I have and I didn't find  12:17:20
24  anything.  In the context of this case,  12:17:22
25  how do you define standard of care?  12:17:24

18  (Pages 66 to 69)

**70**

C. STROM, M.D., PhD.

1  A. I define standard of care as            12:17:27
2  what any reasonable P.G.D. laboratory      12:17:30
3  would do at the time of the case.          12:17:36
4     Q. And do you limit that to the         12:17:38
5  United States?                             12:17:41
6     A. No.                     12:17:41
7     Q. Why not?                 12:17:42
8     A. I have no reason.        12:17:49
9     Q. And the time of the case, we         12:17:56
10 agree, was 2004?                           12:18:08
11    A. Uh-huh. Yes.            12:18:09
12    Q. Are you familiar with the            12:18:10
13 standard of care in P.G.D. as of 2004?     12:18:15
14    A. Yes.                    12:18:15
15    Q. What is the basis of that            12:18:21
16 familiarity?                               12:18:23
17    A. That I helped create the             12:18:24
18 standard of care as of the year 2000 and   12:18:27
19 I continued to be involved with the field  12:18:31
20 by reading and speaking with practitioners in 12:18:34
21 the field up until the present day.        12:18:38
22    MR. LEUCHTMAN: He needs to              12:18:50
23 change the tape.                 12:18:51
24    THE VIDEOGRAPHER: This marks            12:18:56

*(lines renumbered — see below)*

**71**

C. STROM, M.D., PhD.

1  the end of tape number one in the videotaped 12:18:57
2  deposition of Dr. Charles Strom. We're going 12:19:01
3  off the record. The time is 12:18.         12:19:04
4     (The deposition was suspended.)          12:19:12
5     THE VIDEOGRAPHER: This marks             12:21:09
6  the beginning of tape number two in the    12:28:29
7  videotaped deposition of Dr. Charles       12:28:32
8  Strom. We're going on the record. The      12:28:34
9  time is 12:28.                 12:28:37
10 BY MR. LEUCHTMAN:                12:28:39
11    Q. Dr. Strom, do you agree that         12:28:40
12 Mark Hughes never had a physician/patient  12:28:43
13 relationship with the Grossbaums?          12:28:48
14    A. Yes.                    12:28:48
15    Q. He's testified, in essence,          12:28:49
16 that after the initial lengthy consultation he 12:28:49
17 had with them in March of 2004, he does    12:28:52
18 not believe he had a duty to counsel with  12:28:56
19 them or communicate directly with them     12:28:59
20 other than perhaps answering questions     12:28:59
21 they might have had? Do you agree with     12:29:02
22 that statement?                 12:29:02
23    A. No.                     12:29:03
24    Q. What is the basis of your

**72**

C. STROM, M.D., PhD.

1  disagreement? Or state what your           12:29:03
2  disagreement is.                12:29:03
3     A. I believe whether him               12:29:07
4  personally or someone from Genesis         12:29:09
5  Genetics should have communicated to       12:29:12
6  either the physician or to the Grossbaums  12:29:13
7  the results of the amniocentesis and the   12:29:17
8  uncertainties surrounding them.            12:29:21
9     Q. So the question as phrased          12:29:23
10 your answer would be they didn't have a    12:29:25
11 duty --                   12:29:27
12    A. I said they did have a duty.        12:29:27
13    Q. -- to communicate directly with     12:29:31
14 the Grossbaums?                 12:29:33
15    A. Correct.               12:29:37
16    Q. Do you agree that the I.V.F.        12:29:41
17 physician or physicians are and should be  12:29:45
18 the primary contact with a couple in an    12:29:47
19 I.V.F. situation, even if it involves P.G.D.? 12:29:50
20    MR. HAMAD: Objection to form.          12:29:55
21    A. No. No, that I don't agree          12:29:55
22 with.                  12:29:57
23    Q. What's the basis of that            12:29:57
24 disagreement?                 12:29:59

**73**

C. STROM, M.D., PhD.

1  A. I don't believe in absolutes           12:29:59
2  and I believe relationships are developed  12:30:01
3  through specialists and consultants that   12:30:04
4  can oftentimes -- I've met physicians that 12:30:09
5  prefer that I do the communicating to      12:30:13
6  them.                  12:30:15
7     Q. Well, let me reread the             12:30:15
8  question and I want you to pay attention   12:30:17
9  to the word primary. Do you agree that the 12:30:17
10 I.V.F. physicians are and should be the    12:30:20
11 primary contact with the couple in an      12:30:23
12 I.V.F. situation, even if it involves P.G.D.? 12:30:25
13    A. I don't think that's a question     12:30:29
14 that's answerable.                12:30:30
15    Q. Do you agree that by having the     12:30:33
16 I.V.F. physician or physicians being the primary 12:30:38
17 contact with the couple in a P.G.D. situation, 12:30:41
18 the risk of confusion or conflicting information 12:30:44
19 is considerably reduced?           12:30:49
20    MR. HAMAD: Objection to form.          12:30:49
21    THE WITNESS: He objected.             12:31:01
22    MR. LEUCHTMAN: Great.                 12:31:02
23    MR. HAMAD: I'm not your lawyer,        12:31:03
24 so go ahead and answer.            12:31:06

**19  (Pages 70 to 73)**

**82**

C. STROM, M.D., PhD.

1
2  what they felt the accuracy of the assay should   12:38:35
3  be at the time and then at the time of   12:38:40
4  analysis to communicate the fact that   12:38:42
5  since there were so many failures that   12:38:45
6  the risk of A.D.O. was very high in this   12:38:46
7  case and that they should consider the   12:38:51
8  transfer with a great deal of caution.   12:38:53
9     Q.   Have you defined satisfactorily   12:38:56
10  what genetic markers are in this deposition?   12:39:00
11     A.   I believe I have.   12:39:05
12     Q.   Now, in order to do testing   12:39:06
13  with genetic markers, is it necessary to   12:39:09
14  get DNA from family members other than   12:39:12
15  the involved couple?   12:39:16
16     A.   Yes.   12:39:17
17     Q.   In 2004, was that DNA provided   12:39:18
18  in the form of blood?   12:39:20
19     A.   No.   12:39:22
20     Q.   How else were you getting DNA   12:39:23
21  in 2004?   12:39:27
22     A.   I thought you said provided in   12:39:28
23  this case.   12:39:30
24     Q.   No, I said in 2004, was DNA   12:39:30
25  provided when used for genetic markers in   12:39:34

**83**

C. STROM, M.D., PhD.

1
2  the form of blood?   12:39:37
3     A.   It was either in blood or skin   12:39:39
4  biopsies.  Yes.   12:39:42
5     Q.   I'd like you to turn to page   12:39:43
6  three of the precase phone review of   12:39:53
7  P.G.D. informed consent.   12:39:59
8        (The Witness perused the   12:40:04
9     exhibit.)   12:40:14
10    A.   Uh-huh.   12:40:14
11    Q.   Where it says -- and I'll find   12:40:15
12  the line for you, if I can.   12:40:17
13     "? Blood possible from parents?  Seems   12:40:22
14  not."   12:40:27
15     Do you see that?   12:40:28
16    A.   Um-hmm.   12:40:29
17    Q.   Now, does that suggest to you   12:40:29
18  that for whatever reasons, the Grossbaums   12:40:31
19  were not willing to provide Genesis with   12:40:35
20  DNA by way of blood from other family members?   12:40:37
21    A.   Not at all.   12:40:37
22    Q.   Well, how do you interpret that?   12:40:38
23    A.   It means they asked -- we call   12:40:40
24  the parents the Grossbaums.  So my guess   12:40:42
25  would be that he asked the Grossbaums for   12:40:46

**84**

C. STROM, M.D., PhD.

1
2  their own blood.   12:40:48
3     Q.   You interpret that as meaning   12:40:49
4  their blood, not their parents' blood?   12:40:53
5     A.   Right.  We would call their   12:40:53
6  parents grandparents and siblings, but Mark   12:40:56
7  Hughes may have a different interpretation, I   12:41:04
8  don't know; but the appropriate request   12:41:06
9  is not just for grandparents, but for siblings.   12:41:08
10    Q.   If you know, and I've asked you   12:41:13
11  this in another form --   12:41:28
12    A.   That was page four, by the way.   12:41:29
13    Q.   Pardon me?   12:41:29
14    A.   That was on page four.  Just a   12:41:32
15  correction.   12:41:32
16    Q.   No, it isn't.   12:41:32
17    A.   Yes, it is.  My page four.   12:41:36
18     MR. HAMAD:  The bottom of page   12:41:37
19  four --   12:41:38
20     THE WITNESS:  No, the middle of   12:41:39
21  page four.  I see it's page three up   12:41:41
22  top.  Okay, it's confusing.  Go ahead.   12:41:46
23     MR. LEUCHTMAN:  Okay.   12:41:48
24  BY MR. LEUCHTMAN:   12:41:49
25    Q.   Now, I've asked you this in one   12:41:53

**85**

C. STROM, M.D., PhD.

1
2  form or another and -- but I'll ask again.  Do   12:41:56
3  you know how many labs in the United   12:42:01
4  States used genetic markers at all in early to   12:42:02
5  mid 2004 for P.G.D.?   12:42:05
6     A.   I know of one for sure.  That   12:42:08
7  was my laboratory.   12:42:12
8     Q.   And you were not specifically   12:42:13
9  aware of any other lab at that time doing that?   12:42:14
10    A.   No.   12:42:17
11    Q.   Correct?   12:42:18
12    A.   Correct.   12:42:18
13    Q.   Did your lab use genetic   12:42:19
14  markers for two mutations at that time?   12:42:25
15    A.   No.  We used genetic markers   12:42:27
16  for three linked markers and whatever   12:42:31
17  mutations the patients had.  We always   12:42:34
18  looked at the specific mutations in   12:42:37
19  addition to the three linked markers.  So   12:42:39
20  in this case, we would have looked at five.   12:42:44
21    Q.   And you personally started   12:42:46
22  doing P.G.D. in either 1990 or the early   12:42:48
23  '90s?   12:42:52
24    A.   Yes.   12:42:53
25    Q.   When did you first read about   12:42:53

22  (Pages 82 to 85)

110

C. STROM, M.D., PhD.

1        C. STROM, M.D., PhD.
2   although this isn't a de benne esse     13:08:48
3   deposition anyway, because what is     13:08:52
4   done internationally is not standard     13:08:55
5   of care; but that aside, let me --     13:08:58
6       MR. STEIN: That's your     13:08:58
7   statement.     13:08:58
8       MR. LEUCHTMAN: Pardon me?     13:08:59
9       MR. STEIN: That's -- you're     13:08:59
10   making a legal statement now for the     13:09:00
11   Witness?     13:09:02
12       MR. LEUCHTMAN: I'm -- for the     13:09:03
13   Witness? No. It's for the record.     13:09:06
14       MR. STEIN: Oh, I see.     13:09:08
15   BY MR. LEUCHTMAN:     13:09:08
16    Q.   Putting aside allele dropout     13:09:12
17   and issues of multiplex testing polar body     13:09:14
18   biopsy, do you agree that in other respects     13:09:16
19   Dr. Hughes adequately explained the     13:09:19
20   process of P.G.D. to the Grossbaums?     13:09:21
21    A.   Yes, with those exceptions.     13:09:24
22    Q.   If Dr. Hughes had attempted to     13:09:26
23   explain allele dropout to the Grossbaums     13:09:33
24   in his one-hour plus conversation with them, do     13:09:35
25   you think they would have understood what     13:09:41

111

1        C. STROM, M.D., PhD.
2   he was talking about?     13:09:44
3    A.   I think it's possible to put     13:09:45
4   things in layman's terms, yes.     13:09:49
5    Q.   Not having read the depositions     13:09:51
6   of the Grossbaums, do you have any idea     13:10:02
7   of the level of their sophistication or lack of     13:10:03
8   the same in issues such as this?     13:10:09
9    A.   No.     13:10:11
10    Q.   Can you say, without engaging     13:10:11
11   in speculation, guess or conjecture, that if     13:10:23
12   Dr. Hughes had explained A.D.O. to the     13:10:23
13   Grossbaums, it would have been made a difference     13:10:27
14   in their decision to go forward with P.G.D.?     13:10:28
15    A.   No.     13:10:31
16    Q.   Do you know whether in early to     13:10:34
17   mid 2004, the average P.G.D. provider in the     13:10:39
18   United States with reasonable skill and care     13:10:43
19   specifically advised couples consulting with them     13:10:45
20   as to the nature of allele dropout?     13:10:50
21    A.   Yes.     13:10:52
22    Q.   How are you aware of that     13:10:52
23   knowledge?     13:10:55
24    A.   Because it's what we were doing     13:10:55
25   and what the people that we were talking     13:10:59

112

1        C. STROM, M.D., PhD.
2   to at meetings were doing. There are I.V.F.     13:11:01
3   providers who use genetics consultation     13:11:05
4   and any reasonable P.G.D. provider would     13:11:11
5   have had that discussion at that time.     13:11:15
6    Q.   When you say what we were     13:11:16
7   doing, you mean R.G.I. in Chicago?     13:11:18
8    A.   Yes. And the greater P.G.D.     13:11:20
9   community.     13:11:24
10    Q.   Did any of the following labs     13:11:25
11   advise couples consulting with them as to     13:11:27
12   the nature of allele dropout: R.G.I. in     13:11:31
13   Chicago, you said yes.     13:11:32
14    A.   Yes.     13:11:33
15    Q.   Reprogenetics in New Jersey?     13:11:33
16    A.   I can't say what they were     13:11:37
17   doing.     13:11:37
18    Q.   Genetics and I.V.F. in     13:11:39
19   Virginia?     13:11:42
20    A.   Can't say what they were doing.     13:11:42
21    Q.   And Cornell Medical Center in     13:11:43
22   New York City?     13:11:46
23    A.   Can't say what they were doing.     13:11:46
24    Q.   Please describe what polar body     13:11:47
25   biopsies are? Let me back up.     13:11:52

113

1        C. STROM, M.D., PhD.
2   Are you aware of any other     13:11:54
3   P.G.D. labs that existed in early to mid 2004     13:11:58
4   besides the four that I've mentioned?     13:12:03
5    A.   There was another lab called     13:12:05
6   Shady Grove that I don't know if they     13:12:08
7   were doing DNA-based diagnoses at the     13:12:09
8   time. Baylor had a small program they     13:12:12
9   were trying to develop. There was a lab     13:12:16
10   in Florida that was trying to develop     13:12:20
11   P.G.D., but I'm not sure what they were     13:12:23
12   doing.     13:12:23
13    Q.   Where was Shady Grove?     13:12:27
14    A.   I think it's in North Carolina.     13:12:27
15   LabCorp bought it.     13:12:30
16    Q.   And you think they were in     13:12:31
17   existence in 2004, but you're not sure?     13:12:34
18    A.   I don't know.     13:12:36
19    Q.   You don't know. Okay. And,     13:12:37
20   of course, you also don't know what they     13:12:37
21   were advising couples?     13:12:39
22    A.   No, because I wasn't sitting in     13:12:41
23   the room with them.     13:12:44
24    Q.   Right. And you don't know what     13:12:44
25   Baylor was?     13:12:47

29 (Pages 110 to 113)

**118**

C. STROM, M.D., PhD.

1
2  option of polar body removal in P.G.D.   13:16:25
3  cases in cystic fibrosis in 2004?   13:16:31
4      A.  I don't know the statistics.  I   13:16:32
5  simply don't know.   13:16:35
6      Q.  Do you agree that it's true   13:16:37
7  that polar body biopsies or removal are   13:16:45
8  mainly done because a particular hospital   13:16:50
9  or country does not permit biopsies of   13:16:53
10  embryos?   13:16:57
11      A.  I don't think that's an   13:16:58
12  accurate statement.   13:17:00
13      Q.  What foreign countries do polar   13:17:00
14  body removal regularly?   13:17:02
15      A.  Germany, France, Belgium,   13:17:02
16  Italy.   13:17:06
17      Q.  Is that because of restrictive   13:17:08
18  laws?   13:17:10
19      A.  I'm not told.  I don't know why   13:17:10
20  they do polar body biopsies.  There are   13:17:13
21  restrictive laws in this country.   13:17:16
22      Q.  Do you agree that even today   13:17:16
23  polar body biopsy is not a mainstream   13:17:18
24  approach in the United States?   13:17:20
25      A.  I disagree.   13:17:21

**119**

C. STROM, M.D., PhD.

1
2      Q.  What is the basis of your   13:17:22
3  opinion to disagree with that?   13:17:26
4      A.  By the sheer numbers that we   13:17:28
5  still continue to do in the lab in Chicago.  We   13:17:32
6  provide services to I.V.F. providers all   13:17:35
7  over the United States and it's just one   13:17:39
8  of the many -- it's an established option.   13:17:41
9      Q.  And your definition of mainstream   13:17:46
10  is whether something is established?   13:17:53
11      A.  I said it's established.  I don't know   13:17:55
12  the definition of mainstream.   13:17:57
13      Q.  How is it that you're aware of   13:18:01
14  what R.G.I. in Chicago practices are today?   13:18:04
15      A.  Because I recently went to Yury   13:18:07
16  Verlinsky's funeral in October -- in July or   13:18:13
17  August and I spent a great -- a day or two with   13:18:14
18  them reviewing what they're doing, finding out   13:18:17
19  what's going on.   13:18:20
20      Q.  Do you know whether in 2010   13:18:21
21  the average P.G.D. provider in the United States   13:18:23
22  with reasonable skill and care would have   13:18:27
23  been used genetic marker testing for cystic   13:18:29
24  fibrosis in undergoing P.G.D.?   13:18:34
25      MR. STEIN:  Object to the form   13:18:37

**120**

C. STROM, M.D., PhD.

1
2  of the question.  The doctor already   13:18:38
3  said he doesn't know what average   13:18:41
4  means in the terms of the context.   13:18:43
5  BY MR. LEUCHTMAN:   13:18:46
6      Q.  We're going to define average   13:18:46
7  as meaning that more of them are doing a   13:18:48
8  certain thing or engaged in a certain practice   13:18:53
9  than not.  Using that definition, and that's   13:18:57
10  going to be the consistent definition for   13:19:00
11  my questions for averaging.   13:19:04
12      A.  I would say the overwhelming   13:19:05
13  majority of P.G.D. centers would offer linked   13:19:07
14  marker testing for patients that are compound   13:19:09
15  heterozygotes.   13:19:16
16      Q.  Using my definition of average,   13:19:21
17  do you know whether in early to mid 2004,   13:19:52
18  the average P.G.D. provider in the United   13:19:56
19  States with reasonable skill and care would have   13:19:58
20  used genetic marker testing for cystic fibrosis   13:20:01
21  in undergoing preimplantation genetic diagnosis?   13:20:05
22      MR. STEIN:  I object to the form   13:20:10
23  of the question.   13:20:11
24      A.  As I said, the overwhelming   13:20:11
25  majority of centers with a case of cystic   13:20:14

**121**

C. STROM, M.D., PhD.

1
2  fibrosis with parents of compound   13:20:18
3  heterozygosity would offer linked marker   13:20:22
4  testing.   13:20:24
5      Q.  In 2004?   13:20:24
6      A.  Yes.   13:20:25
7      Q.  What's the basis of that   13:20:25
8  opinion?   13:20:27
9      A.  Basis of that opinion is the   13:20:27
10  overwhelming literature in support of this, my   13:20:29
11  attending meetings and speaking with people   13:20:34
12  at the meetings in terms of what they   13:20:36
13  were providing in their own practice and   13:20:39
14  the fact that we were providing probably   13:20:40
15  over half the services for P.G.D. in the   13:20:42
16  country at that time.   13:20:45
17      Q.  R.G.I. was?   13:20:46
18      A.  Uh-huh.   13:20:48
19      MR. STEIN:  Yes?   13:20:50
20      THE WITNESS:  Yes.   13:20:52
21  BY MR. LEUCHTMAN:   13:20:54
22      Q.  As of early to mid 2004, without   13:20:55
23  guessing or making assumptions, which of   13:20:57
24  the following labs were doing genetic marker   13:20:57
25  testing for cystic fibrosis:  R.G.I. in Chicago?   13:21:01

31  (Pages 118 to 121)

122

| | C. STROM, M.D., PhD. | |
|---|---|---|
| 1 | C. STROM, M.D., PhD. | |
| 2 | A. Yes. | 13:21:06 |
| 3 | Q. Reprogenetics in New Jersey? | 13:21:06 |
| 4 | A. Don't know. | 13:21:11 |
| 5 | Q. Genetics and I.V.F. in | 13:21:12 |
| 6 | Virginia? | 13:21:12 |
| 7 | A. Don't know. | 13:21:12 |
| 8 | Q. Cornell Medical Center in New | 13:21:14 |
| 9 | York City? | 13:21:16 |
| 10 | A. Don't know. | 13:21:16 |
| 11 | Q. Genesis Genetics? | 13:21:17 |
| 12 | A. Don't know. Oh, no. Genesis | 13:21:18 |
| 13 | wasn't. He said he wasn't. | 13:21:22 |
| 14 | Q. Shady Grove? | 13:21:22 |
| 15 | A. No. | 13:21:24 |
| 16 | Q. No, you don't know; or no, they | 13:21:24 |
| 17 | weren't? | 13:21:24 |
| 18 | A. No, I don't know. | 13:21:27 |
| 19 | Q. Baylor? | 13:21:28 |
| 20 | A. Don't know. | 13:21:29 |
| 21 | Q. And the lab in Florida we | 13:21:32 |
| 22 | talked about? | 13:21:40 |
| 23 | A. Don't know. | 13:21:41 |
| 24 | Q. Do you agree with Drs. Kangpu | 13:21:42 |
| 25 | Xu and Mark Hughes that under the circumstances | 13:21:50 |

123

| 1 | C. STROM, M.D., PhD. | |
|---|---|---|
| 2 | existing at the time in this case it was proper | 13:21:52 |
| 3 | to recommend embryos seven and eight for | 13:21:54 |
| 4 | transfer? | 13:21:58 |
| 5 | A. No. | 13:21:58 |
| 6 | Q. What should have been done, | 13:22:01 |
| 7 | given -- you've seen the analysis of the embryos, | 13:22:07 |
| 8 | correct? | 13:22:11 |
| 9 | A. Yes. | 13:22:11 |
| 10 | Q. All right. What recommendations, | 13:22:13 |
| 11 | if any, should Dr. Hughes have made at that | 13:22:15 |
| 12 | time? | 13:22:19 |
| 13 | A. He should have had the | 13:22:19 |
| 14 | conversation either with the physician or | 13:22:20 |
| 15 | with the Grossbaums saying that given the | 13:22:22 |
| 16 | details of this case, that these diagnoses could | 13:22:24 |
| 17 | not be considered reliable in that the Grossbaums | 13:22:28 |
| 18 | should make the decision based on that data. | 13:22:34 |
| 19 | Q. So you do not believe that any | 13:22:49 |
| 20 | different embryos should have been transferred? | 13:23:02 |
| 21 | A. No. | 13:23:05 |
| 22 | Q. Do you believe the procedure | 13:23:06 |
| 23 | should have been cancelled or postponed | 13:23:10 |
| 24 | or is it just your testimony that was up to the | 13:23:12 |
| 25 | Grossbaums? | 13:23:15 |

124

| 1 | C. STROM, M.D., PhD. | |
|---|---|---|
| 2 | A. Correct. | 13:23:16 |
| 3 | Q. Do you have an opinion as to | 13:23:17 |
| 4 | what they would have agreed or not agreed | 13:23:22 |
| 5 | to do? | 13:23:25 |
| 6 | A. No opinion. | 13:23:27 |
| 7 | Q. Do you agree that the two | 13:23:28 |
| 8 | embryos Dr. Hughes said were okay for | 13:23:42 |
| 9 | transfer were eight and ten? | 13:23:45 |
| 10 | A. That's what I was told. | 13:23:47 |
| 11 | Q. Well, you have it in front of | 13:23:48 |
| 12 | you. | 13:23:50 |
| 13 | A. I was told that those were the | 13:23:53 |
| 14 | ones that were transferred. | 13:23:55 |
| 15 | MR. STEIN: Look at the report. | 13:23:57 |
| 16 | THE WITNESS: I'm sorry. You | 13:23:59 |
| 17 | took something from me. Oh, here. | 13:24:05 |
| 18 | (The Witness perused the | 13:24:11 |
| 19 | exhibit.) | 13:24:12 |
| 20 | A. Well, in this particular report, | 13:24:12 |
| 21 | embryos four, seven, eight, thirteen and | 13:24:24 |
| 22 | fifteen would be considered eligible for | 13:24:31 |
| 23 | transfer. | 13:24:35 |
| 24 | Q. On the right-hand column, do | 13:24:36 |
| 25 | you agree that the two that Dr. Hughes or | 13:24:40 |

125

| 1 | C. STROM, M.D., PhD. | |
|---|---|---|
| 2 | his lab said okay for transfer were seven | 13:24:44 |
| 3 | and eight? | 13:24:47 |
| 4 | MR. HAMAD: Objection to form, | 13:24:48 |
| 5 | asked and answered. | 13:24:49 |
| 6 | A. That's actually incorrect. The | 13:24:50 |
| 7 | two that he's got are ten -- | 13:24:52 |
| 8 | Q. I'm sorry, I meant eight and | 13:24:54 |
| 9 | ten. I apologize. Seven and eight were | 13:24:56 |
| 10 | transferred and do we agree that the two | 13:24:59 |
| 11 | he said were okay for transfer were eight | 13:25:01 |
| 12 | and ten? | 13:25:04 |
| 13 | MR. HAMAD: Objection to form. | 13:25:05 |
| 14 | Asked and answered. He already said | 13:25:07 |
| 15 | which ones were eligible for transfer; but | 13:25:07 |
| 16 | beyond that, you can answer it again. | 13:25:08 |
| 17 | A. I think what's interesting to | 13:25:10 |
| 18 | me is that he's got several that say carrier at | 13:25:14 |
| 19 | worst. | 13:25:18 |
| 20 | Q. No, I didn't ask what interests | 13:25:19 |
| 21 | you. I asked you do you agree that the two | 13:25:23 |
| 22 | embryos that are said in that report to be okay | 13:25:24 |
| 23 | for transfer are eight and ten? | 13:25:29 |
| 24 | A. Yes. | 13:25:32 |
| 25 | Q. All right. Do you agree that | 13:25:33 |

32 (Pages 122 to 125)

126

1     C. STROM, M.D., PhD.
2 other than control samples CG and MG, the    13:25:36
3 only cells that were biopsied that had no    13:25:40
4 deletion on the paternal side were samples    13:25:44
5 two, which had a mutant maternal allele    13:25:47
6 and therefore possible paternal A.D.O.,    13:25:51
7 eight and ten?    13:25:57
8     MR. HAMAD: I have an objection    13:25:58
9 to this line of question, in that you stopped    13:26:01
10 him from answering the question, the    13:26:04
11 prior question, and also in the fact that I    13:26:06
12 think you're asking the question --    13:26:08
13     MR. LEUCHTMAN: No, I didn't    13:26:09
14 stop him from answering the question.    13:26:10
15     MR. HAMAD: He wasn't finished.    13:26:11
16     MR. LEUCHTMAN: I encouraged him    13:26:13
17 to answer the question and not to ramble on.    13:26:14
18     MR. STEIN: I object to the    13:26:19
19 characterization of the Doctor rambling on.    13:26:23
20 He's responding to your questions.    13:26:25
21     MR. LEUCHTMAN: Once encouraged,    13:26:26
22 yes, I agree, and I'd like an answer to this    13:26:28
23 one.    13:26:29
24    A.   Okay. Column two, no deletion,    13:26:29
25 sample number two; no deletion, sample    13:26:33

127

1     C. STROM, M.D., PhD.
2 number eight; no deletion sample number    13:26:35
3 ten.    13:26:38
4    Q.   What does no deletion mean?    13:26:38
5    A.   It means, the Delta F 508    13:26:40
6 mutation was not observed in those samples.    13:26:46
7    Q.   What does no amp mean?    13:26:50
8    A.   No amp means no amplification.    13:26:53
9 Means no analysis.    13:26:57
10    Q.   Doctor, I'm going to ask you    13:26:58
11 questions about two embryos, eight and    13:27:00
12 ten and I want to make it clear it that I'm    13:27:02
13 not asking whether one was more likely    13:27:06
14 than the other, but whether you can say    13:27:08
15 without engaging in guess, speculation,    13:27:10
16 or conjecture that either one in and of    13:27:12
17 itself was more likely than not the involved    13:27:14
18 embryo. Do you follow me?    13:27:18
19    A.   No. That's a stupid question.    13:27:19
20     There are higher risks to one    13:27:22
21 of these embryos than the other embryo,    13:27:25
22 but that doesn't mean it's more likely than not    13:27:28
23 to have been the one that caused the    13:27:32
24 pregnancy.    13:27:34
25    Q.   That's what I'm trying to ask    13:27:34

128

1     C. STROM, M.D., PhD.
2 you now.    13:27:36
3    A.   There's no way to know which of    13:27:36
4 those embryos resulted in the pregnancy.    13:27:39
5    Q.   There's no way to know.    13:27:41
6    A.   No.    13:27:44
7    Q.   All right. Do you have an    13:27:49
8 opinion as to the percentage chances of --    13:28:44
9 strike that.    13:28:48
10     Now, this is an issue we    13:28:51
11 touched on earlier. Was it reasonable for    13:28:58
12 Dr. Hughes to set as a condition to Genesis    13:29:01
13 doing P.G.D. the undergoing by a couple    13:29:05
14 of C.V.S. or amniocentesis?    13:29:08
15    A.   A requirement? I don't think    13:29:14
16 that's reasonable.    13:29:16
17    Q.   As a precondition of his    13:29:17
18 getting involved.    13:29:18
19    A.   Well, that's up to him. It's    13:29:19
20 his decision.    13:29:22
21    Q.   Do you agree or disagree that    13:29:23
22 it's important scientifically for a lab doing    13:29:25
23 single cell P.G.D. to learn that there's    13:29:29
24 been a failure or a misdiagnosis ten to    13:29:34
25 fifteen weeks into a pregnancy as opposed    13:29:37

129

1     C. STROM, M.D., PhD.
2 to after the baby has been born?    13:29:41
3    A.   No.    13:29:43
4    Q.   Do you agree that as of early    13:29:44
5 to mid 2004, Genesis consisted of scientists    13:29:49
6 trying to develop a complicated single cell test?    13:29:52
7     MR. STEIN: I object to the form    13:29:58
8 of the question. How is he supposed    13:29:59
9 to know what was going on at Genesis    13:30:02
10 Genetics?    13:30:04
11     MR. LEUCHTMAN: I guess especially    13:30:04
12 now that he's coached, he can say I don't    13:30:07
13 know.    13:30:10
14     MR. STEIN: You know, when you    13:30:10
15 ask a question that is loaded with    13:30:11
16 presumptions and assumptions that on    13:30:14
17 its face is beyond the canon of anything    13:30:16
18 who's not intimately involved in the    13:30:22
19 operation of Genesis Genetics, the    13:30:26
20 question speaks for itself as being    13:30:27
21 inappropriate and if you couch it in    13:30:30
22 those terms, you get an objection from    13:30:33
23 me.    13:30:37
24     MR. LEUCHTMAN: Noted.    13:30:37
25     MR. STEIN: Thank you.    13:30:38

33 (Pages 126 to 129)

**134**

C. STROM, M.D., PhD.

1
2 weeks into the pregnancy other than amnio   13:35:57
3 or C.V.S.?   13:35:58
4    A.   We can't do an amnio that   13:35:59
5 early. Other than prenatal diagnosis.   13:36:06
6    Q.   Ten to sixteen weeks.   13:36:06
7    A.   We can't do an amnio at 10 to   13:36:06
8 16 weeks.   13:36:06
9    Q.   When do you do an amnio?   13:36:06
10    A.   From 16 weeks up. C.V.S. is   13:36:06
11 early.   13:36:09
12    Q.   All right. Well, I thought I   13:36:10
13 said 16 weeks, and you're saying --   13:36:13
14    A.   You said 10 to 16 weeks.   13:36:15
15    Q.   Okay.   13:36:18
16    A.   Well, you're trying to perjure   13:36:18
17 me, I'm sure.   13:36:23
18    Q.   I'm trying to what?   13:36:23
19    A.   I'm trying to be accurate. You   13:36:23
20 can do a C.V.S. at any time after nine weeks;   13:36:28
21 and yes, the only way to determine   13:36:28
22 whether the child is afflicted with cystic   13:36:30
23 fibrosis is to do a prenatal diagnosis.   13:36:33
24    Q.   And as of 2004, were those   13:36:33
25 prenatal diagnostic procedures C.V.S. or   13:36:36

**135**

C. STROM, M.D., PhD.

1
2 amniocentesis?   13:36:39
3    A.   Correct.   13:36:41
4    Q.   And the range for C.V.S., so   13:36:42
5 that we're agreed you're not being tricked,   13:36:46
6 either attempted or otherwise, or to use   13:36:51
7 your word coerced, the range for C.V.S.   13:36:53
8 is what?   13:36:56
9    A.   Nine weeks to twelve weeks,   13:36:56
10 usually.   13:36:59
11    Q.   For amnio?   13:36:59
12    A.   Sixteen weeks and up.   13:37:02
13    Q.   And just so that we're clear,   13:37:06
14 do you agree that the Grossbaums agreed   13:37:11
15 in writing with Dr. Hughes, Genesis Genetics   13:37:13
16 and N.Y.U. that Chaya Grossbaum would   13:37:15
17 undergo C.V.S. or amniocenteses if she got   13:37:20
18 pregnant in the course of this P.G.D., I.V.F.   13:37:20
19 endeavor?   13:37:26
20    A.   Actually, I don't know that.   13:37:26
21    Q.   Do you have the N.Y.U. records?   13:37:27
22    A.   No.   13:37:30
23    Q.   Wow. You are a scientist,   13:37:31
24 right?   13:37:38
25    A.   I consider myself to be.   13:37:38

**136**

C. STROM, M.D., PhD.

1
2    Q.   All right.   13:37:40
3    A.   A medical scientist.   13:37:42
4    Q.   And a scientist wants to look   13:37:43
5 at the universe of relevant information available   13:37:47
6 to him or her in order to formulate opinions   13:37:52
7 based upon that body of knowledge, correct?   13:37:56
8    A.   Yes.   13:38:01
9    Q.   When you were looking at the   13:38:02
10 P.G.D. I.V.F. process --   13:38:04
11    MR. HAMAD: Objection to form.   13:38:08
12 BY MR. LEUCHTMAN:   13:38:09
13    Q.   Were you not, in --   13:38:09
14    MR. LEUCHTMAN: I'm sorry,   13:38:11
15 what's the problem with the question,   13:38:12
16 Jay? How is that incorrect as to form?   13:38:15
17    MR. HAMAD: Well, you're telling   13:38:16
18 him what he was looking at. That's what he   13:38:18
19 was asked to do. You're telling him looking   13:38:18
20 at the P.G.D. I.V.F. process, he wasn't asked   13:38:22
21 to look at that.   13:38:23
22    MR. LEUCHTMAN: You're saying I   13:38:24
23 can't lead an opposing expert?   13:38:26
24    MR. STEIN: You can, but you   13:38:29
25 can't expand by virtue of your question the   13:38:30

**137**

C. STROM, M.D., PhD.

1
2 scope of the witness's investigation. If he   13:38:35
3 was asked to look at Genesis Genetics'   13:38:39
4 participation in this process, then   13:38:43
5 that's what he was asked to look at.   13:38:43
6    Why don't you find out whether   13:38:43
7 he was asked to evaluate N.Y.U.?   13:38:45
8    MR. LEUCHTMAN: Well, I know he   13:38:47
9 wasn't asked to evaluate very much, because   13:38:48
10 he didn't get your clients' deposition   13:38:48
11 transcripts, any of the transcripts from   13:38:52
12 N.Y.U. or N.Y.U.'s records, which frankly   13:38:54
13 strikes me as -- and I'm not even sure of the   13:38:58
14 use of the word intellectually, but I'm going   13:39:01
15 to say it, intellectually dishonest. How's   13:39:06
16 that?   13:39:07
17    MR. STEIN: You can use the   13:39:07
18 term, but there are some of us who   13:39:09
19 recognize that there's a dichotomy of   13:39:11
20 specialty and interest in terms of the   13:39:14
21 physicians who are involved in I.V.F.   13:39:16
22 and the physicians who were involved   13:39:18
23 in genetic analysis; and therefore, maybe   13:39:20
24 the doctor was just asked, as I indicate to   13:39:25
25 you he was, to report on what the   13:39:28

35 (Pages 134 to 137)

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

138

```
1        C. STROM, M.D., PhD.
2    conduct of Genesis Genetics was in        13:39:32
3    this process of P.G.D.              13:39:33
4        So let's not begin to start playing   13:39:36
5    games in the litigation field. Lawyers can  13:39:40
6    ask questions, like you have been asking,   13:39:43
7    that may go far beyond the scope of        13:39:45
8    the Witness's involvement in this case.    13:39:50
9    BY MR. LEUCHTMAN:                  13:39:56
10   Q.   Doctor, are you familiar with        13:39:57
11   the story about the four or five blind people  13:39:58
12   being taken up to an elephant and one of   13:40:02
13   them thinks it's a snake, because he gets  13:40:07
14   the trunk to handle and another one        13:40:10
15   thinks it's maybe a tree because he's got  13:40:13
16   his arms around a leg --             13:40:14
17   A.   I'm familiar with the story.        13:40:14
18   Q.   Were you satisfied as a          13:40:16
19   scientist in your role at only finding the snake  13:40:18
20   and ignoring the larger picture of what was  13:40:22
21   going on with the Grossbaums in the       13:40:26
22   P.G.D. I.V.F. endeavor that resulted in    13:40:29
23   the birth of Rosie Grossbaum?           13:40:33
24       MR. HAMAD: Object to form.          13:40:37
25   A.   I was asked to do a task. I         13:40:38
```

139

```
1        C. STROM, M.D., PhD.
2    reviewed the materials I was sent and I    13:40:38
3    did my task.                        13:40:42
4        This is not a scientific endeavor,   13:40:42
5    this is a legal endeavor and in my experience,  13:40:46
6    they're mutually exclusive.           13:40:49
7    Q.   In my experience in this         13:40:55
8    deposition, they are, but that's not the point  13:40:57
9    we're getting at.                   13:40:57
10   A.   Are you insulting me personally?  13:40:59
11   I just want to know.                13:41:02
12   Q.   I don't know you, but what I am   13:41:03
13   insulting is that you can make assessments that  13:41:06
14   affect someone's reputation and livelihood  13:41:10
15   without looking at the entire picture, just  13:41:14
16   looking at one corner of a page that constitutes  13:41:16
17   the universe of available facts in this case.  13:41:19
18   A.   Counselor, whether or not this   13:41:21
19   patient would have had a C.V.S. or a termination  13:41:23
20   is irrelevant to the conduct of the case.  13:41:27
21   Q.   I'm not just talking about that.  13:41:30
22       MR. HAMAD: I object to this        13:41:30
23   whole line of questioning and I dare      13:41:32
24   to call it questioning. It's more a       13:41:32
25   barrage of the Witness and back and       13:41:34
```

140

```
1        C. STROM, M.D., PhD.
2    forth here.                         13:41:34
3        Listen. Here's the bottom line.    13:41:36
4    He was asked to do something, he        13:41:37
5    reviewed what he reviewed, he gave an      13:41:39
6    opinion. That's it. Now trying to expand  13:41:40
7    the scope of this Witness here is not     13:41:42
8    proper, okay?                       13:41:44
9        MR. LEUCHTMAN: I'm not trying      13:41:46
10   to get him to testify against your client,  13:41:47
11   Jay, and I appreciate that you are       13:41:47
12   otherwise somehow -- well, I'm not        13:41:51
13   sure what incites your passion in this    13:41:54
14   line of questioning.                 13:41:56
15       MR. HAMAD: Well, if you have       13:42:00
16   thirty seconds, I could explain it to you  13:42:01
17   exactly, because, I mean --          13:42:04
18       THE WITNESS: You guys only        13:42:05
19   have 17 minutes to your conference call.  13:42:07
20       MR. HAMAD: Then I guess not.      13:42:13
21   BY MR. LEUCHTMAN:                  13:42:28
22   Q.   Well, it's your opinion that     13:42:28
23   there's nothing in Dr. Hughes's records,  13:42:30
24   the contractual agreement to have        13:42:37
25   I.V.F. -- not I.V.F. -- the contractual agreement  13:42:37
```

141

```
1        C. STROM, M.D., PhD.
2    to have C.V.S. or amnio aside and this    13:42:42
3    Evans reference aside, that indicates that  13:42:45
4    there was a discussion between Dr. Hughes  13:42:49
5    and the Grossbaums about amnio or C.V.S.  13:42:54
6    or that reflected their attitude about it one or  13:42:59
7    the other, correct?                 13:43:05
8    A.   Correct.                      13:43:07
9    Q.   And might the N.Y.U. records      13:43:07
10   shed some light on the attitude of the    13:43:09
11   Grossbaums about C.V.S. or amnio?        13:43:11
12       MR. STEIN: That's speculation.    13:43:17
13   You told him not to speculate.          13:43:19
14       MR. LEUCHTMAN: Well, it is now.  13:43:19
15   Had he had the records, it wouldn't be.   13:43:20
16   A.   You asked me not to speculate    13:43:23
17   and I won't.                        13:43:25
18   Q.   Well, you've made a statement    13:43:30
19   that they were coerced into having amnio or  13:43:34
20   C.V.S., although now you've been informed  13:43:41
21   that they didn't have it. All right. The long  13:43:48
22   and short of it is you don't know what    13:43:49
23   the N.Y.U. records say on that issue.      13:43:53
24   A.   That's right.                  13:43:56
25   Q.   Or since you say it's a couple's  13:43:56
```

---

**150**

C. STROM, M.D., PhD.

1
2  you.                                  13:57:09
3  BY MR. LEUCHTMAN:                      13:57:10
4      Q.  Sir?                           13:57:10
5      A.  Why don't you read them back to    13:57:10
6  me.  You read them to me before.        13:57:17
7      Q.  Read what to you?               13:57:19
8      A.  My conclusions.  That's what    13:57:21
9  you're asking, isn't it?               13:57:24
10     Q.  Well, okay.  Your conclusions   13:57:26
11 had to do with certain things that Dr. Hughes, in  13:57:29
12 your opinion, either did that he shouldn't have   13:57:34
13 done or didn't do that he should have.    13:57:37
14     A.  That's correct.                 13:57:41
15     Q.  I'm asking now is there a       13:57:42
16 causal link between that list of five or six   13:57:44
17 opinions and the bad result in that case?    13:57:46
18         MR. STEIN:  He's asked and      13:57:49
19     answered that question.             13:57:50
20     A.  Well, causal is, I mean, it's   13:57:54
21 contributory.                          13:58:00
22     Q.  What does that mean?            13:58:01
23     A.  It contributed to the outcome   13:58:02
24 of this case.                          13:58:06
25     Q.  Explain in what way you believe    13:58:07

---

**151**

C. STROM, M.D., PhD.

1
2  it contributed.                        13:58:12
3      A.  Well, in several ways.  First   13:58:13
4  the case shouldn't have been done to    13:58:15
5  begin with in this manner.  Second, the   13:58:18
6  fact that it was done and done poorly   13:58:22
7  matters; and third, that it ended up with   13:58:25
8  the birth of an affected child and I think that    13:58:28
9  they all contribute.                   13:58:31
10     Q.  Can each of the following       13:58:34
11 things be possible causes of failure or    13:58:37
12 misdiagnosis in P.G.D.?  One:  Mosaicism?    13:58:41
13     A.  Yes.                            13:58:45
14     Q.  Quickly, what is mosaicism?     13:58:45
15     A.  Mosaicism is when every cell in   13:58:48
16 the embryo is not identical.            13:58:51
17     Q.  As of 2004, was it possible to   13:58:53
18 predict mosaicism with any degree of medical    13:58:56
19 probability?                           13:59:00
20     A.  No.                             13:59:01
21     Q.  Was mosaicism a possible, not   13:59:02
22 necessarily a probable or the probable, but a    13:59:07
23 possible cause of the failure or misdiagnosis in   13:59:10
24 this case?                             13:59:11
25     A.  It could be ruled out by        13:59:11

---

**152**

C. STROM, M.D., PhD.

1
2  testing of the child, but I don't think    13:59:14
3  that that testing has been done yet.  So   13:59:18
4  at the moment, it's still possible.     13:59:21
5      Q.  So with that in mind -- I don't   13:59:24
6  want to make any assumptions about what    13:59:36
7  you might say -- can you without speculating    13:59:39
8  ascribe a percentage of the possible causes of   13:59:42
9  the bad result in this case to mosaicism?    13:59:46
10     A.  Negligibly small.               13:59:49
11     Q.  How did DNA contamination       14:00:00
12 occur, or how can it occur, particularly six   14:00:04
13 years ago in 2004?                     14:00:09
14     A.  Well, DNA contamination can     14:00:10
15 occur, I don't know if intracytoplasmic sperm   14:00:13
16 injection was done in this case.  I assume it    14:00:23
17 was, because that was the standard of    14:00:26
18 care.  Then DNA contamination can occur   14:00:29
19 if the needle as it's going in brushes    14:00:33
20 against coronal cells that surround the    14:00:37
21 embryo.                                14:00:41
22     Q.  Can ambient DNA contaminate     14:00:45
23 an embryo from, first, the embryologist during   14:00:49
24 fertilization?                         14:01:02
25     A.  Theoretically, yes.  We've      14:01:02

---

**153**

C. STROM, M.D., PhD.

1
2  never observed it.  Embryologists wear   14:01:02
3  gloves.                                14:01:03
4      Q.  Second, the way the egg is      14:01:03
5  fertilized?                            14:01:06
6      A.  Yes.  That's I-C-S-I.  ICSI.  It's   14:01:06
7  the abbreviation for intracytoplasmic sperm    14:01:06
8  injection.                             14:01:17
9          MR. LEUCHTMAN:  It's two        14:01:17
10     o'clock.                            14:01:19
11         MR. HAMAD:  My office is calling    14:01:20
12     in with the Judge and everybody on the    14:01:22
13     line.                               14:01:25
14         MR. LEUCHTMAN:  All right.       14:01:26
15 BY MR. LEUCHTMAN:                       14:01:26
16     Q.  Can ambient DNA contaminate an    14:01:27
17 embryo from cells near the egg when it was   14:01:30
18 removed from the ovary?                 14:01:34
19     A.  I just said that.               14:01:35
20     Q.  Okay.  And from cells attaching    14:01:36
21 to the person, such as from the prostate?    14:01:39
22     A.  I have not heard of that one,    14:01:42
23 but I guess it's a possibility.         14:01:46
24     Q.  Was DNA contamination a         14:01:49
25 possible cause of the failure or misdiagnosis in   14:01:51

---

39  **(Pages 150 to 153)**

# EXHIBIT 2

**Mark Hughes**
**5/14/2010**

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   IN THE DISTRICT OF NEW JERSEY

3   ------------------------------------/

4   CHAYA GROSSBAUM and MENCHEN

5   GROSSBAUM, Her Spouse, Individually, and

6   as Guardian ad litem of the Infant, ROSIE

7   GROSSBAUM,

8                   Plaintiffs,

9    -vs-                        Index No. 07-CV-359

10  GENESIS GENETICS INSTITUTE, LLC,

11  OF THE STATE OF MICHIGAN, MARK R.

12  HUGHES, M.D., NEW YORK UNIVERSITY

13  SCHOOL OF MEDICINE, and NEW YORK

14  UNIVERSITY HOSPITALS CENTER, both

15  Corporations of the State of New York,

16  ABC CORPORATIONS:  1-10 and John Doe,

17       Defendants.

18  _____/

19

20  PAGE 1 - 82

21

22       The Deposition of DR. MARK HUGHES,

23       Taken at 1380 Trowbridge Place,

24       Detroit, Michigan,

25       Commencing at 12:55 p.m.,

Mark Hughes
5/14/2010

Page 26

1          MR. STEIN:  Okay.

2          MR. LEUCHTMAN:  I'm not telling him not to

3     answer.

4          THE WITNESS:  Oh.  I'm now gun shy.  Whenever you

5     talk I don't know what to say.

6          Yes, there was.  I was -- can I extrapolate?  I

7     was recruited to the NIH and Georgetown University

8     because of my research in embryo science, and did

9     significant amounts of work there, and gave major

10    lectures at the NIH and at Georgetown, and taught on the

11    subject, and was quite publicly known.  Then there was a

12    change in the administration of Washington.  The

13    republicans took the house for the first time in decades,

14    and Newt Gingrich was the speaker of the house, and the

15    philosophy of doing anything whatsoever with an embryo

16    anywhere near the NIH became of a concern because we were

17    all very actively trying to double the NIH budget at the

18    time.  So we were all busy lobbying to get more money for

19    biomedical research.  And so suddenly I became a

20    liability in that quest.

21  BY MR. STEIN:

22  Q.  And so they asked you to leave?

23  A.  Yes.  Well, they said I could stay, but I couldn't work

24      on this.  And then the good Jesuits were now in the

25      public eye, and they became concerned because it was

Mark Hughes
5/14/2010

1    They do sickle cell anemia and cystic fibrosis, and

2    there's a few tests that they do there inhouse, but most

3    of the cases they send to us.  So it's counting apples

4    and oranges, because they're different techniques.  One

5    technique is looking at genes, and one technique is

6    counting chromosomes to look for abnormal number of

7    chromosomes.

8  Q.  So they don't do single-cell analysis for cystic fibrosis

9    there?

10  A.  They do.  They do cystic fibrosis, and sickle cell

11    anemia, and I'm not sure what other ones, but virtually

12    all of their cases that are not those few they do they

13    send to us.  So I can assure you there's no way they've

14    done 3,000 single-gene cases of PGD.  Not even close.

15  Q.  How about 1300 cases of PGD?

16  A.  We need to define the difference in order for the numbers

17    to be accurate.  In order for me to answer the question I

18    need to know what we're talking about.  If we're talking

19    about embryo testing of a sample, whatever the sample is,

20    for a gene defect, as opposed to chromosome numbers.  If

21    you lump the two together, the numbers are huge.  Because

22    this technology of FISH was widely used by many groups,

23    including Cornell for a while.  If you talk about

24    single-gene testing, like for cystic fibrosis, I don't

25    know how many they've done, but not anywheres near 1300,

**Mark Hughes**
**5/14/2010**

1      I'm sure.

2   Q.  No, cystic fibrosis they've only indicated they've done

3      70.

4   A.  Okay.

5   Q.  But are they still sending single-cell analysis to you?

6   A.  Um-hum (affirmatively).

7   Q.  And this has been continuing all during that period of

8      time?

9   A.  Yes.  In fact, last week or the week before we received a

10      sample from them.

11  Q.  Okay.  Do you interact with Dr. Xu at Cornell in

12      connection with the referrals?

13  A.  No.

14  Q.  Who do you interact with there?

15  A.  I don't, but the team interacts with a woman -- whose

16      name I'm blanking out.  But there's a woman there who

17      does it all, who actually, I think, runs the lab, I

18      think.  I'm not sure.  But we interact with the nurses,

19      and with the embryologists, because we're the laboratory

20      in which they are interacting with if they're sending the

21      sample out.

22  Q.  And do you interact with the doctor or physician who's

23      involved with the IVF there?

24  A.  Almost never.  Unless they call because they have a

25      question.

**Mark Hughes**
**5/14/2010**

1   Q.  And when they call --

2   A.  Are you talking about Cornell, or NYU now?

3   Q.  I'm talking about Cornell.

4   A.  It's the same for both.  I just want to make sure we're

5       on the right institution.

6   Q.  Okay.  Now, you also indicate in that letter that the

7       technology can fail.  Can you tell me in what manner the

8       technology can fail?

9   A.  Oh, many ways.  So the cell that is biopsied may not

10      represent the rest of the embryo.  The cell that's

11      biopsied may not have a nucleus.  The cell that's

12      biopsied may not be properly transferred to the tube to

13      be sent, it gets stuck on the wall or some other place.

14      The amplification technique that is used to make multiple

15      copies of that DNA can fail, or partially fail, or fail

16      because one or other of the chromosomes aren't there, or

17      there's too many.  You can have failures because of DNA

18      contamination.  You can have failures because of allele

19      dropout.

20  Q.  And these various ways in which --

21  A.  And more.  There's more, but --

22  Q.  Okay.  Is there an explanation as to why a laboratory

23      like the one at Cornell would have -- and, by the way,

24      failures can be found before the report is issued, it

25      could be an in-house identification of the failure, is

Mark Hughes
5/14/2010

1    between three and five percent, is that correct?

2  A.  That's the risk that's quoted around the world in other

3      PGD programs, and in general the genetic counselors quote

4      that number.  In our group it isn't that high, but that's

5      the number that's been sort of announced by --

6  Q.  Okay.  Can you tell me, when you say that's announced by

7      other groups and around the world, where are these

8      announcements made?  What specifically are you referring

9      to?

10  A.  So at scientific meetings people stand up and talk about

11      the error rates that they see.

12  Q.  And you have a specific recollection of people standing

13      -- of particular people standing up?

14  A.  Sure.

15  Q.  Okay.  What group or what person in these meetings do you

16      recall standing up and they have an error rate of three

17      to five percent?

18  A.  They don't necessarily say that they have an error rate.

19      They quote that as the rate in the field.

20  Q.  Okay.

21  A.  And I've always thought that was high.

22  Q.  Okay.  In other words, individuals have stated at

23      meetings, who are attending the meetings and are working

24      in the field, that the error rate in the field in general

25      is three to five percent, is that correct?

Mark Hughes
5/14/2010

Page 42

1   A.   I've heard that many times.

2   Q.   Okay.  And has that error rate changed over time?

3   A.   Actually the quoted numbers from just last week at the

4        international meetings were still three to five percent.

5   Q.   Okay.  So someone got up and quoted three to five percent

6        at the meeting last week?

7   A.   I heard it discussed, yes.

8   Q.   Okay.  And who did you hear it discussed from?  Who said

9        it?

10  A.   I'd have to go look.

11  Q.   And where would you look?

12  A.   I'd look at the minutes of the meeting that we just had.

13  Q.   And those minutes are circulated?

14  A.   No.  They're notes that I would have taken.  Or they

15       might be in the abstract.  We can look.

16  Q.   And is the abstract circulated for everybody who's in

17       attendance at the meeting?

18  A.   Yes.

19  Q.   And what was the nature of the meeting, what was the

20       group that met?

21  A.   The PGD International Society.

22  Q.   And where was the meeting?

23  A.   France.

24  Q.   And was Dr. Xu there?

25  A.   No.

Mark Hughes
5/14/2010

1   Q.  And your rate is less than one-half of one percent, is it

2       not?

3   A.  No.  Our rate runs between one and two, depending on the

4       year.

5   Q.  So each year you have one to two percent misdiagnosis?

6   A.  1.2, 1.3, 1.4, 1.5.

7   Q.  Now, is that specifically with respect to cystic

8       fibrosis, or is that with respect to all --

9   A.  No.  That's all diseases.

10  Q.  And how many do you do a year?

11  A.  I can tell you what we did in 2004.

12  Q.  How many did you do in 2004?

13  A.  I wrote the numbers down.  We did 582 cycles.

14  Q.  And you have that specifically available to you, you

15      wrote it down?

16  A.  I wrote it down before I came over here.  Because I

17      figured you'd ask.

18  Q.  Okay.  And what did you write it down on?

19  A.  (No response).

20  Q.  What did you write it down on?

21  A.  I just wrote it in the corner here on this piece of

22      paper.

23  Q.  Before you came over here?

24  A.  No.  I had it in my mind.  But I knew the question was

25      coming, so I scribbled it over here so I wouldn't forget

**Mark Hughes**
**5/14/2010**

Page 44

1      the numbers.

2    Q.   And do you know how many you did in 2009, last year?

3    A.   No.  But almost twice that.

4    Q.   And how many failures did you have in 2004?

5    A.   Three.

6    Q.   The Grossbaums was one of them?

7    A.   Yes.

8    Q.   And what was the analysis done on the other two that had

9         failed?

10   A.   One of them was a healthy child that we predicted was a

11        carrier, and one of them was an affected that was picked

12        up on amniocentesis or CVS.

13   Q.   And was it picked up?

14   A.   Yeah.

15   Q.   And did the parents abort in that case?

16   A.   I don't remember.  There's no link between those.  An

17        amniocentesis is not a search and destroy mission.

18   Q.   I think we explored that at the last deposition, didn't

19        we?

20   A.   I don't remember.

21   Q.   You haven't read your deposition --

22   A.   Months ago.

23   Q.   -- prior to coming here today?

24   A.   No.

25   Q.   The 582 cycles that you described, were they for all

Mark Hughes
5/14/2010

1    forms of genetic disorders, or just for cystic fibrosis?

2  A.  No.  For all forms.

3  Q.  Now, the Grossbaums were described as having a mutation

4    that was -- can be said to be compound heterozygous, is

5    that right?

6  A.  Yes.

7  Q.  Do you know how many of the cystic fibrosis studies that

8    you did in 2004 were for couples who had compound

9    heterozygous mutations?

10  A.  I don't know those numbers off my head, no.

11  Q.  Do you know how frequently you see compound heterozygous

12    mutations to be analyzed?

13  A.  Fairly frequently.  Now.

14  Q.  Now?

15  A.  Um-hum (affirmatively).

16  Q.  How about in 2004?

17  A.  We would see them then, too, but it's gone up

18    substantially, the numbers.  Because the ability to find

19    the mutations in these different diseases has gone up,

20    because the technology for looking for the mutations is

21    easier.  So just a few years ago there weren't very many

22    places that would -- well, cystic fibrosis is different

23    -- but for many of these disorders there wasn't anyone

24    who was willing to screen by DNA sequencing the entire

25    gene looking for what the other mutation might be, so PGD

Mark Hughes
5/14/2010

1     (affirmatively).

2  Q.  And that would be for 2003 and 2002, is that right?

3  A.  That's correct.

4  Q.  And the use of linkage analysis certainly increases the

5     accuracy and reduces the risk of misdiagnosis, isn't that

6     true?

7  A.  Not in 2004.  It was just beginning to be proven to be

8     so, and the manuscripts were beginning to come out

9     showing that it worked.

10  Q.  When you say they were beginning to come out, we do agree

11     that Dresen's group in Europe was reporting in 2001 the

12     success rate for using linkage analysis, weren't they?

13  A.  They were taking two cells in order to get those results,

14     so they were biopsying a couple of cells from each

15     embryo.  Most of the clinics we work with don't want to

16     do that, including NYU.  And the group in Chicago that

17     was doing it was biopsying a polar body, oftentimes a

18     first polar body and a second polar body and a

19     blastomere.

20  Q.  Is that in all compound heterozygous cases?

21  A.  I don't know.  But that was their standard that they

22     reported at meetings and in their papers.  And they

23     argued at the meetings that this was a better approach.

24     And this was all kind of coming out.  But we had a 1.2

25     percent error rate, which was significantly less than

Mark Hughes
5/14/2010

1    anybody else was reporting, so -- and we were having

2    difficulties getting multiplex PCR to make that better or

3    look like it make it better.  Theoretically we could see

4    where it was quite valuable, but we were not happy with

5    the results, in those early papers we weren't able to

6    reproduce them.

7  Q.  When you say you were not happy with the results, what do

8    you mean by that?

9  A.  Well, in anything in science and medicine, a manuscript

10    comes out, and this doesn't suddenly make it the gold

11    standard of practice.  Because if it was a gold standard

12    of practice, that paper wouldn't even be allowed to be

13    published because it isn't new or exciting.  So the

14    papers that were coming out in 2001 were theoretical to

15    start with, then they became one or two cases, take a

16    couple of cells, do the analysis and see what the results

17    are.

18         The RGI group actually were quite leaders in this,

19    and were showing some beautiful data at the time.  But

20    others of us were having difficulties duplicating that.

21    We weren't as good as them perhaps, I'm not sure.  But we

22    were not comfortable, with our preliminary when we

23    developed the test for a couple, we were not comfortable

24    with the multiplexing of more than two different

25    mutations at the same time.  We didn't have the ability,

Mark Hughes
5/14/2010

1       nor did we think we needed, because we had such a low

2       error rate, that we weren't ready to be offering

3       something that was just being discussed.

4   Q.  Well, if there was a laboratory as close as Chicago, you

5       having good results with linkage analysis, didn't you see

6       it as on obligation of your relationship with the couples

7       such as the Grossbaums who had compound heterozygosity,

8       to afford them the opportunity to go there?

9   A.  That's up to the doctor to decide what laboratory they're

10      going to use, first of all.  And secondly, it wasn't

11      hardly proven until the Goossens paper came out that that

12      was actually working clinically.

13  Q.  And when did the Goossens paper come out?

14  A.  Late 2003.  I think.  I can't remember.  I think it was

15      in the fall of 2003.

16          Now, the --

17  Q.  And by the Goossens paper you're talking about Improving

18      Clinical Preimplantation Genetic Diagnosis for Cystic

19      Fibrosis by Duplex PCR?

20  A.  Yes.

21  Q.  And you were aware of that paper when it came out?

22  A.  I don't remember when I first saw it, but when I did it

23      was a good group that had some clinical successes, and it

24      was beginning to -- the handwriting was beginning to

25      become quite clear that this was the future.  Now, we

Mark Hughes
5/14/2010

Page 50

1    were already trying to do it, but we do lots of things in

2    the laboratory as we test for several years before we

3    move it to clinical activities.

4  Q.   Now, when you say you were already trying to do it, can

5       you explain what you mean by that?

6  A.   So we would take hundreds of single cells that we would

7       micropick, as though they were a cell from an embryo.

8       Lymphocytes, fibroblasts, amniocytes, in which we knew

9       what the mutations were in those cell lines.  We would

10      pick them and study them as though they were a biopsy

11      from an embryo, blinded.  And then we would analyze to

12      see if we could reproduce the results better than the

13      error rates that we already had in our program.  And what

14      we were finding was that the -- we would pick up some

15      markers that were very nice to have, but we would lose

16      other pieces of data, oftentimes the mutation.  And so to

17      get them to all work together just was a problem.  We

18      weren't comfortable that the technology was improving

19      anything.  So that's what happens over a period of a few

20      years, you try, you analyze, you compare, you check out

21      to see if the other laboratory's work is reproducible.

22      And sometimes it is and sometimes it isn't.  And in the

23      field of IVF there's all kinds of these false starts, but

24      you don't know which one's a false start.  So you don't

25      just move it to the clinical arena because somebody

**Mark Hughes**
**5/14/2010**

1      publishes a couple of papers, most of them theoretical.

2  Q.  Well, you do agree in the year 2000 Chicago had published

3      its atlas describing the use of linkage analysis, isn't

4      that so?

5  A.  Everybody knew about linkage analysis.

6  Q.  And do you agree that Dresen's paper was in about the

7      year 2000 or 2001, wasn't it?  Dresen.

8  A.  I don't recognize that name.  I probably was a graduate

9      student or something.

10  Q.  Or am I mispronouncing it?  Is it Dresen?  It's D R E S E

11      N.  That's the Department of Molecular Cell Biology and

12      Genetics at Maastricht University, that would be in the

13      Netherlands, and it was published in 2000.

14  A.  Let's see.

15  Q.  (Indicating).

16      MR. STEIN:  Let the record show I've handed Dr.

17      Hughes a copy of the journal publication that I've just

18      referred to and he's reading it.

19      THE WITNESS:  Yeah.  We could test single

20      lymphocytes and fibroblasts like this.  This isn't an

21      actual -- there's no pregnancies here, there's no proof

22      that it works in an IVF embryo.  Now, later, soon

23      thereafter, there was.  But this is studying lymphocytes,

24      and some blastomeres.  Let's see here.  Blastomeres were

25      obtained from human embryos that were donated in IVF.  So

Mark Hughes
5/14/2010

1      this is all -- this is a nice paper.  It was new,

2      exciting, new possibilities for changing the technology.

3      But it was a long way from clinical implementation,

4      certainly in the United States, except at RGI.

5  Q.  Well, Doctor, let's separate that.  It would appear from

6      this article in 2000 out of the Netherlands, as well as

7      the RGI publication in its atlas, that the technology was

8      known by 2000 by these various groups as to how to do it,

9      isn't that so?

10  A.  The ability to do multiplex PCR had been around long

11      before that.

12  Q.  All right.  So if these groups --

13  A.  And we were doing it.

14  Q.  Well, when you use the term multiplex analysis --

15  A.  It means having a single cell and looking at multiple

16      places in that genome.

17  Q.  Is that the same as linkage analysis, in your

18      terminology?

19  A.  Looking at those multiple places produces the linkage

20      information.

21  Q.  Okay.  So then using that technique as a standard use in

22      their laboratory, RGI was doing it, they had the

23      technology, didn't they?

24  A.  We had the -- lots of people have the technology.  The

25      question was, was it ready to be added and was it proved

to be useful and was it better.
Q. Well, if it reduced the --
A. Let me give you an example. The same group who I think are outstanding in Chicago, Svetlana Rechitsky and Buck Strom, they were great scientists, they were working on a technology called FISH. And when you quote these numbers from Cornell with thousands of cycles, those were done with FISH. In fact, the world jumped on the ability to count chromosomes using FISH technology. And now, all of the medical societies that oversee this have said that there's no scientific evidence that this works. There's no scientific evidence that a patient should have FISH testing. And it's written in the practice guidelines of the field by the authorities who you would recognize that direct the way something is performed in medicine. In the society's guidelines of practice it says that there's no scientific evidence that FISH works. Now, it's controversial. We never believed in that technology either, and never performed it. Why? Because we couldn't get it to work with the kinds of reliability we wanted. In the same way in IVF, there's all sorts of steps that are taken to try to improve the technology an get people pregnant with healthy babies. It's done all the time. Many of those fall by the way side as being not helpful, can't be reproduced. So in the first few

**Mark Hughes**
**5/14/2010**

Page 54

```
 1     years of the year 2000 people started talking about doing
 2     this in PGD, and everybody, I would hope, was trying to
 3     get this to work because of the theoretical idea that it
 4     was going to help and avoid one of the problems with PGD,
 5     which is allele drop out.  But you have to have a
 6     technique that improved it significantly more than what
 7     you already had.  No more than Memorial Sloan Kettering
 8     invents a new cancer agreement and no other cancer
 9     programs in the country use it for some five years or ten
10     years while they're assessing it.  It doesn't make it
11     standard, just because you publish a paper, doesn't make
12     it standard of care.
13  Q. Well, when you publish it in an atlas on how to do it,
14     would you say that then it has moved from theoretical to
15     clinical practice?
16  A. No.
17           MR. LEUCHTMAN:  Object to the form of the
18     question.
19           THE WITNESS:  The atlas is written by the people
20     who are promoting their own science.
21  BY MR. STEIN:
22  Q. All right.  Now, in fact, had you been provided with
23     blood samples from family members of the Grossbaums, you
24     would have done linkage analysis, wouldn't you?
25  A. We would have tried.
```

# EXHIBIT 3

Strom

Page 159

1   IN THE UNITED STATES DISRICT COURT

2   IN THE DISTRICT OF NEW JERSEY

3   ------------------------------------x

4   CHAYA GROSSBAUM and MENCHEN

5   GROSSBAUM, Her Spouse, Individually

6   and as Guardian ad litem of the

7   infant, ROSIE GROSSBAUM,

8                Plaintiffs,

                                    Index No.

9     -against-                    07-CV-359

10  GENESIS GENETICS INSTITUTE, LLC,

11  THE STATE OF MICHIGAN, MARK

12  HUGHES, M.D., NEW YORK UNIVERSITY

13  SCHOOL OF MEDICINE and NEW YORK

14  UNIVERSITY HOSPITAL CENTER, both

15  corporations of the State of Ne York,

16  ABC CORPORATIONS 1-10 and John Doe

17  DOE,

18                Defendants.

19  ------------------------------------x

20          DEPOSITION OF CHARLES STROM

21             New York, New York

22             June 24, 2010

23

    Reported by:

24  Judith A. Frost

25  Job No. NJ263710

Strom

Page 164

1 Genesis Genetics in this case, and Dr. Mark
2 Hughes.
3        MR. HAMAD: Jay Hamad from the office
4 of Marshall Dennehey on behalf of the
5 defendants.
6        MR. STEIN: Lewis Stein from Nusbaum
7 Stein Goldstein Bronstein & Kron on behalf
8 of the plaintiffs.
9 EXAMINATION BY
10 MR. LEUCHTMAN:
11    Q    Mr. Strom, we met on May 4 when I
12 questioned you at some length about this case.  You
13 have in front of you a file, and I believe we
14 inventoried it during the first session of your
15 deposition.
16        Have you added anything to that file?
17    A    No.
18    Q    Since we last convened, let me ask you
19 this.  Is there any correspondence to or from Mr.
20 Stein that you did not bring with you?
21    A    Just about this particular
22 arrangement.  The logistics.
23    Q    Nothing substantive about the case?
24    A    No.
25    Q    Have you reviewed the transcript of

Page 165

1 your May 4, 2010 deposition?
2    A    No.
3    Q    I want to point out one thing, and I
4 think the court reporter sort of outdid herself, I
5 could find only one typo, but I want to give us all
6 the opportunity to straighten that out.
7        It's page 102 where you were asked, I
8 was asking you your opinions on whether you believed
9 that Dr. Hughes and/or his lab were coersive and
10 abusive in trying to coerse the Grossbaums in having
11 amniocentesis and your answer, it says here "and
12 effective child"?
13    A    That was meant to be affected.
14    Q    I suspected that's what you meant, and
15 it is probably what you said.
16    A    Right.
17    Q    You have also not read the transcript
18 of the deposition of Dr. Kangpu Xu, correct?
19    A    No, have not.
20    Q    Have you ever been informed about the
21 contents of that deposition?
22    A    No.
23    Q    Have you read the second deposition of
24 Dr. Mark Hughes when he was deposed as an expert?
25    A    Yes.  Wait a second.  Is Kangpu Xu the

Page 166

1 one you sent me?  I must correct myself.  Yes, I did
2 read the second deposition.  I didn't know how the
3 last name was pronounced, I'm sorry.
4    Q    You read also the second deposition of
5 Dr. Hughes?
6    A    Yes, those two I would say.
7    Q    Since that time have you read any
8 other depositions such as, and we kind of or I kind
9 of belabored this is in your last deposition, of
10 either of the plaintiffs or any of the NYU people?
11    A    No.
12    Q    Or any synopsis of those depositions?
13    A    No.
14    Q    Since we last convened have you
15 reviewed or read a synopsis of the NYU records?
16    A    No.
17    Q    Did you ask for any of these materials
18 and not receive them?
19    A    No.
20    Q    Now, let me ask you if you can
21 remember in Dr. Kangpu's deposition transcript,
22 there must have been areas where you disagreed with
23 him.
24        Can you tell me as we sit here right
25 now what those area were?

Page 167

1        MR. STEIN:  Let me put my objection on
2 the record.  Going from memory into the
3 contents of the deposition of many pages to
4 me is an unfair question.
5        MR. LEUCHTMAN: He said he can't
6 remember.
7    A    I said I can't remember either way.
8    Q    I'll be more specific then.
9        There were a handful of things in Dr.
10 Kangpu's deposition that I want to ask you about.
11        He said that polar body biopsies are
12 not commonly done in the United States and they are
13 not a mainstream approach.
14        Do you agree or disagree with that?
15        MR. STEIN:  I object to the form of
16 mainstream, but if the doctor understands
17 what you mean.
18    A    Polar body biopsies are commonly done,
19 but only done in one center in the United States.
20    Q    Is that R.G.I.?
21    A    Right.
22    Q    Would you agree with Dr. Kangpu that
23 polar body biopsies are not standard of care in this
24 country?
25    A    I would agree.

3 (Pages 164 - 167)

# EXHIBIT 4

1

1     IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF NEW JERSEY

3

4  CHAYA GROSSBAUM and MENCHEN

5  GROSSBAUM, Her Spouse,      Certified

6  Individually, and as       Transcript

7  Guardians ad litem of the

8  Infant, ROSIE GROSSBAUM

9        Plaintiffs

10  vs.               Docket No. 07-CV-359

11  GENESIS GENETICS INSTITUTE,

12  LLC, OF THE STATE OF MICHIGAN,

13  MARK R. HUGHES, M.D., NEW    GARRY CUTTING, M.D.

14  YORK UNIVERSITY SCHOOL OF

15  MEDICINE and NEW YORK      April 24, 2010

16  UNIVERSITY HOSPITALS CENTER,

17  Both Corporations of the

18  State of New York, ABC

19  CORPORATIONS: 1-10 and

20  John Doe

21        Defendants

22  _____/

23

24  (TITLE PAGE Continued on the Next Page)

25  Reported by:  Linda Lindsey, CSR

2

1          The deposition of GARRY CUTTING, M.D. was

2   held on Saturday, April 24, 2010, commencing at 1:12

3   p.m., at the Tremont Plaza Hotel, 222 Saint Paul Place,

4   Suite 506, Baltimore, Maryland 21202, before Linda

5   Lindsey, CSR, Notary Public.

6   APPEARANCES:

7          ON BEHALF OF THE PLAINTIFFS:

8          LEWIS STEIN, ESQUIRE

9              Nusbaum, Stein, Goldstein, Bronstein & Kron

10             20 Commerce Boulevard, Suite E

11             Succasunna, New Jersey 07876

12             Telephone: 973-584-1400

13             Facsimile: 973-584-8747

14             Email: lstein@nsgbklaw.com

15

16         ON BEHALF OF DEFENDANTS, GENESIS GENETICS

17         INSTITUTE, LLC AND MARK R. HUGHES, M.D.:

18         STEPHEN N. LEUCHTMAN, ESQUIRE

19             Stephen N. Leuchtman, P.C.

20             1380 E. Jefferson Avenue

21             Detroit, Michigan 48207

22             Telephone: 313-259-6900

23             Facsimile: 313-259-3474

24             Email: leuchlaw@gmail.com

25   (APPEARANCES CONTINUED on the Next Page)

3

1   APPEARANCES CONTINUED:

2

3           ON BEHALF OF DEFENDANTS, NEW YORK UNIVERSITY

4           SCHOOL OF MEDICINE AND NEW YORK UNIVERSITY

5           HOSPITALS CENTER:

6           JAY A. HAMAD, ESQUIRE

7               Marshall, Dennehey, Warner, Coleman & Goggin

8               425 Eagle Rock Avenue, Suite 302

9               Roseland, New Jersey 07068

10              Telephone: 973-618-4100

11              Facsimile: 973-618-0685

12              Email: jahamad@mdwcg.com

13

14

15

16  ALSO PRESENT:   Stanley Dickson, Genesis Genetics

17              Lynn Harrison, Paralegal

18

19

20

21

22

23

24

25

10

1     A.  Training to take care of patients,
2 particularly pediatric patients with a variety of
3 different conditions.
4     Q.  Can you define pediatrics for me?
5     A.  Pediatrics is children from neonatal to
6 18 years of age.
7     Q.  Okay.
8     A.  Sometimes a little longer, in the twenties,
9 depending on exactly the case and condition.
10     Q.  Okay. Um, now is it fair to say your CV,
11 and -- which I have a copy of here and I believe is to
12 the tune of 31 pages?
13     A.  Yes.
14     Q.  Which you produced to -- to -- to counsel?
15     A.  It's the one I sent to Mr. Lewis.
16     Q.  Is that an accurate -- is that -- let's strike
17 that.
18     Is your CV an accurate -- an accurate
19 description of your medical experience?
20     A.  Yes.
21     Q.  So if there is anything worthwhile in that you
22 did in the medical -- in the medical field it's in
23 here?
24     A.  Sure.
25     Q.  Okay. Now, after your -- your residency in

11

1 pediatrics you completed a fellowship, correct?
2     A.  Correct.
3     Q.  Okay. We'll -- what did that -- strike that.
4     What was the concentration of that fellowship?
5     A.  Genetics, medical genetics.
6     Q.  Okay. What does that mean, medical genetics.
7     A.  It's training in the care, diagnosis -- let's
8 start, care and treatments of patients with a variety
9 of genetic disorders.
10     Q.  Can you be -- be more specific? Tell me
11 exactly sort of what that entails?
12     A.  Well, patients whose disease is primarily
13 caused by abnormalities in specific genes.
14     Q.  Okay. Yeah, I'm just trying to get an idea
15 sort of what kind of things did you do? I mean, did
16 you --
17     A.  I would be consulted on patients who were,
18 where the physicians felt that there would be a genetic
19 case because a familial recurrence of children of the
20 same family. So, like CF, two children same family
21 have the disease, so we get consulted for that. We get
22 Sickle Cell Disease. We get consulted for skeletal
23 abnormalities --
24     Q.  Fine.
25     A.  -- a whole variety conditions. And they

12

1 included both children and adults.
2     Q.  I see. So it's -- it was people already born,
3 obviously, that's what I was trying to focus to.
4 People who are already born --
5     A.  Oh, no, not just that.
6     Q.  Okay.
7     A.  No, we also did consult on prenatal cases as
8 well.
9     Q.  Okay.
10     A.  So we included prenatal counseling. The --
11 the discussion of things such as teratogens that may
12 affect a pregnancy, genetic conditions that may affect
13 a pregnancy.
14     In addition to my training, I also trained in
15 clinical laboratory genetics, as well as this is called
16 molecular genetics, which I'm board certified in, and
17 as in biochemical genetics. So that was undertaken
18 during the time that I was training in medical
19 genetics.
20     Q.  So biochemical genetics and clinical genetics?
21     A.  And, well, clinical genetics, biochemical
22 genetics and molecular genetics. The molecular is in
23 the diagnosis of disorders by examination of DNA
24 directly.
25     Q.  Okay. Now -- okay. So, what specific

13

1 function did you do during your fellowship as it
2 pertains to, um, prenatal involvement with patients?
3     A.  So we would counsel patients who had prenatal
4 conditions. We would see patients who had undiagnosed
5 prenatal conditions where there was concern. We would
6 see women who had advance maternal age, which I'm sorry
7 to say, is beyond 35 years of age who have were at
8 higher risk for children with abnormalities, such as
9 Down Syndrome.
10     If I'm going too fast, please tell me to slow
11 down.
12     It would be working with families to tell them
13 about the results of test, such as sider genetics tests
14 or -- or DNA based tests and the results and counseling
15 them on those results. With working with them to make
16 decisions about whether to continue the pregnancy or
17 not to continue the pregnancy, particularly if the
18 pregnancy was affected.
19     Q.  And that was during your fellowship?
20     A.  That was during my fellowship and I continue
21 to do that. That's why I'm carrying the beeper today,
22 if this condition came up today at Johns Hopkins, I
23 would be called for it and I would go in and talk to
24 them.
25     Q.  Okay. Now, as part of your fellowship --

4 (Pages 10 to 13)

50

1   need to.
2       Q.   As soon as you objected I said I will rephrase
3   it.
4           Now, doctor, please -- right now I'm going
5   to -- I'm looking at this first paragraph here and it
6   says, I have reviewed the records that were provided by
7   Genesis Genetics, the New York University School of
8   Medicine, as well as depositions of Mark Hughes, Dr.
9   Licciardi, and Alexis Adler, and publications involving
10  multiplex marker analysis provided by Dr. Rechitsky,
11  fair?
12      A.   Yes.
13      Q.   Okay.  Is that a listing of things you
14  reviewed before authoring this report?
15      A.   I believe it is complete, but I would say that
16  is an estimate, I can't -- I can't --
17      Q.   Well, can you think of anything that you
18  reviewed before authoring the report --
19      A.   Oh, other than --
20      Q.   -- that --
21      A.   -- other than the literature, I don't cite
22  specifically here.
23      Q.   Okay.
24      A.   And the information is available in textbooks
25  and so forth.

51

1       Q.   Okay.  All I'm -- by --
2       A.   It's just not citing -- that's, if I can
3   digress, as a scientist, I have to say that we try as
4   best as we can, obviously, to disclose what sources
5   we've had.  So, if you asking me in that context, I'm
6   trying to be as complete as I can, so, yes there was
7   other literature and so forth.  But as far as legal
8   documents, I believe that that's a complete list.
9       Q.   Okay.  I'll actually be more specific.  As far
10  as documents that were generated, medical records,
11  deposition testimony, um, anything else that was
12  provided to you by Mr. Stein that is not medical
13  literature medical, medical resource is this all that
14  you reviewed before authoring your report?
15      A.   Yes.
16      Q.   Okay.  And then after that sentence you spend,
17  you, I think indicate, you write, "as I understand" and
18  then you complete the paragraph with couple of more
19  lines, fair?
20      A.   Yes.
21      Q.   Okay.  And in those few lines you give the
22  history, um, of the presentation of the patients and
23  the, um, the, um, outcome with -- of a child -- of a
24  child with -- that's affected with cystic fibrosis
25  fair?

52

1       A.   Yes.
2       Q.   Is it fair to say, beginning with, as I
3   understand and con -- and -- and concluding with was
4   found to be affected with cystic fibrosis that that
5   portion of the first paragraph of your report contains
6   the history that you felt was relevant to analyzing this
7   case?
8       A.   Yes.
9       Q.   Okay.  There was something else that is
10  important fundamentally important to this case, to your
11  analysis you would have put it in that -- in those --
12  in that paragraph, fair?
13          MR. STEIN:  I object to the form of the
14  question.  Go ahead.
15      Q.   I think the -- would you like me to rephrase
16  it?  Or do you understand what I'm saying?
17      A.   (Holding hands up.)
18      Q.   Okay.
19      A.   My answer is that this is a distillation of my
20  understanding of the case.  It may not contain all
21  elements that are essential to understanding and
22  appreciation of the issues, but it is an attempt on my
23  part to be as brief and to the point as possible.
24      Q.   All right.  Now, just so I can limit my time
25  with you, Doctor, is it fair to say that all the

53

1   criticisms you have of NYU are contained in -- strike
2   that.
3           All the opinions you have regarding NYU's
4   performance in this case are contained in the second
5   paragraph of the first page of your report?
6       A.   This is a distillation of my opinion of the
7   case.  It may not contain all my criticisms.
8       Q.   Doctor, you've authored eight reports before,
9   correct?
10      A.   Correct.
11      Q.   Did you understand -- did you understand that
12  when you wrote this report, Doctor, that you're --
13  you -- you were putting on notice --
14      A.   Um-hum.
15      Q.   -- the defendants in this case as to what your
16  opinions regarding their performance are?
17      A.   Yes.
18      Q.   Okay.  Do you -- do you understand that you're
19  bound by the four corners of this report --
20          MR. STEIN:  I object, that's a legal --
21          MR. HAMAD:  -- and that's --
22          MR. STEIN:  -- conclusion that has much
23  definition and complicated definition for you to ask
24  the doctor a legal question.
25          MR. HAMAD:  Um --

14 (Pages 50 to 53)

114

1    A.  We -- we attempt to work always through the
2  physician because the physician and/or genetic
3  counselor are the one who contacts us.
4    Q.  Yeah?
5    A.  No, I'm done.
6    Q.  How is PGD different from what you routinely
7  do in your lab?
8    A.  If we're talking about blastomere biopsy which
9  the removal of one cell or two, depending on which lab
10  you do and how you do it, it involves a much smaller
11  amount of DNA and it requires exquisite levels of, um,
12  testing ahead of time to assure that you get an
13  accurate diagnosis, because unlike in the case, as you
14  have been indicating, that when you get a large amount
15  of DNA from a CVS sample or from a blood sample of a
16  patient we're getting six picograms of DNA on average
17  from one cell.
18    Q.  This is in PGD?
19    A.  PGD, sorry.
20    Q.  All right.
21    A.  So the test and the importance of being
22  accurate and having plenty of additional assays there
23  to be sure you achieve accuracy is absolutely paramount
24  in PGD because it is the more challenging area of
25  genetic diagnosis currently available.

115

1    Q.  PGD is?
2    A.  Yes, by fair.
3    Q.  Now, is the sample use in PGD, if you know,
4  different from the samples you use in your lab?
5    A.  Yes, because they're based on blastomere,
6  which is single cell from an embryo.  CVS is actually a
7  sample of the fetal portion of the placenta.
8  Amniocentesis is actually cells shed by the embryo that
9  is present in the amnionic fluid that is drawn when a
10  needle is placed into the --
11    Q.  Now, if a cultured sample from a cytogenics
12  lab or other patient tissue samples has one or
13  two milligrams in it, and the PGD sample has two
14  picograms, then would you agree that there's one
15  billion times less DNA in the PGD sample?
16    A.  Has six picograms but, yes, it has quite a bit
17  less.
18    Q.  On the order of of a billion times less in
19  PGD?
20    A.  Well, what's important is the genome
21  equivalence not the amount of DNA.
22    Q.  But I'm -- I'm just asking you as to DNA?
23    A.  Okay.  Fine.
24    Q.  Are we agreed?
25    A.  We're agreed.

116

1    Q.  Okay.  Would it be correct to say that PGD
2  pushes molecular DNA testing to the limit because it
3  tests, first of all, one cell, which is the smallest
4  unit of life?
5    A.  Yes.
6    Q.  And for one gene which is smallest unit of
7  inheritance?
8    A.  That's not correct, but anyway, yes, we'll
9  say --
10    Q.  For one gene?
11    A.  We'll stick with it.
12    Q.  All right.
13    A.  I'm being a scientist type, let me shut up,
14  yes.
15    Q.  And more often times a change on one A or T or
16  G or C, character in 3.3 billion DNA letters of the
17  human genome?
18    A.  Yes.
19    Q.  Is there any lab testing you're aware of
20  that's anymore complicated than PGD?
21    A.  Yes.
22    Q.  And what would that be?
23    A.  There's lots assays that involve protein
24  biology which involve use of antibodies which have
25  actually quite tricky characteristics in order to

117

1  properly identify the proteins, and these proteins can
2  actually predict whether you're going to get cancer,
3  you're going to get -- you're actually have metastasis
4  of cancer.
5      In fact, there's a whole range of these assays
6  available, and they're quite complex to carry out and
7  do, and they acquire exquisite levels of controls and
8  inter assay controls and so forth.  So, yes, there are
9  more complicated ones than this.
10      DNA is a very simple thing to work with, the
11  simplest chemical we probably work with.
12    Q.  Now, your laboratory does not at present do
13  PGD?
14      MR. STEIN:  He said that.
15      MR. LEUCHTMAN:  Yes, I know, it's
16  foundational.
17    A.  Yeah, at present.
18    Q.  Was there a time when you did that?
19    A.  Yes, yes.
20    Q.  When?
21    A.  Over the past couple of years we've done two
22  cases for CF.
23    Q.  Other than that have you ever been involved in
24  PGD?
25    A.  No.

30 (Pages 114 to 117)

118

1    Q.  Specifically, you're not involved in PGD
2  directly in the year 2004?
3    A.  2004, no, I don't think we -- no, no.
4    Q.  Okay.  Well, then let's clarify when you say
5  you have done two --
6    A.  Two cases were done after 2004 and before
7  today.
8    Q.  All right.  Well, you said the last couple of
9  years?
10    A.  No, no, you're right.  You're absolutely
11  right.
12    Q.  Okay.
13    A.  I don't mean --
14    Q.  Well, let's narrow that down because it's
15  important, I think, in this case.
16    A.  Yes.
17    Q.  When were these two cases --
18    A.  I would say --
19    Q.  -- PGD cases for CF in the past couple of
20  years?
21    A.  -- in the past probably couple of years, I'm
22  doing it again, sorry.  Probably more than 12 months
23  ago, but not more than three years ago.
24    Q.  Okay.
25    A.  Is about when I recall them.  They were about

119

1  one and a half to two years apart, if I recall
2  correctly.
3    Q.  So, as -- as best you can recall as we sit
4  here today, the first one you did was in perhaps 2007?
5    A.  Yes.  Something like that.
6    Q.  And no earlier than that?
7    A.  Yes, about that.
8    Q.  All right.  And you were not involved in any
9  form or fashion directly in PGD in 2004?
10    A.  In delivering the test.  We certainly were
11  spending time doing assays to develop the tests, yes.
12    Q.  But you weren't doing PGD testing?
13    A.  No.
14    Q.  No, you were not?
15    A.  No, you're correct.
16    Q.  The two -- the two PGD cases you've done in
17  last three year were for cystic fibrosis?
18    A.  Correct.
19    Q.  And what means did you do to do those tests?
20    A.  A single cell from a cleavage embryo, so it
21  was eight cells, we took out one cell, in the same way
22  this method was done and did a diagnostic to see it.
23    Q.  When you say the same way this method was
24  done --
25    A.  Okay.

120

1    Q.  -- the same thing that Hughes did in this
2  case?
3    A.  Yes, well, as was done by both NYU and Hughes.
4    Q.  Okay.
5    MR. HAMAD:  I'm sorry.  I may have missed
6  something.  The last couple of years?  What -- when was
7  the timing of these tests?
8    MR. STEIN:  Between 12 months and three, he
9  said.  Twelve months and years?
10    THE WITNESS:  Yeah.
11    MR. LEUCHTMAN:  Yeah.
12    MR. HAMAD:  Go ahead.  I'm sorry.
13    MR. LEUCHTMAN:  And no earlier than 2007.
14    THE WITNESS:  Yeah.
15    Q.  Well, did -- did the two tests that you did
16  three years or less ago involve genomic markers?
17    A.  Yes.
18    Q.  Did they involve polar body biopsy?
19    A.  No.
20    Q.  Do you agree there are many safeguards that
21  need to be put into place in PGD testing over and
22  above, for labs that do not do it?
23    MR. STEIN:  Over and above what?
24    MR. LEUCHTMAN:  Well, for labs that do
25  testing, such as -- as Dr. Cutting does.  There are

121

1  safeguards that exist for PGD that do not exist in --
2  in the diagnostic labs -- in diagnostic labs such as
3  the one that Dr. Cutting operates.
4    MR. STEIN:  I object to form of the question,
5  but he can answer it.
6    A.  Um, we did offer PGD within our lab using the
7  same safeguards that we use for the other tests.  It's
8  just as important to develop the right assays for a CVS
9  test to make sure it's not contaminated with maternal
10  cells, which is a maternal cell test we do using linked
11  marker, and we've being doing for a decade to be sure
12  that we don't have contamination that leads to a
13  misdiagnosis.  So we take the same level of care with
14  every test we do.
15    There are different technical challenges in
16  executing the test which require additional or other
17  approaches and so forth, PGD is one that requires some
18  additional tests, and there are other ones that we do
19  in our labs that do require, also, additional marker
20  tests, but I give you the example, we've been using
21  linked markers, genomic markers for over ten years for
22  maternal contamination CVS.  To prevent --
23    Q.  For maternal contamination?
24    A.  Yes.  That's finding mother's cells in with
25  the baby's cells when you do the sampling of the

31 (Pages 118 to 121)

122

1 placenta. And that was found, actually, some ten, 15
2 years ago to be a major cause of misdiagnosis, and the
3 entire field then realized that in fact the way to do
4 this was to do a maternal test, a contamination test
5 using these markers, these genome markers that you
6 mentioned.
7     So now laboratories do this standardly. And
8 this was adopted quite rapidly when it was discovered
9 this is an error that could cause a misdiagnosis in
10 prenatal testing.
11   Q. And this was when?
12   A. Oh, this would have been back ten, 15 years
13 ago.
14   Q. Now, are you using gene chips SNPs or
15 microbead's or did you use it in two PGD tests that you
16 did?
17   A. No. No.
18   Q. All right. And why not?
19   A. Not needed.
20   Q. The PGD that you did for cystic fibrosis was
21 it for a variety of mutations or just for DeltaF508?
22   A. Just for DeltaF508.
23   Q. And was there a pregnancy in each of those?
24   A. Yes.
25   Q. How many clinics do you receive PGD biopsy

123

1 samples from?
2   A. Zero. Well, the only cases, those two cases
3 were from Hopkins. We don't do any cases.
4   Q. How many labs in the country do PGD testing?
5   A. Two or three. As far as I know.
6   Q. Given PGD is a growth industry -- well, do you
7 believe that it is?
8   A. No.
9   Q. And why not?
10   A. It doesn't look like it is. It is in Europe
11 it appears to be a more, but I'm not sure in the United
12 States whether it's a growth industry.
13   Q. Well, do you have, um, a reason or do you have
14 an idea why the number of labs doing PGD has not
15 expanded from the two or three that you say exist at
16 the present time?
17   A. Um, I think there's been some concern about
18 the number of misdiagnosis that have been -- occurred
19 in these cases lead IVF physicians to be a little
20 concerned about doing this testing and expand it.
21 Certainly major institutions, also, like my own, have
22 been concerned about getting into this business unless
23 we can provide high accuracy testing.
24   Q. You're saying --
25   A. I apologize, if you don't mind --

124

1   Q. No, I didn't mean to interrupt you?
2   A. -- if I continue.
3   So, it's probably a multiple of things. It's
4 like doing very risky surgery for example. How many
5 people are going to take on risky surgery, particularly
6 when they, major centers here there's been issues or
7 problems, even though, at the same time we've witnessed
8 that Europeans have actually done an outstanding job of
9 making this a high quality offering, an option for
10 couples who are at risk for single gene disorders.
11   And it's -- it's a dichotomy that we can't --
12 I would have to say that there are several reasons.
13 The adoption of the technology, although the technology
14 is challenging and yet the Europeans have gone ahead
15 and actually fully implemented tests using as we were
16 talking before, SNPs, and chips and everything else.
17 We in the United States have not progressed in doing
18 this case.
19   Q. Is -- is the view in the United States there
20 is a high level of inherent risk within this country in
21 CVS or PGD? And that that prevents --
22   A. I can't --
23   Q. -- it from being more widespread?
24   A. You're asking me do I know what the word on
25 the street is. Sorry, I don't know what the word on

125

1 street is. All I can say is that when I go to a few of
2 the meetings where I interact with some colleagues, for
3 for example with their own IVF unit, who have interact
4 with others, um, the concern is they understand that
5 it's tricky, it's a difficult test to -- to do because
6 it's on the basis of one cell.
7   They are somewhat frustrated that Europeans
8 seemed to have sold, not just Europeans but people in
9 the Middle East and other places, that have sold these
10 things. There's a question as to why not we've not
11 brought them into more full play in United States.
12   Q. Which Europeans do you have in mind when are
13 addressing?
14   A. Well, Peter Braude and his group in the UK,
15 there's Alan Handyside, is another group, Dagon Wells
16 is in Europe -- there -- he's also in England, he's
17 Oxford, so that's a British group. There are groups in
18 France, Germany, no not Germany. Germany is one place
19 because of their own guidelines regarding diagnostics
20 and prenatal that does not allow it. Netherlands, so
21 forth.
22   In fact, there's this organization called
23 ESHRE, that's this European Society for Human
24 Reproduction Endocrinology, that's actually been in a
25 leadership position, putting all of the cases together,

32 (Pages 122 to 125)

146

1   Q.  So it's a mixture it isn't just PGD?
2   A.  Yes.  Yes, it's IVF.  PGD is part of it.
3   Q.  Have you ever presented a paper on
4   preimplantation genetics?
5   A.  A -- a.
6   Q.  Yeah.
7   A.  Have I presented on it, yes.
8   Q.  Okay.  Where and when?
9   A.  At the meetings last week.  I was invited to
10  present on it.
11  Q.  And what did you present?
12  A.  I presented on the issues surrounding the
13  development of PGD tests in the clinical environment.
14  Q.  And is that presentation reduced to writing
15  anywhere?
16  A.  There should be a -- not reduced to writing,
17  no, just slides.
18  Q.  Have you ever been a member of the PGD
19  International Society or PGD group of scientists in
20  United States or Canada?
21  A.  No.
22  Q.  Or anywhere in the world?
23  A.  No.
24  Q.  Is it fair to say that while you're an expert
25  in cystic fibrosis that you are not an expert in PGD?

147

1   A.  I'm expert in genetic diagnostics, and this is
2   a genetic diagnostic test.
3   Q.  So, you're an expert in the G D but not the P?
4   A.  Yes.  Thank you.
5   (Laughing.)_
6   Q.  All right.
7   A.  I agree with you.
8   Q.  And therefore are --
9   A.  He's displaying a sense of humor which I like
10  retained.
11  Q.  -- not an expert preimplantation genetic
12  diagnosis?
13  A.  I have spent seven years developing tests in
14  our laboratory along with the IVF unit at our own
15  hospital evaluating the methods for developing PGD
16  testing.  I presented at the COPS meeting and I was
17  invited to present at this PCRS meeting, so somebody
18  must think I know something.
19  Q.  Well, I -- I certainly have been convinced in
20  the last three hours that you know quite a bit, the
21  question is are you an expert in PGD?
22  A.  Am I --
23  Q.  You know some of the issues bearing on PGD?
24  A.  Yes, I know the issues on -- when you say an
25  expert, what -- what -- I'm an expert in the -- all of

148

1   the concepts underlying what needs to be done for PGD.
2   MR. STEIN:  Okay.
3   THE WITNESS:  I don't know how to say it.  I
4   understand the whole thing, that's the best I can say.
5   I understand all the concepts as a genetic diagnostic,
6   running a laboratory 16 years.  I understand the
7   concepts of doing single cell analysis, we've done it
8   in our lab, we've done two cases.
9   So I would say that while -- while -- would
10  you say that if expertise is granted by doing thousands
11  of cases, I haven't done thousands of cases.  Do I
12  understand all the complications and other issues
13  related to because we spent an extensive amount of time
14  doing validation and have I kept with the literature
15  and gone to meetings, yes.
16  Q.  Did you ever work with Dr. Strom before?
17  A.  Through collaboration on, I believe
18  accumulating information about the frequency of CF
19  mutations, I believe.  Not directly.  No, not this
20  collaborators like we work on an assay.
21  Q.  Well, --
22  A.  I believe you'll find in the literature that
23  we might be on the same papers because we both
24  contributed to a knowledge base.
25  Q.  Do you know Dr. Strom personally?

149

1   A.  I've met him.
2   Q.  Under what circumstances?
3   A.  Oh, meetings and like American Society of
4   Human Genetics and things like that.
5   Q.  Were you and he ever colleagues?
6   A.  No.
7   Q.  Did you ever work directly with him on a
8   paper?
9   A.  No.
10  Q.  So, some -- some sort of loose amorphus kind
11  of collaboration?
12  A.  Well, there's also people, there's probably
13  other colleagues you know in the field, right?  And
14  some you know better than others you work with.  So, I
15  have met Dr. Strom, I know who he is.  I know we have
16  contributed to group efforts regarding CF.
17  Q.  Have you ever testified on behalf of Dr. Strom
18  or against him?
19  A.  No.
20  Q.  Have you ever been -- have you ever reviewed
21  any cases involving Dr. Strom without testifying?
22  A.  No.
23  Q.  Do you have any connection or have you ever
24  had with Quest Diagnostics?
25  A.  Do I have any connection with Quest

38 (Pages 146 to 149)

154

1  heterozygous", like this couple here, ADO, I can only
2  read so far upside down, compound heterozygous, I'll
3  leave the autosomal dominant conditions, the
4  consequences of ADO can be catastrophic, as
5  misdiagnosis and subsequent transfer of affected
6  embryos can occur. Indeed ADO is the most likely cause
7  of reported errors in PGD of cystic fibrosis in which
8  affected compound heterozygote embryos were
9  misdiagnosed as carrier embryos because the analysis
10  could only detect one of inherited things. That's
11  pretty explicit, isn't it?
12      Q.  This article by Thornhill and Snow doesn't
13  address --
14      A.  Oh, yes, it does. It addresses the use of
15  multiplex markers in a later portion as demonstrating,
16  reducing the risk of error due to ADO occurring in
17  cases of compound heterozygotes, and it clearly shows
18  that that is a method available. And this is in 2002,
19  two years before this case occurred.
20      Q.  And what -- what publication is that?
21      A.  It's Thornhill and Snow. And it was in a
22  journal in JMD. I don't have the whole thing here, I
23  just have portions of this one. This -- this is pretty
24  classic -- I just brought the.
25      MR. STEIN: I may have that.

155

1      THE WITNESS: You have the whole thing.
2      MR. STEIN: Yeah.
3      THE WITNESS: This is pretty classic summary.
4  A very nice review.
5      Q.  This Verlinsky --
6      A.  Right.
7      Q.  -- article does not address the multiplex,
8  does it?
9      A.  Yes, it does. Fact, simultaneous
10  amplification of the CF DeltaF508 with a linked marker
11  reduced the ADO rate by more than an half, irrespective
12  of the use of conventional or this other fancy PCR they
13  use. With an additional second marker in multiplex
14  PCR, the ADO rate was further reduced by half and was
15  completely absent with the simultaneous amplification
16  of three markers.
17      This was in atlas of preimplantation genetic
18  diagnosis. Seemed to be a bible the year 2000 by
19  Verlinsky and Kuliev, which many of us starting up a
20  genetic diagnostic for PGD, certainly we read this and
21  we said, well, we've got to use, obviously, linked
22  markers. There's no way you would put it in play this
23  was 2000.
24      MR. STEIN: Excuse me, do you want, gentleman,
25  want the journal reference for the Thornhill article?

156

1      MR. LEUCHTMAN: Not right now.
2      MR. STEIN: Okay.
3      Q.  Now do you know for a fact whether
4  reproduct -- as of early to mid-2004 Reproductive
5  Genetic Institute, RGI, was doing multiplex testing
6  for, or genomic marker testing for --
7      A.  It's my understanding they were doing marker
8  testing as well, yes, multiplex testing.
9      Q.  For cystic fibrosis?
10      A.  As of 2004.
11      Q.  Yeah, yeah, in early 2004?
12      A.  At the time this was case of done. At the
13  time this case was done.
14      Q.  How do you know that?
15      A.  It's been indicated on -- by, first of all,
16  indicated that they used this. I heard from Verlinsky
17  at a genetics meeting, oh, it must have been, American
18  Society of Human Genetics 2000, 2001 that he presented
19  that his lab was doing this.
20      Q.  Were they routinely doing it to your
21  knowledge?
22      A.  I assume the way he presented was that they
23  were.
24      Q.  You don't know?
25      A.  I don't know for sure, I can't tell you. But

157

1  they certainly indicated that they were doing the
2  testing. When they presented this data.
3      Q.  Do you know Repro Genetics in New Jersey,
4  Dr. --
5      A.  I don't know.
6      Q.  Do you know whether -- you said you never
7  heard of Genetics and IVF in Virginia?
8      A.  No, not really. No, no, I mean, that's just
9  not one I think about, I think of just Repro and --
10      Q.  So you don't know?
11      A.  No, no.
12      Q.  Or Cornell Medical Center in --
13      A.  I don't know if Wells was doing it, I don't
14  know, I don't.
15      Q.  Do you know how many of these labs besides
16  maybe RGI were using genetics markers at all, let alone
17  in testing for cystic fibrosis?
18      A.  I -- I know it was indicated that it's good to
19  use it for causes. I don't -- I don't know for sure,
20  no, I don't. But I think this is all discoverable.
21  You could certainly ask these laboratories --
22      Q.  And you don't know --
23      A.  It's not worth me guessing. We can find this
24  out definitively. It's straightforward.
25      Q.  Well, I'm asking what you know and I don't

40 (Pages 154 to 157)

158

1 think you have to guess you know.
2    A. I don't want to guess. Well, he told me not
3 to guess, I'm telling you I'm guessing, so I don't want
4 to guess anymore.
5    Q. Well, the questions you're being asked are, do
6 you know such and so --
7    A. I --
8    Q. -- and if you don't know you're not guessing
9 you don't know?
10    A. Yeah, okay. I was under the impression --
11    Q. Correct?
12    A. -- other labs beyond of RGI because the
13 presentations given by Dagon Wells and others --
14    Q. All right.
15    A. -- they were using markers. I can't say for
16 sure. You said it as a fact, I don't know for a fact.
17    Q. Okay. But you don't --
18    A. But it's my impression labs beyond RGI were
19 certainly aware of this information and --
20    Q. I didn't ask you were they aware, I asked were
21 they doing genetic marker testing?
22    A. Do I know for sure, yeah. Sorry. I'll say I
23 don't know.
24    Q. Do you know how many, if any, of the labs use
25 genetic markers for two mutations?

159

1    A. Well, it's the same question, so I don't know.
2    Q. How much more complicated is it to test for
3 two mutations than one using genetic markers, genomic
4 markers?
5    A. How much more?
6    Q. Yes. Is it more complicated?
7    A. Okay. Let's start there. Yes, it is. How
8 much more --
9    Q. How much more?
10    A. -- you're hitting two targets, you're asking
11 for two targets to be assayed instead of one.
12    Q. So is it twice as complicated or somewhat?
13    A. Not really because it's not a doubling of the
14 effect, you're still doing only one PCR method in which
15 now you put in two set of primers.
16    So, in fact, yes, it's more complicated but it
17 is something that, um, can be built into the test. It
18 is more complicated, yes, because you're trying to hit
19 two targets. Is it you actually do a whole new assay
20 or some other thing, no.
21    Q. All right. Now, this question I'm going to
22 ask now is not whether you think they should have done
23 or -- or whether they knew about it or anything of that
24 nature, I want you to listen to the question literally
25 and answer it.

160

1    A. Sure.
2    Q. Do you know whether in early to mid-2004, the
3 average PGD provider with reasonable skill and care in
4 the United States used genetic marker testing for
5 cystic fibrosis in individuals undergoing PGD?
6    MR. STEIN: I object to form of the question
7 because you -- because haven't defined average. You
8 talk -- only know that there's three people doing it,
9 what's the average.
10    MR. LEUCHTMAN: Well, I'm taking from the jury
11 instruction.
12    MR. STEIN: Well --
13    THE WITNESS: But --
14    MR. STEIN: Just take it from the facts.
15    THE WITNESS: And I don't --
16    MR. LEUCHTMAN: Now that you've coached the
17 answer we'll --
18    THE WITNESS: Well, he hasn't said anything.
19 What do you mean by average? Was it reasonable to
20 expect?
21    Q. I didn't ask you that.
22    A. Okay.
23    Q. Let me read the question again it's important
24 question in this case.
25    MR. STEIN: You say it's an important question

161

1 in case.
2    Q. In my opinion it's an important question?
3    A. I grant you, I understand. You feel it's an
4 important question.
5    Q. I did write it here and I will show it --
6    A. I want to give you --
7    Q. -- of you want.
8    A. Yes. And I -- I want to give you, yes, the
9 best answer.
10    Q. Do you know whether in the early to mid -- in
11 early to mid-2004, the average PGD provider with
12 reasonable skill and care was using genetic markers for
13 testing for cystic fibrosis in individuals undergoing
14 preimplantation genetic diagnosis?
15    A. The average --
16    Q. And that's in the United States?
17    A. So, if it were two out four, I think probably,
18 yeah, two out of four would do it. Because I'm under
19 the impressio Repro was doing it. I'm under the
20 impression one of the other labs was doing it because
21 their presentation I recall seeing. I know RGI was
22 doing it and I believe, at least, one other lab. So
23 that's an average of two out of four, so that's
24 average, yeah.
25    Q. Do you know whether?

41 (Pages 158 to 161)

162

1    A.  Do I absolutely know?  No.  You asked my
2  impression.
3    Q.  So you don't know what they were doing but
4  you -- you sort of think that maybe --
5    A.  Well, you're asking me something from seven
6  years ago, do I remember exactly all the labs that were
7  doing it, when I was at the different meetings, when --
8  this presented considerably at the American Society of
9  Human Genetics, I do remember and the American College
10  of Human Genetics.
11    Several labs were presenting they were doing
12  this, certainly Verlinsky's group was, and so were
13  others.
14    Do I remember all those?  I don't.  Was my
15  strong medical impression or impression that there more
16  than one lab doing it and that -- this was because of
17  these publications becoming a reasonable thing to do in
18  all of these cases, particularly the compounds
19  heterozygous, I would say yes.  So, that's my
20  impression, best I can recollect seven years ago in
21  2004.
22    Q.  Is it necessary to get DNA from family members
23  other than -- than the involved couple in order to do
24  testing with genetic markers?
25    A.  Yes.

163

1    Q.  Are -- do you have any criticism of Dr.
2  Hughes, or Genetic relating -- Genesis Genetics
3  relating to any communications with the Grossbaums
4  other than what you've already talked about?
5    A.  You mean with -- with this communication here?
6    Q.  Beyond the two that you testified to.  You
7  said he should have talked to them about allele
8  dropout?
9    A.  Yes.
10    Q.  And he should have --
11    A.  Informed that -- that his lab did not do the
12  multiplex test where other labs did, at least one other
13  lab we know was offering it.  Um, and was there any,
14  I'm sorry, I apologize, I'm getting a bit fuzzy.
15    Q.  Do you have any criticism of any communication
16  with the Grossbaums by Dr. Hughes or Genesis Genetics
17  other than what we've just talked about?
18    A.  Give me one second to think about that answer,
19  please.
20    Q.  Sure.
21    A.  I think I would have to say no.
22    Q.  Do you have an opinion as to whether the --
23  there should have any direct communication between
24  Mark Hughes or anybody else at Genesis Genetics and the
25  Grossbaums after their conversation that's memorialized

164

1  in this PGD Informed Consent Phone Review, on March 25?
2    In other words, should he have talked to them
3  about anything, if they didn't call him after March 25,
4  2004?
5    A.  Did he have a duty to call them --
6    Q.  Well, in essence?
7    A.  -- contact them, to follow them up?  Yes.
8    Q.  Well, not to follow them up after she got
9  pregnant?
10    A.  Okay.  Pregnant --
11    Q.  Okay.  Before the implantation?
12    A.  Um, it's -- I know we all want to get out of
13  here, give me a second to think about this one.  Did he
14  have a duty to follow them further?
15    Q.  That's not what I asked.
16    A.  Okay.  That's why I'm restating it.
17    Q.  All right.
18    A.  Because maybe I misunderstood --
19    Q.  Should he have spoken with the Grossbaums
20  between --
21    A.  You say should he this is so ambiguous.
22    Q.  All right.  All right.
23    A.  Should he have spoken --
24    Q.  And you're --
25    A.  I'm not trying to -- I'm just not sure what

165

1  you're asking.
2    Q.  All right.  Let me rephrase it then.
3    A.  Yeah, please.
4    Q.  In your opinion did Dr. Hughes or anyone else
5  at Genesis Genetics have duty to speak to the
6  Grossbaums about anything between the discussion Mark
7  Hughes had with them on March 25, 2004 and the date of
8  the implantation, which I believe to be July 17th or
9  19th?
10    A.  To speak directly to the Grossbaums?
11    Q.  Yes.
12    A.  No.
13    Q.  All right.  And what is the basis of your
14  saying no to that question?
15    A.  Well, I would have hoped that all the
16  information that should have been communicated as far
17  as the risk and everything else would have been done in
18  phone interview.
19    Q.  Do you agree that the IVF physician or
20  physicians are and should be the primary contact with
21  the couple in an IVF situation, even if it involves
22  PGD?
23    A.  Yes.
24    Q.  And do you agree that the typical PGD
25  provider, once he returns or once he reports on the

42 (Pages 162 to 165)

178

1  present time, you and your lab?
2      A.  FSH testing for PGD, no.
3      Q.  No.  Well, you're not doing PGD?
4      A.  Right.
5      Q.  You didn't -- did you use FSH testing when you
6  did the --
7      A.  No.
8      Q.  -- two cases in the --
9      A.  No.
10     Q.  -- last three years?  Why not?
11     A.  It's not necessary for single gene testing.
12     Q.  Would -- would you have described FSH testing
13  as standard of care at one time when it was generally
14  popular and used in the PGD community?
15     A.  I'm -- I'm really not an expert on the FSH
16  testing side of PGD.  I'm on discussing the single gene
17  diagnosis side of PGD.
18     Q.  Do you know whether in early to mid-2004 the
19  average PGD provider with reasonable skill and care
20  would have used FSH testing for cystic fibrosis in
21  undergoing preimplantation genetic diagnosis?
22     A.  FSH testing can't make a diagnosis of CF,
23  unless there's a deletion known and the deletions is
24  also within the reason, and even that would be tricky.
25         So this is -- FSH is a different assay.  So

179

1  look at chromosome compliment, are all the chromosomes
2  there, and are they missing and so forth, that's what
3  the FSH test does.
4         Is it -- is it a Down Syndrome case, for
5  example, where there's three copies of chromosome 21.
6  Because the FSH, which is a little probe, can light up
7  each chromosome 21.  And if you see three signals you
8  know there's three 21s.
9         So, you say, okay, embryo has three copies of
10  chromosome 21, that is going to lead to Down Syndrome.
11  That's how FSH testing is done.
12         That condition is different than this type
13  which is one nucleotide -- I'm sorry if this is
14  redundant.
15     Q.  Well, do you know whether or not there was a
16  time when the PGD community by and large, with the
17  exception of Mark Hughes and perhaps others, were doing
18  FSH testing in an attempt to do preimplantation genetic
19  diagnosis?
20     A.  Of CF?  No, you never use FSH for CF.
21     Q.  Nobody ever did?
22     A.  For CF, for cystic fibrosis?
23     Q.  Yes.
24     A.  For this condition?  I don't know of any case.
25     Q.  It doesn't work?

180

1      A.  It's a different technology, yeah.  Does that
2  make sense?
3      Q.  Yes.  What are polar body biopsies?
4      A.  That is the removal the polar bodies which are
5  generated during the development of the -- of the egg.
6      Q.  All right.  And generally speaking polar body
7  biopsy is done because certain hospitals in certain
8  countries don't allow invasive testing on embryos
9  themselves?
10     A.  That is an alternative.  Yes.
11     Q.  Okay.  And it's an alternative mainly in
12  situations where going into the embryo is verboten by
13  either early legal authority or --
14     A.  Well, that's one reason to do it, yes.
15     Q.  All right.  Is it standard of care to do polar
16  body biopsies?
17     A.  Are we going to get in standard of care
18  discussions again, and my knowledge of whatever
19  everyone does and does -- polar biopsy, from what I
20  understand is a technically challenging assay to do.
21         It has been mastered by a subset of the PGD
22  labs.  RGI has -- has championed it and Uri Verlinsky
23  championed, and demonstrated, had some very, in certain
24  circumstances, some very good uses.
25         And certainly as you point in Europe where one

181

1  is not able to manipulate an embryo after -- so
2  post-fertilization that is used.  So that's my
3  understanding of it.  We've never used it and I do not
4  know more than that.  I can't give you any more
5  expertise.
6      Q.  Can you tell me whether or not as of 2004
7  polar -- polar body biopsies were routinely done in the
8  United States?
9      A.  Well, certainly RGI was offering it.  RGI, the
10  lab in Chicago was offering it.  I don't know about the
11  other ones.
12     Q.  Are they being used now routinely polar body
13  biopsies?
14     A.  They are being, I can't -- as far as I
15  understand, they still can be obtained.  I don't know
16  if it's routine.
17     Q.  Do you have an opinion as to whether or not
18  Mark Hughes or Genesis should have offered polar body
19  biopsy to the Grossbaums?
20     A.  I have an opinion that he could have
21  considered offering it as an alternate to -- to doing
22  the testing.
23     Q.  But you don't believe it was negligent for
24  him --
25     A.  No, I actually don't and that's why I have not

46 (Pages 178 to 181)

182

1 mentioned it myself.
2    Q. Now, I don't know if I asked you for this, it
3 is getting late in day. Does your lab at any time do
4 polar body --
5    A. No, no, no, we don't.
6    Q. You do you agree that even today polar body
7 biopsy is not a mainstream approach?
8       MR. STEIN: Mainstream, objection to form.
9    Q. In the United States, granted that you're not
10 going to be all that familiar with the PGD community?
11       MR. STEIN: Approach to -- objection.
12    A. Certain conditions people would argue that
13 it's a good application. I -- I -- it's a difficult
14 question to answer. It -- it his comments aside.
15 Could you ask that again and give it to me precisely.
16    Q. Okay.
17    A. See if I ask answer it as best I can.
18    Q. Yes. And I'll add -- well, first of all do
19 you agree that even today polar body biopsy is not a
20 mainstream approach in the PGD community in the United
21 States?
22       MR. STEIN: Same objection.
23    Q. Okay. Noted. Go ahead and answer the
24 question.
25    A. So, the single cell analysis it is an option

183

1 but it is the major one, no, it is an option so it is
2 there.
3    Q. Okay. Do you expect to offer any opinions in
4 this case as to the existence of a causal relationship
5 between the action or failure to act by any of the
6 defendants and the misdiagnosis or failure that
7 occurred?
8    A. Yes.
9    Q. All right. Do you expect to offer such
10 opinion as to Dr. Hughes, just yes or no?
11    A. Yes.
12    Q. Do you agree that because of the many
13 variables involved in PGD, the cause or causes of PGD
14 misdiagnosis are always difficult to pin down?
15    A. Say that again.
16    Q. Do you agree because of the many variables
17 involved in PGD, and we've discussed some of them,
18 potential mislabeling or --
19    A. Right.
20    Q. -- transaction position of things --
21    A. Yes.
22    Q. -- et cetera, et cetera? The cause or causes
23 of PGD misdiagnoses are always difficult to pin down?
24    A. Always difficult to pin down. I don't agree
25 with that.

184

1    Q. Generally difficult?
2    A. No, I don't agree.
3    Q. Can each of the following things be possible
4 causes of failure or misdiagnosis of PGD mosaicism?
5       MR. STEIN: Are you talking in this case or
6 abstractly?
7    A. In any case?
8    Q. Can they be possible causes of failure or
9 misdiagnosis in PGD, generally?
10    A. Can they be?
11    Q. Yes.
12    A. Yes, mosaicism can be which leads to ADO which
13 you need to detect.
14    Q. All right. What is mosaicism?
15    A. Mosaicism is the fact that the embryo -- the
16 cells of the embryo contain different numbers of
17 chromosomes or difficult portions of the chromosomes.
18       Instead of them having an entire compliment of
19 46 chromosomes they my make additional amounts or
20 subset and some of the cells have it and some of them
21 don't, so it's mosaic. So ...
22    Q. As of 2004 was it possible to predict
23 mosaicism with any degree of medical probability?
24    A. Mosaicism had been recognized as a condition
25 seen in egg cell embryos and in animals decades ago,

185

1 and humans also.
2    Q. Okay.
3    A. It was known --
4    Q. It was know that it occurs --
5    A. Okay.
6    Q. -- in any given case --
7    A. Yes.
8    Q. -- was it possibly to predict mosaicism?
9    A. Predict whether mosaicism was there or
10 appreciate that it could be there?
11    Q. Predict in a given case that it could --
12    A. Well, sure if you aggregated the entire embryo
13 and test each one of them, yeah, you could show --
14    Q. But that isn't done?
15    A. Well, you could take two of the cells and that
16 was shown when you take two cells that there was
17 mosaicism. So this I was known by 2004.
18    Q. As PGD was practiced was it -- was it possible
19 to predict mosaicism more likely than not?
20    A. It was reasonable to expect that it would --
21 it could potentially complicate the case, yes. That's
22 about as far as I can go. I don't know where you're
23 going with this question.
24    Q. Was mosaicism possible, not necessarily a
25 probable or the probable but --

47 (Pages 182 to 185)

# EXHIBIT 5



**Weill Cornell Medical College**

⌐ **NewYork-Presbyterian Hospital**
⌐ **Weill Cornell Medical Center**

Kangpu Xu, Ph.D.
Director, Laboratory of Preimplantation Genetics
Associate Professor

The Center for Reproductive Medicine and Infertility
1300 York Avenue, P.O. Box 30
New York, NY 10065

Telephone: 212-746-6301
Fax: 212-746-8589
E-mail: kpxu@med.cornell.edu

February 26, 2010

Stephen N. Leuchtman, P.C.
1380 E. Jefferson Ave.
Detroit, MI 48207

RE: Grossbaum v. Genesis Genetics & Hughes

Dear Mr. Leuchtman,

Per your request, I have reviewed the following documents which you sent to me:

1) Medical Records of Genesis Genetics
2) Medical Records of IVF Center of New York University Medical Center
3) Reports from Dr. Garry R, Cutting and Dr. Charles M. Strom
4) Depositions of Mark R. Hughes, MD, PhD, Genesis Genetics; and Frederick Licciardi, MD, James Grifo, MD, PhD; Ms Alexis Adler, Kaycian Brown, R.N.; and Ms. Imelda Weill, New York University Medical Center
5) Depositions of Chaya Grossbaum (Volume 1 and 2) and Menachem M. Grossbaum.

As I understand, both Chaya Grossbaum and Menachem M. Grossbaum are carriers of a mutation for cystic fibrosis gene. They were referred to NYU IVF center and underwent IVF and biopsy at NYU and the specimens were sent and analyzed by Genesis Genetics. The child born from the procedure was found be affected with cystic fibrosis.

As you probably know, I have been involved in PGD since 1992 when I was recruited as a faculty member at Cornell Medical College. I have published number of papers in PGD. For example, in 1993 we studied a new procedure, call Primer Extension Preamplification (PEP) for single human blastomeres. In particular we tested the most common CF mutation, delta F508, in the amplified products (Human Reproduction, 1993vol.8, No.12, pp2206-2210). In 1999, we published the first successful PGD case for sickle cell anemia (JAMA). Again in 2004, first PGD for retinoblastoma was reported in American Journal of Ophthalmology. Furthermore, I am a certified laboratory directory by ABB (American Board of Bioanalysis) since 2002 and by New York State Department of Health as laboratory director since Oct. 5, 2004. My laboratory, Laboratory of Preimplantation Genetics, Center for Reproductive Medicine and Infertility, Weill Medical College of Cornell University, obtained permit for performing PGD for molecular testing since March 2006 and for

- 1 -

cytogenetics, since 2007. Beginning from 1995, as I was the head of the PGD program and later as the director of the laboratory at the Center for Reproductive Medicine and Infertility, Weill Cornell Medical College. We have completed over 1300 cases of PGD for variety of indications, including more than 70 cases for cystic fibrosis, covering more than a dozen of CF mutations.

Having known Dr. Mark Hughes as many years as I have been involved in PGD, he is, without any doubt, one of the most renowned pioneers in Preimplantation Genetic Diagnosis. He was the coauthor of the very first paper in the scientific literature described the success of PGD for cystic fibrosis (1992, New England Journal of Medicine). He was a member of President Bioethics Council that described the importance of PGD and recommended funding for PGD research in 1994. It is definitely not trivial that he was recognized and highly praised by the Jewish community, Bonei Olem, for his contribution to PGD (see Dr. Licciardi's deposition, page 25).

An open question and a central issue in PGD is that PGD has its limitations because it is a single cell based test. It has been recognized in the beginning of last decade in the PGD community that allele drop out (ADO), which occurs when low DNA copy numbers are used as the starting material for genetic testing, is a challenging issue. Numerous papers have been published in order to reduce or eliminate this inherent risk. Some proposed to biopsy two cells from one embryo, others tested different lysis strategies; still others were trying to use whole genome amplification to obtain more DNA for replicate testing. None of them appears to be fully effective. Current understanding is that ADO is a very complicated matter and there may be many contributing factors. ADO varies from cell type to cell type. ADO is usually low in the healthy cells, such as lymphocytes and fibroblast cells harvested at the growth phase. Likewise in blastomeres, ADO may also vary according the healthy status of the cells/embryos. It is not unreasonable that a healthy diploid blastomere (D3, 7-9 cell stages) provide lowest chance of ADO. Indeed, we have seen more aneuploidy/mosaicism in those slow developing or arrested embryos (4-5 cells on the morning of Day-3 post fertilization) in our FISH based aneuploidy tests.

Accumulated knowledge from the Human Genome Project facilitates the use of linkage markers which may reduce substantially the risk of ADO. Though it is highly desirable, markers are not always used even as of today for various reasons. Finding informative linkage markers is not trivial task or an overnight procedure. Building whole sets of linkage markers for each disorder/mutation is a continuing process. In 2004, not all the laboratories were using linkage markers and not for every single mutation; in other words, multiplex PCR was not the standard in 2004. During a period from 2001 to 2005, we successfully performed PGD for RB, an autosome dominant disorder with 50% risk without using markers. The reason was not that we were ignorant, but with the limitation that we had because we could not find markers that were informative for the couple. Three healthy singletons were born from 4 diferent IVF-PGD attempts. I believe tests conducted by Dr. Hughes were proper, appropriate and within the standard of practice existing at the time for this couple.

The tests performed on July 18-19, 2004 did statistically reduce the risk, from 25% to a much lower percentage. It was proper to recommend the transfer of embryo #7 and 8 based upon both reports issued by Dr. Hughes and Genesis Genetics on July 19, 2004. Results in both of Dr. Hughes' reports prepared on July 19, 2004 were within the accepted level of risk and the level of risk agreed to by the patients.

Another issue of embryological work using polar body biopsy is open for debate. Polar body biopsy or preconception genetic diagnosis was reported in 1990. However, the use of polar body biopsy has been limited in a few laboratories around the world. A few laboratories that performing polar body biopsy, such as those in Germany and Italy, not because of its superior strategy but because of their

- 2 -

country's law. As of today polar body biopsy for PGD is yet to be a mainstream approach (see a most recent debate article by Geraedts et al. Human Reproduction, 2010, v25, pp575). It was not its technical difficult, but with its real benefits in routine PGD. If one looks ESHRE (European Society of Human Reproduction and Embrylogy) data collection from I to IX (the latest one), one could only find few cases PGD using polar bodies as testing materials. At CRMI, we performed PB biopsy in the late 90's for balanced translocation; the girl is now over 12 year old. Nevertheless, we have not, as most of the labs in the world, used PB biopsy as a routine procedure.

Because of the ever-present risk of ADO, and other risk factors inherent in PGD, CVS and amniocentesis are universally relied upon as a safety net in PGD. CVS has been shown to be very accurate. I know from my experience that Dr. Hughes and Genesis Genetics will not take on PGD of a couple if they will not agree in advance to CVS or amniocentesis; and this is appropriate and within accepted standards.

From the documents I reviewed I believe that the couple was well informed on many occasions that there were risks of misdiagnosis and they have signed at least two important PGD consents, one from NYU, and one from Hughes' team. Dr Hughes went all the details, as much as he could, with the couple. Specifically, and without going into every detail in the consent forms, the Grossbaums demonstrated an understanding that this is not a perfect technology, it is complicated, it is an experimental process, lowering the risk to zero is not realistic or possible, the technology can fail, and follow-up confirmation testing (in the form of CVS or amniocentesis) is necessary. The Grossbaums agreed to go forward in light of the risks and alternatives, and they agreed with both NYU and Genesis Genetics to undergo confirmation testing in the form of CVS or amniocentesis.

Because of so many variables involved in PGD, the cause(s) of PGD misdiagnosis is always difficult to pin down. Based on the literature most misdiagnosis is due to intercourse or unprotected sex. In a published data collection (ESHRE PGD consortium data collection VII: cycles from January to December 2004 with pregnancy follow-up to October 2005, Human Reproduction, 2008; Vol 23, No. 4, pp 741755), the best data collection and analysis in PGD community, the consortium stated on page 750 that "Eighteen misdiagnosis have been reported, 9 after PGD for PCR and 9 after PGD or PGS using FISH. In all cases of misdiagnosis, unprotected sex during the PGD cycle could be responsible as any embryos generated in vivo would not be tested." With this in mind, it is speculation to say that the bad result in this case was caused by the implantation of an affected embryo, as opposed to any of a number of other causes, including intercourse or unprotected sex by the Grossbaums.

In summary, I see a tragic case happened, not because of any negligence, but unfortunately because of the complexity and the limitations of the PGD technology and likely other confounding factors. Genesis Genetics did very professionally, and no deviations were seen from the standard of care.


Respectfully yours,

Kangpu Xu, Ph.D., HCLD.
Associate Professor
Director, Laboratory of Preimplantation Genetics
CRMI, Weill Cornell Medical College

# EXHIBIT 6

Thomas E. Redburn, Jr.
Sarah Blaine
**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: 973.597.2500
Fax: 973.597.2400

-and-

Stephen N. Leuchtman, P.C.
**OF COUNSEL TO TROWBRIDGE LAW FIRM, P.C.**
1380 East Jefferson Avenue
Detroit, MI  48207
Tel: 313.259.6900 x. 126
Fax: 313.259.3474

*Attorneys for Defendants Genesis Genetics*
*Institute, LLC and Mark R. Hughes*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAYA GROSSBAUM and MENACHEM GROSSBAUM, her spouse, individually and as *guardians ad litem* of the infant ROSIE GROSSBAUM,<br><br>Plaintiffs,<br><br>-vs-<br><br>GENESIS GENETICS INSTITUTE, LLC, of the State of Michigan, MARK R. HUGHES, NEW YORK UNIVERSITY SCHOOL OF MEDICINE and NEW YORK UNIVERSITY HOSPITALS CENTER, both corporations in the State of New York, ABC CORPS. 1-10, JOHN DOES 1-10,<br><br>Defendants. | CIVIL ACTION NO.<br>07-CV-1359 (GEB)(ES)<br><br><br>**DECLARATION OF MARK R. HUGHES IN SUPPORT OF THE GENESIS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

01/16/2011

**MARK R. HUGHES**, being of full age, hereby declares as follows, pursuant to 28 U.S.C. § 1746:

1.      I am a genetics research scientist specializing in studying the human genome of DNA and the technology of pre-implantation genetic diagnosis ("PGD"). I am also one of the principals of Genesis Genetics Institute, LLC, which is one of my co-defendants in this litigation.

2.      I completed my B.S. in Biology and Chemistry at St. Johns University, and then earned an M.S. in molecular biophysics at Stanford University. I then completed my training a Ph.D. degree in Molecular Biochemistry from the University of Arizona. I then completed a postdoctoral fellowship in Medical Genetics at the Baylor College of Medicine in Houston, Texas, where I also earned my M.D. I completed my internship and residency in Internal Medicine at Duke University before returning to Baylor College of Medicine as a junior faculty member.

3.      At Baylor, I researched the question of whether single cells could be molecularly data mined for diagnosis and began a multi-year collaboration with IVF clinicians and embryologists at Hammersmith Hospital in London, England. My colleagues in London and I were pioneers in the arena of PGD. Indeed, in 1993 our research was recognized by *Science* magazine, the most prestigious scientific journal, as being one of the "ten most significant advances" in all of science that year.

4.      In 1993, I was one of the first 11 members of the Human Genome Institute at the National Institute of Health, where I led the section on Translational Genomic Diagnostics. I was also named Professor and Chair of the Human Genetics program at Georgetown University in Washington, DC.

5.      In 1998, I accepted a position as a Professor and Director of Molecular Medicine and Genetics, Professor of Obstetrics and Gynecology, and a Professor of Pathology at Wayne State University, and a Senior Scientist at the Karmanos Cancer Institute. I also became

the Director of the State of Michigan's "Life Sciences Genomics Hub," which focused on developing cutting-edge molecular science.

6. In 2003, because of federal funding limitations on embryonic stem cell science, I founded Genesis Genetics Institute, LLC to provide PGD to IVF centers and reproductive endocrinologists.

7. Since the early 1990's, the focus of my research has been on developing techniques for pre-implantation genetic diagnosis both in a theoretical sense, as a genetic researcher, and in a practical sense, for providing practical applications of this research to families in which both partners have been diagnosed as carriers of genetic mutations that create a significant risk that their offspring will have serious genetic diseases. The purpose of PGD is to help couples reduce their risk of giving birth to offspring with devastating genetic diseases. The technology, however, is still new enough to be constantly evolving, and we fully inform every couple we work with that the technology, which pushes science to its practical and theoretical limits, is not error-free.

8. Despite the full disclosure I give to each couple Genesis works with about PGD technology's imperfections, during my entire career in the field of PGD, I have constantly monitored the scientific literature and best practices at the other laboratories that provide PGD as well as stayed active in PGD-related professional organizations and attended PGD-related conferences (often as a speaker, panelist, or other presenter) in an effort to ensure that the PGD services provided by the laboratories I have been associated with, including Genesis, have incorporated all proven technological advances into the services they offer to couples. I have also been a member in good standing of the Preimplantation Genetic Diagnosis International Society and President of the PGD-SIG of the American Society of Reproductive Medicine, the foremost organization in this field.

9. Because the PGD field is constantly evolving and changing, scientists are constantly publishing articles describing the latest technology trials. Publication of articles in the scientific literature describing a possible advance in PGD technology or techniques does not

-3-

dictate that the technology is proven or widely accepted, or that PGD laboratories will immediately change their standard practices. This includes any medical diagnostics: first, the published datas provided by the new technology or technique must be replicated repeatedly, over time; second, evidence must be collected demonstrating that the new technology or technique provides a significant benefit and no harm over the previous methodology; and finally, the technology or technique must be refined and adapted as necessary to be commercially viable. The length of time between publications and clinical implementation of a medical technique often requires several years.

10.     In 2004, Genesis was not performing multiplex DNA amplification of genomic markers for clinical PGD.  We had seen the results published by RGI of Chicago, but we had trouble replicating these data in our laboratory.  Furthermore, our error rate without using multiplex markers was significantly lower than the industry average reported error rate.  Finally, while we were aware that RGI in Chicago was providing multiplex testing to couples at the time, we agreed with Dr. Xu and others that the evidence did not yet support offering multiplex testing as the standard of care.

11.     At his deposition, Dr. Charles Strom identified laboratories that he said were performing PGD in early-to-mid 2004.  The laboratories he identified were:

- "RGI in Chicago" (Strom Dep. at 112:7-8)
- "Reprogenetics in New Jersey" (Strom Dep. at 112:15-16)
- "Genetics and I.V.F. in Virginia" (Strom Dep. at 112:18-20)
- "Cornell Medical Center in New York City" (Strom Dep. at 112:21-23).
- "Shady Grove" of "North Carolina" (Strom Dep. at 113:2-16)
- "Baylor" (Strom Dep. at 113:2-12)
- "a lab in Florida that was trying to develop P.G.D." (Strom Dep. at 113:9-12)

12.     In fact, Dr. Strom's testimony betrays not only his lack of knowledge regarding the standard of care at United States PGD laboratories in 2004, but also displays that

-4-

he was not even aware of <u>which</u> laboratories were performing PGD at that time. For instance, Shady Grove (of Washington, D.C., not North Carolina) was not independently performing PGD for disorders like Cystic Fibrosis in 2004, but instead was sending all of its PGD work to Genesis Genetics.

13.     From my active participation in the PGD community and interaction with professionals at these institutions, I am familiar with the practices of these laboratories in the 2004 time frame. To the best of my knowledge, in July of 2004, when Genesis performed its study of the Grossbaums' embryos, the only United States laboratory that routinely offered multiplex testing to its patients was RGI of Chicago, Illinois. In particular, from my previous association with the Prenatal Genetics Center at Baylor, I am aware that Baylor was not routinely providing multiplex testing in early-to-mid 2004.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  <u>January 11, 2011</u>

_Mark R. Hughes, MD, PhD_

Mark R. Hughes, M.D., Ph.D

# EXHIBIT 7

*ENTERED*

"a great 'Rockie' (for Rodeo)"   "Mendel"

**Page:** 1
**Date:** 2004 - 03 - 25
Month    Day
Noon

## Pre-Case Phone Review of PGD Informed Consent

**Last Name:** Morgenstern-Grossbaum   **Disorder:** Cystic Fibrosis

**Patient's First:** Chaya  [ ]  **Man's First:** Menachem [ ]  **Affected's First:** —

**Referred By:** ?Liccardi   **IVF Program:** NYU-IVF   Rec'd

▶ **Infertility** Y ✗N ✗?. ▶ **IVF Before:** Y ✗N ▶ **Blood Here:** 3/30/04 Date ___ N
no pregnancies

Chaya has G542X & Menachem has ΔF508 mutation

---

**Example of numerical outcomes & Description of Protocol**

Eggs Retrieved ~ 6+6=12
Eggs Fertilized ~ 10
Embryos To Biopsy ~ 8
Genetic Results Est ~

MM ~ 2  2
MN ~ 4 } 6
NN ~ 2

Test Sperm

DAY 0 → DAY 1 First check → 2 → DAY 3 Biopsy Day Biopsy → Embryo shop at NYU
1 cell → X 8 Tubes

3,300,000,000 DNA "letters" (nucleotides)

Testing for → one-cell - smallest unit, life,
→ one-gene - smallest unit inherit   ATGC
→ two-tiny "typos" in 3 billion letters
All → overnight

---

**Summary of Conversation Checks – actually SAY these sentences in quotes "word for word" and initial them when said.**

☐ Protocol Description: A detailed, step-by-step, description of PGD was described. In addition, this couple ✗ has ✗ has not, also seen a geneticist / genetic counselor, who is an independent source of medical information about this disease, and the options available to them.

☐ Genesis Involvement: (We are not your physicians) We are scientists who will try to develop a complicated single-cell test for your family so that Preimplantation Genetic Diagnosis can be used. This will involve: ✗ designing new DNA probes; ___ using existing probes in your care.

☐ Risks Described. ("This is not perfect technology") "This is an experimental process." "There have been errors by virtually all groups performing this technology, including our group." "The objective here is to lower your risk from ✗ %, but lowering it to zero is not realistic or possible."

☐ "It is important that you understand that technology like this can fail." 'zero risk' is not expected, not promised and not possible in one-cell, one-gene, one/two DNA typo, overnight testing". "It would not be truthful to suggest that we are perfect or that this technology has not produced errors – neither is true"

☐ Alternative Treatments. "You do not need preimplantation genetic diagnosis. You can get pregnant and assume the risks that are inherent to this disease."

☐ Follow-up Confirmation Testing: "Because single cell testing, overnight, pushes diagnostic technology to its limits – theoretical and practical – it is imperative that should a pregnancy ensue, conventional prenatal testing (chorionic villus sampling at around 10 weeks, or amniocentesis around 15-16 weeks is necessary. Maternal fetal medicine doctors will perform this testing for you."

☐ Affected / Non-transferred Embryos: The choices available explained. They should discuss this with the Reproductive Endocrinologist as well. Donation to medical research is a possibility to consider. Couple ___ agrees; ___disagrees; ___not sure yet, that donation is the choice they prefer; ✗ not discussed during this particular conversation.

☐ The couple indicates that all of their questions at this juncture have been answered. They want to: ___ Think about this more; ___Use an alternative approach to building their family. ✗ Have us design/optimize DNA probes to their mutation for PGD.

☐ "Are all your questions answered". Offered to be available to answer any question they have in the future. (Email / Phone) number provided.
☐ Photograph

"Yes - Thank you"  Both
MG

Page: 2
Date: 5-25-04
Last Name: _MORGANSTERN_

**Phone notes continued**

→ No history of infertility @ (but no children either)
  Rabbi Jacob - (something) referred us to NYU.

No apparent history of CF in either family pedigree. This
was found with a routine Jewish screen *

You do not need P&D. Remember - you can just get pregnant
+ have a prenatal test like "CVS or AMNIO" There
are great OB docs in NYC who could do this for you

"We do not like those odds" (MS)

This is complicated. Two different mutations tested    Not
simultaneously, in one cell. Details explained.               ↓
Chaya → $11^{E}$ 'sentence', 542 'word', 1756 letter G>T
                                                    normal
Mendel → $10^{E}$ a ; 508 'word', 1652 letter
                                          → CTT missing

G>T  ⬚——⬛ CTT>del CTT
                              Affected
A/N    N/M    N/M   (M/M)
NORMAL      carrier
noncarrier     like mom+dad
G/CTT   G/Del CTT     T/del CTT
         T/CTT
Normal    carrier        Affected
1/4    &   2/4      &      1/4   = 4/4

Page: 3
Date: 3/25/04
Last Name: Morgan'sBRN

notes continued

We would design custom test for you —
→ your DNA is unique on the planet
→ the DNA you mix together to make a baby
    is unique.
→ Every time you do that it is different & unique
→ The test is special too.
✓ this is not routine care    ? Blood possible from parents?
✓ Your test will be optimized    Seems not.
    just for you.
✓ There have been errors in PGD in the past even in
    CF testing. We've had 11 errors in 14 years
    in hundreds of families. It is awful when it
    does.    I'm not so arrogant as to tell you
    I am perfect or we can make a perfect test.
    Med is not a perfect science. "Art" of medicine.
Need to follow-up with CVS or amnio — EVANS?
    etc.
The goal is to cut your risks — from 1-in-4
    to much less. Not zero risk. The technology
    can fail too.
Some samples might not produce any gene data.
    Usually problem with embryo or the removed
    cell.
→ We won't be testing chromosomes here.
    They will look at the chromosomes when you
    have your prenatal confirmatory test.

Biopsy Risk –
None known. Could ↓ implantation
· just like freezing embryos.
No evidence of ↑ birth defects

Page: 4
Date: 3-25-04
Last Name: Morgovstern

(then went to)

Embryo Donation – Think about this MORE. Good.
We support whatever decision you make.
We would study the affected ones,
to make a better test for you for
the future. New technology is
coming along now.

P)
(Plans = 1) They state clearly they understand the
process – its success + risks

2) They would like to proceed ASAP → summer?

3) They want us to design their 2 mutation
test to help them build a healthy
family by lowering the odds
of CF in a baby

* 4) Need blood samples.
Contact NYU
No guarantees here.
Going for you → probably not infertile. (Great)
Going Against you → some nice looking embryos
will probably have CF.

5) Order oligos/primers.
Test DNA when arrives
Optimize test to 1 cell
Start IVF when ready.