# PART 2

# EXHIBITS TO DECLARATION OF SARAH BLAINE

# EXHIBIT 8

2981.101

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
DOCKET NO. 07-CV-1359

CHAYA GROSSBAUM and MENACHEM
GROSSBAUM, her spouse, individually
and as guardians ad litem of the
infant, ROSIE GROSSBAUM,

                              DEPOSITION OF:

        Plaintiffs,
                MENACHEM MENDEL GROSSBAUM

        vs.

GENESIS GENETICS INSTITUTE,
L.L.C., of the State of Michigan,      
MARK R. HUGHES, M.D., NEW YORK
UNIVERSITY SCHOOL OF MEDICINE and
NEW YORK UNIVERSITY HOSPITALS
CENTER, both corporations in the
State of New York, ABC
CORPORATIONS 1-10 and JOHN DOE
1-10,

        Defendants.
----------------------------------

        B E F O R E:   NANCY J. GILMARTIN, a

Certified Shorthand Reporter and Notary Public of

the State of New Jersey at the office of

NUSSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON,

ESQS., 20 Commerce Boulevard, Succasunna, New

Jersey, on Thursday, March 12, 2009, commencing

at 2:45 p.m., Pursuant to Notice.

        GILMARTIN COURT REPORTING SERVICE
         Certified Shorthand Reporters
              28 Peterson Road
               P.O. Box 5879
        Hillsborough, New Jersey 08844
              (908) 369-0080
            FAX (908) 369-0081



APPEARANCES:

NUSSBAUM, STEIN, GOLDSTEIN, BRONSTEIN
& KRON, ESQS.
BY: LEWIS STEIN, ESQ.
    For the Plaintiffs

STEPHEN N. LEUCHTMAN, P.C.
BY: STEPHEN N. LEUCHTMAN, ESQ.
    For the Defendants Genesis
    Genetics Institute, L.L.C. and
    Dr. Hughes

MARSHALL, DENNEHEY, WARNER, COLEMAN &
GOGGIN, ESQS.
BY: R. SCOTT EICHHORN, ESQ.
    For the Defendants New York
    University School of Medicine
    and New York University
    Hospitals Center

---

INDEX

WITNESS          DIRECT   CROSS   REDIRECT   RECROSS
MENACHEM MENDEL GROSSBAUM
    By Mr. Eichhorn   4      68,81
    By Mr. Leuchtman        64            80,92

EXHIBITS

FOR ID      DESCRIPTION          PAGE

---

**4**

1  MENACHEM M. GROSSBAUM,
2      97 Mill Street, Morristown, New Jersey,
3      having duly affirmed, testified as
4      follows:
5
6  DIRECT EXAMINATION BY MR. EICHHORN:
7      Q      Good afternoon, Mr. Grossbaum.  You
8  have been here and listened to me question your
9  wife for the better part of a day back in
10 December and for the first half of today, and now
11 it's your turn to have your deposition taken.
12     Do you remember the instructions that I
13 gave to your wife at the outset of her deposition
14 in December?
15     A      Basically answer the questions.
16 Don't cut you off.
17     Q      Part of it.  Those are two good
18 ones, yes.  Tell the truth.
19     A      She said that already so.
20     Q      Don't guess at anything.  You can
21 estimate.  If you are estimating, tell us, but if
22 your estimation gets to the point that it's a
23 guess, tell us you would have to guess and we
24 don't want a guess.  Okay?
25     A      Okay.

---

M. Grossbaum - Direct                         **5**

1      Q      The reason for that is because,
2  since you're under oath, your testimony is very
3  important today.  Even though we're not in a
4  courtroom, it's as important as if you were in a
5  courtroom.  So if you were to answer the question
6  one way today and answer it differently at trial,
7  you could be confronted with the discrepancy.  Do
8  you understand that?
9      A      Yes.
10     Q      So that's the reason we don't want
11 you to guess, because you might guess in good
12 faith one way today and differently later and now
13 there's a discrepancy.  That's the reason for
14 that instruction.  Okay?
15     A      Okay.
16     Q      Mr. Stein may object from
17 time-to-time to some of my questions, although he
18 tends to object more to Mr. Leuchtman's questions
19 than mine.  If he does, let him put his position
20 on the record and he'll tell you what to do.  The
21 chances are you'll be permitted to answer the
22 question in all likelihood.  So listen to the
23 question and, even though we have an objection,
24 most likely you'll answer it, but you'll abide by
25 his instructions.  Okay?

M. Grossbaum - Direct                                    6

1        If you need any question repeated, you can
2   ask to have it read back. If there's any
3   question that you don't understand, let me know
4   that and I will endeavor to rephrase it so that
5   you do understand it. Okay?
6        You didn't answer and that brings me to my
7   next one. You need to answer --
8        A    Okay.
9        Q    -- every question with a verbal
10  response. You did nod your head just before.
11       A    Right.
12       Q    But nods of the head can be
13  ambiguous, and all we end up with after this is a
14  written transcript. You're not on a video. No
15  one can see you nodding.
16       A    Right.
17       Q    So you need to answer verbally and
18  you need to use a word rather than uh-hum
19  because uh-hum and uh-uh are probably spelled the
20  same, although they sound different. So yes and
21  no or any other word is required. And if you
22  forget to do that, hopefully one of us lawyers
23  here will remind you that you need to answer
24  verbally. Okay?
25       A    Okay.

M. Grossbaum - Direct                                    7

1        Q    If you do answer any question, and
2   you'll be answering a lot of them, I'll assume
3   two things; one, that you understood it, and,
4   two, that your answer is truthful. Okay?
5        A    Okay.
6        Q    Do you have any questions about
7   those instructions for me before we start?
8        A    No.
9        Q    Have you ever testified under oath
10  in your life before right now?
11       A    No.
12       Q    Have you ever been a party to a
13  lawsuit other than this one?
14       A    No.
15       Q    By party I mean did you ever bring
16  a lawsuit or were you ever sued before?
17       A    No.
18       Q    You were born January 1, 1980?
19       A    Yes.
20       Q    So let me do the math. You are
21  29?
22       A    Correct.
23       Q    That's why I'm a lawyer. I'm not
24  really very good at math. I understand that you
25  are a self-employed locksmith?

M. Grossbaum - Direct                                    8

1        A    Correct.
2        Q    And the name of your company is
3   what?
4        A    Emco Security Incorporated.
5        Q    Did you start that company?
6        A    Yes.
7        Q    When? What year?
8        A    I don't remember.
9        Q    Can you estimate for us how long
10  that's been in existence, although not exactly?
11       A    A few years. Three, four, five
12  years.
13       Q    Was that you -- did you have that
14  company before Rosie was born?
15       A    I don't remember.
16       Q    Before starting this company, did
17  you work as a locksmith?
18       A    Yes.
19       Q    And where did you work before this?
20       A    I worked for myself, but I didn't
21  have a company at that time.
22       Q    For how long have you been working
23  as a locksmith for yourself, since about what
24  year?
25       A    Since I got married.

M. Grossbaum - Direct                                    9

1        Q    And when was that?
2        A    Seven years, August 2002.
3        Q    And where is your company located?
4        A    New York.
5        Q    Where in New York?
6        A    The address is in New York. I'm
7   mainly a mobile locksmith.
8        Q    So you go where they call you to
9   go?
10       A    Right.
11       Q    Where is your clientele?
12       A    Wherever the calls come in.
13       Q    So just to give me an idea, I'm
14  not --
15       A    I've done work in New York as well
16  as New Jersey.
17       Q    And your wife said that you and she
18  are the only employees?
19       A    Correct.
20       Q    So you do all the work and she
21  handles the paperwork?
22       A    Pretty much.
23       Q    Is this your only marriage?
24       A    Yes. What do you mean by only?
25       Q    Meaning --

M. Grossbaum - Direct                                  10

1    A    Do I have another one on the side?
2    Q    No, whether or not you could have
3  been married before this.
4    A    No.
5         MR. LEUCHTMAN:  Either way, before
6  or during.
7    Q    At the present time, do you and
8  your wife have any plans or any decision made as
9  to whether you do or do not want to have more
10 children in your family?
11   A    We want to have more children.  We
12 don't have any plans yet.
13   Q    Okay.  So is it fair to say is that
14 something you've discussed since Rosie was born?
15   A    We discussed it, but that's pretty
16 much about as far as it goes.
17   Q    So the two of you are on the same
18 page that you'd like to have more children, but
19 there's nothing specific yet?
20   A    Yes.
21   Q    And I gather you're both young so
22 you figure you have plenty of time to get
23 specific at some point.  Is that fair to say?
24        MR. STEIN:  I take it your
25 question, by getting specific, means making

M. Grossbaum - Direct                                  11

1  concrete plans.
2         MR. EICHHORN:  Exactly.
3         MR. STEIN:  To have a child.
4    A    We would like to.
5    Q    And have you decided when you do
6  endeavor to do that how you will go about doing
7  it?
8    A    No.  That's what we haven't thought
9  about yet.
10   Q    So is that you haven't decided what
11 method to use yet to get pregnant again?
12   A    We haven't even researched much of
13 what our options are.  We haven't put them on the
14 table to make a decision.
15   Q    So have you and Chaya had any
16 discussions about the different methods for you
17 to get pregnant and the pros and cons now that
18 you've already had Rosie?
19   A    Not in that state of having pros
20 and cons and weighing each one out.  Just more of
21 we'd like to have it and we have to come up with
22 something, some way or something that we can do.
23   Q    So then would it be fair to say you
24 haven't really focused on the details of it yet?
25   A    Correct.

M. Grossbaum - Direct                                  12

1    Q    Okay.  As we know, you and your
2  wife are both CF carriers.  As a result of that
3  knowledge, when you decided to get pregnant, tell
4  us what discussion you and Chaya had about what
5  method you would choose to get pregnant and have
6  a child.
7    A    Well, we met with the rabbis and we
8  were directed or suggested to do the whole IVF
9  and so on, and that was pretty much what we did.
10   Q    When you say you met with the
11 rabbis, now, if I remember correctly, and I do
12 have notes from when I deposed your wife, she
13 said that this was not an issue that you
14 discussed with the rabbi at the synagogue a mile
15 away from your home.
16   A    No.
17   Q    Because she said you don't have a
18 personal relationship with him.  Is that right?
19   A    No.  Correct.
20   Q    So is it correct that you got in
21 touch with Rabbi Zalman Markowitz and he put you
22 in touch with Rabbi Aaron Jacobowitz?
23   A    Correct.
24   Q    And when you say you spoke to the
25 rabbis and IVF was suggested, was it Rabbi

M. Grossbaum - Direct                                  13

1  Jacobowitz who suggested the IVF?
2    A    No, it wasn't Jacobowitz.  First we
3  met with Tendler.
4    Q    Before you met with Jacobowitz, you
5  met with Rabbi Tendler?
6    A    Correct.
7    Q    How did you learn about him?
8    A    About who?
9    Q    Rabbi Tendler.  How did you learn
10 about him?
11   A    Through Rabbi Markowitz.
12   Q    And did you meet with Rabbi Tendler
13 in person or talk to him over the phone?
14   A    Spoke to him in person.
15   Q    Where did you see him?
16   A    Either in his office or in his
17 home.
18   Q    You don't recall where?
19   A    No.
20   Q    Do you know where he works?
21   A    In Monsey.
22   Q    At a synagogue?
23   A    I believe so.
24   Q    Is he the head rabbi of the
25 synagogue?

M. Grossbaum - Direct                                    14

1        A    I don't know.
2        Q    What had you learned about him from
3  Rabbi Markowitz that led you to go to see him?
4        A    That he's familiar with these types
5  of things.
6        Q    When you say "these types of
7  things --"
8        A    Meaning genetic type of stuff.
9        Q    And when you spoke to Rabbi Tendler
10 was it he, Rabbi Tendler, you and your wife?
11       A    It was Rabbi Markowitz was there
12 and then another rabbi, Rabbi Solomon was there
13 as well.
14       Q    Who is Rabbi Zalman?
15       A    Solomon.
16       Q    Solomon. Sorry.
17       A    He's a basically a friend of ours.
18       Q    And you said Rabbi Jacobowitz was
19 there?
20       A    No.
21       Q    No. So Rabbi Tendler, Rabbi
22 Solomon, you and your wife?
23       MR. STEIN:  And Markowitz.
24       A    Correct.
25       Q    Oh, Markowitz. I'm sorry.

---

M. Grossbaum - Direct                                    15

1        A    Right.
2        Q    So what was the discussion? Did
3  you to go to Rabbi Tendler to ask him for advice?
4        A    Pretty much.
5        Q    And what was the substance of the
6  discussion?
7        A    What our options were that
8  basically I believe that Markowitz or Rabbi
9  Solomon pretty much gave the -- what the story
10 was and that was pretty much where it went.
11       Q    And what was Rabbi Tendler's advice
12 to you?
13       A    Basically that abortion was brought
14 up and he put that down. And it was pretty much
15 I believe the IVF.
16       Q    Did you and your wife ask Rabbi
17 Tendler for permission for her to use birth
18 control?
19       A    I don't remember.
20       Q    Now, you and your wife are
21 Lubavitch, correct?
22       A    Correct.
23       Q    Rabbi Tendler, he's not Lubavitch,
24 correct?
25       A    Correct.

---

M. Grossbaum - Direct                                    16

1        Q    Is Lubavitch a very conservative
2  orthodox sect?
3        A    What do you mean?
4        Q    Well, as opposed to -- well, let me
5  ask you.
6        A    Long coats, long pants, everything?
7        Q    No. But I mean, is there a
8  difference to you between calling someone a
9  conservative orthodox and a moderate or centrist
10 orthodox? Do those terms have meaning to you?
11       A    No.
12       Q    Let me ask you this then: If you
13 are Lubavitch, why did you not go to a Lubavitch
14 rabbi to get advice on these issues?
15       A    Because when it comes to certain
16 things, you go to professionals that know about
17 the stuff instead of going to somebody you know.
18 Also we went to Rabbi Solomon and Rabbi Markowitz
19 are both Lubavitch and they both recommended to
20 us to go to Rabbi Tendler because he's informed
21 on the stuff.
22       Q    Who brought up the issue of
23 abortion at that meeting?
24       A    I don't remember.
25       Q    Do you remember any other

---

M. Grossbaum - Direct                                    17

1  information that Rabbi Tendler conveyed to you
2  and your wife other than that abortion was out
3  and that he recommended IVF? Do you remember
4  anything else?
5        A    No.
6        Q    Do you recall about how long that
7  meeting was?
8        A    No.
9        Q    Was this before or after you were
10 married?
11       A    Before.
12       Q    Can you tell me -- you were married
13 in 2002, correct?
14       A    Correct.
15       Q    So can you tell me the approximate
16 year that you met Rabbi Tendler?
17       A    I can guess before that. I don't
18 know when.
19       Q    You know it was before that, but
20 you can't say when?
21       A    Right.
22       Q    Did you ever meet with Rabbi
23 Tendler again?
24       A    No.
25       Q    Ever speak with him again?

M. Grossbaum - Direct                    18

1    A    I don't think so.
2    Q    And did your wife ever meet with or
3  speak with him again, to your knowledge?
4    A    I don't think so.
5    Q    Did you have any more specific
6  discussion with Rabbi Tendler such as, other than
7  the fact that abortion was out and recommending
8  IVF, did you ask him about other testing, whether
9  he would or would not allow her to have it?
10   A    I don't remember.
11   Q    So after that meeting, did you and
12 your wife decide that when you would try to
13 become pregnant you would use the IVF method?
14   A    Correct.
15   Q    And did you have an understanding
16 back then as to what your chances were of having
17 a CF baby if you and your wife were to get
18 pregnant naturally?
19   A    Yes.
20   Q    What was your understanding?
21   A    One in 25.
22   Q    You mean 25 percent?
23   A    Twenty-five percent.
24   Q    One in four?
25   A    One in four, right.

M. Grossbaum - Direct                    19

1    Q    When you spoke to Rabbi Tendler,
2  did he give you any names of particular either
3  doctors or centers where you could go for either
4  IVF or PGD testing?
5    A    I don't think so. I don't know.
6    Q    When Rabbi Tendler recommended IVF,
7  was the issue of PGD testing part of that
8  recommendation?
9    A    Yes.
10   Q    So what was your understanding as
11 to the potential benefit of using IVF and PGD
12 based upon your discussion with Rabbi Tendler?
13   A    That it would bring down the risk
14 of having a child with CF.
15   Q    Now, did there come a time when you
16 and Chaya decided to start trying to have a
17 child?
18   A    What do you mean by that?
19   Q    Well, in other words, she told me
20 that she was on the pill. So do you remember her
21 saying that?
22   A    Okay.
23   Q    Well, okay, let me do it this way.
24 Do you remember whether or not your wife was on
25 the pill?

M. Grossbaum - Direct                    20

1    A    Yes, she was.
2    Q    So was she on the pill in order to
3  not get pregnant?
4    A    Yes.
5    Q    Did there come a time when the two
6  of you decided to have her stop using the pill?
7    A    Yes.
8    Q    Was that because the two of you
9  decided that you wanted to start a family?
10   A    Yes.
11   Q    So did you and your wife ask about
12 places that you could get IVF and PGD from
13 anyone?
14   A    No. We were referred.
15   Q    Who referred you?
16   A    Between Rabbi Markowitz and Rabbi
17 Jacobowitz, that's where we got our referrals
18 from.
19   Q    So you and your wife had
20 discussions with these two rabbis in which they
21 gave you names of somewhere or some places you
22 could go to to get IVF and PGD?
23   A    Place, yes.
24   Q    Place. What were you told?
25   A    That NYU did it. And that's where

M. Grossbaum - Direct                    21

1  Rabbi Jacobowitz was the masgiach.
2    Q    So these rabbis gave you the name
3  of NYU?
4    A    Yes.
5    Q    And you had an understanding that
6  Rabbi Jacobowitz had been involved with NYU
7  before?
8    A    Correct.
9    Q    In cases in infertility cases for
10 orthodox people?
11   A    Yes.
12   Q    Orthodox Jewish people?
13   A    Yes.
14   Q    Now, how did you learn of Dr. Mark
15 Hughes' name?
16   A    Dr. Liccardi at NYU.
17   Q    So did you and your wife contact
18 NYU at any time before she learned she was
19 pregnant or after?
20   A    NYU?
21   Q    You're right. I'm sorry. That
22 was -- I had a mind freeze.
23       Tell me when you and your wife first got
24 in touch with NYU.
25   A    Date wise?

M. Grossbaum - Direct                                    30

1    A    Yes.
2    Q    So and so was Dr. Hughes presumably,
3  to your understanding, at his office in Michigan?
4    A    I don't know.
5    Q    So did you and your wife have a
6  speaker phone that you could both hear at the
7  same time or was it a regular phone?
8    A    Maybe two different hand sets.
9    Q    Do you remember where you were when
10  you spoke with Dr. Hughes?
11   A    In our apartment.
12   Q    And do you have more than one hand
13  set to your phone there?
14   A    I guess so.
15   Q    I don't mean to be --
16   A    I don't remember -- I believe we
17  did. I don't remember. I think we were on two
18  different hand sets. I can't say for sure.
19   Q    Is it your recollection that you
20  and your wife were both involved in that
21  conversation with Dr. Hughes?
22   A    Yes.
23   Q    And did both of you participate and
24  say something during that discussion?
25   A    Yes.

M. Grossbaum - Direct                                    31

1    Q    And did both of you listen to what
2  Dr. Hughes was saying?
3    A    Yes.
4    Q    Other than him saying that PGD is
5  not 100 percent in terms of its ability to be
6  correct, do you remember him saying anything in
7  any more specifics about that other than it's not
8  100 percent?
9    A    That he had a very high success
10  rate and that it pretty much was a regular thing.
11  I believe that he said that our mutations were
12  good to work with, and that he's very confident
13  in the procedure.
14   Q    Do you remember whether you or your
15  wife, when she was in your presence, ever had any
16  discussion with anyone at NYU about the success
17  rates of PGD testing?
18   A    I don't know.
19   Q    Did you have an understanding that
20  the various things that needed to be done as part
21  of the IVF procedure created a potential risk to
22  the fetus, hopefully to become child?
23   A    What do you mean?
24   Q    In other words, did you have an
25  understanding that they needed to manipulate

M. Grossbaum - Direct                                    32

1  certain things that they were dealing with, eggs
2  and cells and with your wife's body, and did you
3  have an understanding that those manipulations
4  did carry a risk of damage to the fetus?
5    A    Yes.
6    Q    And you accepted that risk?
7    A    That was the only way we could get
8  pregnant.
9    Q    So you accepted the risk?
10   A    Yes.
11   Q    And you accepted the IVF procedure
12  understanding that it could fail?
13   A    Yes.
14   Q    And you accepted the PGD testing
15  understanding that it could make an error?
16   A    Yes.
17   Q    Did you also have an understanding
18  that the things required in order to achieve an
19  IVF pregnancy could result in injury to your wife
20  as well?
21   A    Repeat it.
22   Q    Did you have an understanding that
23  the procedures and the medications necessary in
24  order to achieve a pregnancy through IVF did
25  create a risk of injury to your wife as well?

M. Grossbaum - Direct                                    33

1    A    I don't know. I mean, I don't
2  recall.
3    Q    Let me just show you this document
4  we just referred to, Grossbaum-1, and do you see
5  in addition to the signature on the last page
6  that there are a set of initials at the bottom
7  right of each page? Could you just confirm for
8  me that those are your and your wife's initials
9  at the bottom of each page?
10   A    Yes.
11   Q    And I'll just show you page 2 --
12  actually page 3. And, again, I'm not going to go
13  through all of these, but the bottom where it
14  says No. 3, from the corticosteroids, this is
15  under the portion dealing with potential risks
16  that could happen, you see it says vaginal
17  infection, impaired wound healing, increases in
18  blood pressure, hypersensitivity reactions
19  resulting in shock, blood diseases, mood swings,
20  vertigo, insomnia, psychotic manifestations and
21  depression, loss of muscle mass, osteoporosis?
22  You see all those things listed there as
23  potential, although highly unlikely?
24   A    Yes.
25   Q    So does this refresh your memory

M. Grossbaum - Direct                                          42

1    every single thing that we specifically did not
2    want to go through those and that we were not and
3    that was the reason why we went through
4    everything.
5              Q        What do you mean you threw out
6    everything single document? I don't know what
7    you mean.
8              A        You went through with my wife many
9    documents.
10             Q        Right.
11             A        Every single one, why she did and
12   why she didn't. I'm saying the same. Basically
13   we stressed that we were not going to be doing
14   that, and that's why we're doing the IVF.
15             Q        Let me ask you this: When did you
16   first -- strike that.
17             When did you first learn that part of the
18   IVF PGD process was undergoing an amnio or a CVS?
19             A        Probably at that time when we
20   discussed that we weren't going to do it.
21             Q        But --
22             MR. STEIN:   When at that time?
23   With whom?
24             Q        When was that?
25             A        I don't remember.

M. Grossbaum - Direct                                          43

1              Q        Can you remember whether that was
2    at the first -- let just finish, and I don't mean
3    to be rude, but I'll finish and then you can
4    answer it however.
5              Do you remember whether that was at the
6    first meeting with Dr. Liccardi or whether it was
7    when you spoke with Dr. Hughes or some other
8    time?
9              A        No. The first thing we did, we
10   spoke to Dr. Liccardi and that's when we spoke to
11   him about that.
12             Q        So my question is did you learn at
13   that first discussion with Dr. Liccardi that an
14   amnio or a CVS was part of the process?
15             A        I vaguely remember that. I can't
16   remember specifically. I remember that we --
17   that's one of the things that we discussed that
18   we were not going to be doing. That's why we're
19   doing the IVF.
20             Q        Well, if you told Dr. Liccardi, for
21   example, that your wife would not undergo either
22   of these tests, I assume you would have said that
23   because you learned that they were part of the
24   process. Am I right?
25             A        Right.

M. Grossbaum - Direct                                          44

1              Q        So in order for you to say, we're
2    not doing that, it was because you learned that
3    that test was part of it?
4              A        Right.
5              Q        And am I correct your recollection
6    is that this issue of amnio and CVS was discussed
7    at the first meeting with Dr. Liccardi?
8              A        I believe so.
9              Q        Are you sure of that?
10             A        I don't remember specifically. I
11   believe so.
12             Q        And what person or people did you
13   and your wife tell that she would not be
14   undergoing either of these tests?
15             A        I don't remember. My wife was
16   dealing with these types of things because she
17   would be the one going through it. So I don't
18   remember. I don't know who she spoke to about
19   it.
20             Q        So then I'll ask for you. What
21   person or people, if any, did you tell, my wife
22   won't go for either of these tests?
23             A        I don't know.
24             Q        Is it possible you didn't, you
25   yourself, didn't tell anyone that?

M. Grossbaum - Direct                                          45

1              A        I wouldn't say throughout the whole
2    process I wouldn't say, but to other friends or
3    family, I didn't speak to any friends or family
4    about that.
5              Q        I'm just asking about the doctors,
6    the people at the IVF center.
7              A        I don't remember specifically if I
8    was the one or my wife was the one who voiced it.
9    Most probably my wife.
10             Q        So then it's possible that you
11   yourself didn't tell anyone that?
12             A        Possible.
13             Q        Do you remember whether that issue
14   of amniocentesis and CVS and whether or not your
15   wife would go for them, do you remember whether
16   that issue came up in the conversation with
17   Dr. Hughes?
18             A        I don't recall.
19             Q        Do you recall whether that issue
20   came up in discussion with anyone else at the IVF
21   center other than Dr. Liccardi?
22             A        Throughout the tests and form
23   shoving, if you want to call it that, every
24   single time it was written up or brought up on
25   the form it had to be done, my wife probably

M. Grossbaum - Direct                                46

1  volced an opinlon.
2      Q      Okay.  My question though right now
3  is are you aware of your wife telling any
4  particular people at the center, other than Dr.
5  Liccardi, that she wouldn't go for either of
6  these?
7      A      Yes.  There were other people that
8  she said to it.
9      Q      Do you know who any of those
10  people were?
11      A      No.  There were many different
12  people around the office.
13      Q      Can you tell me if you know whether
14  any of them were physicians like Dr. Liccardi?
15      A      No.  They didn't have any stripes
16  on their shoulders.
17      Q      Did you have an understanding as to
18  what the roles were of any of these people, you
19  know --
20      A      No.
21      Q      -- In other words, what doctor,
22  nurse --
23      A      No.
24      Q      -- lab person?
25      A      No.

M. Grossbaum - Direct                                47

1      Q      And although you may not have been
2  the one who said It, assuming It was your wife
3  that said It, what was the reason for not
4  agreeing to undergo either amnio or CVS?
5      A      That we were recommended.
6      Q      I don't know what you mean.
7      A      Basically anything that would --
8  because it wouldn't make a difference.  What
9  would be the polnt of doing if you weren't going
10  to have an abortion?
11      Q      So your reason was there's no
12  reason for it because If I'm not going to choose
13  to have an abortion, it doesn't serve any
14  purpose?
15      A      Right, partially.
16      Q      Partially to me means there's
17  something else.
18      A      Basically anything that's not
19  necessary for -- since we wouldn't be having an
20  abortion, so that's why we wouldn't be doing It.
21  If we wouldn't be having an abortion, then it's
22  not necessary.
23      Q      You told me that.  Was that the
24  only reason?
25      A      Right.

M. Grossbaum - Direct                                48

1      Q      Now, so you're saying that -- okay.
2  I want to explore for a second your rationale
3  that It wouldn't serve any purpose.  Okay?  Just
4  so you know where I'm going.  You understood that
5  if you got pregnant naturally you had a
6  25 percent chance that your baby would have CF?
7      A      Correct.
8      Q      And you understood that by going
9  for IVF and PGD testing the chances of you having
10  a baby with CF were 2 or 3 percent, certainly
11  less than 10 percent, correct?
12      A      Correct.
13      Q      So would you agree with me that in
14  going for the IVF and the PGD you were reducing
15  the chance of a CF baby from 25 percent down to 2
16  or 3 or 4 percent?
17      A      Yes.
18      Q      Now, was there any religious
19  aspects to that decision or was it just the
20  reason you gave me?
21      A      What do you mean?
22      Q      In other words, your decision that
23  your wife wouldn't undergo either of these tests,
24  was that at all religiously based or was it just
25  for the reason you told me?

M. Grossbaum - Direct                                49

1      A      In general pregnancy, anything
2  that's not necessary to go through, religiously
3  we don't do any of that stuff.
4      Q      So my question is did religion play
5  any role In your decision here or was it just the
6  reason you gave me before?
7      A      Well, of course, it has religion.
8  If we're not going to have an abortion, then
9  that -- we wouldn't have an abortion because of
10  religious purposes.  So that's where it all stems
11  from.
12      Q      Now, what about the fact that --
13  what about the idea that by going for testing you
14  could learn whether or not there had been an
15  error and you could know in advance that you were
16  going to have a CF baby?  Although you wouldn't
17  be aborting that baby, do you agree that that
18  would give you and your wife time to become
19  emotionally prepared for that?
20      A      That would be a living hell.
21      Q      A living hell to know in advance?
22      A      A hundred percent.  If you knew you
23  had a chlld that had an Issue and that basically
24  you're waiting for your life to merge into a hell
25  and like a time bomb, would you await that

M. Grossbaum - Direct                              50

1  pregnancy or would you dread the day that the kid
2  was born?
3       Q       So are you saying then that --
4       A       That's what I'm asking.
5       Q       I understand.  So are you saying
6  then, in your frame of mind, it would be worse to
7  know it and have time to prepare for it than to
8  suddenly learn it at birth?
9       A       Yes.
10           MR. STEIN:  Just a note, you used
11  the term time to prepare for it.  That's a
12  concept that has not been defined.  So although
13  he answered the question, if posed again I would
14  object to it on that basis.
15           MR. EICHHORN:   I think he knew
16  emotionally.
17       Q       Did you understand that I meant
18  emotionally prepare for it?
19       A       Yeah.
20       Q       And you gave me your answer?
21       A       (The Witness nods in the
22  affirmative.)
23           MR. STEIN:  Again, the objection
24  still stands that how do you emotionally prepare
25  has not been defined.

M. Grossbaum - Direct                              51

1           MR. LEUCHTMAN:  Suppose we change
2  that to get used to the idea, would your answer
3  still be the same?
4           MR. STEIN:  Get used to an idea?
5           THE WITNESS:  What is -- translate
6  get used to the idea.
7           MR. LEUCHTMAN:  To become
8  accustomed to the fact that you were going to
9  have a child with CF.
10          THE WITNESS:  I mean, what do you
11  do?  If you're dealing with a cup of water, for
12  instance, you can see if the cup is cold or hot.
13  When you have a child that you don't know where
14  it is and CF has a spectrum of a tremendous
15  amount of things where you could be at any part
16  of the spectrum, you're just throwing a line into
17  an open pond and seeing what you pull out.  All
18  that's going to do to you is just make you go
19  miserable.
20          MR. LEUCHTMAN:  You've answered my
21  question.  Thank you.
22       Q       Let me ask you, given that the last
23  sentence we just read from this consent form
24  marked Grossbaum-3 was the one talking about the
25  fact that amniocentesis or CVS are required, why

M. Grossbaum - Direct                              52

1  did you initial this page and sign this document
2  and not delete or redact or put a line through
3  that sentence?
4       A       With all the documents, had we
5  known that we were able to cross things out, we
6  would have.  I never knew or we never knew that
7  we could just cross something out and say we
8  don't agree to that.
9       Q       Who was with you at the hospital
10  dealing with these documents?  Do you remember?
11      A       Well, besides for my wife and I?
12      Q       Yes.  Who from the IVF center was
13  with you dealing with --
14      A       Each one was different.  You know,
15  the nurse or doctor or whoever had the lab coat
16  on at that time.
17      Q       So it was always different people?
18      A       For the most part I believe so.
19      Q       I'm going to show you another
20  document which was marked Grossbaum-4 at your
21  wife's first deposition, five pages, and there's
22  a signature page at the end, and then along the
23  way, as opposed to those other forms which had a
24  place at the bottom, this form has areas within
25  the pages themselves for initials.  Could you

M. Grossbaum - Direct                              53

1  look through and tell me whether you signed and
2  dated this form and whether all the initials that
3  appear under the word man are yours and under
4  woman are your wife's?
5       A       Yes.
6       Q       In looking at this form, does this
7  look at all familiar to you?
8       A       I don't remember any of the forms.
9       Q       So do you remember a form where you
10  were actually putting your initials in the body
11  of it rather than at the bottom?
12      A       I don't recall.
13      Q       No memory at all of doing that?
14      A       No.
15      Q       Was it your understanding that your
16  religion prohibited your wife from going for an
17  amnio or CVS?
18      A       Yes.
19      Q       What was the basis for that?
20      A       That any, like I explained to you
21  earlier.
22      Q       What?  Anything that's not used in
23  order to achieve the pregnancy you don't do?
24      A       Or anything that's not necessary
25  for the pregnancy.

M. Grossbaum - Direct                                   54

1     Q      Did any rabbi or rabbinical
2  authority tell you that or is that your own --
3     A      Personally to myself?
4     Q      To you or to your wife.
5     A      No.  That's just a known thing that
6  everybody knows.
7     Q      Your wife brought up the name --
8     A      I can't say everybody because if
9  you don't know, it's not everybody.  It's a
10 general.
11    Q      Last time your wife brought up the
12 name of Rabbi Menachem Mendel Schneerson.
13    A      Right.
14    Q      Do you know who he was?
15    A      Yes.
16    Q      And what role does he have in
17 Lubavitch orthodox Jewish sect?
18    A      In the Lubavitch sect there were
19 seven head rabbis throughout generations and he
20 was the one in our generation.
21    Q      And is it your understanding
22 that -- has he ever said or written anywhere that
23 you've read that you can't undergo a test like
24 the amnlocentesis or the CVS?
25    A      I can't tell you specifically that

M. Grossbaum - Direct                                   55

1  I can show you a page, but he's written many,
2  many things about all this, you know, all this
3  kind of stuff.
4     Q      When you say this kind of stuff,
5  can you be more specific?
6     A      As in childbearing and things like
7  that.
8     Q      Now, when did Rabbi Schneerson die?
9     A      '94.
10    Q      And is there someone who has taken
11 his place in the sense of giving opinions on
12 medical issues as they relate to your Jewish
13 belief?
14    A      No.
15    Q      After that first meeting with Dr.
16 Liccardi, when is the next time you can remember
17 being at the IVF center yourself?
18    A      For testing and things like that.
19    Q      Do you remember -- strike that.
20    Were you there the day that the eggs were
21 removed from your wife?
22    A      Yes.
23    Q      And who was there that day other
24 than you and your wife?
25    A      What do you mean?

M. Grossbaum - Direct                                   56

1     Q      Well, first of all, who removed the
2  eggs?
3     A      I don't know.
4     Q      Was there anyone else present?
5     A      I believe Jacobowitz may have been
6  there, but I don't remember.
7     Q      And did you have an understanding
8  of what was going to happen with those eggs once
9  they were removed?
10    A      Yes.
11    Q      What was your understanding?
12    A      That they would mix the sperm and
13 the egg and then ship it off to Dr. Hughes.
14    Q      And then did you receive a phone
15 call at some point after that to go back to the
16 IVF center or for your wife to go back?
17    A      For what?
18    Q      To have the embryos reimplanted?
19           MR. STEIN:   How about implanted?
20    Q      Well, they've been taken out --
21 okay, implanted.
22    A      I guess at some point there they
23 contacted us.  I don't remember how or when.
24    Q      So you figure it had to happen, but
25 you don't remember it as you sit here?

M. Grossbaum - Direct                                   57

1     A      Right.
2     Q      Now, during this period of time
3  from March when you first saw Dr. Liccardi up
4  through the day of implantation, were you and
5  your wife having normal sexual relations?
6     A      Up to when?
7     Q      From the --
8     A      Meeting Dr. Liccardi?
9     Q      Meeting Dr. Liccardi up through the
10 time that the embryos were implanted.
11    A      No.  There were times that they
12 told us we weren't allowed to.  Then those were
13 the times we didn't.
14    Q      So when were those times that you
15 didn't?
16    A      I don't remember.
17    Q      So you don't remember the details
18 of when you didn't, but other than when you were
19 told not to, you were having normal sexual
20 relations?
21    A      Depends on the day.
22    Q      Your wife was not on the pill?
23    A      Right.
24    Q      And I'm not trying to get personal
25 with this question, but can you estimate for me

M. Grossbaum - Direct                    58

1  approximately how many times a week you were
2  having normal sexual relations during that time?
3        A     I have no idea.
4              MR. STEIN:  During what time?  I
5  object to the form.
6        Q     During this time frame other than
7  when you were told not to.
8        A     I don't know.
9        Q     Well, can you estimate for me?
10       A     No.
11       Q     You don't remember?
12       A     I don't remember.
13       Q     When your wife had the embryos
14 implanted, were you there?
15       A     Yes.
16       Q     Who else was there?
17       A     Dr. -- Rabbi Jacobowitz.
18       Q     Who implanted them?
19       A     I don't know.  I think Dr.
20 Liccardi.
21       Q     Did you and your wife have any
22 discussion with Dr. Liccardi that day before he
23 implanted the embryos?
24       A     Yes.
25       Q     And what did that discussion

M. Grossbaum - Direct                    59

1  consist of?
2        A     He went through the different
3  styles of the embryos that he had or that were
4  available, which were good and stuff like that.
5        Q     Can you tell me with any more
6  specificity than that what he said?
7        A     He said that one of them was not
8  affected, you know, was no carrier, and he said
9  that one of them was a carrier.
10       Q     Okay.  Well, you've mentioned two.
11 Did you have an understanding as to how many
12 embryos there were that they had tested?
13       A     I don't remember, eight, nine, 10.
14 I don't remember, 14, 13.  I don't remember.
15       Q     So what did he say about the group
16 of embryos?
17       A     Some of them were good or a couple
18 of them were good, and the rest of them were not
19 developed enough to implant.
20       Q     So putting aside the ones that were
21 not developed enough, do you remember anything
22 specific he told you about the ones that were
23 developed enough?
24       A     Basically I remember about two of
25 them, the two that we were implanting.  One of

M. Grossbaum - Direct                    60

1  them was not a carrier, and the other, second
2  one, was a carrier but did not carry the disease.
3  It was not a double carrier, if you want to call
4  it that.
5        Q     You said that one of them was not a
6  carrier?
7        A     Meaning one of them was plain,
8  regular.
9        Q     What do you mean by regular?
10       A     Was not a carrier for cystic
11 fibrosis.
12       Q     So that it had -- it was completely
13 devoid of CF.  It didn't have it and it didn't
14 carry it either.  There was none?
15       A     Correct.
16       Q     And the other one?
17       A     Was just a carrier.
18       Q     So after telling you that, what was
19 the rest of the discussion?
20       A     That was pretty much it.  Let's do
21 it.
22       Q     Well, your wife testified that she
23 said -- this is what she said -- they said some
24 of the embryos that he tested that were good
25 embryos had CF and there were some good ones that

M. Grossbaum - Direct                    61

1  did not have CF but they were carriers for CF.
2  Did we want to use them and we said yes.
3        A     They were carriers, correct.
4        Q     So I'm just trying to make it -- to
5  clarify it because you said your recollection is
6  that one of them was completely clean, not even a
7  carrier.
8        A     I believe so.
9        Q     Do you remember once Dr. Liccardi
10 told you about the results, do you remember him
11 asking you if you wanted to have these two
12 implanted?
13       A     Yes.
14       Q     And you and your wife said what?
15       A     Yes.  If they were not affected,
16 then that's what we were basing it on, yes.
17       Q     So you and your wife, your position
18 was as long as they're not CF, meaning that our
19 child will have CF, then it's okay?
20       A     Yes.
21       Q     So the implantation was done that
22 day?
23       A     Yes.
24       Q     And Rabbi Jacobowitz was there?
25       A     Yes.

M. Grossbaum - Direct                                           62

1    Q       He was there as the -- I'll butcher
2    the pronunciation.
3            MR. STEIN:  Masgiach.
4    Q       Masgiach.  He was there in that
5    role, to make sure that the embryos that were
6    implanted into your wife were hers?
7    A       Yes.
8    Q       After that day, did you go back to
9    NYU at all?
10   A       A couple times.  Sometimes I would
11   drop her off and then wait in the car because
12   there's no parking or lack of parking.
13   Q       Did you ever speak to any of the
14   doctors at NYU again after that day?
15   A       I don't recall.  I mean, possibly.
16   I don't remember.
17   Q       And once your wife started her
18   prenatal care at Midwives of Denville, from that
19   time on did you ever speak to anyone at NYU
20   again?
21   A       I don't think so.
22   Q       Were you involved in going to your
23   wife's prenatal visits at Midwives of Denville?
24   A       I think I had to go once.  I think
25   that just for childbirthing thing.

M. Grossbaum - Direct                                           63

1    Q       Was it your understanding that your
2    wife was -- had one or more ultrasounds done
3    while she was at Midwives?
4    A       I don't know how many she had over
5    there.
6    Q       But did you know that she had at
7    least she had them done, some number of them?
8    A       I guess so.
9    Q       I don't want to tell you.
10   A       I don't know.  I don't know how
11   many she had.
12           MR. STEIN:  Then say it.  If you
13   don't know, you don't know.
14   Q       So back at the time you were not
15   aware -- you don't remember whether you were
16   aware she was undergoing ultrasounds?
17   A       Yes.
18           MR. EICHHORN:  Steve, do you have
19   any questions on liability before I must have on?
20           MR. LEUCHTMAN:  Yes, I do.
21           MR. EICHHORN:  We might as well do
22   it that way, right?
23           MR. STEIN:  No objection.
24
25

M. Grossbaum - Cross                                            64

1    CROSS-EXAMINATION BY MR. LEUCHTMAN:
2    Q       You may not remember the date
3    exactly, do you recall having the telephone
4    conversation that you spoke of earlier with your
5    wife and Dr. Hughes?
6    A       Yes.
7    Q       And does March 25, 2004 sound right
8    to you?
9    A       Okay.
10   Q       Okay.  I guess that means yes.  You
11   wouldn't disagree it was March 24th?
12   A       I don't remember the date, so I
13   can't say for sure.
14   Q       Now, I want to go through a list
15   of things that are mentioned in a form called
16   precase phone review of PGD informed consent
17   which was Exhibit 5 in your wife's deposition.
18   Before I do that though, I'll ask you have you
19   ever seen this form?
20   A       Yes.
21   Q       When did you first see it?
22   A       When we got started with Mr. Stein.
23   Q       Do you recall being told by Mark
24   Hughes that he was not your physician, that there
25   wasn't a physician/patient relationship between

M. Grossbaum - Cross                                            65

1    him and either you or your wife?
2    A       Yes.
3    Q       Do you recall being told that the
4    technology involved was not perfect?
5    A       Yes.
6    Q       Do you recall being told that what
7    was being done was, at least to some degree, an
8    experimental process?
9    A       To some extent.  He said it was an
10   experimental process and in the same breath
11   saying that he's very confident in the procedure.
12   Q       Do you recall being told that the
13   objective of the procedure was to lower the risk
14   from a risk of 25 percent?
15   A       Yes.
16   Q       Do you recall being told that zero
17   risk was, and I'm quoting, "not realistic or
18   possible"?
19   A       Yes.
20   Q       Do you recall being told that the
21   technology could fail?
22   A       I don't recall.
23   Q       Do you recall being told that
24   Dr. Hughes did not regard himself or his lab as
25   perfect?

M. Grossbaum - Cross                                          66

1       A       I don't recall.
2       Q       Do you recall being told that the
3   technology to determine whether genes carried
4   cystic fibrosis had produced errors?
5       A       Yes, eleven or something, 11 in a
6   number of years, hundreds of cases.
7       Q       Do you recall being told that, and
8   again I'm quoting, "Conventional prenatal
9   testing, chorionic villus sampling at around 10
10  weeks or amniocentesis at around 15 to 16 weeks,
11  is necessary"?
12      A       I don't recall.
13      Q       Do you recall representing to
14  Dr. Hughes, you and your wife representing to
15  him, that all of your questions had been answered
16  in the telephone conversation?
17      A       I believe so.
18      Q       Do you recall that your response to
19  the statement that you could just get pregnant
20  and have CVS or amnio being, and I'm quoting, "We
21  do not like those odds"?
22      A       Yes.
23      Q       Do you recall being told that the
24  testing was complicated?
25      A       No.

M. Grossbaum - Cross                                          67

1       Q       Do you recall being told that there
2   were 11 errors in 14 years?
3       A       Yes.
4       Q       Do you recall being told that there
5   was a need to follow up with CVS or
6   amniocentesis?
7       A       No.
8       Q       Do you recall any mention of a New
9   York physician named Evans?
10      A       I don't recall.
11      Q       And finally, do you recall being
12  told -- I'm sorry, do you recall telling
13  Dr. Hughes that you wanted to give some thought
14  to embryo donation before consenting to it?
15      A       Yes.
16      Q       And did you ultimately not consent
17  to embryo donation?
18      A       Yes.
19      Q       And I know Mr. Eichhorn showed you
20  what was Exhibit 4 to your wife's deposition, and
21  I think you told us you don't remember signing or
22  initialing it, but are those your signature and
23  initials?
24      A       Yes.
25      Q       Just so I'm sure, did you ever have

M. Grossbaum - Redirect                                       68

1   any conversation with Dr. Hughes other than the
2   one that the record reflects as having been in
3   March of 2004?
4       A       I don't think so.
5               MR. LEUCHTMAN:   Thanks.  That's all
6   I have.
7                       (Pause)
8
9   REDIRECT EXAMINATION BY MR. EICHHORN:
10      Q       Before we get on to the starting
11  about Rosie a little bit, I just want to go over
12  this.  So the odds of a 25 percent chance of you
13  having a CF baby were unacceptable to you and
14  your wife, correct?
15      A       Correct.
16      Q       And you told that to Dr. Hughes and
17  that's the reason why you decided to not get
18  pregnant naturally?
19      A       Right.
20      Q       And then after learning about PGD
21  and learning that its success rate was not a
22  hundred percent, was not guaranteed, but it was
23  much higher than -- much better than a 25 percent
24  chance, that was acceptable to you and that's why
25  you did it, correct?

M. Grossbaum - Redirect                                       69

1       A       Right.
2       Q       What percentage chance of your
3   having a CF baby would have become unacceptable?
4   In other words, if a 2 or 3 percent chance of it
5   was okay, and we know 25 percent was not okay, at
6   what number did it become not okay for you?
7               MR. STEIN:   I object to that.
8   You're asking him now what is his position now in
9   terms of how he thought then.  And also I object
10  to it because it calls for him to speculate.
11              MR. EICHHORN:   Okay.  I don't agree
12  with you, but you can answer it.
13              MR. LEUCHTMAN:   Well, which are you
14  asking, then or now?
15      A       I don't know.  We were --
16  basically, we were dealing -- we were making a
17  decision on the 98 percent and that's what we
18  made a decision on.  So any -- earlier we didn't
19  have that information to make the decision.  We
20  were making the decision on 98 or better.  So
21  anything less, I don't know.
22      Q       Well, okay, if you had learned that
23  the chances were not 98 percent but 90 percent,
24  would that have been acceptable to you?
25      A       I don't know.  It's a decision we

M. Grossbaum - Redirect                    78

1  philosophy that --
2          MR. STEIN:  That's holistic
3  medicine.  That's not osteopathy.  An osteopath
4  is a D.O.  They practice pretty conventional
5  medicine.
6          THE WITNESS:  Well, they do now.
7          MR. EICHHORN:  All right, boys.
8  Enough.
9      Q      Does Dr. Somers treat anyone in
10  your family other than Rosie?  Does she also
11  treat your wife?
12     A      Possibly.  I think so, but I don't
13  know what she goes for.
14     Q      And do you know what Dr. Somers
15  does for Rosie?
16     A      I know when my wife comes back
17  she'll say that basically she checks her overall
18  health, her lungs, how her breathing is.  I guess
19  somehow checks something or other.  My wife knows
20  better.
21     Q      I don't remember your wife
22  mentioning that name.  So now we're stuck with
23  you.  So do you remember anything more about what
24  she does other than what you've said?
25     A .     I don't know.  What's kinesiology?

M. Grossbaum - Redirect                    79

1      Q      We can look it up.
2          MR. LEUCHTMAN:  It's all muscles
3  and joints interacting --
4          MR. STEIN:  Well, it doesn't matter
5  what it is.  The only question is what you know
6  or don't know.
7      A      Basically what she does is checks
8  her, you know, how her lungs are and how she's
9  growing and progress, things like that.
10     Q      To your knowledge, does she, aside
11  from checking these things, does she do anything,
12  administer any kind of treatment or medicine or
13  anything like that?
14     A      Medicine, no.  Medicine, I really
15  don't think so.  But treatment, like massage or
16  things of that.  I remember when she -- when
17  Rosie was younger she used to ask us to massage
18  her chest and things around her lungs and things
19  like that, but I don't know other than that.
20         MR. LEUCHTMAN:  Before we get off
21  Dr. Somers, how is she spelled, S-O-M-E-R-S or
22  S-U-M-M-E-R-S?
23         THE WITNESS:  I think S-O.
24         MR. LEUCHTMAN:  Where is her
25  office?

M. Grossbaum - Redirect                    80

1          MR. EICHHORN:  I was going to ask
2  that.
3          MR. LEUCHTMAN:  Sorry.  Sounded
4  like you were going on to another topic, but go
5  ahead.
6      A      I don't know.
7      Q      You don't know where her office is?
8      A      No.
9      Q      Do you know what town it's in?
10     A      It's in New Jersey.
11     Q      That's a start.
12     A      I don't know.
13         MR. EICHHORN:  I'm going to send
14  you an authorization.  I'll make it out to
15  Dr. Kim Somers and I'll leave the location blank.
16         MR. STEIN:  Fine.
17         MR. EICHHORN:  Do you have anything
18  else you'd like to ask before I ask another one?
19         MR. LEUCHTMAN:  Yes.  As a matter
20  of fact, there's a question I forgot.  Thank you.
21
22  RECROSS EXAMINATION BY MR. LEUCHTMAN:
23     Q      You mentioned bringing up to Dr.
24  Liccardi on several occasions the unwillingness
25  to have CVS and amnio, and I don't recall whether

M. Grossbaum - Recross                    81

1  you said that you remembered that during your
2  conversation with Dr. Hughes either you or your
3  wife mentioned an unwillingness to have CVS or
4  amnio.  So please enlighten me.
5      A      My wife probably did.
6      Q      Probably, but you don't know for
7  sure.
8      A      I believe she did, yes.
9      Q      You believe she did?
10     A      Yes, she did.
11     Q      You did not?
12     A      I don't recall.
13         MR. LEUCHTMAN:  Thank you.
14
15  REDIRECT EXAMINATION BY MR. EICHHORN:
16     Q      Anything else that you think your
17  wife left out in talking about what is done for
18  Rosie?
19     A      I don't know if she mentioned about
20  going on trips.  Meaning every time we went on a
21  trip it's like a whole process and procedure.
22     Q      Give me an example.
23     A      Meaning, let's say, Toronto.  Going
24  to Toronto, making sure that she has -- being
25  able to get her all of her enzymes and all her

# EXHIBIT 9

*2981./0/*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
DOCKET NO. 07-CV-1359

CHAYA GROSSBAUM and MENACHEM
GROSSBAUM, her spouse, individually
,as guardians ad litem of the
infant, ROSIE GROSSBAUM,

DEPOSITION OF:

            Plaintiffs,

CHAYA GROSSBAUM
(Volume 1)

        vs.

GENESIS GENETICS INSTITUTE,
L.L.C., of the State of Michigan,
MARK R. HUGHES, M.D., NEW YORK
UNIVERSITY SCHOOL OF MEDICINE and
NEW YORK UNIVERSITY HOSPITALS
CENTER, both corporations in the
State of New York, ABC
CORPORATIONS 1-10 and JOHN DOE
1-10,

ORIGINAL

            Defendants.
-----------------------------------
        BEFORE:  ESTHER J. HODGE, a Certified

Court Reporter and Notary Public of the State of

New Jersey, at the offices of NUSBAUM, STEIN,

GOLDSTEIN, BRONSTEIN & KRON, ESQS., 20 Commerce

Boulevard, Succasunna, New Jersey, on Wednesday,

December 17, 2008, commencing at 10:15 a.m.,

Pursuant to Notice.


GILMARTIN COURT REPORTING SERVICE

Certified Shorthand Reporters
28 Peterson Road
P.O. Box 5879
Hillsborough, New Jersey 08844
(908) 369-0080
FAX  (908) 369-0081

A P P E A R A N C E S:


        NUSBAUM, STEIN, GOLDSTEIN, BRONSTEIN &
        KRON, ESQS.
        BY:  LEWIS STEIN, ESQ.
             For the Plaintiffs

        STEPHEN N. LEUCHTMAN, P.C.
        BY:  STEPHEN N. LEUCHTMAN, ESQ.
             For the Defendant Genesis Genetics
             Institute, L.L.C. and Dr. Hughes

        MARSHALL, DENNEHEY, WARNER, COLEMAN &
        GOGGIN, ESQS.
        BY:  R. SCOTT EICHHORN, ESQ.
             For the Defendants New York
             University School of Medicine and New
             York University Hospitals Center

ALSO PRESENT:


    Menachem Grossbaum, Plaintiff

C. Grossbaum - Direct                    6

1    we're speaking at the same time, and it could lead
2    to an inaccuracy in the transcript. Do you
3    understand that?
4         A    Yes.
5         Q    I'll ask you to wait until I've
6    finished and then answer.
7         A    Okay.
8         Q    And the same applies to me. I will
9    have to try to wait until the end of your answer
10   before I ask you another question. All right?
11        A    Okay.
12        Q    Another thing is you need to use
13   words in answer to a question rather than sounds
14   or gestures. For example, "uh-huh" and "uh-uh"
15   sound different and mean something differently,
16   but I would venture to say that if we were to look
17   at the transcript, they would read the same, so
18   clearly we don't want that to happen, so if you
19   use a yes or no there's no misunderstanding but
20   what you intended. I'll ask you to do that.
21   Sometimes people forget that and will use a sound,
22   and with three lawyers here, if you ever do that
23   one of us will remind you that you need to use a
24   word. Okay?
25        A    Yes.

C. Grossbaum - Direct                    7

1         Q    If you don't understand a question
2    that I ask you, let me know that. It's my
3    obligation to ask a question that you understand
4    before it's your obligation to answer it. Okay?
5         A    Okay.
6         Q    So if you do answer a question,
7    I'll assume two things. Number one, I will assume
8    that you understood it, and number two, I will
9    assume that your answer is truthful. Okay?
10        A    Yes.
11        Q    You've been placed under oath.
12   Although we're in a courtroom, your testimony and
13   your husband's testimony is every bit as important
14   as if you were in a courtroom, and therefore, it's
15   important to understand that if you were to answer
16   a question one way today and answer that question
17   differently at a later time, you can be confronted
18   with the discrepancy. Do you understand that?
19        A    Yes.
20        Q    So to try to avoid that, we ask
21   that you testify to what you remember. You can
22   have your memory refreshed if you want to look at
23   something to help you answer a question. You can
24   do that. We'll ask you what you're looking at,
25   and if you can give a reasonable estimate in order

C. Grossbaum - Direct                    8

1    to answer we ask that you do that, but if your
2    answer gets to the point where you're just
3    guessing, no one wants you to guess because you
4    might guess one way today and you might guess
5    differently at a later time, and now you have a
6    discrepancy. Okay?
7         A    Yes.
8         Q    So just keep that in mind. If you
9    know the answer, tell us that. If you have a
10   reasonable estimate of the answer, tell us that,
11   and if you need something to help you refresh your
12   memory to answer, tell us that. Okay?
13        A    Okay.
14        Q    Are you taking any medication that
15   would impair your ability to answer all these
16   questions and answer them honestly to the best of
17   your ability?
18        A    No.
19        Q    Is there any reason why you feel
20   you're not in tip-top shape ready to answer these
21   questions today?
22        A    No.
23        Q    Did you understand the instructions
24   that I gave you?
25        A    Yes.

C. Grossbaum - Direct                    9

1         Q    Have you had the opportunity to
2    speak to your attorney before the deposition about
3    the deposition?
4         A    Yes.
5         Q    Do you think that you have an
6    understanding of what we're about to do?
7         A    Yes.
8         Q    Am I correct your date of birth was
9    May 27th, 1980?
10        A    Yes.
11        Q    Although I'm terrible at math,
12   you're 28?
13        A    Yes.
14        Q    And your husband is a few months
15   older than you are?
16        A    Yes.
17        Q    When were you married?
18        A    August 22nd, 2002.
19        Q    And was that a first marriage for
20   each of you?
21        A    Yes.
22        Q    Have you lived together since that
23   time without interruption?
24        A    Yes.
25        Q    Have you lived at the same place as

C. Grossbaum - Direct                    10

1    a couple since that time or more than one?
2          A       More than one.
3          Q       How many?
4          A       Two.
5          Q       We can do those.  Where have you
6    lived?
7          A       Brooklyn, New York.
8          Q       For how long?
9          A       Three years.
10         Q       So from August of 2002 till
11   sometime in 2005?
12         A       Yes.
13         Q       And after that where?
14         A       Morristown, New Jersey.
15         Q       And is that at the address -- I
16   think it was Lake something.  What's the address?
17         A       122 Lake Valley Road.
18         Q       Has that been the address in
19   Morristown the whole time?
20         A       Yes.
21         Q       When you lived in Brooklyn, did
22   anyone live with you other than you and your
23   husband?
24         A       No.
25         Q       How about in Morristown?  Has

C. Grossbaum - Direct                    11

1    anyone lived with you and your husband and now, of
2    course, Rosie?
3          A       Yes.
4          Q       Who is that?
5          A       My family, my parents.  We rent the
6    basement.
7          Q       So is this a single-family home?
8          A       Yes.
9          Q       Do you and your husband own it?
10         A       No.
11         Q       Rent it?
12         A       We rent the basement.
13         Q       Who owns the home?
14         A       My parents.
15         Q       Did your parents live in Morristown
16   at this address for some period of years --
17         A       Yes.  Sorry.
18         Q       That's okay.  Before you moved
19   there and rented the basement?
20         A       Yes.
21         Q       Is that the house that you grew up
22   in?
23         A       No.
24         MR. STEIN:  That's why he asked you
25   to wait.

C. Grossbaum - Direct                    12

1          MR. EICHHORN:  She's doing pretty
2    good.
3          MR. STEIN:  I know.
4          Q       Rosie's date of birth was what?
5          A       March 25th, 2005.
6          Q       Is "Rosie" what you call her?
7          A       Yes.
8          Q       Do you have any other children?
9          A       No.
10         Q       Are you presently pregnant with a
11   child?
12         A       No.
13         Q       Do you have any plans for more
14   children?
15         A       Yes.
16         Q       Could you tell me what you mean by
17   that?  What are your plans?
18         A       I don't know yet.  I don't know.
19   That's -- I don't know.
20         Q       Now you're going to find out what
21   it's like with lawyers.  See, most people would
22   leave that alone, but we dig a little deeper to
23   find out exactly what that means.  I'm not trying
24   to be nosy.
25         A       I understand.

C. Grossbaum - Direct                    13

1          Q       When you say "I don't know," does
2    that mean that you don't know whether or not you
3    want more children, or does it mean you want more
4    children but you don't know when you will try
5    again, or exactly what more specifically does it
6    mean?
7          A       It means I want more children.  I
8    don't know when I'm going to try again.
9          Q       Is there any particular reason why
10   you don't know when you'll try again, given that
11   you know that you want more children?
12         A       Yes.
13         Q       What's that?
14         A       I don't know how I will decide to
15   get pregnant again.
16         Q       And tell me what you mean by that.
17         A       Well, the last time I got pregnant
18   through the IVF, but now I don't know how exactly
19   I want to go about doing it again because I don't
20   know if I want to do that again.
21         Q       So the options are doing it
22   naturally.  Right?
23         A       Yes.
24         Q       Doing it through IVF?  Yes?
25         A       Yes.

C. Grossbaum - Direct                                                                18

1   the testing in 2000, did you learn, take efforts
2   to learn about CF at that time?
3           A      Yes.
4           Q      And what did you specifically learn
5   about the results of your testing vis-a-vis CF?
6           A      I don't understand.
7           Q      In other words -- I'll ask it this
8   way. Did this testing reveal that you were a
9   carrier of CF?
10          A      Yes.
11          Q      After you learned that, what did
12  you then learn on your own about CF?
13          A      I learned about what the disease is
14  and how it works and what happens, you know -- the
15  disease.
16          Q      And did you learn about if two
17  people are carriers --
18          MR. EICHHORN:    Strike that.
19          Q      Did you learn what is required for
20  a baby to be born with CF as opposed to just being
21  a carrier of CF?
22          A      Yes.
23          Q      What did you learn in that regard?
24          A      That if both parents are carriers,
25  then the chances of a child being born with CF are


C. Grossbaum - Direct                                                                19

1   about one in four.
2           Q      And how did you learn this
3   information that you just explained to me?
4           A      Several different ways. Through a
5   genetic counselor, through reading about it.
6           Q      When did you see the genetic
7   counselor?
8           A      2001 I believe.
9           Q      When you were growing up -- are you
10  still thinking on that one?
11          A      I'm just trying to remember if it
12  was 2000 or 2001.
13          Q      Let's say when you were growing up,
14  up until the time you graduated high school, did
15  you know anyone, have any friends -- did you have
16  any friends who had CF?
17          A      No.
18          Q      Did you know anyone who had CF?
19          A      No.
20          Q      After you graduated high school up
21  until the time that you met Dr. Hughes and the
22  people at the NYU IVF clinic, in that window of
23  time, did you know anyone with CF?
24          A      I don't know what you mean by
25  "know." Personally have a relationship or know?


C. Grossbaum - Direct                                                                20

1   Can you explain?
2           Q      Personally have a relationship and
3   know them as opposed to, "I know there's a woman
4   two streets down who has CF." I mean know them as
5   a person.
6           A      No.
7           Q      At the present time other than
8   Rosie, do you know anyone who has CF?
9           A      Yes.
10          Q      When did you first meet and get to
11  know as a person someone who has CF?
12          A      After she was born.
13          Q      Was that after you learned that she
14  had CF?
15          A      Yes.
16          Q      And then did you seek to learn more
17  about it, and that's how this happened?
18          A      Yes.
19          Q      And where did you meet the first
20  person that had CF?
21          A      She lives in the area where we
22  live, and someone that I knew knew her and
23  connected us.
24          Q      What is her name?
25          A      Kate Arian.


C. Grossbaum - Direct                                                                21

1           Q      Kate?
2           A      Uh-huh.
3           Q      How is Arian spelled?
4           A      A-r-i-a-n.
5           Q      How old is Kate?
6           A      She's about 18 or 19. She's
7   college age.
8           Q      Does she live in Morristown also?
9           A      Mendham.
10          Q      You met her through a mutual
11  friend?
12          A      Yes, the family, her family.
13          Q      Did you talk to Kate about what
14  it's like having CF and how she's handled it?
15          A      It was more her mother. We spoke
16  more with her parents.
17          Q      Who are they? What are their
18  names?
19          A      I don't remember their first names
20  now.
21          Q      Can you tell me where they live?
22          A      Mendham.
23          Q      Right. Can you tell me their house
24  address or street address?
25          A      No.

C. Grossbaum – Direct                                          38

1   a family?
2          A      Yes.
3          Q      Was he the first person whose
4   counsel you sought out on that issue, you and your
5   husband?
6          A      Yeah.
7          Q      Is he still one of the principals
8   at Cheder Lubavitch?
9          A      No.
10         Q      Did you say he lives in Munsey, New
11  York?
12         A      Yes. It's like Rockland County
13  area.
14                MR. STEIN:   It's up near Suffern.
15                THE WITNESS:   Technically it might
16  even be Suffern. It's in one mushed area.
17         Q      Are you still in contact with Rabbi
18  Markowitz?
19         A      Not on a regular basis.
20         Q      Do you speak to him once a year or
21  more?
22         A      I would say maybe once a year.
23         Q      Can you tell me -- first of all,
24  can you tell me approximately when it was that you
25  first consulted him on the issue of you and your

C. Grossbaum – Direct                                          39

1   husband wanting to start a family?
2          A      I don't remember the exact time.
3          Q      Can you tell me what information
4   did you seek to gain from him about that issue?
5          A      I guess just advice. Yeah, advice.
6          Q      Was it advice specifically because
7   of your prior test results, or was it just general
8   advice?
9          A      I don't understand what you're
10  saying.
11         Q      In other words, did you seek out
12  Rabbi Markowitz and talk to him about wanting to
13  start a family because you knew you were a CF
14  carrier, or just generally because you wanted to
15  talk to him about the idea of starting a family?
16         A      Specifically because we were a CF
17  carrier.
18         Q      At the time that you first spoke to
19  Rabbi Markowitz about these issues, did you
20  already know that your husband also was a CF
21  carrier?
22         A      Yes.
23         Q      How had you learned that?
24         A      When we were ready to get engaged
25  we called the organization Dor Yeshorim, and what

C. Grossbaum – Direct                                          40

1   they do is they take your blood work.
2          Q      Do you want some water?
3          A      That would be good, yes, please.
4                 MR. EICHHORN:   We'll take a break
5   and get you some water.
6                 (Whereupon, a break is taken.)
7          Q      You were in the middle of
8   answering.
9          A      I said before I was in high school,
10  and he was in Yeshiva. They take your blood work,
11  but they don't tell you your results until they're
12  ready to get married, and when you're ready to go
13  get engaged -- after the couple gets engaged --
14  before you're engaged they tell you whether you
15  are compatible or not. They told us that we were
16  carriers for cystic fibrosis, so it was several
17  years after we were in high school.
18         Q      I'm afraid you lost me on that.
19  Maybe I misunderstood earlier. I thought that you
20  had that testing done by Dor Yeshorim in 2000 and
21  that you learned at that time.
22         A      I didn't get tested by Dor Yeshorim
23  in 2000. In 2000 it was Morristown Memorial. In
24  1998 I got tested by Dor Yeshorim.
25         Q      In 1998 when Dor Yeshorim tested

C. Grossbaum – Direct                                          41

1   you, you did not learn the results then?
2          A      No.
3          Q      In 2000 were you and Menachem
4   considering getting married at that time?
5          A      Yes.
6          Q      Were you engaged yet?
7          A      No.
8          Q      At that point in your relationship
9   is that the point when couples would generally
10  find out the results of their testing? Is that
11  what you just told me?
12         A      People find out before they go out
13  or get engaged.
14         Q      By "go out" you mean date?
15         A      Uh-huh, yes.
16         Q      Some people will find out before
17  they even date. Other people may date and find
18  out before they get engaged?
19         A      Right.
20         Q      In your situation you had dated
21  already. You were serious. You were thinking of
22  getting engaged, and then you found out?
23         A      Right.
24         Q      From whom did you learn the results
25  of both your tests? From what organization?

C. Grossbaum - Direct                                    42

1    A      Dor Yeshorim said we were not
2  compatible.
3          Q      Tell me what "not compatible" means
4  in the way Dor Yeshorim uses it.
5          A      When they take your blood, they
6  give you a card with an I.D. number, and before
7  you're ready to get engaged, you give them the two
8  numbers, and they tell you whether it's a match or
9  not.
10         Q      When you say "match," according to
11 what criteria are you talking match?
12         A      If you're both carriers I guess for
13 the same genetic condition.
14         Q      Maybe you told me. Did you tell me
15 when it was you learned this information about you
16 and your husband, when you learned the results of
17 the test in which they told you you were not
18 compatible?
19         A      That was in 2000.
20         Q      And did you or your husband test
21 positive for any other disease or abnormality
22 other than being carriers for CF?
23         A      They don't tell you if you're a
24 carrier for something.  They just tell you if you
25 both are the carrier for the same condition.

C. Grossbaum - Direct                                    43

1          Q      So the sum and substance of the
2  results of your testing that you learned was both
3  of you were carriers for CF, and therefore, you
4  were characterized as not compatible?
5          A      That we were both -- we found out
6  that we were both carriers.
7          Q      For cystic fibrosis?
8          A      Yes.
9          Q      Did Dor Yeshorim make any
10 recommendations to you as a result of that
11 testing?
12         A      No, they don't do that.
13         Q      They don't say anything from a
14 religious authority perspective of whether you
15 should or should not get married?
16         A      No, they just -- that's not what
17 they do.  They just -- it's like a database.
18         Q      When you learned this information,
19 were you given any additional information as to
20 the significance of the fact that you were both CF
21 carriers, or just simply you're both carriers for
22 cystic fibrosis, and you're not compatible and
23 that's it?
24         A      Can you explain what you're asking?
25         Q      How did you find out these results?

C. Grossbaum - Direct                                    44

1          Q      Did you call up Dor Yeshorim to find out?
2          A      Yes.
3          Q      Did you learn the results over the
4  phone?
5          A      Yes.
6          Q      When you learned the results over
7  the phone, were you simply told that you and your
8  husband were both carriers for CF, and you were
9  not compatible, or were you also told additional
10 information about the significance of those test
11 results?
12         A      We were not really given much more
13 information about cystic fibrosis or anything
14 else.
15         Q      When you were saying "not really
16 given much more," to me that means you were given
17 some more.  My question is, what else were you
18 told?
19         A      We were told that we were both
20 carriers of cystic fibrosis, and we had to do
21 research to find out what cystic fibrosis was.
22         Q      Was it after that that you went to
23 Morristown and had testing redone?
24         A      Yes.
25         Q      Why did you do that?

C. Grossbaum - Direct                                    45

1          A      Because they recommend that you do
2  that just to confirm the results.
3          Q      Were the results confirmed?
4          A      Yes.
5          Q      Did you go to Morristown, just you
6  or your husband also?
7          A      In 2000, just I went, and he got
8  retested by the organization.  They took his blood
9  again.
10         Q      Were the results confirmed?
11         A      Yes.
12         Q      Did you know all of that
13 information before you first spoke to Rabbi
14 Markowitz?
15         A      Yes.
16         Q      Is that why you spoke to Rabbi
17 Markowitz?
18         A      Yes.
19         Q      What is Rabbi Markowitz's role that
20 he would be a person that you would go to for
21 consultation in this field?
22         A      He was just somebody that we were
23 close to and is connected to a lot of different
24 people and has a lot of different resources.
25         Q      Does he himself get involved in

C. Grossbaum - Direct                                    46

1    issues of fertility for couples?
2          A      I don't know if it's like a general
3    thing that he does.  I don't know.
4          Q      I assume you told Rabbi Markowitz
5    that you were both CF carriers?
6          A      Yes.
7          Q      What did he tell you?
8          A      I don't know -- I can't really --
9    how much do you want me to -- I don't understand
10   what you want me to . . .
11         Q      I'm trying to get a feeling for
12   what the discussion was, what he told you.  I
13   believe you did tell me that he ended up referring
14   you to Rabbi Jacobowitz?
15         A      Right, so we were just basically
16   discussing with him what our options could be,
17   what options we had, how we can go about finding
18   out what our options were, advice on what his
19   opinion on -- how we should go about finding out
20   different options.  He was kind of like -- I don't
21   know the word, but someone that we were close to
22   that was an open ear that we could talk to and
23   confide in.
24         Q      He told you that the person that
25   would be in the best position to possibly help you

C. Grossbaum - Direct                                    47

1    would be Rabbi Jacobowitz?
2          A      Yes.
3          Q      Did Rabbi Markowitz say anything to
4    you about the issue of becoming pregnant given
5    that you were both CF carriers, or did he just
6    defer on that issue completely?
7          A      We spoke about -- can you explain?
8          Q      Did he give you any advice?
9          A      He didn't tell me what to do one
10   way or the other.  He wasn't like, Do this or
11   don't do that.  He was trying to help guide us to
12   make the right decision for ourselves.
13         Q      I'm trying to get a little bit of
14   what that discussion was.  If he tried to help
15   guide you and what decision was best for you, what
16   were you talking about?  What was the issue that
17   you were concerned about?
18         A      About having children obviously and
19   getting married -- you know, getting married and
20   having children and having a family and what our
21   future would be.
22         Q      Did you ask him whether he knew any
23   couples similarly situated to you?
24         A      Yes.
25         Q      What did he tell you?

C. Grossbaum - Direct                                    48

1          A      He knew of some, and I knew of
2    some.  We both knew.
3          Q      When I say "similar situated," I
4    mean where both the husband and the wife were CF
5    carriers.
6          A      Uh-huh, yes.
7          Q      If I'm wrong, tell me.  It
8    sounds -- from what you've just told me it sounds
9    like he didn't really give you any significant
10   substantive information about CF or
11   recommendations about what you should do, other
12   than referring you on to Rabbi Jacobowitz.  Is
13   that accurate?
14         A      Yes.
15         Q      Can you tell me when you first met
16   Rabbi Jacobowitz?
17         A      I guess it was in '04
18         MR. STEIN:  You know, Scott, I know
19   it's a memory test, but I can't help saying I'm
20   sitting here with the first appointment call to
21   NYU in the records which has a date on it, and I
22   think that would probably be the answer.
23         MR. EICHHORN:  That's not when
24   Rabbi -- that's when they contacted NYU through
25   him.  They could have been talking to him for I

C. Grossbaum - Direct                                    49

1    don't know how long before that.
2          MR. STEIN:  You can focus on it
3    right like that, how long before.
4          Q      I'm not trying to trip you up.  You
5    told me already that you were referred by Rabbi
6    Jacobowitz in NYU in around February or March of
7    2004, so with that date in mind, can you tell me
8    in relation to that how much before that you did
9    first meet Rabbi Jacobowitz?
10         A      I don't remember exactly, but it
11   was probably two to three months before.
12         Q      Did you first encounter him in
13   person or on the telephone?
14         A      We spoke to him on the phone.
15         Q      Did you arrange a personal meeting?
16         A      Not at that time.
17         Q      When you first spoke to him, I
18   would imagine you told him that you were referred
19   to him by Rabbi Markowitz.  Right?
20         A      Yes.
21         Q      What was the rest of the
22   discussion?
23         A      He basically explained what the
24   general options were, and he referred us to Dr.
25   Liccardi at NYU.

C. Grossbaum - Direct                    50

1    Q    Tell me what he told you the
2  general options were.
3    A    The PGD and IVF.
4    Q    Did he discuss anything else?
5    A    No. We went to him basically
6  because we knew he did that work. He was involved
7  in that at NYU.
8    Q    Had you learned that from Rabbi
9  Markowitz?
10   A    Yes.
11   Q    That's something that Rabbi
12 Markowitz told you?
13   A    Yes.
14   Q    When you spoke to Rabbi Jacobowitz,
15 he then talked to you about the possibility of
16 using PGD and IVF, and he referred you to Dr.
17 Liccardi?
18   A    Yes. He said he works with Dr.
19 Liccardi at NYU, and they do that.
20   Q    How many times had you met or spoke
21 to Rabbi Jacobowitz before you went to the NYU IVF
22 clinic?
23   A    Two or three times.
24   Q    In that period of time, can you
25 tell me what involvement he had with PGD and IVF?

C. Grossbaum - Direct                    51

1    A    He worked more on the supervision
2  end, the Jewish, the Halachic supervision when
3  they do the procedure.
4    Q    What is that?
5    A    When they do IVF and they implant
6  the embryo in the woman, he's like supervisor
7  there to make sure that it's done all according to
8  Jewish law properly.
9    Q    He had had prior experience in
10 personally attending to these procedures, not in a
11 medical capacity, but a religious capacity?
12   A    Right, that's what he does at NYU.
13   Q    When you said he does that at NYU,
14 to your understanding, is he an employee of NYU or
15 does he work with them?
16   A    I don't know if he's an employee of
17 theirs.
18   Q    Did he tell how many such cases he
19 had been involved in in his experience?
20   A    I don't remember.
21   Q    What if you know is he there to
22 observe for in connection with observance of
23 Jewish law?
24   A    I don't really know all the
25 details, but I know it has to do with making sure

C. Grossbaum - Direct                    52

1  the right embryo gets implanted in the correct
2  woman and whatever Jewish laws are connected with
3  the procedure, that they are followed. He's what
4  they call a mashgiach. I don't know if you know
5  that word.
6    Q    No. How do you spell it?
7    A    M-a-s-h-g-i-a-c-h.
8    Q    That's a title, a mashgiach?
9    A    Yes.
10   Q    And what does it mean?
11   A    It means basically someone who
12 watches or supervises whatever it is that they're
13 watching, so when you see a food that has an "OU"
14 or "kosher," similarly there was a mashgiach that
15 was supervising at the plant to make sure that
16 nothing unkosher went in to make sure there was --
17       MR. STEIN:  He's the lawyer in
18 residence basically.
19   Q    So whether it's a medical procedure
20 or food procedure, he's the one that makes sure --
21       MR. STEIN:  The same way that
22 there's somebody there at a stockyard.
23       THE WITNESS:  That's right.
24       MR. STEIN:  When you went to a
25 stockyard to get chickens, he supervises when the

C. Grossbaum - Direct                    53

1  animals are killed. It's humane treatment of
2  people and animals.
3    A    If it's a dairy plant, they are
4  making sure that it gets cleaned and koshered
5  properly, just making sure that everything is
6  kosher.
7    Q    I was trying to do this
8  chronologically to make it easier for both of us,
9  but I'm going to jump ahead for now. Did Rabbi
10 Jacobowitz fulfill this role as mashgiach with
11 regard to your procedures at NYU?
12   A    Yes.
13   Q    At any time did Rabbi Markowitz
14 ever tell you that there had been any violation of
15 Jewish law during any of the procedures at NYU?
16   A    No.
17   Q    Did Rabbi Jacobowitz ever tell you
18 that there was any problem that he was aware of
19 with respect to any of your procedures at NYU?
20   A    No.
21   Q    To your knowledge, did Rabbi
22 Jacobowitz personally believe for himself that the
23 correct embryos had been implanted in you?
24       MR. STEIN:  I object. You're
25 asking for state of mind.

C. Grossbaum - Direct                                    62

1    Q    Was that medical detail about the
2  process itself?
3    A    Yes.
4    Q    You mentioned that he said
5  something about pregnancy rates or some kind of
6  rates.  Tell me what he was talking about in that
7  regard.
8    A    Any time you do in vitro
9  fertilization, even if you don't have a fertility
10  problem, your chances of getting pregnant are
11  lowered because it's them implanting with the
12  embryo.
13    Q    This is what he told you?
14    A    Yeah, and then it goes by age.
15    Q    Did he mention any pertinent
16  success rates, pertinent to your case?
17    MR. STEIN:  Obviously if he's
18  talking about a success rate in getting pregnant,
19  the only thing that's meaningful to her is how it
20  relates to her, so are you suggesting that there
21  was some distinguishing characteristics?
22    MR. EICHHORN:  I'll rephrase it.
23    Q    Given your age, given whatever your
24  medical history was, did he talk to you based upon
25  his experience what your expected -- the expected

C. Grossbaum - Direct                                    63

1  success rate for your IVF pregnancy?
2    A    Yes.  There was about a 50-percent
3  chance of actually resulting in a pregnancy.
4    Q    Did you have any discussion with
5  Dr. Liccardi about the option of having a baby
6  naturally without IVF?
7    A    He did mention that that was a
8  possibility.
9    Q    Is that something that you
10  considered?
11    A    No.
12    Q    Why not?
13    A    Because we're orthodox, and we
14  wouldn't want to -- we wouldn't make the decision
15  to have an abortion.
16    Q    You're telling me that your
17  orthodox Jewish religion prevents you from having
18  an abortion?
19    A    In many circumstances.
20    Q    Tell me what that means.
21    A    You just can't go ahead and decide
22  to have an abortion.  There would have to be
23  extenuating circumstances to make it okay
24  according to Jewish law.
25    Q    What extenuating circumstances

C. Grossbaum - Direct                                    64

1  would make it okay?
2    A    If there's danger to the mother's
3  life.  I'm not -- I'm not really an expert on it,
4  but I know some cases if they know that the child
5  won't survive past -- for a while and it will be
6  in a lot of pain, they might say it's okay.  I'm
7  not like an expert in the allowances of having an
8  abortion, but I think those are the two main
9  factors.
10    Q    Did you seek information and
11  guidance on that issue from anyone during this
12  process?
13    A    Yes.
14    Q    Who?
15    A    Rabbi Tendler.
16    Q    Where is Tendler from?
17    A    He's also from the Munsey area.
18    Q    How did you get his name?
19    A    I believe also from Rabbi
20  Markowitz.
21    Q    And what issues did you discuss
22  with Rabbi Tendler?
23    A    What he thought our best options
24  according to Jewish law were to get pregnant.
25    Q    Out of what choices?

C. Grossbaum - Direct                                    65

1    A    Getting pregnant naturally, getting
2  pregnant and having an abortion, and doing the
3  PGD.
4    Q    So those three choices were
5  discussed with Dr. Tendler?
6    A    Yes.
7    Q    What advice did he give you?
8    A    His advice was that the best option
9  according to Jewish law would be the PGD.
10    Q    If you and your husband were to
11  decide to get pregnant naturally, it was your
12  understanding that you would have a one-in-four
13  chance that your child would have CF.  Correct?
14    A    Yes.
15    Q    So if you decided to get pregnant
16  naturally and learned during your pregnancy that
17  your child was going to have CF, Jewish law
18  wouldn't prevent you from giving birth to that
19  child, would it?
20    A    No.
21    Q    So you're certainly free under
22  Jewish law to have that baby and raise that baby
23  with CF.  Correct?
24    A    Yes.
25    Q    On the other hand, if you learned

C. Grossbaum - Direct                                    66

1   during the pregnancy that your child was going to
2   have CF, are you saying that Jewish law would not
3   permit you to have an abortion?
4        A      It depends on the circumstances.
5        Q      And in these circumstances, the
6   circumstance of you and your husband and knowledge
7   that your child was going to be afflicted with CF,
8   is it your testimony that Jewish law would prevent
9   you from having an abortion?
10       A      Yes.
11       Q      And who told you that?
12       A      Rabbi Tendler.
13       Q      Did you seek counsel from anyone
14  else on that issue?
15       A      No.
16       Q      Is he the only person you discussed
17  that issue with ever before giving birth to Rosie?
18       A      Probably not the only person I
19  discussed the issue with.
20       Q      Well, did you discuss it with any
21  other rabbis for their expertise and guidance on
22  that issue?
23       A      No.
24       Q      Am I correct that you never spoke
25  to your own rabbi about that issue, the rabbi at

C. Grossbaum - Direct                                    67

1   the synagogue one mile away?
2        A      No.
3        Q      Is it your understanding that
4   rabbis have the authority to make exceptions to
5   rules, to general rules for people?
6        A      I don't believe they make
7   exceptions. There's different circumstances, and
8   different circumstances can result in different
9   decisions.
10       Q      Am I correct that there's a general
11  --
12              MR. EICHHORN:  Strike that.
13       Q      Am I correct that generally your
14  religion looks down on abortions, however,
15  understanding that there are times when based upon
16  the circumstances it is considered acceptable?
17       A      Yes.
18       Q      Am I correct that one of those
19  circumstances that can be considered acceptable is
20  if it is determined that the couple is not in a
21  position to have to deal with whatever the
22  abnormalities of their child will be?
23       A      No, it's not as simple as that.
24       Q      You think that statement is
25  inaccurate, what I just said?

C. Grossbaum - Direct                                    68

1        A      Yes.
2        Q      And that was based upon speaking to
3   Rabbi Tendler?
4        A      Yes.
5        Q      Am I correct that a circumstance
6   that would make abortion acceptable in your
7   religion is if based upon the abnormalities of the
8   child, it's known that that child would be born
9   with a significant illness that would impact on
10  the quality of their life and the expectancy of
11  their life, their life expectancy?
12       A      Correct.
13       Q      So in that situation those facts
14  are such that abortion would be acceptable in that
15  setting?
16       A      Right, depending on the specific
17  situation.
18       Q      After that first meeting with Dr.
19  Liccardi, I think you said you talked to him a
20  couple of times?
21       A      Dr. Liccardi?
22       Q      Yes.
23       A      At that time we had the
24  consultation with him.
25       Q      You met him for the consultation,

C. Grossbaum - Direct                                    69

1   and what happened next?
2        A      He had us set up a phone meeting
3   with Dr. Hughes.
4        Q      Phone meeting with him also or just
5   Dr. Hughes?
6        A      No, just Dr. Hughes.
7        Q      How long after your consultation
8   with Dr. Liccardi did the phone conference with
9   Dr. Hughes take place?
10       A      It was within a few weeks.
11       Q      Tell me what the discussion was.
12       A      What exactly do you want to know?
13       Q      I'd like to know what was said.
14       A      He told us about what the PGD was
15  and what he did and how -- just how he did the
16  PGD, you know, the scientific things behind it.
17       Q      Do you remember -- I assume you and
18  your husband were both involved in this?
19       A      Yes.
20       Q      Do you remember whether either of
21  you had any questions for him?
22       A      Yes.
23       A      Yes --
24       A      We had questions for him.
25       Q      And did he answer them to your

C. Grossbaum - Direct                                          78

1    procedures associated with IVF?
2         A       No. In fact, I believe I asked
3    about that, and they said that there were very
4    small, you know, chances of there being a specific
5    problem with the baby once it was born other than
6    not getting pregnant.
7         Q       When you say "small chances"
8    though, what do you mean by that?
9         A       That there was a very slim chance
10   of there being any problem with the baby once it
11   was born.
12        Q       When you say "slim," are you
13   talking statistically?  Is that what you mean?
14        A       I don't know the statistics, but
15   when I said -- I asked what are the long-term
16   effects for having a baby through IVF or health
17   risks, and they said, you know, it's not really a
18   common situation.
19        Q       And what's your understanding as to
20   the percentage incidence of damage to the baby
21   from an amnio?
22        A       I don't remember the percentages.
23        Q       Would you agree that it's uncommon?
24        A       Yes.
25        Q       Would you agree that it's slim?

C. Grossbaum - Direct                                          79

1         A       Yes.
2         Q       So your knowledge of a
3    amniocentesis was that while, yes, it does create
4    a risk to the baby on a statistical basis, it's
5    rare that it happens?
6         A       Yes.
7         Q       And your knowledge also of the IVF
8    process is that while it can create a risk to the
9    baby, it's rare that it happens?
10        A       My understanding of the IVF is it's
11   even less rare -- it's even more -- it's even
12   rarer that there would be a problem with the baby,
13   whereas the CVS and the amnio, it's uncommon but
14   it's not as rare.
15        Q       So each of them create potential
16   risks to the baby.  It's not common for either of
17   them, but it's more rare for amniocentesis.  That
18   was your understanding.  Correct?
19        A       No, it's even more rare for the
20   IVF.
21        Q       More rare for the IVF.  Is it your
22   testimony that Lubavitch, the Lubavitch sect's
23   belief would preclude you from having an
24   amniocentesis?
25        A       When you say "preclude," what do

C. Grossbaum - Direct                                          80

1    you mean?
2         Q       Prevent.
3         A       Yes, most rabbis within the Chabad
4    movement would say not to do the amnio or the CVS.
5         Q       You said the main reason you
6    believe they would say that is because of the risk
7    to the baby?
8         A       No, I didn't say only because of
9    the risk, but also if you're not going to abort
10   the baby, then what's the purpose of doing the
11   test?
12        Q       If you know that you and your
13   husband are carriers of a gene of an illness and
14   it's possible that your child can have that
15   illness, do you agree with me that one reason for
16   having an amniocentesis, even if you're not
17   thinking of abortion, is to find out whether or
18   not your child is going to have that illness so
19   that if your child does have that illness when
20   your child is born, you'll be more emotionally
21   prepared for it?
22        A       Not necessarily.
23        Q       You don't think that's a viable
24   reason for undergoing an amniocentesis?
25        A       I think it's a viable reason for

C. Grossbaum - Direct                                          81

1    people to do that.
2         Q       Does it sound like a reason that
3    makes sense to you?
4         A       It makes sense.
5         Q       Did you consider that since you
6    knew you and your husband were carriers for this
7    illness, did you consider maybe we should test
8    just to see how this worked out since we know it's
9    not perfect so that if we are going to have a
10   child with CF, we can be prepared for that?  Did
11   you consider that?
12        A       No.
13        Q       Why not?
14        A       Because I wouldn't want to -- my
15   philosophy is what happens, happens.  I'll deal
16   with it, but not -- there's no point in six weeks
17   of pregnancy to tell and then they can't do
18   anything about it while I'm pregnant anyway.
19        Q       So the rationale that I gave you a
20   minute ago for undergoing an amnio, you agree that
21   it makes sense and is logical, but it wasn't for
22   you?
23        A       Correct.
24        Q       By the way, if you need a break at
25   any time, you don't get brownie points for

C. Grossbaum - Direct                                    118

1    any detail.  One thing -- basically one thing the
2    consent form says is that you agree to have the
3    fertilized embryos frozen, and there's no
4    guarantee that they'll survive the freezing
5    process.
6         A     Yes.
7         Q     You understood that?
8         A     Yes.
9
10             (Addendum to IVF-ET Transfer Consent,
11        Embryo Biopsy and Preimplantation Genetic
12        Diagnosis dated 6/4/04, marked as Exhibit
13        Grossbaum-3 for Identification.)
14
15        Q     This is a consent form that we've
16   marked as Grossbaum-3, and it's entitled,
17   "Addendum to IVF-ET Transfer Consent, Embryo
18   Biopsy and Preimplantation Genetic Diagnosis."  If
19   you look, is that your signature and again after
20   that your printed name and the date that you
21   signed it?
22        A     Yes.
23        Q     And that's June 4, 2004?
24        A     Yes.
25        Q     I'm going to go through a couple of

C. Grossbaum - Direct                                    120

1         A     Yes.
2         Q     It then says, "The genetic analysis
3    may fail or be incorrect, although in PIVF's
4    experience with 60-plus patients to date, the
5    accuracy has been greater than 90 percent."
6         You read that?
7         A     Yes.
8         Q     You understood that?
9         A     Yes.
10        Q     Did you have any questions for
11   anyone or comments about that when you read it?
12        A     Our questions and comments were
13   addressed by Dr. Hughes when we had the
14   conversation with him.
15        Q     So you had your conversation with
16   Dr. Hughes before you read and signed this
17   document.  Correct?
18        A     Yes.
19        Q     So was your -- are you saying it
20   was you understanding from Dr. Hughes that there
21   was a success rate better than 90 percent?
22        A     Yes.
23        Q     And can you be any more specific
24   about what you said before, that there had been
25   hundreds of people and 10 or 11 errors?

C. Grossbaum - Direct                                    119

1    things on this consent, maybe a few more than a
2    couple.  On the first page, the first main
3    paragraph talks about that PGD can detect numerous
4    genetic disorders, and when successful it reduces
5    the chance of giving birth to a child afflicted
6    with a hereditary disease.  Is that right?
7         A     Yes.
8         Q     You read this document before you
9    signed it.  Correct?
10        A     Yes.
11        Q     And it also -- as with the other
12   consent forms, each page has a line at the bottom
13   where it appears that you initialed it and you
14   dated it.  Is that correct?
15        A     Correct.
16        Q     And was that initialed at the end
17   of each page by you, an indication that you had
18   read that page?
19        A     Yes.
20        Q     If you look at page three,
21   paragraph two, it says, "We understand that
22   because PGD is a new procedure, a major risk is
23   that the procedure may not be successful."
24        You read that and you understood that.
25   Correct?

C. Grossbaum - Direct                                    121

1         A     Yes.  He said that although he
2    can't guarantee it because nothing is guaranteed,
3    that it was very unlikely that it would be a
4    mistake, and he also specified within cystic
5    fibrosis, because we had more common mutations,
6    that it should be even less difficult to do it
7    properly because it was a more common condition,
8    more common mutation, and that he wasn't going to
9    guarantee anything because nothing is guaranteed,
10   but that the risks of it not being a success were
11   very slim, and it was a very high chance of it
12   being successful.
13        Q     So your testimony is that Dr.
14   Hughes essentially said to you that you had common
15   mutations so that there was a better chance of
16   success than other cases?
17        A     I didn't say he said because of the
18   mutations it was going to be less of a risk.  He
19   was just saying that it shouldn't be a difficult
20   thing to do because we had a common mutation, and
21   I guess what he felt was that there was a very
22   slim chance of him being incorrect, and that he
23   felt very optimistic that it would be successful.
24        Q     Did Dr. Hughes say to you and your
25   husband that yours was a complicated case for him?

C. Grossbaum - Direct                                   146

1   A lot of difference. You've objected. Go ahead.
2          A        I don't understand. Specifically
3   at that time?
4          Q        No. We've talked so far about some
5   of the things that your sect of orthodox Judaism
6   believes?
7          A        Yes.
8          Q        I'm asking you another question
9   along those lines. Does the Lubavitch sect of
10  orthodox Judaism believe when a Lubavitch couple
11  is seeking to have a baby, that when the woman is
12  ovulating she and her husband should be having
13  sexual intercourse?
14         A        There's a time when -- there's a
15  time when physical contact is not permitted and
16  any time other than that is appropriate. It's not
17  like you have to do it exactly this time and this
18  day. It's like how do you exactly know when
19  you're ovulating anyway? It's when you don't have
20  your period, and you're clean then you can have
21  sexual relations. It's not -- the average person
22  doesn't know when -- necessarily know when they're
23  ovulating.
24         Q        You have a pretty good idea when
25  you're ovulating, don't you?

C. Grossbaum - Direct                                   147

1          MR. STEIN:  Maybe I can help you.
2   I think her last answer said that there's a time
3   calculation, and you may want to ask her how to
4   calculate, and that may provide you with the
5   information that you want.
6          MR. EICHHORN:  I could, but I'm
7   asking her a different question.
8          A        I don't know exactly when I
9   ovulate. I can guess probably assuming that my
10  cycle is normal around when I do, but it's not
11  like you are forced to do it on those days. It's
12  like during this time when you're clean according
13  to the kosher law, and you don't have your period
14  and you're not bleeding, that any of that time is
15  permitted.
16         Q        That's not what I'm asking you.
17         A        I don't understand.
18         Q        I'm not asking about when
19  intercourse is permitted. I'm asking a little
20  different question which is when you're seeking to
21  have a child, whether or not your sect of orthodox
22  Judaism states that you and your husband should be
23  having sexual intercourse?
24         A        I don't think so.
25         Q        Did you ever discuss that with

C. Grossbaum - Direct                                   148

1   anybody?
2          A        I mean, I don't know that there's a
3   -- I don't know how to really answer the question
4   because I'm not -- basically I don't know how to
5   answer the question because there's the time when
6   the woman has a period, and then after a certain
7   amount of days after she's not seeing any blood
8   for a certain amount of time she goes to what's
9   called a mikvah. Do you know what a mikvah is?
10         Q        No.
11         A        It's like a ritual bath, she dunks
12  in there, and from that point on till she sees
13  blood again is considered the appropriate time to
14  try to get pregnant. It's not like you -- it's
15  not like you are forced to do it at any specific
16  time. The night that you go to the mikvah, I
17  guess is the best time to do it, but it's not like
18  at any point during that month you have to do it,
19  so I don't have like a specific answer to give
20  you.
21         Q        During that time in July of 2004,
22  were you and your husband having sexual relations?
23         A        In July?
24         Q        Yes.
25         A        Well, from when I started taking

C. Grossbaum - Direct                                   149

1   certain hormones, there were certain times that I
2   wasn't allowed to do anything because they didn't
3   want me to have the risk of -- getting pregnant
4   while on the hormones could be detrimental, but in
5   the times -- unless they specifically said no,
6   then I assume we probably did. I don't remember
7   specific occasions, but it wasn't like -- unless
8   they told us -- I guess when we didn't was when
9   they said from here to here, you cannot have
10  sexual relations or while you're on these
11  hormones.
12         Q        You started those hormones back in
13  April I think?
14         A        April? I don't think so.
15         Q        When did you start them? Let's ask
16  it that way.
17         A        I think going back from
18  implantation, I don't think it was more than a
19  month or so.
20         Q        The egg retrieval was July 14th?
21         A        Right, so I guess -- I think I
22  started the hormones sometime in May or June.
23         Q        From the time you started them in
24  May or June, what you're saying is that other than
25  times when you were told you couldn't have sexual

C. Grossbaum - Direct                                    150

1   relations, while you don't remember exact dates
2   and details, you probably were?
3        A      Yes.
4        Q      That would include the month of
5   July, wouldn't it?
6        A      Yes.
7        Q      Was there any time in July that you
8   specifically remember not having sexual relations
9   for a particular reason?
10       A      Unless I had my period or they told
11  me not to.
12       Q      Was there any time in July that
13  they told you not to?
14       A      Yes.
15       Q      When?
16       A      I don't remember exactly when, but
17  when I was on certain hormones they said to not
18  have sexual relations at this time, and for sure
19  once they did the egg retrieval to the
20  implantation they also said not to.
21       Q      How long a period of time was it
22  that we are talking about?
23       A      I think that was a week or so.
24       Q      So during that week is it your
25  testimony that you did not have sexual relations?

C. Grossbaum - Direct                                    151

1        A      I think the last time before that
2   that we did is when we had to get the sperm
3   sample, and that was with a condom because they
4   had to collect it.
5        Q      But the sperm sample, that was
6   earlier. When was that done?
7        A      I don't remember in relation to
8   this how much before it was.
9        Q      So what you're saying if I
10  understand you correctly -- and if I'm wrong
11  please tell me -- that you believe that for about
12  a week after the egg retrieval you did not have
13  sexual relations other than in the month of July,
14  unless there was a time that you had your period,
15  and you assumed that you probably did?
16       A      I can assume. I don't remember for
17  sure. I don't remember. I really don't remember.
18  I can't give you a very clear answer on that.
19       Q      What was your understanding of what
20  was going to happen now that your eggs had been
21  retrieved? What was next in the process from your
22  understanding?
23       A      Once the eggs were retrieved?
24       Q      Yes. What was going to happen?
25       A      That they take the sperm, make the

C. Grossbaum - Direct                                    152

1   embryos, and I continued taking the hormones to
2   get my body ready to receive the embryos, and then
3   the day -- basically they didn't know exactly what
4   day, but they watched the embryos to see how they
5   developed, and at a certain point depending on
6   which are the best most viable embryos, like come
7   in Tuesday at 3:00 because we have these three
8   embryos in the right stage to implant them.
9        Q      Where in all of that does Dr.
10  Hughes' PGD testing begin?
11       A      I had guess on day three or four,
12  depending on which embryo is ready they send them
13  to him overnight. He does his genetic testing and
14  then sends them back with the information about
15  each one.
16       Q      After Dr. Hughes' laboratory did
17  their genetic testing, was there any interaction
18  between you and your husband and his lab, either
19  speaking over the phone or in documentation?
20       A      No, I don't think so.
21       Q      What I'm asking is did you receive
22  any kind of report from Dr. Hughes' lab as to what
23  his genetic testing had found?
24       A      I believe he gave the report to Dr.
25  Liccardi.

C. Grossbaum - Direct                                    153

1        Q      Did you ever speak to Dr. Hughes or
2   did your husband after the date of the egg
3   retrieval procedure?
4        A      No.
5        Q      That was obviously before he did
6   his testing. The day of the procedure he
7   obviously couldn't have done his testing yet.
8   Correct?
9        A      Say it again.
10       MR. EICHHORN:   Strike that. I'll
11  do it over.
12       Q      From the time that you had your
13  eggs retrieved from Dr. Liccardi, did you ever
14  again speak with Dr. Hughes?
15       A      No.
16       Q      Did your husband?
17       A      No.
18       Q      Did you or your husband ever again
19  speak to anyone at Dr. Hughes' laboratory after
20  the day of the egg retrieval?
21       A      Did we speak to anybody --
22       Q      At Dr. Hughes' laboratory.
23       A      I don't think so, no.
24       Q      Your understanding was that you
25  were going to wait until NYU called you, and then

C. Grossbaum - Direct                                                     154

1   you would have the implantation of the most viable
2   embryos. Correct?
3          A      Right. That's what we were told to
4   do basically.
5          Q      After a few days did a phone call
6   come?
7          A      Yes.
8          Q      Tell me what happened.
9          A      They said -- they told us what day
10  to come in for implantation.
11         Q      Do you remember what day that was?
12         A      No.
13         Q      According to the records, it was
14  July 19th, which would have been five days after
15  the egg retrieval. Does that sound right?
16         A      Yes.
17         Q      Tell me what happened.
18         A      They told us to come for the
19  implantation. They said some of the embryos that
20  he tested that were good embryos had cystic
21  fibrosis, and there were some good ones that did
22  not have cystic fibrosis but they were carriers
23  for CF. Did we want to use them? We said yes,
24  and they implanted me with two I believe, two
25  embryos, and they said both of them were carriers

---

C. Grossbaum - Direct                                                     155

1   for CF.
2                 MR. EICHHORN:   Can you read her
3   answer back slowly?
4                 (Whereupon, the previous answer is
5   read by the Reporter.)
6          Q      Who had the discussion that you
7   related to us?
8          A      Dr. Liccardi.
9          Q      Was anyone else present for that
10  discussion other than Dr. Liccardi and you? Was
11  your husband there?
12         A      Yes, I believe he was.
13         Q      Anybody else present?
14         A      I don't remember.
15         Q      And when Dr. Liccardi said that
16  there were some good embryos that were CF carriers
17  and asked whether you wanted to go ahead with
18  those, did you have an understanding of what a CF
19  carrier was?
20         A      Yes. I'm a CF carrier. It just
21  means that you carry the gene for CF.
22         Q      So in other words, it was your
23  understanding that Rosie could be a CF carrier
24  such as you or your husband?
25         A      Correct.

---

C. Grossbaum - Direct                                                     156

1          Q      And was there any further
2   discussion about that issue, other than what you
3   just relayed to me now? Did you have any
4   questions?
5          A      I don't think I had any specific
6   questions. I knew what it meant to be a CF
7   carrier.
8          Q      So it was your understanding that
9   according to the testing that Dr. Hughes' lab had
10  done, that the two embryos that they were going to
11  implant in you were both CF carriers?
12         A      Yes, and I said as long as it's
13  just a carrier for CF, then that's fine for me. I
14  don't care if she's a carrier for the gene.
15  Everybody is a carrier for something.
16         Q      Anything else to that discussion
17  that you haven't told us?
18         A      I mean, I think he just spoke
19  specifically about what he was going to do, what
20  the procedure was, how long it would take, but
21  that's it. That's pretty much it.
22         Q      Was the implantation done that day?
23         A      Yes.
24         Q      Did you ever see any written report
25  from Dr. Hughes' laboratory about his genetic

---

C. Grossbaum - Direct                                                     157

1   testing?
2          A      Yes.
3          Q      When?
4          A      A long time after, like in the last
5   year or two I guess.
6          Q      After the lawsuit was filed?
7          A      I don't remember what exactly --
8          Q      After Rosie was born?
9          A      Yeah.
10         Q      And that was the first time you saw
11  it?
12         A      Yes.
13         Q      Did you get to go home that day
14  after the implantation procedure?
15         A      Yes.
16         Q      What did Dr. Liccardi say to you if
17  anything after the procedure?
18         A      To just be careful, not to do
19  anything strenuous, not to do anything heavy, not
20  to do a lot of physical activity, to just try to
21  rest, and I had to continue taking progesterone
22  and then I had to come in very often for blood
23  work and ultrasounds or sonograms, whichever.
24         Q      And it's your recollection that you
25  returned there for about how long to get blood

C. Grossbaum - Cross by Mr. Leuchtman                    162

1              MR. LEUCHTMAN:   Exhibit 4.
2        Q      It does say, "However, since this
3    is a relatively new procedure the success rate of
4    identifying these problems is unclear"?
5        A      Correct.
6        Q      You signed this document and your
7    husband did as well, and it's relatively clear to
8    me -- there's the "relatively" word -- that you
9    read these things carefully, and you don't sign
10   something that you disagree with or don't
11   understand.  Correct?
12       A      Correct, and when I spoke to Hughes
13   he made it very clear that while it was
14   experimental, the reason it was called
15   experimental is because they're awaiting approval.
16   It was still considered experimental, but he was
17   very clear in stating his experience that he had
18   been around long enough to do it, that he felt it
19   was a very accurate procedure.
20       Q      Here is the part I guess I don't
21   understand.  You spoke to Hughes on the phone, you
22   and your husband on one occasion.  Correct?
23       A      Correct.
24       Q      Can we agree that was on March 25,
25   2004?

C. Grossbaum - Cross by Mr. Leuchtman                    163

1        A      Yes.
2        Q      This was faxed, this document was
3    faxed to somebody I presume at NYU -- I guess I'm
4    not sure when, but you saw it for the first time
5    on June 4, 2004.  Correct?
6        A      I don't know exactly when I saw it
7    for the first time, but I guess it seems like
8    that.  I don't remember the exact date.
9        Q      Did you carry this thing around for
10   a few days before you signed it, or did you read
11   it and sign it all at once?
12       A      I believe I read it and signed it
13   all at once, but I don't remember the exact date.
14       Q      So obviously you didn't question
15   Dr. Hughes about anything on this occasion since
16   you only spoke to him on one occasion?
17       A      I spoke to him on the phone about
18   these risks, and that was it.
19       Q      When you signed this, you didn't
20   ask Dr. Hughes specifically about this form and
21   this context?
22       A      Specifically about this form?
23              MR. STEIN:   You've answered this
24   question.  You did not discuss this form?
25              THE WITNESS:   Right.

C. Grossbaum - Cross by Mr. Leuchtman                    164

1              MR. STEIN:   It is anything more
2    needed?
3              THE WITNESS:   No.
4        Q      Looking at the last paragraph of
5    page three, it says, "In order to monitor the
6    success rates of this technology, you agree that
7    between 10 and 15 weeks of pregnancy you will
8    undergo conventional prenatal genetic testing in
9    the form of chorionic villus sampling, CVS, or
10   amniocentesis."
11          It says that, doesn't it?
12       A      Yes.
13       Q      And you didn't write anything in
14   the margin that says, "I've got to talk to Dr.
15   Hughes about this," or voice anything to Dr.
16   Hughes in response to this language in this form
17   that you saw on June 4.  Right?
18       A      Right.
19       Q      Do you agree that if Hughes got
20   this form back, he had every reason to take this
21   as the agreement of you and your husband to
22   undergo amniocentesis or CVS?
23              MR. STEIN:   I object to that.  She
24   is testifying as a fact witness.  She's not here
25   to offer opinions as to what Hughes, how Hughes

C. Grossbaum - Cross by Mr. Leuchtman                    165

1    can take it, so that's the objection to the
2    question.
3              MR. LEUCHTMAN:   Are you instructing
4    her not to answer?
5              MR. STEIN:   The words "instruct her
6    not to answer" in a Federal case is a very limited
7    opportunity, so I will not instruct her not to
8    answer, but I point out to you the infirmities of
9    your question, and the reason that I object to it
10   is so that if you want to stay with the question
11   and ask for an answer, please do.
12             MR. LEUCHTMAN:   I understand your
13   instruction, and I'm not going to quibble with you
14   one way or the other.
15       A      I'm not really sure how to answer
16   that because we made it clear to him that we
17   wouldn't be doing that.
18       Q      You don't have an answer?
19             MR. STEIN:   She had an answer.
20   It's on the record.
21             MR. LEUCHTMAN:   She said she
22   doesn't know how to answer the question.  That's
23   fine.
24       A      I'm saying I don't know what he
25   would assume when he read this.  I just know what

C. Grossbaum - Cross by Mr. Leuchtman    170

1   phone conversations with Dr. Hughes.
2            MR. STEIN:   When you said about
3   4:00, it's now quarter after three. Do you have
4   to make a phone call?
5            THE WITNESS:   I already arranged
6   it.
7        Q        Let me hand you deposition Exhibit
8   5, and I will provide Mr. Stein and Mr. Eichhorn
9   with copies.
10           MR. EICHHORN:   Thank you for your
11  politeness.
12           MR. STEIN:   Thank my secretary for
13  his politeness.
14           MR. LEUCHTMAN:   Everybody had a
15  hand in it I guess.
16       Q        Let's go through some of these
17  items, and you said you reviewed this, and I guess
18  it should save us some time. You can see from the
19  first page that there's a summary of conversation,
20  checks in other words, a checklist that Dr. Hughes
21  goes through with people such as yourself, goes
22  through that?
23           MR. STEIN:   You're making a
24  statement of fact about what Dr. Hughes goes
25  through with people such as herself. This is not

C. Grossbaum - Cross by Mr. Leuchtman    171

1   a document that she prepared, so I would object to
2   questions which contain within them substance of
3   facts that are not within her knowledge.
4        Q        You reviewed this, and I assume it
5   refreshed your memory about your discussion with
6   Mark Hughes. Correct?
7        A        Correct.
8        Q        I described this as a checklist.
9   Do you understand that has the same function?  Do
10  you agree that that's what it is, whether or not
11  you agree with all the things Dr. Hughes checked
12  off?
13       A        Yes.
14       Q        Did he tell you that he and his lab
15  were not your physicians?
16       A        Yes.
17       Q        Did he tell you that they're
18  scientists who try to develop a complicated
19  single-cell test so the preimplantation genetic
20  diagnosis can be used?
21       A        Yes.
22       Q        Did he say it involved designing
23  new DNA probes?
24       A        Yes.
25       Q        Did he tell you this it was not a

C. Grossbaum - Cross by Mr. Leuchtman    172

1   perfect technology?
2        A        Yes.
3        Q        Did he tell you it was an
4   experimental process, that there have been errors
5   by virtually all groups performing this technology
6   including his group, and that the objective is to
7   lower your risk from 25 percent, but lowering it
8   to zero is not realistic or possible?
9        A        Yes.
10       Q        Did he tell you it's important that
11  you understand technology like this can fail, that
12  zero risk is expected, not promised, not possible
13  in one cell, one gene, one to two type, overnight
14  testing?
15       A        Yes.
16       Q        Did he tell you it would not be
17  truthful to suggest that his clinic or he are
18  perfect and that the technology has not produced
19  errors because neither of those would be a true
20  statement?
21       A        Yes.
22       Q        Did he tell you you didn't
23  necessarily need preimplantation diagnosis, that
24  you could get pregnant and assume the risk for the
25  disease, being cystic fibrosis?

C. Grossbaum - Cross by Mr. Leuchtman    173

1        A        Yes.
2        Q        Did he tell you because single-cell
3   testing overnight, pushing diagnostic technology
4   to its limits theoretical and practical, it's
5   imperative that should a pregnancy ensue
6   conventional prenatal testing, CVS at around ten
7   weeks or amniocentesis at around 15 or 16 weeks is
8   necessary? I'm asking did he tell you that. I'm
9   not asking for your reaction.
10       A        I don't know if he said that
11  necessarily, but I remember discussing this.
12       Q        Did he say it was imperative to do
13  this, that CVS or amniocentesis be done?
14       A        I don't remember him saying it was
15  imperative. He said that this is what people do
16  to ensure that the baby does not have that genetic
17  condition.
18       Q        Did he tell you that this was an
19  experimental technology, that there is some risk,
20  no matter how well it's done, of just failure of
21  the technology?
22       A        Yes.
23       Q        Did he ask you as it says on this
24  form, "Are all your questions answered," and was
25  the answer, "Yes, thank you," from apparently your

C. Grossbaum - Cross by Mr. Leuchtman    174

1  husband?
2      A      Say that again.
3      Q      Did he say, "Are all your questions
4  answered," at some point in this process?
5      A      Yes.
6      Q      Did your husband Mendel say, "Yes,
7  thank you"?
8      A      Yes.
9      Q      Do you remember that?
10     A      Yes.
11     Q      You weren't engaging in this
12  because of a history of infertility.  Correct?
13     A      Correct.
14     Q      Now, there's a note on the second
15  page in a hand that I certainly recognize as that
16  of Dr. Hughes that says, "You do not have to do
17  PGD.  Remember, you can just get pregnant and have
18  a prenatal test like CVS or amnio.  There are
19  great OB docs in New York City who could do this
20  for you," and did your husband respond to that
21  statement whether or not it's verbatim saying, "We
22  don't like those odds"?
23     A      I don't remember him saying that,
24  but it could be that he was referring to something
25  else, but I don't know what he was referring to

C. Grossbaum - Cross by Mr. Leuchtman    175

1  because I don't know what the odds are.  I don't
2  know what that has to do with.
3      Q      Hughes says, "Remember you can get
4  pregnant and have a test like CVS or amnio."
5      A      I think he said getting pregnant
6  naturally and just winging it.
7      Q      And your husband said he doesn't
8  like those odds?
9      A      Of just getting pregnant naturally
10  and winging it, the 25-percent chance.
11     Q      At that point in the conversation,
12  nobody voiced any objection to the amnio?
13     A      I don't know at what point in the
14  conversation we mentioned it, but we did mention
15  that CVS and amnio is not an option.
16     Q      He says on the third page, "There
17  have been errors in PGD in the past, even in CF
18  testing, cystic fibrosis.  We've had 11 errors in
19  14 years and hundreds of families.  It's awful
20  when it does"?
21     A      Yes.
22     Q      Did he describe medicine as an art
23  and not a perfect science?
24     A      Yes.
25     Q      There's a line right under that

C. Grossbaum - Cross by Mr. Leuchtman    176

1  that says, "Need to follow-up with CVS and amnio,"
2  and then the word Evans written in capital letters
3  and circled, and there's a question mark after it.
4  Do you know what that reference is?
5      A      No.
6      Q      You don't Dr. Evans or anybody
7  named Evans at NYU or having to do with your
8  obstetric or gynecological care or pertaining in
9  any way to this case?
10     A      No.
11     Q      Do you agree that there's nothing
12  on this page that indicates the Grossbaums
13  categorically refused to go along with amnio or
14  CVS or refused it in any way?
15     MR. STEIN:   You're asking me if she
16  can find that and note it here, what she
17  interprets as recording that information?  Is that
18  what you're saying?
19     Q      In the entire document is there
20  anything that presents resistance by you or your
21  husband to amnio or CVS?
22     MR. STEIN:   I object to the form of
23  the question because you're asking her to
24  interpret some things on this page that even you
25  and I don't know what it means.  I don't know what

C. Grossbaum - Cross by Mr. Leuchtman    177

1  "Evans," question mark, means.
2      MR. LEUCHTMAN:   He wouldn't
3  document it -- that's correct.  I'm helping her to
4  help herself.
5      Q      Where?  Is there anything that even
6  suggests an opposition to an amnio in this
7  document?
8      A      No.
9      Q      Did he tell you there could be a
10  failure of the technology that can just happen
11  despite everybody's best efforts and without
12  anybody doing anything wrong?
13     A      Yes.
14     Q      On page four, Embryo Donation, it
15  says, "They want to think about this more."
16     Do you know why you and your husband opted
17  to ruminate on whether any embryos were going to
18  be donated?
19     A      I guess what he was asking was if
20  we wanted to donate the embryos that we weren't
21  using to research, and we didn't know at that time
22  what we wanted to do about that.  I think that we
23  signed that we did not want them to go to
24  research.
25     Q      Was that for reasons having to do

---

C. Grossbaum - Cross by Mr. Leuchtman                178

1  with your religion?
2      A      Religion and also personal reasons.
3  I just didn't feel comfortable with that.
4      Q      Have you reviewed over the course
5  of time, not just in preparation for this
6  deposition, the records of NYU?
7      A      Yes.
8      Q      And do you see anything in there
9  that suggests that you or your husband voiced an
10 opposition to amnio or CVS?
11     A      Not that I -- no, I don't think so.
12     Q      Now, do you maintain that Hughes
13 and Liccardi and whoever else was dealing with
14 your care at either of their institutions
15 deliberately left out any documentation of your
16 opposition to amnio, especially in light of the
17 fact that it's an important aspect of these
18 procedures?
19     MR. STEIN:   I object to the form of
20 that question.  She has no idea -- there's no way
21 she can describe the state of mind of the
22 physicians that you've identified, and the use of
23 the word "deliberate" is a characterization of a
24 state of mind.
25     MR. LEUCHTMAN:   I'm just asking –

---

C. Grossbaum - Cross by Mr. Leuchtman                179

1  it's discovery.
2      Q      Is that your position as we sit
3  here today, that this is all deliberately omitted?
4      MR. STEIN:   Lawyers take positions.
5  Clients answer and testify as to the facts of what
6  they know.
7      Q      Do you believe that?
8      MR. STEIN:   Her beliefs are not
9  relevant.
10     MR. EICHHORN:   You're getting
11 ornery.
12     MR. STEIN:   Stop the questions like
13 that then.
14     Q      You consulted with Rabbi Tendler in
15 weighing your options before going forward with
16 in vitro fertilization and PGD.  Correct?
17     A      Yes.
18     Q      And I believe you've testified that
19 before you got pregnant, you didn't discuss those
20 procedures with any other spiritual advisor?
21     A      Yes.
22     Q      So the entire source of your
23 information of what your particular sect of
24 orthodox Judaism permitted and did not permit was
25 Rabbi Tendler?

---

C. Grossbaum - Cross by Mr. Leuchtman                180

1      A      Correct.
2      Q      Plus, of course, your own reading,
3  prayer and learning?
4      A      Correct.
5      Q      At some point in the deposition you
6  made the comment that most authorities in your
7  sect oppose CVS or amnio.  You didn't know what
8  the weight of opinion was when you talked to
9  Tendler, did you, since he was the only person
10 that you talked to?
11     A      Say that again.
12     Q      I don't know that I necessarily
13 wrote it down verbatim, but I did write down the
14 word "most," that most authorities in your branch
15 of orthodox Judaism oppose CVS and amniocentesis.
16     A      Yes.
17     Q      And since Tendler is the only
18 person you talked to, did you do research after
19 the fact, after you got pregnant as to the
20 position of orthodox Judaism on amniocentesis or
21 CVS?
22     A      No.
23     Q      Did you do research after Rosie was
24 born?
25     A      After Rosie was born on

---

C. Grossbaum - Cross by Mr. Leuchtman                181

1  amniocentesis and CVS.
2      Q      Not just amniocentesis and CVS, but
3  the position of orthodox Judaism on amniocentesis
4  and CVS?
5      A      No, not -- I wasn't planning on
6  having a kid yet, so there wasn't any need to do
7  research on that.
8      MR. STEIN:   He asked after Rosie
9  was born, did you do research in your religious
10 teaching as to the availability of amnio and CVS
11 testing.
12     THE WITNESS:   Not too much, no.
13 Not really.
14     Q      I'm wondering what the basis that
15 the consensus of the opinion is against CVS or
16 amnio if you only talked to one spiritual adviser,
17 that being Rabbi Tendler.
18     A      I spoke to Rabbi Tendler because
19 he's the authority on medical issues in orthodxy.
20 That's why we went to him.
21     Q      Did he say whether opinion was
22 divided?
23     A      We didn't ask him what the opinion
24 was.  We asked him what was the best solution
25 according to Jewish law.

C. Grossbaum - Cross by Mr. Leuchtman        186

1      A      Chorionic villus sampling that
2  basically during some time in the pregnancy they
3  remove some of the DNA from the embryo and check
4  the genetic make-up or chromosomes to see if that
5  embryo has cystic fibrosis or whatever you're
6  testing for, abnormality.
7      Q      What do you understand to be the
8  risk factor to the baby when that procedure is
9  being done?
10     A      That there is some risk of
11 terminating the pregnancy.
12     Q      You said earlier that that risk is
13 minimal. I take it you stand by that?
14     A      Yes.
15     Q      And amniocentesis is what, to your
16 understanding?
17     A      Also when they take amniotic fluid
18 and test that for abnormalities.
19     Q      Just so that I'm clear, you had one
20 phone contact with Mark Hughes. Correct?
21     A      Correct.
22     Q      Did you ever have any other phone
23 contacts either before or after the pregnancy with
24 Hughes or with his laboratory?
25     A      I don't think so.

C. Grossbaum - Cross by Mr. Leuchtman        187

1      Q      I'm a little unclear, and I hate to
2  go back over this. When is it during this whole
3  process that you were specifically told not to
4  engage in sexual relations with your husband?
5      A      I don't know exactly. I know at
6  certain times with different hormones or between
7  when the eggs were retrieved until they did the
8  implantation, but I don't remember -- I don't
9  remember.
10     Q      And you've indicated at least at
11 some point in July you did have sex with your
12 husband when it was not explicitly prohibited?
13     A      I said it was possible. I don't
14 remember specific cases. We did it when we had to
15 get the sperm sample, but I don't remember
16 specific cases of it. I don't have -- I can't
17 give you a specific instance.
18     Q      After you knew you were pregnant,
19 did you have sexual relations with your husband?
20     A      After a certain point where they
21 told me I was allowed to, probably. In the nine
22 months of pregnancy I would say yes. I can't give
23 you certain specific instances either.
24     Q      When you had sex with your husband
25 or believed that you did in July -- and I'm not

C. Grossbaum - Cross by Mr. Leuchtman        188

1  talking about getting the sperm sample -- was any
2  contraception used?
3      A      Yes.
4      Q      Condom?
5      A      No, by some form of birth control
6  but not a condom.
7      Q      Tell me.
8      A      I was on birth control at some
9  point, but then at some point I had to stop taking
10 birth control, and then we had to use I guess
11 over-the-counter spermicide or something like
12 that, yes.
13     Q      Did you at any time during this
14 entire period of time have unprotected sex --
15     A      No, never.
16     Q      Sex without any contraception
17 effort?
18     A      No.
19     Q      Have you gotten pregnant at any
20 time since these events?
21     A      No.
22     Q      I recognize this is discovery and
23 you're neither an expert nor qualified as such.
24 Do you have an idea as we sit here what went wrong
25 if anything in terms of human failure that caused

C. Grossbaum - Cross by Mr. Leuchtman        189

1  you to become pregnant with a daughter who ended
2  up having cystic fibrosis?
3          MR. STEIN:  Since you recognize
4  that that question calls for an answer from an
5  expert to the cause of a certain medical
6  condition, that can only be known by either what
7  somebody told her or which could only come me --
8  couldn't only come from me but come from others,
9  so the question is totally inappropriate in a
10 discovery proceeding.
11     Q      Well, you've sued an individual and
12 two entities, maybe more than two entities, I
13 presume because you believe that there's some
14 human failure that led you to have a baby with CF.
15 Correct?
16     A      Yes, correct.
17     Q      What do you understand that failure
18 to be?
19     A      I don't know.
20         MR. LEUCHTMAN:  I think that's all
21 I have at this point.
22
23 REDIRECT EXAMINATION BY MR. EICHHORN:
24     Q      Does your sect of orthodox Judaism
25 approve of birth control?

C. Grossbaum - Redirect                    190

1       A       In general you would get Halachic
2  allowance, allowance for that, for specific
3  circumstances. It's not something that you would
4  use because you're not interested in having kids.
5  There would need to be a reason, and you would
6  discuss it with a rabbinical authority.
7       Q       Is that because ordinarily your
8  sect of your religion believes in advocating
9  procreation and inhibiting anything else?
10      A       Correct.
11      Q       What was the kind of exemption you
12 said you would need to ask for?  You used a word.
13      A       For every circumstance you would
14 speak to a rabbi and discuss your circumstance,
15 and then the rabbi would, you know, tell you what
16 to do.
17      Q       You used a word.  I could tell it
18 was a word that I didn't understand.
19      A       Halachic.
20      Q       What does that mean?
21      A       It means just according to Jewish
22 law.  That's all.
23      Q       You would have to seek a
24 Halachic --
25      A       Authority.

C. Grossbaum - Redirect                    191

1       Q       Now, I think you said that you had
2  been using birth control and then switched to a
3  spermicide, so when you said "birth control," did
4  you mean the pill?
5       A       Yes.
6       Q       Did you speak to your rabbi in
7  order to get this exemption to go on birth
8  control?
9       A       Yes.
10      Q       And that's the rabbi of a synagogue
11 that's a mile away?
12      A       No, we don't really have a personal
13 relationship with him.
14      Q       Is that Zalman Wilshanski?
15      A       The rabbi of the synagogue.
16      Q       A mile away?
17      A       Yes.
18      Q       I want to make sure my notes are
19 right because I have scribbling all over.  That's
20 who that person is.  You said you don't really
21 have a personal relationship with him?
22      A       No.
23      Q       Before Rosie was born, how often
24 did you attend synagogue there?
25      A       We didn't live in New York before

C. Grossbaum - Redirect                    192

1  she was -- we didn't live in New Jersey before she
2  was born.  We lived in New York.
3       Q       You moved here after she was born?
4       A       No.
5       Q       What rabbi did you seek out for you
6  to obtain approval to use birth control?
7       A       That was discussed when we spoke
8  with Rabbi Tendler.
9       Q       You had spoke to Rabbi Tendler
10 before about these PGD issues and in order to talk
11 about birth control?
12      A       Yes.  It was all in the same
13 conversation.
14      Q       You only spoke to him once?
15      A       Yes.
16      Q       And when was that?  What year?
17      A       2002 I guess, before I got married.
18      Q       I thought you spoke to Rabbi
19 Tendler after getting to him through a few other
20 rabbis.  Am I wrong about that?
21      A       Yes.
22      Q       I thought you had a chain of rabbis
23 that led you to him.
24      A       Yes.
25      Q       And that chain of Rabbi was who,

C. Grossbaum - Redirect                    193

1  from who?
2       A       Rabbi Markowitz suggested that we
3  meet with him, and he set up the meeting.
4       Q       And this occurred in 2002?
5       A       I believe so.
6       Q       Are you saying at that time in 2002
7  you spoke about the issue of you getting approval
8  to go on birth control and the other issues that
9  you discussed before about amniocentesis and CVS
10 and abortion?
11      A       Yes.
12      Q       You talked about all those things
13 at once?
14      A       Yes.
15      Q       What was your reason for asking him
16 for Halachic authority to be allowed to use birth
17 control?
18      A       What was my reason?
19      Q       Don't you need to give him a reason
20 for him to allow you that exemption?
21      A       We would discuss the whole idea of
22 what we would do, and he understood why we needed
23 -- it was part of the whole conversation of both
24 being carriers for CF.  We didn't want to just
25 wing it and get pregnant naturally with CF, so we

C. Grossbaum - Redirect                194

1   would do the IVF.
2        Q       So if I understand right, because
3   you knew you were both carriers, you talked to him
4   about it, and he said it was okay if you use birth
5   control until you do IVF?
6        A       Correct.
7        Q       Is Rabbi Tendler the rabbi of a
8   particular synagogue?
9        A       I believe he is, but I don't know
10  the name of it.
11       Q       If I wanted to find him, do you
12  have an address for him?
13       A       Not off the top of my head, no.
14       Q       But could you get his address?
15       A       Yes.
16       Q       *I'm going to ask that you supply
17  to Mr. Stein the whereabouts of Rabbi Tendler.
18  He's in New York State.  Correct?
19       A       Yes.
20       Q       I'm going to ask that you supply
21  that to him, and ask Mr. Stein to supply it to me.
22               MR. EICHHORN:  Thank you.
23
24  RECROSS-EXAMINATION BY MR. LEUCHTMAN:
25       Q       Did you ever — and I don't recall

C. Grossbaum - Recross by Mr. Leuchtman        195

1   your answer and it's been a long day I'm sure for
2   all of us, but did you ever see Dr. Hughes' final
3   report on July 19?
4        A       I don't know if I saw his — I saw
5   reports.  I don't know who specifically they were
6   from.
7        Q       The cover sheet of his final
8   report — and maybe it's a fax transmittal to the
9   NYU IVF team, "Attached is the final data for PGD
10  results for your patients Chaya Morgenstern and
11  Menachem Grossbaum PGD for two mutations in the
12  CFTR July 2004 IVF cycle," and then it goes on.
13  I'm asking you first of all if you've ever seen
14  this.  "If the couple chooses a transfer with this
15  partial data set those samples disclaim, the gene
16  allele at G542X would be predicted uneffected
17  assuming no allele dropout.  However, allele
18  dropout is possible in compound heterozygote
19  testing such as this and even more likely given
20  the embryo quality."
21               Do you remember any of that, that there
22  was a risk of allele dropout, in other words, the
23  embryo changing while it was in utero?
24       A       Yes.
25       Q       He goes on to say, "Therefore,

C. Grossbaum - Recross by Mr. Leuchtman        196

1   follow-up amniocentesis or CVS would be essential
2   in this setting.  The couple understands this."
3        Q       Do you recall Dr. Hughes saying that in
4   this —
5        A       About the amnio?
6        Q       Yes.
7        A       In this report?  No, I don't ever
8   recall seeing that report.
9        Q       And you're saying that is not
10  correct, that you did not understand that amnio or
11  CVS was essential in this clinical picture?
12       A       Specific to this report?
13       Q       Yes.
14       A       No.
15               MR. LEUCHTMAN:  Thank you.
16
17  FURTHER REDIRECT EXAMINATION BY MR. EICHHORN:
18       Q       Dr. Hughes issued a report dated
19  July 19, three pages long, and in that report he
20  says at the end — I'm going to read it for you
21  and then I'm going to ask you a question about it.
22  The last sentence of this report says, "Should a
23  pregnancy ensue, Chaya Morgenstern has agreed to
24  undergo conventional prenatal testing to confirm
25  these microgenomic experimental results."

C. Grossbaum - Redirect                197

1        Q       Is it your testimony that that statement
2   in this report is untrue?
3        A       I didn't say that I was going to
4   get testing.  I understand that they said that is
5   what is suggested, but I never said that I would
6   do it.
7        Q       This statement in this report says
8   you have agreed to undergo it, so my question to
9   you is, are you saying that this statement in this
10  report is untrue?
11       A       Yes.
12               MR. LEUCHTMAN:  Off the record.
13  (A discussion takes place off the record.)
14               MR. LEUCHTMAN:  Just for the
15  record, this is a four-page document consisting of
16  a cover page and three-page report all dated July
17  19, 2004.
18               MR. EICHHORN:  Are you done?
19               MR. LEUCHTMAN:  I just wanted to
20  jump in.
21               MR. EICHHORN:  That's what I'm
22  asking.  You're done or you're still going?
23               MR. LEUCHTMAN:  I am done.
24  BY MR. EICHHORN:
25       Q       Do you remember answering written

# EXHIBIT 10

# Preimplantation Genetic Diagnosis

## <u>Patient Informed Consent</u>

### <u>Consent for Participation in Research Activities</u>

<u>Title of Project</u>:     Preimplantation Diagnosis for Families with High Genetic Risk

<u>About this informed consent</u>:  An informed consent is really a *process* rather than just a form. . This is why we have spent considerable time with you discussing all of your reproductive options, not just those involving this research protocol.  By now you should know that there are more conventionally accepted medical options to having a genetically unaffected baby.  For personal reasons you have found these other "traditional" options unsatisfactory for your family and you are considering enrollment in the Preimplantation Genetic Diagnostic (PGD) program.  From the information you have received, you should be familiar with both *in vitro* fertilization and the molecular diagnosis of the inherited disease in your family.  You should understand that this is a research technology, and in no way should be construed as "routine" medical care.  It is important that you feel comfortable with, and knowledgeable about, the information that we have given you concerning this research.  Below is a summary of the most pertinent aspects of the PGD-IVF program.  *You should feel free to ask any and all questions you have about it.*  If you are undergoing the initial DNA testing or reproductive aspects of this process at a center distant from our program in Michigan, your doctors in genetics and reproductive medicine are logically your first source of information.  However, we are available to assist you in understanding this process, so please call us if you have questions.

<u>Overview</u>:  You are invited to participate in a research study.  *In vitro* fertilization and embryo transfer is a routine procedure offered to infertile couples to assist them in obtaining a pregnancy.  While you are not necessarily infertile, we know from prior genetic studies that the two of you have a high likelihood of bearing a child with a severe genetic disorder, and/or you have a member of your family who could potentially benefit from this research.  Our research combines the technologies of *i)* in vitro fertilization (IVF); *ii)* micromanipulation and embryo biopsy; *iii)* genetic analysis of the biopsy material for potentially abnormal gene(s) and; *iv)* uterine transfer of the potentially normal embryo(s) to the donor mother.  Biopsy is the process by which a single cell(s) is removed from the embryo for genetic analysis.  Each of the steps involved in this protocol is outlined below.

<u>Background Genetics</u>:  You are at a significantly increased risk of conceiving a child with a severe genetic disorder, or you have a child who could benefit from single cell DNA diagnostics.  It is important that you understand that you have other reproductive options not involving this research protocol.   You could elect not to have any (additional) children.  Alternatively, adoption is a choice of many couples.  Others choose artificial insemination or oocyte (egg) donation by an anonymous donor who has tested negative for the gene mutation.  Many couples decide to assume the genetic risk, begin a pregnancy by natural means, and test prenatally by amniocentesis or chorionic villus sampling.   You have received private counseling regarding these options.

131357762000
131357762000   WAYNE STATE GENETICS                                    250 P04   MAY 02 '02   09:

If you elect to participate in this research project, it may be necessary for us to retest you blood to confirm the genetic information you have as well as to see if our methods ca detect the particular genetic error in your family. Sometimes, the testing that has alread been performed for your family is not suitable for clinical use, and we need to repeat it an confirm the results. (*Please initial*)

**Man**   **Woman**

_MmG_   _CRM-G_    I give permission for chromosome/DNA testing to be performed on me,

[and my minor child(ren) if medically appropriate], in order to identify o confirm the genetic information necessary to participate in this research study.

_MmG_   _CRM-G_    I understand that these genetic methods cannot predict all birth defects

or genetic disorders. The objective will be to test for just the specific inherited condition(s) involving my family.

**In Vitro Fertilization:** IVF has resulted in the birth of over a million babies around the world to couples who are otherwise infertile. While you are not necessarily infertile, most of these same medical techniques and procedures will be used in obtaining the eggs and fertilizing them outside of the body. You have received personal reproductive counseling by your physician(s), and again by the IVF counselor-coordinator. IVF itself is not considered "research" since it is in routine practice throughout the world. However, there are risks involved that are important for you to understand. You have read, been counseled, asked any questions you might have, and signed the Consent Form(s) pertaining to (*Please initial*:

**Man**   **Woman**

_MmG_   _CRM-G_    Disclosure and Consent to *In Vitro* Fertilization and embryo transfer

(or similar such document at your clinic)

_MmG_   _CRM-G_    Disclosure and Consent for embryo cryopreservation (freezing)

(or similar such document at your clinic; if appropriate)

When ovarian stimulation is complete her eggs will be retrieved by transvaginal ultrasound and described on the separate IVF consent form. The retrieved eggs are then inspected and graded prior to insemination with the man's sperm. The laboratory procedures are state-of-the-art and subject to modification at the discretion of the IVF team to improve the likelihood of pregnancy.

**Biopsy of the Pre-embryo:** The experimental portion of this research project begins at this step. Approximately three days after fertilization, a biopsy will be performed with the removal by micromanipulation of one or two cells (blastomeres) from the 4-8 cell embryo. After the micromanipulation, the embryos will either be returned to culture or frozen to allow in-depth genetic analysis of the biopsied cell(s). The genetic findings from this research

13135776200   13135776200   WAYNE STATE GENETICS

250 P05    MAY 02 '02   09:1

study is combined with information regarding the embryology (the quality of the dividing cells), and then you and your Reproductive Endocrinologist(s) decide which, if any, of the embryos will be transferred to the uterus to begin the pregnancy. Embryos that have are not genetically or morphologically suitable for uterine transfer are not transferred.

Many families who have undergone this process before you have donated their unused embryos in order for your doctors to develop new DNA/chromosome tests which, in turn, help other couples. If you choose to donate your untransferred embryos to research, they will not be further grown as embryos and they will not be given to any other patient. Your doctors will use them in an ethically responsible way to understand more about the disease in your family and to develop new PGD tests to assist future families needing this technology. Untransferred embryos that are not cryopreserved for us will be: (*Please initial your choice*)

**Wife   Husband**

CRMG   /MMF

Used for research purposes at the discretion of the investigator, to understand the molecular basis of inherited birth defects and to assist in the development of PGD testing on other diseases for other families.

CRMG   MMF

Allowed to dissolve in culture and be discarded.

**Background Information on the Risks Involved:**   The post fertilization time period is an early stage in embryo development, before it has implanted into the mother's uterus. At this early stage the embryo is relatively undifferentiated. This means that the cells seem to have identical potential to ultimately become the placenta, membranes, fetus or any organ system. Numerous animal studies and also human twin studies have shown that the microsurgery of the embryo does not seem to affect the normal development of the baby. This biopsy procedure has been performed on embryos at centers in the United States and around the world beginning in 1991. Currently, the combination of the biopsy procedure with genetic testing can identify some of the characteristics that would lead to birth defects and genetic disease. However, since this is a relatively new procedure, the success rate of identifying these problems is unclear. Thus far, there is no evidence that deleterious effects have occurred from the biopsy process.   At present, we are uncertain of all of the potential risks that could occur as a result of the microsurgery.

In order to monitor the success rates of this technology, you agree that between ten and fifteen weeks of pregnancy you will undergo conventional prenatal genetic testing in the form of chorionic villus sampling (CVS) or amniocentesis. The sample will be used to confirm the predicted PGD test results. If any abnormality of the fetus is identified, or risk of genetic disorder is recognized, the implications of these findings will be discussed with you in detail.

## Specific Points Regarding Participation in this Research Project

This research protocol carries some potential risks. Below is a list of specific points pertaining to these procedures. Only those three marked with an asterisk (numbers 1, 5 and 6) are new to the preimplantation genetics protocol. The remaining points pertain to standard IVF, should also be part of your separate consent form(s) pertaining to the IVF procedures, and are included here for completeness:

1. *The purpose of this procedure is for us to obtain a pregnancy and to have a child that does not have the severe genetic disease for which we are at high risk, and/or to assist a child we have currently that could benefit from this research procedure via cord blood transplantation;

2. We will be enrolled in standard IVF protocols as conducted by our reproductive endocinologists and embryologists. The normal and high standards of care in this medical setting will be used. We have read and understand the risks and benefits of ovulation-induction as outlined on a separate consent form(s);

3. If pregnancy occurs, there is a risk of multiple gestation (multiple fetuses), miscarriage, ectopic pregnancy such as in the fallopian tube requiring further treatment, and abnormalities in the fetus/child such as, but not limited to, congenital anomalies or embryonic/fetal death or stillbirth;

4. Fertilization may fail to occur, the embryos may fail to develop or grow, or the growth may be abnormal;

5. *A laboratory or transportation accident may result in loss or damage to the egg, sperm or embryos. Specific data provided to us by others prior to your testing could be inaccurate, leading potentially to a misdiagnosis. The specific genetic test used in this PGD protocol may fail to diagnose correctly the embryo as having (or not having) the DNA/Chromosome abnormality or molecular markers of interest.

6. *The genetic testing will be performed on a single cell. This pushes the molecular technology to its theoretical and practical limits. This research is relatively new and not widely available. There is a possibility that a misdiagnosis may be made on any one of the embryos prior to uterine transfer, or that the actual process of testing may adversely affect the development of the fetus;

7. Any or all of the embryo(s) may not survive freezing or thawing if cryopreserved;

8. The pregnancy may not be normal even if implantation occurs in the uterus. There is a risk for loss of the fetus or neonate, and there is an unknown risk for congenital abnormalities or other problems with the newborn.

## Confidentiality.

You should understand every effort will be made to maintain the confidentiality of your medical records and research material within legal limits; however, absolute confidentiality cannot be guaranteed. You also understand that your names and other information that could be associated with your family will not be disclosed without your expressed written consent. It will be necessary for the doctors and scientists involved directly in your care to exchange medical information about you, and you will have the opportunity to approve or deny this exchange of material. Data generated within the PGD program will be presented in scientific format with your anonymity maintained, unless you authorize otherwise in writing.

## Risk & Injury.

IN THE EVENT OF INJURY RESULTING FROM THIS RESEARCH, THE UNIVERSITY AND/OR THE DETROIT MEDICAL CENTER, ARE NOT ABLE TO OFFER FINANCIAL COMPENSATION NOR ABSORB THE COSTS OF YOUR MEDICAL TREATMENT. HOWEVER, NECESSARY FACILITIES, EMERGENCY TREATMENT AND PROFESSIONAL SERVICES WILL BE AVAILABLE TO RESEARCH SUBJECTS, JUST AS THEY ARE TO THE COMMUNITY GENERALLY. MY SIGNATURE BELOW ACKNOWLEDGES MY VOLUNTARY PARTICIPATION IN THIS RESEARCH PROJECT, BUT IN NO WAY RELEASES THE INVESTIGATORS FROM THEIR PROFESSIONAL AND ETHICAL RESPONSIBILITY TO ME.

## Final Comments.

If you have undergone or will be undergoing diagnostic and therapeutic care (DNA/chromosome testing, reproductive care etc) at another institution (University, Clinic, Hospital, Company) not formally affiliated with Wayne State University, it is likely that you will have a separate consent form pertaining to that institution. This Informed Consent does not supercede or replace the one you accept from that/those institution(s).

You understand that your participation in this procedure is voluntary and that your refusal to participate will involve no penalty or loss of benefits to which you would otherwise be entitled. If you agree to participate, you (or your legal representative) may change your mind about participating at any time.

You understand that your signature indicates that you have read and understand the above information. You have discussed this procedure in detail with the Principle Investigator or your geneticist and/or genetic counselor, and your reproductive endocrinologist/gynecologist. Your signature below indicates that you wish to have your oocytes fertilized for the purpose of preimplantation genetic analysis.

If you have any additional questions later, you can contact any of your doctors.

| | | | |
|---|---|---|---|
| _Chya R Grosh_ | 6/04/04 | | 6/4/04 |
| Woman's Signature | Date | Man's Signature | Date |
| _Mark Hughes_ | 7/16/04 | | 6/4/04 |
| Principal Investigator | Date | Witness | Date |

PGD Informed Consent Page 5 of 5

# EXHIBIT 11

```
 1                             UNITED STATES DISTRICT COURT
                               FOR THE DISTRICT OF NEW JERSEY
 2                             DOCKET NO. 07-CV-359

 3  _____
    CHAYA GROSSBAUM and MENCHEM           )
 4  GROSSBAUM, her spouse,                )
    individually, as guardians ad        )
 5  litem of the infant, ROSIE           )
    GROSSBAUM,                            )
 6                                        )
                          Plaintiffs,    ) DEPOSITION OF:
 7                                        )
         v.                               ) FREDERICK LICCIARDI
 8                                        )
    GENESIS GENETICS INSTITUTE,           )
 9  L.L.C., of the State of Michigan,    )
    MARK R. HUGHES, M.D., NEW YORK        )
10  UNIVERSITY SCHOOL OF MEDICINE and    )
    NEW YORK UNIVERSITY HOSPITALS         )
11  CENTER, both corporations in the     )
    State of New York, ABC                )
12  CORPORATIONS 1-10 and JOHN DOE       )
    1-10,                                 )
13  ----------------------------------   )

14          T R A N S C R I P T of the stenographic notes of

15  the proceedings in the above-titled matter, as taken by

16  PHILIP A. FISHMAN, a Certified Shorthand Reporter and

17  Notary Public of the State of New Jersey, held at the

18  offices of Dr. Frederick Licciardi, 660 First Avenue,

19  New York, New York, on Wednesday, March 11, 2009,

20  commencing at 3:00 in the afternoon.

21

22
                          PHILIP A. FISHMAN
23                     COURT REPORTING AGENCY
                      89 Headquarters Plaza North
24                            14th Floor
                     Morristown, New Jersey 07960
25                (973)285-5331 - FAX (732)605-9391
```

2

```
 1   A P P E A R A N C E S :

 2

 3   NUSSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON, ESQS.
     BY:   LEWIS STEIN, ESQ.
 4   Appearing on behalf of the Plaintiffs

 5

 6   STEPHEN N. LEUCHTMAN, P.C.
     BY: STEPHEN N. LEUCHTMAN, ESQ.
 7   Appearing on behalf of the Defendant Genesis Genetics
        Institute, L.L.C., and Dr. Hughes
 8

 9
     MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.
10   BY:   R. SCOTT EICHHORN, ESQ.
     Appearing on behalf of the Defendants New York
11      University School of Medicine and New York University
        Hospitals Center
12

13

14                       *          *          *

15

16

17

18

19

20

21

22

23

24

25
```

37

15:49:30 1 fragmentation or granularity?

15:49:33 2    A. Yes.

15:49:33 3    Q. What does "granularity" mean?

15:49:?? 4    A. "Granularity" means if you look inside a cell and

15:4?:?? 5 see dark areas or granular areas.

15:49:40 6    Q. And that's a negative characteristic for ultimate

15:49:45 7 gestation?

15:49:45 8    A. We are not sure. We make note of it, but we are

15:49:49 9 not sure if that means much.

15:49:51 10    Q. Okay. And what about after "Embryo Description,"

15:49:59 11 we have a column known as "AH"?

15:50:01 12    A. That stands for "assessed hatching," which

15:50:05 13 "assessed hatching" means opening the shell, as I have

15:50:08 14 described, and it also in handwritten is "right biopsy"

15:50:13 15 above that.

15:50:15 16    Q. Okay. And we only have checkmarks.

15:50:17 17    Can I assume then that those cells with

15:50:24 18 checkmarks were biopsied?

15:50:25 19    A. Yes.

15:50:25 20    Q. What's the last column?

15:50:27 21    A. "Disposition," what do we end up doing with the

15:50:31 22 embryo, and "C" means "culture" and "D" means "discard"

15:50:36 23 and "R" means "research."

15:50:38 24    Q. Okay. Now, we have a day four?

15:51:13 25    MR. EICHHORN: What does "R" mean?

38

15:51:15 1    MR. STEIN: "Research."

15:51:18 2    THE WITNESS: "Research."

15:51:26 3    I don't have a day four.

15:51:27 4    Generally, we do not assess the embryos on

15:51:31 5 day four. Sometimes we do, but we may not.

15:51:33 6    Q. Would day three, when there is a biopsy, would

15:51:37 7 those cells then be sent to the laboratory, Genesis

15:51:41 8 Genetics, for analysis?

15:51:42 9    A. Yes.

15:51:42 10    Q. Now, at that time all of the cells are just

15:51:49 11 single cells from each embryo. Is that correct?

15:51:53 12    MR. EICHHORN: I am sorry.

15:51:54 13    Could you read that back?

15:51:55 14    (Whereupon, the court reporter reads as

15:52:05 15 requested.)

15:52:05 16    MR. STEIN: Let me withdraw that question.

15:52:07 17    I am going to make it a more precise

15:52:09 18 question.

15:52:09 19    MR. EICHHORN: Okay.

15:52:10 20    Q. Do I understand then, when the biopsy takes

15:52:12 21 place, a single cell has been retrieved from each of the

22 embryos that are designated and sent for analysis to

15:52:20 23 Genesis Genetics?

15:52:21 24    A. Yes.

15:52:21 25    Q. Is there any evaluation of the quality of the

39

15:52:29 1 cells or the quality of the embryos at the time that the

15:52:36 2 cells are sent to Genesis Genetics for evaluation?

15:52:42 3    A. We just make note if they are intact or not, in

15:52:45 4 other words, if the cell was ruptured or not during the

15:52:47 5 biopsy procedure.

15:52:50 6    Q. Are there any other characteristics of those

15:52:53 7 cells that are sent that are important to determine

15:52:56 8 their utility and later implantation?

15:52:59 9    A. No.

15:52:59 10    Q. Okay. What is the -- after the biopsy is taken

15:53:13 11 and the cells sent to Genesis Genetics -- by the way,

15:53:17 12 how are they sent?

15:53:18 13    A. I don't know.

15:53:22 14    Q. I take it that you, as a doctor, are not involved

15:53:26 15 in that mechanism by which these things go from a

15:53:30 16 laboratory to laboratory?

15:53:30 17    A. Correct.

15:53:32 18    Q. What's the next involvement of NYU in connection

15:53:37 19 with the cells that are sent to Genesis Genetics?

15:53:49 20    MR. EICHHORN: You mean after they send them

15:53:49 21 what do they do next with them?

15:53:49 22    MR. STEIN: Right.

15:53:49 23    What's the next involvement of NYU with

15:53:49 24 regard to either those cells or the results of

15:53:50 25 the analysis? What's the next thing that

40

15:53:53 1 happens?

15:53:53 2    A. We receive information from the testing

15:53:55 3 laboratory about the cells.

15:53:56 4    Q. And who gets that information?

15:53:59 5    A. The laboratory.

15:54:00 6    Q. The laboratory here at NYU?

15:54:02 7    A. Yes.

15:54:03 8    Q. What does the laboratory do with that

15:54:04 9 information?

15:54:05 10    A. They examine the information and then they will

15:54:09 11 bring the findings to one of the physicians.

15:54:11 12    Q. Okay. In connection with Mrs. Grossbaum, to whom

15:54:18 13 were those findings brought?

15:54:19 14    A. To me.

15:54:21 15    Q. And are those findings of the laboratory, that

15:54:27 16 is, the laboratory that did the genetic analysis,

15:54:30 17 included in the chart?

15:54:31 18    A. Yes.

15:54:33 19    Q. And do you have those results in this chart?

15:54:35 20    A. Yes.

15:54:38 21    Q. And after you get the results, do you make a

15:54:43 22 determination as to whether the embryos are -- where was

15:54:44 23 that?

15:54:44 24    After you get the results of the analysis by

15:54:48 25 Genesis Genetics, was it you who made the determination

41

43

1  as to the suitability of any embryos for invitro

2  fertilization?

3      A.  That determination is made in conjunction with

4  myself and the laboratory person who is in charge of the

5  case.

6      Q.  And who was the person -- laboratory person in

7  charge of the eggs here?

8      A.  Alexis Adler.

9          MR. LEUCHTMAN:  I am sorry.

10         I didn't catch that.

11         THE WITNESS:  Alexis Adler.

12         MR. LEUCHTMAN:  Thank you.

13     Q.  Can you tell me a little bit Alexis Adler, what

14  is her background and qualifications?

15     A.  Alexis Adler has been doing invitro fertilization

16  since before 1992, probably before 1988.

17         I don't know the exact date.

18     Q.  Okay.  And is she a nurse?  Is she -- does she

19  have any other special training other than experience

20  here in the invitro fertilization laboratory?

21     A.  That's her role, laboratory personnel.

22     Q.  Okay.  So then -- but you are, I take it, the

23  ultimate determinant as to whether the embryos are

24  suitable for invitro fertilization.  Is that correct?

25     A.  That is correct.

1          please.

2          MR. LEUCHTMAN:  You are marking the page.

3          Is this the page, Morganstern Grossbaum

4  results?

5          MR. STEIN:  That's correct.

6      Q.  Doctor, I show you a document which we have

7  marked P-6 for identification and ask you if you have

8  the actual chart copy of that document?

9      A.  Yes, I do.

10     Q.  And is that an accurate photocopy?

11     A.  It is.

12     Q.  Okay.  Now, Doctor, is this the report that you

13  received from Genesis Genetics?

14     A.  Yes.

15     Q.  Did you receive anything else from Genesis

16  Genetics regarding the studies that were done at Genesis

17  Genetics?

18     A.  This was the page that I used.

19     Q.  Okay.  But you didn't answer the question.

20     A.  Yes, there are other records from Genesis in the

21  chart.

22     Q.  Okay.  Regarding the results of this study?

23     A.  Yes.

24     Q.  Could you show me what they are?

25     A.  Sure.

42

44

1      Q.  Okay.  Do you have the record of what was

2  reported to you by Genesis Genetics?

3      A.  Yes.

4          MR. EICHHORN:  I wonder if we should close

5  that window.  It's getting pretty loud.

6          MR. STEIN:  Were you -- if you would like to

7  do it.

8          MR. LEUCHTMAN:  Some kind of interference.

9          I am getting a sort of buzzing kind of

10  noise.

11         Does somebody have something near the

12  speaker?

13         THE WITNESS:  A jackhammer.

14         MR. EICHHORN:  Yes.  Some power equipment

15  outside.

16         MR. LEUCHTMAN:  Okay.  It's only been doing

17  it the last couple --

18         MR. EICHHORN:  The doctor closed the window.

19         MR. LEUCHTMAN:  That's much better.

20         MR. EICHHORN:  Thank you.

21         THE WITNESS:  Sure.

22         MR. EICHHORN:  Did we have a question

23  pending?

24         MR. STEIN:  Yes.

25         MR. STEIN:  Would you mark this a number,

1          MR. EICHHORN:  I think those were these.

2          He is referring to these, which I sent to

3  him.

4          THE WITNESS:  I see.

5          MR. STEIN:  Okay.  Let me see what you are

6  referring to.

7          MR. EICHHORN:  Well, there is a letter here.

8          I can show you what the documents are.

9          The letter is from the person at the

10  hospital, so I will take that off, but these are

11  the records I sent to him.

12         MR. STEIN:  Well, at this juncture there is

13  a question on the table.

14     Q.  And that question is, what is in the chart from

15  Genesis Genetics regarding their studies of this

16  patient's embryos other than the page which we have

17  marked P-6 for identification?

18     A.  There is nothing else.

19     Q.  Okay.  May I see -- may I see the chart, please.

20         MR. EICHHORN:  Don't forget to give those

21  back to me.

22         MR. STEIN:  We won't.

23     Q.  Okay.

24         MR. STEIN:  I am going to put a sticker on

25  this page and then I am going to show it to you.

53

1    A.  Yes.

2    Q.  Did that discussion take place?

3    A.  Yes.

4    Q.  And is there a record of that discussion in your

5  chart?

6    A.  There is not, but it's -- I wouldn't do a

7  transfer in a scenario like this without having a

8  discussion about it.

9    Q.  And what does the "scenario like this" mean?

10    A.  Where there is an embryo biopsy and results need

11  to be discussed, et cetera.

12    Q.  Do you discuss it with every family that has an

13  analysis of PGD testing for a potential cystic fibrosis

14  baby?

15    A.  Yes.

16    Q.  And what did you tell the family here?

17    A.  That she has had an analysis of her embryos and

18  there are really two analysis.

19         There is the genetic analysis that Dr. Hughes

20  provided, but there is also our analysis how well the

21  embryos are growing, and we need to use both of those

22  specific information to determine which embryos to

23  transfer.

24         In other words, if we have an embryo that's a

25  nonaffected cystic fibrosis embryo, but it's a very poor

54

1  looking embryo, then that embryo will have a low

2  priority for transfer.

3         If we have a beautiful embryo that's a cystic

4  fibrosis embryo, that embryo will not be transferred.

5         If we have an embryo that looks very nice and

6  maybe a carrier or is a carrier, then that transfer may

7  be -- that embryo may be a candidate for transfer.

8    Q.  That's because only one of the two genetic

9  materials is a carrier.  Is that right?

10    A.  Yes.  Abnormal.  Only one of the two is abnormal.

11    Q.  Okay.  Four and seven samples are described, four

12  and seven samples are described by Dr. Hughes as

13  "Carrier at worst."  Is that right?

14    A.  Yes.

15    Q.  And is it -- does it ever say "carrier at best"?

16    A.  I don't see that written here.

17    Q.  Does that mean anything, the words "Carrier at

18  worst," to you?

19         MR. EICHHORN:  "Carrier at worst"?

20         MR. STEIN:  Yes.

21         MR. EICHHORN:  Does it mean anything?

22    A.  Yes.

23    Q.  It means it's suitable for transplant?

24    A.  It means the worst-case scenario would be that

25  that embryo is a carrier.

55

1    Q.  A "carrier," a carrier by one of the two parents?

2    A.  By one or the other, yes.

3    Q.  But not both?

4    A.  Correct.

5    Q.  Okay.  Now we get down to eight, it says,

6  "Carrier maternal okay for transfer."

7         What does that mean?

8    A.  That means that that embryo is a carrier and they

9  had completed genetic -- they had received genetic

10  results on both the CF10 and CF11.

11    Q.  And that one is okay for transfer?

12    A.  According to Dr. Hughes, yes.

13    Q.  But he doesn't say that seven is okay for

14  transfer or that four is okay for transfer?

15    A.  No, he doesn't say it's not okay for transfer.

16    Q.  Okay.

17         MR. STEIN:  Can someone tell me what the

18  bells are?

19         MR. EICHHORN:  It's my phone.

20         I am sorry.

21         MR. STEIN:  That's okay.

22    Q.  In this case an election was made to transfer not

23  eight and ten, but two other -- but other embryos.  Is

24  that right?

25    A.  That's right.

56

1         MR. EICHHORN:  Objection to the form.

2    Q.  What embryo samples were implanted in invitro

3  fertilization?

4    A.  Embryo No. 7 and Embryo No. 8.

5    Q.  And ten was not acceptable because of the

6  condition of the embryos at the time you determined

7  implantation.  Is that right?

8    A.  That's correct.

9    Q.  Now, did the cells continue to divide while in

10  the possession of Genesis Genetics?

11    A.  I don't know.

12    Q.  Well, would Genesis Genetics have more than one

13  cell to examine from each of the embryos?

14    A.  Occasionally they do, but I don't see the

15  document that shows that one cell was sent per embryo.

16    Q.  I am sorry?

17    A.  One cell was sent per embryo.

18    Q.  So then Dr. Hughes would only have one cell per

19  embryo to examine and report on?

20    A.  That's correct.

21    Q.  On an occasion do you send more than one cell per

22  embryo?

23    A.  On occasion.

24    Q.  What determines whether you send more than one?

25    A.  I am not sure.

**57**

1   Q. Who makes that decision?

2   A. The laboratory. People in the laboratory.

3   Q. Okay. Were you told at all by Dr. Hughes that he

4 was disappointed with the results of his studies?

5   A. No.

6   Q. And were you told by Dr. Hughes that many of the

7 embryos were significantly behind in their development?

8   A. No.

9   Q. If you were told that, would that affect your

10 decision as to whether to implant?

11   A. No.

12   Q. Why not?

13   A. Because I haven't found that embryo growth has

14 anything to do with whether or not the analysis

15 represents the embryo.

16   Q. All right.

17     Well, do you know how he can make an analysis of

18 the embryo based on the single cell?

19   A. You mean the growth of the embryo?

20   Q. Yes.

21   A. No.

22   Q. All right.

23     Do you find that unusual for a laboratory to make

24 a comment on the growth of the embryo?

25   A. I am not sure what information he had, so I don't

**58**

1 think I can comment.

2   Q. Well, don't you, as the physician, usually know

3 what information is given to the laboratory for their

4 analysis?

5   A. I know that they receive a cell to analyze.

6     If he is given any information about the growth

7 of the other embryos, I am not sure.

8   Q. Okay.

9     Do you consider the set that he had, the set

10 of -- samples to be less than optimal?

11   A. I am sorry.

12     I don't completely understand the question.

13   Q. Okay. Well, do you think that most of the cells

14 that he was sent were of poor quality and would not be

15 helpful?

16   A. No.

17   Q. Now, are you familiar with the mechanisms that

18 Dr. Hughes used, that is, his laboratory used, to make a

19 determination in the presence of the cystic fibrosis in

20 these embryos?

21   A. I am not.

22   Q. From your knowledge, is there anyone here, at the

23 -- at the Fertility Department, who has that capacity by

24 virtue of your discussions with them?

25     MR. EICHHORN: What capacity specifically?

**59**

1   Q. Capacity to determine the nature of the studies

2 done at a laboratory such as Genesis Genetics?

3   A. I wouldn't know.

4   Q. Is the number of cells at the time of biopsy at

5 all significant in terms of the viability of those cells

6 for implantation?

7     MR. EICHHORN: I am sorry.

8     Could you read that back?

9     (Whereupon, the court reporter reads as

10 requested.)

11   A. Yes.

12     MR. EICHHORN: Objection to the form.

13     I don't understand it.

14     If you understand it.

15     MR. LEUCHTMAN: Viability or suitability?

16     MR. STEIN: To me those two are -- words are

17 synonymous.

18     MR. LEUCHTMAN: They are not.

19   Q. Do you think they are not?

20   A. I do think they are not.

21     MR. LEUCHTMAN: I object to the form of the

22 question.

23     Now, he can try to give an answer or

24 rephrase it.

25     It's up to you.

**60**

1   Q. Why don't you think that's --

2   A. Well, "suitability" implies genetics, and

3 "viability" assumes nongenetics.

4   Q. Okay. So then I will rephrase the question and

5 ask you, are the number of cells at the time of biopsy

6 an indication of suitability for implantation?

7   A. I don't believe so.

8   Q. Is that the general -- is there literature

9 discussing this subject?

10   A. I am not aware.

11   Q. Were you struck by the fact when you looked at

12 this report from Genesis Genetics by the fact that only

13 three of the ten samples sent containing the DNA from

14 the husband, were able to be analyzed?

15   A. No.

16   Q. Is that common, to your experience, that only

17 three out of ten samples allow one of the two partners

18 to be analyzed for the presence of the CF, cystic

19 fibrosis, mutation?

20   A. It's common for some cells not to be amplified.

21   Q. Well, you said "some."

22     When some reaches the number of 70 percent of the

23 cells of a single parent that cannot be analyzed, is

24 that a significant depreciation in the value of the

25 analysis done by the laboratory?

61

1     A. I don't know, because I am not completely
2 familiar with the techniques that Dr. Hughes is using in
3 his laboratory, so I don't know.
4     Q. Well, is it common for other laboratories to get
5 back or report that seven out of ten of one of the
6 mutations is not available for analysis?
7     A. It's more than average.
8     Q. Okay. Does the -- taking into consideration the
9 risk of allele drop out, does the fact that seven out of
10 ten of the samples did not allow a DNA analysis,
11 increase the risk of a false diagnosis?
12     A. This is something which Dr. Hughes would be an
13 expert on, and I am not sure.
14     Q. It doesn't fall within your expertise?
15     A. It does not.
16     Q. Well, suppose only one of the ten were reported
17 as having a DNA signal, would you be troubled by that
18 analysis by the laboratory in the advising of your
19 patient as to whether to go ahead with invitro
20 fertilization?
21     MR. EICHHORN: Objection to the form.
22 I think it's improper.
23     MR. LEUCHTMAN: I will join in that.
24     MR. EICHHORN: I think a hypothetical is an
25 improper question, but you can answer it if you

62

1 can.
2     A. I can't answer.
3     Q. Why can't you answer it?
4     A. Because every case is different.
5     Q. In what way?
6     A. Well, there may be certain circumstances which
7 may lead to a laboratory telling me that they only have
8 analysis on one.
9     Q. Let me ask you this: In this meeting that you
10 have indicated took place with Chaya Grossbaum and her
11 husband, I take it, both were present?
12     A. Yes.
13     Q. And what did you tell them?
14     A. Do you want me to go through the whole hour
15 consultation?
16     MR. EICHHORN: Well, I don't think he means
17 that meeting.
18 Do you mean the day of implantation?
19     MR. STEIN: Yes.
20     MR. EICHHORN: Or the first meeting?
21     Q. I mean after you got the report --
22     A. I see.
23     Q. -- from Genesis Genetics, you said you had a
24 meeting --
25     A. Yes.

63

1     Q. -- with the parents, Mrs. Grossbaum and Mr.
2 Grossbaum, regarding invitro fertilization of the
3 embryos that had been retrieved. Is that correct?
4     A. That is correct.
5     Q. And that meeting took place here in your office?
6     A. Yes.
7     Q. And what did you tell them at that time?
8     A. I told them that there are -- we see the results
9 for the analysis and there are embryos that had been
10 determined to be carriers, and according to the report,
11 Dr. Hughes' lab, they are carriers at worst and,
12 therefore, we feel comfortable transferring them.
13     Q. And that was -- and that was the extent of the
14 discussion --
15     A. Yes.
16     Q. -- you had with them? Is that correct?
17     A. That's correct.
18     Q. Do you know -- I may be asking this in a
19 different way, but I do -- do I understand you don't
20 have the expertise to explain why there is an inability
21 to get a signal from a particular gene cell that's being
22 analyzed?
23     A. I can tell you that I cannot be an expert in
24 everything that goes on in Dr. Hughes' lab and he can't
25 be an expert in everything that goes on here, so the

64

1 answer is I am not an expert in embryo biopsy DNA
2 genetics.
3     Q. Well, when you receive a report from a laboratory
4 such as Genesis Genetics, were you concerned about
5 allele drop out?
6     A. Allele drop out is a possibility. However, that
7 was signaled in Sample 2.
8 It said "ADO Paternal," allele drop out.
9     Q. Well, does that concern about allele drop out
10 apply to all of the samples that are being reported on?
11 We are waiting your answer.
12     A. Yes, you are.
13 I am sorry.
14     Q. That's okay.
15     A. Can you repeat -- repeat the question, please?
16 (Whereupon, the court reporter reads as
17 requested.)
18     A. I would have followed the recommendations of Dr.
19 Hughes, and if he told me that allele drop out was a
20 concern, I would have been concerned about it.
21     Q. And would you have advised the family of your
22 concerns in that case?
23     A. Yes.
24     Q. Okay.
25     MR. STEIN: Next one.

73

1    A.  That's in the consent form, so I do not.

2    Q.  And are you aware of why it's in the consent

3  form?

4    A.  Because errors can be made during the PGD

5  process.

6    Q.  And if errors are made during the PGD process,

7  then what does amniocentesis and CVS testing have to do

8  with the errors that are made?

9    A.  Well, a CVS testing would determine if the child

10  was affected with cystic fibrosis and the same for

11  amnio.

12    Q.  And once that was determined of what moment is

13  it?

14    A.  CVS sampling is performed at about ten or 11

15  weeks.

16       Amnio could be performed 16, 17, 18 weeks.

17    Q.  Okay.  And that tells the parents that their baby

18  has or has not cystic fibrosis.  Is that correct?

19    A.  Correct.

20    Q.  And what benefit is that to the parents to know

21  that at ten -- ten, at ten weeks or 16 weeks?

22    A.  Well, they may elect not to proceed with the

23  pregnancy based on those results.

24    Q.  Okay.  Is there any other reason to do those

25  tests other than to give the parents an opportunity to

74

1  elect whether to proceed with the pregnancy or not?

2    A.  Well, they may get other information unrelated to

3  the CVS testing.

4    Q.  Such as?

5    A.  Other chromosome abnormalities, information about

6  neurotube defects in the case of amniocentesis.

7    Q.  Okay.  And knowing those things, likewise, would

8  give the parents an opportunity to determine whether or

9  not they want to proceed with the pregnancy.  Is that

10  right?

11    A.  Correct.

12    Q.  Are there other tests which are given to the

13  parents, or to the mother, which would allow her to

14  assess the likelihood of one of those other

15  abnormalities without confirmatory information of CVS

16  testing or amniocentesis?

17    A.  There are blood tests that can be performed.

18  Ultrasounds can be performed.  They may not completely

19  rule out genetic, but it would certainly lower their

20  chance, lower their odds of having a genetic

21  abnormality, and possibly obviate the need for a CVS or

22  amnio.

23    Q.  In your experience with the Grossbaums, did they

24  ever not comply with any of requests made by your

25  department with regard to or how she was to prepare for

75

1  the invitro fertilization procedure or the PGD testing?

2    A.  No.

3    Q.  Do I understand from your prior answer, any

4  language contained in the consent form was generated by

5  others than you and since the form was executed by

6  others than you, it's not something that you involve

7  yourself with?

8    A.  Correct.

9    Q.  Are you aware of any people -- any of your

10  patients who had terminated the pregnancy upon the

11  receipt of PGD testing results?

12    A.  I am not.

13    Q.  Doctor, is there anyone here in the department

14  that you know as being identified as Evans, E-v-a-n-s?

15       MR. EICHHORN:  Someone by the name of Evans.

16    A.  Do you have any other names that go with that?

17       I am sorry.

18       I don't.

19    Q.  That's okay.  Were you aware or had it been

20  called to your attention that Genesis Genetics requires

21  a commitment to amnio or CVS testing before they would

22  do a study for PGD testing?

23    A.  Yes.

24    Q.  When did you become aware of that?

25    A.  I became aware of that -- that's part of Dr.

76

1  Hughes' policy, so since we have been working with Dr.

2  Hughes, that's been his policy.

3       I was -- that's my answer.

4    Q.  Okay.  Did you discuss this patient with Dr.

5  Hughes at all?

6    A.  I did not.

7    Q.  Okay.  Do you normally discuss any of Dr. Hughes'

8  studies with your patients?

9       (Whereupon, a discussion takes place off the

10       record.)

11    Q.  How did you ascertain it was Dr. Hughes' policy

12  to require it?

13    A.  Just through working here.

14    Q.  Through working here?

15    A.  Just through the relationship with him and

16  actually working with Dr. Grifo.

17       Dr. Grifo also explained to me early on that's a

18  requirement for PGD.

19    Q.  For everybody in PGD?

20    A.  Yes.  Yes.

21    Q.  I just have one or two questions that I know of.

22       Have you been aware -- maybe I asked this

23  before -- of any of the patients here at NYU's fertility

24  lab giving birth to a cystic fibrosis baby other than

25  the Grossbaums?

---

**77**

| | |
|---|---|
16:59:47 | 1    A.  I am not aware.  I cannot specifically cite a
17:00:16 | 2  case.
17:00:16 | 3         MR. STEIN:  Thank you.
| 4         MR. EICHHORN:  Okay.
...7 | 5    Steve, Lew is finished.
17:00:20 | 6         MR. LEUCHTMAN:  I don't have any questions.
17:00:21 | 7         MR. EICHHORN:  I just have a couple.
17:00:26 | 8         CROSS-EXAMINATION BY MR. EICHHORN:
17:00:26 | 9    Q.  Doctor, do you remember the Grossbaums?
17:00:27 | 10   A.  Yes.
17:00:28 | 11   Q.  Did Mr. or Mrs. Grossbaum ever say to you that
17:00:32 | 12  they would not undergo -- that she would not undergo
17:00:37 | 13  amnio or CVS?
17:00:40 | 14   A.  No.
17:00:41 | 15   Q.  If she had said that to you, would you have done
17:00:44 | 16  anything in response?
17:00:48 | 17        MR. STEIN:  Just a hypothetical that we are
17:00:49 | 18        allowed.
17:00:49 | 19        MR. EICHHORN:  Well, this goes to exactly
17:00:51 | 20        what your client said.  Sure.
17:00:53 | 21        MR. STEIN:  Okay.
17:00:54 | 22   A.  I would have made a note of it.
17:00:58 | 23   I would have said, "This patient is going to do
17:00:58 | 24  IVV, PGD, and is not going to have prenatal testing."
17:01:06 | 25   Q.  Okay.  So you told us about Dr. Hughes' policy.

---

**78**

| | |
|---|---|
17:01:10 | 1    What would have been your policy here?  You would
17:01:15 | 2  have allowed her to do it but noted it?
17:01:16 | 3    A.  That's correct.
17:01:18 | 4    Q.  Okay.  And if she told you that along with noting
17:01:23 | 5  it, would that have generated any discussion?
17:01:26 | 6    A.  Well, it would have generated the decision also.
17:01:28 | 7  It would have generated discussion A and B, she wouldn't
17:01:31 | 8  have signed the consent form.
17:01:33 | 9    What would have happened is, she would have
17:01:34 | 10  objected to signing the consent form, which sometimes
17:01:37 | 11  happens.  The nurse would have said, "Okay, fine, there
17:01:40 | 12  is an objection here."
17:01:41 | 13   She would have brought me the consent form or had
17:01:44 | 14  me speak to the patient to clarify the issue further.
17:01:50 | 15        MR. EICHHORN:  Okay.  That's all I have.
17:01:53 | 16        REDIRECT-EXAMINATION BY MR. STEIN:
17:01:53 | 17   Q.  Doctor, who in this case administered the consent
17:01:58 | 18  forms?
17:01:58 | 19   A.  Nurse Kaycian.
17:02:01 | 20   Q.  Pardon me?
17:0?:02 | 21   A.  Kaycian Brown.
     ↲ | 22   Q.  Is she still here at the hospital?
17:02:06 | 23   A.  She is not.
17:02:07 | 24   Q.  How long ago did she leave?
17:02:09 | 25   A.  I am not sure.

---

**79**

| | |
|---|---|
17:02:15 | 1    Q.  How do you spell her name?
17:02:22 | 2    We have that.
17:02:22 | 3    Thank you.
17:02:23 | 4         MR. EICHHORN:  Okay.  We are done.
17:02:24 | 5         MR. STEIN:  We are done.
17:02:25 | 6         MR. EICHHORN:  We are done, Steve.
17:02:27 | 7         MR. LEUCHTMAN:  Thanks, gentlemen.
17:02:28 | 8    See you tomorrow.
17:02:28 | 9         MR. STEIN:  Okay.
| 10              *     *     *

---

**80**

| | |
|---|---|
| 1              CERTIFICATION
| 2
| 3         I, PHILIP A. FISHMAN, a Notary Public and
| 4  Certified Shorthand Reporter for the State of New
| 5  Jersey, do hereby certify that prior to the commencement
| 6  of the examination, FREDERICK LICCIARDI was duly sworn
| 7  by me to testify the truth, the whole truth and nothing
| 8  but the truth.
| 9         I DO FURTHER CERTIFY that the foregoing is a true
| 10  and accurate transcript of the testimony as taken
| 11  stenographically by and before me at the time, place and
| 12  on the date hereinbefore set forth.
| 13        I DO FURTHER CERTIFY that I am neither a relative
| 14  nor employee nor attorney nor counsel of any of the
| 15  parties to this action and that I am neither a relative
| 16  or employee of such attorney or counsel, and that I am
| 17  not financially interested in the action.
| 18
| 19
| 20  Dated   3/31/09          PHILIP A. FISHMAN, C.S.R.
| 21                          A Notary Public of the
|                            State of New Jersey
| 22
| 23
| 24
| 25

# EXHIBIT 12

Morganstern-Grossbaum results – 07/19/2004

Patient: Chaya Morganstern-Grossbaum – carrier - Exon 11, G542X Nt1756g>t
Partner: Menachem Grossbaum – carrier - Exon 10. dF508Nt1652 delCTT

Locus ID: 1080        Chromosome: 7q31.2        Gene: CFTR
OMIM: 602421

Biopsy done 7/17/2004 – began 10 am EDT, completed 11 am EDT
Quality is 1-4, where 1 is best
20 total tubes – 10 cells, 10 blanks

| Sample | Quality | CF 10 | CF 11 | Call |
|--------|---------|-------|-------|------|
| 2 | 2-8c | No deletion | T only | Possibly affected – ADO paternal |
| 3 | 2-3c | No amp | No amp | No molecular signal |
| 4 | 2-4c | No amp | G | Carrier at worst |
| 7 | 2-7c | No amp | G | Carrier at worst |
| 8 | 2-8c | No deletion | G/T | Carrier maternal – OK for transfer |
| 9 | 2-4c | No amp | No amp | No molecular signal |
| 10 | 2-4c | No deletion | G/T | Carrier maternal – OK for transfer |
| 13 | 2-4c | No amp | G | Carrier at worst |
| 14 | 2.-7c | No amp | No amp | No molecular signal |
| 15 | 2-4c | No amp | G | Carrier at worst |
| CG | | No deletion | G/T | Control – as expected |
| MG | | Het. deletion | G | Control – as expected |

Note: For sample 2, since only the mutant maternal allele was observed, it is possible that
the paternal allele also dropped out of CF 10, and could be affected.

All controls and media blanks worked as expected.  These data are very clear.  All media
blanks showed no evidence of exogenous DNA contamination.

Electronically signed,

Mark Hughes, M.D. Ph.D.