02981.00101-RSE

MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
425 EAGLE ROCK AVENUE, SUITE 302
ROSELAND, NJ 07068
(973) 618-4100
ATTORNEYS FOR DEFENDANTS-
New York University School of Medicine and New York University Hospitals Center

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAYA GROSSBAUM and MENACHEM GROSSBAUM, her spouse, individually and as guardians ad litem of the infant, ROSIE GROSSBAUM, <br><br> Plaintiffs, <br><br> v. <br><br> GENESIS GENETICS INSTITUTE, LLC of the State of Michigan, MARK R. HUGHES, NEW YORK UNIVERSITY SCHOOL OF MEDICINE and NEW YORK UNIVERSITY HOSPITALS CENTER, both corporations in the State of New York, ABC CORPS. 1-10, and JOHN DOES 1-10, <br><br> Defendants. | Hon. Garrett E. Brown, Jr. <br><br> Civil Action No. 07-1359 (GEB) <br><br> **REPLY BRIEF OF DEFENDANTS NEW YORK UNIVERSITY SCHOOL OF MEDICINE AND NEW YORK UNIVERSITY HOSPITALS CENTER IN SUPPORT OF THEIR THE MOTION FOR SUMMARY JUDGMENT AND FOR FINALITY OF JUDGMENT** |

**REPLY BRIEF OF DEFENDANTS NEW YORK UNIVERSITY SCHOOL OF
MEDICINE AND NEW YORK UNIVERSITY HOSPITALS CENTER
IN SUPPORT OF THEIR THE MOTION FOR SUMMARY JUDGMENT
AND FOR FINALITY OF JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS .................................................................................................ii

I.  INTRODUCTION ............................................................................................ 1

II.  REPLY ARGUMENT ....................................................................................... 1

   A.  DR. CUTTING AND PLAINTIFFS' NEGLIGENCE CLAIM AGAINST THE NYU
      DEFENDANTS' DR. LICCIARDI ................................................................. 1

   B.  PLAINTIFFS CANNOT PROVE THE causation ELEMENT OF THEIR CASE
      AGAINST THE NYU defendants .................................................................7

   C.  PLAINTIFFS' PRECLUDING ABORTION AS AN OPTION DEFEATS THEIR
      WRONGFUL BIRTH AND WRONGFUL LIFE CLAIMS UNDER NEW JERSEY
      LAW .................................................................................................9

   D.  STATUTES OF LIMITATION .................................................................12

III.  CONCLUSION ............................................................................................ 13

i

# TABLE OF CITATIONS

**Page**

**Cases**

*Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807 (1978) ................................................. 8, 12

*Berman v. Allen*, 80 N.J. 421, 404 A.2d 8 (1979) ........................................................................ 9

*Canesi v. Wilson*, 158 N.J. 490, 730 A.2d 805 (1999) ................................................................. 8

*DeChico v Northern Westchester Hospital Center*, 73 A.D.3d 838, 900 N.Y.S.2d 743 (App. Div. 2010) ........................................................................................................................... 8, 12

*Gardner v. Pawliw*, 150 N.J. 359, 696 A.2d 599 (1997) ............................................................. 9

*Hummel v. Reiss*, 129 N.J. 118, 608 A.2d 1341 (1992) ......................................................... 11, 12

*Rockefeller v. Moront*, 81 N.Y.2d 560, 618 N.E.2d 119 (1993) ............................................... 12

*Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981) ............................................................. 10

**Statutes**

CPLR § 214-a ............................................................................................................................. 13

## I.    INTRODUCTION

Plaintiffs' brief in opposition does not provide an acceptable reason for this Court deny the NYU defendants' motion for summary judgment.

Far from being "almost unbelievable" (Plaintiffs' opposing brief, p. 2), the NYU defendants' challenge to the qualifications of plaintiffs' expert Dr. Cutting is exactly on point and has to be sustained under controlling New Jersey law, which plaintiffs' opposing brief completely ignores.  Without the testimony of Dr. Cutting, plaintiffs' case against the NYU defendants completely collapses.

Moreover, even if this case were the only case ever to involve IVF and PGD, the application of additional well-established legal principles mandate the grant of summary judgment to the NYU defendants.  Despite the label that plaintiffs try to affix to their case, it is one in which they cannot prove negligence or causation on the part of the NYU defendants' Dr. Licciardi.

Furthermore, plaintiffs' insistence that their case does not involve abortion compels the response that they have no viable case under New Jersey law, and, at best, a very limited case under New York law.  Additionally, plaintiffs' case may be barred under the New Jersey or the New York statute of limitation.

## II.    REPLY ARGUMENT

### A.    DR. CUTTING AND PLAINTIFFS' NEGLIGENCE CLAIM AGAINST THE NYU DEFENDANTS' DR. LICCIARDI

Plaintiffs proclaim that "Defendant NYU's Motion to Strike Plaintiffs' liability expert is almost unbelievable in that the *curriculum vitaes* of these individuals document their pre-eminence in the clinical and laboratory practice of the science of genetics in eliminating hereditary diseases."  (Plaintiffs' brief in opposition, p. 2.)  That proclamation and plaintiffs'

1

later discussion about their expert Dr. Cutting at pages 31-34 of their brief and of their negligence claim against the NYU defendants' Dr. Licciardi at pages 26-30 of their brief miss four critical points which disqualify Dr. Cutting from testifying against Dr. Licciardi and defeat plaintiffs' negligence claim against the NYU defendants.

First, NYU's challenge is only against plaintiffs' expert Dr. Cutting.  Plaintiff's other expert Dr. Strom will not be testifying regarding the standard of care of the NYU defendants' Dr. Licciardi.  (NYU Exhibit I, p. 5; NYU statement of facts/plaintiffs' response ¶ 40.)  Plaintiffs' use of the plural in their proclamation is mistaken.

Second and more significant, although ignored by plaintiffs, the testimony of record from both of plaintiffs' experts establishes that Dr. Licciardi was not negligent in selecting embryo 7 based on the one-page PGD report that he received from Genesis/Hughes.  Neither expert can or does question the embryological or morphological basis for that decision.[1]  However, both experts recognize that the PGD report told Dr. Licciadri that embryo 7 was as genetically suitable for implantation as was embryo 8, whose implantation plaintiffs do not claim was negligent for Dr. Licciardi to perform based on the report.

---

[1]     Strom will not be testifying about Dr. Licciardi's standard of care.  (NYU Exhibit I, p. 5; NYU statement of facts/plaintiffs' response ¶ 40.)

        Dr. Cutting also admitted that he did not know the grading scale or the basis on which the NYU IVF team determined that one of the embryos in this case was not morphologically viable for implantation or transfer, and he further admitted that he could not talk about how the embryos were tracked in the NYU IVF lab, because **"I'm not an embryologist. Not my area of expertise."**  Dr. Cutting recognized that those functions were under the IVF specialty umbrella and areas of expertise for embryologists, "OB/GYN, maternal/fetal medicine, [and] reproductive endocrinology."  (NYU Exhibit L p. 65-67; NYU statement of facts/plaintiffs' response ¶ 50; emphasis added.)  In addition, Dr. Cutting admitted that he was not an expert in IVF clinics and laboratories:  **"I can't say, I'm not – expert in IVF laboratories.**  So, I've – I've already indicated I'm not – will talk about DNA labs but not – I could cite to the areas where I have expertise and be more careful."  (NYU Exhibit L, p. 104; NYU statement of facts/plaintiffs' response ¶ 50; emphasis added.)

Dr. Strom's testimony of record confirmed that the PGD report indicated to Dr. Licciardi that the "Carrier at worst" embryos, including embryo 7, were genetically eligible for implantation, as was embryo 8, one of the two "Carrier maternal - -OK for transfer" embryos involved in this case.  (NYU Exhibit I, Deposition of Charles Strom, p. 124; NYU statement of facts/plaintiffs' response ¶ 41.)

Dr. Cutting's testimony of record also admitted that the "call" section of the PGD report provided Dr. Licciardi with Genesis/Hughes' genetic evaluation of the embryos; that "carrier at worst" meant **"the worst this could be is a carrier,"** a meaning which was "**obvious**"; and that the only mention of ADO and "possibly affected" was with respect to embryo 2.  (NYU Exhibit L, p. 70, 76-77, 218-219, emphasis added.)[2]

As discussed at length in the NYU defendants' supporting brief, but ignored by the plaintiffs' opposing brief, that testimony, along with the solid testimony that Dr. Licciardi was expected to depend on the accuracy of the PGD report from Genesis/Hughes, completely undermines plaintiffs' claim that Dr. Licciardi should not have selected embryo 7, since embryos 7 and 8 were obviously both genetically eligible for implantation according to the PDG report.

Third, even if Dr. Cutting were as "eminent" as plaintiffs believe, his fields of expertise lie in pediatrics and in genetics, not in obstetrics and gynecology or in reproductive endocrinology, fields in which Dr. Licciardi is licensed and board-certified, or in the practice of IVF medicine and the operations of IVF laboratories, areas in which Dr. Licciardi specializes and

---

[2]    Paragraph 56 of plaintiffs' response to the NYU defendants statement of material facts mistakenly brands this statement as "an argument on the quality of the Opinions offered by Dr. Cutting, which is clearly a matter for the ultimate factfinder."  The statement is factual.  It accurately relates Dr. Cutting's opinions.  Moreover, it is a matter for consideration and action by the Court, because it demonstrates that, even if plaintiffs were permitted to call Dr. Cutting as a witness against Dr. Licciardi, plaintiffs would be unable to satisfy their burden of proof, and therefore that the NYU defendants are entitled to summary judgment as a matter of law.

3

has long maintained an active practice.  "[T]o dichotomize the areas of specialty" between Dr. Licciardi and Dr. Cutting is hardly "specious and unsustainable," as plaintiffs mistakenly assert. (Plaintiffs' brief, p. 33.)

Although ignored by plaintiffs' brief, the controlling New Jersey law regarding expert testimony in medical malpractice cases such as this, which the NYU defendants' supporting brief accurately discussed, requires a comparison between the respective backgrounds and qualifications of the proposed expert and the targeted doctor, and that law expressly prohibits the expert's testimony when there exists a dichotomy between the respective backgrounds and qualifications such as the sharp and definitive dichotomy between Dr. Licciardi and Dr. Cutting in this case.  As a pediatrician/geneticist, Dr. Cutting is not "equivalently qualified" to testify about the standard of care applicable to the far different obstetrics, gynecology, reproductive endocrinology, and IVF fields in which Dr. Licciardi practices.

Plaintiffs concede that "[t]he issues in this case do not relate to the practices and processes of in-vitro fertilization," and that "[i]t is the genetic component of the in-vitro fertilization process involving PGD and the utilization of the laboratory information where fault is laid."  (Plaintiffs' brief, p. 33.)  That concession drives home the NYU defendants' point.  Dr. Cutting criticizes Dr. Licciardi as if Dr. Licciardi were a geneticist.  Under the controlling law, Dr. Cutting cannot make that criticism.

Dr. Cutting has never expressed what specialists in obstetrics and gynecology and in reproductive endocrinology and IVF regard as the standard of care applicable to the IVF procedures that Dr. Licciardi conducted as such a specialist, and Dr. Cutting cannot opine as an equivalent specialist, simply because he is not and has never been such a specialist.  Under controlling New Jersey law, Dr. Cutting does not qualify, and he should not be allowed to testify

4

against Dr. Licciardi on the appropriate standard of practice or care for an IVF specialist with specialty training in obstetrics and gynecology and in reproductive endocrinology.

Fourth, plaintiffs' brief reiterates the criticisms which Dr. Cutting made against Dr. Licciardi and against Genesis/Hughes in his report, but plaintiffs' brief does so by ignoring and not discussing the various facets of the record, presented at length in the NYU defendants' supporting brief, which negate the criticisms against Dr. Liciardi made in Dr. Cutting's report and repeated at pages 28-30, and 32 of plaintiffs' brief.

Contrary to his report, Dr. Cutting acknowledged at his deposition that Dr. Licciardi was, in fact, familiar with the ADO mechanism.  (NYU Exhibit L, p. 69-70.)

Dr. Cutting also acknowledged that the "call" section of Dr. Hughes' report provided Dr. Licciardi with Dr. Hughes' genetic evaluation of the embryo; that "carrier at worst" in the "call" section of the report meant that "the worst this could be is a carrier," a meaning which was "obvious"; and that the only mention in the report of ADO and "possibly affected" was with respect to embryo 2.  (NYU Exhibit L, p. 70, 76-77, 218-219.)

The record also established that, while the specifics of the conversation between plaintiffs and Dr. Licciardi about the implantation of "carrier at worst" embryos were not recorded, both plaintiffs and Dr. Licciardi confirmed in their respective depositions that the conversation took place; that it was based on the evaluation of the embryos' genetic suitability provided by the Genesis/Hughes' PGD report; and that the decision was made to implant what the report indicated were "carrier" but not "affected" embryos, because the "carrier" embryos were genetically the same as the parents.

The record of this case also established that Dr. Cutting's primary opinion that the birth of plaintiffs' CF-affected child resulted from a misdiagnosis by Genesis/Hughes contradicted his

5

theory against Dr. Licciardi.  Obviously, Dr. Licciardi did not make and cannot be held liable for that misdiagnosis.

Furthermore, given the statements in the Gensis/Hughes' PGD evaluation report that "[a]ll controls and media blanks worked as expected [--] [t]hese data are very clear [--] [a]ll media blanks showed no evidence of exogenous DNA contamination" (NYU Exhibit G; NYU statement of facts/plaintiffs' response ¶ 25); given that the report mentioned ADO only with respect to embryo 2, stating in the report's "call" that it was "Possibly affected – ADO paternal," and noting, "For sample 2, since only the mutant maternal allele was observed, it is possible that the paternal allele also dropped out of CF 10, and could be affected" (NYU Exhibit G; NYU statement of facts/plaintiffs' response ¶ 26); given, as noted above, that the "obvious" message from the Genesis/Hughes' PGD evaluation report was that both embryos 7 and 8 were CF-carriers, but not CF-affected, there was no reason for Dr. Licciardi to question the accuracy of the Genesis/Hughes' evaluation, no reason for him to doubt the quality of the embryonic cells that were sent for testing by Genesis/Hughes, and no reason for Dr. Licciardi to place the plaintiffs back in contact with Dr. Hughes after receipt of that report.

Plaintiffs' arguments to the contrary are simply unacceptable legal contentions that have no factual support, and no support in the reports or the testimony of plaintiffs' experts.  The only acceptable conclusion from the record is that the birth of plaintiffs' CF-affected child stemmed from the inherent risk of misdiagnosis in PGD testing (which was always known by the plaintiffs to be a potential result), rather than from a lack of understanding or a faulty acceptance or explanation by Dr. Licciardi of the evaluation actually conveyed by the Genesis/Hughes' PGD report, that embryos 7 and 8 were genetically suitable for implantation.

The Court should preclude Dr. Cutting from testifying against the NYU defendants, and it should grant the NYU defendants' motion for summary judgment.

### B.   PLAINTIFFS CANNOT PROVE THE CAUSATION ELEMENT OF THEIR CASE AGAINST THE NYU DEFENDANTS

Plaintiffs' response to the NYU defendants' statement of facts and plaintiffs' opposition brief concede the basis for the NYU defendants' contention that plaintiffs cannot prove the causation element of their case against then, because plaintiffs made their decision on the low risk that Hughes conveyed to them, not on the higher risk conveyed by the NYU defendants.

Plaintiffs' argument that there is no documentary support for the 90% success rate mentioned in the NYU consent form (plaintiff's brief, p. 30-31) misses the point.  The record established that plaintiffs' decision to proceed with IVF/PGD processes was predicated solely on the risk/success rate provided to them by Hughes, not on any information that they obtained from the NYU defendants, regardless of the documentation or the lack thereof behind the NYU success rate.

In their responses to the NYU defendants' statement of facts, plaintiffs admitted that they decided to go forward with the IVF/PGD process based upon their discussion with Dr. Hughes and his assurance that the success rate would be 97-98%, with a risk rate of 2-3%.  (NYU Exhibit B, p. 69-72, 82, 120-122, 141-142, 213-214; NYU Exhibit C, p. 31-32, 36-39, 48, 69-70; NYU statement of facts/plaintiffs' response ¶ 19.)[3]  Plaintiffs also admitted that, if Mrs. Grossbaum had been told that the success rate was less than 97-98% and the risk higher than 2-3%, but still far better than the inherent 25% risk, she probably would <u>not</u> have had the embryos implanted. (NYU Exhibit B, p. 213-214 ["If I was told that there was a chance, a greater chance than what

---

[3]        In paragraph 17 of their response to the statement of facts, plaintiffs assert that they "were misled by Dr. Hughes into believing that the risk was minimal, even lower than the claimed 2 to 3 percent."

we had originally understood, I would probably not have implanted the embryo."]; NYU statement of facts/plaintiffs' response ¶ 20.)  Plaintiffs also admitted that Mr. Grossbaum was guided by and followed his wife's decisions regarding the process.  (NYU Exhibit C, p. 36-39; NYU statement of facts/plaintiffs' response ¶ 21.)

In their opposing brief, plaintiffs concede that if they "were told that there was a substantial risk greater than **what Dr. Hughes had told them**, they would have not likely gone through with the pregnancy," and that they "clearly understood that they had a minimum if any risk of a cystic fibrosis **based on Dr. Hughes' communication**."  (Plaintiffs' brief, p. 24-25; emphasis added.)

Proximate cause is an essential element to plaintiffs' claim against the NYU defendants under New Jersey law.  *Canesi v. Wilson*, 158 N.J. 490, 506, 730 A.2d 805, 813 (1999). Although New York law, which plaintiffs eschew, differs from New Jersey law in several respects on wrongful birth and similar claims, New York law, like New Jersey law requires the plaintiff to prove proximate cause.  *Becker v. Schwartz*, 46 N.Y.2d 401, 410-415, 386 N.E.2d 807, 811-814 (1978); *DeChico v Northern Westchester Hospital Center*, 73 A.D.3d 838, 840, 900 N.Y.S.2d 743, 745 (App. Div. 2010).

As to the NYU defendants, plaintiffs' cannot prove proximate cause, because there is no evidence that plaintiffs were induced by or relied on any risk information provided by the NYU defendants.  Instead, as their admissions firmly establish, plaintiffs were solely induced by and relied only on what Hughes told them.

Although the Court should grant summary judgment to the NYU defendants on that proximate cause basis, there are other fatal causation problems with the plaintiffs' case which also compel the grant of summary judgment in favor of the NYU defendants.

Plaintiffs do not criticize the NYU defendants for implanting embryo 8; their criticism is for implanting embryo 7.  If, as plaintiffs contend, the testimony of Drs. Grifo and Pang that plaintiffs' daughter grew from embryo 8 "is challenged by the testimony of Plaintiffs' expert, Dr. Charles Strom, who expressly disclaimed [that] science allows one to determine which of two embryos resulted in the pregnancy that brought forth the cystic fibrosis baby" (plaintiff's brief, p. 25), there is no acceptable basis for the jury to find that the baby grew from embryo 7, and there is no basis for the plaintiffs' claim against the NYU defendants for implanting embryo 7.

Additionally, plaintiffs' retort to the argument that plaintiffs cannot prove that their child was a product of poorly protected sexual intercourse addresses only the sexual intercourse in which the plaintiffs engaged to produce the sperm that was used to fertilize the eggs which were extracted that day.  The plaintiffs' testimony indicates other occasions of sexual intercourse which plaintiffs have not effectively dispelled.

Accordingly, plaintiffs' inability to establish the causation element of their case provides an additional reason to grant the NYU defendants' motion for summary judgment.

### C.   PLAINTIFFS' PRECLUDING ABORTION AS AN OPTION DEFEATS THEIR WRONGFUL BIRTH AND WRONGFUL LIFE CLAIMS UNDER NEW JERSEY LAW

The Court should reject plaintiffs' attempt to distance their case from "the classic wrongful birth/wrongful life case" due to "the absence of an opportunity to terminate the pregnancy" in this case, and yet to draw their case under the umbrella of *Berman v. Allen*, 80 N.J. 421, 404 A.2d 8 (1979), "and its progeny" by quoting a passage from *Gardner v. Pawliw*, 150 N.J. 359, 375, 696 A.2d 599, 615 (1997).  (Plaintiffs' brief, p. 23-24).

Plaintiffs' brief does not cite a single case from *Berman's* progeny which applied the *Gardner* increased risk of harm principle, and the NYU defendants' research has not found any such case.  Indeed, *Berman* itself rejected the application of the increased risk doctrine.  In

9

*Berman*, as in this case, the gist of the cause of action was that, absent the defendants' alleged negligence, the child would not have been born, and "[a]s such, this case presents issues different from those involved in malpractice actions where a plaintiff asserts that a defendant's deviation from sound medical practices *increased* the probability that an infant would be born with defects." *Berman*, supra, 80 N.J. at 426, 404 A.2d at 11 (italics in original).

What the research does reveal, and what plaintiffs' brief avoids, is that plaintiffs' claims in this case are classic wrongful birth/wrongful life claims under New Jersey law, and that plaintiffs do not have a valid wrongful birth claim or a valid wrongful life claim, because New Jersey law conditions those claims on the defendant's deprivation of the mother's right to abort a pregnancy, and plaintiffs' testimony in this case establishes that abortion was entirely out of the question for them even before they decided to begin the IVF/PGD processes.

The fact that this case involves PGD and the "commencement of the gestation as opposed to situations where the deformity is not known until pregnancy is at least three to four months underway" (plaintiffs' brief, p. 23) makes no difference under New Jersey law. *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981). one of *Berman's* progeny, also involved the failure to diagnose and to inform the parents **before conception** that they faced a risk of conceiving a CF-affected child, and the mother's testimony that she would not have become pregnant had she been told of that risk. *Id.*, 87 N.J. at 57-58, 60, 432 A.2d at 836, 837.

However, it was more than the failure to provide pre-conception advice that prompted the New Jersey Supreme Court to allow the parents to claim extraordinary medical expenses in *Schroeder* in addition to the emotional distress damages allowed under *Berman* for depriving the parents "of the option to accept or reject a parental relationship with the child." *Berman*, *supra*, 80 N.J. at 433, 404 A.2d at 14.  In *Schroeder*, the Court noted that "[t]he delay in the diagnosis

had precluded Mr. and Mrs. Schroeder from making an informed choice as to whether or not to assume the risk of conceiving a second child with cystic fibrosis. **The delay also had prevented them from making an informed choice whether Mrs. Schroeder should have an abortion**. *Schroeder*, *supra*, 87 N.J. at 60, 432 A.2d at 837 (emphasis added).

Based on *Berman*, in which the Court recognized that the cause of action arose from the defendants' allegedly depriving the parents "of the option to accept or reject a parental relationship with the child," *Berman*, *supra*, 80 N.J. at 433, 404 A.2d at 14, the Court in *Schroeder* extended the parents' recovery to include extraordinary medical expenses, because the defendants' alleged negligence deprived the parents of their choice "to accept or reject a parental relationship." *Schroeder*, *supra*, 87 N.J. at 60, 432 A.2d at 837

The New Jersey Supreme Court's decision in *Hummel v. Reiss*, 129 N.J. 118, 126, 608 A.2d 1341, 1346 (1992) (no cause of action based upon a birth that occurred before *Roe v. Wade*, when eugenic abortion was not available), underscores the linkage between liability and abortion in New Jersey wrongful birth/wrongful life jurisprudence. On that point, the Court explained that "[t]he breaches of duty in *Procanik*, *Berman*, and *Schroeder* all revolve, at least in part, around the defendant-doctor's failure to diagnose a condition that might have caused the parents to terminate the pregnancy had they been informed of that condition. **The wrongful-life and -birth causes of action are, therefore, dependent on a woman's right to terminate a pregnancy for reasons other than the mother's health.**" *Hummel*, 129 N.J. at 126, 608 A.2d at 1345 (emphasis added).

Further underscoring the point, the New Jersey Supreme Court summarized its analysis and holding by stating, "In 1971, then, when Kelly Hummel was born, the state of the law was such that the defendants in *Berman, Schroeder*, and *Procanik* could not have been liable. Even

had the respective doctors diagnosed Down's Syndrome (*Berman*), cystic fibrosis (*Schroeder*), or rubella (*Gleitman, Procanik*), the parents of the impaired children would have had no recourse: no abortion was legally available to them in New Jersey." *Hummel*, 129 N.J. at 126, 608 A.2d at 1345.

Because New Jersey law holds that parents of impaired children and impaired children themselves have no recourse when abortion was not legally available to the parents to terminate the pregnancy in question, there should be no recourse when abortion was not personally available to the parents. On this ground, the Court should enter summary judgment in favor of the NYU defendants.[4]

### D.   STATUTES OF LIMITATION

Genesis/Hughes contends that plaintiffs' wrongful birth claim is barred by New Jersey's two-year statute of limitations and its discovery rule, because plaintiffs agreed in writing to undergo CVS or amnio testing, and such testing would have revealed that plaintiffs' unborn child was CF-affected no later than October of 2004, more than two years before plaintiffs commenced this action on March 23, 2007. (Genesis/Hughes' summary judgment brief, p. 31-32.)

The record establishes that plaintiffs made the same written promise to the NYU defendants. (See, *e.g.*, Genesis/Hughes' Local Rule 56.1 Exhibit 13 at CG091.) Therefore, if the Court accepts the argument and grants summary judgment to Genesis/Hughes on the New Jersey

---

[4]      Although plaintiffs insist on the application of New Jersey law, if the Court is persuaded to apply New York law to plaintiffs' wrongful birth and wrongful life claims under the jurisprudence developed from *Becker* through *DeChico*, *supra*, the NYU defendants would be entitled to judgment in their favor on the parents' emotional distress claim and on their child's claim, thus limiting the case to the parents' claim for extraordinary medical expenses until their daughter reaches the age of 18, which is the age of majority under current New York law. See, CPLR 105 [j]; *Rockefeller v. Moront*, 81 N.Y.2d 560, 564 n. 2, 618 N.E.2d 119, 121 n. 2 (1993).

statute of limitations, it should grant summary judgment on that basis to the NYU defendants as well.

Likewise, once the record in this case crystallizes to answer the presently open question as to when Mrs. Grossbaum ceased treating with the NYU defendants, they may be entitled to judgment under the New York 30-month statute of limitations governing medical malpractice actions, CPLR § 214-a ("**An action for medical malpractice** must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure.") (emphasis added).

## III.   CONCLUSION

The Court should grant summary judgment in favor of the NYU defendants on all claims made against them in this case, and it should make that grant of summary judgment a final order. In the event that the Court does not grant that relief, the Court should limit the plaintiffs' cause of action to extraordinary medical expenses until their daughter reaches the age of 18.

Respectfully submitted,

MARSHALL, DENNEHEY, WARNER,
     COLEMAN & GOGGIN

By:  *R. Scott Eichhorn, Esquire*
425 EAGLE ROCK AVENUE, SUITE 302
ROSELAND, NJ  07068
DIRECT DIAL TELEPHONE:  (973) 618-4154
FAX:  (973) 618-0685
EMAIL:  rseichhorn@mdwcg.com
ATTORNEY FOR DEFENDANTS,
NEW YORK UNIVERSITY SCHOOL OF MEDICINE and

DATED:  March 10, 2011        NEW YORK UNIVERSITY HOSPITALS CENTER

13