NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAYA GROSSBAUM and MENACHEM GROSSBAUM, individually and as guardians ad litem of ROSIE GROSSBAUM,<br><br>Plaintiffs,<br><br>v.<br><br>GENESIS GENETICS INSTITUTE, LLC, MARK R. HUGHES, NEW YORK UNIVERSITY SCHOOL OF MEDICINE and NEW YORK UNIVERSITY HOSPITALS CENTER, ABC CORPS. 1-10, JOHN DOES 1-10,<br><br>Defendants. | Hon. Garrett E. Brown, Jr.<br><br>Civil Action No. 07-1359 (GEB)<br><br>**MEMORANDUM OPINION** |

**BROWN**, Chief Judge:

This matter comes before the Court upon the *Daubert* motion and summary judgment motion (Doc. Nos. 109, 111) filed by Defendants Genesis Genetics Institute, LLC, and Dr. Mark R. Hughes (collectively "Genesis Defendants"); the motion for summary judgment (Doc. No. 108) filed by New York University Hospitals Center and New York University School of Medicine (collectively "NYU Defendants"); as well as multiple motions to strike (Doc. Nos. 122, 124, 129) related to certain aspects of the parties' briefing. This Court has considered the parties' motions and decided them without oral argument pursuant to Federal Rule of Civil Procedure 78. For the following reasons, the Court will grant Genesis Defendants' summary judgment motion (Doc. No. 109) and deny as moot Genesis Defendants' *Daubert* motion (Doc. No. 111). The Court will permit supplemental briefing on NYU Defendants' summary

judgment motion.

*Background*

This dispute concerns the liability of a genetics laboratory and reproductive services clinic when, notwithstanding their pre-pregnancy screening services, a couple using their services conceives and delivers a child with birth defects.  In discussing the relevant facts, the Court draws all reasonable inferences in favor of Plaintiffs, the non-moving parties.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Plaintiffs Chaya Grossbaum and Menachem Grossbaum were married on August 22, 2002.  When they were in high school, both Chaya and Menachem learned that they were genetic carriers for cystic fibrosis ("CF").  (GG 56.1 Statement ¶ 1; Pls.' 56.1 Resp. ¶ 1.)  Because of their status as CF carriers, when the Grossbaums decided they were ready to start a family in or about early 2004, the Grossbaums were referred by one or more rabbis to the New York University School of Medicine Program for IVF (*in vitro* fertilization), Reproductive Surgery and Infertility.  (*See* GG 56.1 Statement ¶ 8; NYU 56.1 Resp. ¶ 8; Pls.' 56.1 Resp. ¶ 8.)  During their consultation with the NYU Defendants, Plaintiffs agreed to undergo IVF with pre-implantation genetic diagnosis (PGD), in the hopes of conceiving a child without CF.  (GG 56.1 Statement ¶ 10; Pls.' 56.1 Resp. ¶ 10.)

NYU Defendants provided the IVF and implantation services, and the Genesis Genetics Institute, LLC, provided PGD testing of the Grossbaums' embryos prior to implantation.  Genesis Genetics is a Michigan limited liability corporation with its sole place of business in Michigan, and its founder and director Dr. Mark R. Hughes has been a Michigan resident since 1998.  (GG 56.1 Statement ¶ 11; Pls.' 56.1 Resp. ¶ 11.)  The IVF process began in late June or July 2004,

2

with Chaya taking fertility drugs to increase her body's production of mature eggs.  (GG 56.1

Statement ¶¶ 15–16; NYU 56.1 Resp. ¶¶ 15–16; Pls.' 56.1 Resp. ¶¶ 15–16.)  On July 14, 2004,

an NYU physician retrieved 33 eggs from Chaya's ovaries, and NYU personnel successfully

fertilized 10 of the eggs with Menachem's sperm via IVF.  (GG 56.1 Statement ¶ 21; NYU 56.1

Resp. ¶ 21; Pls.' 56.1 Resp. ¶ 21.)  According to NYU's contemporaneous Semen Collection

Record, the Grossbaums had intercourse on the morning of July 14 using a condom to collect the

sperm that would be used for the IVF.  (Blaine Decl. Ex. 13 at CG 129.)  Plaintiffs do not

specifically dispute this fact.  (*See* Pls.' 56.1 Resp. ¶¶ 17–20.)[1]  NYU personnel performed

biopsies on the Grossbaum embryos on July 17, 2004, and sent cells from each embryo to

Genesis Defendants for PGD testing.  (GG 56.1 Statement ¶ 22; NYU 56.1 Resp. ¶ 22; Pls.' 56.1

Resp. ¶ 22.)  On July 19, 2004, Genesis Defendants faxed a report to NYU Defendants

addressing the results of the PGD testing and the transferability of different embryos ("PGD

report").  (*See* GG 56.1 Statement ¶ 23; NYU 56.1 Resp. ¶ 23; Pls.' 56.1 Resp. ¶ 23; Blaine Decl.

Ex. 13 at CG064, CG125.)  The PGD report identified embryos Nos. 8 and 10 as "Carrier

maternal—OK for transfer," and made differing assessments about the other tested embryos.

(Blaine Decl. Ex. 13 at CG064.)  That day, NYU endocrinologist Dr. Frederick Licciardi and

---

[1]Genesis Defendants also aver that the Grossbaums had intercourse on July 12 using a
spermicide as contraception.  Genesis Defendants appear to derive this assertion from
Menachem's response in the Semen Collection Record that the July 14 sample had followed a
two-day period of abstinence, as well as Chaya's deposition testimony speculating that they may
have used spermicide for contraception prior to the July 14 sample collection.  (*See* Blaine Decl.
Ex. 13 at CG 129; Dep. of Chaya Grossbaum, Vol. I, at 187–88.)  Plaintiffs deny that the
evidence cited by Genesis Defendants supports this factual conclusion.  (Pls.' 56.1 Resp. ¶ 20.)
While Genesis Defendants' inference from the evidence is reasonable, the Court cannot say that
this fact has been conclusively established by the record materials cited by Genesis Defendants.
However, this Court need not resolve this factual issue in order to decide the pending motions.

NYU embryologist Alexis Adler reviewed the results of the PGD report and decided to substitute embryo No. 7 for embryo No. 10; the PGD report indicated that embryo No. 7 was "Carrier at worst." (*See* GG 56.1 Statement ¶ 24; NYU 56.1 Resp. ¶ 24; Pls.' 56.1 Resp. ¶ 24; Blaine Decl. Ex. 13 at CG064.) The same day, Chaya was implanted with embryos No. 7 and 8.

Rosie Grossbaum was born on March 25, 2005, in Denville, New Jersey. However, at all relevant times during their interactions with Defendants, the Grossbaums resided in Brooklyn, New York. Indeed, the Grossbaums lived in New York from 2002 until "approximately five months" after Rosie's birth in 2005, at which point the Grossbaums moved to New Jersey. (GG 56.1 Statement ¶¶ 7, 28; Pls.' 56.1 Resp. ¶¶ 7, 28; Blaine Decl. Ex. 9 (Dep. of Chaya Grossbaum, Vol. I) at 9–10; Pls.' Resp. Br. at 3 ("The Plaintiffs move to New Jersey followed the baby's birth by approximately five months.").) Approximately two weeks after her birth, Rosie was diagnosed with CF. (GG 56.1 Statement ¶ 28; Pls.' 56.1 Resp. ¶ 28; Blaine Decl. Ex. 27 (Dep. of Chaya Grossbaum, Vol. II) at 221:5–7.)

On March 23, 2007, the Grossbaums, both individually and on behalf of their infant daughter Rosie, filed a four-count Complaint alleging that Genesis Defendants, NYU Defendants, and unidentified parties were negligent in their provision of embryo-screening and *in vitro* fertilization services. Plaintiffs seek emotional distress damages "with respect to the delivery and upbringing of the infant Plaintiff Rosie Grossbaum due to the special needs for care and treatment of a cystic fibrosis baby and the attendant risks to the child," damages for the "considerable costs and expenses" of Rosie's medical care, and damages for Rosie's continuing care after she reaches the age of majority. The Genesis Defendants and NYU Defendants have filed crossclaims for contribution against each other.

Both Genesis Defendants and NYU Defendants now move for summary judgment. Genesis Defendants argue: (1) that Michigan law applies, and does not allow Plaintiffs' wrongful birth and wrongful life claims; (2) alternatively, that New York law applies, and Plaintiffs' claims are barred by New York's two-and-a-half-year statute of limitations for medical malpractice claims, N.Y. C.P.L.R. 214-a; and (3) if New Jersey law applies, Plaintiffs claims fail under New Jersey's statute of limitations.  Regardless of choice of law, Genesis Defendants contend that Plaintiffs' negligence claim fails because: (a) Plaintiffs cannot prove causation, and (b) because Plaintiffs have not presented credible evidence that Genesis Defendants' conduct departed from the applicable standard of care for PGD.  Genesis Defendants also move to exclude Plaintiffs' proffered expert witnesses, Dr. Garry Cutting and Dr. Charles Strom, pursuant to Federal Rule of Evidence 702.   In their summary judgment motion, NYU Defendants assert: (1) that New Jersey law governs; (2) that Dr. Cutting's expert opinion is inadmissible, because Dr. Cutting is not qualified to testify against Dr. Licciardi; and (3) that the record establishes that Dr. Licciardi was not negligent and did not cause Plaintiffs' harm.  NYU Defendants also responded to Genesis Defendants' summary judgment motion, opposing Genesis Defendants invocation of Michigan law, presenting grounds for summary judgment in their favor under New York law, and arguing in favor of a longer statute of limitations for Plaintiffs' claims against Genesis Defendants.  Both Plaintiffs and Genesis Defendants have moved to strike NYU Defendants' response brief to Genesis Defendants' motion for summary judgment as an improper and untimely additional brief.  (*See* Doc. Nos.  122, 124.)  Plaintiffs filed a consolidated response brief to the Defendants' motions, countering, *inter alia*: (1) that New Jersey law applies; (2) that they can prove causation and negligence against both Genesis Defendants and NYU Defendants;

5

(3) that their claims were filed within the statute of limitations; and (4) that their proffered experts are sufficiently qualified to provide expert testimony.

### *Jurisdiction*

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Plaintiffs, New Jersey residents, are diverse from the Genesis Defendants (Michigan) and NYU Defendants (New York), and Plaintiffs seek damages in excess of $75,000.

### *Summary Judgment*

A party seeking summary judgment must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no triable issue exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, this Court must view the underlying facts and draw all reasonable inferences in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587; *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). "After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f).

Before the Court may resolve the parties' motions, the Court must determine which

state's law governs the parties' claims.

      *1. Choice of Law*

      A federal court sitting in diversity jurisdiction must apply the forum state's choice of law rule. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Gen. Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377, 379 (3d Cir. 1992). New Jersey has adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 142–43 (2008). New Jersey's choice of law analysis is a two-step process. First, a court must determine whether an actual conflict in law exists. *See Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir. 2006). If no actual conflict exists, "the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." *Id.* at 428. However, if the court finds that a conflict exists, the court must determine which jurisdiction has the "most significant relationship" to the claim. *Camp Jaycee*, 197 N.J. at 136. This second step of the most significant relationship test requires the court to weigh the factors set forth in the Restatement section corresponding to the plaintiff's cause of action. *See, e.g.*, *Nafar v. Hollywood Tanning Sys.*, 339 F. App'x 216, 220 (3d Cir. 2009) (citing *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 461–62 (D.N.J. 2009)); *Camp Jaycee*, 197 N.J. at 143–44. The Appellate Division recently determined that the same "most significant relationship test" applied in *Camp Jaycee* applies to a choice-of-law determination regarding which state's statute of limitations applies. *Cornett v. Johnson & Johnson*, 414 N.J. Super. 365, 377–78 (App. Div. 2010). If there is a "reasonable probability" that the application of another state's statute of limitations would affect the timeliness of the plaintiff's claims, then the court must apply the most significant relationship test, as outlined in *Camp Jaycee*. *Cornett*, 414 N.J.

7

Super. at 377–78.

      *a. Conflict of Law*

      Here, it is evident that the laws of Michigan, New York, and New Jersey materially conflict as they pertain to Plaintiffs' claims.  Whereas Michigan law expressly forbids wrongful life, wrongful birth, and wrongful pregnancy claims, Mich. Comp. Laws Ann. § 600.2971 (West 2011), New York law only permits parents to recover a child's extraordinary medical expenses under a wrongful life claim, *Becker v. Schwartz*, 46 N.Y.2d 401, 412–13 (N.Y. 1978), and New Jersey law permits both wrongful birth and wrongful life causes of action, *see Procanik by Procanik v. Cillo*, 97 N.J. 339, 347–56 (1984).  In addition to these substantive differences, New York and New Jersey have different statutes of limitations for this type of claim.  New York requires plaintiffs to file medical malpractice claims within two and a half years of the "of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure . . . ." N.Y. C.P.L.R. 214-a (McKinney 2011).  New Jersey, meanwhile, applies the two-year limitations period from the generally applicable personal injury statute of limitations, N.J. Stat. Ann. § 2A:14-2.  *E.g.*, *Carter v. Univ. of Med. & Dentistry of N.J.*, 838 F. Supp. 957, 960–66 (D.N.J. 1993); *see also* N.J. Stat. Ann. § 2A:14-2.1 (permitting an extended limitations period "[w]here a parent or other person has a claim for damages suffered by him because of an injury to a minor child caused by the wrongful act, neglect or default of any person within this State").  Plaintiffs appear to argue that Michigan law does not foreclose their claim, because "it is merely a medical negligence case and does not necessarily involve decisions of abortion and thus, wrongful birth/wrongful life."  (Pls.' Resp. Br. at 14.)  Plaintiffs' argument in this regard is belied by their

later characterization of their claim as "whether Rosie Grossbaum, the product of the union of Chaya and Menachem Grossbaum, would have been a child born from an embryo free of the cystic fibrosis disease." (*Id.* at 15.) So described, Plaintiffs' claim appears to be the sort of wrongful life or wrongful pregnancy claim expressly forbidden by Michigan law.[2] Regardless, Plaintiffs do not deny that the respective statutes of limitations of New York and New Jersey conflict. Not only do the limitations periods differ, but New York and New Jersey apply different rules for when the cause of action accrues. Whereas New York's medical malpractice statute of limitations runs from the date of "the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure . . . ," N.Y. C.P.L.R. 214-a, New Jersey applies an equitable discovery rule, *see Lopez v. Swyer*, 62 N.J. 267, 272–77 (1973). Because Plaintiffs

---

[2]The Michigan law provides in pertinent part:

> (1) A person shall not bring a civil action on a wrongful birth claim that, but for an act or omission of the defendant, a child or children would not or should not have been born.

> (2) A person shall not bring a civil action for damages on a wrongful life claim that, but for the negligent act or omission of the defendant, the person bringing the action would not or should not have been born.

> (3) A person shall not bring a civil action for damages for daily living, medical, educational, or other expenses necessary to raise a child to the age of majority, on a wrongful pregnancy or wrongful conception claim that, but for an act or omission of the defendant, the child would not or should not have been conceived.

Mich. Comp. Laws Ann. § 600.2971(1)–(3) (West 2011). The law does exempt "intentional or grossly negligent" conduct from the above proscriptions. *Id.* § 600.2971(4). Plaintiffs do not invoke this exception, but this Court need not determine the application of Michigan law to the merits of Plaintiffs claims in order to determine that a conflict of law exists.

9

filed their Complaint more than two and a half years after the critical medical act—the implantation of the IVF embryos—there is a reasonable probability that the choice of law determination will affect the timeliness of Plaintiffs' claims. The Court concludes that there are conflicts with regard to the statute of limitations and the substantive law, and this Court proceeds to the second phase of New Jersey's choice-of-law analysis.

### b. Most Significant Relationship

For personal injury claims like this case, Restatement (Second) § 146 sets the default rule: "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement (Second) Law of Conflicts § 146; *see also id.* § 145(1); *Camp Jaycee*, 197 N.J. at 140–41. Restatement (Second) § 145 instructs that, in determining whether another state has a more significant relationship, the reviewing court must consider the following contacts while applying the principles of Restatement (Second) § 6:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflicts § 145(2). Restatement (Second) § 6, in turn, requires

consideration of the following factors:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflicts § 6. Drawing upon these standards, *Camp Jaycee* observed:

> The Second Restatement assessment takes place on an issue-by-issue basis. It is qualitative, not quantitative. In other words, the inquiry does not focus solely on the number of contacts with each state, although that can be persuasive. We also look to the principles in section 6 to measure the significance of the contacts in order to determine whether the presumption has been overcome. Viewed through the section 6 prism, the state with the strongest section 145 contacts will have the most significant relationship to the parties or issues, and thus its law will be applied.

197 N.J. at 143 (citations omitted).

Before this Court may consider the § 145 contacts and § 6 principles, this Court must resolve the parties' dispute regarding where the actual injury took place. Under Restatement (Second) § 146, the answer to this question is the presumptive choice of law. Plaintiffs and NYU Defendants argue that Plaintiffs injury took place in New Jersey, where Rosie was born. Genesis Defendants contend that the injury took place in New York, where, accepting Plaintiffs' claims to be valid, Plaintiffs were deprived of the opportunity to decline reproductive services (IVF) that

11

resulted in a child afflicted with CF.  In deciding this matter, the Court must be mindful of what

the respective jurisdictions recognize as legal injuries.

Although New York and New Jersey have diverged in their treatment of wrongful life and

wrongful birth claims, with New York permitting only a limited form of a "wrongful life" claim,[3]

both states characterize the injury in terms of the parents' loss of reproductive choice.  *See*

*Becker*, 46 N.Y.2d at 412–13 (concluding that the parents' "wrongful life" claim alleged

"ascertainable damages," in the form of "the pecuniary expense which [the parents] have borne

. . . for the care and treatment of their infants.  Certainly, assuming the validity of plaintiffs'

allegations [that they would have terminated the pregnancy upon a proper diagnosis], it can be

said in traditional tort language that but for the defendants' breach of their duty to advise

plaintiffs, the latter would not have been required to assume these obligations"); *Procanik*, 97

N.J. at 347–48 ("The terms 'wrongful birth' and 'wrongful life' are but shorthand phrases that

describe the causes of action of parents and children when negligent medical treatment deprives

parents of the option to terminate a pregnancy to avoid the birth of a defective child.").  In New

Jersey, "wrongful life" describes "a cause of action brought by or on behalf of a defective child

who claims that but for the defendant doctor's negligent advice to or treatment of its parents, the

child would not have been born," and "wrongful birth" refers to "the cause of action of parents

who claim that the negligent advice or treatment deprived them of the choice of avoiding

conception or . . . of terminating the pregnancy."  *Procanik*, 97 N.J. at 348; *see also Provenzano*

───────────────────

[3]The Court notes that what Court of Appeals of New York refers to as a "wrongful life"
claim in *Becker* more closely resembles what the New Jersey courts refer to as a "wrongful birth"
claim: that is, parents' claim that negligent medical advice, diagnosis, or treatment deprived them
of the choice of avoiding conception or terminating the pregnancy.  *Compare Becker*, 46 N.Y.2d
at 407–415 *with Procanik*, 97 N.J. at 348; *see also Hummel v. Reiss*, 129 N.J. 118, 122 (1992).

*v. Integrated Genetics*, 22 F. Supp. 2d 406, 413–14 (D.N.J. 1998).

The Court finds instructive the New Jersey Supreme Court's decision in *Hummel v. Reiss*, 129 N.J. 118 (1992), which chronicled the development of wrongful life and wrongful birth claims in New Jersey.  New Jersey initially rejected wrongful birth and wrongful life claims, *see Gleitman v. Cosgrove*, 49 N.J. 22 (1967), but the New Jersey Supreme Court reversed course after the United States Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973) established that women had a qualified right to terminate their pregnancies.  *Hummel*, 129 N.J. at 122.  Subsequent to *Roe v. Wade*, the New Jersey Supreme Court in a trio of cases recognized claims for wrongful birth and wrongful life.  In the first, *Berman v. Allan*, 80 N.J. 421 (1979), the court recognized a wrongful birth claim, but limited damages to emotional distress damages. *Hummel*, 129 N.J. at 122–23 (citing *Berman*, 80 N.J. at 431).  In the second, *Schroeder v. Perkel*, 87 N.J. 53 (1981), the court expanded the wrongful birth doctrine to permit damages for the extraordinary medical expenses of a child born with CF.  *Hummel*, 129 N.J. at 123–24 (citing *Schroeder*, 87 N.J. at 66-71).  Finally, in *Procanik v. Cillo*, the court determined that the same damages available to parents in a wrongful birth action were available to the child in a wrongful life action, and that the "child may recover the lifetime extraordinary expenses resulting from a misdiagnosis that deprived its parents of the choice of terminating the pregnancy."  *Hummel*, 129 N.J. at 124 (citing *Procanik*, 97 N.J. at 348–52).  The *Hummel* court found these cases distinguishable from Hummel's wrongful life claim, because Hummel was born before *Roe v. Wade* determined that there was a qualified right to abortions.  *Hummel*, 129 N.J. at 125–26.  The *Hummel* court reasoned:

The breaches of duty in *Procanik*, *Berman*, and *Schroeder* all revolve,

13

> at least in part, around the defendant-doctor's failure to diagnose a condition that might have caused the parents to terminate the pregnancy had they been informed of that condition.  The wrongful-life and -birth causes of action are, therefore, dependent on a woman's right to terminate a pregnancy for reasons other than the mother's health.

*Hummel*, 129 N.J. at 126.

The Court also finds instructive New Jersey's less-developed wrongful pregnancy doctrine.  Generally speaking, wrongful pregnancy refers to a cause of action where parents who did not wish to conceive claim that they have nevertheless did conceive due to a defective sterilization procedure or defective contraception.  Two cases from the Appellate Division held that the wrongful pregnancy claim was sufficiently similar to the wrongful birth claim that *Berman*'s wrongful birth damages rule should apply to the wrongful pregnancy claim as well, such that parents could not recover the future expenses of raising, educating, and supervising the child under either claim: *P. v. Portadin*, 179 N.J. Super. 465, 470–72 (App. Div. 1981); *J. P. M. v. Schmid Labs., Inc.*, 178 N.J. Super. 122, 126–27 (App. Div. 1981).[4]

Plaintiffs' claims fall between these two strands of tort law that are predicated on reproductive choice.  Their Complaint refers to the implantation of "a defective embryo" as the negligent act.  (Compl. Ct. I ¶ 9; *see also id.* Ct. II ¶ 4.)  In their brief, Plaintiffs characterized their claims as follows:

> . . . [T]he scenario created by Genesis in its argument regarding "classic wrongful birth" claim misstates the facts.  The issue is not whether Rosie Grossbaum would never have been born and the Plaintiffs would never had become the parents of a child with cystic fibrosis.  The issue is

---

[4]These wrongful pregnancy cases rejected a prior Law Division decision that had allowed for future damages incidental to parenting the child.  *See Betancourt v. Gaylor*, 136 N.J. Super. 69, 77 (L. Div. 1975).  *P.* and *J.P.M.* appear to remain the prevailing authority in New Jersey on the treatment of damages in wrongful pregnancy actions.

> whether Rosie Grossbaum, the product of the union of Chaya and
> Menachem Grossbaum, would have been a child born from an
> embryo free of the cystic fibrosis disease.  That opportunity existed with
> IVF . . . .

(Pls.' Resp. Br. at 15.)  This characterization of their claim is supported by Plaintiff Chaya

Grossbaum's deposition testimony; when asked whether the Grossbaums would have gone

forward with implantation if they had been told that the risk of error was greater than the 2–3 %

estimate provided by Dr. Hughes, but "far better than" the 25% chance of CF from natural

conception, Chaya replied: "If I was told that there was a chance, a greater chance than what we

had originally understood, I would probably not have implanted the embryo."  (NYU Ex. B (Dep.

of Chaya Grossbaum) at 214:9–19.)  So understood, Plaintiffs' claims resembles a wrongful birth

cause of action, in that the parents did not want to give birth to a child afflicted with CF.

However, unlike the traditional wrongful birth claim, Plaintiffs do not claim that they would have

terminated their pregnancy if they received a proper diagnosis; rather, Plaintiffs claim they never

would have undergone implantation of the embryo.  This aspect of Plaintiffs claim more closely

resembles a wrongful pregnancy claim.  Beyond their wrongful birth/wrongful pregnancy hybrid

claim, it further appears that Plaintiffs advance a wrongful life claim on behalf of Rosie, because

Plaintiffs' Complaint seeks damages for Rosie's continuing medical expenses after she becomes

an adult.  (Compl. Ct. I ¶ 12, Ct. II ¶ 7.)[5]

---

[5]This Court is hesitant to attribute a wrongful life claim to Plaintiffs that is not apparent
on the face of the Complaint, because such a cause of action presupposes that non-existence
would have been preferable to the child's current life.  *See Becker*, 46 N.Y.2d at 412 (describing
the difficulty in ascertaining damages for a wrongful life claim as "the Hobson's choice of life in
an impaired state and nonexistence").  However, the Court is duty-bound to construe the
pleadings "so as to do justice."  Fed. R. Civ. P. 8(e); *see also Schiavone v. Fortune*, 477 U.S. 21,
27 (1986).  In light of the fact that Plaintiffs seek damages on Rosie's behalf, the Court would be
remiss if it did not consider Rosie's injury, as distinct from her parents' injury, in determining

Under these circumstances, the Court discerns three distinct injuries from Plaintiffs' allegations: (1) the parents' loss of reproductive choice, when Defendants' negligence deprived them of the opportunity to make an informed choice regarding the implantation of embryos; (2) the injury to the parents upon learning that, despite their efforts, Rosie was born with CF; and (3) the injury to Rosie, who was born with CF. All of these injuries, which derive from the parents' loss of reproductive choice, occurred in New York.[6] It is undisputed that the parents engaged in the primary reproductive services—IVF, selection of a PGD-testing facility, and embryo implantation—with NYU Defendants in New York. It is further undisputed that the parents learned of Rosie's condition approximately two weeks after her birth, during a time when they lived in New York.[7] Only Rosie's injury can arguably be linked to New Jersey, because she was born in New Jersey. However, her birth was a consequence of the aforementioned injury to her parents' reproductive choice, and her genetic condition was caused by reproductive services—IVF and implantation—that occurred in New York. The fact that she was born in

_____

choice of law.

[6]This Court's analysis of where Plaintiffs' injuries occurred does not constitute a ruling on the merits that New York or New Jersey law permits a cause of action for these injuries. For instance, the Court does not decide the issue presented by NYU Defendants that the New Jersey Supreme Court's ruling in *Hummel* forecloses Plaintiffs' wrongful birth and wrongful life claims, because Plaintiffs are unwilling to consider terminating their pregnancy.

[7]Genesis Defendants contend that the Grossbaums learned of Rosie's condition from a letter sent to their home in New York. (GG 56.1 Reply ¶ 28.) The deposition testimony cited by Genesis Defendants indicates that Plaintiffs received the letter at their home approximately two weeks after Rosie's birth. (Blaine Suppl. Decl. Ex. 32 (Dep. of Chaya Grossbaum, Vol. II) at 221, 236.) Plaintiffs do not dispute that they lived in New York from before Rosie was born until approximately five months after she was born. (GG 56.1 Statement ¶¶ 7, 28; Pls.' 56.1 Resp. ¶¶ 7, 28; Blaine Decl. Ex. 9 (Dep. of Chaya Grossbaum, Vol. I) at 9–10; Pls.' Resp. Br. at 3 ("The Plaintiffs move to New Jersey followed the baby's birth by approximately five months.").)

16

another state does nothing to dispel the conclusion that her injury, like her parents' injuries, occurred in New York. Because Plaintiffs injuries occurred in New York, New York law presumptively governs under the Restatement (Second) § 146 and *Camp Jaycee*.

The contacts provided by Restatement (Second) § 145(2) supports this Court's conclusion. As noted above, the alleged injuries occurred in New York. The alleged negligent conduct that caused the injuries primarily occurred in New York.[8] Furthermore, New York is the place where the relationship between the parties was centered. The Court recognizes that Plaintiffs' current domicile in New Jersey weighs against application of New York law, but the relative importance of this fact is diminished by the fact that the Grossbaums lived in New York at the time the injuries occurred, as well as the overwhelming weight of the aforementioned contacts. Viewing these contacts through the prism of Restatement (Second) § 6, *see Camp Jaycee*, 197 N.J. at 143, the Court finds that the presumption of New York law is sustained. From the perspective of interstate comity, the legislatures and courts of Michigan, New York, and New Jersey have adopted differing policies on the issue of wrongful birth and wrongful life claims. These determinations reflect that each state has come to different public policy conclusions on how to treat these claims. Yet, among these states, New York has the greatest interest in the determination of Plaintiffs' claims. While all three states have an interest in regulating the reproductive services provided and/or utilized by its residents, New York has a

---

[8]Genesis Defendants argue that their alleged negligent conduct occurred in Michigan, because that is where they conducted the PGD testing on the Grossbaums embryos. However, Genesis Defendants recognize that they provided information and the results of their PGD tests to a New York reproductive services center for the benefit of its patients. Because this information and these results are the focus of Plaintiffs' negligence claim against them, the Court is satisfied that this conduct is also linked to New York, even if it originated in Michigan.

greater interest because the Plaintiffs in this case conducted all relevant reproductive

services—IVF, selection of PGD-testing provider, and implantation—in New York, at a time

when they were New York residents.  Applying New York law, as the forum where the

reproductive services took place and the home state of the residents seeking reproductive

services, would also promote certainty, predictability, and uniformity in the law.  Conversely,

basing the choice-of-law determination on the state of birth would open the door to forum-

shopping, by encouraging residents of states with more restrictive laws (*i.e.*, Michigan, New

York) to deliver their babies in a state with less restrictive laws.  The Court notes that Plaintiffs

have submitted a declaration indicating that they had planned to move to New Jersey after

Rosie's birth, and did in fact do so.  (Pls.' Ex. 3 (Decl. of Chaya Grossbaum) ¶ 4.)  Towards this

end, Plaintiffs arranged for care with the Midwives of Denville; delivered Rosie at St. Claire's

Hospital—Denville Campus; took Rosie for pediatric care in Denville; and began consultations

with the Cystic Fibrosis Center at Morristown Memorial Hospital, which has continued to treat

Rosie.  (*Id.* ¶¶ 4–5.)  The Court does not doubt the sincerity of the Grossbaum's assertion that

they intended to move their family to New Jersey.  However, their expectation to move to New

Jersey, coupled with their delivery of Rosie in New Jersey, does not overcome their strong

contacts with New York, or New York's strong interest in regulating the reproductive services at

issue in this case.

Having carefully considered the relevant Restatement factors according to their relative

importance, this Court concludes that New York has the most significant relationship to the

parties and legal issues involved in this case.  Under the facts presented, this Court's choice-of-

law determination is no less applicable to NYU Defendants.  Consequently, this Court will apply

New York law to Plaintiffs' claims against Genesis Defendants and NYU Defendants.

### 2. *Genesis Defendants' Motion: Statute of Limitations*

Having determined that New York law governs, the Court turns to Genesis Defendants' argument that Plaintiffs' claims against them are barred by New York's statute of limitations for medical malpractice claims, N.Y. C.P.L.R. 214-a.  This provision provides in pertinent part:

> An action for medical, dental or podiatric malpractice must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure . . . .

N.Y. C.P.L.R. 214-a (McKinney 2011).  It is undisputed that Genesis Defendants rendered their sole medical advice—the results of the PGD tests—on or about July 19, 2004.  Plaintiffs filed the present lawsuit on March 23, 2007 (two days prior to Rosie's second birthday), more than two years and eight months after Genesis Defendants returned the PGD-testing results.

Plaintiffs offer no argument disputing the effect of New York's statute of limitations if New York law applies.  The Court notes that NYU Defendants filed a responsive brief (Doc. No. 112) opposing Genesis Defendants' motion for summary judgment that disputed, *inter alia*, application of New York's statute of limitations to Plaintiffs' claims against Genesis Defendants. Ironically, however, Plaintiffs unequivocally moved to strike NYU Defendants' response brief as an impermissible additional brief (Doc. No. 122).  The irony of Plaintiffs' position vis-a-vis NYU Defendants' responsive arguments aside, NYU's argument in this regard is unavailing.

NYU Defendants contend that the medical malpractice statute of limitations does not apply to Genesis Defendants, because Genesis Defendants made clear to Plaintiffs that they did not have a doctor-patient relationship, and that their services would be limited to performing

19

genetic tests on the embryos.  (NYU Defs.' Resp. Br. at 16–17.[9])  In support of their argument, NYU Defendants cite two cases that concluded that certain services tangentially related to medical care were not subject to the medical malpractice statute of limitations.  *See Rodriguez v. Saal*, 841 N.Y.S.2d 232 (App. Div. 2007) (medical malpractice statute of limitations does not apply to claims against organ bank based on the adequacy of testing and screening procedures used in harvesting organs and providing organs for transplant); *Weiner v. Lenox Hill Hospital*, 88 N.Y.2d 784, 788 (1996) (same, for claims challenging the adequacy of hospital blood bank's blood-testing procedures).  However, the defendants in these cases did not provide medical diagnostic treatment to particular patients.  *Rodriguez*, 841 N.Y.S.2d at 275 ("The issue here, as it concerns [defendant organ bank], does not involve questions of medical competence or treatment provided to decedent."); *Weiner*, 88 N.Y.2d at 786 (concluding that the medical malpractice statute of limitations did not apply "[b]ecause the challenged conduct was not linked to the medical treatment of a particular patient").  The Court of Appeals of New York distinguished between medical malpractice and negligence claims for purposes of the statute of limitations in *Weiner*, explaining that "a claim sounds in medical malpractice when the challenged conduct 'constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician[.]'"  *Weiner*, 88 N.Y.2d at 788 (quoting *Bleiler v Bodnar*, 65 N.Y.2d 65, 72 (1985)).  "By contrast, when 'the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the hospital's failure in fulfilling a different duty,' the claim sounds in negligence."  *Id.* (citations omitted).   Although

---

[9]NYU Defendants point to, *inter alia*, Dr. Hughes' statements to Plaintiffs that Genesis Defendants were not their physician, that he did not have an active medical license, and that he did not see patients.  (*See* NYU 56.1 Resp. ¶ 11.)

"the distinction between medical malpractice and negligence is a subtle one," *id.* at 787, New York courts have clarified that,"[w]hen 'the incompetence alleged is of a specialized medical nature . . . and substantially related to medical *diagnosis* and treatment, the action it gives rise to is by definition one for medical malpractice rather than for simple negligence,'" *Richner v. Smithkline Beecham Clinical Labs*, No. 96 Civ. 2523, 1996 WL 432473, at *2 (S.D.N.Y. Aug. 1, 1996) (quoting *Spatafora v. St. John's Episcopal Hosp.*, 619 N.Y.S.2d 118, 119 (App. Div. 1994)).

Here, notwithstanding Dr. Hughes' statements concerning Genesis Defendants' relationship with Plaintiffs, it is undisputed that Genesis Defendants provided genetic diagnoses of Plaintiffs' embryos, with the understanding that Plaintiffs would rely on their diagnoses for purposes of conceiving a child that would not be afflicted with CF. Dr. Hughes' deposition testimony reflects that Genesis Defendants provide patients with a risk rate, which represented the percentage of PGD tests that result in misdiagnoses. (NYU Ex. E at 31; *see also* NYU Ex. B (Dep. of Chaya Grossbaum) at 71, 111–12 (reporting that Dr. Hughes told her that PGD-testing had a high success rate).) Unlike a blood bank's screening process, which plays no role in the designation of specific units of donated blood for specific patients, Genesis Defendants performed specialized diagnostic tests on the Grossbaums' embryos for purposes of determining whether those embryos could be implanted. *Cf. Price v. Benedict Cmty. Health Ctr., Inc.*, No. 96-CV-1295, 1998 WL 743707, at *2–5 (N.D.N.Y. Aug. 11,1998) (concluding that the medical malpractice statute of limitations applied to claims arising from a laboratory's misdiagnosis of Pap smears); *Richner*, 1996 WL 432473, at *2 (same). Genesis Defendants thus played an integral part in the medical reproductive treatment provided to Plaintiffs, because,

21

unlike NYU Defendants' IVF and implantation services, their PGD tests were the only part of the

process that had the potential of diagnosing flaws with embryos prior to pregnancy.

This Court's conclusion is supported by the Court of Appeals of New York's decision in

*Jorge v. New York City Health & Hospitals Corp.*, which held that a similar medical malpractice

statute of limitations, McKinney's Uncons. Laws of N.Y. § 7401(2), applied to a mother's

wrongful birth claim against a hospital whose erroneous reading of a genetic screening test (for

sickle cell anemia) during the pregnancy prevented the parents from terminating the pregnancy.

79 N.Y.2d 905, 906 (1992).  Although *Jorge* primarily dealt with whether the continuing

treatment doctrine tolled the statute of limitations, and did not specifically consider the

application of the medical malpractice statute of limitations to a third-party genetics lab, this

Court is persuaded under the circumstances of this case that Genesis Defendants performed

diagnostic services that bore a substantial relationship to the rendition of medical treatment to the

Grossbaums.  Consequently, N.Y. C.P.L.R. 214-a applies to Plaintiffs' claims against Genesis

Defendants, and these claims are time-barred.

### 3.  *Application of New York Law to Claims Against NYU Defendants*

NYU Defendants did not present specific arguments on the basis of New York law in

their motion for summary judgment, but in their reply brief they argue that Plaintiffs' claims fail

under either New Jersey or New York law.  Following Genesis Defendants' lead, NYU

Defendants invoke New York's medical malpractice statute of limitations, and NYU Defendants

argue that Plaintiffs cannot prove causation under either New Jersey or New York law.  Courts

generally do not permit a party to raise an argument for the first time in a reply brief, but Federal

Rule of Civil Procedure 56(f) gives this Court flexibility to "(1) grant summary judgment for a

nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute," so long as the Court "giv[es] notice and a reasonable time to respond" to the parties. While NYU's causation argument in its reply brief does not appear to differ substantively from its causation argument presented in its motion brief, despite the application of New York law, the statute of limitations defense was not raised at all in their motion brief. Plaintiffs, meanwhile, did not address any New York law issues in their consolidated response brief to Defendants' motions.

In light of the Court's rulings that (i) New York law applies, and (ii) that New York's statute of limitations for medical malpractice claims applies, the Court deems it most prudent to give Plaintiffs an opportunity to respond to the New York law arguments advanced in NYU Defendants' reply brief. Plaintiffs will have until 20 days after the filing of this Opinion and Order to file a supplemental brief, not to exceed 10 pages, addressing only NYU Defendants' reply brief arguments that Plaintiffs' claims fail under New York's statute of limitations and for lack of causation. NYU Defendants may file a sur-reply to Plaintiffs' new arguments, not to exceed 5 pages, no later than 10 days after receipt of Plaintiffs' supplemental brief.

### Conclusion

For the aforementioned reasons, the Court will grant Genesis Defendants' summary judgment motion (Doc. No. 109). Genesis Defendants' *Daubert* motion (Doc. No. 111) will be denied as moot. The Court will permit supplemental briefing on NYU Defendants' summary judgment motion. Plaintiffs will have until 20 days after the filing of this Opinion and the accompanying Order to file a supplemental brief, not to exceed 10 pages, addressing only NYU

23

Defendants' reply brief arguments that Plaintiffs' claims fail under New York's statute of limitations and for lack of causation.  NYU Defendants may file a sur-reply to Plaintiffs' new arguments, not to exceed 5 pages, no later than 10 days after receipt of Plaintiffs' supplemental brief.  An appropriate form of order accompanies this Memorandum Opinion.

Dated:  June 9, 2011

_____/s/ Garrett E. Brown, Jr._____
GARRETT E. BROWN, JR. U.S.D.J.
